**No. 24-60650**

# In the United States Court of Appeals for the Fifth Circuit

---

STARBUCKS CORPORATION,

*Petitioner/Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner.*

---

*On appeal from a decision of the National Labor Relations Board, Nos. 03-CA-285671, et al.*

---

## BRIEF OF PETITIONER/CROSS-RESPONDENT STARBUCKS CORPORATION

---

JEFFREY S. HILLER
LITTLER MENDELSON, P.C.
  *41 S. High St., Ste. 3250*
  *Columbus, OH 43215*

JONATHAN O. LEVINE
LITTLER MENDELSON, P.C.
  *1111 E. Kilbourn Ave., Ste. 1000*
  *Milwaukee, WI 53202*

LISA S. BLATT
  *Counsel of Record*
AMY MASON SAHARIA
DANIELLE J. SOCHACZEVSKI
KEES D. THOMPSON
CLAIRE R. CAHILL
SEPHORA D. GREY
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue, S.W.*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

*Counsel for Petitioner/Cross-Respondent*

## CERTIFICATE OF INTERESTED PERSONS

### Case No. 24-60650

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made so that the judges of this Court can evaluate possible disqualification or recusal:

**Petitioner/Cross-Respondent:**

- Starbucks Corporation

**Respondent/Cross-Petitioner:**

- National Labor Relations Board

**Intervenor:**

- Workers United, affiliated with the Service Employees International Union

**Counsel for Petitioner/Cross-Respondent:**

- Lisa S. Blatt
  Amy Mason Saharia
  Danielle J. Sochaczevski
  Kees D. Thompson
  Claire R. Cahill
  Sephora D. Grey
  Williams & Connolly LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  lblatt@wc.com
  asaharia@wc.com
  dsochaczevski@wc.com
  keesthompson@wc.com

i

ccahill@wc.com
sgrey@wc.com
- Jeffrey S. Hiller
  Littler Mendelson, P.C.
  41 S. High St., Ste. 3250
  Columbus, OH 43215
  (614) 463-4230
  jhiller@littler.com
- Jonathan O. Levine
  Littler Mendelson, P.C.
  1111 E. Kilbourn Ave., Ste. 1000
  Milwaukee, WI 53202
  (414) 291-5537
  jlevine@littler.com

**Counsel for Respondent/Cross-Petitioner:**

- Ruth E. Burdick
  Heather Stacy Beard
  Amy Helen Ginn
  M. Kathleen McKinney
  National Labor Relations Board
  1015 Half Street, SE
  Washington, DC 20570
  (202) 273-2960
  appellatecourt@nlrb.gov
  heather.beard@nlrb.gov
  amy.ginn@nlrb.gov

**Counsel for Intervenor:**

- Manuel Alfonso Quinto-Pozos
  Deats Durst & Owen, P.L.L.C.
  8140 N. Mopac Expressway, Ste. 250
  Austin, TX 78759
  (512) 474-7896
  mqp@ddollaw.com

ii

Counsel further certifies that Starbucks Corporation has no parent company and that no public company owns 10% or more of its shares.

/s/ Lisa S. Blatt
LISA S. BLATT
*Attorney of Record for*
*Petitioner/Cross-Respondent*

iii

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner/Cross-Respondent Starbucks Corporation requests oral argument pursuant to Fifth Circuit Rule 28.2.3.  This case presents significant questions regarding whether the National Labor Relations Board's order applies incorrect legal standards or violates the substantial-evidence standard, as well as whether the Board's remedies exceed its authority and violate the Constitution.  Oral argument will assist the Court in resolving these important issues.

## TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT .................................................................1
STATEMENT OF THE ISSUES .....................................................................1
INTRODUCTION.............................................................................................2
STATEMENT OF THE CASE ........................................................................5
    A.    Factual History .................................................................5
    B.    Procedural History ..........................................................10
SUMMARY OF ARGUMENT ......................................................................12
STANDARD OF REVIEW ...........................................................................16
ARGUMENT ..................................................................................................17
I.    Starbucks Did Not Violate Section 8(a)(1) .........................................18
    A.    Starbucks Did Not Unlawfully Solicit Grievances or
        Extend Benefits...............................................................19
        1.    *The Board ignored Starbucks' national standards
            and past practices*................................................20
        2.    *The Board mischaracterized Starbucks' operational
            changes as "benefits"*.........................................24
        3.    *The Board confused motive with but-for causation*...........25
    B.    Starbucks Did Not Unlawfully Promise or Implement a
        Wage Increase or Promote Employees.............................27
    C.    Starbucks Did Not Create a Coercive Impression of
        Surveillance.....................................................................28
    D.    Starbucks Did Not Coercively Interrogate .....................33
    E.    Starbucks' Speech Was Non-Threatening and Protected ...........34
II.    Starbucks Did Not Violate Sections 8(a)(3) and 8(a)(4)........................37
    A.    The General Counsel Failed To Present a Prima Facie
        Case of Anti-Union Motive..............................................39
        1.    *The Board erred in concluding that union activity
            motivated Starbucks' at-issue actions* ...............40
        2.    *The Board did not find employer knowledge of union
            activity as to each supposedly discriminatory
            incident* ................................................................46
    B.    Starbucks Would Have Taken the Same Actions .............48
        1.    *Starbucks would have closed the Galleria kiosk*............49

*2.     Starbucks would have discharged the at-issue employees*................................................................49

III.    Starbucks Did Not Violate Section 8(a)(5) ................................................54

IV.    Certain Remedies Require Vacatur ..........................................................55

    A.    The Board's Damages Remedy Is Unlawful.................................55

    B.    The Evidence Does Not Support a *Gissel* Bargaining Order ..........................................................................60

    C.    The Order To Reopen the Galleria Kiosk Is Unlawful.................65

    D.    The Board's Notice-Reading Remedy Is Unwarranted...............66

CONCLUSION.......................................................................................68

# TABLE OF AUTHORITIES

Page

## CASES

*800 River Rd. Operating Co.*, 369 NLRB No. 109 (2020) ...............................55

*3484, Inc. v. NLRB*, 137 F.4th 1093 (10th Cir. 2025)....................................56

*Adams & Assocs., Inc. v. NLRB*, 871 F.3d 358 (5th Cir. 2017) ......................61

*Advance Pierre Foods, Inc.*, 366 NLRB No. 133, slip op. (2018).....................20

*Advanced Life v. NLRB*, 898 F.3d 38 (D.C. Cir. 2018) ...................................26

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975)....................................58

*Apple Inc. v. NLRB*, --- F.4th ---,
    2025 WL 1862823 (5th Cir. July 7, 2025)...........................................1, 17, 34, 44

*Asarco, Inc. v. NLRB*, 86 F.3d 1401 (5th Cir. 1996) ............................40, 42, 46

*Atl. Grp., Inc. v. NLRB*, 2023 WL 5584119 (5th Cir. Aug. 29, 2023) .........19, 37

*Brown & Root, Inc. v. NLRB*, 333 F.3rd 628 (5th Cir. 2003) ...............16, 34, 35

*Cal. Gas Transp., Inc.*, 347 NLRB 1314 (2006)..........................................63

*Cal. Gas Transp., Inc. v. NLRB*, 507 F.3d 847 (5th Cir. 2007) ......61, 62, 63, 64

*Cent. Freight Lines Inc. v. NLRB*, 653 F.2d 1023 (5th Cir. 1981)...................50

*Chamber of Com. v. Brown*, 554 U.S. 60 (2008)..........................................34

*Cordua Rests., Inc. v. NLRB*, 985 F.3d 415 (5th Cir. 2021)...........................29

*Delchamps, Inc. v. NLRB*, 588 F.2d 476 (5th Cir. 1979)...........18, 24, 27, 29, 47

*Delco-Remy Div., Gen. Motors Corp. v. NLRB*,
    596 F.2d 1295 (5th Cir. 1979)...............................................34, 43, 53

*Denton Cnty. Elec. Coop., Inc. v. NLRB*,
    962 F.3d 161 (5th Cir. 2020).................................................61, 65, 67

*DirecTV Holdings, L.L.C. v. NLRB*, 650 F. App'x 846 (5th Cir. 2016).....43, 49

*Douglas Foods Corp. v. NLRB*, 251 F.3d 1056 (D.C. Cir. 2001) .....................66

*Dow Chem. Co., Tex. Div. v. NLRB*, 660 F.2d 637 (5th Cir. 1981)..................37

*Elec. Mach. Co. v. NLRB*, 653 F.2d 958 (5th Cir. 1981) ...............................54

*Ex parte Lennon*, 166 U.S. 548 (1897)......................................................57

*FDRLST Media, LLC v. NLRB*, 35 F.4th 108 (3d Cir. 2022) ..........................34

*Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973) ..............................58

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989)......................................59

*Greater Omaha Packing Co. v. NLRB*, 790 F.3d 816 (8th Cir. 2015) .............29

*Grove v. NLRB*, 140 F.4th 506 (D.C. Cir. 2025)....................................11, 51

*HTH Corp. v. NLRB*, 823 F.3d 668 (D.C. Cir. 2016)....................................67

*Indep. Elec. Contractors, Inc. v. NLRB*, 720 F.3d 543 (5th Cir. 2013)......28, 32

*Int'l Union of Operating Eng'rs v. NLRB*, 127 F.4th 58 (9th Cir. 2025)........56

vii

Page

Cases—continued:

*Intertape Polymer Corp. v. NLRB*, 801 F.3d 224 (4th Cir. 2015).....................29

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ..................................16

*Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) ............................................58

*Mid-S. Bottling Co. v. NLRB*, 876 F.2d 458 (5th Cir. 1989)...........................65

*Nichols Aluminum, LLC v. NLRB*, 797 F.3d 548 (8th Cir. 2015)....................41

*NLRB v. AllService Plumbing & Maint., Inc.*,
   138 F.4th 889 (5th Cir. 2025) .............................................................16, 17

*NLRB v. Arkema, Inc.*, 710 F.3d 308 (5th Cir. 2013)....................25, 39, 40, 48

*NLRB v. Computed Time Corp.*, 587 F.2d 790 (5th Cir. 1979) ..................30, 31

*NLRB v. Dorn's Transp. Co.*, 405 F.2d 706 (2d Cir. 1969) .............................26

*NLRB v. Exch. Parts Co.*, 375 U.S. 405 (1964)........................................18, 24

*NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) .......................................60

*NLRB v. Mini-Togs, Inc.* 980 F.2d 1027 (5th Cir. 1993)................................54

*NLRB v. Mueller Brass Co.*, 509 F.2d 704 (5th Cir. 1975) .......29, 41, 46, 50, 52

*NLRB v. Muscogee Lumber Co.*, 473 F.2d 1364 (5th Cir. 1973) .....................24

*NLRB v. S. Coach & Body Co.*, 336 F.2d 214 (5th Cir. 1964) .........................55

*NLRB v. Starbucks Corp.*, 125 F.4th 78 (3d Cir. 2024).......................56, 57, 58

*NLRB v. United Min. & Chem. Corp.*, 391 F.2d 829 (2d Cir. 1968)................25

*NLRB v. USA Polymer Corp.*, 272 F.3d 289 (5th Cir. 2001)..........................63

*NLRB v. Whitfield Pickle Co.*, 374 F.2d 576 (5th Cir. 1967) ..........................38

*Novelis Corp. v. NLRB*, 885 F.3d 100 (2d Cir. 2018)......................................11

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
   584 U.S. 325 (2018)..................................................................................60

*Pioneer Nat. Gas Co. v. NLRB*, 662 F.2d 408 (5th Cir. 1981)........................33

*Poly-Am., Inc. v. NLRB*, 260 F.3d 465 (5th Cir. 2001) ..............................38, 46

*RAV Truck & Trailer Repairs, Inc. v. NLRB*,
   997 F.3d 314 (D.C. Cir. 2021).................................................................65

*Regal Knitwear Co. v. NLRB*, 324 U.S. 9 (1945) ..........................................58

*SEC v. Jarkesy*, 603 U.S. 109 (2024)........................................................59, 60

*Starbucks Corp. v. NLRB*, 140 F.4th 971 (8th Cir. 2025)...........................4, 34

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) .................57

*Stern Produce Co., v. NLRB*, 97 F.4th 1 (D.C. Cir. 2024) ....................29, 40, 41

*Stern v. Marshall*, 564 U.S. 462 (2011).......................................................59

Page

Cases—continued:

*Tesla, Inc. v. NLRB*, 86 F.4th 640 (5th Cir. 2023) ...................................26
*The Broadway*, 267 NLRB 385 (1983) ...................................30, 31
*Thryv, Inc.*, 372 NLRB No. 22, slip op. (Dec. 13, 2022) ...................................55
*Thryv, Inc. v. NLRB*, 102 F.4th 727 (5th Cir. 2024) ...................................56
*TRW, Inc. v. NLRB*, 654 F.2d 307 (5th Cir. 1981) ...................................33
*U.S. Steel Corp. v. NLRB*, 682 F.2d 98 (3d Cir. 1982) ...................................31
*UNF W., Inc. v. NLRB*, 844 F.3d 451 (5th Cir. 2016) ...................................67
*United States v. Burke*, 504 U.S. 229 (1992) ...................................58
*UPS, Inc.*, 369 NLRB No. 1 (2019) ...................................44
*Wal-Mart, Inc.*, 339 NLRB 1187 (2003) ...................................20, 26
*Wal-Mart Stores, Inc.*, 348 NLRB 274 (2006) ...................................20
*Wal-Mart Stores, Inc.*, 352 NLRB 815 (2008) ...................................30, 31
*Wright Line*, 251 NLRB 1083 (1980) ...................................39

## CONSTITUTION AND STATUTES

U.S. Const.
   art. III ...................................59
   amend. I ...................................13, 37
   amend. VII ...................................59, 60
29 U.S.C.
   §§ 151-169 ...................................10
   § 158 ...................................18, 54
   § 160 ...................................1, 57
   § 187 ...................................58
   § 2617 ...................................59

## OTHER AUTHORITIES

Samuel L. Bray, *The System of Equitable Remedies*,
   63 UCLA L. Rev. 530 (2016) ...................................57
Dan B. Dobbs, 1 Law of Remedies (2d. ed. 1993) ...................................58
Howard Schultz, *Statement Before the Senate Committee on Health,
   Education, Labor, and Pensions* (Mar. 29, 2023),
   https://tinyurl.com/ydh7phk7 ...................................5
Walden Galleria, https://tinyurl.com/4rrcm4f5 ...................................66

ix

## JURISDICTIONAL STATEMENT

The National Labor Relations Board (NLRB or Board) issued its Decision and Order on December 16, 2024. Starbucks petitioned for review on December 24, 2024. The Board applied for enforcement on January 17, 2025. This Court has jurisdiction because the Decision and Order is a final order, and venue is proper because Starbucks transacts business within this Circuit. 29 U.S.C. § 160(e), (f); *Apple Inc. v. NLRB*, --- F.4th ---, 2025 WL 1862823, at *3 (5th Cir. July 7, 2025). The petition is timely because the National Labor Relations Act (NLRA) imposes no time limit. *Id.*

## STATEMENT OF THE ISSUES

1.     Whether, in concluding that Starbucks violated NLRA Section 8(a)(1), the Board erred by failing to consider Starbucks' ordinary, nationwide practices, mischaracterizing operational changes as benefits, confusing motive with but-for causation, ignoring the "coercion" element, and punishing protected speech.

2.     Whether, in concluding that Starbucks violated NLRA Sections 8(a)(3) and 8(a)(4), the Board erred by inferring that Starbucks' actions were motivated by anti-union animus while ignoring evidence that Starbucks ordinarily enforced its policies in analogous circumstances and by relying on

1

the Board's conclusion that Starbucks violated Section 8(a)(1) without tying those supposed violations to the at-issue actions.

3.      Whether, in concluding that Starbucks violated Section 8(a)(5), the Board erred by ignoring Starbucks' pre-existing policies.

4.      Whether the Board exceeded its authority in ordering (A) compensatory damages to employees, (B) a *Gissel* bargaining order at the Camp Road store, (C) re-opening the Galleria kiosk, and (D) reading a public notice.

**INTRODUCTION**

The Board's decision effects a massive intrusion into Starbucks' day-to-day operations and freezes employers from addressing operational issues during union campaigns. During the COVID-19 pandemic, Starbucks stores around Buffalo, New York faced understaffing, degraded facilities, and underperformance. Starbucks senior management started learning of these issues in July 2021. Consistent with its typical practice across the country, Starbucks sent reinforcements. Executives and managers came to Buffalo in September 2021 and were dismayed by the poor condition and mismanagement of most stores—including pest and standing water issues, overwhelmed supervisors, and unhappy employees.

2

Over the following months, Starbucks worked tirelessly to improve store conditions, employee performance, and customer satisfaction. It invested in needed renovations and repairs, increased staffing, added support managers, centralized training, and engaged with employees, all while level-setting expectations for employee performance. As during normal times, Starbucks promoted some employees, while disciplining or discharging others based on longstanding policies. And it closed one run-down mall kiosk location that experienced a significant drop in revenue, while offering its employees positions in other stores.

On August 23, 2021, Workers United publicly announced it had formed an organizing committee with partners from some Starbucks stores in the Buffalo area. By May 2022, Workers United had filed petitions at ten of the twenty-one Buffalo stores and one Rochester store and was ultimately certified to represent employees at eight stores. During the campaign, Starbucks had frank discussions with Buffalo employees about the potential impacts of unionizing but reiterated that employees had "every right" to vote and that Starbucks would respect employees' decisions. This case boils down to whether Starbucks' legitimate efforts to improve its Buffalo-area stores infringed its employees' rights to unionize. They did not.

3

Yet, in another "order containing more footnotes than opinion," *Starbucks Corp. v. NLRB*, 140 F.4th 971, 975 (8th Cir. 2025), the Board largely affirmed an Administrative Law Judge (ALJ)'s contrary conclusions. The ALJ's sprawling opinion contains little legal analysis and ignores undisputed facts. Instead, it weaves a tale of coercion and animus by nitpicking everything Starbucks did at its Buffalo-area stores during the union campaign. The resulting conclusions are irrational. According to the ALJ, ridding stores of bees and fruit flies violated the NLRA. Discharging an employee who stuck his finger in a customer's drink violated the NLRA. Creating centralized training locations violated the NLRA because it conferred "benefits" on employees even though it simultaneously removed training bonus opportunities from some employees. In total, the ALJ found 146 NLRA violations from less than a one-year period.

Starbucks lacks space in this brief to address each supposed violation one-by-one. It will focus this brief on significant, cross-cutting errors in the ALJ's decision (adopted by the Board). These errors infect the Board's entire order, requiring denial of enforcement in full. The ALJ and Board ignored Starbucks' pre-existing policies and national practices, leading them to find coercion simply because Starbucks applied its national standards in Buffalo

4

during the union campaign. From that original sin, the ALJ and Board broadly inferred anti-union animus and discriminatory motive without evidentiary support. The Board then ordered aggressive remedies beyond its authority. This Court should deny enforcement.

## STATEMENT OF THE CASE

### A.    Factual History

Starbucks is America's largest coffeehouse chain, with more than 200,000 domestic employees, whom Starbucks calls "partners" because they each share in the company's stock-ownership plan. RE25 n.6. The national market comprises regions managed by regional directors, who supervise teams of district managers. District managers supervise store managers and assistant store managers, who in turn supervise shift supervisors and baristas. RE25. Starbucks promotes many baristas to management and offers "industry-leading benefits," including comprehensive healthcare, paid sick leave, generous student loan assistance, and paid parental leave. *See* Howard Schultz, *Statement Before the Senate Committee on Health, Education, Labor, and Pensions* 2 (Mar. 29, 2023), https://tinyurl.com/ydh7phk7.

Starbucks maintains high standards for its stores and the partners who operate them. At hire, each partner agrees to follow Starbucks' Partner Guide, which specifies Starbucks' policies and partner duties. ROA.5506-86.

For example, the guide establishes Starbucks' dress code, health-and-safety requirements, and respectful-workplace, no-harassment, and attendance policies. ROA.5523-25, 5530-32, 5535-39.

In July 2021, before the at-issue union campaign launched publicly, Starbucks appointed Deanna Pusatier, then-regional director in Boston, as regional director for the Buffalo area. ROA.2822. She was not aware of any union activity at that time. ROA.2831. Pusatier first attended a regional meeting in Saratoga Springs—in the same Starbucks Region as Buffalo—and observed dirty stores, poor customer service, dissatisfied partners, and leadership problems that needed change. ROA.2829-30, 2833. She then arrived in Buffalo the week the first union petitions were filed at three of twenty-one Buffalo stores. RE34. Across all Buffalo stores, she immediately began remedying poor leadership, staffing shortages, health-and-safety issues, and negative effects from the COVID-19 pandemic—just like in Boston, where she had imported managers to fix understaffing; sent senior managers to stores to work alongside partners; and ordered needed repairs, all when there was no union activity. ROA.2828-34, 2842-43, 2848, 2856-58. As with other underperforming regions (with no union petitions), Starbucks sent support teams to investigate conditions, elevate standards, and respond to

6

partner feedback. ROA.2591, 2630, 2710, 2829-30, 2840, 2843, 3370-73, 3407; RE38 n.62. Partner listening sessions were commonplace nationwide and consistent with Starbucks' Partner Guide. RE38; ROA.5553.

Based on partner feedback and supervisors' assessments, Starbucks implemented measures to increase the functionality, cleanliness, and orderliness of its Buffalo-area stores, including by hiring additional partners, renovating stores, and repairing faulty equipment. ROA.2830-36. At all Buffalo-area stores—including where no known union organizing occurred—Starbucks implemented "level-setting"—*i.e.*, reminding partners of company policies, re-establishing measures to ensure adherence to policy and proper store function, and centralizing training. ROA.3153, 3202, 3374-77; RE5.

At issue are Starbucks' actions from August 2021 through July 2022 involving twenty-one Buffalo-area locations. On August 23, 2021, Workers United posted a "Dear Kevin" letter addressed to Starbucks' then-CEO Kevin Johnson. The letter announced the launch of a unionization campaign in the area, listing partners from several Buffalo-area stores who joined an organizing committee. RE33-34.

In fall 2021, management decided to close an underperforming and unsanitary kiosk in the Walden Galleria mall. This closure coincided with

Starbucks' closing underperforming mall locations nationwide given reduced mall traffic during the COVID-19 pandemic, and it aligned with Pusatier's experiences in Boston and Washington, D.C.  ROA.1290, 1794, 2827-28, 2852, 3379-80.  There is no evidence Pusatier knew that kiosk employees were considering unionizing when she ordered the closure.

Starbucks otherwise continued normal operations in its Buffalo stores, including adjusting store hours and partner schedules to fit business needs. Buffalo-area managers continued to discipline partners who violated policies, including at stores where no known organizing occurred.  ROA.3136-40, 3185-86, 8097, 8162, 8596.  Starbucks discharged several partners during this time, including:

- Brian Nuzzo, for entering a Starbucks store alone, ignoring the mask policy, and lying about both violations;

- Edwin Park, for violating multiple policies, notably the respectful-communications and health-and-safety policies (when he put his finger in a customer's drink);

- Nathan Tarnowski, for violating the health-and-safety policy by lying about COVID-19 symptoms;

8

- Angel Krempa, for violating the respectful-communications, dress code, and attendance policies, even after receiving a final written warning;

- Daniel Rojas Jr., for multiple attendance-policy violations and for, after a final written warning, leaving partners locked outside the store until he arrived; and

- Cassie Fleischer, whose limited shift availability failed to meet her store's business needs.  The ALJ found Kellen Higgins to be constructively discharged for the same reason.

ROA.2047-50, 2142-43, 5278, 5724, 5747, 5763; RE74-75, 79-80, 119-20.  The discharges occurred six to eight months after the Dear Kevin letter. ROA.4457, 5262, 5278, 5722, 5747, 5763.

On August 23, Buffalo-area partners began openly soliciting and signing unionization cards purporting to authorize collective bargaining by Workers United, including at the "Camp Road" store.  RE34.  Solicitation sometimes occurred in stores during work shifts with store managers present.  RE34. Baristas and supervisors alike weighed and discussed possible benefits and drawbacks of unionization.  RE40, 64, 68, 71, 77, 80, 83, 87-89, 91.  Numerous

9

partners showcased their union support by wearing pro-union pins at work. RE68, 71, 77, 80, 83, 89, 91.

Eventually, eight stores voted for unionization; as relevant here, the Camp Road store rejected unionization with eight votes in favor and twelve against, out of twenty-nine eligible votes. RE61. One Camp Road partner who voted in the election testified that store partners had unfettered ability to campaign and that Starbucks' actions elsewhere in Buffalo did not interfere with the election, which proceeded fairly. ROA.3273-80.

## B.    Procedural History

The union filed objections to conduct it claimed affected the Camp Road election results and unfair labor practice charges regarding Starbucks' activities in Buffalo between August 2021 and July 2022. RE24. After consolidation, the NLRB General Counsel issued an amended complaint alleging violations of NLRA Sections 8(a)(1), (3), (4), and (5). *See* 29 U.S.C. §§ 151-169.

In a March 2023 decision, ALJ Michael A. Rosas concluded that Starbucks violated Sections 8(a)(1), (3), (4), and (5) and sustained the union's objections to the Camp Road election.[1]

In December 2024, the Board adopted the ALJ's conclusions that Starbucks violated Section 8(a)(1) by: (1) creating the impression that employees' union activities were under surveillance, (2) coercively interrogating employees, (3) soliciting grievances during the organizing campaign, (4) staffing the Genesee Street store to dilute the pro-union vote, (5) promising or granting benefits to employees in response to union organizing, and (6) making threatening statements to employees. RE3.

Next, the Board concluded that Starbucks violated Sections 8(a)(3) and 8(a)(4) by closing the Galleria kiosk and disciplining or discharging employees—inferring that Starbucks was driven by "widespread union animus" based on the "vast and systemic barrage of Section 8(a)(1) violations"

---

[1] Another court recently noted that ALJ Rosas committed a "gross evidentiary blunder" because his factual findings were "not supported by any evidence," his legal theory was "irrational," and his conclusions were "arbitrary, capricious, and senseless" and "amount[ed] to [a] faintly ridiculous proposition." *Grove v. NLRB*, 140 F.4th 506, 513 (D.C. Cir. 2025); *see also Novelis Corp. v. NLRB*, 885 F.3d 100, 111 (2d Cir. 2018) (rejecting *Gissel* bargaining order by Board and ALJ Rosas).

and the company's level-setting efforts—while rejecting contrary explanations as unpersuasive or "pretextual." RE5. Additionally, the Board (in a footnote) adopted the ALJ's conclusions that Starbucks violated Section 8(a)(5) by changing company policy and failing to bargain with the union over certain policies and partner discharges. RE2 n.6.

The Board ordered Starbucks to cease and desist from all unfair labor practices, and to reinstate and "make whole" discharged employees, including "for any other direct or foreseeable pecuniary harms incurred as a result of its unlawful conduct." RE13. Among other remedies, the Board issued a "bargaining order" for the Camp Road store, instructed Starbucks to reopen the Galleria kiosk, and ordered company executives to attend a public reading of a Board-crafted notice to Buffalo-area employees. RE13-19.

## SUMMARY OF ARGUMENT

The NLRA seeks to protect employees' right to organize, not freeze companies' operations at the first hint of organized labor campaigns. The Board erred in concluding that Starbucks' efforts to improve Buffalo-area stores and enforce its longstanding policies violated the NLRA.

I.      Employers do not violate Section 8(a)(1) when they follow their past practice of soliciting employee feedback and improving working

conditions. When Starbucks management came to Buffalo and discovered problems, they sought to improve operations just as they had done in regions with no union activity. That Starbucks undertook legitimate operational improvements at the same time as union activity, or even because union activity drew increased attention to the region, does not prove that Starbucks had the required motive to interfere with union organizing by conferring "benefits" on employees. The Board's contrary conclusion overlooks Starbucks' nationwide practice, confuses but-for causation with motive, and effectively forecloses employers from fixing problems they discover after union activity has commenced.

The Board likewise strayed when concluding that Starbucks illegally surveilled and interrogated partners. Starbucks' actions were not coercive. As for the alleged "threats," the First Amendment protects—and NLRA Section 8(c) *encourages*—robust debate among employers and employees about the merits of unionization. An employer can express views on unionization and predict its effects, provided it does not threaten employees with reprisal. The Board ignored evidence that Starbucks' statements to employees were factual, informative, and non-threatening.

13

II.     The Board independently erred in concluding that Starbucks violated Sections 8(a)(3) and 8(a)(4) when management disciplined partners, altered work schedules, and closed an underperforming store.  Union activity does not tie employers' hands.  Management may continue enforcing company policies, including by discharging union organizers when appropriate.  Under the *Wright Line* framework, the General Counsel bears the burden to show that anti-union animus motivated an employer's action, and the employer can rebut a finding of animus by showing it would have taken the same action absent anti-union animus.

The Board inferred animus from its improper conclusions that Starbucks violated Section 8(a)(1)—analytical bootstrapping that this Court has never endorsed.  And the Board wrongly inferred animus from its conclusion that Starbucks began enforcing policies more strictly in Buffalo after the union campaign.  It reached that conclusion only by overlooking evidence of level-setting campaigns elsewhere and by arbitrarily demanding that Starbucks produce an example of similar discipline at the very same store before August 23.

The Board further ignored evidence that Starbucks would have taken the same actions absent anti-union animus.  Starbucks has a history of closing

14

underperforming mall locations and routinely enforced its policies governing partner conduct. Policy enforcement was not unique to Buffalo. Food-service establishments need not forgo disciplining employees who, as here, stick a finger in a customer's drink, knowingly come to work sick, or yell profanity, just because union activity is underway.

III.  The Board further erred in concluding that Starbucks violated Section 8(a)(5). The Board affirmed the ALJ's conclusion that Starbucks failed to consult the union when purportedly changing employment conditions at one store and discharging two partners. But Starbucks did not need to consult the union because there was no change in policy, and it discharged the two partners under preexisting rules.

IV. The Court should deny enforcement of several remedies. First, the Board ordered compensatory damages, but the NLRA and the Constitution limit the Board's authority to equitable relief. Second, the Board overreached in overriding employee choice and compelling Starbucks to bargain with the union at Camp Road—where workers voted *against* unionization—because the record lacks NLRA violations specific to that store supporting such drastic relief. Third, the Board ordered Starbucks to reopen a store Starbucks no longer owns; the Board lacks authority to order impossible remedies. Fourth,

15

the Board directed Starbucks to send an executive to Buffalo for a public reading of a list of the company's wrongs, yet such punitive spectacles are reserved for "repeat offenders" that created an "atmosphere of fear," unlike Starbucks.

## STANDARD OF REVIEW

Courts "play an important role in NLRB enforcement," as they are "expressly empowered to enforce, modify or set aside, in whole or in part, the Board's orders." *NLRB v. AllService Plumbing & Maint., Inc.*, 138 F.4th 889, 896 (5th Cir. 2025). "To stand aside and rubber-stamp Board actions [courts] deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute would abdicate [courts'] responsibility." *Id.* (cleaned up); *see Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 392-93, 403-05, n.4 (2024).

This Court reviews the Board's legal conclusions de novo and its factual findings for substantial evidence. *AllService Plumbing*, 138 F.4th at 900 (citing *Brown & Root, Inc. v. NLRB*, 333 F.3rd 628, 633 (5th Cir. 2003)). The Board must "adequately explain the factual basis for its opinion." *Id.* at 903. And its factual findings can stand "only if they are supported by evidence that is substantial when viewed in light of the record as a whole," including

"whatever in the record fairly detracts from its weight" and "the body of evidence opposed to the Board's view." *Id.* at 900 (citations omitted); *accord Apple,* 2025 WL 1862823, at *3, *6.  This Court "must reject an order of the Board when it fails to grapple with countervailing portions of the record." *AllService Plumbing*, 138 F.4th at 900-01 (cleaned up).

## ARGUMENT

To a hammer, everything looks like a nail.  To the ALJ and the Board, practically every action Starbucks took during the union campaign was evidence of anti-union animus warranting the most aggressive punishments the Board can impose (plus some it can never legally impose).  The truth is much more mundane.  Starbucks sought to improve stores, listen to and reward partners, and discipline noncompliant partners in accordance with its national standards because that is its company culture, regardless of union activity.  A new regional director with a track record of fixing problems began addressing Buffalo's issues in the normal course, including identifying issues to change, *before* the union campaign launched.  Given the poor conditions in Buffalo, management had no choice but to implement corrective actions, at both organizing *and* non-organizing stores.

17

## I.    Starbucks Did Not Violate Section 8(a)(1)

The Board erred in concluding that Starbucks violated Section 8(a)(1) by supposedly promising or granting benefits; soliciting grievances; diluting one store's union vote; creating an impression of surveillance; questioning one employee about his union support; and making statements about unionization. Starbucks' conduct aligned with its lawful past practices; it did not "interfere with, restrain, or coerce employees in the exercise of [their union-related] rights." 29 U.S.C. § 158(a)(1).

An employer violates Section 8(a)(1) if it confers "economic benefits" on employees during a union campaign with the "express purpose" of quelling union support—suggesting "a fist inside the velvet glove." *Delchamps, Inc. v. NLRB*, 588 F.2d 476, 479 (5th Cir. 1979) (citing *NLRB v. Exch. Parts Co.*, 375 U.S. 405, 409 (1964)). The relevant inquiry is "whether the promise or grant of benefits was motivated by an unlawful purpose to coerce or interfere with protected activity." RE3 n.10. This Court assesses impression-of-surveillance, interrogation, and threatening-speech violations under an objective test: "whether, under the totality of the circumstances, the conduct had a reasonable tendency to coerce or interfere with employees' [union]

18

rights." *Atl. Grp., Inc. v. NLRB*, 2023 WL 5584119, at *4 (5th Cir. Aug. 29, 2023).

### A.    Starbucks Did Not Unlawfully Solicit Grievances or Extend Benefits

The Board concluded that Starbucks violated Section 8(a)(1) when it solicited grievances and promised or granted employees benefits such as improved working conditions, expedited store repairs, centralized training, staff additions, and a wage increase. RE3-4. The ALJ failed to mention the applicable *Exchange Parts* rule. Instead, he erroneously applied a categorical standard, stating that "it is unlawful for an employer to expressly or impliedly promise or grant benefits to its employees during a union campaign because it improperly influences employees' choices." RE94.

The Board attempted to correct this blunder by clarifying that "the 8(a)(1) analysis under *Exchange Parts* is motive-based and assesses whether the promise or grant of benefits was motivated by an unlawful purpose to coerce or interfere with protected activity." RE3 n.10. But the Board failed to analyze Starbucks' motive for these supposed benefits. The Board's conclusions contain three flaws: the Board (1) ignored Starbucks' national standards and past practices, which show that Starbucks acted in the ordinary

19

course; (2) misunderstood what constitute unlawful "benefits"; and (3) confused motive with but-for causation.

### 1. The Board ignored Starbucks' national standards and past practices

Union activity does not preclude employers from making needed repairs or taking steps to ensure customer-friendly, safe, and operational stores, if they would do so in the ordinary course. *See Wal-Mart Stores, Inc.*, 348 NLRB 274, 282 (2006) (NLRA "does not require an employer to leave a drain clogged" and "does not keep an employer from equipping its workers with appropriate tools" during union campaign); *Advance Pierre Foods, Inc.*, 366 NLRB No. 133, slip op. at 34 (2018) ("union's organizing interest and campaign is not a padlock on an employer's ability to update and revamp its operations"). Nor does the NLRA preclude employers from continuing "a past policy and practice of soliciting employees' grievances" during union campaigns. *Wal-Mart, Inc.*, 339 NLRB 1187 (2003).

Starbucks has a culture of listening to partners in order to improve its stores, regardless of union activity. During a listening session with Buffalo-area employees, Starbucks' U.S. Community Engagement Director explained his practice outside Buffalo (before any union activity):

> I literally sit down with baristas every single month to listen what's working, what's not working, groups just like this, and based on what they say, we act immediately. You need more labor? Let's figure that out. You need more staffing? Let's get a recruiter in. What you've seen in the last two weeks is actually Starbucks … this is actually the culture.

ROA.5795. He apologized if Buffalo had not previously received such attention. *Id.* New Regional Director Pusatier added that "last year, [Starbucks] did over 2,000 listening sessions across the country" and that, once Starbucks learned of problems in the Buffalo region, it followed its national practice and tried to fix them—"we dropped everything to be here." ROA.5796. For example:

1. <u>Starbucks engaged in open dialogue with partners.</u> The Board mischaracterized Starbucks' discussions with Buffalo partners as "soliciting grievances" to suppress union support. RE3. Even the ALJ acknowledged that "in the past, similar meetings had been held for the Buffalo area with store managers and shift supervisors" and that Starbucks "held listening sessions that included baristas in other areas of the country." RE38 & n.62. The ALJ also observed that "[i]t was not unusual for … high level corporate officials to visit markets to assess needs and respond," RE35 n.42, as they did in Buffalo. The record amply reflects Starbucks' longstanding practice of asking partners about issues and how to help. *E.g.*, ROA.5551-53.

21

The ALJ concluded that during listening sessions in fall 2021, Starbucks coerced partners to reject unionization by soliciting grievances and promising management would follow up on partners' complaints about, *e.g.*, understaffing, pest infestation, and broken equipment, and by updating partners on the timing of remedial measures. RE94-96. But the ALJ erred by ignoring Starbucks' extensive history of listening and responding to partners nationwide. The ALJ improperly focused only on Starbucks' "previous practices in the Buffalo market." RE95-96. Whether Starbucks had previously brought executives to Buffalo to address issues is irrelevant given its demonstrated practice of doing so nationwide and what the new Buffalo leader had done elsewhere. ROA.3420-23; *supra* pp.6-7.

Moreover, the ALJ ignored that Starbucks talked to partners and fixed operational problems *across* the Buffalo region, including in stores with no union petitions. ROA.2868, 8596; RE34, 95-96, 99. That is compelling evidence that its actions were not intended to coerce union activity.

2. <u>Starbucks invested in needed store renovations and repairs.</u> Starbucks had planned some improvements before the union campaign and implemented them nationwide—*e.g.*, new computers, cash registers, and store layouts. ROA.888, 2856-58, 2990-91, 3438, 3479, 4416. And, once Starbucks'

senior policy-setting leaders learned that most Buffalo stores were unclean, unsafe, decrepit, and experiencing pest or water issues, it had no choice but to rectify them, regardless of union activity.

3. <u>Starbucks alleviated understaffing.</u>  Starbucks hired new partners, not in response to employee complaints or to dilute the pro-union vote, but because Buffalo stores were understaffed "by as many as 300 employees." RE35.  Starbucks used the same recruiting methods to address staffing issues nationwide.  ROA.2847-48.

4. <u>Starbucks increased and centralized training</u>.  Throughout the country, Starbucks has operated centralized training facilities.  ROA.2679, 2849, 3102.  To improve partner training and performance, Starbucks implemented centralized training in Buffalo.  ROA.2848-49.  The ALJ found no evidence "that any Buffalo-area employees asked to have training centralized." RE59 n.235.  But the ALJ nonetheless concluded that Starbucks violated Section 8(a)(1) when it conferred the "benefit" of centralized training, RE99, while simultaneously concluding that the same decision discriminated *against* some partners who lost training bonuses, RE107-08.

### 2. The Board mischaracterized Starbucks' operational changes as "benefits"

The ALJ grossly overreached in characterizing these and other actions as unlawful "benefits" even though they had no economic value to employees. "[C]onferral of *economic* benefits upon the employees 'which is undertaken with the *express purpose* of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect'" can violate Section 8(a)(1). *Delchamps*, 588 F.2d at 479 (emphases added) (quoting *Exch. Parts*, 375 U.S. at 409). "Employer … inducements prohibited by the [B]oard have generally involved the promise or granting of tangible economic benefits to employees which enhance their economic position and induce them to vote for the donor." *NLRB v. Muscogee Lumber Co.*, 473 F.2d 1364, 1367 (5th Cir. 1973).

This rule makes sense: if employers were prohibited from taking *any* action that improved working conditions during a union campaign, they could be forced into safety and regulatory violations. On the ALJ's view, because individual store managers had failed to remedy obvious safety problems, any attempt to fix them departed from past practice and thus violated the NLRA. That cannot be right. Starbucks' actions had the purpose and *effect* of improving its operations—not impinging unionization or inducing votes.

24

### 3. *The Board confused motive with but-for causation*

Instead of analyzing Starbucks' *motive* for conferring benefits, the ALJ merely found but-for causation. The ALJ found that Starbucks officials "rallied to Buffalo only because of the Dear Kevin letter." RE104. As an initial matter, that finding conflicts with the evidence that Starbucks appointed a new regional director to fix problems in Buffalo in July 2021—before the Dear Kevin letter in August—and she planned changes based on her experience in Boston where no union activity occurred. ROA.2821-23, 2826-34.

That finding also confuses but-for causation with motive. Even if Starbucks discovered problems because executives came to the Buffalo region after the Dear Kevin letter, that suggests only that the Dear Kevin letter may have prompted their visit. It does not prove that Starbucks' *motive* for fixing problems was to coerce employees into voting against unionization. *See, e.g.*, *NLRB v. United Min. & Chem. Corp.*, 391 F.2d 829, 834 (2d Cir. 1968) ("We know of no principle and have been cited no authority that such 'but-for' causation suffices to support a violation of § 8(a)(1)."); *NLRB v. Arkema, Inc.*, 710 F.3d 308, 323 (5th Cir. 2013) ("timing alone … is not substantial evidence that [an employer] was motivated by anti-union animus"). Even where union activity is the but-for cause for increasing the "level," "frequency," and

25

"intensity" of managers' asking employees the same types of questions they asked before the campaign (because the employer sent managers to the organizing location), that does not establish a violation of Section 8(a)(1). *Wal-Mart,* 339 NLRB at 1188.

For example, the ALJ found that most Buffalo store improvements were "neither requested nor planned prior to September" 2021 and that "there [was] scant evidence that such work would have been performed prior to January *but for* the organizing campaign." RE99 (emphasis added). But even if Starbucks learned of the need for improvements only after, or because of, the organizing campaign, it had legitimate business reasons to undertake such improvements, as it had done elsewhere. The ALJ's analysis turns Section 8(a)(1) into a moratorium on employers' advancing their "legitimate … interests" once they learn of union activity. *Cf. Tesla, Inc. v. NLRB*, 86 F.4th 640, 651 (5th Cir. 2023).

The Board's one-sided analysis puts employers in an "[u]nfair if you do[,] unfair if you don't" bind during union campaigns, making it impossible for employers to know how to comply with the NLRA. *See Advanced Life v. NLRB*, 898 F.3d 38, 40 (D.C. Cir. 2018); *NLRB v. Dorn's Transp. Co.*, 405 F.2d 706, 715 (2d Cir. 1969) ("Such a 'damned if you do, damned if you don't'

26

approach by the Board does not further the policies of the Act."). If employers rectify issues as they normally would, they risk being accused of unlawfully granting benefits. If employers disregard issues they would normally rectify, they risk being accused of withdrawing benefits in retaliation for union activity. The ALJ's conflicting conclusions that centralizing training was both an unlawful benefit, RE99, and discrimination because it reduced store hours and trainer compensation, RE107-08, highlight this Catch-22.

### B. Starbucks Did Not Unlawfully Promise or Implement a Wage Increase or Promote Employees

The Board also adopted the ALJ's conclusion that Starbucks violated Section 8(a)(1) by supposedly moving up a planned national wage increase. RE3-4. "[A] wage increase made during a union organizational campaign is not forbidden unless it is granted for the purpose of restraining employees in the free exercise of their right of choice of whether to unionize." *Delchamps*, 588 F.2d at 479 (employer's grant of "across-the-board wage increase" at all stores, during union campaign at fraction of stores, was not unlawful benefit). The record showed that Starbucks has, for many years, implemented nationwide, annual wage increases. ROA.2947, 2950, 7931; RE33.

On July 28, 2021, *before the union campaign*, Starbucks announced it was moving up a planned *nationwide* pay increase from January 2022 to

27

October 2021. RE36-37, 97. In October 2021, Starbucks revised its nationwide wage announcement, which did not reference Buffalo or any union campaign, did not "promise" higher pay to all employees, and was consistent with its pattern of annual compensation increases. ROA.4410-14. In some respects, the revised increase was less beneficial than the one announced before the union campaign. RE36-37 (comparing July and October announcements). The ALJ's conclusion that Starbucks effected an (already announced) nationwide wage increase across 9,000 stores to restrain union organizing in Buffalo is illogical.

Relatedly, the Board sua sponte tacked on a "velvet-glove" Section 8(a)(1) violation for promoting two employees during the union campaign. RE8. This conclusion was improper; the General Counsel alleged only that the promotions violated Section 8(a)(3), and the ALJ and Board dismissed those allegations, so a Section 8(a)(1) theory of liability for the promotions was not fairly litigated. *See Indep. Elec. Contractors, Inc. v. NLRB*, 720 F.3d 543, 552-54 (5th Cir. 2013).

## C.    Starbucks Did Not Create a Coercive Impression of Surveillance

The Board concluded that Starbucks created an impression of surveillance by: (1) increasing support manager presence; (2) support

managers wearing headsets when not on store floors; (3) photographing a partner who happened to be wearing a union pin; and (4) referencing, while investigating a partner's use of a racial slur, an employee-only text thread without identifying the source of the information. RE3 n.7; RE8-9 nn.20-21. These conclusions are unsupported by law or facts.

"The only surveillance, or impression of surveillance, which the [NLRA] prohibits is that which tends to interfere with, restrain, or coerce Union activities." *NLRB v. Mueller Brass Co.*, 509 F.2d 704, 708 (5th Cir. 1975). In this case, like in other recent cases, the Board "seemed to ignore this critical coercion element." *Greater Omaha Packing Co. v. NLRB*, 790 F.3d 816, 823 (8th Cir. 2015); *see also, e.g.*, *Stern Produce Co., v. NLRB*, 97 F.4th 1, 10 (D.C. Cir. 2024); *Intertape Polymer Corp. v. NLRB*, 801 F.3d 224, 239 (4th Cir. 2015). Where this Court has found unlawful surveillance or the impression thereof, it has generally been where an employer asks about an employee's undisclosed union activities or states it is monitoring union activities. *See, e.g.*, *Cordua Rests., Inc. v. NLRB*, 985 F.3d 415, 425 (5th Cir. 2021) (admittedly photographing and forwarding employee's text messages without permission); *Delchamps*, 585 F.2d at 94 (supervisors told employees that union meetings were monitored by management and that company "spy" attended meetings).

29

The Board erred in concluding that Starbucks unlawfully created an impression of surveillance on each ground.

1. <u>Support managers</u>:  The "mere presence of a supervisor" around union activity does not create the impression of surveillance.  *NLRB v. Computed Time Corp.*, 587 F.2d 790, 794 (5th Cir. 1979).  The Board "has long held that management officials' observation of public union activity, particularly where such activity occurs on company premises, does not violate Section 8(a)(1) of the Act, unless officials do something out of the ordinary" and such "extraordinary conduct" would cause an employee to "reasonably assume … that their union activities had been placed under surveillance." *Wal-Mart Stores, Inc.*, 352 NLRB 815, 816-17 (2008); *see also The Broadway*, 267 NLRB 385, 400 (1983).

Starbucks routinely sends support managers where they are needed, irrespective of union activity.  ROA.2630, 2710, 2842-43, 2856-57, 3370-73, 3407. They were needed in Buffalo to fix problems as Starbucks managers typically do.  As in *Wal-Mart*, reasonable partners would likely see the increased presence of support managers as "a stopgap assignment … of a sorely needed manager rather than as an effort to surveill [sic] their union activity."  352 NLRB at 817.  And, as in *The Broadway*, the "motivation for additional

30

management presence" arose from "a benign desire" to solve operational problems. 267 NLRB at 400.

2. <u>Headsets</u>: Contrary to the ALJ's finding that support managers "constantly" and "continuously" wore headsets even off store floors, RE104, multiple managers testified that they wore headsets only in limited circumstances. RE nn.180, 221, 294, 323, 412. Regardless, managers' use of headsets (even off store floors) was not coercive; it was part of their duties. Again, observing employees working on company premises is not coercive or unlawful. *Wal-Mart*, 352 NLRB at 816-17; *The Broadway*, 267 NLRB at 400.

3. <u>Photograph</u>: Photographing union activity does not per se violate Section 8(a)(1). *U.S. Steel Corp. v. NLRB*, 682 F.2d 98, 101 (3d Cir. 1982) (relying on Fifth Circuit's rejection of "per se doctrine" in *Computed Time*, *supra*). Here, the manager denied taking the photograph. ROA.1882. But even crediting the employee's testimony that the manager held his phone in a way that *looked like* he was taking a picture, such conduct was not extraordinary; the employee admitted the manager had taken pictures at the store before. ROA.415. Moreover, any such photograph would not cause an employee reasonably to assume he was under surveillance for union activity because it depicted the employee working, not engaging in union activity.

Nothing suggested the manager photographed the employee *because* he was wearing a union pin. And there is no evidence that any photograph was used coercively.

4. <u>Investigation of Employee</u>: The ALJ found that an HR manager's investigation of a partner amounted to threatening discipline or retaliation. RE112. While rejecting that theory, two Board members sua sponte found an impression-of-surveillance violation under Section 8(a)(1) for the same conduct. RE8-9, nn.20-21. Again, this theory was not fairly litigated. *See Indep. Elec. Contractors,* 720 F.3d at 552-54; *supra* p.28.

Regardless, the conclusion is irrational. The partner under investigation admitted calling another partner a "white fucking twink" on an employee-organizing chat. RE62. As then-Chair McFerran explained in declining to find this violation, "a reasonable employee would expect an employer's inquiry if they used a highly offensive term in conversation with colleagues." RE9 n.21. Investigating such conduct did not create a coercive impression of surveillance. No authority holds that the employer must tell an employee under investigation how it learned of the employee's offensive conduct to avoid NLRA liability. On these facts, any reasonable employee would assume that

another partner informed management of the offensive comment, which is not unlawful surveillance.

### D.    Starbucks Did Not Coercively Interrogate

The Board (in a footnote) adopted the ALJ's implausible determination that store manager Shanley unlawfully interrogated partner Higgins by pointing to Higgins's union pin in the parking lot and asking, "you support this?" RE3 n.8.  That conclusion cannot be squared with the ALJ's additional finding that, after Higgins replied affirmatively, "Shanley said she respected that decision and it did not change her personal view of Higgins." RE105; ROA.623-24 (Higgins testifying that Shanley "said that, you know, she respected my decision and that she would never change her mind about me, who I am, as a person" and they "just had, like, a little -- a little moment there, just understanding").

This exchange is exactly "the kind of casual question that this court has never held to be a [Section] 8(a)(1) violation." *Pioneer Nat. Gas Co. v. NLRB*, 662 F.2d 408, 416 (5th Cir. 1981) (supervisor asking employee whether she was going to attend union meeting and observing that unionization has "its good points and its bad"). "[T]here is little doubt that these discussions were not coercive." *TRW, Inc. v. NLRB*, 654 F.2d 307, 314-15 (5th Cir. 1981)

(supervisor asking employee what union button was, if he knew anything about the union, and if he was a paid union "plant"); *see also Apple,* 2025 WL 1862823, at \*5; *Delco-Remy Div., Gen. Motors Corp. v. NLRB*, 596 F.2d 1295, 1310 (5th Cir. 1979).

The Board and ALJ also failed to weigh Higgins's subjective impression that the exchange was "a little moment there, just understanding." ROA.624. Employees' subjective impressions are relevant to whether an employer's conduct was threatening in violation of Section 8(a)(1). *See Starbucks*, 140 F.4th at 976; *FDRLST Media, LLC v. NLRB*, 35 F.4th 108, 124 (3d Cir. 2022). Starbucks did not coercively interrogate Higgins.

### E.    Starbucks' Speech Was Non-Threatening and Protected

Starbucks' statements contrasting benefits of nonrepresentation versus unionization did not violate Section 8(a)(1). Congress "implement[ed]" employers' "First Amendment rights" in the NLRA. *Brown & Root*, 333 F.3d at 633. The NLRA promotes "uninhibited, robust, and wide-open debate in labor disputes," and Section 8(c) manifests "congressional intent to encourage free debate on issues dividing labor and management." *Chamber of Com. v. Brown*, 554 U.S. 60, 67-68 (2008) (cleaned up).

34

"Under Section 8(c) an employer is free to communicate to employees a statement of opinion about the union as well as predict the effect of unionization on the workplace so long as such a prediction is based on objectively verifiable facts and it does not contain a threat of reprisal or force." *Brown & Root*, 333 F.3d at 633. "An unlawful threat is established if the totality of the circumstances reveals an employee reasonably could conclude the employer is threatening economic reprisals if the employee supports the union." *Id.* at 634.

The Board summarily adopted the ALJ's erroneous conclusion that Starbucks made "threatening statements to its employees." RE4. The Board mischaracterized Starbucks' statements as assertions that unionization would (1) "prevent" managers from helping employees on store floors, (2) "eliminate" employees' ability to pick up extra shifts at other stores, and (3) "prevent" employees from receiving new benefits. *Id.* The record shows that Starbucks' statements in response to partner questions discussed *potential* effects of unionization, deriving from management's need to negotiate and respect union contracts. For example, Starbucks honestly explained:

35

(1) "[I]f it's a union shop … the work has to be done by those that are part of the union, and others that in more managerial positions, aren't really able to do that." ROA.4978:8-11.

(2) "If you are working in a union store and there are other stores around you that are not, that would impede our abilities to support each other" by changing "how we're able to move partners back and forth." ROA.4976:6-14; *see also* ROA.4236:21-4237:3 (explaining "challenge" with "picking up shifts from a non-unionized to a unionized store, or vice versa, because the unionized partners are under a contract").

(3) "[I]f we added benefits" those might be "better" or "not better" than the union's contract, so the "flexibility of a contract is something you need to consider." ROA.4969:10-16.

Those are accurate legal statements, and they reference a negotiated contract, not unilateral employer action. Partners could not reasonably have perceived Starbucks' statements to be threatening in context. In the same discussions, Starbucks made amply clear partners had a "right" to vote for unionization and Starbucks would "respect" the results:

36

- "I want every single partner in this market to have a choice whether to seek representation through a union or not." ROA.4956:18-20.

- "You have every right to do it." ROA.4959:23.

- "We want every partner to vote. And we want every partner to have a voice. And we're gonna respect whatever that voice is." ROA.4970:4-6.

The First Amendment and NLRA Section 8(c) protect Starbucks' speech, which was objectively fact-based and non-threatening under the totality of the circumstances. This Court has held, for example, that threats of job loss if employees unionize can violate Section 8(a)(1). *See Atl. Grp.*, 2023 WL 5584119, at *4. By contrast, Starbucks confirmed partners would remain employed despite unionizing. Starbucks presented a "truthful comparison of benefits available to represented and unrepresented employees, a comparison recognized as legitimate campaign conduct protected under [Section] 8(c)." *Dow Chem. Co., Tex. Div. v. NLRB*, 660 F.2d 637, 647 (5th Cir. 1981).

## II.    Starbucks Did Not Violate Sections 8(a)(3) and 8(a)(4)

The Board further erred by concluding Starbucks violated Sections 8(a)(3) and 8(a)(4). Section 8(a)(3) "prohibits discrimination in regard to hire

37

or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." *Poly-Am., Inc. v. NLRB*, 260 F.3d 465, 488 (5th Cir. 2001) (citation omitted). Section 8(a)(4) makes it an unfair labor practice for an employer "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony." *NLRB v. Whitfield Pickle Co.*, 374 F.2d 576, 579 n.2 (5th Cir. 1967) (citation omitted).

The ALJ identified a kitchen sink of supposed Section 8(a)(3) violations: stricter application of rules; closing and reducing store hours and thus compensation; denying partners the ability to pick up shifts; removing benefits; imposing more onerous working conditions; refusing or delaying approval of transfers to other stores; denying training assignments; retaliating and threatening to impose discipline against partner Reeve; randomizing employee shifts; reducing partner work hours; refusing to consider partner Cochran for promotion; refusing to permit partners to attend pre-election meetings; prohibiting partner Murray from reporting to work; denying partner Brisack's leave requests; disciplining partners; discharging partners Fleischer, Rojas, Park, Nuzzo, Tarnowski, and Krempa; and denying partner Higgins's availability request and constructively discharging him.

38

RE106-20.  The ALJ further concluded that Starbucks violated Section 8(a)(4) by disciplining and discharging Krempa.  RE119.

The ALJ's conclusions represent an unprecedented interference with Starbucks' operations.  The NLRA does not straitjacket employers during union campaigns.  Employers remain free to respond to conditions in real-time—*e.g.*, by adjusting hours, closing underperforming locations, disciplining and even discharging employees.  Starbucks lacks space in this brief to address the facts of each supposed violation.  Instead, Starbucks focuses on cross-cutting errors in the ALJ's reasoning that permeated the Section 8(a)(3) and 8(a)(4) conclusions.

## A.    The General Counsel Failed To Present a Prima Facie Case of Anti-Union Motive

To establish Section 8(a)(3) or 8(a)(4) violations, the General Counsel must first "show, by a preponderance of the evidence, that [1] the employee was engaging in protected activity, [2] that the employer had knowledge of the activity, [3] that adverse action was taken against the employee, and [4] that the activity was a motivating factor in the decision to discipline the employee." *Arkema*, 710 F.3d at 320-21 (footnote omitted) (citing *Wright Line*, 251 NLRB 1083 (1980)).  If the Board shows all four factors, "the burden shifts to the

employer to demonstrate that the action would have taken place regardless of any animus." *Id.* at 321. The General Counsel failed to meet its initial burden.

### 1. The Board erred in concluding that union activity motivated Starbucks' at-issue actions

The Board failed to show that Starbucks' actions were motivated by partners' union activity. Two key analytical flaws pervaded the animus conclusions. First, the Board improperly inferred anti-union animus from its Section 8(a)(1) conclusions. Second, it improperly inferred anti-union animus from Starbucks' level-setting campaign and enforcement of longstanding policies.

a. The Board erroneously concluded that Starbucks' purported Section 8(a)(1) violations (discussed above) "warrant[ed] an inference that an overwhelming number of the adverse employment actions alleged to be unlawful … resulted from … extreme animus toward the organizing campaign in the Buffalo area." RE5. That short-cut is improper. "Though the NLRB may make inferences to establish anti-union motive or disparate treatment, the inferences must be reasonable and must be supported by substantial evidence." *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1408 (5th Cir. 1996).

"An employer's 'simple animus' and 'general hostility' toward the union are insufficient" to create an inference of improper motive. *Stern Produce*, 97

40

F.4th at 12 (quoting *Nichols Aluminum, LLC v. NLRB*, 797 F.3d 548, 554-55 (8th Cir. 2015)). "Rather, there must be something more to connect the employer's animus to the adverse action." *Id.* The Board must "establish a reasonable inference of *causal connection* between the employer's antiunion motivation and the employee discharge." *Mueller Brass*, 509 F.2d at 711 (emphasis added).

Neither the Board nor the ALJ made any concrete finding that partners' union activities motivated the alleged discriminatory actions. For example, although the at-issue decisions were made by myriad managers, the ALJ never discussed the motivations of any decision-maker. Instead, the ALJ drew a categorical "inference" of animus "[b]ased on the vast and systemic barrage of Section 8(a)(1) violations described above," RE106, and merely pointed to his finding of "widespread union animus" in his Section 8(a)(3) conclusions. RE118-20. This was error.

In any event, because the Board and ALJ expressly linked their animus conclusions to their Section 8(a)(1) conclusions, if the Court denies enforcement of any Section 8(a)(1) conclusion, it must remand on the Section 8(a)(3) conclusions.

b.    The Board also improperly inferred anti-union animus from Starbucks' practice of level-setting expectations regarding performance and adherence to company policies.  The purpose of Starbucks' level-setting was to fix issues in Buffalo-area stores by reminding partners of Starbucks' *pre-existing* policies.  ROA3153, 3202, 3374-77.  There was substantial evidence that the disciplined partners violated existing company policy; the ALJ acknowledged that "many" Starbucks employees in the Buffalo region "were out of compliance with rules and policies[], most commonly, the dress code, jewelry, attendance and punctuality, and communication (no-cursing[)] policies." RE106.

The NLRA "does not prevent an employer from disciplining an employee for violating established company rules and policies, especially when the discipline is provided in a manner consistent with discipline given for similar conduct in the past." *Asarco*, 86 F.3d at 1409.  Notwithstanding this principle, the Board "presum[ed] that [Starbucks] acted from an unlawful motivation" based on its conclusion that Starbucks "began enforcing its rules and policies in a manner it had not done prior to the union organizing campaign." RE5.  The Board erred in drawing that presumption for at least two reasons.

First, level-setting was not new. District manager Mkrtumyan testified that level-setting on attendance and other policies was typical whenever she started in a new market, such as Northern Virginia (despite no union activity there). ROA.3374-77, 3385-86. The record also reflected level-setting before September 2021 in Georgia, Virginia, and Maryland, where stores needed improvements (despite no union activity there either). ROA.3202. The Board failed to consider this conflicting evidence.[2]

Second, the Board and ALJ concluded that there was "stricter enforcement of work rules" against union organizers in the Buffalo region only because they artificially limited the evidence they considered. RE5. "[T]he essence of discrimination in a [Section] 8(a)(3) violation consists of treating like cases differently." *Delco-Remy,* 596 F.2d at 1305. Where anti-union sentiment is alleged across a region, one must consider evidence from the entire region, not just one store. *See DirecTV Holdings, L.L.C. v. NLRB*, 650 F. App'x 846, 852 n.10 (5th Cir. 2016) (holding it "appropriate to consider employees within

---

[2] Moreover, the ALJ's conclusion that the fall 2021 level-setting in Buffalo "occurred *solely* as a result of the organizing campaign" is wholly unsupported. RE38 n.60 (emphasis added). The manager testimony he cited establishes that level-setting occurred, but it does not justify the "solely as a result of" conclusion.

the [entire] region" where the region "was an alleged source of discrimination"); *UPS, Inc.*, 369 NLRB No. 1, at 30 (2019) (reviewing comparator evidence throughout Western Pennsylvania). As this Court recently explained when the Board similarly restricted its analysis by time period, the Board must look "to the *full* record—not just the three days in question," in evaluating how an employer enforced policies. *Apple,* 2025 WL 1862823, at *8.

Starbucks enforced its work policies similarly in stores nationwide regardless of union activity. ROA.3145-54, 3192-95, 3199-202. Starbucks presented more than 100 examples of employee discipline in stores in the Buffalo region and elsewhere in upstate New York (*e.g.*, Albany and New Hartford) before and after the union activity. RE31-32 & n.32, 92-94. The ALJ closed his eyes to much of this evidence. As an initial matter, the ALJ refused to consider discipline at stores outside the Buffalo or Rochester areas. RE31 n.32, 92 n.439.

Even more problematic, in assessing whether discipline was consistent with prior discipline, the ALJ restricted his analysis to discipline *in the exact same store*. For example, because the record contained prior instances of time and attendance warnings at the Genesee Street store, he concluded that

Starbucks did not violate Section 8(a)(3) when it issued such a warning at that store during the union campaign. RE116. But, because he could not find prior examples of such warnings at the Delaware & Chippewa store, he came to the opposite conclusion for a warning at that store. RE116.

This pattern repeated itself across the ALJ's conclusions. *See, e.g.,* RE117 (comparing Rojas's termination only to previous discipline in his store, rather than similar discipline at other Buffalo stores); RE116-19 (comparing Norton, Park, Krempa, and Skretta's violation of professional language policy only to prior discipline at each of their *specific* stores); RE116 (comparing discipline for Rizzo's and Doherty's attendance policy violations, Murray's dress code violation, and Norton's swearing violation only to prior discipline in their stores, and concluding that Rizzo's did not breach Section 8(a)(3) because his store manager had documented other tardiness violations); RE116 (same for final written warnings to Park, Krempa, Skretta, and Doherty).

The ALJ provided no coherent rationale for this arbitrary restriction. The result of this restriction was to bind Starbucks to the discipline practices of its worst-performing store managers. If an individual store manager mismanaged a store and failed to enforce company policy before the union activity, the ALJ's approach bars the company from enforcing company policy

45

at that store during the union campaign, even if it had been enforcing the same policy at the next store over.

Relatedly, the ALJ erroneously assumed animus where an employee was the first to be disciplined for a particular action. *See* RE118 (concluding that because there was no evidence of prior discipline for entering the store alone, Nuzzo's discipline was motivated by anti-union animus). But a violation "is not established simply because an employee is first to be disciplined under existing policy." *Asarco*, 86 F.3d at 1410. "[C]oincidence alone is not sufficient" to show causation. *Mueller Brass*, 509 F.2d at 711.

### 2. *The Board did not find employer knowledge of union activity as to each supposedly discriminatory incident*

The Board concluded generally that the "General Counsel established union activity … and [Starbucks'] knowledge thereof." RE5. But to establish a Section 8(a)(3) violation, "the particular supervisor responsible for the firing [must know] about the discharged employee's union activities." *Poly-Am.*, 260 F.3d at 489 (citation omitted). And employees' "openness in [] union involvement cannot, standing alone, constitute substantial evidence that [a supervisor] was aware of the activity." *Id.* (finding "no evidence" that decisionmaker "was ever present" when employee engaged in union activity and "[w]ithout such linkage, the evidence that [employee] was open in his

46

union participation is not by itself adequate circumstantial evidence from which [supervisor] knowledge may be inferred"); *Delchamps*, 585 F.2d at 94-95 (because decisionmaker "solely responsible for the discharge" did not know of discharged employee's union activities, his "knowledge 'obviously'" was not a cause "of the firing").

The Board did not uniformly find that the supervisors who took disciplinary action knew of the disciplined employees' union activity. For example, there was no evidence that the managers who discharged Rojas or Nuzzo knew of their union activity; that managers who reduced Reeve's shift-supervisor work or investigated her hate speech knew of her union activity; that the manager who denied Skretta's request to pick up a shift knew of his union activity; or that managers knew of Baganski's "personal relationship with Cochran, a vocal Union supporter," a contention the ALJ made without support. RE112; *see also* ROA.1827-28, 1830-31, 1836-37 (Baganski's testimony that she wore a union pin *after* being notified her transfer would be delayed). The Board improperly inferred specific knowledge based on general union activity. RE5.

As another example, the Board agreed with the ALJ that Starbucks violated Section 8(a)(4) by issuing Krempa a final written warning and later

47

discharging her because she testified at an NLRB hearing on December 3, 2021, RE119, but Krempa's final written warning (dated November 23, 2021) predated her testimony. ROA.4422. The ALJ dismissed this obvious problem by noting that support manager Mann did not *deliver* the warning to Krempa until December 7. RE74 n.330. The undisputed evidence shows, however, that the final written warning was *issued* on November 23, before anyone would have known about Krempa's future testimony. ROA.4422. The record includes numerous instances of warnings involving delays between the "date created" and "date delivered." *E.g.*, ROA.8360 (10-day delay); ROA.8368 (6-day delay); ROA.8372 (7-day delay); ROA.8393 (20-day delay).

## B.  Starbucks Would Have Taken the Same Actions

Even if the General Counsel had established a prima facie case of anti-union animus (it did not), Starbucks proved it would have taken the same actions absent anti-union animus. *See Arkema*, 710 F.3d at 321. Again, the ALJ concluded otherwise only by ignoring Starbucks' historical practices shown through comparator evidence. *See supra* pp.44-45. Consider the following salient examples, which illustrate the ALJ's broader errors.

### 1. *Starbucks would have closed the Galleria kiosk*

Starbucks offered uncontradicted evidence for why it closed the kiosk: its disrepair and financial underperformance, the cost to raise it to Starbucks' standards, and a nationwide policy of closing kiosks as mall traffic diminished during the pandemic. ROA.1290, 1794, 2827-28, 2852-53, 3462, 8063. Notably, no Galleria kiosk employee lost their job due to the closure; Starbucks permitted employees to transfer to other stores, undermining any supposed retaliatory purpose. ROA.1290-92, 2852-53. The ALJ ignored these legitimate business justifications. RE109. This ipse dixit ruling "ignores a portion of the record" and "cannot survive review." *DirecTV Holdings*, 650 F. App'x at 852 (citation omitted).

### 2. *Starbucks would have discharged the at-issue employees*

Starbucks undoubtedly would have terminated the employment of each employee whom the ALJ concluded was unlawfully discharged:

a. <u>Brian Nuzzo</u>: Nuzzo entered his Starbucks location alone without a mask, which violated rules requiring masking and the presence of at least two partners in any unlocked store. RE79; ROA.2589, 3448, 5524. When asked about the incident, Nuzzo lied. RE79 n.360; ROA.1481-85, 8439. "Any employer has the right to demand that its employees be honest and truthful in

49

every facet of their employment." *Mueller Brass*, 509 F.2d at 713. Nuzzo responded to his dismissal with a profane tirade, shoving a cart, telling his manager, "kiss my ass" and "[I] hope you die," then returning to say he meant it, drawing a store ban. RE80; ROA.1494, 1511-14.

In finding a Section 8(a)(3) violation, the ALJ relied on "the absence of … proof [of prior discipline] in the repository of past discipline produced by" Starbucks. RE118. Even if true,[3] that an employee is the first to be disciplined under existing policy is "of no moment." *Cent. Freight Lines Inc. v. NLRB*, 653 F.2d 1023, 1027 (5th Cir. 1981). Regardless, Starbucks introduced evidence of discharging employees for dishonesty during investigations. ROA.8229, 8360.

b. <u>Edwin Park:</u> In November 2021, Park kicked a door, threw dishes into a sink, and directed profanity at another partner. ROA.2614-18, 2810-12, 7882. Starbucks issued Park a final written warning for that conduct, *id.*, and in December 2021 issued a coaching for dress code, profanity, and tardiness. ROA.1644-456, 1623-66, 5275. Then, in February 2022, Park stuck his finger in a customer's drink and arrived late again. ROA.1651-55, 5278. Each

---

[3] The record includes no evidence that any district manager *knew* of similar infractions where partners entered the store alone.

violation sufficed to discharge Park, both individually and cumulatively. Starbucks established that it enforced its attendance and respectful communications policies before and during the union campaign. ROA.8226, 8232, 8297-99, 8318, 8320, 8324, 8358, 8360, 8386, 8390. Additionally, Starbucks disciplined partners for lesser food-safety violations. ROA.8197, 8446 (disciplining partners for failing to check temperature of food and beverage at Galleria kiosk).

Sticking one's finger in a customer's drink is unacceptable any time, but especially during a pandemic. The Board ignored this egregious health and safety violation, accepting that Park must have done it as a joke. RE118. Citing no evidence, the ALJ bizarrely found that Starbucks "was more concerned about putting together a case against Park than immediately removing a health risk, indicating that it was not really concerned about health and safety considerations." RE118. The ALJ improperly assumed an employee's gross violation of health protocol to be a joke, while assuming Starbucks' enforcement of its standard policies was "driven by discriminatory motivation." RE118. The Court should reject such "arbitrary, capricious, and senseless" analysis. *Grove*, 140 F.4th at 513.

51

c. <u>Nathan Tarnowski</u>:   Tarnowski lied about his symptoms on his COVID-19 "virtual coach," which required employees to report symptoms like diarrhea.  Upon learning of Tarnowski's illness and dishonesty, his manager sent him home and discharged him for lying and violating the health-and-safety policy.  ROA.2222-23, 2236-38, 2241, 5763.  Dishonesty is a permissible ground for termination.  *Mueller Brass*, 509 F.2d at 713.

d. <u>Angel Krempa</u>:   Krempa's *multiple* policy violations warranted discharge.  ROA.1005-14 (repeatedly violating dress code policy in February 2022), 1061-62 (repeated tardiness), 2657 (time-and-attendance violations), 4422 (foul language), 4457 (tardiness on March 7 and 21, 2022); RE74-75.  The record contains multiple instances of Starbucks treating like cases alike. RE31-32 (evidence addressing foul language and disrespect before union activity); ROA.3178-79 (dress code policy); RE31-32 (attendance policy).  Even if Starbucks had disciplined but not discharged other employees for some of the same conduct, Starbucks was permitted to discharge Krempa given her multiple policy violations.  *See Mueller Brass*, 509 F.2d at 712-13 (company could investigate and suspend employee for excessive absenteeism, even when it had not done so for other employees, because absentee record was significantly worse).  Krempa's multiple policy violations warranted discharge,

and the ALJ failed to connect her discharge to her NLRB testimony four months earlier, foreclosing any Section 8(a)(4) violation.

e. <u>Daniel Rojas, Jr.:</u>  In fall 2021, Rojas acknowledged the attendance policy, then repeatedly arrived late to work.  ROA.2102-04, 2120, 2145, 2147. In January 2022, Rojas was coached for five incidents of tardiness and reminded that discharge could result.  ROA.5724.  Rojas was late again in March 2022, leaving partners locked outside, and was discharged for tardiness.  ROA.2142-43, 5747.  "This is simply a case in which the employee chose to [violate company policy] more than once and seeks immunity on the ground that he really was not fired for that but because the company was out to 'get him' for his union activities several months previously."  *Delco-Remy*, 596 F.2d at 1306.  Starbucks introduced evidence of multiple tardiness discharges before the union campaign.  ROA.8360, 8413-19.

f. <u>Cassie Fleischer:</u>  Fleischer, like all employees, agreed to satisfy the store's minimum-availability requirements.  Fleischer's request to reduce her hours did not fit the store's needs, and her manager denied the request. ROA.2047-50, 5523.  Starbucks attempted to meet Fleischer in the middle, asking her to add more availability or transfer stores.  ROA.2047-50, 5687-89. Fleischer declined and was separated in April 2022.  ROA.2050-53.  Fleischer

thus "fired herself." *NLRB v. Mini-Togs, Inc.* 980 F.2d 1027, 1034 (5th Cir. 1993). Starbucks is not required to keep an employee who rejects "reasonable conditions for continued employment." *Id.*[4]

## III. Starbucks Did Not Violate Section 8(a)(5)

The Board (in a single-sentence footnote) adopted the ALJ's conclusion that Starbucks violated Section 8(a)(5) by failing to bargain with the union regarding a purported change in Starbucks' minimum-availability policy at the Elmwood store, and over the discharges of partners Park and Krempa. RE2 n.6. Under Section 8(a)(5), an employer cannot "refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). An employer must "consult and negotiate with the union before changing terms and conditions of employment." *Elec. Mach. Co. v. NLRB*, 653 F.2d 958, 962 (5th Cir. 1981) (citation omitted).

Starbucks did not change its terms and conditions of employment at its Elmwood store. Contrary to the ALJ's conclusion, RE124, Starbucks did not change its availability policy. That policy remained that partners' work schedules depend on business needs; Starbucks cannot guarantee that

---

[4] Similarly, Starbucks did not constructively discharge partner Higgins, who decided to resign despite his store manager putting him on the schedule. RE120.

partners will receive their preferred hours; and availability that does not meet business needs may result in separation. ROA.3077-78, 3389-92, 5523. The "mere continuation of the status quo during the bargaining period cannot constitute a disparagement of the bargaining process; there must be an actual change in working conditions." *NLRB v. S. Coach & Body Co.*, 336 F.2d 214, 217 (5th Cir. 1964) (citations omitted).

Additionally, Starbucks was not required to consult the union about its decisions to discharge Park and Krempa because it did so under its pre-existing disciplinary policies. *Supra* pp.50-52. Indeed, Park's and Krempa's violations and discipline leading up to their discharges occurred before they were represented by the union. "[E]mployers do not have an obligation under [Section 8(a)(5)] … to bargain prior to disciplining unit employees in accordance with an established disciplinary policy or practice." *800 River Rd. Operating Co.*, 369 NLRB No. 109 (2020).

## IV.  Certain Remedies Require Vacatur

### A.  The Board's Damages Remedy Is Unlawful

This Court should vacate the Board's compensatory-damages remedy. In *Thryv*, the Board asserted it could award compensation to employees for "all direct or foreseeable pecuniary harms." 372 NLRB No. 22, slip op. at 1

55

(Dec. 13, 2022), *vacated in part on other grounds*, 102 F.4th 727 (5th Cir. 2024). The Board exercised that supposed authority here, ordering Starbucks to "compensate" certain employees for any "direct or foreseeable pecuniary harms incurred as a result of" Starbucks' alleged misconduct, even if that compensation *exceeds* their lost employment earnings. RE13.

That aggressive expansion colors outside the statute and raises constitutional concerns. This Court has already deemed the Board's *Thryv* remedy "a novel, consequential-damages-like labor law remedy." *Thryv*, 102 F.4th at 737. Other courts and judges agree. *NLRB v. Starbucks Corp.*, 125 F.4th 78, 96-97 (3d Cir. 2024) (holding that *Thryv* remedy is award of "compensatory damages" that "exceeds the Board's authority under the NLRA"); *3484, Inc. v. NLRB*, 137 F.4th 1093, 1121-27 (10th Cir. 2025) (Eid, J., concurring in part and dissenting in part) (similar). Of the circuits to have addressed the question, only the Ninth Circuit has upheld the *Thryv* remedy, albeit over a vigorous dissent. *Int'l Union of Operating Eng'rs v. NLRB*, 127 F.4th 58, 79-88 (9th Cir. 2025); *but see id.* at 88-99 (Bumatay, J., dissenting). Nonetheless, the Board here doubled down on *Thryv*. RE13 & n.24. This

56

Court should confirm that the Board lacks authority to award compensatory damages.[5]

*Thryv* damages constitute classic compensatory damages because they "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citation omitted). But the NLRA does not authorize compensatory damages. The NLRA "limits the Board's remedial authority to equitable, not legal, relief." *Starbucks*, 125 F.4th at 95.

Under Section 10(c), the Board can order employers to "take … affirmative action," such as to "reinstate[] … employees with or without back pay," or to compel inaction, *i.e.*, to "cease and desist from" labor practices deemed unfair. 29 U.S.C. § 160(c). That remedial power sounds in pure equity, which "compel[s] action or inaction." Samuel L. Bray, *The System of Equitable Remedies*, 63 UCLA L. Rev. 530, 553 (2016); *see Ex parte Lennon*, 166 U.S. 548, 556 (1897) (explaining that courts of equity could order "restraint of a contemplated or threatened action" and "even require affirmative action"). Unsurprisingly, then, the Supreme Court has repeatedly described the

---

[5] Starbucks has challenged this remedy in another action pending before this Court. *Starbucks v. NLRB*, No. 24-60651 (5th Cir.).

Board's Section 10(c) authority in purely equitable terms. *See, e.g.*, *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945); *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 177-78 n.4 (1973); *see also Starbucks*, 125 F.4th at 95-96 (discussing additional precedents).

Although Section 10(c) authorizes the Board to award monetary relief in the form of "back pay," that limited relief "is based on what an employer has wrongfully withheld" and thus fulfills "an equitable remedy, a form of restitution." *Starbucks*, 125 F.4th at 96 (citation omitted); *see also* Dan B. Dobbs, 1 Law of Remedies 280 (2d ed. 1993) ("To measure restitution, courts look at the defendant's gain or benefit."). The NLRA conspicuously lacks any broader reference to compensatory "damages"—the "classic form of *legal* relief." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993).

Related statutory history confirms the distinction. Congress "modeled" Title VII's remedial provision—Section 706(g)—on Section 10(c). *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419 (1975). And the Supreme Court has held that Section 706(g) "does not allow awards for compensatory … damages." *United States v. Burke*, 504 U.S. 229, 238 (1992). Indeed, when Congress wants to authorize compensatory damages, it says so plainly, and it directs that courts—not agencies—adjudicate such cases. *E.g.*, 29 U.S.C.

58

§ 187(b) (Labor Management Relations Act); 29 U.S.C. § 2617(a)(1)(A)(i)(II) (Family and Medical Leave Act).

The Board's contrary interpretation would infringe Article III and the Seventh Amendment. Claims involving private rights—rights involving "the liability of one individual to another"—must be heard by "Article III judges in Article III courts." *Stern v. Marshall*, 564 U.S. 462, 484, 489-90 (2011) (citations omitted). Likewise, under the Seventh Amendment's jury-trial guarantee, suits involving private rights must include the "right to a jury trial whenever the cause of action is legal in nature." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989); *see also SEC v. Jarkesy*, 603 U.S. 109, 122-23 (2024) (holding that Seventh Amendment guarantees right to jury trial for claims involving "money damages"). Together, these rights ensure that only courts—not agencies—adjudicate private rights, and that juries—not agencies—award common-law remedies.

The Board's interpretation would violate both constitutional guarantees by arrogating to the agency the power to impose the legal relief of compensatory damages. Claims for compensatory damages involve "the liability of one individual to another" akin to tort and contract claims—that is, traditional private rights that courts must adjudicate. *Stern*, 564 U.S. at 489-

59

90 (citation omitted). Allowing the Board to issue such awards improperly hands an agency instead of a jury the right to impose a "prototypical common law remedy." *Jarkesy*, 603 U.S. at 123.

Nor can the *Thryv* remedy survive as one that implicates only "public rights"—*i.e.*, "matters which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018) (cleaned up). Congressionally created rights are not exempt from the Seventh Amendment, and courts must still examine the "nature" of the proceeding to determine whether private rights are implicated. *Id.* at 340. *Thryv* damages squarely implicate private rights.

## B.    The Evidence Does Not Support a *Gissel* Bargaining Order

The Board erred in issuing a bargaining order at the Camp Road store. Through a bargaining order, the Board overrides employees' vote against unionization, bypasses the typical remedy of a new election, and compels the employer to bargain immediately with the union that lost the election. *See generally NLRB v. Gissel Packing Co.*, 395 U.S. 575, 613-16 (1969). Given their extraordinary nature, "*Gissel* orders are limited to exceptional cases

60

where the employer's attempts to circumvent the election process indicate that the Board's traditional remedies cannot ensure a fair election." *Adams & Assocs., Inc. v. NLRB*, 871 F.3d 358, 375 (5th Cir. 2017). Even when such grounds exist, a bargaining order "will not stand if it constitutes 'a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the'" NLRA. *Denton Cnty. Elec. Coop., Inc. v. NLRB*, 962 F.3d 161, 172 (5th Cir. 2020) (citation omitted).

In this Circuit, a stringent test governs the propriety of bargaining orders. *See Cal. Gas Transp., Inc. v. NLRB*, 507 F.3d 847, 853-55 (5th Cir. 2007); *see also Denton Cnty.*, 962 F.3d at 171-74 (vacating bargaining order and faulting Board for failing to apply Fifth Circuit law). What the Board must show to justify a bargaining order depends on the "category" at issue. As relevant here, in a "*Gissel* category II" case, RE121, the Board must show four elements:

> (a) the union had valid authorization cards from a majority of employees in an appropriate bargaining unit; (b) the employer's unfair labor practices, although not outrageous and pervasive enough to justify a bargaining order in the absence of a card majority, were still serious and extensive; (c) the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight; and (d) employee sentiment can best be protected in the particular case by a bargaining order.

*Cal. Gas*, 507 F.3d at 854-55 (cleaned up).

61

Starbucks does not dispute that the union initially secured authorization cards from a majority of eligible Camp Road employees,[6] satisfying the first factor. Yet the Board failed to justify a bargaining order under the remaining elements.

For starters, the Board's cursory analysis neglects to identify unfair labor practices at the Camp Road store that were both sufficiently "serious and extensive." *Cal. Gas*, 507 F.3d at 855. Long on rhetoric but short on record citations, the Board accused Starbucks of "perpetrat[ing] specifically at the Camp Road store" so-called "hallmark" violations "*like* a coercive grant of benefits," a "retaliatory demotion," and a "threat of a loss of benefits." RE13 (emphasis added). But the Board did not identify any such violations at Camp Road. Perhaps for good reason: at the Camp Road store, the only instance of a supposed "grant of benefits" is the offer of promotion to two partners in August 2021—only one of whom was engaged in Union organizing. RE8, 57. Likewise, the only supposed retaliatory "demotions" at the Camp Road store were two instances of reductions in employee hours occurring months apart during a five-month period. RE6-7, 61-62. And even the ALJ

---

[6] In August 2021, a sixteenth employee of Camp Road's then-thirty eligible employees signed a union authorization card. RE2, 34.

noted that some reductions coincided with undisputed overstaffing at that location. RE62.

Even if credited, these occurrences fall far short of "serious and extensive" violations warranting a bargaining order. *See, e.g.*, *Cal. Gas*, 507 F.3d at 855 (employer "interrogated and threatened employees, created the impression of surveillance, promised benefits if the Union lost, terminated two employees … who were leading the unionization effort, provided negative employment references for [those employees], refused to bargain with the Union, and engaged in direct-dealing"); *NLRB v. USA Polymer Corp.*, 272 F.3d 289, 293, 297 (5th Cir. 2001) (employer threatened employees with "more onerous working conditions" and "physical harm" and fired 39 of 68 non-supervisory employees). Starbucks did not terminate a single Camp Road store employee. Nor does the record establish "threats" anywhere close to those in cases upholding a *Gissel* order.

The Board further departed from the correct legal analysis by improperly padding the record with Starbucks' supposed misconduct at other "Buffalo-area stores." RE13-14. To justify this bootstrapping, the Board cited its decision in *California Gas Transport, Inc.*, 347 NLRB 1314 (2006). But in enforcing the Board's order in that case—including its *Gissel* order directed

63

at one facility—this Court *declined* to endorse the aggregation that the Board embraced here, instead limiting the analysis to violations at the at-issue facility. *Compare Cal. Gas*, 507 F.3d at 854 ("[T]he unfair labor practices committed in Nogales alone justify a *Gissel* Order under the category II analysis…"), *with id.* at 857 (King, J., concurring) (writing alone to argue in favor of considering violations elsewhere).

The Board made unjustified inferences about the pervasiveness of the supposed Buffalo-area misconduct—"inferr[ing] that the coercive tendency of" terminations elsewhere would affect Camp Road partners. RE14. But there is no record evidence that Camp Road partners knew of those terminations. To the contrary, the Board ignored testimony that occurrences elsewhere had no impact on the Camp Road election, when store employees voted fairly to reject unionization. ROA.3276-77.

The *Gissel* order also cannot stand because the Board failed to show the third and fourth factors. At bottom, "the overriding inquiry in determining whether a Gissel Order should issue [is] whether a fair election could have been held at the time of the Board's decision." *Cal. Gas*, 507 F.3d at 856. The Board failed to meaningfully consider the possibility of a new election, much less determine that one *could not* be fairly held. Instead, the Board strained to

64

issue an order mandating unionization based on the union securing the barest majority—16 of 30—in August 2021, months before a December vote rejecting union representation by a decisive vote of 12-8 (with 9 not participating). RE61. That one-sided push for unionization, against the best indicia of employee sentiment, should not stand. *See Denton Cnty.*, 962 F.3d at 172.

## C. The Order To Reopen the Galleria Kiosk Is Unlawful

As explained above, Starbucks closed the Galleria kiosk in September 2021 for legitimate, non-retaliatory reasons. *See supra* p.49. Disagreeing, the ALJ ordered Starbucks to "[r]estore the operation of the Walden Galleria kiosk as it existed prior to September 2021." RE128(ff). The Board disclaimed any need to reexamine the remedy, contending that it was Starbucks' burden to first "demonstrate the affirmative defense of undue hardship." RE13 n.23.

Not so. Case law and common sense present an independent, threshold question of whether such an order is even possible. *See RAV Truck & Trailer Repairs, Inc. v. NLRB*, 997 F.3d 314, 330-31 (D.C. Cir. 2021) (distinguishing undue-burden inquiry from "the legal legitimacy of an order that purports to compel a company to 'reopen' an operation that no longer exists"); *Mid-S. Bottling Co. v. NLRB*, 876 F.2d 458, 461 n.2 (5th Cir. 1989) (order to resume operations might be inappropriate "even without a showing of undue burden").

The Board lacks authority to order a party to achieve outcomes that are factually impossible or that require decisions or actions of non-parties. *See Douglas Foods Corp. v. NLRB*, 251 F.3d 1056, 1064 (D.C. Cir. 2001). That includes orders to "restore … operations as they existed prior to" a certain date if that outcome is not unilaterally achievable by the sanctioned party. *Id.*

Here, as the ALJ noted, Starbucks no longer controls the kiosk, which is now "owned and operated by the Walden Galleria as a licensed store." RE67; ROA.2853.[7] Resuming ownership of the location and then restarting its operation "as it existed" years ago (whatever that vague directive means) would depend, at the very least, on the assent of the mall that now owns and operates that location. Nor is there evidence that the location could still operate in the same manner (*e.g.*, with the same number of employees). Mandating that Starbucks achieve an end dictated by circumstances beyond Starbucks' control situates this order outside the Board's authority.

### D.    The Board's Notice-Reading Remedy Is Unwarranted

The Board erred in ordering Starbucks to send a "high-ranking management" official to witness the reading of the notice crafted by the Board.

---

[7] *See also* Walden Galleria, https://tinyurl.com/4rrcm4f5.

RE19(cc).  Public-notice reading is an extraordinary remedy warranted only for "repeat violator[s]" whose conduct created a "chill atmosphere of fear" that cannot be ameliorated by traditional remedies.  *Denton Cnty.*, 962 F.3d at 174; *see also HTH Corp. v. NLRB*, 823 F.3d 668, 673 (D.C. Cir. 2016) (likening notice reading to "the system of 'criticism-self-criticism' devised by Stalin and adopted by Mao").

Starbucks was not a "repeat violator," which would require that violations persisted in the Buffalo area "despite intervening declarations of illegality" (*i.e.*, judicial declarations).  *UNF W., Inc. v. NLRB*, 844 F.3d 451, 463 (5th Cir. 2016) (citation omitted).  Nor does the Board's order show that Starbucks "created a chill atmosphere of fear" that—years later—requires a punitive public spectacle to erase.

It is not enough that Starbucks' violations were supposedly "numerous and serious."  RE15.  This Court in *Denton County* rejected that argument, disagreeing that the seriousness or pervasiveness of violations could justify public-notice reading for a non-repeat violator.  962 F.3d at 174.  *Denton County* requires vacating this remedy.

## CONCLUSION

This Court should deny enforcement.

Respectfully submitted,

/s/ Lisa S. Blatt

| | |
|---|---|
| JEFFREY S. HILLER | LISA S. BLATT |
| LITTLER MENDELSON, P.C. | AMY MASON SAHARIA |
| *41 S. High St., Ste. 3250* | DANIELLE J. SOCHACZEVSKI |
| *Columbus, OH 43215* | KEES D. THOMPSON |
| | CLAIRE R. CAHILL |
| JONATHAN O. LEVINE | SEPHORA D. GREY |
| LITTLER MENDELSON, P.C. | WILLIAMS & CONNOLLY LLP |
| *1111 E. Kilbourn Ave., Ste. 1000* | *680 Maine Avenue, S.W.* |
| *Milwaukee, WI 53202* | *Washington, DC 20024* |
| | *(202) 434-5000* |
| DATED:  JULY 16, 2025 | *lblatt@wc.com* |

68

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the Fifth Circuit by using the appellate NextGen system. I certify that all participants in the case are registered NextGen users and that service will be accomplished by the appellate NextGen system.

DATED: JULY 16, 2025

/s/ *Lisa S. Blatt*
LISA S. BLATT

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, that the attached Brief of Petitioner/Cross-Respondent contains 12,998 words and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2019, in 14-point CenturyExpd BT.

DATED: JULY 16, 2025

/s/ *Lisa S. Blatt*
LISA S. BLATT