**Appellee's Brief**

No. 24-60650

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### STARBUCKS CORPORATION,

**Petitioner/Cross-Respondent**

**v.**

### NATIONAL LABOR RELATIONS BOARD,

**Respondent/Cross-Petitioner**

_____

### ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

_____

### BRIEF FOR THE NATIONAL LABOR RELATIONS BOARD

_____

**AMY H. GINN**
*Supervisory Attorney*

**HEATHER S. BEARD**
*Senior Attorney*

**ERIC WEITZ**
*Attorney*

***National Labor Relations Board***
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-2942**

**WILLAM B. COWEN**
*Acting General Counsel*
**STEPHANIE CAHN**
*Acting Deputy General Counsel*
**PETER SUNG OHR**
*Associate General Counsel*
**RUTH E. BURDICK**
*Deputy Associate General Counsel*
**MEREDITH JASON**
*Assistant General Counsel*

**National Labor Relations Board**

## STATEMENT REGARDING ORAL ARGUMENT

The National Labor Relations Board submits that this case does not require oral argument because it involves the application of established legal principles to factual findings that are well supported by the record evidence.  However, if the Court determines that oral argument would be of assistance, the Board respectfully requests the opportunity to participate.

# <u>TABLE OF CONTENTS</u>

**Headings**                                                    **Page(s)**

Statement regarding oral argument ........................................................ i

Table of contents.................................................................................. ii

Table of authorities ............................................................................ vi

Jurisdictional statement.......................................................................1

Issue statement....................................................................................2

Statement of the case .........................................................................3

II.    Significant factual findings ......................................................3

      A.    Background; the Union publicly launches its campaign in Buffalo ......3

      B.    The Union-representation petitions, elections and certifications...........4

      C.    Starbucks corporate officials descend on Buffalo and attribute union activity to widespread facilities issues and stores "not being up to standard" ........................................................................5

      D.    Starbucks immediately begins soliciting employee grievances and promising and granting benefits ............................................................7

      E.    Corporate officials instruct store managers to monitor and respond to union activities. ................................................................................8

      F.    Corporate-assigned support managers wear headsets to listen to employee conversations. ...................................................................9

      G.    Starbucks holds "listening sessions," solicits grievances, and promises benefits to employees ..........................................................11

## <u>TABLE OF CONTENTS (cont'd)</u>

**Headings**                                                                **Page(s)**

H.    Starbucks undertakes massive store repairs and renovations, with an out-of-state facilities manager overseeing lightning-speed upgrades ....................................................................................12

I.    "Level-setting" ..................................................................13

J.    Starbucks imposes more onerous working conditions ........................14

II.    Procedural history .........................................................15

III.    The Board's conclusions and Order ...........................................15

Summary of argument...................................................................17

Standard of review ......................................................................18

Argument....................................................................................19

I.    The Board is entitled to summary enforcement of the portions of its Order remedying uncontested or inadequately challenged unfair-labor-practice findings.........................................................................19

II.    Substantial evidence supports the Board's findings that Starbucks committed numerous Section 8(a)(1) violations .........................................23

A.    Unlawful promises and grants of benefits; solicitation and promise to remedy grievances..........................................................23

B.    Unlawful announcement of a wage increase ....................................30

C.    Unlawful threats of coercion ...........................................31

D.    Unlawful interrogation ....................................................32

E.    Unlawful surveillance ....................................................33

## <u>TABLE OF CONTENTS (cont'd)</u>

**Headings**                                                                      **Page(s)**

III.    Substantial evidence supports the Board's findings that Starbucks
committed numerous Section 8(a)(3) and (4) violations ............................36

    A.    Starbucks unlawfully discriminated against employees by more
strictly enforcing work rules following announcement of the
organizing campaign.........................................................................38

    B.    The Board's additional findings of discrimination stand largely
unchallenged; Starbucks's limited arguments on review are
unavailing ......................................................................................43

        1.    The purported errors ............................................44

            a.  The Board's findings that Starbucks acted at all times
with knowledge of employees' union activity is
supported by substantial evidence ......................................44

            b.  The Board properly relied on Starbucks's many
contemporaneous violations as evidence of its motive .......46

        2.    Starbucks' limited challenges to six unlawful-discharge
findings fail............................................................47

        3.    Starbucks only cursorily, and unpersuasively, defends its
closure of the Galleria kiosk ...................................52

IV.    Substantial evidence supports the Board's finding that Starbucks
violated Section 8(a)(5) and (1) of the Act.................................................53

V.    The Board reasonably tailored its Order to remedy Starbucks's extensive
campaign of unlawful conduct ...................................................................55

    A.    The Board acknowledges that only partial enforcement of its
make-whole order is permitted in this Circuit ...................................55

## <u>TABLE OF CONTENTS (cont'd)</u>

**Headings** **Page(s)**

B.    The Board did not abuse its discretion by issuing a remedial bargaining order for the Camp Road store..........................................56

C.    The Court lacks jurisdiction to entertain Starbucks's objection to the Board's order to reopen the Galleria kiosk ..................................61

D.    The Board did not abuse its discretion by including a notice-reading requirement for the Buffalo-area stores ................................64

Conclusion....................................................................................................66

Certificate of service ....................................................................................67

Certificate of compliance .............................................................................68

v

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*800 River Rd. Op. Co.*,
　369 NLRB. No. 109 ...........................................................................54

*Am. Art Indus., Inc.*,
　166 NLRB 943 (1967), *enforced*,
　415 F.2d 1223 (5th Cir. 1969)...........................................................29

*American Sunroof Corp.*,
　248 NLRB 748 (1980) ........................................................................25

*Cal. Gas Transp. v. NLRB*,
　507 F.3d 847 (5th Cir. 2007)...............................................56, 58, 60

*Care One at Madison Ave., LLC v. NLRB*,
　832 F.3d 351 (D.C. Cir. 2016) ...........................................................24

*Cent. Freight Lines Inc. v. NLRB*,
　653 F.2d 1023 (5th Cir. 1981)............................................................50

*Charter Communications, LLC*,
　366 NLRB No. 46 (2018), *enforced*,
　939 F.3d 798 (6th Cir. 2019)........................................................34, 35

*Chromalloy Mining & Minerals Alaska Div. v. NLRB*,
　620 F.2d 1120 (5th Cir. 1980)...........................................................28

*Conley Trucking*,
　349 NLRB 308 (2007), *enforced*,
　520 F.3d 629 (6th Cir. 2008)............................................................35

*Contemporary Cars, Inc. v. NLRB*,
　814 F.3d 859 (7th Cir. 2016)............................................................24

*Cordua Rests., Inc. v. NLRB*,
　985 F.3d 415 (5th Cir. 2021)...................................... 19, 20, 37, 41, 42

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                              **Page(s)**

*Daikichi Sushi,*
   335 NLRB 622 (2001), *enforced,*
   56 F. App'x 516 (D.C. Cir. 2003) ....................................................32

*Data Sys. Corp. v. NLRB,*
   985 F.2d 801 (5th Cir. 1993) ........................................................37

*Delchamps, Inc. v. NLRB,*
   585 F.2d 91 (5th Cir. 1978)....................................................33, 45

*Denton Country Electric Cooperative v. NLRB,*
   962 F.3d 161 (5th Cir. 2020) ........................................................64

*Detroit Edison Co. v. NLRB,*
   440 U.S. 301 (1979)......................................................................19

*El Paso Elec. Co. v. NLRB,*
   681 F.3d 651 (5th Cir. 2012) ........................................................18

*Evergreen Am.,*
   348 NLRB 178 (2006), *enforced,*
   531 F.3d 321 (4th Cir. 2008)........................................................57

*Fibreboard Paper Prods. v. NLRB,*
   379 U.S. 203 (1964)......................................................................55

*Fla. Steel Corp. v. NLRB,*
   620 F.2d 79 (5th Cir. 1980)..........................................................65

*Flex Frac Logistics, LLC v. NLRB,*
   746 F.3d 205 (5th Cir. 2014) ........................................................18

*Friedel v. City of Madison,*
   832 F.2d 965 (7th Cir.1987)..........................................................21

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                    **Page(s)**

*Gelita USA Inc.*,
  352 NLRB 406 (2008), *adopted,*
  356 NLRB 467 (2011) ..................................................................29

*Hendrix Mfg. Co. v. NLRB*,
  321 F.2d 100 (5th Cir. 1963) ........................................................34

*Hiran Management v. NLRB*,
  --- F.4th ---, 2025 WL 3041862 (5th Cir. 2025) .............................56

*Holly Farms*,
  311 NLRB 273 (1993), *enforced,*
  48 F.3d 1360 (4th Cir. 1995) ........................................................58

*Holsum de P.R., Inc.*,
  344 NLRB 694 (2005), *enforced,*
  456 F.3d 265 (1st Cir. 2006) .........................................................20

*Hudson Inst. of Process Rsch. Inc. v. NLRB*,
  117 F.4th 692 (5th Cir. 2024) .......................................................19

*IBEW Local Unions 605 & 985 v. NLRB*,
  973 F.3d 451 (5th Cir. 2020) ........................................................31

*Indep. Elec. Contractors, Inc. v. NLRB*,
  720 F.3d 543 (5th Cir. 2013) ........................................................31

*In-N-Out Burger, Inc. v. NLRB*,
  894 F.3d 707 (5th Cir. 2018) ........................................................18

*Intertape Polymer Corp.*,
  372 NLRB No. 133 (2023), *enforced mem.,*
  2024 WL 2764160 (6th Cir. 2024) ...........................................37, 46

*J.P. Stevens & Co. v. NLRB*,
  417 F.2d 533 (5th Cir. 1969) ........................................................64

# TABLE OF AUTHORITIES (cont'd)

**Cases** **Page(s)**

*J.P. Stevens & Co. v. NLRB*,
441 F.2d 514 (5th Cir. 1971)................................................................60

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)............................................................................18

*Marathon LeTourneau Co., Longview Div. v. NLRB*,
699 F.2d 248 (5th Cir. 1983)..............................................................44

*Marriott Corp.*,
310 NLRB 1152 (1993) ......................................................................28

*Medo Photo Supply Corp. v. NLRB*,
321 U.S. 678 (1944)............................................................................23

*Metro. Edison Co. v. NLRB*,
460 U.S. 693 (1984)............................................................................36

*Mid-South Bottling Co. v. NLRB*,
876 F.2d 458 (5th Cir. 1989)........................................................61, 63

*Miller Plastic Prods. Inc. v. NLRB*,
141 F.4th 492 (3d Cir. 2025)..............................................................38

*Network Dynamics Cabling*,
351 NLRB 1423, 1424 (2007)............................................................24

*New Orleans Cold Storage & Warehouse Co. v. NLRB*,
201 F.3d 592 (5th Cir. 2000)..............................................................36

*Newburg Eggs, Inc.*,
357 NLRB 2191 (2011) ......................................................................29

*NLRB v. ADCO Elec. Inc.*,
6 F.3d 1110 (5th Cir. 1993)................................................................36

*NLRB v. Anchorage Times Publ'g*,
637 F.2d 1359 (9th Cir. 1981)............................................................59

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                               **Page(s)**

*NLRB v. Associated Milk Producers, Inc.*,
   711 F.2d 627 (5th Cir. 1983) ...................................................... 42

*NLRB v. Camco, Inc.*,
   340 F.2d 803 (5th Cir. 1965) ...................................................... 33

*NLRB v. Curtin Matheson Sci.*,
   494 U.S. 775 (1990) ...................................................... 19

*NLRB v. Eagle Material Handling, Inc.*,
   558 F.2d 160 (3d Cir. 1977) ...................................................... 24

*NLRB v. Exch. Parts Co.*,
   375 U.S. 405 (1964) ...................................................... 23

*NLRB v. Gissel Packing*,
   395 U.S. 575 (1969) ...................................................... 31, 56, 60

*NLRB* v. *Katz*,
   369 U.S. 736 (1962) ...................................................... 53

*NLRB v. Mooney Aircraft, Inc.*,
   310 F.2d 565 (5th Cir. 1962) ...................................................... 21

*NLRB v. Nueva Eng'g, Inc.*,
   761 F.2d 961 (4th Cir. 1985) ...................................................... 33

*NLRB v. Rexall Chem. Co.*,
   418 F.2d 603 (5th Cir. 1969) ...................................................... 23

*NLRB v. Transp. Mgmt. Corp.*,
   462 U.S. 393 (1983) ...................................................... 37

*NLRB v. United Mineral Corp.*,
   391 F.2d 829 (2d Cir. 1968) ...................................................... 28

*NLRB v. Wagner Elec. Corp.*,
   586 F.2d 1074 (5th Cir. 1978) ...................................................... 19

x

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                          **Page(s)**

*NLRB v. WKRG-TV,*
   470 F.2d 1302 (5th Cir. 1973) ..............................................23, 24, 59

*Parsippany Hotel Mgmt. Co. v. NLRB,*
   99 F.3d 413 (D.C. Cir. 1996) ...........................................................40

*Perdue Farms v. NLRB,*
   144 F.3d 830 (D.C. Cir. 1998) .........................................................31

*Poly-Am., Inc. v. NLRB,*
   260 F.3d 465 (5th Cir. 2001) ...........................................................45

*Pope Maint. Corp.,*
   573 F.2d 898 (5th Cir. 1978) ...........................................................24

*Purolator Armored, Inc. v. NLRB,*
   764 F.2d 1423 (11th Cir. 1985) .......................................................53

*Quickway Transp. v. NLRB,*
   117 F.4th 789 (6th Cir. 2024) ....................................................61, 62

*RAV Truck & Trailer Repairs v. NLRB,*
   997 F.3d 314 (D.C. Cir. 2021) .........................................................63

*Remington Lodging & Hosp., LLC v. NLRB,*
   847 F.3d 180 (5th Cir. 2017) ...........................................................48

*Rollins v. Home Depot USA,*
   8 F.4th 393 (5th Cir. 2021) ..............................................................21

*Roure Bertrand Dupont, Inc.,*
   271 NLRB 443 (1984) ......................................................................42

*Ryder Truck Rental v. NLRB,*
   401 F.3d 815 (7th Cir. 2005) ...........................................................22

*Spengler-Loomis Mfg. Co.,*
   95 NLRB 243 (1951) ........................................................................27

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                **Page(s)**

*St. Francis Fed'n of Nurses v. NLRB*,
  729 F.2d 844 (D.C. Cir. 1984) ........................................................25

*Starbucks Corp.*,
  360 NLRB 1168 (2014) ...................................................................64

*Starbucks Corp.*,
  372 NLRB No. 50 (2023), *enforced in relevant part*,
  125 F.4th 78 (3d Cir. 2024) .............................................................64

*Stephens Media Grp.-Watertown*,
  371 NLRB No. 11 (2021).................................................................62

*Supershuttle of Orange Cnty., Inc.*,
  339 NLRB 1 (2003) .........................................................................50

*Texaco v. NLRB*,
  436 F.2d 520 (7th Cir. 1971) ...........................................................30

*The Broadway*,
  267 NLRB 385 (1983) .....................................................................34

*Thryv, Inc.*,
  372 NLRB No. 22 (2022), *enforcement denied on other grounds*,
  102 F.4th 727 (5th Cir. 2024)...........................................................55

*U Save Foods*,
  341 NLRB 161 (2004) ...............................................................27, 29

*UNF West, Inc.*,
  844 F.3d 451 (5th Cir. 2016)..................................................22, 32, 55

*Wal-Mart Stores, Inc.*,
  339 NLRB 1187 (2003) .............................................................27, 28

*We Can, Inc.*,
  315 NLRB 170 (1994) .....................................................................62

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                    **Page(s)**

*Westwood Healthcare Ctr.*,
  330 NLRB 935 (2000) ................................................................32

*Woelke & Romero Framing, Inc. v. NLRB*,
  456 U.S. 645 (1982)................................................................31

*Wright Line*,
  251 NLRB 1083 (1980), *enforced on other grounds*,
  662 F.2d 899 (1st Cir. 1981) .......................................36, 37, 42, 47

**Statutes**                                                 **Page(s)**

National Labor Relations Act, as amended
  (29 U.S.C. § 151 et seq.)

29 U.S.C. § 157 ......................................................................15, 22
29 U.S.C. §158(a)(1)...........................................................15, 38, 53
29 U.S.C. §158(a)(3)...........................................................15, 36, 38
29 U.S.C. §158(a)(4)...............................................................15, 36
29 U.S.C. §158(a)(5)...............................................................15, 53
29 U.S.C. § 160(a) ...................................................................... 2
29 U.S.C. § 160(c) ......................................................................55
29 U.S.C. §160(e) ........................................... 2, 18, 19, 20, 31
29 U.S.C. § 160(f).......................................................................... 2

**Rules**                                                    **Page(s)**

Fed. R. App. P. 28(a)(8)(A) ................................................................21

**Regulations**                                              **Page(s)**

29 C.F.R. § 102.46(a)(1)(ii) ................................................................20

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————————————

### No. 24-60650

————————————

### STARBUCKS CORPORATION

**Petitioner/Cross-Respondent**

### v.

### NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

————————————

### ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR
### ENFORCEMENT OF AN ORDER OF
### THE NATIONAL LABOR RELATIONS BOARD

————————————

### BRIEF FOR RESPONDENT/CROSS-PETITIONER
### THE NATIONAL LABOR RELATIONS BOARD

————————————

### JURISDICTIONAL STATEMENT

This case is before the Court on the petition of Starbucks Corporation to

review, and the cross-application of the National Labor Relations Board to enforce,

the December 16, 2024 Board Order against Starbucks reported at 374 NLRB No.

10.  (RE.1-134.)[1]  The Board had jurisdiction over the unfair-labor-practice

————————————

[1] "RE" refers to record excerpts on appeal; "ROA" to the record on appeal.

proceeding below under Section 10(a) of the National Labor Relations Act ("the Act"), as amended, 29 U.S.C. § 160(a), which empowers the Board to prevent unfair labor practices affecting commerce. The Board's Order is final. The Court has jurisdiction under Section 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f). Venue is proper because Starbucks transacts business in this Circuit. Starbucks's petition and the Board's cross-application were timely because the Act imposes no time limits for such filings.

## ISSUE STATEMENT

1.    Whether the Board is entitled to summary enforcement of the portions of its Order remedying uncontested or inadequately challenged unfair labor practices.

2.    Whether substantial evidence supports the Board's findings that Starbucks committed numerous serious and extensive violations of the Act under the following statutory provisions:

      a.    Coercive actions prohibited by Section 8(a)(1);

      b.    Discrimination prohibited by Sections 8(a)(3), (4), and (1);

      c.    Bargaining violations prohibited by Section 8(a)(5), and (1).

3.    Whether the Board reasonably tailored its Order to remedy Starbucks's extensive unlawful conduct.

2

**STATEMENT OF THE CASE**

The record overwhelmingly demonstrates that Starbucks committed numerous violations of the Act to thwart the first coordinated, well-publicized union campaign it had ever faced.  Starbucks fails to properly contest most of the unfair labor practices found and virtually ignores the Board's painstakingly thorough findings grounded in ample credited evidence.  It practically admits, as it must, that its battalion of corporate officials' unprecedented actions were taken in response to the union campaign.

Given the scope of the violations and the nominal nature of Starbucks's challenges, the specific facts of each properly contested issue are addressed in the relevant Argument section.  Next, we briefly state additional necessary facts, focusing on Starbucks's extreme union animus, which are conspicuously missing from its brief.

## I.     SIGNIFICANT FACTUAL FINDINGS

### A.     Background; the Union Publicly Launches Its Campaign in Buffalo

On August 23, 2021, Workers United ("the Union") posted an employee-signed letter addressed to Starbucks's then-CEO, Kevin Johnson, on social media. (RE.1,33;ROA.3877-79.)  The "Dear Kevin" letter announced a union-organizing campaign focused on and including employees from across Starbucks's Buffalo

market.[2]  (RE.1,33;ROA.3877-79.)  The letter stated that "we don't see our desire to organize as a reaction to specific policies but as a commitment to making Starbucks, Buffalo, and the world a better place."  (RE.103;ROA.3877-79.)  The 49 Buffalo-area employees who signed the letter included many of the employees impacted by Starbucks's actions in this case.  (RE.34;ROA.3877-79.)  After launching the campaign, employees at multiple Buffalo stores continued soliciting authorization cards to support holding representation elections, and openly engaged in other union activity.  (RE.5,40,50,56-57,62,64,79-80,86-87,89; ROA.948,1074,1123,1140-48,1280.)  Shortly after the Union began organizing at Starbucks's Galleria kiosk, half of whose employees signed the "Dear Kevin" letter, Starbucks abruptly closed it.  (RE.109;ROA.1290.)

### B.    The Union-Representation Petitions, Elections, and Certifications

On August 30, just after announcing its campaign, the Union petitioned for union-representation elections at three Buffalo stores.  (RE.34;ROA.2316,2318.)  Between September 2021 and March 2022, it petitioned to represent employees at nine additional stores.  (RE.34,ROA.2316,2318,3881-3976.)  Following Board-

---

[2] There are 21 stores in Buffalo, which is part of Starbucks's Area 156 covering a territory from Buffalo in the west to Saratoga Springs in the east.  (RE.33.)

conducted elections, the Union was certified to represent employees at the

following stores:

|  | Election | Certification |
|---|---|---|
| Elmwood | December 9 | December 17 |
| Genesee Street | December 9 | January 10, 2022 |
| Sheridan & Bailey<br>Transit & French | March 9 | March 17 |
| Delaware & Chippewa<br>Monroe Avenue | April 7 | April 15 |
| East Robinson | June 16 | July 14 |
| Transit Commons | July 11 | July 19 |

(RE.34,50,55,61,62,64,65,68,71,105,111;ROA.947-48,2316,2318,3881-3976).  At

the Camp Road store, where 16 of 29-30 unit employees signed authorization cards

by August 31 (RE.121), the Union lost a December 9 election 12 to 8.

(RE.2,13,19,34,56-58,61-62,95,113,120-22.)

### C. Starbucks Corporate Officials Descend on Buffalo and Attribute Union Activity to Widespread Facilities Issues and Stores "Not Being Up to Standard"

Immediately after seeing the "Dear Kevin" letter, a corporate team of some

of Starbucks's most senior national executives, including Rossann Williams, then-

executive vice president of Starbucks North America and the president of

Starbucks U.S., arrived in Buffalo ("the Williams Team.")  (RE.5,33-34;ROA.54-

55.)  The Williams Team included Allyson Peck, regional vice president; Deanna

Pusatier, the former regional director in Boston who in July 2021 had been made

5

Regional Director for Area 156; Emily Filc, a temporary regional director serving as a partner resource manager supporting Pusatier; Kristina Mkrtumyan and Mark Szto, district managers; and Michaela Murphy and Greta Case, support district managers. (RE.34-35;ROA.112,786,864,875,1098-99,1614,2105-06.) The Williams Team also included district managers from other parts of the country who were to serve as store-level support managers for existing Buffalo store managers, and facilities employees.[3] (RE.34-35;ROA.112,786,864,875,1098-99,1614,2105-06.)

The day after the "Dear Kevin" letter, Buffalo District Manager David LeFrois, who oversaw Elmwood and Genessee, two of the first stores to begin organizing, was reportedly seen in those stores for the first time in years. (RE.40n.81,95;ROA.1155,1216,1926.) Shortly thereafter, senior executives pulled LeFrois away from group meetings to talk to him "about Union issues" and soon after that fired him. (RE.35,40n.45;ROA.1848-50,2832.)

The Williams Team immediately held meetings with regional, district, and store managers about the union campaign. (RE.35; ROA.1848-50.) In late August

---

[3] Area 156, like other regions in Starbucks's U.S. market, is managed by a regional director supervising a team of district managers, who in turn supervise store managers and assistant store managers. Store managers and assistant store managers supervise shift supervisors and baristas (employees). (RE.25.) Despite their title, it is undisputed that shift supervisors are considered employees.

or early September, Regional Vice President Peck, Regional Manager Pusatier (now responsible for the Buffalo market as part of Area 156), and Resources Manager Filc held a call with Buffalo-area store managers.  (RE.35;ROA.1848-50.)  Peck stated that although Pusatier and Filc had previously said employees could wear pro-union pins in stores, managers should instead prohibit employees from wearing them.  (RE.36;ROA.1850-51.)

Peck also told the managers that the union activity was not because employees had any concerns, but rather, because Buffalo-area stores were "not to standard."  (RE.36;ROA.1850-51.)  When Transit Commons Store Manager David Almond asked what Peck meant by that, Peck said that managers were not "holding employees accountable" or providing sufficient training, and there were "widespread facilities issues."  (RE.36; ROA.1850-51.)  Almond commented that managers had tried to address such issues before but were usually told to wait because no money was available.  (RE.36;ROA.1851.)

### D.    Starbucks Immediately Begins Soliciting Employee Grievances and Promising and Granting Benefits

Starbucks began asking employees across its Buffalo stores how it could make working conditions better.  (RE.2,35,38-67,69,73,78,87,88,90,95-97; ROA.3975-4037,4481,4625,4534-35,5178-5250,5297-5351.)  For example, LeFrois asked Elmwood and Genessee employees if they had concerns, needed

support, or had any suggestions for improvements.  (RE.2,35,50;ROA.691-93,747-48,2150-51.)  On the day the union campaign went public, Camp Road Store Manager David Fiscus offered promotions to two employees seemingly out of the blue—one of whom, William Westlake, was involved in organizing the store. (RE.8;ROA.1151-53.)

Previously, Starbucks allotted specific amounts of labor to each Buffalo store based on its revenue-forecasting system.  By late September, available labor hours for employees at the Transit Commons store suddenly increased by 60 hours every week.  (RE.36;ROA.1843,1848-50.)

### E.    Corporate Officials Instruct Store Managers To Monitor and Respond to Union Activities

Contemporaneously, corporate officials instructed managers to monitor union activities.  (RE.63;ROA.1855-56.)  District Manager Murphy criticized Almond for not realizing that employees were discussing unionization and filling out authorization cards, ordering him to change the schedule so that either he or Mary Harris, a corporate-supplied support manager, were always present. (RE.63;ROA.1855-56.)  Murphy stressed that a constant managerial presence was needed to make employees feel uncomfortable discussing the Union and urged Almond to discourage such conversations by interjecting and disagreeing.  (RE.63-64;ROA.422-23,1855-56.)

Support Manager Taylor Pringle told Westlake that employees were not supposed to be talking about wages.  (RE.58;ROA.1167-69.)  Support Manager Ashley Justus would stop union conversations at the Genessee store and then pull perceived instigators aside for counseling—for example, telling Lexi Rizzo that she was not allowed to talk to an off-duty employee about the Union. (RE.51,103;ROA.733-34,756,1234-36,2160-61.)  At East Robinson, Store Manager Letitia Clark instructed Shift Supervisor Victoria Conklin not to give shifts to union supporters, then threatened Conklin with reprisals when she began supporting the Union.  (RE.2n.5,84;ROA.1887-88,2367-69.)  Clark asked Conklin for updates on East Robinson employees who were union supporters. (RE.84;ROA.1888-89.)  At Sheridan & Bailey, managers removed union literature while non-work-related, nonunion materials remained.  (RE.69;ROA.911-12,2094-95.)

###### F.    Corporate-Assigned Support Managers Wear Headsets To Listen to Employee Conversations

The Williams Team assigned support managers to every Buffalo store and visited themselves to talk directly to employees.  (RE.1,36;ROA.1855-56,2710,2729-31,2841-48,3095,3368,3402-03,3461-62.)  Not only had employees never met or seen Williams, Pusatier, Peck, and other corporate leaders in their stores before, they had never heard of support managers.  (RE.35;ROA.

93,417,544,859,1220,1531,2651.)  For most employees, the highest-level
Starbucks official they had encountered in their store was their district manager—
with those visits being few and far between.  (RE.35;ROA.93,417,544,859.)  Now,
in contrast, everyone up to the president of Starbucks North America was fetching
milk and sweeping the floor.  (RE.35;ROA.546-47,1220,1531;ROA.4125-26.)

     Managers also began wearing headsets as a means of monitoring employee
conversations.  (RE.3n.7,52,52n.180,57,57n.219,70;ROA.700-05,2154-
55,2987,3334.)  Previously, at the Genessee store, baristas and shift supervisors
wore headsets all the time for work- and nonwork-related communications.
(RE.52,52n.180;ROA.726-30,789-90,2154-55.)  During the union campaign, a
support manager at Genessee imposed a rule that headsets could only be used by
three employees working at particular stations.  (RE.52;ROA.726-30,789-
90,2154.)  While limiting employee use of headsets, support managers always
wore them, even when off the floor, to monitor operations and employee chatter.
(RE.52;ROA.726-30,789-90,2154.)  As a result, Rizzo and Danka Dragic were
reprimanded for swearing while using headsets.  (RE.52;ROA.726-30,789-
90,2154.)

### G.    Starbucks Holds "Listening Sessions," Solicits Grievances, and Promises Benefits to Employees

On September 2 and 3, Starbucks corporate officials began holding meetings with Buffalo baristas and shift supervisors to elicit their suggestions and complaints.  (RE.38-39;ROA.4215-4305,4314-4405,4476-4573.)  Corporate officials repeatedly stated that Starbucks had held thousands of such listening sessions throughout the country.  (RE.38;ROA.4481.)  Pusatier nonetheless clarified that these sessions were "a little but different than others" because of the union-representation petitions.  (RE.38;ROA.4481.)  Employees responded with complaints about understaffing, wages, insufficient training of new employees, managers' inability to disable mobile orders, supply shortages, fruit-fly plagues, and broken equipment.  (RE.38-39;ROA.4625,4534-35.)

In response, Starbucks went on a hiring boom in some stores that resulted in overstaffing such that there was chaos on the floor, not enough work for employees, and reduced hours.   (RE.41,98;ROA.703-06,1540-41.)

Employees also raised the issue of seniority pay.  (RE.43;ROA.309.)  On October 27, Starbucks announced that, effective January 2022, there would be a better seniority-pay increase than previously announced in July.  (RE.36-37;ROA.4411-19.)

11

### H.     Starbucks Undertakes Massive Store Repairs and Renovations, with an Out-of-State Facilities Manager Overseeing Lightening-Speed Upgrades

Repairs and renovations at Starbucks are typically planned approximately 12 to 18 months in advance.  (RE.37,99;ROA.3429-30,3479.)  Upon arriving in September 2021, however, Mkrtumyan led a team that escalated and implemented renovations and repairs at numerous stores within weeks or months before January 2022.  (RE.37,99;ROA.286-87,565-66,720,725,742,878-88,1104,1179,1417-1418,1541,1557,1637-38,1867-68,1892-93,3011-36.)  Most of the improvements were neither requested nor planned prior to September.  (RE.37;ROA.2855-57,3429-32.)

Michelle Claytor, a facilities manager covering Indiana and Illinois, relocated to Buffalo in September at the request of Denise Nelson, Starbucks's senior vice president.  (RE.37;ROA.3011,3036.)  Claytor repeatedly visited and evaluated every store, retained additional suppliers and building contractors, and generated and prioritized work orders to implement repairs, maintenance, and equipment upgrades.  (RE.37;ROA.3011,3036.)  From September to January, 14 stores underwent renovation while additional stores were treated for numerous issues.  (ROA.99;ROA.286-87,565-66,720,725,742,878-88,1104,1179,1417-18,1541,1557,1637-38,1867-68,1892-93,3011-36.)

12

During the listening sessions, management would steer discussions towards voting "no" in any upcoming election.  (RE.39-40,101-02;ROA.713.)  Officials commented that a union would prevent managers from helping employees on the floor, prevent employees from picking up shifts outside their home stores, possibly leading to fewer benefits and/or no new benefits.  When pressed by employees about how that would happen, officials stated they did not know and were just learning about unions themselves.  (RE.39-40,102;ROA.561,1096,1224, 1228,2110,2431,4215-4305.)

Similarly, Store Manager Patty Shanley told employee Jaz Brisack, right after the campaign went public, that if employees unionized, Shanley would no longer be able to assist by working on the floor. (RE.102;ROA.1518.)  Partner Resources Manager Kate Fenton told employees they could lose the right to pick up shifts at other stores if they chose union representation.  (RE.102;ROA.1395-97.)

## I.  "Level-Setting"

Individual store managers in the Buffalo market historically could enforce Starbucks's rules and policies as they thought appropriate.

(RE.5;ROA.503,741,868,873,994,1244.)  At some stores, enforcement of certain policies—for example, related to attendance and the dress code—was lax.  (RE.5;ROA.476,503,741,868,871-73,994,1005,1244,1702-04.)

After the union campaign began, Starbucks inundated Buffalo stores with additional management staff, charging them with strict enforcement of all company policies.  (RE.5,37;ROA.473-75,3080,3153,3202-03,3336-37,3374-77,3385-86,3408-09.)  Starbucks also compelled all Buffalo-area employees to re-acknowledge its work rules and policies.  (RE.37;58;ROA.1172-73.)  Starbucks did not engage in similar "level setting" in parts of Area 156 where employees were not engaged in union activity.  (RE.34-35,106;ROA.2826-34,2858-59.)

### J.    Starbucks Imposes More Onerous Working Conditions

In the fall, Starbucks routinely granted East Robinson shift-supervisor requests to disable mobile orders, but in February it began requiring more details and rarely granted the requests.  (RE.57,57n.220;ROA.1175-76.)  In the winter, two store managers implemented new minimum-availability policies that required employees to work more hours than they were usually available and/or on days when they had not been available in the past.  (RE.111;ROA.1568).  At one store, a support manager ended the practice of approving shift switches via group chat,

instead requiring employees to call her and contact involved store managers.
(RE.111;ROA.1696.)

## II.     PROCEDURAL HISTORY

The Union filed numerous unfair-labor-practice charges and the Board's
General Counsel later issued multiple consolidated complaints.  After a lengthy
hearing, an administrative law judge (ALJ) issued a decision and recommended
order, finding that Starbucks violated the Act in more than 60 different ways for a
total of more than 125 violations.  (RE.122-24.)

## III.    THE BOARD'S CONCLUSIONS AND ORDER

The Board (Chairman McFerran and Members Prouty and Wilcox) found,
largely in agreement with the ALJ, that Starbucks committed numerous unfair
labor practices under Section 8(a)(1), (3), (4), and (5) of the Act (29 U.S.C.
§158(a)(1), (3), (4) and (5))—ranging from unlawful threats and promises of
benefits to discriminatory employment actions and unilateral changes to unionized
employees' working conditions—in response to unprecedented organizing activity
across 21 stores in Buffalo.  (RE.1-10.)

The Board's Order requires Starbucks to cease and desist from the unfair
labor practices found and from, in any other manner, interfering with, restraining,
or coercing employees in the exercise of their rights under Section 7 of the Act (29

U.S.C. § 157).  Affirmatively, the Order requires Starbucks to:  bargain with the Union before implementing changes to working conditions at its unionized stores; on request, bargain with the Union as the exclusive representative of a unit of employees at the Camp Road store; on request, rescind unilateral changes to bargaining-unit employees' working conditions and restore conditions to those in place before August 23, 2021; make employees whole for any lost earnings and benefits, and any other direct or foreseeable pecuniary harms, resulting from Starbucks's unlawful conduct; offer full reinstatement to all employees who lost their jobs because of Starbucks's unlawful conduct; rescind the unlawful disciplines issued to numerous employees; and expunge any reference in its records to the unlawful discharges, disciplines, and other adverse actions taken against employees.

The Order further requires Starbucks to reopen a store it discriminatorily closed (the Galleria kiosk), and to offer former kiosk employees full reinstatement and make-whole relief in the same above manner.  Finally, the Order requires Starbucks to compensate employees for any adverse tax consequences of a lump-sum backpay award, post remedial notices, and hold notice-reading meetings during work hours at the stores involved in this case.

16

## ARGUMENT SUMMARY

Starbucks attempted to stymie the Union's campaign with swift, extensive, and unprecedented violations of the Act.  It sent massive numbers of corporate officials and top managers from across the country to swarm Buffalo, for the first time ensuring a constant managerial presence during all operating hours.  Acting on its assessment that the campaign was a result of stores "not being up to standard," Starbucks committed numerous carrot-and-stick violations of the Act.  It solicited grievances and simultaneously promised and granted benefits—including a long-desired seniority-based wage increase and massive store renovations—all because employees exercised their organizing rights.  Meanwhile, it coerced employees by threatening them with loss of benefits, interrogating them, and creating the impression of surveillance.

Starbucks simultaneously committed blatant acts of unlawful discrimination against union activity, including by more strictly enforcing store rules across Buffalo (unlawfully failing to bargain in the process).  These actions culminated in the discharge of numerous prominent union activists and came only months after Starbucks sent yet another clear anti-union message by abruptly closing a store in which half of the employees had signed union authorization cards.

Starbucks avoids grappling with the ample record evidence that it committed these hallmark violations of the Act. Indeed, it tellingly ignores the overwhelming evidence while brazenly asserting its unprecedented actions were anodyne policy resets. As shown below, the Board's findings that Starbucks committed "serious and pervasive" violations of the Act are supported by substantial evidence and its remedial order is squarely within the Board's discretion.

## STANDARD OF REVIEW

Judicial review of Board decisions is "limited and deferential." *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir. 2018). This Court will uphold the Board's unfair-labor-practice findings "if they have a reasonable basis in the law and are not inconsistent with [the Act]," and the Board's factual findings "so long as they are supported by 'substantial evidence.'" *Id.* (quoting 29 U.S.C. §160(e)) (citations omitted). "Substantial evidence is that which…a reasonable mind [would] accept as adequate to support a conclusion." *Flex Frac Logistics, LLC v. NLRB*, 746 F.3d 205, 207 (5th Cir. 2014). Accordingly, "[the Court] may not reweigh the evidence, try the case de novo, or substitute [its] judgment for that of the Board, even if the evidence preponderates against the [Board's] decision." *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656 (5th Cir. 2012) (quotation omitted). The Court "give[s] special deference to the Board's credibility determinations,

upholding [them] unless they are inherently unreasonable or self-contradictory."

*Cordua Rests., Inc. v. NLRB*, 985 F.3d 415, 428 (5th Cir. 2021) (quotation

omitted).  Moreover, the Court will "not lightly displace the Board's factual

finding of discriminatory intent." *Id.* at 424.[4]

## ARGUMENT

## I. THE BOARD IS ENTITLED TO SUMMARY ENFORCEMENT OF THE PORTIONS OF ITS ORDER REMEDYING UNCONTESTED OR INADEQUATELY CHALLENGED UNFAIR-LABOR-PRACTICE FINDINGS

Under Section 10(e) of the Act, "no objection that has not been urged before

the Board shall be considered by the Court unless the failure or neglect to urge

such objection shall be excused because of extraordinary circumstances."  29

U.S.C. § 160(e).  Where a party fails to except to the ALJ's finding of a particular

unfair labor practice, it not only forfeits the issue before the Board but forfeits any

opportunity to challenge the finding on appeal.  *Detroit Edison Co. v. NLRB*, 440

U.S. 301, 311 & n.10 (1979); *accord NLRB v. Wagner Elec. Corp.*, 586 F.2d 1074,

---

[4] Starbucks's passing reference (Br.16) to *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), changes nothing about the standard of review.  It is well settled that the Board's legal conclusions will be upheld if "rational and consistent with the Act."  *NLRB v. Curtin Matheson Sci.*, 494 U.S. 775, 786-87 (1990) (citing decades of Supreme Court caselaw); *accord Hudson Inst. of Process Rsch. Inc. v. NLRB*, 117 F.4th 692, 700 (5th Cir. 2024) (discussing *Loper*; stating Board legal conclusions should be affirmed unless "inconsistent with the Act").

1076 n.2 (5th Cir. 1978). Additionally, Board findings that a petitioner does not

challenge in its opening brief are waived on review, entitling the Board to

summary enforcement. *Cordua*, 985 F.3d at 422.

Here, Starbucks did not except to the ALJ's findings that it violated Section

8(a)(1) of the Act by allotting additional available work hours to employees at

certain stores; threatening employee Madison Emler with discipline for raising

employees' health and safety concerns to management; instructing employee

Conklin not to give shifts to union supporters and threatening her with reprisals

once she began supporting the Union; and prohibiting union-related speech during

working time while allowing other non-work-related speech. Nor did Starbucks

except to the ALJ's finding that it violated Section 8(a)(3) and (1) by prohibiting

employee Gianna Reeve from attending a captive-audience meeting and issuing a

verbal warning to employees Reeve and Danka Dragic. (RE.2n.5.)

Furthermore, Starbucks filed a wholly unsupported and therefore inadequate

exception to the ALJ's finding that it violated Section 8(a)(3) and (1) by reducing

the work hours of employees Dragic and Caroline Lerczak after they returned from

a COVID-19 leave of absence. The Board properly "disregard[ed]" that exception,

consistent with its Rules and Regulations. (RE.7n.16 (citing 29 C.F.R. §

20

102.46(a)(1)(ii)).  *See Holsum de P.R., Inc.*, 344 NLRB 694, 694 n.1 (2005)

(disregarding exceptions on same basis), *enforced*, 456 F.3d 265 (1st Cir. 2006).

Given Starbucks's failure to file proper exceptions to the unfair-labor-

practice findings described above, Starbucks cannot challenge them on appeal.  29

U.S.C. § 160(e).  The Board accordingly is entitled to summary enforcement of the

portions of its Order corresponding to the previously uncontested—and now

uncontestable—violations.  *See NLRB v. Mooney Aircraft, Inc.*, 310 F.2d 565, 565-

66 (5th Cir. 1962) (granting summary enforcement based on employer's failure to

preserve challenge via proper exceptions).

The Board is also entitled to summary enforcement of unfair-labor-practice

findings that Starbucks does not challenge in its opening brief except through

generalities (Br.3,39) about "cross-cutting errors" that assertedly "infect" or

permeate "all" Board findings.  Starbucks forfeits arguments "by failing to

adequately brief" them, not addressing the Board's analysis, and not "explain[ing]

how it erred."  *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 & n.1 (5th Cir.

2021).  *See also* Fed. R. App. P. 28(a)(8)(A); *cf. Friedel v. City of Madison,* 832

F.2d 965, 969 (7th Cir.1987) ("It is not the court's duty on appeal to wade through

the record and make arguments for either party.").

21

Accordingly, the Board is entitled to summary enforcement of numerous findings (RE.10-13) that Starbucks either does not mention or gives only cursory treatment.  These include Section 8(a)(1) violations (RE.10-11) such as prohibiting wage-talk, transferring employees to stores with upcoming union elections to dilute pro-union support, discriminatorily restricting employees from talking about the union and posting union literature, newly permitting disabling of mobile ordering (a new benefit), authorizing more work hours, and threatening employees. Starbucks also fails to challenge findings that it violated Section 8(a)(3) by, for example, more strictly enforcing the dress code against an employee wearing a union t-shirt, reducing training and promotion opportunities for certain employees, changing course and prohibiting mobile ordering from being disabled, disconnecting a store's phone line, changing policies on how employees order food and drinks, and denying employee leave requests in retaliation for the unionization campaign.  (RE.11-12.)

Importantly, Starbucks's myriad uncontested violations do not disappear from the case.  Instead, they remain, "lending their aroma to the context in which the contested issues are considered."  *Ryder Truck Rental v. NLRB*, 401 F.3d 815, 819 (7th Cir. 2005) (quotation omitted).  Further, as shown below, Starbucks has shown no basis to disturb the few findings that were preserved for appeal.

22

## II.    SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDINGS THAT STARBUCKS COMMITTED NUMEROUS SECTION 8(a)(1) VIOLATIONS

An employer's conduct violates Section 8(a)(1) of the Act if it has a reasonable tendency to coerce employees in the exercise of their Section 7 right (29 U.S.C. § 157) to form, join or assist labor organizations and to engage in other concerted activities—regardless of whether employees are actually coerced.  *UNF W. v. NLRB,* 844 F.3d 451, 457-58 (5th Cir. 2016).  Starbucks attempted to coerce its employees in varied ways, from promises of benefits to surveillance.

### A.    Unlawful Promises and Grants of Benefits; Solicitation and Promise To Remedy Grievances

An employer violates Section 8(a)(1) by offering to reward employees for rejecting unionization, because such conduct reasonably tends to impinge upon their freedom to choose a collective-bargaining representative.  *Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 685-86 (1944).  As the Supreme Court explained, "[t]he danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove.  Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged."  *NLRB v. Exch. Parts Co.*, 375 U.S. 405, 409-10 (1964); *accord NLRB v. Rexall Chem. Co.,* 418 F.2d 603, 605 (5th Cir. 1969).

The determination whether a grant of benefits violates Section 8(a)(1) under

*Exchange Parts* is motive based.  (RE.3,3n.10.)  *NLRB v. WKRG-TV*, 470 F.2d

1302, 1308 (5th Cir. 1973).[5]  To find a violation, the Board asks whether the entire

record, including any "legitimate reason" proffered by the employer for its promise

or grant of benefits, supports an inference that the promise or grant "was motivated

by an unlawful purpose to coerce or interfere with [employees'] protected union

activity."  *Network Dynamics Cabling*, 351 NLRB 1423, 1424 (2017).

Accordingly, the Act "requires…that the employer make its benefits decisions

precisely as it would if the union were not on the scene."  *Care One at Madison*

*Ave., LLC v. NLRB*, 832 F.3d 351, 357 (D.C. Cir. 2016) (quotation omitted).

Relatedly, grievance-solicitation and promises to fix grievances to induce

disaffection from the union violates Section 8(a)(1).  *NLRB. v. Pope Maint. Corp.*,

573 F.2d 898, 905 (5th Cir. 1978); *Contemporary Cars*, *Inc. v. NLRB*, 814 F.3d

859, 870–71 (7th Cir. 2016) (solicitation of grievances with express or implied

promises to adjust them, with aim of frustrating employees' concerted activity,

unlawful).

---

[5] Starbucks inexplicably claims (Br.19) that the Board did not do a motive analysis (after nonetheless recognizing that the Board explicitly said that such analysis was required (RE.3n.10))—yet the Board explained and upheld the ALJ's relevant findings regarding motive.  (RE.3-4,94-95.)

An announcement or grant of benefits during the critical pre-election period "without a showing of business justification" may, by itself, "[be] deemed evidence of improper motive." *Care One*, 832 F.3d at 358. Starbucks had the burden not only to justify the *need* for new benefits, but also to justify the *timing* of promises and grants bestowed during the union campaign. *St. Francis Fed'n of Nurses v. NLRB*, 729 F.2d 844, 850 (D.C. Cir. 1984). Starbucks failed to establish that it acted pursuant to "an already established company policy" that it "did not deviate from" when the campaign publicly launched. *American Sunroof Corp.,* 248 NLRB 748, 748-49 (1980).

Substantial evidence supports the Board's findings (RE.3-4) that Starbucks made multiple unlawful solicitations and promises to fix employee grievances, and promised and granted benefits to employees, "once it became aware of the employees' union activity" and *because of* that activity. Only after Starbucks learned of the public union campaign did it spring into action descending on the Buffalo market. Peck, a top corporate official, directly and undisputedly told store managers that union activity was because Buffalo-area stores were "not to standard," which she defined in part as having "widespread facilities issues." (RE.36;ROA.1850-51.) Her subordinate corporate officials held countless group listening sessions and one-on-one conversations to solicit employee input as to

what would fix employee concerns, and to promise benefits including long-awaited store repairs and renovations. Starbucks ignores, thus conceding, that Mkrtumyan led a team that implemented renovations and repairs in 14 Buffalo stores, within weeks or several months, that typically required 12-18 months of advance planning. (above p.12.) Strikingly, Starbucks gives nary a mention to the undisputed fact that it went so far as to relocate Facilities Supervisor Claytor from the Midwest to Buffalo to effectuate its lightning-speed plans.

As a further unexpected benefit, corporate officials immediately relaxed the disabling of mobile ordering that employees found onerous at times while concurrently remedying understaffing complaints that had lingered for years.[6]

Starbucks's brazen defenses ignore the powerful credited evidence and relevant law and wrongly accuse the Board (Br.19-23) of ignoring Starbucks's asserted past practices. But the Board, after thoroughly reviewing the credible evidence, concluded that Starbucks's responses in Buffalo were in no way equivalent to actions it previously took elsewhere. Starbucks's burden was to show that it acted in Buffalo when it did for reasons other than the union

---

[6] As discussed above (pp. 14, 22), as the union campaign gained momentum, Starbucks turned from "carrots" to "sticks," reverting to stricter rules on disabling mobile orders. Starbucks also used understaffing complaints as a justification to overstaff stores—causing chaos, fewer hours for longer-term employees, and dilution of the bargaining unit. (RE.11.) None of these findings are challenged.

26

campaign. *Care One*, 832 F.3d at 358. Starbucks's feeble claims (Br.19-23)—that it met its burden based on general corporate policies of open dialogue, previously planned repairs in a small number of situations, severe understaffing, and training issues—are woefully inadequate. As the Board found, Mkrtumyan did not establish that any specific renovations were previously planned in Buffalo, and there was no evidence of this level of solicitation of grievances, promises, or fixes outside Buffalo. (RE.45,45n.125,99;ROA.2855-57,3429-32.) Rather, store managers in Buffalo had asked repeatedly for repairs that were ignored, until the Williams Team arrived. (RE.36;ROA.1851.)

While Starbucks was "certainly entitled to follow its existing practices to ensure that its stores met its standards, were customer-friendly, safe, and operationally sound," (RE.99) its extraordinary feats of fast-tracked repair and renovation were far outside its usual practice nationwide, let alone in Buffalo. *See U Save Foods,* 341 NLRB 161, 163 (2004) (store remodeling unlawful where employer viewed it as benefit to employees); *Spengler-Loomis Mfg. Co.*, 95 NLRB 243, 244-245 (1951) (facilities improvements made in response to union activity were unlawful).

Nor can Starbucks take shelter (Br.20) in its past use of online and similar tools for employees to submit requests, inquiries, and complaints when corporate

27

officials swooped in during the critical pre-election period to hold unprecedented in-person meetings to solicit grievances. (RE.94.) *See Wal-Mart Stores, Inc.,* 339 NLRB 1187, 1187 (2003) (employer cannot rely on past practice where it "significantly alters its past manner and methods of solicitation"). Here, unlike in *Wal-Mart*, the Board found abundant evidence that "deficiencies…were corrected quicker than usual." *Id.* at 1188.

Starbucks cites (Br.25) *NLRB v. United Mineral Corp.*, 391 F.2d 829 (2d Cir. 1968), in arguing that even if the union campaign was the but-for cause of its benevolence, that is insufficient to establish unlawful motivation. While employer actions following a union campaign are not *necessarily* motivated by it, here, as in *United Mineral*, "[t]he circumstances…were as suspicious as could be imagined." *Id.* at 833-34 (reversing single discharge finding that would have taken place absent union activity).

Starbucks incorrectly claims (Br.24) that a promise or grant of benefits to dissuade unionization is unlawful only if the benefits are economic in nature. However, courts and the Board have long found *Exchange Parts* violations from the grant of non-economic benefits, including the same type of benefits Starbucks provided here. For example, violations can include offers to provide employee training. *Chromalloy Mining & Minerals Alaska Div. v. NLRB*, 620 F.2d 1120,

1124 (5th Cir. 1980); *see also Marriott Corp.*, 310 NLRB 1152, 1157 (1993) (employer "promised" to "look into training" for employees).  Repairs or renovations likewise can violate the Act.  *See, e.g.*, *Am. Art Indus., Inc.*, 166 NLRB 943, 945 (1967) (employer "promise[d] to make some tables, and to fumigate the place, to improve the conditions" for employees eating lunch onsite), *enforced*, 415 F.2d 1223 (5th Cir. 1969).  An employer's promise "to remedy a staffing problem" can also violate the Act, particularly where, as here, "under-staffing…was a problem that directly affected employees."  *Gelita USA Inc.*, 352 NLRB 406, 406 (2008), *adopted* 356 NLRB 467 (2011).  Although the cases Starbucks cites (Br.24) involved economic benefits, nothing in the analysis suggested *Exchange Parts* is limited to that context.

Starbucks's argument also ignores the principle that, under *Exchange Parts*, "[t]he relevant inquiry is whether employees would view the change in working conditions as a benefit to them."  *Newburg Eggs, Inc.*, 357 NLRB 2191, 2192 n.10 (2011).  Accordingly, "the benefit is not removed from the realm of unlawful or objectionable conduct simply because it would also be enjoyed by others."  *Id.* (quotation omitted); *accord U Save Foods*, 341 NLRB at 162-63 (rejecting "a distinction…between improvements that directly benefit only the employees themselves (such as a wage increase), and improvements that directly benefit the

29

Employer and only indirectly benefit the employees (such as the remodeling of a store)").

Finally, Starbucks's warning that it would "be forced into safety and regulatory violations" by not making the changes it did (Br.24) overlooks that the violation stems from the motive behind the changes, not the changes themselves. The promise or grant of benefits can violate the Act "notwithstanding the fact that the company was legally obligated to take the remedial steps," if "antiunion sentiment and not a sudden desire to make good its obligations motivated" the employer's actions. *Texaco, Inc. v. NLRB*, 436 F.2d 520, 524-25 (7th Cir. 1971).

### B.    Unlawful Announcement of a Wage Increase

Substantial evidence supports the Board's finding that Starbucks unlawfully announced a new seniority-based wage increase to interfere with the organizing campaign. Starbucks announced on October 27 that upcoming January 2022 raises would be revised such that employees with at least two years of service "could receive up to 5%" and those with at least 10 years of service "could receive up to a 10% raise." (RE.97.) The October 27 announcement, "in the midst of the organizing campaign, with dozens of listening sessions where tenured employees complained about the lack of seniority-based wage increases," clearly deviated from the raises planned for 2022 while promising a "major benefit" ahead of union

30

elections.  (RE.98.)  Starbucks failed to meet its burden of showing that it would have made the same change to an already-announced nationwide compensation plan in the absence of union activity—indeed, "the only evidence of employee dissatisfaction over pay issues is found in the Buffalo listening sessions."  (RE.98.)  *See Perdue Farms v. NLRB*, 144 F.3d 830, 836 (D.C. Cir. 1998).[7]

### C.    Unlawful Threats of Coercion

Starbucks violated Section 8(a)(1) by repeatedly threatening employees that they would or could lose benefits, such as store managers helping them on the floor and the right to transfer to and pick up shifts at other stores, if they unionized.  (RE.101-02.)  Corporate officials and managers cited no objective facts in support of these predictions.  *NLRB v. Gissel Packing*, 395 U.S. 575, 618 (1969)

---

[7] Starbucks also briefly challenges (Br.32) as improper the Board's *sua sponte* finding that Starbucks's promotion of two employees violated Section 8(a)(1), rather than Section 8(a)(3) as originally alleged.  (RE.8.)  However, Starbucks was required, but failed, to file a motion for reconsideration with the Board to preserve this argument.  29 U.S.C. § 160(e); *see Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982) (failure to present issue to the Board deprives an appellate court of jurisdiction to review it); *IBEW Local Unions 605 & 985 v. NLRB*, 973 F.3d 451, 461 (5th Cir. 2020) (same).  *Cf. Indep. Elec. Contractors, Inc. v. NLRB*, 720 F.3d 543, 551-52 (5th Cir. 2013) (rejecting intervenor's assertion that argument barred because Board itself did not assert bar and gave "full consideration" to employer's due process claim, and extraordinary circumstances applied).

(prediction as to effects of unionization "must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond [employer's] control"). Accordingly, stating the "potential effects" (Br.35) of unionization can be coercive, particularly where, as here, Starbucks's predictions are not based on objective facts or the nature of the collective-bargaining process. *Daikichi Sushi*, 335 NLRB 622, 623-24 (2001) (not a defense to phrase prediction "as a possibility rather than a certainty"), *enforced*, 56 F. App'x 516 (D.C. Cir. 2003); *see also UNF W.*, 844 F.3d at 458 (prediction without reference to collective-bargaining process or other objective facts impermissible because it implies an employer may act unilaterally and for its own reasons).

### D.    Unlawful Interrogation

Substantial evidence supports the Board's finding that an Elmwood store manager's pointed question to an employee—"you support this?"—during a union election violated Section 8(a)(1) of the Act. As the Board found, the circumstances of the question "strongly suggest coercion" (RE.3n.8,105) such that the employee "would feel restrained" from exercising statutory rights, *Westwood Healthcare Ctr.*, 330 NLRB 935, 940 (2000). *See UNF W.*, 844 F.3d at 462 ("the inquiry relates to *potentiality* [of coercion], and not to *actuality*").

When Store Manager Shanley pointed to Higgins' union pin while outside loading supplies in her car and asked, "you support this?", Higgins truthfully admitted the obvious, "that she supported a cause reflected on a pin she was wearing." (RE.105.)  While the demand for verbal confirmation naturally conveyed disapproval, adding to the coerciveness of the question was its timing "in the midst of mail balloting at Elmwood and following a series of coercive actions at the store by [Shanley], corporate officials, and support managers." (RE.105.)  *See NLRB v. Camco, Inc.*, 340 F.2d 803, 804 n.6 (5th Cir. 1965) ("even a single question" can be unlawful against background of hostility).  Contrary to Starbucks's claim (Br.34), Shanley's later statement that she "respected [Higgins'] decision" and "would never change her mind about [Higgins]," would not have dispelled reasonable fear of reprisal for union support during the corporate-led anti-union campaign.

### E.    Unlawful Surveillance

An employer violates Section 8(a)(1) by "creat[ing] the impression of employer surveillance of the union activities of employees." *Delchamps, Inc. v. NLRB*, 585 F.2d 91, 93 (5th Cir. 1978).  An impression of surveillance interferes with employees' rights because employees may reasonably fear "retaliation against identified union supporters, [and] may thereafter feel reluctant to participate in

union activities." *NLRB v. Nueva Eng'g, Inc.*, 761 F.2d 961, 967 (4th Cir. 1985); *see Hendrix Mfg. Co. v. NLRB*, 321 F.2d 100, 104 n.7 (5th Cir. 1963) (describing chilling effect of surveillance or perceived surveillance).

Prior to the union campaign, Starbucks did not have a practice of sending outside managers to Buffalo, let alone having them wear headsets on and off the floor. During the campaign, however, support managers—sometimes two or three at a time—worked alongside employees in the store often wearing headsets that allowed monitoring of employee conversations.[8] Similarly, Store Manager Almond took the "highly unusual" step of photographing an employee wearing a union pin one day after the campaign went public. (RE.104;ROA.415.) The Board reasonably found (RE.104) that these "unprecedented practices" created the impression that employee union activities were under surveillance. *See Charter Communications, LLC*, 366 NLRB No. 46 (2018) (employer unlawfully created impression employee's activities were being monitored by high-level manager who rode along with him for the first time), *enforced*, 939 F.3d 798 (6th Cir. 2019); *cf. The Broadway*, 267 NLRB 385, 400 (1983) (longstanding procedures that

---

[8] Contrary to Starbucks (Br.31), the ALJ credited detailed employee testimony about support managers wearing headsets and interrupting nonwork-related conversation, discrediting the "cursory denials" of managers about only wearing headsets at certain workstations. (RE.73&n.323.)

"continued without significant change after the advent of organizing activities" did not create impression of surveillance).

Substantial evidence supports the Board's finding that Starbucks also created the impression it was surveilling employees' union activity when manager Klein confronted employee Reeve about a message Reeve posted to an employee-only group chat.  (RE.8-9.)  Employees used the group chat to discuss unionization.  (ROA.1118.)  By informing Reeve that she was aware of Reeve's message, Klein created the impression that Starbucks had access to and monitored the chat.  That impression was strengthened by Klein's refusal to answer Reeve's question about how she obtained the message.  (ROA.1117-18.)  An employer creates the impression of surveillance when it makes clear it knows about employees' union-related activities but "d[oes] not reveal the manner in which [it] learned the information."  *Conley Trucking*, 349 NLRB 308, 315 (2007), *enforced*, 520 F.3d 629 (6th Cir. 2008).  In such situations, employees "are left to speculate as to how the employer obtained its information, causing them reasonably to conclude that the information was obtained through employer monitoring."  *Charter Commc's*, 366 NLRB No. 46, slip op. 6.  Accordingly, the Board reasonably found that Klein's unexplained possession of Reeve's messages would lead group-chat participants to believe management was monitoring their union-related

conversations.  (RE.9.)  If, as Starbucks hypothesizes (Br.32-33), another employee informed Klein about Reeve's post, Klein could have removed the impression of management surveillance by telling her that.[9]

### III.   SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDINGS THAT STARBUCKS COMMITTED NUMEROUS SECTION 8(a)(3) AND 8(a)(4) VIOLATIONS

Section 8(a)(3) of the Act prohibits employer discrimination to "discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).  An employer violates this provision by retaliating against employees because of their union activity.  *NLRB v. ADCO Elec. Inc.*, 6 F.3d 1110, 1116 (5th Cir. 1993).  Section 8(a)(4) bars an employer from discharging or otherwise discriminating against an employee "because he has filed charges or given testimony under [the Act]."  29 U.S.C. § 158(a)(4).  A violation of Section 8(a)(3) or 8(a)(4) derivatively violates Section 8(a)(1).  *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1984).

The Board applies its *Wright Line* framework to ascertain motive for purposes of Section 8(a)(3) or 8(a)(4).  *See New Orleans Cold Storage & Warehouse Co. v. NLRB*, 201 F.3d 592, 600-01 (5th Cir. 2000) (citing *Wright Line*,

---

[9] Starbucks briefly challenges (Br.32) as improper the Board's sua sponte finding that Starbucks's surveillance of Reeve violated Section 8(a)(1) because the ALJ originally dismissed it as an 8(a)(3) violation.  (RE.8.)  However, as noted above in n.7, Starbucks did not preserve this argument.

251 NLRB 1083 (1980), *enforced on other grounds*, 662 F.2d 899 (1st Cir. 1981));
*see also NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401-04 (1983) (affirming
Board's *Wright Line* framework).   Under *Wright Line*, an employer action against
an employee is unlawful if protected conduct was a motivating factor in the
employer's decision and the record does not compel acceptance of the employer's
affirmative defense that it would have taken the same action in the absence of
protected conduct.  *See Cordua*, 985 F.3d at 423-24.

     Because an employer "rarely admits" an unlawful motive, the Board may
rely on circumstantial evidence to infer one.  *Elec. Data Sys. Corp. v. NLRB*, 985
F.2d 801, 804-05 (5th Cir. 1993); *accord Cordua*, 985 F.3d at 423.  The Board
may infer a discriminatory motive where the employer's adverse action is
suspiciously timed in relation to protected activity; the employer has shown
hostility towards that activity, for example through contemporaneous unfair labor
practices; the employer offers shifting, false, or exaggerated reasons for its action;
or the employer's action is out of step with past practices.  *Intertape Polymer
Corp.*, 372 NLRB No. 133, slip op. 6-7 & n.27 (2023), *enforced mem.*, 2024 WL
2764160 (6th Cir. 2024) (citing cases); *see Cordua*, 985 F.3d at 423.

     Where an employer has adopted a stricter disciplinary approach, a close
temporal connection between protected activity and that change can be

37

"especially" telling. *Miller Plastic Prods. Inc. v. NLRB*, 141 F.4th 492, 515 (3d Cir. 2025). Thus, as the Board explained here, "[i]f the only change in the workplace is that employees have started to unionize, which the employer opposes, then that change offers a rational, and indeed likely, explanation for the employer's stricter enforcement of the rules." (RE.5.)

### A. Starbucks Unlawfully Discriminated Against Employees by More Strictly Enforcing Work Rules Following Announcement of the Organizing Campaign

Ample evidence supports the Board's finding that Starbucks violated Section 8(a)(3) and (1) of the Act, 29 U.S.C. 158(a)(3) and (1), "by more strictly enforcing its workplace rules and policies in response to the employees' union activity." (RE.5.) On the heels of the Buffalo employees' announcement of their intent to unionize, Starbucks engaged in "unprecedented" level setting in Buffalo—"a program of stricter enforcement of work rules" at stores where enforcement had been lax. (RE.5.) Starbucks fails to counter the Board's well-supported finding that this suspiciously timed re-setting of expectations was unlawfully motivated. Nor has Starbucks proven that its level setting would have occurred even absent union activity.

As the Board found (RE.5,106) and the record shows, the level setting occurred in the context of a massive, unprecedented management mobilization to

38

Buffalo. Starbucks deployed additional managers to individual stores; told them to monitor employee conversations about unions and to deny shifts to union supporters so they could not talk to fellow employees; and held so-called listening sessions to address, among other things, corporate management's unusual presence and interest in the region. (above, pp. 5-12.) As the Board found (RE.106), during the listening sessions, corporate officials presented employees with a "blatantly false reason" for their unusual activity, telling employees "that they heard the pleas of Buffalo employees about the problems they were dealing with"—even though the employees had not asked for help with problems in their "Dear Kevin" letter, but instead expressed an interest in unionizing. (RE.106.)

Tellingly, one of the top-level corporate officials involved, Regional Vice President Peck, ventured that the union activity in Buffalo stemmed, in part, from the fact that stores were not "up to standard," which included non-compliance with attendance policies. (RE.36;ROA.1850-51.) Consistent with Peck's suggestion of a need to return to fixed standards in the face of employee union activity, Starbucks immediately tightened up its rules—including for dress code, jewelry, attendance, and communication—across Buffalo. Thus, at individual stores where

policy adherence had been spotty or lax, Starbucks began going after every infraction.[10]

The timing of this level setting—on the heels of the organizing-campaign announcement and Peck's statement expressly connecting union activity with a breakdown of store standards—strongly supports the Board's finding that Starbucks took action because of employees' union activity.  But that highly suggestive timing is only the tip of the iceberg.  As the Board found (RE.6), the level setting occurred alongside a "vast and systemic barrage of Section 8(a)(1) violations" that demonstrated Starbucks's "extreme animus toward the organizing in the Buffalo area."  (RE.5.)  *See Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 423 (D.C. Cir. 1996) ("a company's open hostility toward [u]nion activity, and its 8(a)(1) violations, are clearly sufficient to establish anti-union animus") (quotation omitted).

---

[10] Starbucks quibbles (Br.43-46) that the Board might not have found stricter enforcement at all if it had considered the history and practices of the best performing stores (in Buffalo or the country) as transferring wholesale to underperforming stores in Buffalo.  However, the evidentiary record that Starbucks helped to develop did not establish any widespread borrowing or sharing of practices between stores.  Accordingly, for every instance of alleged stricter enforcement, the Board reasonably asked whether enforcement of Starbucks's pre-existing policies aligned with past practice at the particular store involved.

Accordingly, the Board had no difficulty concluding that employees' union activity was "a motivating factor" behind Starbucks's decision to more strictly enforce work rules in Buffalo. (RE.4,5.) Where, as here, substantial evidence establishes unlawful motivation, the employer may only avoid the finding of a violation by proving that it would have taken the same action even in the absence of any protected union activity. *Cordua*, 985 F.3d at 423-24. As the Board reasonably found, Starbucks failed to establish this affirmative defense.

Although Starbucks cited deficient expectations, standards, and conditions at the Buffalo stores as the basis for its level-setting effort, those deficiencies, as the Board found, "were not new." (RE.5.) The only thing that made them suddenly worthy of corporate management's attention in the fall of 2021 was the newly announced union-organizing campaign. Indeed, Regional Vice President Peck admitted as much when she expressly linked employee organizing with deficient store conditions.

Further undermining Starbucks's claim is the fact that Starbucks took no steps to address deficiencies elsewhere in parts of Area 156 where employees were *not* organizing. Thus, even after learning of severely deteriorated conditions at stores in Saratoga Springs in the summer of 2021, there is no evidence that Starbucks engaged in level-setting there at any time that year. (RE.34-

35n.39,106.)  Instead, it poured resources into a massive level-setting effort in Buffalo, where employees were engaged in a highly publicized union-organizing drive.

Contrary to Starbucks's claim (Br.43), the mere fact that it has occasionally "level set" in other parts of the country does not render its action in Buffalo lawful. To meet its *Wright Line* burden, Starbucks must persuade by a preponderance of the evidence that it would have taken the same action "irrespective of…protected activity."  *See NLRB v. Associated Milk Producers, Inc.*, 711 F.2d 627, 629 (5th Cir. 1983).  Showing a history of level setting that *could have* informed the decision to level set in Buffalo is not enough.  *Roure Bertrand Dupont, Inc.*, 271 NLRB 443, 443 (1984); *see also Cordua*, 985 F.3d at 424 (mere fact that "the record would allow a competing, perhaps even equal, inference of a legitimate basis" for the employer's action does not suffice to reverse the Board's finding of discrimination) (quotation omitted).  As the Board found, Starbucks simply "failed to show that its stricter enforcement of work rules was motivated by considerations unrelated to its employees' union activities."  (RE.5.)

42

### B. The Board's Additional Findings of Discrimination Stand Largely Unchallenged; Starbucks's Limited Arguments on Review Are Unavailing

Starbucks expressly forfeits any specific challenge to many of the Board's remaining discrimination findings—which included changes to store hours, disciplines, and discharges—citing a lack of "space" in its brief to engage with the facts and analysis for each finding.  (Br.39.)  Instead, Starbucks rests on purported "cross-cutting" errors in the Board's analysis of motive (Br.39-41,46-48), and cursorily claims it would have discharged six named employees (Br.49-54) and closed its Galleria kiosk store (Br.49) even in the absence of any union activity. Starbucks's scattershot arguments provide no basis to set aside the underlying findings, which the Board painstakingly supported and explained over the course of an unusual, over-100-page decision matching the scope of Starbucks's unlawful conduct in Buffalo.  *See* above p. 21 (Board is entitled to summary enforcement of the portions of its Order corresponding to violations only obliquely challenged by reference to alleged cross-cutting errors).

1.     **The purported errors**

a.     **The Board's findings that Starbucks acted at all times with knowledge of employees' union activity is supported by substantial evidence**

Starbucks essentially admits that many of the decisionmakers who took disciplinary action against union supporters had firsthand knowledge of those employees' union activity.  Nonetheless, it suggests that, in a handful of cases, direct evidence of the decisionmaker's knowledge was lacking.  (Br.47-48.)

In every example cited by Starbucks, however, the Board was able to "reasonably infer" the decisionmaker's knowledge "based upon circumstantial evidence." *Marathon LeTourneau Co., Longview Div. v. NLRB*, 699 F.2d 248, 253 (5th Cir. 1983).  Employees Reeve and Skretta had, among numerous other union activities, openly signed the August 23 letter.  (RE.34;ROA.3877-79.)  Likewise, Nuzzo, also an active union proponent, was the first signatory on a February 1, 2022 letter announcing the campaign at his store.  (RE.79;ROA.5253-57.)  Rojas, meanwhile, disclosed his union support directly to Rossann Williams, Starbucks's most senior national executive, in an October 2021 conversation. (RE.70;ROA.2086-87).  The Board could reasonably infer that, when lower-level managers—most of whom Starbucks brought to Buffalo as part of its emergency anti-union effort—later took retaliatory action against these employees, those

managers could not have been ignorant of the employees' highly publicized union support.

Resisting this commonsense inference, Starbucks points to cases where an employee's union activity was visible only to lower-level supervisors and thus inadequate to establish a higher-level decisionmaker's knowledge. (Br.46-47.) For instance, where an employee engaged in union activities entirely out of sight of the high-level supervisor who later disciplined him, the Court found insufficient evidence that the decisionmaker knew about the activity. *Poly-Am., Inc. v. NLRB*, 260 F.3d 465, 489 (5th Cir. 2001); *see also Delchamps*, 585 F.2d at 94-95 (no evidence area supervisor who discharged employee knew of employee's union activity, despite knowledge of store managers). Here, by contrast, the employees' union support was openly communicated to the highest-ranking officials at Starbucks, who were waging an aggressive campaign to oppose the Union and enlisting subordinate managers in their efforts. It was thus entirely reasonable for the Board to infer that lower-level managers at the affected stores would be aware of employees' union sympathies.[11]

---

[11] Starbucks suggests it did not know of Krempa's December 3, 2021 Board testimony when it gave her a final written warning on December 7 for purported cursing on November 23. (Br.47-48.) However, Starbucks indisputably knew of Krempa's testimony when it disciplined her four days later. (RE.74n.330.) Starbucks nevertheless claims that the warning was a previously drafted document.

**b.    The Board properly relied on Starbucks's many contemporaneous violations as evidence of its motive**

Contrary to Starbucks's claim (Br.40), its corporate-led effort to stymie employee organizing activity—through a "vast and systemic barrage of Section 8(a)(1) violations" and discriminatory level-setting at Buffalo stores—sheds important light on its motivations for the numerous adverse employment actions in this case.  The Board, consistent with settled law (RE.5n.13 (citing cases)), evaluated Starbucks's specific adverse actions with that pervasive unlawful conduct in mind.

Although Starbucks asserts that its surrounding conduct shows only "general hostility" towards union activity (Br.40-41), Starbucks is wrong that such sweeping animus—even if termed "general"—is irrelevant to the question of unlawful motive.  As the Board has explained, general animus does not "invariably" suffice to establish unlawful motive, but it can be sufficient depending on the circumstances.  *Intertape*, 372 NLRB No. 133, slip op. 9.  Thus, "an employer's statement that it will fire anyone who engages in union activities, although 'general' in that it is not aimed at any particular employee, may give rise to a reasonable inference that a causal relationship exists between an employee's

---

(Br.47-48.)  The fact remains that Starbucks made no effort to issue the discipline until after it knew of Krempa's protected Board activity.

union activities and the employer's decision to take adverse action against the employee." *Id.*, slip op. 10 (quotation omitted).

Here, Starbucks's carefully coordinated top-down, city-wide effort to stamp out union activity fairly suggested that "union animus at least partially motivated many of the adverse actions it took against its employees" in Buffalo. (RE.5n.13.) None of the cases that Starbucks cites (Br.40-41) involved a situation where comparably broad-based animus was discounted or ignored altogether, as Starbucks incredibly suggests it should be here.

### 2. Starbucks's limited challenges to six unlawful-discharge findings fail

Starbucks does not acknowledge, much less challenge, the Board's specific findings supporting its conclusion that Starbucks unlawfully discharged employees Cassie Fleischer, Daniel Rojas, Jr., Edwin Park, Brian Nuzzo, Nathan Tarnowski, and Angel Krempa. Instead, Starbucks argues only (Br.49-54) that it met its defensive burden under *Wright Line*, based on purported infractions that, in theory, may have supported disciplinary action. But Starbucks failed to prove, as it must, that, based on its own record of conduct, it in fact *would* have discharged these employees in the absence of their protected activity.

*Cassie Fleischer*: Starbucks claims (Br.53) that its denial of Fleischer's reduced-hours request, which effectively terminated her employment, was justified

because her schedule adjustment "did not fit" Starbucks's needs under newly

"tighten[ed]" minimum-availability requirements (RE.117).  However, Starbucks

does not address the Board's finding that this "tightening" came in direct response

to the unionization effort.  It also ignores the evidence that, in spite of these new,

union-motivated requirements, it continued to accommodate the reduced-hours

requests of other employees, including one who began working only one day a

week.  (RE.117;ROA.2049.)  Starbucks cannot meet its burden of proving it would

have taken the same action absent union activity where, as here, it applied a policy

that would not have existed absent employees' union activity, and it did not even

apply the policy uniformly.[12]

*Daniel Rojas, Jr.*:  Starbucks asserts (Br.53) that it fired Rojas because, after

coaching him about minor tardiness incidents in January 2022, he was late once in

March.  However, the record demonstrates that occasional tardiness was tolerated

at Rojas's store (Sheridan & Bailey) prior to August 23.  (RE.32.)  As a defense,

Starbucks points to "evidence of multiple discharges before the union campaign"

(Br.53 (citing ROA.8360,8413-19)), but its examples only highlight the

unusualness of Rojas's discharge.  In one, a worker was discharged after she was

---

[12] For the same reasons, Starbucks's feeble challenge (Br.54n.4) to the Board's
finding (RE.120) that it violated Section 8(a)(3) and (1) by constructively
discharging union advocate Higgins also fails.

severely tardy three times in two weeks, and, on the third occasion, falsely recorded an on-time arrival when she arrived over an hour late. (ROA.8360.) In the others, two workers were discharged for multiple complete days of unexcused absence. (ROA.8413-19.) Rojas's slight tardiness on a handful of occasions bears no resemblance to these examples. *See Remington Lodging & Hosp., LLC v. NLRB*, 847 F.3d 180, 186 (5th Cir. 2017) (at affirmative-defense stage, where "the details are important," any disparity in severity of conduct that led to equivalent discipline can defeat showing that employees were "similarly situated").

*Edwin Park*: Starbucks claims it discharged Park primarily for dipping his finger in a drink.[13] (Br.50-51.) Two coworkers had approached Park with a drink and asked him the difference between a wet and dry cappuccino. (RE.118;ROA.1653-54,1671.) Park, thinking it was a practice drink because "there was no one left in the café or the drive-thru," dipped his finger in it and said it seemed to be dry enough. (ROA.1671-72,1674-75.) When the coworkers told him that the drink was for a customer, Park had the drink thrown away and another one made. (RE.118;ROA.1653-54.) Even had this explanation not been, as the

---

[13] Although Starbucks also pointed to two instances of slight tardiness—which the Board found Park had credibly explained (RE.76,117-18)—Starbucks presented no evidence that, prior to the union campaign, it had discharged employees at Park's store (Transit & French) for time-and-attendance infractions. (RE.32.)

Board found (RE.118), entirely sensible, Park's conduct pales in comparison to the purported "lesser food-safety violations" (Br.51)—failing to check that food and beverage temperature had not reached the "danger zone" (ROA.8197,8446)—for which Starbucks previously issued discipline. Potentially spoiled food carries a greater risk to customer health and safety than a discarded drink. And importantly, the employees involved in the referenced food-safety infractions received only documented coaching, not discharge, making Park's treatment an unexplained outlier. (ROA.8197,8446.)

*Brian Nuzzo*: Starbucks claims that Nuzzo violated rules requiring masking and the presence of at least two partners in any unlocked store when he entered his Starbucks location alone without a mask one morning. (Br.49-50.) Prior to the union campaign these rules had never been enforced. The record established that opening-shift supervisors regularly entered the store several minutes before another employee arrived and started setting up without facing discipline, and that employees had removed their masks in the store when customers were not present, also without discipline. (RE.79;ROA.1469-1473, 1478-1481,2546.) *Cf. Cent. Freight Lines Inc. v. NLRB*, 653 F.2d 1023, 1027 (5th Cir. 1981) (while employee was first disciplined under new policy, he was "first and only driver to violate" it). Since the investigation of Nuzzo would never have been conducted absent

Starbucks's union-induced scrutiny, it is also irrelevant that Nuzzo falsely denied the allegation. *See Supershuttle of Orange Cnty., Inc.*, 339 NLRB 1, 4 (2003) (employee misconduct discovered in investigation unlawfully motivated by protected activity does not sanitize illegality).

*Nathan Tarnowski*: Starbucks defends its discharge of Tarnowski based on one occasion when he completed the COVID-19 "virtual coach" without disclosing symptoms like diarrhea. (Br.52.) Tarnowski understood the coach to be asking for "out of the ordinary or unusual" symptoms (ROA.2240), and some of his symptoms did not register as unusual. (ROA.2223.) However, because Tarnowski otherwise "wasn't feeling good," because of a headache, he sought and received his supervisor's permission to leave. (ROA.2222-23.) He returned the next day, once his symptoms subsided, after seeing that he still appeared on the schedule. (ROA.2224-26.) Not only do these circumstances not showcase dishonesty, but Starbucks neglected to discharge other employees who failed to report symptoms like coughing when arriving to work. (RE.119;ROA.2156-57.)

*Angel Krempa*: Starbucks's discharge of Krempa relied on only two instances of minor tardiness. (RE.75;ROA.4457.) On both occasions, Krempa was fewer than twenty minutes late and offered credible evidence—which Starbucks failed to consider—that she had called the store to alert the shift

51

supervisor.  (RE.75,ROA.1035-36,1040-43,1262-63,1748-49,2657-62.)  Starbucks

seems to suggest that Krempa had been disciplined for tardiness before (Br.52

(citing ROA.1061-62,1657,4457)), but all the evidence it cites refers to the same

two instances.  Starbucks presented no evidence that, prior to the union campaign,

it had discharged employees at Krempa's store (Transit & French) for time-and-

attendance infractions.  (RE.32.)

### 3.    Starbucks only cursorily, and unpersuasively, defends its closure of the Galleria kiosk

Starbucks fails to propound any specific challenge to the Board's finding

(RE.7) that its closure of the Galleria kiosk was unlawfully motivated.  Contrary to

Starbucks's fleeting claim (Br.49), in finding the closure unlawful, the Board did

not ignore Starbucks's proffered reasons for the decision.  It found those reasons

unsupported or uncorroborated by record evidence, and thus pretext for a

retaliatory motive.  (RE.109.)

As the Board explained, Starbucks's purported non-retaliatory reasons for

the closure "all existed prior to the employees' organizing activity" (RE.7), but did

not lead to closure before the union campaign.  Starbucks does not contend that the

purported "disrepair and financial underperformance" at Galleria and "nationwide

policy of closing kiosks" (Br.49) were new developments that Starbucks could not

have addressed earlier.  Yet "there is no evidence in the record that [Starbucks]

planned to close the Galleria kiosk prior to August 23"—when Starbucks began

responding to the organizing campaign.  (RE.67n.288.)  Despite the pre-existing

issues at Galleria, Starbucks "continued to operate the service until" learning of

union activity there.  *Purolator Armored, Inc. v. NLRB*, 764 F.2d 1423, 1429 (11th

Cir. 1985).

Further demonstrating that the closure was not made pursuant to a

nationwide policy of phasing out mall kiosks is that Starbucks made the permanent

closure announcement "suddenly" after installing a new stove and temporarily

closing the store for cleaning, reorganizing, and to retrain staff.

(RE.109;ROA.1285-86,1790.)  If closing mall kiosks had been the plan all along,

Starbucks would not have taken those steps.  Tellingly, the Galleria manager was

surprised and upset by the closure (ROA.1289,1793), having previously told

employees that the kiosk was going to reopen as normal after the temporary

closure.  (ROA.1287.)

## IV.    SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT STARBUCKS VIOLATED SECTION 8(a)(5) AND (1) OF THE ACT

An employer violates Section 8(a)(5) and (1) (29 U.S.C. §158(a)(5) and (1))

by failing to consult and negotiate with the union before changing terms and

conditions of employment.  *NLRB* v. *Katz*, 369 U.S. 736, 743 (1962).  Substantial

evidence supports the Board's finding (RE.2n.6) that Starbucks unlawfully failed to notify and bargain with the Union regarding changes to the minimum-availability policy at the Elmwood store and two discharges.

As the Board found, "[p]rior to February, [Starbucks] did not impose or enforce a minimum availability requirement." (RE.46,46n.129,130;ROA.1567.) Starbucks's feeble assertion (Br.54-55) that it did not change its policy at Elmwood after the Union's December 2021 certification flies in the face of credited evidence.

Starbucks claims (Br.55) it was "not required to consult the [U]nion" about discharging Park and Krempa because it acted "under its pre-existing disciplinary policies." (Br.55; *see* Br.50-52.) But Starbucks's stricter enforcement of its "pre-existing" policy was unlawful. Starbucks's claim fails because it equates, at best, an unlawful practice with the "status quo" for bargaining under Section 8(a)(5).

The Board also found (RE.6) that Starbucks's disciplinary practice immediately prior to union certification was not an "established" one. *Cf. 800 River Rd. Op. Co.*, 369 NLRB. No. 109, slip op. 4 (2020) (employers have no "obligation…to bargain" before discharging unit employees "in accordance with an established disciplinary policy or practice"). Unlike here, the Board's *800 River Road* decision involved an undisputedly lawfully established policy or practice.

Because the employees' discipline "resulted in part due to [Starbucks's] unlawful unilateral change[s]" in response to the union campaign, its failure to bargain over that discipline was a change in the status quo in violation of Section 8(a)(5) and (1).  (RE.117-19.)

## V.   THE BOARD REASONABLY TAILORED ITS ORDER TO REMEDY STARBUCKS'S EXTENSIVE CAMPAIGN OF UNLAWFUL CONDUCT

Section 10(c) of the Act grants the Board "broad discretionary" authority to remedy unfair labor practices by ordering "such affirmative action…as will effectuate the policies of [the Act]."  *Fibreboard Paper Prods. v. NLRB*, 379 U.S. 203, 215-16 (1964) (citing 29 U.S.C. § 160(c)).  The task of devising unfair-labor-practice remedies rests with the Board, and its choice of remedies must stand unless they are "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act."  *Id.*; *UNF W.*, 844 F.3d at 463. Starbucks falls far short of making that difficult showing in objecting to discrete portions of the Board's Order.  (Br.55-67.)

### A.   The Board Acknowledges That Only Partial Enforcement of Its Make-Whole Order Is Permitted in This Circuit

In *Thryv, Inc.*, 372 NLRB No. 22 (2022), *enforcement denied on other grounds*, 102 F.4th 727 (5th Cir. 2024), the Board modified its standard make-whole remedy to include, inter alia, a requirement that respondents make

employees whole for "foreseeable" harms suffered as a result of unfair labor practices.  (RE.13.)  Starbucks objected below to the inclusion of that requirement (Exc.Br.96), and Starbucks renews such objection on review (Br.55-60).  The Board acknowledges that this Court's recent opinion in *Hiran Management v. NLRB*, --- F.4th ---, 2025 WL 3041862 (5th Cir. 2025), forecloses enforcement of the portions of the Order requiring make-whole relief for foreseeable harms.  *See id.* at *3-6 & n.6.

### B.     The Board Did Not Abuse Its Discretion by Issuing a Remedial Bargaining Order for the Camp Road Store

Settled law permits the Board to remedy unlawful conduct by directing an employer to bargain with a union, including where the union lost a tainted representation election after previously possessing majority support.  *NLRB v. Gissel Packing*, 395 U.S. 575, 614 (1969).  This Court will enforce a bargaining order where:  (i) the union possessed valid authorization cards from a majority of the unit; (ii) the employer's unfair labor practices, "although not 'outrageous' or 'pervasive,'" were still "serious and extensive"; (iii) the possibility of ensuring a fair rerun election by use of traditional remedies, "though present, is slight"; and (iv) employee sentiment would best be protected by a bargaining order.  *Cal. Gas Transp. v. NLRB*, 507 F.3d 847, 854-55 (5th Cir. 2007).

56

As the Board found, all four factors support a bargaining order for the Camp Road store. (RE.13-14,120-122.) The Union undisputedly held majority support at the store in August 2021. (RE.56,121.) Starbucks undermined that support by targeting the store's employees with serious and extensive unfair labor practices. For example, Starbucks: (i) coercively granted significant benefits to employees at the Camp Road store to dissuade them from unionizing, including a seniority-based wage increase (RE.97-98), promotions to higher-paying positions (RE.8), and other improved working conditions (RE.99-100); (ii) retaliated against a lead organizer at the store by demoting her to lesser-skilled work at a lower wage rate (RE.112), while punishing the remaining employees by reducing store hours (RE.6-7); and (iii) brought in high-level managers to threaten that more benefits would be taken away if the store unionized (RE.101-02). Such "hallmark" unfair labor practices are particularly difficult to remedy absent a bargaining order. (RE.121.) *E.g.*, *Evergreen Am.*, 348 NLRB 178, 180 (2006) (explaining unusually pernicious impact of coercively timed grants of benefits), *enforced*, 531 F.3d 321 (4th Cir. 2008). Moreover, the violations occurred in the context of myriad other violations directly affecting employees at the Camp Road store. (RE.13,121.)

In addition, as the Board emphasized, Camp Road employees would have been further coerced by Starbucks's spree of unlawful conduct at other Buffalo-

area stores.  (RE.13-14,121.)  Starbucks committed *hundreds* of discrete violations in response to the organizing campaign, including discharging seven prominent union supporters and permanently closing an entire store in retaliation for growing pro-union sentiment.  Given the unified nature of the organizing campaign, the extensive contact between Buffalo-area employees, the overt and highly publicized nature of Starbucks's response, and the centralized control wielded by high-level managers, the Board properly inferred that the prospect of a fair rerun election at Camp Road has been undermined by serious and extensive violations at neighboring stores.  (RE.14.)  *Holly Farms*, 311 NLRB 273, 282 (1993), *enforced*, 48 F.3d 1360 (4th Cir. 1995).

The Board therefore concluded that the "relentless" nature of Starbucks's unlawful anti-union campaign is likely to remain in the minds of Camp Road employees, making it "extremely unlikely that a fair rerun of the election could ever be held."  (RE.121.)  The "severity and pervasiveness" of Starbucks's violations "would reasonably tend to cause employees to fear retaliation if…the Union were to prevail in an election," and thus the majority sentiment of the employees would be best effectuated through a bargaining order predicated on the prior authorization cards.  (RE.14.)  This Court has repeatedly enforced *Gissel*

bargaining orders in cases involving far less extensive misconduct than what

occurred here.  *See Cal. Gas*, 507 F.3d at 855 (collecting cases).

Starbucks's challenge to the *Gissel* order here simply ignores the Board's

careful analysis.  (Br.62-65.)  Starbucks first makes the puzzling claim that the

Board "did not identify" (Br.62) serious and extensive unfair labor practices at the

Camp Road store.  As noted, however, the Board detailed myriad violations

committed at the Camp Road store, including numerous hallmark violations.  (*E.g.*,

RE.6,8-9,56-62,94-95,97-104,106-110,112,-114.)  Acknowledging just two

violations (Br.62), Starbucks unconvincingly downplays the obvious coercive

impact of granting promotions to employees to dissuade them from organizing and

misrepresents the facts of the Board's finding that a lead organizer was demoted

from higher-paying work despite continuing to work the same number of shifts.

*Cf.* above p.8, RE.62.

Starbucks does not acknowledge, much less dispute, other Camp Road

violations.  It is settled, for example, that a coercively timed wage increase and

threats from upper-level management to withdraw benefits are hallmark violations

difficult to remedy absent a bargaining order.  *See NLRB v. Anchorage Times

Publ'g*, 637 F.2d 1359, 1370 (9th Cir. 1981).  Nor does Starbucks acknowledge its

multitude of other violations at Camp Road, such as repeatedly conveying that

union supporters were under surveillance (RE.8-9,103-104) and punishing

employees with stricter enforcement of rules (RE.106-107,109-110). Standing

alone, the violations directly affecting Camp Road employees were more than

sufficient to justify a bargaining order. *See, e.g.*, *NLRB v. WKRG-TV*, 470 F.2d

1302, 1319-20 (5th Cir. 1973) (enforcing *Gissel* bargaining order where employer

interfered with union solicitation, interrogated employees, and promised benefits).

Starbucks also wrongly claims the Board departed from the "correct legal

analysis" (Br.63) by considering the impact of contemporaneous violations at other

Buffalo-area stores. The ultimate analysis is whether an employer's unfair labor

practices have rendered a fair election unlikely. *Gissel*, 395 U.S. at 614-15. It

defies reason to suggest the Board may not draw the logical inference that

employees would be coerced by retaliatory actions taken at nearby stores in

response to the same organizing campaign. In *California Gas*, the Court found it

unnecessary to address an objection to the Board's consideration of violations at

other facilities—which the employer argued had occurred in Mexico and thus

outside the Board's jurisdiction—because the violations at the primary facility

were enough to "independently justify" a bargaining order. 507 F.3d at 853.

Nothing in the Court's opinion supports the illogical rule Starbucks proposes. To

the contrary, this Court has affirmed the relevance of violations at other facilities to

60

find an atmosphere of coercion justifying a *Gissel* bargaining order.  *See J.P. Stevens & Co. v. NLRB*, 441 F.2d 514, 521-22 (5th Cir. 1971).

Starbucks's claim that "no record evidence" supports the Board's inference of area-wide coercion (Br.64) is also unfounded.  As the Board noted, employees across various Buffalo-area stores were in contact throughout the union campaign, and there was frequent employee interchange between Camp Road and other stores.  (*E.g.*, ROA.1174,1562,1933,2092.)  Many of Starbucks's most egregious violations were overt and highly publicized by the Union and even by Starbucks itself.  (*E.g.*, ROA.2176.)  Violations at other stores occurred as part of a centralized response to the Buffalo-area organizing activity, all overseen by the same high-level managers.  (*E.g.*, RE.40.)  Starbucks's concluding claim, that the Board failed to consider the possibility of a fair rerun election (Br.64-65), is simply false.  The Board explained why a fair election is highly unlikely given the scope and nature of Starbucks's violations, and why employee sentiment is better protected by a bargaining order.  (RE.14,121.)

## C.    The Court Lacks Jurisdiction To Entertain Starbucks's Objection to the Board's Order To Reopen the Galleria Kiosk

An order to restore the status quo ante is the presumptively appropriate remedy for an employer's unlawful closure of a store in response to union activity.  *Mid-South Bottling Co. v. NLRB*, 876 F.2d 458, 460-61 (5th Cir. 1989).  It is the

employer's burden to show that such remedy is not appropriate or would be unduly burdensome.  *Id.*; *accord Quickway Transp. v. NLRB*, 117 F.4th 789, 815-17 (6th Cir. 2024).  Here, as the Board observed, Starbucks failed to advance any such claim in response to the ALJ's recommended order to reopen the kiosk.  (RE.13 n.23.)  Starbucks made no mention of the restoration order in its exceptions brief, which took issue with other remedies.  (Exc.Br.94-100.)  Nor did Starbucks seek reconsideration of the Board's determination that it failed to present an undue-burden defense.

Accordingly, pursuant to Section 10(e) of the Act, *see* above p.19, this Court lacks jurisdiction to address in the first instance the unlitigated claim that there is some impediment to restoring operations at the Galleria mall.  Even if Starbucks's claim were not jurisdictionally barred, it is unsupported by record evidence.  The testimony Starbucks cites (Br.66) merely confirms that Starbucks retaliated against organizing activity by closing the kiosk and "convert[ing]" it to a licensed store paying royalties to Starbucks.  (ROA.2827-28,2853,2860-61.)  There is no evidence Starbucks would be unable to undertake a good-faith effort to reopen a corporate-managed store at the mall.  *Cf. We Can, Inc.*, 315 NLRB 170, 175 (1994) (noting general requirement that respondents make good-faith efforts to comply with restoration orders "as far as possible").  If reopening has become impossible,

Starbucks may seek to present previously unavailable evidence to that effect during a compliance proceeding. *Cf. Quickway*, 117 F.4th at 817; *Stephens Media Grp.-Watertown*, 371 NLRB No. 11, slip op. 1 n.3 (2021).

Attempting to evade binding precedent holding that a restoration order is "prima facie the appropriate remedy," *Mid-South*, 876 F.2d at 461, Starbucks makes the new, jurisdictionally barred argument (Br.65-66) that an employer should not be obligated to inform the Board that a restoration order is impossible. But the law is clear: it is the employer's burden to show that an order to restore the status quo ante would be unduly burdensome or should not issue "under any other ground." *Id.* Dicta cited by Starbucks (Br.65) does not support a contrary rule. In *Mid-South*, this Court simply noted there may be factual scenarios where an employer can show a restoration order would not effectuate the policies of the Act. *Id.* at 461 n.2. In *RAV Truck & Trailer Repairs v. NLRB*, 997 F.3d 314, 330-31 (D.C. Cir. 2021), the court observed in dicta—having remanded the underlying unfair-labor-practice finding—that the Board failed to consider the employer's "compelling and uncontradicted evidence" that a restoration order would be impossible. Starbucks made no such showing here.

### D.     The Board Did Not Abuse Its Discretion by Including a Notice-Reading Requirement for the Buffalo-Area Stores

Finally, the Board did not abuse its discretion by requiring that remedial notices be read aloud to employees at the impacted Buffalo-area stores.  (RE.15.) As this Court has long recognized, a notice-reading requirement "is an effective but moderate way to let in a warming wind of information and, more important, reassurance."  *J.P. Stevens & Co. v. NLRB*, 417 F.2d 533, 540 (5th Cir. 1969). Regardless of whether Starbucks had already been adjudged a "repeat violator" at the time it engaged in its extensive course of unlawful conduct (Br.67), the Board reasonably concluded that Starbucks's hundreds of discrete violations—many of which were perpetrated by the highest level of its management—were sufficiently coercive to warrant additional reassurance that the employees' statutory rights will be respected going forward.  (RE.15.)

Moreover, even accepting, *arguendo*, Starbucks's characterization of dicta in *Denton Country Electric Cooperative v. NLRB*, 962 F.3d 161, 174 (5th Cir. 2020), as imposing a categorical rule that a notice-reading remedy can *only* issue against a "repeat violator" (Br.67), such remedy would be warranted here.  In late 2021, Starbucks already had a marked history of engaging in unlawful conduct to stamp out nascent union-organizing campaigns—including in New York and neighboring states.  *See Starbucks Corp.*, 372 NLRB No. 50 (2023) (affirming June 2021

64

decision finding Starbucks unlawfully discharged employees attempting to organize Philadelphia-area stores), *enforced in relevant part*, 125 F.4th 78 (3d Cir. 2024); *Starbucks Corp.*, 360 NLRB 1168, 1168-71 (2014) (finding unlawful discharge of employee attempting to organize Manhattan-area stores).  The fact that Starbucks had not previously been sanctioned for unfair labor practices at these exact stores is immaterial.  *Cf. Fla. Steel Corp. v. NLRB*, 620 F.2d 79, 81-82 (5th Cir. 1980) (enforcing notice reading at all of employer's facilities nationwide).

## CONCLUSION

The Board respectfully requests that the Court deny Starbucks's petition for review, grant the Board's cross-application, and enter a judgment enforcing the Board's Order in all respects except those portions requiring make-whole relief for foreseeable harms.

Respectfully submitted,

s/ Amy H. Ginn
AMY H. GINN
*Supervisory Attorney*

s/ Heather S. Beard
HEATHER S. BEARD
*Senior Attorney*

ERIC WEITZ
*Attorney*

WILLIAM B. COWEN
   *Acting General Counsel*

STEPHANIE CAHN
   *Deputy General Counsel*

PETER SUNG OHR
   *Associate General Counsel*

RUTH E. BURDICK
   *Deputy Associate General Counsel*

MEREDITH  JASON
   *Assistant General Counsel*

National Labor Relations Board
November 2025

National Labor Relations Board
1015 Half Street SE
Washington, D.C. 20570
(202) 273-2942

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STARBUCKS CORPORATION      )

        )

    Petitioner/Cross-Respondent     )      No. 24-60650

        )

    v.        )      Board Case Nos.

        )      03-CA-285671 *et al.*

NATIONAL LABOR RELATIONS BOARD   )

        )

    Respondent/Cross-Petitioner     )

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2025, I electronically filed the

foregoing document with the Clerk of the Court for the United States Court of

Appeals for the Fifth Circuit by using the CM/ECF system.  I certify that the

foregoing document was served on all parties or their counsel of record through the

appellate CM/ECF system.

                     /s/ Amy H. Ginn
                     Amy H. Ginn
                     Supervisory Attorney
                     NATIONAL LABOR RELATIONS BOARD
                     1015 Half Street, SE
                     Washington, DC  20570
                     (202) 273-2942

Dated at Washington, DC
this 26th day of November 2025

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| STARBUCKS CORPORATION | ) | |
| | ) | |
| Petitioner/Cross-Respondent | ) | No. 24-60650 |
| | ) | |
| v. | ) | Board Case Nos. |
| | ) | 03-CA-285671 *et al.* |
| NATIONAL LABOR RELATIONS BOARD | ) | |
| | ) | |
| Respondent/Cross-Petitioner | ) | |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board

certifies that its brief contains 12,955 words of proportionally-spaced,

14-point type, excluding the signature block, as permitted by Fed. R. App. P. 32(f),

and the word processing system used was Microsoft Word 365.

/s/ Amy H. Ginn
Amy H. Ginn
Supervisory Attorney
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC  20570
(202) 273-2942

Dated at Washington, DC
this 26th day of November 2025