UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD

STARBUCKS CORPORATION

and

WORKERS UNITED

Cases 03-CA-285671, et al.

and

Case 03-RC-282127

**STARBUCKS' BRIEF IN SUPPORT OF EXCEPTIONS
TO ADMINISTRATIVE LAW JUDGE DECISION**

Terrence H. Murphy
Jacqueline Phipps Polito
Ethan Balsam
Jeffrey S. Hiller
William Whalen
Bruce Buchanan
LITTLER MENDELSON, P.C.

*Counsel for Respondent
Starbucks Corporation*

Dated:  April 28, 2023

# TABLE OF CONTENTS

**PAGE**

I. STATEMENT OF THE CASE ....................................................................... 1

II. ARGUMENT ................................................................................................ 2

    i. Procedural Exceptions .......................................................................... 2

        A. The Arbitrary Page Limit For Exceptions Briefing To The Board Denies Due Process ..................................................................... 2

        B. The ALJD Should Be Vacated Because The Statutory Removal Restrictions For NLRB ALJs Are An Unconstitutional Limit On Performance Of The Executive Function ..................................... 3

        C. The ALJ's Award Of Evidentiary Sanctions Against Starbucks Was Improper ............................................................................... 3

    ii. Section 8(a)(1) Claims ......................................................................... 4

        A. Starbucks Did Not Violate Section 8(a)(1) Through Solicitation Of Grievances .......................................................................... 4

        B. Starbucks Did Not Violate Section 8(a)(1) By Announcing A Seniority-Based Wage Increase On October 27, 2021 And The Record Does Not Support It Was Implemented In Buffalo ...................... 6

        C. Starbucks Did Not Violate Section 8(a)(1) On November 6, 2021 By Promising An Increase In Benefits ....................................... 7

        D. Starbucks Did Not Violate Section 8(a)(1) By Increasing Staffing At Buffalo Stores ..................................................................... 8

        E. Starbucks Did Not Violate Section 8(a)(1) By Centralizing Training ....................................................................................... 9

        F. Starbucks Did Not Grant Benefits And Violate Section 8(a)(1) By Making Repairs To and Renovating Stores In Buffalo ........................... 10

        G. Starbucks Did Not Violate Section 8(a)(1) In Allowing Shift Supervisors To Disable Mobile Ordering Or Close Stores ..................... 13

        H. Starbucks Did Not Violate Section 8(a)(1) By Providing Training To Angel Krempa ........................................................................ 15

        I. Starbucks Did Not Violate Section 8(a)(1) By Posting Work Schedules At The Genesee Street Store .................................................. 15

# TABLE OF CONTENTS
### (CONTINUED)

| | | | |
|---|---|---|---|
| J. | | Starbucks Did Not Violate Section 8(a)(1) Through Statements Alleged In Subparagraphs Of Paragraph 10 Of The Complaint | 16 |
| | 1. | September 15 at Camp Road | 17 |
| | 2. | Elmwood Avenue | 18 |
| | 3. | Genesee Street and Williamsville Place | 19 |
| | 4. | Delaware & Chippewa | 20 |
| K. | | Executives Visiting Stores, Support Managers In Stores And Managers In Stores During All Operational Hours Did Not Create The Impression Of Surveillance | 21 |
| L. | | Starbucks Did Not Violate Section 8(a)(1) By Creating An Impression Of Surveillance In Late August At Transit Commons | 23 |
| M. | | Starbucks Did Not, By Use Of Headsets, Engage In Surveillance Of Employees Violating Section 8(a)(1) | 23 |
| N. | | The Record Does Not Establish Starbucks Unlawfully Interrogated Employees | 24 |
| O. | | Starbucks Did Not Violate Section 8(a)(1) By Engaging In Unit Packing At The Genesee Street Store | 25 |
| iii. | | Section 8(a)(3) and 8(a)(4) Claims | 27 |
| A. | | Starbuck Did Not Violate Section 8(a)(3) Through Stricter Application Of Work Rules | 27 |
| B. | | The ALJ Misapplied Wright Line | 28 |
| | 1. | The ALJ erroneously infers unlawful motive based on Section 8(a)(1) violations | 28 |
| | 2. | The ALJ fails to find the required nexus between claimed unlawful motivation and the specific decisions found to violate Section 8(a)(3) | 29 |
| | 3. | In his findings regarding disciplinary actions as to individuals, the ALJ disregards relevant comparator evidence. | 29 |

## TABLE OF CONTENTS
(CONTINUED)

PAGE

C.  Starbucks Did Not Violate Section 8(a)(3) By Operational Changes At The Walden & Anderson Store ........................................................... 30

    1.  Operational hours ................................................................. 31

    2.  Training store. .................................................................... 31

D.  Starbucks Did Not Violate Section 8(a)(3) By Reducing Hours At The Camp Road Store .................................................................... 31

E.  Starbucks Did Not Violate Section 8(a)(3) By Reducing Store Hours At The UB Commons Store ............................................................. 32

F.  Starbucks Did Not Violate Section 8(a)(3) By Reducing Store Hours Or Shift Supervisor Hours At The East Robinson Store ............... 33

G.  Starbucks Did Not Violate Section 8(a)(3) By Reducing Store Hours At The Elmwood Store ................................................................ 34

H.  The Record Does Not Support The ALJ's Finding That Starbucks' Closure Of The Walden Galleria Kiosk Violated Section 8(a)(3) ........... 34

I.  Starbucks Did Not Violate Section 8(a)(3) By Temporarily Closing Stores For Maintenance Or Meetings ......................................... 38

J.  Starbucks Did Not Violate Section 8(a)(3) By Changing Store Manager Hiring Duties Or Scheduling And Promoting Duties At Elmwood and Williamsville Place ............................................................ 39

    1.  Transfer of hiring responsibility to recruiters. ............................ 40

    2.  Elmwood and Williamsville Place ............................................ 41

K.  Starbucks Did Not Impose More Rigorous Or Onerous Working Conditions Based On Antiunion Sentiment, Violating Section 8(a)(3) ..................................................................................... 42

L.  Starbucks Did Not Violate Section 8(a)(3) With Respect To Erin O'Hare, Cory Johnson and Kaitlyn Baganski .......................................... 44

M.  L. Starbucks Did Not Violate Section 8(a)(3) By Denying Training Assignments At East Robinson ................................................. 46

N.  Starbucks Did Not Violate Section 8(a)(3) With Regard To Gianna Reeve ..................................................................................... 47

# TABLE OF CONTENTS
### (CONTINUED)

PAGE

1.   Starbucks did not violate Section 8(a)(3) with respect to playcaller shifts as to Reeve..........................................48

2.   Starbucks did not violate Section 8(a)(3) by investigating Reeve in January 2022. ..................................................48

O.   Starbucks Did Not Violate Section 8(a)(3) With Respect To James Skretta ...................................................................48

P.   Starbucks Did Not Violate Section 8(a)(3) With Respect To Colin Cochran ..................................................................50

1.   Starbucks did not refuse to allow Cochran to train in violation of Section 8(a)(3). ....................................................50

2.   Starbucks did not violate Section 8(a)(3) in connection with Cochran seeking to be a shift supervisor. ....................52

Q.   Starbucks Did Not Violate Section 8(a)(3) With Respect To William Westlake Or The Coworkers He Identified As Having Hours Reduced ...............................................................52

R.   Starbucks Did Not Violate 8(a)(3) With Respect To Nicole Norton.......55

S.   Starbucks Did Not Violate Section 8(a)(3) With Respect To Roisin Doherty ....................................................................56

T.   Starbucks Did Not Violate Section 8(a)(3) With Respect To Brian Murray.......................................................................57

U.   Starbucks Did Not Violate Section 8(a)(3) With Respect To Mikaela Jazlyn Brisack ...........................................................58

V.   Starbucks Did Not Violate Section 8(a)(3) With Respect to Michelle Eisen ...................................................................60

W.   Starbucks Did Not Violate Section 8(a)(3) With Respect To Cassie Fleischer ..................................................................60

1.   Meeting attendance. ...............................................60

2.   Discharge. ..............................................................61

X.   Starbucks Did Not Violate Section 8(a)(3) With Respect To Daniel Rojas, Jr...................................................................64

# TABLE OF CONTENTS
(CONTINUED)

PAGE

1. The General Counsel failed to carry its initial burden under Wright Line with respect to the claimed violations as to Rojas. .......................................................................................... 64

2. Starbucks established it would have disciplined and discharged Rojas absent union activity ........................................ 66

Y. Starbucks Did Not Violate Section 8(a)(3) With Respect To Edwin "Minwoo" Park ................................................................................. 67

1. The initial burden under Wright Line was not met with respect to the claimed violations as to Park. ................................ 67

2. Starbucks established it would have disciplined and discharged Park absent union activity ........................................... 68

Z. Starbucks Did Not Violate Section 8(a)(3) With Respect to Brian Nuzzo ................................................................................................... 69

1. The record does not establish that the initial burden under Wright Line was met regarding the alleged discrimination against Nuzzo. ............................................................................... 69

2. The record establishes that Starbucks would have taken the same action with respect to Nuzzo absent protected activity ........................................................................................... 71

3. Nuzzo's ban was appropriate and reinstatement would be improper. ................................................................................... 73

AA. Starbucks Did Not Violate Section 8(a)(3) With Respect To Nathan Tarnowski ................................................................................. 73

1. The General Counsel failed to carry the initial Wright Line burden with respect to Tarnowski's discharge ............................ 73

2. Tarnowski would have been discharged absent protected activity ........................................................................................... 76

BB. Starbucks Did Not Violate Section 8(a)(3) With Respect To Angel Krempa ................................................................................................. 77

1. The record does not establish that the initial burden under Wright Line was met with respect to these actions ..................... 77

## TABLE OF CONTENTS
### (CONTINUED)

PAGE

2.    The record establishes Starbucks would have disciplined and discharged Krempa absent protected activity. ...................... 80

CC.    Starbucks Did Not Violate Section 8(a)(4) With Respect To Angel Krempa ................................................................................... 82

1.    Krempa's final written warning did not violate Section 8(a)(4). ...................................................................................... 83

2.    Krempa's discharge did not violate Section 8(a)(4). ................. 83

DD.    Starbucks Did Not Constructively Discharge Kellen Higgins In Violation of Section 8(a)(3) ...................................................... 84

iv.    Section 8(a)(5) Claims ................................................................. 87

A.    Starbucks Did Not Violate Section 8(a)(5) With Respect To Angel Krempa And Edwin Park ......................................................... 87

B.    Starbucks Did Not Violate Section 8(a)(5) With Respect To the Minimum Availability Policy At Elmwood .................................. 88

C.    The Record Does Not Support The ALJ's Finding That A Gissel Bargaining Order Is Warranted At The Starbucks' Camp Road Store ............................................................................................. 90

v.    Remedies ....................................................................................... 94

A.    To The Extent The ALJ Has Granted A Nationwide Remedy, Such A Remedy Is Unwarranted And An Error ................................... 94

B.    The ALJ Erred In Ruling That Starbucks Must Compensate Discriminatees For Direct Or Foreseeable Pecuniary Harm Based On Thryv, Inc. ............................................................................ 96

C.    The ALJ's Direction That The Notice Be Posted For The Length Of The Organizing Campaign, Distributed To Current And New Supervisors And Managers, And Be Publicly Read In The Buffalo Stores By Or In The Presence Of Named Senior Managers Is Unwarranted .................................................................................. 96

D.    The Other Forms Of Special Relief Ordered By The ALJ Are Not Warranted Based On The Record ................................................ 98

# TABLE OF CONTENTS
(CONTINUED)

**PAGE**

E.     The ALJ's Order That Starbucks Cease And Desist From Interfering With, Restraining or Coercing Employees In The Exercise of Section 7 Rights In Any Like Or Other Manner Is Not Warranted ................................................................................. 100

III.     CONCLUSION ............................................................................. 100

[TABLE OF CONTENTS]

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*800 River Rd. Operating Co., LLC, D/B/A Care One,*
369 NLRB No. 109 (2020) ...................................................................88

*ABF Freight System,*
304 NLRB 585 (1991) ..........................................................................85

*Albertson's, Inc.,*
307 NLRB 787 (1992), *rev'd on other grounds,* 8 F.3d 20 (5th Cir. 1993) ............................96

*American Freightways, Inc.,*
327 NLRB 832 (1999) ............................................................................8

*American Licorice Co.,*
299 NLRB 145 (1990) ...........................................................................85

*Arrow Automotive Industries,*
258 NLRB 860 (1981), enfd. 679 F.2d 875 (4th Cir. 1982) ...................23

*Blue Grass Industries, Inc.,*
287 NLRB 274 (1987) ...........................................................................93

*Bourne v. NLRB,*
332 F.2d 47 (2d Cir. 1964) .....................................................................24

*Brown Transport Corp.,*
294 NLRB 969 (1989) ...........................................................................24

*Bruce Duncan Co.,*
233 NLRB 1243 (1977), *modified on other grounds,* 590 F.1304 (4th Cir. 1999) ...................36

*Burlington Times, Inc.,*
328 NLRB 750 (1999) ...........................................................................93

*Cardinal Home Products, Inc.,*
338 NLRB 1004 (2003) .........................................................................94

*Cast-Matic Corp. d/b/a Intermet Stevensville,*
350 NLRB 1349 1359 (2007) ................................................................92

*Cherokee Marine Terminal,*
287 NLRB 1080 (1988) .......................................................................100

*Computer Ass'n Int'l*,
324 NLRB 285 (1997) ...................................................................10

*CP Anchorage Hotel 2, LLC*,
369 NLRB No. 92 (2020) ...............................................................52

*Desert Aggregates*,
340 NLRB 289 (2003) ...................................................................93

*DeSoto, Inc.*,
278 NLRB 788 (1986) ...................................................................37

*Einhorn Enterprises, Inc.*,
279 NLRB 576 (1986) ...................................................................26

*Flamingo Hilton-Laughlin*,
324 NLRB 72 (1997) .....................................................................12

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) ........................................................................3

*Frierson Bldg. Supply Co.*,
328 NLRB No. 149 (1999) .............................................................84

*In re Furr's Cafeteria, Inc.*,
179 NLRB 240 (1969) ...................................................................25

*Hialeah Hospital*,
343 NLRB 391 (2004) ...................................................................93

*Hickmott Foods*,
242 NLRB 1357 (1979) ...............................................................100

*Holy Cross Health*,
370 NLRB No. 16, slip op. (September 1, 2020) ......................17, 19

*Hotel & Restaurant Employees Local 11 v. NLRB*,
760 F.2d 1006 (9th Cir. 1985) ......................................................24

*HTH Corp.*
362 NLRB 709 ..............................................................................99

*HTH Corporation*,
361 NLRB 709 (2014) .................................................................100

*Jarkesy v. SEC*,
34 F4th 446 (5th Cir. 2022) ............................................................3

*Joint Industrial Board,*
238 NLRB 1398 (1978) ................................................................36

*KDEN Broadcasting Co.*,
225 NLRB 25 (1976) ...................................................................91

*Libertyville Toyota,*
360 NLRB No. 141, slip op. (2014), *enfd. sub nom. AutoNation, Inc. v. NLRB,*
801 F.3d 767 (7th Cir. 2015) .......................................................18

*Longview Fibre Paper and Packaging, Inc.,*
365 NLRB No. 108, slip. op (2011).................................................4

*Lotes Co. v. Hon Hai Precision Indus. Co.,*
753 F.3d 395 (2d Cir. 2014).........................................................84

*Lucky Cab Company,*
360 NLRB No. 43 (2014) ..............................................................30

*Mediplex of Danbury,*
314 NLRB 470 (1994) ..................................................................16

*Merck, Sharp & Dohme Corp.,*
367 NLRB No. 122 (2019) ............................................................20

*Michigan Timber & Truss, Inc.*
328 NLRB 459 (1999) ..................................................................18

*Midland National Life Insurance Co.,*
263 NLRB 127 (1982) ..................................................................19

*Miller Group,*
310 NLRB 1235 (1993) ................................................................96

*Montgomery Ward & Co,*
288 NLRB 126 (1988) ..................................................................19

*Multi-Aid Service,*
331 NLRB 1126 (2000), enfd. 255 F.3d 363 (7th Cir. 2001) ................25

*Munford, Inc.,*
266 NLRB 1156 (1983) ................................................................87

*Nalco Chemical Co.,*
163 NLRB 68 ...............................................................................7

*Naomi Knitting Plant,*
328 NLRB 1279 (1999) ..................................................................4

*NLRB v. Bin-Dicator Company*,
356 F.2d 210 (6th Cir. 1966) ................................................................74

*NLRB v. Katz*,
369 U.S. 736 (1962).............................................................................90

*NLRB v. Kay Elecs., Inc.*,
410 F.2d 499 (8th Cir. 1969) ................................................................84

*NLRB v. R.C. Can Company*,
340 F.2d 433 (5th Cir. 1965) ................................................................74

*NLRB v. United States Postal Service*,
Nos. 14-1223 and 14-2575 (6th Cir. 2018).............................................99

*North Carolina Prisoner Legal Services*,
351 NLRB 464 (2007) ..........................................................................86

*Ogihara Am. Corp. & Int'l Union*,
347 NLRB 110 (2006), *aff'd by Int'l Union v. NLRB*, 514 F.3d 574 (6th Cir.
2008) ...................................................................................................85

*Pennsy Supply, Inc.*,
295 NLRB 324 (1989) ............................................................................8

*Plumbing and Industrial Supply Co. Inc.*,
237 NLRB 1124 (1978) .........................................................................26

*Raytheon Network Centric Systems*,
365 NLRB N0. 161, slip op. (2017)........................................................88

*Register Guard*,
344 NLRB 1142 (2005) .........................................................................92

*Roadway Package System, Inc.*,
302 NLRB 961 (1991) ...........................................................................24

*Rogers Electric, Inc.*,
346 NLRB 508 (2006) ...........................................................................21

*Rossmore House*,
269 NLRB 1176 (1984) .........................................................................24

*Sam's Club*,
349 NLRB 1007 (2007) .........................................................................52

*Sara Lee*,
348 NLRB 1133 (2006) .........................................................................17

*SBM Site Servs., LLC*,
    367 NLRB No. 147 ...................................................................................30

*Sears, Roebuck & Co.*
    305 NLRB 193 (1991) ...............................................................................12

*Shell Oil Co.*,
    77 NLRB 1306 (1948) ...............................................................................20

*Southwire Co.*,
    277 NLRB 377 (1985), enfd. 820 F. 2d 453 (D.C. Cir. 1987)..................24

*Spengler-Loomis Mfg. Co.*,
    95 NLRB 243 (1951) .................................................................................13

*Sportsmen's Service Center*,
    317 NLRB 195 (1995) ...............................................................................84

*Strategic Tech. Inst., Inc. & Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 371 NLRB No. 137 (2022) ...........................................................58

*Sun Mart Foods*,
    342 NLRB 161 (2004) ...............................................................................13

*Sutphin Car Wash*,
    365 NLRB No. 106 (2017) .........................................................................16

*T Kal-Die Casting Corp*,
    221 NLRB 1068 (1975) .............................................................................91

*Textile Workers v. Darlington Mfg. Co.*,
    380 U.S. 263 (1965)...................................................................................36

*The Atlantic Group*,
    371 NLRB No. 119, slip op. (2022)...........................................................91

*The Broadway*,
    267 NLRB 385 (1983) ...............................................................................22

*The Jewish Home for the Elderly*,
    343 NLRB 1069 (2004) .............................................................................93

*Thryv, Inc.*,
    372 NLRB No. 22 (2022) ...........................................................................97

*Tri-Cast, Inc.*,
    274 NLRB 377 (1985) ...............................................................................17

*Tschiggfrie Properties, Ltd.,*
 368 NLRB No. 120 slip. op. (2019)................................................................29, 48

*UPS, Inc.,*
 369 NLRB No. 1 (2019) ...........................................................................................30

*Volvo Group North America, LLC,*
 370 NLRB No. 52 (2020) .........................................................................................29

*Wake Electric Membership Corp.,*
 338 NLRB 298 (2002) ..............................................................................................92

*Wal-Mart Stores,*
 348 NLRB 274 (2006) ..............................................................................................12

*Wal-Mart Stores, Inc.,*
 340 NLRB 637 (2003) ................................................................................................4

*Wal-Mart Stores, Inc.,*
 350 NLRB 879 (2007) ..................................................................................21, 23, 24

*Wal-Mart Stores. Inc.,*
 352 NLRB 815 (2008) ......................................................................................23, 41

*Waste Stream Management,*
 315 NLRB 1099 (1994) ............................................................................................21

*Wiers Int'l Trucks, Inc.,*
 353 NLRB 475 (2008) ..............................................................................................10

*Wilker Bros. Co.,*
 236 NLRB 1371 (1978) ............................................................................................19

*Wright Line. American Gardens Management Co.,*
 338 NLRB 644 (2002) ..............................................................................................83

**Statutes**

29 U.S.C. § 153(a) .............................................................................................................3

Administrative Procedures Act, 5 U.S.C. § 7521 ............................................................3

**Other Authorities**

251 NLRB at 1089 .......................................................................................................7, 29

Seventh Amendment to the U. S. Constitution ...............................................................97

# I.     STATEMENT OF THE CASE

The procedural stance of this case is set out on the first two pages of the decision (ALJD) of the Administrative Law Judge (ALJ).[1]

Respondent Starbucks Corporation ("Starbucks") is the world's largest coffeehouse chain, operating approximately 9,000 stores in the U.S. It has 20 stores in the Buffalo area - formerly 21, but the Walden Galleria Mall kiosk closed in September 2021 and did not reopen. Four stores are in the City of Buffalo and the rest in neighboring municipalities and suburbs.

This case involves unfair labor practices charges aggregated over eight months, arising in 18 Starbucks stores in Buffalo and one in Rochester, New York. The earliest of them concern events in late August 2021 when Workers United posted on Twitter a "Dear Kevin" letter, which marked the beginning off the union's public organizing campaign. The rest stretch to April 2022. Also part of this case is the representation proceeding at the Camp Road Store in Hamburg, New York, southwest of Buffalo, where the union lost the election and the General Counsel seeks a bargaining order.

Workers United ultimately filed representation petitions at 10 stores in Buffalo and the store in Rochester that is at issue in this case and was certified as the collective bargaining representative at eight stores. The facts across all the issues in this case are lengthy and won't be detailed here. However, here are some key points about the ALJD and Starbucks' exceptions.

First, the ALJ repeatedly labels steps Starbucks took to address managerial underperformance, degraded store conditions and understaffing in Buffalo as "coercive." The

---

[1] References to the hearing transcript are by "Tr." with the page number. References to exhibits are by "Ex." and exhibit number, preceded by "GC", "R," "Jt." or "U" for the General Counsel's, Respondent Starbucks', joint, or Workers United's exhibits, respectively. References to the ALJD are by "ALJD" with page, line and/or paragraph number.

record makes apparent that Starbucks' senior managers, when they came to Buffalo, were shocked at the sub-standard status and management of their stores and tried to eliminate problems to bring them to standard, not because of organizing. They brought support managers to Buffalo not to combat the unions, but to support the stores. Every one of the support managers so testified.

Second, the ALJ refers over and over to Starbucks' "widespread union animus." But no witness testified to a manager comment evidencing union animus or connecting discipline to union activity. Instead of examining whether union animus could be connected to a particular challenged action alleged to violate Section 8(a)(3), the ALJ finds union animus infecting most or all actions based on Section 8(a)(1) violations, an unsupported end-run around *Wright Line*. He also essentially ignores comparator evidence.

Third, the seven employment separations alleged to violate Section 8(a)(3) all occurred more than six months after organizing started. Each of the individuals either admitted rule violations or were separated after requesting diminished work hours which Starbucks tried to accommodate but could not.

Fourth, the ALJ finds a bargaining order appropriate at Camp Road even though no hallmark violation or claimed unlawful discharge occurred there and the record includes no evidence that Camp Road partners knew of events in other stores.

Below are Starbucks' arguments in support of its exceptions.[2]

## II.    ARGUMENT

### i.    Procedural Exceptions

A.    The Arbitrary Page Limit For Exceptions Briefing To The Board Denies Due Process

---

[2] Starbucks respectfully maintains that recusal of Board members Gwynne Wilcox and David Prouty is warranted based on the past, present and perceived relationships with the Service Employees International Union, its local unions and affiliates, including Workers United.

In this case, Starbucks is required to respond to an over 50-page unfair labor practice complaint that resulted in an ALJ decision of 204 pages, finding well over 120 unfair labor practices.  The Board's rules require a respondent to except and brief every allegation and finding by the ALJ or confront a claim of waiver.   Notwithstanding the volume of findings and adverse consequences for failing to except, the Board limited Starbucks to 100 pages for its brief in support of exceptions, less than half the number of pages the ALJ used to make the findings at issue. To place arbitrary limitations on briefing when the NLRB General Counsel and the ALJ have full discretion to bring an unlimited number of claims and issue decisions of an unlimited number of pages denies due process.  Starbucks cannot reasonably be expected to take exceptions and meaningfully argue them within such arbitrary page limitations.

B.     The ALJD Should Be Vacated Because The Statutory Removal Restrictions For NLRB ALJs Are An Unconstitutional Limit On Performance Of The Executive Function

The existence of two layers of for-cause protection for administrative law judges unconstitutionally deprives the President of the ability to adequately oversee agency actions.  *See Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 492, 496 (2010); *Jarkesy v. SEC*, 34 F4th 446, 465-66 (5th Cir. 2022). The NLRB has such a system for ALJs -  for cause termination rights under the Administrative Procedures Act, 5 U.S.C. § 7521, for ALJs and a similar limitation on removal of Board members,  29 U.S.C. § 153(a). Thus, because of the unconstitutional status of the ALJ who authored the ALJD, he lacked legal authority to issue the decision, which should be vacated *in toto*.

C.     The ALJ's Award Of Evidentiary Sanctions Against Starbucks Was Improper

In this case, Starbucks received subpoenas containing hundreds requests, excluding subparts, seeking the equivalent of tens of thousands of documents and requiring the need to

3

conduct voluminous email searches and reviews of electronic discovery. The Board's rules require a petition to revoke be filed within five business days of receipt of a subpoena. When Starbucks filed petitions to revoke, which the ALJ rejected without any meaningful analysis of them or any weighing of the proportionality of the burden imposed on Starbucks in producing this information versus the needs of the case or the importance of information sought.  The ALJ then issued evidentiary sanctions against Starbucks despite its good faith compliance with the subpoena.  Evidentiary sanctions are a drastic sanction not supported by Board law and his award of them was error possible rising to denial of due process.

### ii.    Section 8(a)(1) Claims

A.    Starbucks Did Not Violate Section 8(a)(1) Through Solicitation Of Grievances

Paragraph 6 of the complaint through its subparagraphs (GC Ex. 1zzz ¶ 6) alleges Starbucks solicited grievances at 12 stores in the Buffalo market, primarily in September 2021. Starbucks excepts to the ALJ's findings that in response to organizing efforts Starbucks "introduced a novel concept to the Buffalo market – listening sessions for all store employees" and that online and other tools for employee complaints "did not entitle corporate officials to solicit grievances during the critical period in the Buffalo market at unprecedented in-person meetings with shift supervisors and baristas." (ALJD 27:12-13, 138:20-25, 41-45, 139:1-15, 189:14, 189:45-190:1).

The ALJ did concede that "in the past, similar meetings had been held for the Buffalo area with store managers and shift supervisors," and that "[r]espondent held sessions including baristas in other areas of the country." (ALJD 27:fn. 62) (emphasis added).

Employers with past practices "of soliciting employee grievances may continue to do so during an organizational campaign." *Naomi Knitting Plant*, 328 NLRB 1279, 1294 (1999); *see also Wal-Mart Stores, Inc*., 340 NLRB 637 (2003) (pre-existing open-door during organizing campaign lawful); *Longview Fibre Paper and Packaging, Inc*., 365 NLRB No. 108, slip. op at 1

(2011) ("brainstorming" meeting to solicit and remedy grievances lawful where consistent with past practices). Here, Kristina Mkrtumyan, Tiffany Mann, Mallori Coulombe (management) and Strohar (barista) testified to Starbucks' longstanding practice of asking partners about issues and how to help. (Tr. 2576, 2675, 3372; GC Ex. 26(b), 26:13-15). Starbucks' Partner Guide, which pre-dates union activity, contains a policy for communicating about experiences, needs and concerns, and accountability for results. (GC Ex. 140, 000094, 0000132; R Ex. 89). Starbucks thus did not unlawfully solicit grievances to discourage unionization, but followed a practice of trying to ensure that partners' experiences met standards.

As to Camp Road (GC Ex. 1zzz ¶ 6(a)), the record does not support the ALJ's finding David Fiscus' August 2021 interactions with William Westlake amounted to solicitation of grievances (ALJD 64:5-6, 10 and fn. 217, 65:6-9, 138:41-45, 189:12-14). Westlake testified that in August Fiscus asked him to be a barista trainer, how things were going in the store, and if Westlake had feedback on how to improve the store. In a later conversation, Fiscus reviewed Westlake's job duties, gave performance feedback, and asked what improvements could benefit the store. (Tr. 1151-52). These interactions were routine and not solicitation of grievances.

The ALJ also finds Rossann Williams' September 10 visit to Camp Road resulted in unlawful solicitation of grievances. (ALJD 127:22-23, 139:7-11, 189:12-14). Westlake testified that upon Williams' first visit to the store, she asked how Starbucks could help with the partner experience. (Tr. 1159). Starbucks' history is of facilitating open dialogue between managers and partners, and Williams' visit to the Camp Road store was no different.

The ALJ further finds that Allyson Peck, Deanna Pusatier and Williams solicited grievances on September 9, 10, and 15. (ALJD 66-71:1-18, 139:1-11, 189:12-14). On September 9, Peck reassured partners the listening sessions were to discuss experiences in an informal setting.

(GC Ex. 98(b), pp. 21, 38). On September 10, Williams stated she was there because the partner experience in Buffalo was inconsistent with the rest of the country. (GC Ex. 87(b), p. 13). During the September 15 meeting, Williams reminded partners of Starbucks' pre-existing "open dialogue" regarding what was and was not working for the store. (GC Ex. 99(b), p. 23). These statements echo language in the Partner Guide and job descriptions which reflect Starbucks' practice of regularly communicating about partner and customer experience.

Paragraph 6(a) of the complaint should be dismissed.

B.      Starbucks Did Not Violate Section 8(a)(1) By Announcing A Seniority-Based Wage Increase On October 27, 2021 And The Record Does Not Support It Was Implemented In Buffalo

The ALJ finds that Starbucks' October 27, 2021 nationwide announcement of increased pay for tenured employees was an unlawful promise and that implementation of the pay increase in January 2022 was an unlawful grant of benefits. (ALJD 25:27-28, 144:6-47, 145:1-10, 189:16-17, 27, 29, 31-32; *see* GC Ex. 1zzz ¶ 7(e) and (v)). These findings are unsupported.

The October 2021 announcement stated that partners "could receive" additional tenure-based raises in January 2022, depending on various factors. (GC Ex. 59). The record reflects that Starbucks has for many years effected nationwide annual wage increases, whose scheduling sometimes changes. It also reflects Starbucks' commitment to raise the wage floor in all markets. (Tr. 2947, 2950; R Ex. 112). Given that this was a nationwide announcement, by its terms did not "promise" higher pay to all tenured employees and was consistent with a corporate pattern of annual compensation increases, it was error for the ALJ to conclude that the announcement coerced the Section 7 rights of Buffalo employees.

As to the finding of unlawful implementation in January 2022, it is erroneous for multiple reasons. First, although *Wright Line* normally is applied to Section 8(a)(3) cases, in *Wright Line* itself the Board stated that its formulation would apply to "all cases alleging violation of section

8(a)(3) or violations of section 8(a)(1) turning on employer motivation." 251 NLRB at 1089. Here, the allegation of an unlawful grant of benefits is pled as based on motive. (*See* GC Ex 1zzz ¶ 9 (v) and (w)). The General Counsel introduced no evidence to establish a causal relationship between the protected activity of Buffalo employees and a nationwide wage increase. The October 27 announcement described the nationwide increase without reference to any union campaign or Buffalo. The conclusion that Starbucks was motivated by union organizing in Buffalo to effect a nationwide wage increase across 9,000 stores is both illogical and unproven. *See Nalco Chemical Co.*, 163 NLRB 68, 70-71 (1967) (corporate-wide improvements in vacation and holiday benefits did not violate Section 8(a)(1) in part because it is doubtful employer would implement costly benefit increases for 1000 employees nationally to influence 34 voters in one location).

Second, the record does not establish the increase happened. The General Counsel adduced no evidence it was effected outside Buffalo. No Starbucks witness testified to its implementation in Buffalo or elsewhere. Almost all of the General Counsel's witnesses testified they did not receive a seniority-based wage increase in January 2022. (Tr. 308-10, 471-72, 743-44, 1108, 1564-65). Only Iliana Gomez, a partner at the Delaware & Chippewa store, testified to receiving a tenure-based raise in January 2022. In short, the record does not support that a seniority-based wage increase occurred in all U.S. stores or for Buffalo employees generally.

Paragraphs 7(e) and (v) should be dismissed.

C.     Starbucks Did Not Violate Section 8(a)(1) On November 6, 2021 By Promising An Increase In Benefits

The ALJ found that Starbucks' "promise to remedy employee grievances on November 6—just three days before three area elections—coerced employees in violation of Section 8(a)(1) of the Act." (ALJD 31:1-38, 145:33-35, 189:16-17). The complaint's allegations are that on November 6 Peck promised "improved working conditions and benefits" and Howard Schultz

promised an "increase in benefits[.]" (GC Ex. 1zzz ¶ 7(f) and (g)). The ALJ's factual findings and analysis support none of the above.

In the November 6 meeting Schultz did not mention Workers United, its organizing efforts or status in Buffalo. He discussed his Starbucks career and *existing* benefits which Starbucks provides it partners. The video of this meeting reflects no promise of "an *increase* in benefits" for partners. At one point, Schultz said the company was concerned about COVID and was trying to ensure that "our customers and you are as healthy and safe as possible," and that he had heard from managers about the condition in "some of the stores" and had assured those *managers* that it would be addressed. (Jt. Ex. 1; ALJD 145:14-21). This is not a promise to partners of an increase in benefits or to remedy grievances. Paragraph 7(g) of the complaint should be dismissed.

As to Peck, according to the ALJ, after Schultz concluded Peck restated the company's promise to solve the problems in their stores when she said: "And again, we haven't gotten this right. But we are absolutely, we're up with everything we have to get this right for you, and for each other.'" (ALJD 145:21-23; Jt. Ex. 1). This is too non-specific to be a promise of improved working conditions and benefits. The cases the ALJ cites do not support his conclusion. *See Pennsy Supply, Inc.*, 295 NLRB 324, 325 (1989) (after petition operations manager communicated to employees in not "general and vague" terms "that an improved health plan and a retirement plan were under active study or consideration by the owner"); *American Freightways, Inc.*, 327 NLRB 832 (1999) (coercive for employer to tell employees it "would fix the problems, and we don't need a third party to intervene"). Paragraph 7(f) of the complaint should be dismissed.

D.      Starbucks Did Not Violate Section 8(a)(1) By Increasing Staffing At Buffalo Stores

Paragraphs 9(b)-(d) of the complaint allege Starbucks was unlawfully remedying grievances, granting benefits and trying to dilute union support by hiring additional employees for and overstaffing Buffalo facilities. (GC Ex. 1zzz ¶9(b)-(d)). Addressing these allegations, the ALJ

says employees complained about understaffing, Starbucks conducted a "hiring blitz," and then devotes the rest of his analysis to overstaffing and unit packing at one store - Genesee Street. (ALJD 52:29-31, 145:39-146:31, 189:16-17, 190:24-25). Unit packing at Genesee Street is separately alleged in paragraph 8(g) of the complaint and addressed elsewhere in this brief. *See* ii, O, *infra*.

Other than referencing a "hiring blitz" to alleviate understaffing after employees complained, the ALJ makes no factual findings relevant to paragraphs 9(b)-(d), but nevertheless makes legal conclusions. (ALJD 190:29-30). The record is clear that most Starbucks stores in Buffalo were understaffed, many of them severely, and that employee callouts often further contributed to stores' day-to-day staffing needs not being met. (Tr. 2724-25, 2404-05, 2476-77, 2724-25, 2848, 2859, 2902). Starbucks hired not in response to employee complaints but because hiring was essential, which does not violate Section 8(a)(1).

Paragraphs 9(b)-(d) of the complaint should be dismissed.

E.  Starbucks Did Not Violate Section 8(a)(1) By Centralizing Training

The complaint alleged that training new hires at a single training facility in September 2021 and then at three stores in November 2021 was an unlawful grant of benefit to employees, and that since November, changing the training procedure at East Robinson took away income and changed working conditions. (GC Ex. 1zzz ¶ 9(a), (s) and (u)). The ALJ finds implementation of centralized training was to fulfill Starbucks' promises to employees, granting them benefits in violation of Section 8(a)(1). (ALJD 24:fn. 51, 82:15-19, 146:33-45, 147:1-10, 190:32-33, 191:7). His apparent finding on paragraph 9(u) is that, because in November at East Robinson most of the training was done by shift supervisors, barista trainers lost training bonuses, violating Section 8(a)(1). (*See* ALJD 116:24-28, 146:42-43, 191:14).

As to the ALJ's finding on paragraph 9(a) and (s), the record demonstrates that centralizing

9

training was based not on solicitation of grievances or promises to employees, but on a desire to improve store operations – to help store managers by reducing the time they otherwise would have to spend training new partners. (Tr. 2834-36, 2848-49, 3407-08). This was not a new approach. Starbucks has operated stores as centralized training facilities throughout the country, including in St. Louis, Seattle, and Nebraska. (Tr. 2679, 2849, 2958, 3102). As referenced in an October 27, 2021 announcement, Starbucks had *40 training stores* around the country at the time. (GC Ex. 59, p. 5). When Walden & Anderson reopened to customers on November 8, 2021, the centralized training approach was transitioned to three other stores to allow new partners to train in locations nearer to their home stores. (Tr. 2850, 3101-02).

Where new hires are trained is not an *employment* or *economic* benefit for existing partners. These facts differ from cases where the Board has found training an unlawful benefit. In those cases, it is the creation of *new* training or agreement to reimburse for training that is the benefit, not providing the same training in a new location. *See, e.g., Wiers Int'l Trucks, Inc.*, 353 NLRB 475 (2008); *Computer Ass'n Int'l*, 324 NLRB 285 (1997). Deciding to train at a centralized location is not the grant of an employee benefit.

Regarding paragraph 9(u) of the complaint, having training at East Robinson performed by shift supervisors (who are not Section 2(11) supervisors) instead of barista trainers does not interfere with any partners' Section 7 rights.

Based on the above, paragraphs 9(a), (s) and (u) should be dismissed.

F.    Starbucks Did Not Grant Benefits And Violate Section 8(a)(1) By Making Repairs To and Renovating Stores In Buffalo

The ALJ erroneously finds that Starbucks, based on its solicitation of grievances and in response to facility-related complaints by employees, rolled out a "massive renovation and repair

operation," granting employees a benefit, which violated Section 8(a)(1). (ALJD 42:fn. 127, 147: 19-148:17, 189:31-32, 190:35-36; *see* GC Ex. 1zzz ¶ 9(e), (l) and (m)).

The ALJ's description of Starbucks' facilities efforts as a response to solicitation of grievances is not objective. The record includes ample evidence that, when Starbucks executives and managers arrived in Buffalo, they were alarmed when they observed stores that were not clean, unsafe and in disrepair with facilities issues being ignored and often unreported. Issues included not only uncleanliness, but also items like unsecure front doors, water damage to cabinets and floors, broken equipment, outdated and inefficient layouts, and pest infestations. (Tr. 2828-31, 2979-81, 3012, 3385). It was the state of the stores in Buffalo that led to the facility work, not union activity, even though the union activity was coincident.

Although the ALJ finds facilities service manager Michelle Claytor relocated to Buffalo in September 2021 in response to union activity, the record indicates she came to support the market's repair and maintenance needs. (ALJD 26:fn. 59). Claytor was asked to support the Buffalo market without any discussion of union activity. (ALJD 26: fn. 59; Tr. 3011). Claytor observed many maintenance issues and testified repairs weren't being called in. (Tr. 3012-18; R Ex. 139-140).

A sampling of completed repairs indicates the nature of basic health and safety concerns to customers and partners:

- Transit & French: September 2021 - store reset to rearrange products and clean (Tr. 1261, 1637-1638, 2783-85);
- Orchard Park: September 2021- awning repair (Tr. 2460, 2869, 2874-75);
- Williamsville Main: September 2021 - address flying pest issues (Tr. 3208-09);
- Walden & Anderson: September 2021- resolve fruit fly and standing water issues (Tr. 1929, 3031);
- UB Commons: September 2021 - improve old storage room (Tr. 1726, 3029-30);
- Elmwood: September 2021 - remove old carpet (Tr. 286-87, 1541, 2741-42, 3025);
- NFB: September-October 2021 - replace floor (Tr. 3435-37);
- Transit & Maple: October 2021 - reset to add shelving and deep clean (Tr. 656);
- East Robinson: October 2021 - rearrange backroom and deep clean (Tr. 1892);

- Genesee Street: October 2021 - repair of cabinet water damage, water filtration and pressure, freezer and refrigerator, and address pest control issues (Tr. 2981-82);
- Camp Road: October 2021 - replace countertops/ floors to eliminate fruit flies (Tr. 3331-34); and
- Sheridan & Bailey: reset, deep clean, restocking shelves (Tr. 881-83, 888).

Union activity does not preclude making needed repairs and improvements at facilities or steps to ensure customer-friendly, safe and operational stores. *Wal-Mart Stores*, 348 NLRB 274, 282 (2006); *see also Sears, Roebuck & Co.* 305 NLRB 193 (1991). To the extent the ALJ's findings imply Starbucks had to ignore needed repairs to avoid unfair labor practices, that is not the case. It is not the grant of a benefit for an employer to make customer-facing stores operational and appealing. *See Flamingo Hilton-Laughlin*, 324 NLRB 72 (1997), enf. in pertinent part 148 F.3d 1166, 331 U.S. App. D.C. 312 (1998) (change over three-month period not unlawful simply because effect was to improve workplace conditions). Needed repairs were discovered, reported to facilities, prioritized and undertaken. (Tr. 3012-3018).

The ALJ's findings on store renovations or remodeling are unsupported for substantially the same reasons. Starbucks undertook renovations not because of partner grievances, but to bring the market to company standards. (Tr. 2856-57, 3430). Plus, his finding that "none of the renovations that were implemented in Buffalo during Fall 2021 were planned prior to August 23, 2021" is incorrect (ALJD 25:fn. 55, 26:fn. 57):

- Williamsville Place: A pre-campaign plan to make this store a drive-thru location delayed due to permitting issues, but interior redesigned, consistent with plan (Tr. 3430-41);
- Sheridan & Bailey: New computers and cash registers at the beginning of 2022 was when new technology was being implemented nationally based on a recommendation from outside the Buffalo market (Tr. 888; GC Ex. 59 at p. 6);
- Genesee Street: In October 2021 Starbucks changed furniture and artwork, repainted, lengthened counters and installed cold brew. (Tr. 2991, 3438). Starbucks' October 27, 2021 press release indicates new equipment and layouts were being implemented nationally at this time (GC Ex. 59 at p. 6); and
- Transit Commons: Transit Commons renovations were planned before the union campaign. (Tr. 3479).

12

Finally, the decisions the ALJ cites are not analogous to these facts. In *Spengler-Loomis Mfg. Co.*, 95 NLRB 243, 244-45 (1951), the Board determined that a construction employer's steps to improve toilets, provide more smoking areas and time clocks, adjust lighting and replace a foreman about whom complaints had been made violated Section 8(a)(1). Since the employer was not a customer-facing business, these improvements were solely to benefit employees. In *Sun Mart Foods*, 342 NLRB 161, 165 (2004), the Board found a renovation to be an employee benefit, but provided no specifics about store conditions, because the employer touted the renovation as a benefit to employees and announced it three days before the election. The Board explicitly stated it was "the announcement of the benefit, not the decision to grant the benefit that [was] objectionable." *Id.*

The ALJ's findings should be rejected and paragraphs 9(e) and (l)-(m) dismissed.

G.     Starbucks Did Not Violate Section 8(a)(1) In Allowing Shift Supervisors To Disable Mobile Ordering Or Close Stores

The ALJ found Starbucks increased benefits to employees, violating Section 8(a)(1), based on allegations in paragraph 9(f) of the complaint (GC Ex. 1zzz¶ 9(f); ALJD 116-17:1-2, 119:1-9, 129:15-23, 148:20-30, 169:36-38, 190:38-42):

- ¶ 9(f) – since September 2021 permitting shift supervisors in Buffalo to disable mobile ordering;
- ¶ 9(i) – since September 2021 permitting shift supervisors in Buffalo to close cafes;
- ¶ 9(j) – since September 2021permitting shift supervisors to close the Main Street store; and
- ¶ 9(t) – on about November 8, 2021 permanently disabling mobile ordering at the Walden & Anderson store.

The ALJ's findings do not track these allegations, are limited to certain stores and are narrower than what is alleged. He finds: at Camp Road support managers allowed employees to text requests to turn off mobile ordering, but reversed that after the election (ALJD 65:69); at

13

Williamsville Main after August 23, shift supervisors were allowed to close channels or the whole store, if necessary (ALJD 125:41, 126:1-2); Walden & Anderson gradually reopened to the public on November 8, 2021, but mobile ordering did not reopen for several months (ALJD 82:27-30 and fn.280); and shift supervisors at East Robinson in Fall 2021 were allowed to disable mobile orders (ALJD 116:30-33, 117:1-2). The ALJ finds that giving employees in these stores the ability to reduce store operations was an unlawful grant of benefit. (ALJD 148:18-30).

First, paragraphs 9(f) and (i) of the complaint should be dismissed at least in part because the ALJ makes no Buffalo-wide finding, and his findings appear temporally limited to Fall 2021. Second, paragraph 9(t) concerning Walden & Anderson should be dismissed. The record does not support either that the disabling of mobile ordering was based on solicited grievances or permanent. It just reflects its being disabled for a period after November 8 as part of the gradual reopening of the store. (Tr. 3101-02). Third, how allowing shift supervisors to close one or more channels is a grant of a benefit interfering with Section 7 rights is wholly unclear. Starbucks managers and the General Counsel's witnesses uniformly testified that shift supervisors can only disable or close a channel with managerial authorization. (Tr. 1175, 1233, 1903-04, 2433, 2579-80, 2626, 2868-69, 3414-20). So, the claimed unfair labor practice is just providing authorization under an already-existing procedure, which does not violate Section 8(a)(1). This finding implies that to avoid an unfair labor practice, Starbucks had to withhold such authorization.

Further, different parts of the decision are at odds with each other. The ALJ orders Starbucks to cease and desist from permitting shift supervisors to shut down mobile ordering and from closing store cafes and stores to remedy grievances, and also orders Starbucks to cease and desist "[r]etaliating against employees . . . by . . . refusing to permit shift supervisors to close a store's café [and] . . . to disable mobile ordering, [and] . . . refusing to allow employees to . . . close

14

the store early to handle an emergency." (ALJD 196:39-42, 198:42-199:2-3, 199:14-26). The latter order purportedly was based on a conclusion that Starbucks violated Section 8(a)(1) by "refusing to permit shift supervisors to close the cafés of stores . . . [and] . . . to disable mobile ordering in response to union activity." (ALJD 193:26-30). The ALJ apparently finds Starbucks violated Section 8(a)(1) both by permitting shift supervisors to disable mobile ordering and close stores, and by refusing to permit such actions. Starbucks cannot comply with both of these orders.

For all the above reasons, paragraphs 9(f), (i), (j) and (t) should be dismissed.

H.     Starbucks Did Not Violate Section 8(a)(1) By Providing Training To Angel Krempa

The ALJ finds that providing shift supervisor training to Angel Krempa at the Transit & French store in or around October 2021 was the grant of a benefit, violating Section 8(a)(1). (ALJD 95:10-13, 149:39-150:2, 191:1-2; *see* GC Ex.1zzz ¶ 9(p)). Krempa was exposed to COVID shortly after being made a shift supervisor. After she returned to work, her shift supervisor training was not completed. Approximately seven months later, she asked Mkrtumyan if it could be scheduled. Mkrtumyan arranged for the training. (Tr. 972-72, 3342-343). This was before the union filed a petition to represent Transit & French employees. Providing the completion of training to an employee requesting it for his or her position is not the unlawful grant of a benefit. Paragraph 9(p) should be dismissed.

I.     Starbucks Did Not Violate Section 8(a)(1) By Posting Work Schedules At The Genesee Street Store

The ALJ erroneously finds posting the work schedule at the Genesee Street store the grant of a benefit, violating Section 8(a)(1). (ALJD 51:24-28, 150:6-10, 191:4-5; *see* GC Ex.1zzz ¶ 9(r)).

The record reflects that when Louis DeFeo arrived at the Genesee Street store as a support manager in Fall 2021, schedules were not being posted in accordance with Starbucks' desired practice of posting schedules three weeks out. DeFeo immediately corrected this practice. (Tr.

2996-97). Ignoring his uncontroverted testimony, the ALJ credits that of Alexis Rizzo, who was uncertain when she spoke to Williams about the schedule issue and did not identify when the schedule issue was remedied. (Tr. 736-38). The ALJ also makes an unsupported finding, which is that after Rizzo talked to Williams: "As soon as the next schedule was ready, it was posted in the back room." (ALJD 51:27-28). No record evidence supports this predicate for the ALJ's finding of a violation. Rizzo just testified that the next time she spoke with Williams "the only thing that had changed was our store schedules being posted more frequently." (Tr. 737-38). The only record evidence regarding *when* schedules started being posted is the uncontroverted testimony of DeFeo.

Paragraph 9(r) should be dismissed.

> J.      Starbucks Did Not Violate Section 8(a)(1) Through Statements Alleged In Subparagraphs Of Paragraph 10 Of The Complaint

The ALJ finds certain statements by Starbucks officials and managers threatened employees with the loss of benefits or adverse changes to their working conditions if they selected the union as their bargaining representative, violating Section 8(a)(1). (ALJD 152:7-155:1-9, 197:43-44, 198:22-35; GC Ex. 1zzz ¶ 10(b)-(j), (l), (n)-(q)). The language the ALJ characterizes as threatening does not, as a matter of law, satisfy the standard for an unlawful threat.

To prove speech unlawful, the General Counsel must show the employer made a threat or promise, that an employee was aware of it in context, and that it would reasonably tend to interfere with, restrain or coerce the employee in the exercise of Section 7 rights. This test is objective. *Sutphin Car Wash*, 365 NLRB No. 106 (2017). The Board considers the totality of the circumstances. *Mediplex of Danbury*, 314 NLRB 470, 471 (1994).

ALJ conclusions that Starbucks violated Section 8(a)(1) in meetings with Camp Road, Elmwood Avenue, Genesee Street and Williamsville Place partners are erroneous. Most of these meetings were recorded and, although quotes the ALJ relies upon are accurate, they are extracted

without consideration of context and the ALJ categorizes statements held lawful under Board law as "threats."

### 1. September 15 at Camp Road

The complaint alleges, and the ALJ finds, that statements by Pusatier, Peck and Williams at Camp Road were unlawful threats. (GC Ex. 1zzz ¶ 10(b), (c)(ii), (d)(i), (f)); (ALJD 40:30-31, 152:7-13, 191:18-22). In the September 15 meeting, Williams, Peck, and Pusatier informed employees that they have the "right" to organize, should vote, and Starbucks would respect the election results. Managers also discussed consequences of unionizing, including the prohibition on direct dealing, the negotiation of bargaining unit work, and the inability unilaterally to provide new benefits outside the contract. (GC Ex. 99(b)).

Contrary to the ALJ's finding that Starbucks "threatened" partners would lose benefits if represented by the union (ALJD 152:5-14, 190-191), managers actually stated that current benefits, like managers working the floor and borrowing partners from other stores, would be subject to bargaining, and that the legal relationship would change because Starbucks would be required to bargain with the union. (GC Ex. 99(b)). These are accurate statements of the law. Statements concerning *possible* changes in the employer/employee relationship without threats of reprisals do not violate Section 8(a)(1). *Tri-Cast, Inc.*, 274 NLRB 377 (1985). Nor is it unlawful for a manager to state that election of a union injects a third party into the workplace through which the company and employees must communicate. *Holy Cross Health*, 370 NLRB No. 16, slip op. at n. 2 (September 1, 2020), *citing Tri-Cast, Inc*., 274 NLRB 377 (1985); *Sara Lee*, 348 NLRB 1133, 1135 (2006).

In the September 15 meeting at Camp Road, managers also offered their personal opinions. Sharing a preference for a direct relationship is not unlawful. *Michigan Timber & Truss, Inc*. 328 NLRB 459 (1999).

        2.    *Elmwood Avenue*

The ALJ erroneously finds that statements at the Elmwood store in late August, and on September 10, 19 and November 8, unlawful. (ALJD 152:15-25, 191:18-22; *see* GC Ex. 1zzz ¶ 10(c)(i), (iii) and (v) (e)(i)).

The ALJ finds that in late August store manager Shanley warned Jaz Brisack she would not be able to help baristas on the floor anymore if there was a union. (ALJD 152:15-25, 191:9-10). This fails to consider context. Shanley was discussing unit work being limited to the bargaining unit as a *possible* consequence of a collective bargaining agreement, emphasizing that the ultimate decision would depend on "what would be negotiated" by the union and Starbucks. (Tr. 1518). It was not improper for Shanley to alert partners to this fact. Further, nothing in Shanley's words suggested *Starbucks* would prevent managers from working on the floor—only that this issue would be bargained. An unlawful threat depends on the assertion or implication that the employer will act. *See Libertyville Toyota*, 360 NLRB No. 141, slip op. at 1 (2014) (finding threat where employer suggested "bargaining might never begin" and employees would lose benefits, not because of uncertainties of collective bargaining, but because they selected union), *enfd. sub nom. AutoNation, Inc. v. NLRB*, 801 F.3d 767 (7th Cir. 2015). Shanley's statements were not an unlawful threat.

The ALJ erroneously finds that in September 10 and 19 meetings, Williams, Peck, and Pusatier warned that a union would not be a "good fit," would result in loss of their direct relationship and diminish the ability to resolve problems. (ALJD 152:15-41, 191:12-13). These statements are not threats. Peck's statement a union is not a "good fit" for Starbucks is protected personal opinion and not coercive. (GC Exh. 26-b, p. 18). "The Act does not preclude a supervisor from expressing opinions or pronouncing antipathy to unions so long as the statements are not coercive [footnote omitted]." *Wilker Bros. Co.*, 236 NLRB 1371, 1372 (1978).

The complaint alleges an unlawful statement by Nelson at Elmwood on November 8. (GC Ex. 1zzz ¶ 10(c)(v)). Nelson asked Elmwood employees "to vote to keep the direct relationship with," which the ALJ finds to be a threat. (ALJD 152:21-23, 39-41, 191:22). It was not. The Board has applied *Tri-Cast* to find no violation where an employer stated that "union representation might limit direct access to management," *Holy Cross Hospital*, 370 NLRB No. 16, slip op. at 1 n. 3 (2020), and where an employer said, "if the union came in, employees could no longer come directly to management with problems . . . [and they] would have to go to the union with any complaint." *Montgomery Ward & Co*, 288 NLRB 126, 126 fn. 3 (1988), remanded on unrelated grounds 904 F.2d 1156 (7th Cir. 1990). Even if Starbucks' statement was a "clumsy recitation" of law, that fails to establish a Section 8(a)(1) violation. *Midland National Life Insurance Co*., 263 NLRB 127, 130 (1982).

### 3.     Genesee Street and Williamsville Place

The ALJ erred in finding statements in September 16 meetings at Genesee Street were threats. (ALJD 152:25-32; *see* GC Ex. 1zzz ¶ 10(d)(ii)). The statements were that representation would cause "change" in "how you're employed[,]" would cause different treatment from unrepresented employees on pay and benefits,  that Starbucks would not be able unilaterally to provide new benefits during the life of the contract, and that exchange of shifts between store might be lost. (ALJD 152:25-32, 198:27-29; GC Ex 52(b)).

Telling partners unionization would "change" how they were employed was accurate, as was stating that partners would be "treated differently from unrepresented store employees as it related to their pay and benefits" and that they would not automatically receive new benefits effected by Starbucks for non-union stores. The Board recognizes an employer's right to treat represented and unrepresented employees differently, so long as not discriminatorily motivated. *Shell Oil Co.*, 77 NLRB 1306, 1310 (1948); *see also Merck, Sharp & Dohme Corp*., 367 NLRB No. 122 (2019)

(employer privileged absent unlawful motive to give wage increases to unorganized employees, but not obligated to make them applicable to union members engaged in collective bargaining).

Borrowing and transferring partners from non-union to union stores and vice-versa is complex because each store would have different terms and conditions of employment and collective bargaining agreements might apply. Pusatier's comments merely expressed that borrowed partners would pose "a challenge" in such a context. (GC Ex. 52(b); ALJD 23:16-25). These comments were not unlawful threats, nor was the ALJ's finding that "Fenton made a similar statement stating that a union contract could cause employees to lose their ability to transfer to or pick up shifts at other stores." (ALJD 152:34-37, 191:22-23; *see* GC Ex. 1zzz ¶ 10(d)(iii)).

Finding these statements violated Section 8(a)(1) by threatening employees with loss of existing benefits was error. (ALJD 152:34-43, 153:1-13, 191:15-16). Starbucks did not state it would take away existing benefits. Rather, managers explained that benefits under a contract could be "better or not better" and "more, less or the same." Further, employees were reassured that they *could* transfer. Each of these statements was lawful. (GC Ex. 52(b), p. 23:18-25).

### 4.      *Delaware & Chippewa*

The complaint alleges that on February 2, 2022 support manager Heather Dow at Delaware & Chippewa threatened no raises if employees unionized. (GC Ex. 1zzz ¶ 10(p)). The ALJ erroneously finds that in telling employees she had been in a union, that they did not know what they were getting into and referring to a Canadian store's failure to receive pay raises, Dow was "suggesting employees in a unionized store might not receive a financial benefit" and thus engaging in coercion. (ALJD 40:31-38, 155:1-10, 191:43-44; GC Ex. 1zzz ¶ 10(p)).

The record does not support this finding. The only testimony was from Iliana Gomez, who testified Dow told her the Canadian store that unionized had not received a raise like the rest of Canada. (Tr. 1700-02). Stating a fact about a unionized Canadian store does not violate Section

8(a)(1). Dow denied threatening no raises if the employees unionized. (Tr. 3072). There was no further testimony. Paragraph 10(p) should be dismissed.

K.     Executives Visiting Stores, Support Managers In Stores And Managers In Stores During All Operational Hours Did Not Create The Impression Of Surveillance

Paragraphs 8(b)-(d) of the complaint allege Starbucks more closely supervised or created an impression of surveillance by putting support managers in the Buffalo stores, having high-ranking officials visit the stores and scheduling managers in the stores during all operating hours. The ALJ finds that in late August and early September, Williams and other corporate executives started making unprecedented visits to the Buffalo stores; and that in September Starbucks, was stationing support managers in most, if not all, stores, and ensuring that a manager was always present during operating hours, which departed from prior practice where store managers were not always in the store during operating hours, and created the impression of surveillance. (ALJD 21:29-21, 155:28-156:24, 189:34).

The test for impression of surveillance is whether employees would reasonably assume from the employer's actions or statements that their union activities were under surveillance. *See Waste Stream Management*, 315 NLRB 1099, 1124 (1994). Management officials do not create an unlawful impression of surveillance by monitoring openly-conducted union activity, especially where conducted on company premises, unless they act in an out-of-the-ordinary, surreptitious manner. *Wal-Mart Stores, Inc*., 350 NLRB 879, 883 (2007); *Rogers Electric, Inc*., 346 NLRB 508, 509 (2006). The record reflects no such conduct by Starbucks executives or managers.

The record includes no evidence Starbucks executives, including Williams, Peck and Pusatier, engaged in surveillance or monitoring of partners. They visited stores, worked and talked with partners. (Tr. 2856-58). This does not support an impression of surveillance. In *The Broadway*, 267 NLRB 385 (1983), executives more frequently visited a store that was the subject

21

of a union campaign. The Board ruled that where there is union organizing, employers may adhere to the past practices and routines "even though this may result in the routine presence of these officials in the precise area or proximity of [employees] openly conducting organizing activities." *Id.* at 400. The Board also stated that the right of employees to organize free from employer surveillance is not violated by the frequency of executives at the store, *absent evidence of actual surveillance. Id.*

Starbucks placed support managers in the Buffalo stores over more hours to support the stores and their managers because the stores needed assistance. (Tr. 2607, 2840-42, 2979, 2983). Starbucks has used support managers in multiple other locations. (Tr. 2630, 2710, 2842-43, 2856-57, 3370-73, 3407). As Mann testified, support managers are used "[i]n different parts of the country where we needed to go in and just really, truly support the operations and build the capabilities of the store managers to be able to successfully execute the expectations." (Tr. 2591).

The record does not establish that support managers engaged in out of the ordinary conduct. They were in the stores because the stores needed support. They were not instructed to watch or listen to partners for information about union activity or organizing. (Tr. 2709-10, 2844, 2987, 3267, 3313, 3361; *see* ALJD 191:30-32). The General Counsel's witnesses did not testify to managers spying on union activity, nor does their testimony indicate extraordinary conduct. Danka Dragic testified the presence of managers "just made it a little bit harder to organize" at work and they continued to talk openly about the union as much as they could. (Tr. 2162, 2164). Colin Cochran testified only that "it was hard to have a conversation with somebody about the Union outside of managers being able to hear it." (Tr. 1955). Danny Rojas said no support manager said they were there for an anti-union reason, and partners understood they were there to help "bring the store up to standards." (Tr. 2122).

None of foregoing evidences out of the ordinary conduct. The mere presence of managers during operating hours does not create an impression of surveillance. *See Wal-Mart Stores. Inc.*, 352 NLRB 815, 816-17 (2008). Paragraphs 8(b)-(d) should be dismissed.

L.     Starbucks Did Not Violate Section 8(a)(1) By Creating An Impression Of Surveillance In Late August At Transit Commons

The ALJ finds that on August 24 or 25, 2021, manager David Almond held his phone in Michael Sanabria's direction and photographed him wearing a union pin while working in the drive-thru station, which was "highly unusual" right after Sanabria's name appeared on the Dear Kevin letter. With "proven union animus," this created the impression that Sanabria's union activities were under surveillance. (ALJD 77:fn. 263, 156:26-35, 189:36; *see* GC Ex. 1zzz ¶ 8(a)).

This conclusion is unsupported. Sanabria was working, *not* engaging in union activity. Sanabria testified he *thought* he saw Almond hold up his phone in a way that *looked like* he was taking a picture. (Tr. 415). Sanabria did not ask Almond if he took a picture and never saw a picture. (Tr. 503-04). Sanabria testified Almond had taken photos at the store before the union campaign - for example, when there was a new manager, new merchandise or a new menu. (Tr. 415). Almond denied taking a photograph of Sanabria wearing a union pin. (Tr. 1882).

Here there was no union activity and Almond did not engage in any "out of the ordinary" behavior. *Wal-Mart Stores, Inc.,* 350 NLRB at 883 (2007); *Arrow Automotive Industries,* 258 NLRB 860 (1981), enfd. 679 F.2d 875 (4th Cir. 1982). Individuals holding phones in front of themselves is not unusual - these days, it is a constant. Paragraph 8(a) should be dismissed.

M.     Starbucks Did Not, By Use Of Headsets, Engage In Surveillance Of Employees Violating Section 8(a)(1)

Addressing paragraph 8(g) of the complaint, the ALJ finds support managers continuously wearing headsets at the Camp Road, Transit & French, Genesee Street and Sheridan & Bailey stores was "out of the ordinary" conduct, creating the impression of surveillance, violating Section

8(a)(1). (ALJD 54:22-24, 156:39-157:16, 189:38-43, 190:3-5, 190:10-11). The ALJ's fact findings at these four stores are not extensive and mixed regarding how often support managers wore headsets. (ALJD 54:16-26 and fn. 180, 65:14-17 and fn. 221, 87:17-25, 93:42-45, 94:1-2).

Monitoring union activity on company premises does not create an impression of surveillance unless managers act in an extraordinary manner. *Wal-Mart Stores, Inc.* 350 NLRB 879 (2007). The employer's open observation of union activities on or near company premises is not unlawful. *Roadway Package System, Inc.*, 302 NLRB 961 (1991); *Brown Transport Corp.*, 294 NLRB 969, 971 (1989); *Southwire Co.*, 277 NLRB 377, 378 (1985), enfd. 820 F. 2d 453 (D.C. Cir. 1987). The record here does not show extraordinary conduct. Wearing a headset was part of a manager's duties. Finiding unlawful surveillance ignores that union activity was occurring in plain sight, during business hours, through use of company property and on company premises. Paragraph 8(g) of the complaint should be dismissed.

N.     The Record Does Not Establish Starbucks Unlawfully Interrogated Employees

Paragraphs 8(i) and (k) of the complaint allege unlawful interrogation at Elmwood in November 2021 and at East Robinson on February 14, 2022. (GC Ex. 1zzz ¶ 8(i) and (k)).

Whether questioning an employee is an unlawful interrogation depends on the totality of the circumstances. *Rossmore House*, 269 NLRB 1176 (1984), affd. sub nom. *Hotel & Restaurant Employees Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985); *see Bourne v. NLRB*, 332 F.2d 47, 48 (2d Cir. 1964). The core issue is whether the questioning would reasonably tend to interfere with, restrain or coerce the exercise of Section 7 rights. *Multi-Aid Service*, 331 NLRB 1126 (2000), enfd. 255 F.3d 363 (7th Cir. 2001).

Regarding Elmwood, near the end of November after Kellen Higgins helped store manager Patty Shanley load supplies into her vehicle in the Elmwood parking lot, Shanley pointed to Higgins' union pin and asked if "you support this?" After Higgins replied that he did, Shanley said

she respected his decision and it did not change her personal view of him. Higgins testified his exchange with Shanley was "a little moment there, just understanding." (Tr. 623-24). The ALJ erroneously finds Shanley's question coercive. (ALJD 158:11-23, 190:22, 24, 30-32). There was no coercion in this conversation. Shanley, with whom Higgins testified he had a good relationship, asked him in casual conversation whether he supported the union, and then reassured him that she supported him and their relationship would not change.

Regarding East Robinson, the ALJ finds that on February 14 store manager Keita Clark and Elizabeth Pool, the NFB store manager, pulled Victoria Conklin off the floor for a meeting in which Clark told Conklin that she needed to stop gossiping about her and trying to turn other employees against her. Conklin asked if the meeting was about her union support and then left. The ALJ finds this conversation to violate Section 8(a)(1). (ALJD 158:25-33, 192:7; Tr. 1898-99). However, neither the record nor his finding reflects interrogation about protected conduct. The parties' exchange was fragmentary and unrelated to union activity. *See In re Furr's Cafeteria, Inc.,* 179 NLRB 240 (1969). Paragraph 8(k) should be dismissed.

O.    Starbucks Did Not Violate Section 8(a)(1) By Engaging In Unit Packing At The Genesee Street Store

The ALJ finds temporarily assigning Niagara Falls Boulevard (NFB) employees, whose store was being renovated, to Genesee Street in October 2021 to violate Section 8(a)(1) because it was to dilute the proportion of presumably pro-union employees eligible to vote in the election. He says other stores were closer, the NFB employees were mostly anti-union or disinterested in the election, the Genesee Street store became overcrowded but employees were not sent home, so NFB employees accumulated enough hours to vote in the election. (ALJD 40:30-31, 52:5-10, 20-21 and fn. 172, 159:3-23, 190:13-14, 16-20; GC Ex. 1zzz ¶ 8(h)).

Whether an employer unlawfully "packs" a unit before an election depends on whether a substantial number of employees were added to dilute the union's strength. *See Einhorn Enterprises, Inc.*, 279 NLRB 576, 596 (1986) (employer increased employee complement to expand unit to dilute union's strength in election); *cf. Plumbing and Industrial Supply Co. Inc.,* 237 NLRB 1124, 1127 (1978) (hiring part-time employees to address understaffing six weeks before election was business judgment beyond purview of Board unless clearly shown to be deliberately taken for purposes proscribed by Act).

The ALJ's finding that Starbucks tried to pack the Genesee Street unit ignores why the NFB employees were placed there. In September-October 2021, call offs in Buffalo stores were making the understaffing problem worse, especially at the Genesee Street store, where call offs ranged from 8 to 14 per day and up to 60% of daily staff. (Tr. 2726, 2848, 2979-81, 2987-88, 3405-06). So, Genesee Street temporarily borrowed partners from neighboring stores, like Walden & Anderson, Transit Regal, Transit & French and NFB. The NFB location was not far from Genesee Street and closed for renovation, which meant it had a pool of partners available to work. (Tr. 2989-90, 3406-3407). Borrowing NFB partners was undertaken not with an eye to the union representation vote, but to help Genesee Street stay open instead of having to close early due to understaffing. (Tr. 2989-90, 3404-3406, 3440-41). This did not interfere with partners' Section 7 rights.

The ALJ's comment that 10 stores were closer to Genesee Street than NFB is wrong. NFB is Store 7327 at 170 Niagara Falls Boulevard (not Store 50060 at 3015 Niagara Falls Boulevard or Store 19001 at 6690 Niagara Falls Boulevard in Niagara Falls). It is 8.9 miles and a 17-minute drive on I-290 from Genesee Street. (R. Exs. 96, 323). The comment also ignores that NFB, unlike other stores, presented a ready source of available partners because it was closed.

26

### iii.     Section 8(a)(3) and 8(a)(4) Claims

A.     Starbuck Did Not Violate Section 8(a)(3) Through Stricter Application Of Work Rules

The ALJ finds Starbucks' stricter enforcement of its rules and policies in response to the organizing campaign in Buffalo adversely impacted employees, violating Section 8(a)(3). (ALJD 160:11-161:44; *see* GC Ex 1zzz ¶ 11(a)-(e), (g)-(l)). His main finding is that Starbucks conducted level settings, in which it communicated to partners expectations on policies and the need for compliance. Starbucks did conduct a level setting in Buffalo in September and October 2021, focused on the dress code policy and the attendance policy, reminding partners that these policies would be enforced. (Tr. 1006, 3153, 3080, 3202, 3336-37, 3374-76, 3409). Mkrtumyan, who had worked in multiple markets, testified she engaged in level setting on attendance and other policies as a regular practice whenever she started in a new market, including before Buffalo in Philadelphia and northern Virginia. (Tr. 3374-77, 3385-86). Level settings also had occurred before August 2021 in locations like Georgia, Virginia and Maryland. (Tr. 3202).

These policies were not ignored before the level setting. Partner Resource Consultants Corrin Crowley and Nick Tobias explained that both before and after the Fall 2021 level setting in Buffalo partners were aware of and disciplined under Starbucks policies. (Tr. 3153-55, 3202). One witness testified that when she was a shift supervisor in Buffalo she reported dress code and attendance policy violations by referring them to the store manager in the same way both before and after August 2021. (Tr. 2774).

The ALJ appears to say that the level setting in Fall 2021 was a consequence of the union campaign, so any stricter enforcement violates Section 8(a)(3). The record reflects that the level setting in Fall 2021 was because rules weren't being enforced and store operations were slipshod, not because of the coincident union campaign. The record demonstrates no effort by Starbucks to

27

punish union supporters or to direct discipline against only those who supported the union. It demonstrates Starbucks believed the way the stores operated needed to be improved. As matter of logic, the way to win union campaigns is not to start treating employees more severely. What Starbuck did with level setting was part of its effort to bring the Buffalo stores to standard. The ALJ's finding also ignores that Starbucks introduced *more than 100 comparator* disciplinary actions, demonstrating that it issued comparable levels of discipline to partners violated policies both before and after campaign and after it began, both in locations where representation petitions were filed and in locations where they were not, and whether a partner's union support was or was not known. (Exhibits A and B). The record further demonstrates that in individual cases partners often ignored the level setting, coachings and warnings, and brought discipline on themselves. Those matters are addressed in Starbucks' exceptions to paragraphs 12, 13 and 14 of the complaint.

      B.      <u>The ALJ Misapplied Wright Line</u>

            1.      *The ALJ erroneously infers unlawful motive based on Section 8(a)(1) violations.*

The ALJ stated: "Based on the vast and systemic barrage of Section 8(a)(1) violations described above, I find that an inference [of unlawful motive] is appropriate with respect to the overwhelming number of adverse actions due to the Respondent's extreme animus toward the organizing campaign in the Buffalo area." (ALJD 159:45-160:1). To infer unlawful motive for Section 8(a)(3) purposes based on Section 8(a)(1) violations and find that this meets *Wright Line's* requirements for most or all discriminatees is error.

Under *Wright Line* the General Counsel must initially establish that protected activity was a motivating factor in a challenged employer action by showing (1) union or other protected activity by the employee, (2) employer knowledge of that activity, and (3) antiunion animus or animus against protected activity by the employer. *See Volvo Group North America, LLC*, 370

NLRB No. 52 (2020). The General Counsel does not meet this burden by producing *any* evidence of animus or hostility toward union or other protected activity, but by evidence establishing a causal relationship between the protected activity and the employer's adverse action. *Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120 slip. op. at 6-8 (2019).

There is no authority that some quantum of Section 8(a)(1) violations establishes union animus. The ALJ cites none. His own analysis states that whether Section 8(a)(1) is violated is an "objective standard" that "does not consider motivation . . . ." (ALJD 137:20-22). He does not explain how Section 8(a)(1) violations on which motive is irrelevant allows inference of unlawful motive in acts independently alleged to violate Section 8(a)(3).

> 2.     *The ALJ fails to find the required nexus between claimed unlawful motivation and the specific decisions found to violate Section 8(a)(3).*

By his approach, the ALJ also ignores the *Wright Line* requirement that the General Counsel's evidence establish a *causal relationship* between the employee's protected activity and the employer's adverse action. He substitutes for that assessment his conclusion that multiple Section 8(a)(1) violations suffice. As stated in *Wright Line* itself, the General Counsel must make "a prima facie showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision." 251 NLRB at 1089. *See Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120, slip op. at *8 (2019) ("evidence must be sufficient to establish that a causal relationship exists between the employee's protected activity and the employer's adverse action against the employee").

> 3.     *In his findings regarding disciplinary actions as to individuals, the ALJ disregards relevant comparator evidence.*

In addressing actions as to individuals claimed to violate Section 8(a)(3), the ALJ improperly disregards comparator evidence from (i) stores outside the Buffalo or Rochester markets, (ii) stores in Buffalo other than the store at which the particular adverse action occurred,

(iii) the time period after August 23, 2021, and (iv) the store at which the adverse action occurred before August 23, 2021 if the evidence reflected what he found to be less strict application than after that date. (ALJD 15:fn. 32; 134:fn. 439, 172:32-35, 177:39-42, 178:24-47, 179:1-22, 180:29-45, 181:33-36, 182:36-37, 183:43-46, 184:14-16, 201:5-202:10).

First, since Starbucks Partner Resources professionals are involved in assuring consistency and fairness in discipline for East Coast, not just Buffalo and Rochester or even all of upstate New York, discipline or corrective actions are not a store-by-store exercise and actions outside Buffalo or Rochester may be considered. (Tr. 3145-51, 3181-82, 3192-95, 3199-200).

Second, evidence of comparable discipline need not involve the same facility or decision-maker. *See, e.g., UPS, Inc.*, 369 NLRB No. 1 (2019) (comparators throughout western Pennsylvania considered in analyzing discharge); *SBM Site Servs., LLC*, 367 NLRB No. 147 (rejecting contention that comparators not similarly situated because different decision maker determined their discipline). Nor is comparator evidence after the onset of union organizing irrelevant. See, *Lucky Cab Company*, 360 NLRB No. 43 (2014) (analyzing comparable disciplines occurring after union organizing began to determine whether violation occurred).

Exhibits A and B are charts setting forth the same comparator evidence as in ALJD pages 15-16 (Exhibit A, pre-August 23, 2021 comparator data) and 135-136 (Exhibit B, post-August 23, 2021 comparator data), but rearranged by store and including exhibit numbers.

C.     Starbucks Did Not Violate Section 8(a)(3) By Operational Changes At The Walden & Anderson Store

The ALJ erroneously finds Starbucks violated Section 8(a)(3) at Walden & Anderson by reducing operational hours on a day in late August, making the store a centralized training center on September 6 which discriminatorily reduced compensation, and imposing more onerous working conditions through eliminating the free food benefit while the store was a training center.

30

(ALJD 82:22-24 and fn. 279, 162:36-163:21, 192:27-28, 38, 40, 42, 45; *see* GC Ex. 1zzz ¶¶ 12(a)(i), (b), (j)).

1. *Operational hours.*

As to the ALJ's finding of discriminatory reduction in compensation on August 26, 2021 (GC Ex. 1zzz ¶ 12(a)(i)), Cochran testified simply that hours were reduced. (Tr. 1927; ALJD 80:5-7). This is insufficient to conclude that any reduced compensation was discriminatorily motivated. At the time Buffalo-area stores reduced hours for differing reasons, including lack of staffing, call offs, COVID and utility repairs. (Tr. 2722-25, 3424-25). Paragraph 12(a)(i) should be dismissed.

2. *Training store.*

Walden & Anderson closed briefly for cleaning and retraining, transitioned to a training store from September to November 2021 to relieve store managers of training obligations, and starting on November 8, 2021 gradually reopened to customers. (Tr. 2833-34, 2848-49, 3101-03). Starbucks has closed stores throughout the country to operate as dedicated training stores. (Tr. 2679, 2849, 2958, 3102, 3402-03; GC Ex. 59, p. 5 (noting 40 dedicated training stores nationally and ongoing effort to have more training stores)). Consistent with what it had done in other markets, Starbucks centralized training because Buffalo-area store managers did not have the time or ability to train effectively. The record includes no evidence this action was motivated by partners' union activity or aimed at discriminatorily reducing compensation. Nor was free food eliminated. Part of the training at Walden & Anderson involved preparation and handling of food. The only difference was that fresh food was not being delivered to the store, which was normal for a training store, not retaliatory. (Tr. 3100-01). Paragraphs 12(b) and (j) should be dismissed.

D.     Starbucks Did Not Violate Section 8(a)(3) By Reducing Hours At The Camp Road Store

The ALJ finds Starbucks violated Section 8(a)(3) at Camp Road by reducing operational hours by one and one-half hours per day, reducing employee compensation. Based on timing, "abundant proof of union animus" and "absence of specific evidence explaining the action," and saying this reduction would not have occurred absent the union campaign, he finds it was retaliation for union activity. (ALJD 66:1-19, 163:34-44, 192:38).

The complaint alleges this occurred in September (GC Ex. 1zzz ¶¶ 12(a)(iii)), the ALJ finds it occurred in late August (ALJD 163:36, 43), and the only General Counsel witness on this point, William Westlake, testified that it was in October. (Tr. 1169-70). Kelleigh Hanlon, who arrived at Camp Road as a support manager on September 13, 2021, testified (unrebutted) that the store started closing earlier at the end of September or beginning of October due to lack of night shift staffing, which lasted about a month. (Tr. 3327, 3334-36).

Based on the above, paragraph 12(a)(iii) should be dismissed. The ALJ has the wrong month, no evidence was introduced of reduced compensation, and based on Hanlon's testimony, no one likely lost compensation because staffing was insufficient to keep the store open later. Her testimony also directly counters the ALJ's findings of union animus and that record does not explain why hours were reduced.

E.    Starbucks Did Not Violate Section 8(a)(3) By Reducing Store Hours At The UB Commons Store

The ALJ finds reduced operational hours at the UB Commons store in January 2022 violated Section 8(a)(3). (ALJD 133:1-6, 164:9-19, 199:14-27), although the Complaint alleged violation in December 2021. (GC Ex. 1zzz ¶ 12(a)(v)). The ALJ finds reduced hours in December were typical, but the store did not return to normal operating hours when students returned in January. Regarding animus, what the ALJ finds is that "at least one employee wore a pro union pin and had been discussing the Union with coworkers" and he then says timing, "abundant proof"

of union animus and the absence of specific evidence explaining any reduced January hours established that it was retaliatory. (ALJD 164:11-19).

Paragraph 12(a)(v) should be dismissed. First, the ALJ's finding is on an unalleged issue. Starbucks introduced evidence regarding reduced hours in December, not January, because no violation was alleged in January. (Tr. 1729, 3428). Second, to find union animus in changed store hours based on one employee wearing a union pin and talking with coworkers is conjecture. The ALJ makes no finding of store manager knowledge of union activity or of union animus connected to January store hours.

F.     Starbucks Did Not Violate Section 8(a)(3) By Reducing Store Hours Or Shift Supervisor Hours At The East Robinson Store

The ALJ finds reducing operational hours at the East Robinson store in January 2022 and limiting shift supervisors to only shifts in that role in February 2022 were retaliatory reductions in compensation, violating Section 8(a)(3), based on "timing, the abundant proof of union animus in the record, and the absence of specific evidence explaining either action[.]" (ALJD 117:3-8, 164:21-33, 199:14-27; *see* GC Ex. 1zzz ¶ 12(a)(vi) and (s)(iii)).

The record does not support these findings. The ALJ credited the testimony of Victoria Conklin and Kayla Disorbo (ALJD 117:fn. 390), but Conklin did not testify she lost hours in January, only February. (Tr. 1895-96). Disorbo similarly testified she lost hours for three weeks in February when shift supervisors were not allowed to take shifts as baristas, but did not testify about January. (Tr. 2365-67). Adrian Morales, a support manager, testified he did not remember store hours being reduced in January except perhaps for weather reasons. (Tr. 3267).

The record thus does not support loss of shifts or compensation in January. Paragraph 12(a)(vi) should be dismissed. As to February, the record includes no evidence that not allowing

shift supervisors to take regular barista shifts was motivated by union animus. Paragraph 12(s)(iii) should be dismissed.

G.     Starbucks Did Not Violate Section 8(a)(3) By Reducing Store Hours At The Elmwood Store

The ALJ finds Starbucks' reducing Elmwood employees' hours for employees in or around November 2021 was a retaliatory reduction in compensation, violating Section 8(a)(3). (ALJD 33:31-39, 164:37-45, 165:35-45, 199:14-27; *see* GC Ex. 1zzz ¶ 12(s)(i)).

The ALJ's findings do not support his conclusion. He finds that before October 24, 2021, Elmwood often was understaffed, on that date six new baristas were hired there and another barista transferred in, increasing staffing, and that store manager Shanley then reduced employees' hours to allow the added employees to receive hours. (ALJD 33:33-38). He says this was an "overreaction" in addressing staffing and training needs and "[n]one of this would have occurred in the absence of the Union campaign[,]" so the reduction in hours for Elmwood employees from solving understaffing unlawfully discriminated against them by reducing their compensation. (ALJD 164:40-45).

Paragraph 12(s)(i) should be dismissed. Trying to alleviate understaffing does not prove unlawful motive. There is no evidence union animus motivated hiring new employees or re-distributing hours. The ALJ's conclusion that Starbucks added too many staff where is conjecture and an improper intrusion on Starbucks' business judgment. His further conclusion that purposeful overstaffing was unlawfully motivated by a desire to reduce other employees' compensation and that Starbucks never would have addressed understaffing but for the union campaign is unsupported. The record evidence is to the contrary. (Tr. 3401-3403).

H.     The Record Does Not Support The ALJ's Finding That Starbucks' Closure Of The Walden Galleria Kiosk Violated Section 8(a)(3)

According to the ALJ, closing the Walden Galleria Mall kiosk violated Section 8(a)(3) because Starbucks' reasons for doing so were pretextual and because it failed to carry its *Wright Line* burden to show that the closing would have occurred absent union activity. (ALJD 84:31-85:6, 165:1-35, 192:44).

The record reflects that the mall kiosk was small and cut off from the other stores in Buffalo. (Tr. 1282; *see* ALJD 84:4-5). In the months before its closing, it was severely understaffed – in 2017 it had approximately 20 employees, but as of August 23, 2021, only 8. It had so few that it couldn't operate with a regular schedule and hours. (Tr. 1788). The General Counsel's witnesses further testified that it was in disrepair, unsanitary, became overheated and had oven fire problems. The lighting caused sunburn problems. Its employees apparently were concerned it would close. (Tr. 543, 1284, 1790; ALJD 84:15-23). At or around the beginning of September Pusatier, Regional Operations Director, visited the kiosk. Her observations were consistent with what the General Counsel's witnesses testified to – the kiosk was in "pretty bad disrepair," not set up to run well and needed a complete rebuild. (Tr. 2836-37).

At the beginning of September 2021, the kiosk was temporarily closed so more staff could be hired and for a store reset (cleaning, reorganization, training). The one-week closure was extended a week to find more employees. (Tr. 1285-86; *see* ALJD 84:25-29). In this time period Pusatier decided to close the kiosk permanently. She testified it would have cost more to rebuild the kiosk than its profit for an entire year, so it "did not make financial sense" to keep operating it. (Tr. 2852). District manager Mark Szto informed employees shortly thereafter of the closure. General Counsel witnesses testified that Szto said the closing was consistent with Starbucks' plan to close mall stores. Employees were also told the kiosk was a low-performing store. (Tr. 1290, 1794). The financial data in Starbucks' closing documents for the kiosk confirm this and the ALJ

misinterpreted the data. (ALJD 85:fn. 288, 165:24). The pertinent report is R Ex. 138, which on page 3 shows that the kiosk's FY 2020 contribution was $13,311 compared to more than $347,000 in the prior year. Its budgeted sales and cash flow for FY 2021 were less than its actual sales and cash flow in FY 2017, 2018 or 2019. The ALJ points to a budgeted 40.8% sales growth in 2021, but that ignores that 2020 was the height of the pandemic when stores (and especially malls) were closed for lengthy periods. Neither the projected sales or profit/contribution of the kiosk warranted its continued operation, particularly given its disrepair and need for a costly rebuild.

Pusatier testified that Starbucks was in the process of closing many mall stores and converting them to licensee stores, which the pandemic accelerated. (Tr. 2827-28). That is precisely what happened with the mall kiosk. (Tr. 2853, 2860). Arrangements were made for partners to transfer to open positions in other stores. (Tr. 1288, 1290-92, 2836-37, 2852-53, 3462-65; R Ex. 138). These facts and the law do not support that the closure violated Section 8(a)(3).

In *Textile Workers v. Darlington Mfg. Co.,* 380 U.S. 263, 275 (1965), the Supreme Court specified the standards that apply to partial closings:

> [A] partial closing is an unfair labor practice under § 8(a)(3) if motivated by a purpose to chill unionism in any of the remaining plants of the single employer and if the employer may reasonably have foreseen that such closing would likely have that effect.

Absent direct evidence of a motive to chill unionism, the General Counsel may point to circumstantial evidence, but "must produce more than a mere suspicion." *Joint Industrial Board*, 238 NLRB 1398, 1401 (1978). The decision in *Bruce Duncan Co.,* 233 NLRB 1243 (1977), *modified on other grounds*, 590 F.1304 (4th Cir. 1999), summarizes the factors used to assess whether circumstantial evidence satisfies the *Darlington* standards:

> Generally, the Board in  determining whether or not the proscribed "chilling" motivation and its reasonably foreseeable effect can be inferred considers the presence or absence of several factors including, inter alia, contemporaneous union activity at the employer's remaining facilities,

geographic proximity of the employer's facilities to the closed operation, the likelihood that employees will learn of the circumstances surrounding the employer's unlawful conduct through employee interchange or contact, and, of course, representations made by the employer's officials and supervisors to the other employees.

Here, some of the identified factors are present – contemporaneous union activity at other employer facilities and (relative) geographic proximity of those facilities - but other factors weigh against finding that *Darlington's* two-pronged test is met.

First, the record lacks evidence of Pusatier's knowledge of union activity at the kiosk. Although aware of the Dear Kevin letter, there is no evidence she knew that any of its signatories worked at the mall kiosk. No representation petition had been filed there. Second, the record includes no evidence of a representation by a Starbucks official to partners at the Walden Galleria kiosk or elsewhere from which they reasonably could have concluded or inferred the kiosk closed because of union activity. The absence of such a representation means partners never learned of cfacts that would have made the closure unlawful. *See DeSoto, Inc.,* 278 NLRB 788 (1986) (closing of one employer plant lawful because, *inter alia*, employer made no statements indicating discriminatory motive). Third, none of the partners who worked at the mall kiosk lost their job. Starbucks assisted in placing all of them in other stores. (Tr. 1290-92, 2836-37, 2852-53, 3462-65; R. Ex. 138). Such action is inconsistent with a motive to chill organizing elsewhere, especially because, if the claims of the General Counsel's witnesses as to the many pro-union kiosk partners are correct, it meant Starbucks was allowing pro-union partners to transfer to other stores and spread pro-union sentiment. Fourth, the record lacks evidence that the kiosk closure actually chilled or might reasonably have been expected to chill organizing activity in other stores. The General Counsel introduced no evidence of whether or how knowledge of the kiosk's closing was conveyed elsewhere. The General Counsel's own witness testified that the mall kiosk was small and insulated from the other stores. (Tr. 1282). Its size and nature cuts directly against any finding

that Starbucks might reasonably have foreseen that its closing would have a chilling effect. Both Starbucks and partners in other stores likely viewed it as different, especially given the effect of the pandemic on mall traffic.

In summary, the General Counsel presented no direct or circumstantial evidence that Starbucks closed the Walden Galleria kiosk to chill unionization at other stores or foresaw such an effect. The reasons for the closure are not pretextual – Starbucks' perception of the store's difficulties was corroborated by the General Counsel's witnesses. Assuming the General Counsel carried the initial burden under *Wright Line* (which would be incorrect), Starbucks offered uncontradicted evidence why the store closed – its disrepair, cost to bring it to Starbucks' standards and financial underperformance. Starbucks' approach was consistent with its approach to other mall stores. Starbucks established it would have closed the kiosk regardless of union activity.

I.    Starbucks Did Not Violate Section 8(a)(3) By Temporarily Closing Stores For Maintenance Or Meetings

The Complaint alleged reduction of employee compensation violating Section 8(a)(3) from temporary store closures, including for anti-union meetings, at different locations at different times. (GC Ex. 1zzz ¶ 12(e) and (f)). The ALJ erroneously finds that when Starbucks temporarily closed 11 stores for renovation and maintenance between September 2021 and January 2022, based on its solicitation of grievances, the loss of pay by some employees violated Section 8(a)(3). (ALJD 165:37-166:15, 192:40). He applies the same analysis to find loss of compensation in connection with 35 store closures for he says were coercive pre-election meetings to violate Section 8(a)(3). (ALJD 166:5-15). Paragraphs 12 (e) and (f) of the complaint should be dismissed.

First, as to the closure list in paragraph 12(e), the ALJ's findings say nothing about loss of compensation. (*See* ALJD 134:13-16, 95:17-21, 76:22-23, 129:31-36, 112:4-14, 42:14-16, 52:28-29, 89:3-4, 134:20-23, 76:25-29, 125:9-10, 192:32). There is no record evidence that employees

at these stores at these times lost compensation. There is no finding of a store closure at Walden & Anderson on September 6, 2021, although September 5 is when it converted to a training store. (*See* ALJD 79-82:15). Some of these were one-day store resets. (*See e.g.,* Transit & Commons, ALJD 76:22-23; Sheridan & Bailey, ALJD 89:3-4). The record is that employees work in store resets. (Tr. 473-74, 566, 881-82, 1286, 1892, 3408, 3409, 3459, 3460).

Second, as to meetings in paragraph 12(f), the ALJ's findings do not establish that each was found coercive and violative of Section 8(a)(1). (*See* ALJD 139:30-33, 139:35-46, 140:1-4, 140:22-26, 142:21-22, 142:29-31, 142:39-43, 143:24-27, 143:44-46, 144:1-2).

Third, as to paragraph 12(f), the record reflects that Starbucks paid its partners when it closed stores for meetings. Both General Counsel and Starbucks witnesses testified partners were paid and sometimes for more time than the meeting took. The only possible compensation loss would be tips, which in Buffalo averaged about $0.60 to $0.80 cents an hour. (Tr. 184, 232, 238-39, 426, 470, 558, 560, 562, 696, 703-04, 792, 843, 964, 971, 977-78, 1088, 1125, 1238, 1385, 1401, 1416, 1522, 1527, 1713, 1944, 2650, 2745, 2807, 2868, 2788-89, 2999, 3073, 3423).

Fourth, to find that, because the renovations and maintenance work that closed stores were unlawful grants of benefits and the pre-election meetings that closed stores were coercive, any employee loss of compensation violated Section 8(a)(3) is unfounded. The record provides no basis to conclude that any reductions in compensation were unlawfully motivated.

J.    Starbucks Did Not Violate Section 8(a)(3) By Changing Store Manager Hiring Duties Or Scheduling And Promoting Duties At Elmwood and Williamsville Place

Addressing the below paragraphs of the Complaint, the ALJ found Starbucks withdrew benefits from employees, violating Section 8(a)(3):

- ¶ 12(g) – in September 2021 transferring responsibilities for hiring from Buffalo store managers to recruiters (ALJD 167:44-168:1-8, 168:19-21, 190:5-7).

- ¶ 12(l) and (n) – in October 2021 transferring responsibility for scheduling and promoting employees to support managers at the Elmwood store (ALJD 168:10-21; 192:40-44); and
- ¶ 12(p) – in November 2021 transferring responsibility for scheduling employees to support managers at the Williamsville Place store (ALJD 168:13-21; 192:40-44)

### 1.    Transfer of hiring responsibility to recruiters.

The ALJ finds not credible that in September 2021 Starbucks brought in recruiting specialists to allow Buffalo store managers to avoid time spent in hiring process because support managers were present. Starbucks thus violated Section 8(a)(3) by "depriv[ing] employees of having their store manager – who knew the store and its personnel well – decide who should work alongside them." (ALJD 167:44-168:1-8, 168:19-21). This is a finding in search of a legal theory, as the Act gives employees no interest in who makes the employer's hiring decisions. The ALJ offers no citation for such a theory and none exists.

In any event, this finding is error. First, no record evidence establishes that having support managers in the store necessarily gave store managers more time for hiring, which the ALJ seems to imply was the case. Second, support managers who came to Buffalo testified their function was to support store operations, not be recruiters. (Tr. 2590, 2710, 2976-77, 3041, 3069, 3095-96, 3259, 3285, 3327, 3329-30, 3341-42, 3344-45). Third, moving hiring responsibility to recruiters changed store manager duties, but did not remove a partner benefit and certainly was not an adverse employment action. Fourth, the record includes no evidence that union animus motivated this change. In Fall 2021 the Buffalo market was so understaffed that it needed over 300 additional partners. (Tr. 2848, 2902). Store managers had been responsible for screening, interviewing, hiring and training new partners, but with such understaffing, Starbucks decided to use hourly recruiting specialists to allow store managers more time to manage their stores. (Tr. 2729-30, 2847, 3402-

03). Finally, using recruiting specialists is a step Starbucks has taken other parts of the U.S. to address understaffing. (Tr. 2728-30, 2847, 2902-03).

Paragraph 12(g) of the complaint should be dismissed.

2. *Elmwood and Williamsville Place.*

The ALJ finds that in October 2021 Elmwood store manager Shanley's scheduling and promoting responsibility was shifted to support managers, so employees were deprived of having her decide those items, and that the same change occurred at Williamsville Place in November 2021 (although only a shift in scheduling responsibility was alleged there). Saying employees did not request these changes and they were not planned before August 23, 2021, the timing was "suspicious," and evidence of unlawful conduct and union animus ample, he finds these changes violated Section 8(a)(3). (ALJD 168:10-21, 167:40-168:17, 193:42-43). This is another finding in search of a legal theory. The Act does not provide employees a protectable interest in who sets their schedules and shifting such a task from one manager to another does not amount to removal of a "benefit" (or an adverse employment action). *Wal-Mart Stores, Inc.*, 352 NLRB 815, 834 (2008), citing *United Airlines Services Corp.*, 290 NLRB 954 (1988).

In any event, the supporting factual findings are error. The record includes no evidence that scheduling requires employee familiarity or that store managers were more familiar than support managers with store employees. No employee "benefits" were taken away. Whether employees requested these changes is irrelevant. The ALJ includes no findings to support union animus entering into these changes. (ALJD 110:331-115:15).

Regarding Elmwood, Michelle Eisen testified that store manager Patty Shanley did the scheduling, but support managers did, too. (Tr. 98-99, 107). Starbucks managers testified that support manager duties included all normal store manager duties, which would include scheduling and promoting. (Tr. 2731, 2843, 3460-61, 3095).

41

At Williamsville Place in November 2012 store manager Mark Behrend's daughter had COVID, which caused him to be out for three weeks. During that time his support manager made the schedule. (Tr. 3461-62). This, of course, has nothing to do with union activity.

Paragraphs 12(l), (n) and (p) should be dismissed.

K.     Starbucks Did Not Impose More Rigorous Or Onerous Working Conditions Based On Antiunion Sentiment, Violating Section 8(a)(3)

The ALJ erroneously finds Starbucks managers imposed more onerous working conditions, violating Section 8(a)(3) (ALJD 168:21-47, 169:147, 170:1-7, 192:27-28, 193:15-30), based on allegations from paragraph 12 of the complaint below:

- ¶ 12(o) – in October 2021 more strictly enforcing its policy for making drinks at the Williamsville Place store (ALJD 111:34-39, 168:33-41, 192:27-28).
- ¶ 12(v) – on December 9, 2021 disconnecting the direct phone line at the Genesee Street store (ALJD 60:12-13, 169:4-15, 193:7);
- ¶ 12(w) – on December 2, 2021, requiring Transit Commons employees to stand in the customer line to order food while working (ALJD 77:25-27, 168:43-169:2);
- ¶ 12(x) – since February 2022 requiring employees to offer minimum scheduling availability to keep employment at the Elmwood and Delaware & Chippewa stores (ALJD 104:36-39, 169:17-27, 192:12-13);
- ¶ 12(y) – since February 2022 prohibiting employees at Delaware & Chippewa from switching shifts through a third-party chat (ALJD 27:2-8, 106:14-26, 169:29-34);
- ¶ 12(z) – since February 2022 not allowing shift supervisors to close the cafe at the East Robinson store (ALJD 119:3-9, 169:36-45, 193:15-16, 193:18-19); and
- ¶ 12(aa) – since February 2022 not allowing shift supervisors to disable mobile ordering at the East Robinson store (ALJD 119:3-9, 169:36-45, 193:21-22).

The only evidence regarding drink policy at Williamsville Place is that support manager Robert Berg required stickers on drinks not cover the siren on the cup and milks be returned to the refrigerator between drinks. (Tr. 1433-34). Evidence of union animus motivating these actions is nonexistent and they do not rise to the level of "more onerous working conditions."

Concerning the December 9 disconnection of the phone line at Genesee Street, Rizzo testified she tried to call the store that day from the NLRB to tell partners Workers United had won

the election, but the line was not operating. (Tr. 715-18; ALJD 60:12-13). Pusatier testified the number of calls disrupting the business that day prompted Starbucks to temporarily disconnect certain lines and reroute them, which Starbucks had done before. (Tr. 2853-55). The record does not establish union animus or that it created "more onerous working conditions."

As to the allegation that on December 2, 2021, Starbucks required partners who were working to stand in the customer line to order food at Transit Commons, that is consistent with Starbucks' policy. (GC Ex. 140, p. 69; Tr. 3411-13). Michael Sanabria testified this rule was enforced after the union campaign began (although December 2 would be more than three months after the campaign began). (Tr. 477). There is no proof that adhering to this policy was the result of union animus, nor is standing in line for food a more onerous working condition.

Regarding the allegation that since February 2022 Murphy, Hunt and Shanley violated Section 8(a)(3) by requiring partners to offer minimum scheduling availability, Roisin Doherty testified that Hunt, the store manager at Delaware & Chippewa, said he needed 3-4 days of availability each week. However, no evidence was offered of implementation of an actual change. (Tr. 1323). The allegations as to Shanley and Murphy concern Elmwood and the availability of Cassie Fleischer and Kellen Higgins. In late January and early February 2022, both Fleischer and Higgins sought to reduce their availability to one or two shifts per week. Shanley responded that those limited hours did not meet the store's scheduling needs and asked them to offer more hours. (GC Ex.141(b), pp. 3-4; GC Ex. 145(b), pp. 3-7; GC Ex. 34(a) and (b), pp. 5-6; Tr. 646, 649-56, 669-78). Starbucks' policy is specific that partner availability must meet store needs (GC Ex. 140 at 0000102). The record does not establish union animus. Responding to partner requests for reduced availability by asking for more than one day or two weekend shifts per week is not imposing harsher working conditions.

As to the allegation that since February 2022 Starbucks has discriminatorily prohibited partners from using a third-party chat to switch shifts at Delaware & Chippewa, partners at the store had used a GroupMe chat to switch shifts. Heather Dow, a support manager, deleted it because Starbucks policy allows only Starbucks-sanctioned communication tools and requires going through the store manager to find a shift replacement. (Tr. 1692-93, 3073-75; GC Ex. 140, pp. 32, 43). The record provides no indication that union animus underlay Dow's action or that not having the chat made employees' duties harder.

As to the allegations that since February 2022 Starbucks has imposed more onerous working conditions at the East Robinson store by not allowing shift supervisors to close the cafe or disable mobile ordering, Victoria Conklin testified she had been allowed to close the café in the past *only* when she asked for a manager's permission, that she could ask for such permission both before and after the campaign, and that she had only been allowed to disable mobile ordering if she had a manager's permission both before and after the campaign. (Tr. 1902-04; *see also* Tr. 3414-15, 3268, 3305). The General Counsel did not prove union animus or imposition of more onerous working conditions were imposed.

Paragraphs 12(v)-(aa) of the complaint should be dismissed.

L.    Starbucks Did Not Violate Section 8(a)(3) With Respect To Erin O'Hare, Cory Johnson and Kaitlyn Baganski

The ALJ erroneously found Starbucks violated Section 8(a)(3) with respect to Erin O'Hare, Cory Johnson, and Kaitlyn Baganski by refusing to approve or delaying approval of transfers to different stores. (GC Ex. 1zzz ¶ 13(c); ALJD 85:15-86:8, 92:13-34, 127:19-128:2, 170:32-171:23, 192:46-47, 194:18, 195:33-43).

The Partner Guide provides: "All transfers to a different place of work are subject to district manager approval, and are contingent upon business needs, partner availability and partner performance." (GC Ex. 140 at 0000101).

When the Walden Galleria kiosk closed, O'Hare, like other employees, was asked to identify stores to which she wanted to transfer. (Tr. 1795). She was initially placed at Delaware & Chippewa, her second choice, but she didn't fit the schedule because the store had too many shift supervisors. She picked up shifts at other stores for a few weeks, and then with the assistance of a district manager at the end of October Williamsville Main became her home store, one her four preferred choices. (Tr. 1795-1801, 1816). This record does not support retaliatory delay in getting O'Hare to a new home store. All the mall kiosk employees were transferred to new stores. (Tr. 1288, 1290-92, 2836-37, 2852-53, 3462-65; R Ex. 138; *see* ALJD 85:8-13). Unsurprisingly, the process of getting all these employees placed was complicated, as store needs did not necessarily match every individual's preferences.

Regarding Johnson, the ALJ found Starbucks denied his requested transfer to the Sheridan & Bailey store based on his union activity. (ALJD 171:4-13). In November 2021, Johnson spoke with his Williamsville Main store manager and with Sheridan & Bailey support manager Derek Sveen about transferring there. He did not seek permission from the district manager. After Sveen returned from vacation, he told Johnson that Sheridan & Bailey was fully staffed and that he had not known that more partners had been hired. (Tr. 2421, 2438-42, 2448). The record does not support ALJ findings that Sveen talked to district manager Szto about this, that this departed from a past practice, or there was anything else that warranted the ALJ's finding that Sveen's response to Johnson was "absurd." As the ALJ points out, two employees had just been added at Sheridan & Bailey, but that only tends to support Sveen's conclusion that the transfer of another was *not*

needed. (*See* ALJD 171:8-10). Johnson thereafter sought a transfer to Richmond, Virginia, where stores were starting to organize, which his Williamsville manager approved and Starbucks did not delay. (Tr. 2443-47; *see also* Tr. 2474). This record belies that union animus played any part in Johnson not being transferred to Sheridan & Bailey.

As to Baganski, the ALJ acknowledges she did not engage in union activity, but says Starbucks knew of her close relationship with Cochran, a vocal union supporter, and concludes that her transfer to Sheridan & Bailey, which did occur, was delayed for retaliatory reasons - either her presumed union support or to discourage Cochran. (ALJD 171:15-24). Baganski testified she trained at East Robinson from January 11 until February 6 and started at Sheridan & Bailey on February 14. (Tr. 1827-28, 1830, 1837). She offered no testimony to support the ALJ's conclusion that Starbucks "was well aware" of her personal relationship with Cochran. She testified she started wearing a union pin *on January 30*. The ALJ's finding that union animus delayed her getting to Sheridan & Bailey is conjecture.

## M.    Starbucks Did Not Violate Section 8(a)(3) By Denying Training Assignments At East Robinson

Addressing a narrower issue than alleged, the ALJ finds only that after openly supporting the union, Nathan Tarnowski was made a barista trainer in January 2022 at East Robinson and in February, after asking why he was not receiving training assignments, was told there was no one to train. The ALJ finds that a lie, violating Section 8(a)(3), because Tarnowski testified shift supervisors were training new baristas. (ALJD 119:22-30, 171:29-30; 193:38; *see* GC Ex. 1zzz ¶ 13(g)).

First, finding union animus is contradicted by Starbucks making Tarnowski a barista trainer when he was an open union supporter. Second, paragraph 13(g) alleges that union supporters were denied the opportunity to train new employees, not that managers lied about such opportunities.

46

Third, General Counsel witness Kaitlyn Baganski testified she trained at East Robinson in January with persons who openly favored the union, indicating training opportunities were not denied to union supporters. (Tr. 1827-31). Paragraph 13(g) should be dismissed.

      N.     <u>Starbucks Did Not Violate Section 8(a)(3) With Regard To Gianna Reeve</u>

Based on the allegations below in paragraph 13 of the Complaint (GC Ex. 1zzz), the ALJ finds Starbucks violated Section 8(a)(3) with respect to Gianna Reeve ("Reeve"), a shift supervisor at Camp Road:

-    ¶ 13(e) – since September 2021 reducing the shifts in which she was assigned to be the playcaller (ALJD 73:27-74:2, 171:38-47-47; 172:1-2; 195:33-43); and
-    ¶ 13(s) – on about January 13, 2022, investigating her (ALJD 172:4-16).

      *1.*     *Starbucks did not violate Section 8(a)(3) with respect to playcaller shifts as to Reeve.*

Paragraph 13(e) alleges reduction of playcaller shifts, on which the ALJ makes no finding. What he finds is that after the union campaign, the percentage of shifts on which Reeve was scheduled as shift supervisor changed from 80% to 50%. He finds that, upon returning to school in September, she reduced her availability by excluding Tuesdays and Thursdays, and the Camp Road store was then overstaffed. Reeve conceded reduction in her shift supervisor work could have been due to her reduced availability. (ALJD 73:34-35; 74:1-2 and fn. 255, 171:38). The ALJ erroneously concludes that assigning Reeve lesser-skilled work violated Section 8(a)(3). (ALJD 171:45-47; 172:1-2).

First, the ALJ finds Reeve was a leading union organizer at Camp Road, but the record includes no evidence of store manager knowledge of that or that such knowledge motivated any reduction in her shift supervisor work. Second, Reeve's concession that "[i]t could be" she had fewer shift supervisor shifts in fall 2021 because of her reduced availability was likely correct. (Tr. 1130-31). Changed availability changes shift supervisor opportunities, especially if other shift

supervisors don't change their availability. Speculation about causation does not satisfy *Wright Line. See Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120 at* 7. Third, a reduction in shift supervisor shifts from 80% to 50%, entailing no loss of pay, is not an adverse action.

> 2. *Starbucks did not violate Section 8(a)(3) by investigating Reeve in January 2022.*

The ALJ says that, when partner resources manager Holly Klein told Reeve she was being investigated for using slurs or hate speech in referring to support manager Taylor Pringle after he counseled her over a Black Lives Matter tee shirt and, according to the ALJ, union solicitation, that created the impression that protected communications outside the workplace were under surveillance, which threatened discipline, which violated Section 8(a)(3). (ALJD 171:31-172:17, 194:6). The record does not support that finding.

Reeve's testimony was only that Pringle was concerned about violation of the no-solicitation policy, not that he knew of any union solicitation. (Tr. 1115-16). There is no evidence Klein was aware of or referred to any union solicitation. Reeve further testified Partner Resources contacted her about a report to Starbucks Ethics & Compliance that in a group chat with no managers she had called Taylor Pringle "a white fucking twink." (Tr. 1117-18). There is no evidence this investigation pertained to protected activity. Being asked about use of a potential slur after a reported violation of the company's non-discrimination policy is not an adverse action. Reeve admitted she was not disciplined. (Tr. 1128-29). Paragraph 13(s) should be dismissed.

O.    Starbucks Did Not Violate Section 8(a)(3) With Respect To James Skretta

The ALJ finds the below actions, alleged in paragraph 13 of the Complaint (GC Ex. 1zzz), to violate Section 8(a)(3) with respect to James Sketta ("Skretta"), who worked at the Sheridan & Bailey store in Buffalo:

- ¶ 13(f)(v) – a verbal warning on November 25, 2021 (ALJD 87:8-15, 177:36);

- ¶ 13(h)(iii) – a final written warning on February 18, 2022 (ALJD 92:1-11, 178:43-179:2); and
- ¶ 13(o)(i) – refusing to allow him to work a shift at another store in November 2021 (ALJD 87:31-36, 166:45-167:37, 195:33-43).

The ALJ finds Skretta was a leading union supporter and without support adds that Starbucks "was well aware of [his] union activities." (ALJD 86:13-15, 93:23-31, 167:21-22). He finds Section 8(a)(3) violated in November 2021 when, after a meeting in which new managers reviewed Starbucks policies, Skretta was warned for a dress code violation and also denied the opportunity to pick up a shift at another store, and in February 2022 when he received a final written warning for foul language and slamming his hand against a door in frustration. (ALJD 87:8-12, 31-36, 92:4-11, 166:45-48, 167:1-26, 179:1-2).

As to the claimed verbal warning, Skretta testified that on November 25, after earlier in the month the dress code had been reviewed and he and others signed it, his store manager told him his shoes did not meet the dress code. He admitted he was not disciplined. (Tr. 2475, 2493-94). Paragraph 13(f)(v) therefore should be dismissed.

As to the shift denial, Skretta testified that in mid-November, when he knew store manager approvals were needed to pick up a shift at another store, he tried to either pick up a shift or trade shifts with Will Westlake at Camp Road. His store manager approved, but the Camp Road store manager did not because Westlake's shift was going to be covered another way. (Tr. 2487-89). The record includes no evidence the Camp Road manager knew of his union activity at Sheridan & Bailey or that alternate coverage of Westlake's shift was based on such activity. Paragraph 13(o)(i) should be dismissed.

On February 18, 2022, Skretta received a final written warning for profanity and hostile conduct, including hitting/slamming his hand against a door, which he admitted. (GC Ex. 157; Tr. 2494-96). Manager Alex Roux testified he disciplined Skretta, consistent with discipline he had

imposed in other markets for similar misconduct, and that he worked with Partner Relations to determine the final written warning. (Tr. 3059-60). The ALJ credited Roux's testimony that this discipline was consistent with discipline he had issued elsewhere but found Skretta credibly testified that cursing had been commonplace at Sheridan & Bailey. (ALJD 92:fn. 311, 99:fn. 330). No proof of union animus was presented as to Roux. A new manager's enforcing Starbucks' clear rule against vulgar or profane language does not evidence unlawful motive. Roux came to Sheridan & Bailey in mid-December 2021. (Tr. 3040). Starbucks introduced many examples of discipline for profanity and hostile conduct. (*See* R Exs. 224(a), 227(a), 227(b), 231, 235, 236, 251, 261, 294; *see also* R. Ex. 152 at p. 1 & GC Ex. 154 (referencing March 2021 FWW); Exs. A and B; ALJD 15-16). The ALJ specifically acknowledged a written warning and termination at Sheridan & Bailey for inappropriate language in 2021 before the union campaign. (ALJD 178:45-179:1). Absent evidence of union animus and given the evidence indicating Skretta would have received the final written warning regardless of protected activity, paragraph 13(h)(iii) should be dismissed.

P.    Starbucks Did Not Violate Section 8(a)(3) With Respect To Colin Cochran

The Starbucks actions alleged in paragraph 13 of the Complaint which the ALJ found to violate Section 8(a)(3) with respect to Cochran, who worked at the Walden & Anderson Road store in Buffalo, are:

- GC Ex. 1zzz ¶ 13(b)(ii) – refusing to allow him to train in November 2021 (ALJD 83:15-19 and fn. 281; 163:12-21); and
- GC Ex. 1zzz ¶ 13(l) - since November 2021 refusing to consider promoting him to shift supervisor (ALJD 83:21-30, 173:35-174:7, 193:26, 195:33-43).

1.    *Starbucks did not refuse to allow Cochran to train in violation of Section 8(a)(3).*

The ALJ finds that after the Walden & Anderson store reopened to customers in November 2021 Cochran lost compensation because he didn't receive training assignments, which violated Section 8(a)(3). (ALJD 83:15-19, 163:12-21).

As to union animus, although Cochran was an open union supporter, he testified his store manager, Romalie Murphy, selected him to become a barista trainer in October 2021 at Walden & Anderson "when it was a training store" which weighs against finding union animus. (Tr. 1923-25, 1934-36).

As to loss of training opportunities, Cochran testified the only time he did not train was "[a]fter the store reopened to customers" in November – i.e., when some training shifted to NFB and East Robinson. Walden & Anderson ceased to be the only training store. (Tr. 1938-39; ALJD 24:12-18). That is one reason Cochran had fewer training opportunities. More importantly, manager Aimee Alumbaugh testified "Colin had let me know that he really preferred to work morning shifts and that he wanted to move his shifts earlier in the day" and she warned him that moving to an opening shift after Walden & Anderson reopened to the public "will limit the amount of training that happens because . . . most of the training is happening from 5 p.m. to 9 p.m. And we don't train during peak because that's our busiest time . . . of day, so it's not conducive to business to have people learning during that time." (Tr. 3103-04). The ALJ's finding is consistent with this - he found that after November 8 the three training stores were open to customers, "but closed early on occasion for training" – meaning the training occurred later in the day. (ALJD 24:14-20). In short, Cochran worked opening shifts which is not when new partners were trained.

Further, to the extent the ALJ finds that moving to three training stores in November 2021 was really a move intended to discriminatorily deprive Cochran of compensation for training, that is unsupported in the record. *See CP Anchorage Hotel 2, LLC*, 369 NLRB No. 92, at *32-33 (2020) ("inappropriate" for "trier of fact to substitute [its] business judgment for that of [the employer]"); *Sam's Club*, 349 NLRB 1007, 1009 n.10 (2007) ("management is for management. Neither Board

nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision"). Paragraph 13(b)(i) should be dismissed.

2.  *Starbucks did not violate Section 8(a)(3) in connection with Cochran seeking to be a shift supervisor.*

The ALJ found Cochran applied in November 2021 for an open shift supervisor position but didn't hear back, applied again in spring 2022 but was not interviewed, and applied in summer 2022 but did not hear back. Alumbaugh testified she told Cochran when he was employed for only four months that he had to be in his position for six months to be eligible to become a shift supervisor, but the ALJ found this to "lack[] merit" because when a different manager first urged Cochran to apply this wasn't mentioned, he became a barista trainer with less than six months experience and Starbucks offered no proof Cochran was considered or followed its normal selection process. Since Cochran was a prominent union supporter, Starbucks engaged in coercive activity and did not explain why Cochran was not considered, Section 8(a)(3) was violated. (ALJD 83:24-27 and fn. 82, 136:1-7, 173:30-174:7; Tr. 3105-06; *see also* R. Ex. 91, Tr. 2584).

The record includes no evidence Cochran has not been considered to be a shift supervisor, only that he was not selected. There is no evidence of union animus – Cochran's managers supported him. (Tr. 1940-42). The ALJ's reasoning provides no basis to infer unlawful motive or pretext – the fact that two managers said different things about the process does not show animus, becoming a barista trainer is not the same as becoming a shift supervisor, and there is no evidence as to how the process worked or who participated in it. Paragraph 13(l) should be dismissed.

Q.   Starbucks Did Not Violate Section 8(a)(3) With Respect To William Westlake Or The Coworkers He Identified As Having Hours Reduced

The ALJ finds Section 8(a)(3) violated, based on the below allegations in paragraph 13 of the Complaint (GC Ex. 1zzz), with respect to William Westlake ("Westlake"), a shift supervisor at the Camp Road store outside Buffalo, and certain others at that store:

- ¶ 13(b) – refusing to allow him to train new baristas in September 2021 (ALJD 72:16-21, 163:6-21);
- ¶ 13(i)(vi) – on December 23, 2021 sending him home before the end of his shift (ALJD 172:13-35);
- ¶ 13(k)(iii - vi) – in January 2022 reducing his work hours and the work hours of others at Camp Road (ALJD 66:15-19, 66:28-30, 73:8-14, 173:14-31);
- ¶ 13(m) – on November 8, 2021 refusing to allow him to attend an anti-union meeting (ALJD 71:22-39, 174:11-27); and
- ¶ 13(o)(ii) – at the end of December 2021 refusing to allow him to work a shift at another store (ALJD 72:25-36, 73:1-4, 167:10-15, 167:27-37, 195:33-43).

As to the alleged December 23, 2021 violation of Section 8(a)(3) by sending Westlake home early, the ALJ collapses it into the allegation of refusing to allow him to work a shift at another store, saying that "on December 23, Westlake was sent home early due to [Starbucks'] stricter enforcement of the policy for picking up shifts." (ALJD 167:27-28, 172:25-27, 194:3-4; *compare* GC Ex.1zzz ¶ 13(i)(vi) and (o)(ii)). This reduces *two* alleged violations to *one* which occurred at Sheridan & Bailey, not Camp Road. In any event, the finding is error. In mid or late December 2021, Westlake tried to pick up a shift at Sheridan & Bailey store, did not obtain permission from both the Camp Road and Sheridan & Bailey store managers, drove to Sheridan & Bailey and started working, but during the shift was sent home by Greta Case, a district manager. No evidence presented that Case knew of, or that her sending Westlake home, related to his union activity at Camp Road. (Tr. 1185-86, 2733, 3060-63, 3350-51, 3414). The record does not support any awareness of Westlake's union activity outside Camp Road or that Case was enforcing a policy of requiring approval of both two store managers to pick up a shift at another store based on Westlake's union activity. (ALJD 72:25-36, 73:1-4, 166:45-48, 167:1-7, 167:10-15). Paragraphs 13(i)(vi) and (o)(ii) should be dismissed.

Regarding the allegation that in September 2021 Starbucks refused to allow Westlake to train new baristas, the ALJ himself finds this resulted from Starbucks' September 6 conversion of the Walden & Anderson store to a training center, which meant barista trainers in other stores

received no (or fewer) training assignments. (ALJD 72:18-19, 163:1-6). The ALJ then makes a finding on a point not alleged – that centralizing training at Walden & Anderson "discriminatorily reduced the compensation of . . . Buffalo-area barista trainers . . . ." (ALJD 163:13-21). There is no proof that the centralization of training at Walden & Anderson was discriminatorily intended to reduce the compensation of barista trainers elsewhere or that Starbucks "refused" to allow Westlake to train. Paragraph 13(b) should be dismissed.

As to the paragraph 13(k)(iii-vi) allegations about reduction in hours for Westlake and others at Camp Road in late December, Westlake testified that after hiring to resolve understaffing at Camp Road partners "could no longer have as many hours as we wanted," but offered no testimony this was connected to union activity. (Tr. 1173). Westlake testified that in mid or late-December 2021 a manager told him hours needed to be cut, so he looked at "future proposed schedules" for himself, Ryan Mox, Elissa Pfleuger, Joshua Pike, and "CC." He did not testify that his or their hours were reduced on final published schedules, actually reduced or reduced disproportionately compared to other partners. (Tr. 1189-90). Westlake admitted he did not work in January 2022, so he could not testify as to hours worked in that month. (Tr. 1201-04). The General Counsel offered no testimony from Mox, Pike or Pfleuger. (*See* (GC Ex. 1zzz ¶ 13(k)(iii), (iv) and (vi)). Paragraph 13(k)(iii-vi) should be dismissed.

As to the allegation that on November 8, 2021, Westlake was not allowed to attend a meeting in retaliation for union activity, the ALJ finds Section 8(a)(3) violated because he was not paid for that meeting (not what was alleged). Westlake attended a make-up meeting and was not disciplined. (ALJD 71:20-39, 72:1-2, 174:23-28; *see* Tr. 1110-11, 1126, 1180-83). Since he attended a make-up meeting, the ALJ's finding of non-payment is unsupported. The record does

not establish he was not allowed to attend a meeting - he was invited to a meeting, tried to attend a different one and then attended a makeup meeting. Paragraph 13(m) should be dismissed.

R.  Starbucks Did Not Violate 8(a)(3) With Respect To Nicole Norton

The ALJ finds two actions alleged in paragraph 13 of the Complaint to violate Section 8(a)(3) with respect to Nicole Norton ("Norton"), who worked at Transit & French in Buffalo:

- ¶ 13(f)(ii) – a verbal warning on December 15, 2021 (ALJD 102:8-35, 177:36-45); and
- ¶ 13(p)(iv) – a written warning on January 2, 2022 (ALJD 103:18-21, 178:18-28, 195:33-43).

The ALJ finds that after a December 15 meeting Norton was "reprimanded by support manager Mann for wearing pants out of dress code" but in his legal analysis finds she received a verbal warning in December for cursing. He finds she received a January 2, 2022 written warning for cursing. He finds these warnings would not have issued but for stricter policy enforcement of and absent union activity. (ALJD 99:fn. 330, 103:4-15, 177:36-45, 178:18-28, 99:fn. 330).

The record reflects that before December 15, 2021, manager Jack Morton reviewed the dress code with Norton and other Transit & French partners and had them acknowledge it in writing. After the December 15 meeting, Mann told Norton her pants did not meet the dress code. Norton testified she was never disciplined for violating the dress code. (R. Ex. 306; Tr. 1739-42, 1749-50). On January 2, 2022, Norton received a written warning for using foul language. Norton admitted the profanity. (GC Ex. 132; Tr. 1742, 1751-52). She testified she previously had sworn in the store without being disciplined, but not testify that on any such occasions a manager heard her or was informed of her language. (Tr. 1746).

The foregoing does not establish a verbal warning on December 15 for cursing or based on the dress code. As to the written warning for profanity, the record establishes no union animus or connection to union activity. The ALJ says Norton "openly supported the Union" but makes no

finding regarding union activity by her. (ALJD 102:31-35, 103:1-21, 178:5-26; *see* Tr. 1738-39). Since Norton did not testify that on any earlier occasion a manager heard her or was informed of her language, her testimony does not establish stricter enforcement. Mann testified she didn't arrive at Transit & French until late October and administered discipline for profanity in the same manner as when she was a store manager in Illinois. (Tr. 2589-92, 2611). Further, the comparator evidence shows that Starbucks had addressed foul language and disrespectful communications before August 23, 2021 at Transit & French and other stores in Buffalo. (*See* ALJD 15-16; Exhibit A; R. Exs. 235, 236, 227(a)& (b) and 254). Paragraphs 13(f)(ii) and (p)(iv) should be dismissed.

### S.    Starbucks Did Not Violate Section 8(a)(3) With Respect To Roisin Doherty

Actions alleged in paragraph 13 of the Complaint which the ALJ finds to violate Section 8(a)(3) as to Roisin Doherty ("Doherty"), who worked at the Delaware & Chippewa store in Buffalo, were:

- ¶ 13(p)(iii) – a written warning on January 1, 2022 (ALJD 106:39-41, 107:1-4, 178:12-16, 24-28); and
- ¶ 13(h)(iv) – a final written warning on March 26, 2022 (ALJD 107:6-12, 179:4-11, 195:33-43).

Although the ALJ cites "widespread union animus" and Starbucks' "knowledge" that Doherty "openly supported" the union to support that disciplining Doherty was Starbucks more strictly enforcing its policies in retaliation for union activity (ALJD 178:15-28, 179:4-19), he makes no findings regarding union activity by Doherty other than that she signed the August 23, 2021 Dear Kevin letter posted on Twitter. (ALJD 18:29-45, 19:1-27, 103:23-107:12). At that time Doherty worked at the Walden Galleria Mall kiosk. (Tr. 1277).

Sometime after Doherty came to Delaware & Chippewa in September 2021 a level set occurred, in which policies were reviewed and it was explained to partners they would be enforced, particularly the dress code and time and attendance policies. On December 4, 2021, Delaware &

Chippewa store manager Robert Hunt gave Doherty a documented coaching for multiple instances of tardiness and a dress code violation in November. (GC Ex. 111; Tr. 1333, 1337, 1352-53, 1372; R Ex. 307; *see* ALJD 106:39-41). On January 1, 2022, he gave Doherty a written warning for tardiness on three different days in December. (GC Ex. 112; ALJD 107:1-2). From January 10 to February 5, 2022, Doherty was tardy six times and called off work four times. On February 22, when she returned to work after an absence due to COVID, support manager Heather Dow gave her a final written warning for the tardiness and call-offs. Hunt had recently resigned. (GC Ex. 110; Tr. 1339, 1344, 3082-84; ALJD 107:6-12).

The record includes no evidence Hunt knew of Doherty's union activity. Dow testified she did not know of Doherty's union support until mid to late February 2022, that her discipline was unrelated to any union activity and consistent with what she issued in other markets and at other Buffalo stores. (Tr. 3084-85). The record further reflects that after the level set emphasizing attendance at Delaware & Chippewa, Doherty ignored that policy's requirements. This record and comparator evidence (*see* Exhibits A and B) indicate she would have been disciplined absent protected activity. Paragraphs 13(p)(ii) and (h)(iv) should be dismissed because the record includes no evidence decisionmakers on Doherty's discipline knew of her union activity and indicates she would have received the warnings absent union activity. *See Strategic Tech. Inst., Inc. & Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 371 NLRB No. 137 (2022) (*Wright Line* requires decisionmaker on adverse action to have "actual knowledge" of protected activity).

T.    Starbucks Did Not Violate Section 8(a)(3) With Respect To Brian Murray

The ALJ found Section 8(a)(3) violations as to Brian Murray ("Murray"), who worked at the Transit Regal/Lancaster store in Buffalo, based on the below allegations from paragraph 13 of the Complaint (GC Ex.1zzz):

- ¶ 13(f)(iv) – a verbal warning on November 8, 2021 (ALJD 129:39-45, 130:1-5,177:32-47, 192:10-16);
- ¶ 13(i)(iii) and (iv) – sent home early on November 23 and 24, 2021 (ALJD 132:14-23, 172:24-25, 32-35, 192:10-16);
- ¶ 13(n) – prohibited from reporting to work November 13-22, 2021 (ALJD 132:6-12;174:38-48, 178:1-6, 175:1-13, 192:30, 194:1-2); and
- ¶ 13(p) – a written warning on November 25, 2021 (ALJD 132:25-32, 178:11-13, 195:33-43; 192:10-16).

Murray testified he refused to sign the dress code policy because he thought it was targeting his union shirt and a labor law violation. A week later a district manager told him the dress code was not being used to target the union. (Tr. 1242-43). He testified that after being sick and missing work on November 11 and 12, he was sent home on a 10-day COVID leave, that when he returned to work he was sent home for a dress code violation because he was wearing a graphic t-shirt, on which the graphic was a Workers United logo. He wore the same shirt the next day and was sent home again. When he arrived to work on November 25, he received a corrective action for dress code violations. (GC Ex. 102; Tr. 1245-50, 3359-60; R Ex. 309).

The record includes no evidence of a verbal warning on November 8, so paragraph 13(f)(iv) should be dismissed. The record includes no evidence Murray's COVID leave was motivated by union animus – it followed two days of absence from work due to illness in a pandemic. Paragraphs 13(i)(iii) and (iv) should be dismissed. Regarding being sent home and receiving a written warning for dress code violations, other partners before and after the union campaign were disciplined for wearing graphic t-shirts, regardless of the content. (Exhibits A and B; *see e.g*., Lexa Michels (graphic printed t-shirt, 2018 at Lancaster Regal) (R Ex. 254); Laura Duggan (green shirt with graphics at Transit & French) (R Ex. 217); David Goyette (Star Wars graphic t-shirt), Henrietta Market Square (R Ex. 280). Paragraphs 13(i)(n) and (p) should be dismissed because the record does not establish he received differential treatment.

U.    <u>Starbucks Did Not Violate Section 8(a)(3) With Respect To Mikaela Jazlyn Brisack</u>

The ALJ finds denying leave requests by Mikaela Jazlyn Brisack ("Brisack") on February 16 and 26, 2022 at the Elmwood store to violate Section 8(a)(3). (ALJD 176:7-43, 194:11, 195:33-43; *see* GC Ex. 1zzz ¶ 13(v)).

The issue here involves a 15-day leave Brisack took in May 2022 when she did not have accrued paid time off. After finding Brisack a visible leader of the union organizing campaign, the ALJ finds Starbucks did not show it would have denied Brisack's leave request absent union activity because a) in October 2021 a Brisack leave request was approved without requiring paid leave, and b) the record does not establish Brisack could not have accrued enough leave to meet her request between February 2022 and May 14. 2022. He finds this is adverse treatment because the procedure when returning from a leave differs from when returning from paid time off. (ALJD 49:8-9, 176:21-43). These findings are error.

Brisack admitted she submitted leave requests before the union campaign that were initially denied, but ultimately approved, including a May 21, 2021 leave request denied several months before the union campaign. (Tr. 1568; GC Ex. 41, p. 2). Store manager Shanley on October 31 approved Brisack's request for time off from December 19, 2021, through January 3, 2022, when submitted correctly, notwithstanding Brisack's union activity. (Tr. 1573; GC Ex. 41, p. 1). When Brisack submitted her May 2022 leave request correctly, it was approved. (Tr. 1604-05).

The ALJ comment that there is no proof Brisack could not have accrued the needed time after her request but before the requested May leave ignores that leave requests are evaluated when received and suggesting the requested amount of paid time off might be accrued in three months is pure speculation. The ALJ essentially finds that requiring and then granting a leave when no paid time off has been accrued violates Section 8(a)(3) even though prior leave requests had also been denied, and the requested time off was received. Paragraph 13(v) should be dismissed.

V.     Starbucks Did Not Violate Section 8(a)(3) With Respect to Michelle Eisen

The ALJ finds Starbucks violated Section 8(a)(3) on November 8, 2021 by refusing to allow Michelle Eisen ("Eisen"), who worked at the Elmwood store to attend an anti-union meeting for which she would have been paid. (ALJD 38:20 – 39:40, 174:11-28, 195:33-43, 194:6-7, GC Ex. 1zzz ¶ 13(m)). He finds Eisen was an open union supporter, was invited to an 8 p.m. meeting on November 8, tried to attend a 5:30 meeting instead, but was not allowed to. (ALJD 174:16-24; *see* Tr. 236-38, 244). Eisen admitted she could have attended the 8 p.m. meeting, but chose not to do so because she had to work early the next day. (Tr. 385-87).

The ALJ's finding regarding lost pay does not address what was alleged. (*See* GC Ex. 1zzz ¶ 13(m)). In any event, Eisen precipitated this event by trying to attend a meeting other than the one to which she was invited, plus she could have attended a make-up session the next day and been paid. (Tr. 237). Paragraph 13(m) should be dismissed.

W.     Starbucks Did Not Violate Section 8(a)(3) With Respect To Cassie Fleischer

The ALJ erroneously finds Starbucks violated Section 8(a)(3) with respect to Cassie Fleischer ("Fleischer"), who worked at the Elmwood store, by refusing to allow her to attend an anti-union meeting on November 8, 2021 for which she would have been paid and by discharging her. (ALJD 38:20 – 39:40, 42:37 – 48:8, 174:11-28, 179:26-47, 180:1-20, 195:28-43; GC Ex. 1zzz ¶ 13(m) and (r)(i)).

1.     *Meeting attendance.*

Contrary to the ALJ's finding, Fleischer testified she was not a known union supporter until "the day of the vote count" at Elmwood which was December 9, 2021 (Tr. 2057), so there was no union animus toward Fleischer on November 8.

As with Eisen, the finding that Section 8(a)(3) was violated by losing pay does not address what was alleged, which was that not allowing her to attend isolated her. (*See* GC Ex. 1zzz ¶

13(m)). In any event, the record establishes that she precipitated this event by trying to attend a meeting other than the one to which she was invited. Paragraph 13(m) should be dismissed.

### 2.  *Discharge.*

(i)  The General Counsel failed to carry its initial burden under with respect to Fleischer's discharge.

The ALJ finds Starbucks retaliated against Fleisher for engaging in union activity by terminating her on February 20." (ALJD 43-44, 179:28 – 180:15, 193:38-39). The record does not support a finding of discriminatory motive in Fleischer's employment termination.

Fleischer agreed to abide by the Partner Guide, including its requirement to offer availability meeting store needs and a minimum number of hours. (Tr. 2047-48; GC Ex. 140 at p. 15). In January and early February 2022, 12 partners at the Elmwood store significantly reduced their availability. Fleischer was one - on February 3, 2022 she requested to reduce her weekly availability from 30-35 hours over 5 days to 12 hours on just Friday nights/Saturday mornings because of a new job. (GC Ex. 151; Tr. 2019-20, 2048, 2735; *see* ALJD 43:9-13). The result was that Starbucks could not grant all the requests. (GC Ex. 146).

Store manager Shanley denied Fleischer's reduced availability request on February 7 because it did not fit the needs of the store. (Tr. 2022; GC Ex. 139). On February 8, Shanley told Fleischer she could schedule Fleischer if Fleischer offered more availability, that she did not want take hours from partners who were willing to work more to accommodate Fleischer's limited availability and asked Fleischer to include Sundays, which Fleischer refused. (GC Ex. 141(b) at pp. 3-4; *see* ALJD 43:18-27). On February 12, Shanley suggested a leave or employment separation and reapplying if the new job didn't work out, telling Fleischer her availability did not fit the store's need. Shanley gave Fleischer her Friday and Saturday shifts and said they would then see what Fleischer decided. (GC Ex. 142(b), pp. 2-11; *see* ALJD 44:2-212).

On February 16, Fleischer again told Shanley her availability would be limited to Friday evenings and Saturday mornings. Shanley said she would see if she could schedule Fleischer for just two days the next week. (GC Ex. 143(a), 143(b), pp. 2-5; *see* ALJD 44:14-17). On February 20, Shanley told Fleischer her offer of two days of limited hours did not make sense for the store's schedule. Fleischer asked about staying off the schedule to see how she liked her new job. Shanley said that after so many weeks Fleischer "would" eventually be "termed from the system" but could be rehired, but that she would not be termed at that time. When Fleischer asked if there was a 12-hour availability policy, Shanley told her the policy was "meet[ing] the demands of the business" and referred her to the Partner Guide. (GC. Ex. 145(b), pp. 2-7; *see* ALJD 44:23-34).

In a February 22 phone call district manager Michaela Murphy told Fleischer she had not been separated, was still in the Starbucks system and asked about meeting in the middle to avoid separation. Fleischer did not change her days of availability but offered more hours on Saturday. Murphy said she would look into options. (GC. Ex. 147(a) and (b), pp. 2-5; *see* ALJD 46:13-23).

On March 9, Murphy and Shanley met with Fleischer and Eisen. Fleischer declined to add availability. Murphy said she was open to Fleischer transferring to a store whose need fit Fleischer's Friday-Saturday availability, there was no set minimum number of hours and it was matter of balancing everyone's availability to create a schedule. (GC Ex. 34(a), (b), pp. 3-18; *see* ALJD 46:25-36, 47:1-3). On March 12, 2022, Murphy told Fleischer Friday evenings at Elmwood were covered and asked her to open her availability or to list stores to which she would accept a transfer. (GC Ex. 148(a) & (b), pp. 2-5; *see* ALJD 47:5-9).

On March 14 and 18, Fleischer told Murphy she would not change her availability, but would consider a transfer or adding hours. (GC Ex. 149(a) & (b), pp. 2-5; *see* ALJD 47:5-9; GC

Ex. 150 (a) and (b); *see* ALJD 47:19-21). On April 21, Shanley and Murphy gave Fleischer a notice of separation, saying in part:

> Given Cassie's substantial reduction in her availability (which fails to meet the business needs of her store), and her refusal to increase her hours or transfer stores, effective immediately, Cassie's employment at Starbucks is separated.

(GC Ex. 151; *see* ALJD 47:31-40; 48:1-4). Fleischer admitted Shanley and Murphy told her each time they met that they could not accommodate her limited availability request because of the needs of the store, and that they offered her the chance to transfer to another store where her limited availability would work, but she refused that offer. (Tr. 2050-52, 2058, 2060).

The record demonstrates Starbucks tried to avoid discharge. Starbucks wanted her to work more often and, if she could not, offered a transfer. No union animus can be inferred on these facts.

(ii)     Starbucks would have discharged Fleischer absent union activity.

The ALJ says Starbucks failed to show "it would have denied Fleischer's request even in the absence of her union activity[,]" that it continued to grant reduced availability requests, and puzzlingly, cites Michelle Eisen, a "leader of the organizing campaign". (ALJD 180:8-15). Granting the availability request of another union supporter does not evidence union animus. In any event, as Shanley explained to Fleischer on February 8, Eisen's request was granted earlier. (GC Ex. 141(b), pp. 3-4). Kellen Higgins' testimony confirmed that Eisen's availability around the holidays was historical. (Tr. 673). So, this evidence does not support that Starbucks "continued to" grant reduced availability. The record is clear and logic dictates that too many requests for reduced availability cannot all be granted or the store won't be able to cover hours or develop a schedule. (GC Ex. 142(a) and (b); GC Ex. 34(b), pp 15-18; GC Ex. 146).

Murphy also testified that Fleischer's separation was consistent with Starbucks' practices, including before Murphy came to Buffalo, but that it was unusual for a partner to refuse every

alternate option and force a discharge. (Tr. 2738-39). On February 4, 2022, at the same time as these events, Partner Relations advised manager Tiffany Mann in Buffalo to deal with barista James Boyers' tardiness and irregular attendance by informing him that his availability did not meet the needs of the business, his options were to open his availability to do so, seek a transfer or role change, or consider resigning and if he failed to meet minimum availability, then involuntary separation would occur. (R Ex. 171).

In sum, Fleischer's termination was consistent with Starbucks' efforts to manage availability based on specific store needs.

(iii)     Fleischer was discharged on April 21, 2022.

The ALJ says that Fleischer worked at the Elmwood store "until April 2022" and that she was terminated on February 20. (ALJD 42:37-38,45 and fn.143, 180:8; *see* GC Ex. 1zzz ¶13(r)(i)). But Fleischer had multiple meetings with Shanley and Murphy after February 20 to try to resolve her availability issues and admitted she was not separated on February 20. (Tr. 2050).

X.     Starbucks Did Not Violate Section 8(a)(3) With Respect To Daniel Rojas, Jr.

The ALJ finds the below actions, alleged in paragraph 13 of the Complaint (GC Ex. 1zzz), violated Section 8(a)(3) as to Daniel Rojas, Jr., ("Rojas"), a shift supervisor at the Sheridan & Bailey store in Buffalo:

- ¶ 13(q)(ii) – a coaching on January 26, 2022 (ALJD 91, 177:22-25, 28-30, 192:18-23); and
- ¶ 13(r)(ii) – his discharge on March 4, 2022 (ALJD 91, 180:22-47, 181:1-7, 195:28-43).

   1.     *The General Counsel failed to carry its initial burden under Wright Line with respect to the claimed violations as to Rojas.*

The ALJ provides minimal analysis of the initial *Wright Line* burden. Regarding the alleged discriminatory coaching (GC Ex. 152), he says it was motivated by Starbucks' "widespread union animus" and "stricter enforcement of its policies" in retaliation for employees union support.

(ALJD 177:23-25, 27-29). Addressing the coaching and discharge, he says Rojas was openly pro-union, engaged in union activity and that "Respondent's widespread coercive actions over six months," stricter enforcement of time and attendance and a "leap from a coaching in late January to a discharge for the same violation in March" evidences discriminatory motive. (ALJD 180:40-43; 192).

None of the above supports an inference of discriminatory motive on the part of manager Amy Ruiz, who delivered the January coaching, or manager Alex Roux or regional operations coach Brittney Sanders, who carried out Rojas' employment separation in March 2022. The General Counsel presented no evidence Ruiz knew of Rojas' union activity or that any such knowledge was the impetus for the coaching addressing multiple incidents. The same is true of Roux and Sanders with respect to Rojas' separation. Reference to "widespread coercive actions" does not satisfy *Wright Line's* requirement for evidence showing that unlawful motive underlay a particular challenged action.

The record belies inference of union animus. The ALJ's only finding regarding possible animus is that in October 2021 Rojas told Williams of his union support and she assured him he would not be subject to retaliation. (ALJD 91:40-41, 92:1-2 and fn. 307; Tr. 2086-87). There is no evidence Ruiz, Roux or Sanders knew of that conversation.

Rojas' conduct precipitated the discipline alleged. In March 2019 he received a written warning for tardiness. (R Ex. 183). On March 17, 2021, he received a final written warning for unprofessional comments and disrespectful behavior toward another barista. (*See* R Ex. 152, p. 1; GC Ex. 154; Tr. 2114-16). In Fall 2021, a manager reviewed the attendance policy with him and had him sign it. (Tr. 2100). Rojas was repeatedly late to work thereafter. (Tr. 2120, 2145, 2147). On January 26, 2022, he received a documented coaching for tardiness, including five incidents in

January alone, which expressly reminded him that "continued violations will result in disciplinary action up to and including separation of employment." (GC Ex. 152). Rojas agreed that, if someone is late multiple times or it is "egregious," then that warrants termination. (Tr. 2125-26). Rojas was again tardy on March 2, 2022 and admitted he did not communicate he would be late to his store manager. Rojas was the shift supervisor responsible for opening the store, was 26 minutes late, arriving four minutes before the store was to open at 6 a.m. The baristas who showed up on time could not enter until he arrived with the key. (Tr. 2116-17, 2142-43). On March 4, 2022, Roux and Sanders, informed Rojas that he was being discharged for tardiness. (GC Ex. 154). None of this reflects union animus.

2.    *Starbucks established it would have disciplined and discharged Rojas absent union activity.*

The ALJ says Starbucks did not meet its burden of showing it would have made the same decisions with respect to Rojas absent union activity, that occasional lateness was not typically enforced, and using a nearly year old final written warning shows Starbucks was just trying to get rid of a union supporter. (ALJD 91:fn. 310, 180:44-47, 181:1-33).

The record does not support the ALJ. Roux testified that Rojas's discipline did not differ from how he handled other partner discipline in Pennsylvania. (GC Ex. 154; Tr. 3052-53, 3064).[3] Roux similarly disciplined for attendance Buffalo partners whose union support is unknown, including Khadijah Khan. (Tr. 3058-59). Starbucks introduced examples of consistent discipline for tardiness, including discharges before the union campaign (R Ex. 252) at stores where no petition was filed (R Exs. 275-78; *see* R Ex. 323 (list of petitioned stores)) and after the campaign

---

[3] Contrary to showing union animus, Greta Case, a DM in Buffalo in fall 2021 until the first week of March 2022, chose *not* to discipline Rojas when he engaged in disrespectful communication to her and made crude remarks to make fun of her. Instead, she used it as an educational opportunity about partners treating each other with respect and dignity, despite her knowledge Rojas supported the union. (Tr. 3354-56).

started where union support was unknown (*see, e.g.*, R Ex. 150; Tr. 3136-40; R Ex. 181; Tr. 3185-86). The ALJ's own listing of pre-August 23, 2021 discipline sets out multiple examples of discipline for time and attendance at the Sheridan & Bailey store, including a discharge. (ALJD 15-16; Exhibits A and B).

Y.    Starbucks Did Not Violate Section 8(a)(3) With Respect To Edwin "Minwoo" Park

The ALJ finds the actions below, alleged in paragraph 13 of the Complaint (GC Ex. 1zzz), to violate Section 8(a)(3) with respect to Edwin "Minwoo" Park ("Park"), a shift supervisor at the Transit & French store in Buffalo:

- ¶ 13(j) – imposing onerous working conditions by randomizing his shifts in November 2021 (ALJD 101:21-38, 102:1-29, 172:46-47 - 173:1-17, 192:12-22);
- ¶ 13(h)(i) – a final written warning on December 3, 2021 (ALJD 101:21-38, 102:1-29, 178:34-35; 179:11-19, 192:12-22);
- ¶ 13(q)(i) – a coaching on December 9, 2021 (ALJD 101:21-38, 102:1-29, 177:20-22, 28-30, 192:12-22); and
- ¶ 13(r)(iii) – his discharge on March 21, 2022 (ALJD 101:21-38, 102:1-29, 181:9-32; 193:38-39).

   1.   *The initial burden under Wright Line was not met with respect to the claimed violations as to Park.*

As to *Wright Line's* initial burden, the ALJ finds Park was an open union supporter, signed the Dear Kevin letter, wore a pro-union pin at work, expressed support for the union to coworkers and told Melissa Garcia he supported the union when she became the Transit & French store manager in November.  (ALJD 101:28-30).  Regarding alleged randomizing of shifts, the ALJ finds Park openly supported the union and that Starbucks failed to offer a legitimate reason for the schedule changes, and "had knowledge of Park's union activities." The ALJ ascribes no anti-union animus to the decision-maker, Mkrtumyan. Instead, the ALJ concedes that Park admitted the misconduct cited in his termination notice, yet still concludes Starbucks' discharge of Park was driven by "discriminatory motivation to eliminate yet another union supporter[,]" and that its

"coercive behavior over six months had permeated every store in the Buffalo market. (ALJD 173:5, 181:11, 24-26; 193:40). The record does not support a conclusion that union animus motivated the alleged unlawful actions as to Park.

Regarding Park's shift changes, store manager Morton testified that Park's shifts changed based on his request. (Tr. 2814-15). Park admitted all the conduct for which he received a December 3, 2021 final written warning – on November 9, using profanity, kicking a door and throwing dishes into a sink, and then directing more profanity at a partner on November 15. (GC Ex. 125; R Ex. 93h; Tr. 1641, 1660, 2614-17, 2810-11, 3451). Morton, who came to Transit & French in October 2021, witnessed Park's November 9 behavior and language, and immediately contacted Partner Resources about discipline. He testified he was unaware of Park's union support. (Tr. 2811-12). The ALJ made no finding Morton knew of union activity by Park. The December 9, 2021 memorialized coaching to Park was for three more violations between November 24-29, all of which Park admitted: dress code (sweatpants), profanity and tardiness. (GC Ex. 126; R Ex. 93; Tr. 1644-45, 1660, 1663-66). He was not discharged for these violations because they occurred before delivery of the final written warning, which weighs heavily against union animus. (Tr. 2942). Park admitted all the conduct that led to his March 21, 2022 discharge - sticking his finger in a customer drink at the Orchard Park store on February 25 and tardiness on February 28 and March 5. (GC Ex. 127; Tr. 1649-57, 1660, 1666-74, 2659-61, 2865-66). Park's discharge was after the March 9 election at his store (R Ex. 323), seven months after he signed the August 23 Dear Kevin letter, and only when new managers were simply trying to enforce policies as written.

The ALJ's statement that "widespread coercive behavior . . . permeated every store," is conclusory, exaggerated and does not establish discriminatory motive as to these actions.

> 2.    *Starbucks established it would have disciplined and discharged Park absent union activity.*

Starbucks would have disciplined and discharged Park absent union activity. As to profanity, although Park testified he previously had sworn without being disciplined, he did not testify that a manager heard it. (Tr. 1640-41). Support manager Morton testified that in the Minnesota market from which he came Park would have been discharged for his November 9 conduct. (Tr. 2811-12). The record also establishes that Starbucks enforced its tardiness and respectful communications policies both before and during the union campaign in Buffalo, including at Transit & French. (Exhibits A and B, R Exs. 227a and b, 235, 236, 254).

Regarding Park sticking a finger in a drink, Starbucks disciplined partners for lesser food safety violations or loss of composure before the union campaign. (R. Exs. 191, 227b, 293; *see* Exhibit A). Further, for a Starbucks partner to stick a finger in a drink is unacceptable behavior in a coffee store in a pandemic. That it may be uncommon does not change that it is egregious. The ALJ dismisses that safety and health considerations warranted discipline. (ALJD 181:38-47; 182:1-5). But even Workers United organizer Daisy Pitkin agreed that partners should never handle food items directly or stick their fingers in drinks. (Tr. 2411-13).

Paragraphs 13(j), (h)(i), (q)(I) and (r)(iii) should be dismissed.

Z.  Starbucks Did Not Violate Section 8(a)(3) With Respect to Brian Nuzzo

The ALJ found the actions below, alleged in paragraph 13 of the Complaint (GC Ex. 1zzz), to violate Section 8(a)(3) with respect to Brian Nuzzo ("Nuzzo"), a shift supervisor at the 2750 Monroe Avenue store in Rochester, New York:

- ¶ 13(r)(iv) – his discharge on March 21, 2022 (ALJD 107:17-110:7,182:16-47; 183:1-13; 195:28-43); and
- ¶ 13(x) – ban from stores (ALJD 110:8-30,183:9-13, 194:24).

  1.  *The record does not establish that the initial burden under Wright Line was met regarding the alleged discrimination against Nuzzo.*

The ALJ finds Nuzzo to be a lead union organizer in Rochester, signer of the union's letter to Starbucks' CEO, that he posted that letter on social media and participated in a press conference about it, and wore union pins and shirts. The ALJ also finds that the Monroe Avenue store manager knew of Nuzzo's activity. (ALJD 182:18-23; 107:26-34). He makes no other findings on whether or how union animus was a motivating factor in the alleged Section 8(a)(3) violations as to Nuzzo. His statement that Starbucks "expanded its reign of coercion into Rochester" is baseless and hyperbolic as no unfair labor practices are alleged at Monroe Avenue except those concerning Nuzzo. (ALJD 182:35; *see* GC. Ex. 1zzz). The ALJ finds Mkrtumyan alone decided to discharge Nuzzo, but makes no finding as to her knowledge of his union activity. (ALJD 109:14-15 and fn. 361). Nor is there any finding as to knowledge of Nuzzo's union activity on the part of acting district manager Marcus Rainford, who communicated Nuzzo's ban from Starbucks stores. (ALJD 109:25-38; 110:1-29).

The facts belie that union animus was a motivating factor. Starbucks has a safety rule in the Partner Guide, requiring two partners to be present in a store at all times:

> *Note: Starbucks Safety and Security Guidelines require the presence of at least two partners in the store at all times.

(GC Ex. 140 at 0000103; Tr. 2589, 3448). In the pandemic, Starbucks instituted a rule requiring masks for partners on duty (except when actively eating or drinking). (Tr. 1478, 3445). Nuzzo received and agreed to abide by these policies. (Tr. 1507-08). On March 4, 2022, Nuzzo entered the store alone at 4:48 a.m. but clocked in at 4:56 a.m., 8 to 10 minutes before a second partner arrived. (Tr. 1474). Nuzzo admitted this violated the two partners in the store rule and not wearing his mask before customers came in the store violated the facial covering policy. (Tr. 1508-09).

Mkrtumyan wanted to know why the store opened late on March 4, 2022 and asked Nuzzo to provide a written explanation. (Tr.      ). On March 9 he sent an email statement denying being

in the building alone, which he admitted in testimony was dishonest. (R. Ex. 288; Tr. 1481-85). Mkrtumyan reviewed Nuzzo's email. Then she and SPRA Nick Tobias reviewed the store video, which confirmed Nuzzo had lied - he was alone in the store for 13 minutes not wearing a mask and did not enforce the mask policy for other partners. Tobias and Mkrtumyan agreed Nuzzo should be discharged. (R Ex. 133; Tr. 3445-51; *see* ALJD 182:29-31). No evidence was presented Tobias knew of any union activity on Nuzzo's part.

On March 21, 2022, Rainford and Ballard met with Nuzzo to terminate his employment. When Rainford offered Nuzzo his help, Nuzzo responded with profanity, called Rainford an idiot, and slammed his apron on the table. Rainford told Nuzzo he had to leave, which resulted in more profanity directed at Rainford and Nuzzo's shoving a pastry cart. (Tr. 1490, 1492-95; GC Ex. 121). Nuzzo told Rainford: "I hope you die."  (Tr. 1511). Nuzzo came to the store the next day and Rainford asked him to leave. Nuzzo said he had meant what he said the preceding day. (Tr. 1497, 1511-12). When Nuzzo returned to the store on March 27 Rainford told him he was banned and texted him a message regarding his ban. (Tr. 1497-99; GC Ex. 122).

These events do not support that union animus motivated the actions as to Nuzzo. They reflect that Nuzzo violated rules and lied about it. No evidence establishes knowledge of his protected activity by the decisionmakers or a causal nexus between his protected activity and discharge or ban.

### 2. *The record establishes that Starbucks would have taken the same action with respect to Nuzzo absent protected activity.*

The record also shows Starbucks would have taken the same actions absent protected activity. The ALJ finds Starbucks was applying "previously unenforced rules to eliminate union supporters" and "did not meet its burden to show that it would have conducted a similar investigation had Nuzzo not been a union supporter" (ALJD 182:35-43), but the record does not

support the former statement and the latter misses the mark – the issue is not whether Starbucks would have investigated absent union activity but whether it would have discharged and/or banned Nuzzo absent such activity.

The ALJ says there was no evidence district managers, who have access to store opening information, had previously responded to infractions like what Nuzzo admitted (ALJD 182:38-41), but the record includes no evidence district managers *knew* of past similar infractions. Managers generally will not know what occurs when a store opens in the early morning unless a reason requires review of store video because only two partners normally are present. (Tr. 1469-73). An employer cannot address conduct of which it is unaware. Although Nuzzo testified he and other partners violated the two partners in the store rule, no testimony was offered that a *manager* was aware of this.

The ALJ says Mkrtumyan's not meeting with Nuzzo so he could explain his lie[4] indicates pretext (ALJD 182:41-47, 183:1), but the critical fact is that Nuzzo lied. The ALJ also says Nuzzo's lying didn't justify an investigation that was unlawful in the first place (ALJD 183:1-4), but the complaint does not allege an unlawful investigation, nor is there proof it was discriminatorily motivated. The issue is whether Nuzzo's lie supports a conclusion that Starbucks would have fired Nuzzo regardless of union activity and/or was not pretextual. Starbucks was entitled to take account of Nuzzo's dishonesty about his own conduct. (*See* GC Ex. 140 at 0000112 ("Partners are expected to participate in an investigation and to provide truthful and accurate information") and 0000120 ("All partners are required to conduct themselves with the utmost honesty and integrity")). Starbucks has discharged partners for dishonesty during investigations. (R Ex. 252 - Mysia Agnew Turner for tardiness and dishonesty about arrival time at Mt. Hope

---

[4] The ALJ references that Nuzzo lied to "Tollar" but there is no evidence anyone named Tollar worked at the Monroe Avenue store. (ALJD 182: 42-43). Nick Tollar was a store manager at Transit & French in Buffalo.  (Tr. 1269).

Avenue store in Rochester; R Ex. 143 (manager terminated); R Ex. 205 (barista terminated before union campaign)).

The COVID facial covering policy also has been enforced. Erin O'Hare received a documented coaching for violating that policy when she failed to coach a partner working without a mask at Walden Galleria. (R Ex. 190). No testimony was adduced that any manager was actually aware of and failed to correct a mask violation. (Tr. 2545-46). Neither Nuzzo nor former co-worker Michaela Wagstaff testified that any manager saw a partner in the store alone in violation of policy.

### 3. *Nuzzo's ban was appropriate and reinstatement would be improper.*

Even if Nuzzo's discharge violated Section 8(a)(3), his post-termination misconduct supports his ban and precludes reinstatement. A partner who tells a manager "I hope you die" accompanied by profanity, shoves objects and the next day says to the manager he meant what he said should not be reinstated. Starbucks' Workplace Violence policy prohibits violence, threats of violence or implied statements of violence and states that any partner who violates the policy is "subject to immediate separation from employment." (GC Ex. 140 at 0000125). *See NLRB v. R.C. Can Company*, 340 F.2d 433, 435 (5th Cir. 1965); *NLRB v. Bin-Dicator Company*, 356 F.2d 210, 211 (6th Cir. 1966).

### AA. Starbucks Did Not Violate Section 8(a)(3) With Respect To Nathan Tarnowski

The ALJ found Starbucks' March 30, 2022 discharge of Nathan Tarnowski ("Tarnowski"), who worked at the East Robinson store in Buffalo, to violate Section 8(a)(3). (ALJD 121:16-20; 183:17-36; 184:1-5; 195:28-43; *see* GC Ex. 1 zzz ¶ 13(r)(ii)).

### 1. *The General Counsel failed to carry the initial Wright Line burden with respect to Tarnowski's discharge.*

The ALJ finds Tarnowski openly supported the union, Clark's animus toward his union activities was well established, Starbucks was in its eighth month of widespread coercive activities

in the Buffalo markets and "Clark was at the forefront of that onslaught." (ALJD 183:17-21; 192:24-25). He also finds Tarnowski's discharge for lying pretextual because of a false report about him and because he was initially being told he wouldn't be. (ALJD 119:34-35, 120:1-26 and fns. 400-401, 121:1-20, 183:15-36). These findings are either unsupported broad conclusions or unsupported in the record.

Although Tarnowski testified he supported the union between January-March 2022, he testified he "wasn't too open about it" and "did keep it on the downlow," even when it came to wearing a pin. He offered no evidence that Clark or any other manager knew of his union support. (Tr. 2220, 2232-33).

Events do not support that union animus motivated Tarnowski's discharge. The Partner Guide provides: "Partners Not Working While Ill - A partner who is experiencing symptoms such as vomiting, diarrhea, jaundice, sore throat with fever, or a medically diagnosed communicable disease must notify the manager. The manager will determine whether work restrictions apply." (GC Ex. 140 at 0000115). In the pandemic, Starbucks developed a partner pre-check log, COVID-19 Virtual Coach and reference guide, including a requirement to disclose symptoms. (R Ex. 144; Tr. 3134-35).

Tarnowski testified that when he came to work on March 23, 2022 he wasn't feeling well, told his shift supervisor, but then filled out the COVID coach form without listing his symptoms, which included diarrhea and other COVID symptoms. Unusually, he testified that diarrhea, headache and fatigue were ordinary for him. Later, he told NFB store manager Elizabeth Pool, working at East Robinson while her store was being remodeled, he did not feel well. In response to her questions, he said his symptoms were fatigue, headache and diarrhea. Pool told him this was "serious" and that he had lied, noting she lost a family member from COVID. He replied it wasn't

that serious. She asked him why he did not answer the COVID coach honestly.  He said it wasn't "a big deal" and that COVID is not real. Pool instructed Tarnowski he needed to be symptom-free for 24 hours before returning to work and sent him home. (Tr. 2222-23, 2236-38, 2241, 3286; R Ex. 305).

As to this interaction, the ALJ makes findings he says support an unlawful discharge. He says the record does not support Pool's report because this phrase - "On 3/23, SM arrived and BAR Nathan came to SM to share they had not been feeling well" - was false since Pool "did not just arrive" but had been standing there, because Pool's report did not mention that Tarnowski also told his shift supervisor he was not feeling well, and because Pool's report failed to refer to her family tragedy or that Tarnowski said his symptoms were not unusual for him. (ALJD 120:400 fns. 400, 403; 183:24-28; 192:22). First, the phrase "SM (Pool) arrived" does not contradict Tarnowski's testimony that when they interacted she had been standing nearby. (*See* Tr. 2222; R. Ex. 305). Second, Tarnowski did tell his shift supervisor he wasn't feeling well, but the report was Pool's, not the shift supervisor's. (Tr. 2222-24; *see* ALJD 120:15-180). Third, Pool's family COVID experience was irrelevant. Fourth, as to the report not mentioning that Tarnowski said headache, fatigue and diarrhea were ordinary for him, Pool may credibly have thought that not believable and/or that it did not alter that the COVID coach was not honestly completed. Pool's report was not "false" and these findings do not support a finding of union animus.

Tarnowski returned to work the next day, March 24, but was sent home because he had to be symptom-free for 24 hours. A few days later, he met with Clark who focused on how serious the situation was and that he "could be fired . . . . "  Tarnowski asked if he was being fired. She said he could be, but not if they moved past this. (Tr. 2224-27; R Ex. 305, p. 2). That, however,

didn't happen. On March 30, 2022, Tarnowski's employment was terminated for violation of the Health & Safety policy and dishonesty. (GC Ex. 161; R Ex. 305, p. 5; Tr. 2230).

These facts do not support that unlawful motive underlay Tarnowski's discharge.

> ### 2.     *Tarnowski would have been discharged absent protected activity.*

The ALJ finds Starbucks failed to show Tarnowski would have been discharged absent union activity because (i) the reasons for Tarnowski's discharge were false, (ii) the record lacks examples of prior discipline for employee omission of symptoms on the COVID coach, (iii) Danka Dragic and Caroline Lerczak were not fired at Genesee Street experienced coughing and dizziness at the Genesee Street store and didn't enter it on the COVID coach, and (iv) other employees worked when not feeling well and were not fired. (ALJD 183:37-46; 195:33-43). None of this persuades.

First, the stated reasons on Tarnowski's notice of separation – violation of health and safety policy and dishonesty were not false. He did misrepresent his symptoms. (*See* Tr. 2381). Second, Starbucks has discharged partners, including managers, for violating the illness policy, especially when dishonesty is involved. Buffalo store manager Matthew Morreale was discharged on October 18, 2021, for failing to follow and enforce COVID safety policy involving an element of dishonesty. (R Ex. 143; Tr. 3129-32). PRM Kelly testified she has been involved in imposing discipline on other partners for similar violations. (Tr. 3132-34). Barista Connor Maggiore at the Genesee Street store was discharged on January 12, 2021, before the union campaign after admitting working despite her mother (with whom she lived) having tested positive for COVID and that she was dishonest on the pre-check. (R Ex. 205). Third, the ALJ's references to treatment of Danka Dragic and Caroline Lerczak at Genesee Street are not analogous. Each testified a manager reviewed symptoms with them and then sent them home. Neither employee omitted

symptoms while filling out a COVID coach, which is what Tarnowski did. (Tr. 834, 2157). Fourth, the testimony about employees working while ill was pre-COVID. (Tr. 2156-57, 2224).

In short, Starbucks did establish that Tarnowski's discharge would have occurred in any event.

BB.     Starbucks Did Not Violate Section 8(a)(3) With Respect To Angel Krempa

The ALJ found the actions below, alleged in paragraph 13 of the Complaint (GC Ex. 1zzz), to violate Section 8(a)(3) with respect to Angel Krempa, a shift supervisor at the Transit & French store in Buffalo (Tr. 2605):

- ¶ 13(j) – imposing more onerous working conditions by randomizing her shifts in November 2021 (ALJD 98:24-37, fn. 329; 173:5-17, 194:1);
- ¶ 13(f)(vi) – a verbal warning for cursing in November 2021 (not December, as alleged) (ALJD 99:2-9,177:36-37);
- ¶ 13(h)(ii) – a final written warning for cursing on December 7, 2021 (ALJD 99:9-10, 178:34-37);
- ¶ 13(f)(viii) – a verbal warning for violation of the pin policy in February 2022 (ALJD 99:12-17, 177:38-39, 192:12-17);
- ¶ 13(q) – a coaching for violation of the pin policy on February 25, 2022 (ALJD 99:19-23,177:25-28, 192:12-17);
- ¶ 13(i)(vii) – being sent home for violation of the jewelry policy on March 15, 2021 (ALJD 99:25-30,172:27-28, 32-34, 192:12-17); and
- ¶ 13(r) – being discharged on April 1, 2022 (ALJD 100:13-37, 101:1-17,184:7-21; 193:36-39, 195:28-43).

> 1.     *The record does not establish that the initial burden under Wright Line was met with respect to these actions.*

As to the initial burden under *Wright Line,* the ALJ says only that Krempa openly supported the union and, in discussing her discharge, references Starbucks' "ninth month of its coercive campaign," that Transit & French had recently voted to unionize, that Starbucks had "saddled" Krempa with prior unlawful discipline and its "animus towards her union activity was well established." (ALJD 173:6, 184:9-14).

The ALJ does not discuss how union animus was specifically directed toward Krempa or causally connected to any claimed adverse actions. Citing Section 8(a)(1) violations and stricter policy enforcement does not satisfy *Wright Line*. The ALJ's conclusions fail to assess events at Transit & French, including that the claimed violations as to Krempa did not start until three months after the Dear Kevin letter at a time when new managers were trying to enforce Starbucks' policies as written, Krempa's policy violations were repeated and deliberate, and she disregarded warnings and coachings, which resulted in higher levels of discipline.

As to her shifts becoming randomized, store manager Jack Morton testified Krempa wanted to work in the morning and was open to closing as well, so she was assigned differing earlier shifts as requested. (Tr. 2814-15).

Regarding profanity, Starbucks' Partner Guide provides: "Partners are expected to communicate with other partners and customers in a professional and respectful manner at all times. The use of vulgar or profane language is not acceptable." (GC Ex. 140 at 000130). Krempa admitted her profanity on the floor on November 23, 2021, which prompted both Mann's claimed verbal warning that she should not talk that way and the December 7 final written warning. (GC Ex. 61; R Ex 92; Tr. 994-96, 2608-11, 2938, 3443; *see* ALJD 99:4-10; *see* GC Ex. 1zzz ¶ 13(f)(vi) and (h)(ii)). The record does not connect these events to Krempa's union activity.

Concerning dress code issues, in Fall 2021 store managers met with partners about complying with dress code and attendance policies. (Tr. 1050; GC Ex. 140 at 0000115-118). On February 16, 2022, Mann spoke with Krempa about the dress code policy, the number of non-Starbucks pins and the need to remove non-compliant pins, which is alleged as a verbal warning. (GC EX. 1zzz ¶ 13 (f)(viii)). The ALJ finds Krempa raised her voice, disregarded Mann and continued to wear 4-6 pins, which Krempa admitted. (Tr. 1012-14, 2613; GC Ex. 62; *see* ALJD

99:14-17).   On February 25, 2022, Mann and new store manager Melissa Garcia met with Krempa again to review the dress code and gave her a memorialized coaching for violating it. (GC Ex. 63; Tr. 2654-55; *see* ALJD 99:19-23). A coaching rather than discipline at this juncture evidences leniency, not union animus. Krempa admitted she continued to wear multiple non-Starbucks pins under a mask. (Tr. 1019-20).

On February 27, Mann and Garcia met with the store's partners to review the dress code and other policies, coaching on the jewelry and body piercing section of the dress code policy, and giving non-compliant partners two weeks to comply.   On Sunday, March 13 Garcia saw Krempa had multiple facial piercings and asked her to remove some to comply with policy. Krempa refused. (Tr. 1021-22, 2663-64). In a March 15 meeting Garcia and support manager Dustin Taylor had with Krempa, Garcia said to her:

> We talked about the dress code, we talked about facial piercings. We gave all the partners two weeks and . . . [on Sunday] I asked you to take it out and you literally, like, told me no. That's insubordinate ... so I'm gonna have to ask you to go home for the day.

(GC Ex. 64(b) at p. 3). Not issuing discipline after Krempa directly refused a supervisory directive shows leniency, not union animus.

Regarding attendance, in the February 27, 2022 meeting Krempa and other partners were reminded of the policy, which requires partners who cannot report as scheduled or will be late to call the store manager or assistant manager as early as possible, specifies that leaving a message is unacceptable and states that violation may lead to employment termination. (GC Exs. 67, 140; Tr. 2656-57). Krempa was tardy on March 7 when she gave insufficient notice by texting a coworker group chat and calling a coworker instead of the store manager and again tardy on March 21 when she called a barista instead of the store manager. (Tr. 1035, 1041-43, 1046-47, 1059-62, 2657-59).

79

Starbucks discharged Krempa on April 1, 2022 for multiple violations. (GC Exs. 67 & 68). Krempa admitted she understood the policies, but believed she could ignore them:

> Q. At that point in time, you were informed and advised that it was Starbucks' intention to ensure complete compliance with those [dress code, attendance, and profanity] policies?
> A. Correct.
> Q. And you understood that.
> A. Yes.
> Q. And yet, notwithstanding your agreement and understanding of those policies, you still intentionally failed to comply with those policies, correct?
> A. Correct.
> Q. Did you think that you were going to be insulated from any type of discipline by virtue of not complying with those policies?
> A. No, due to the union drive.

(Tr. 105). This is plainly incorrect. Engaging in union activity did not exempt her from compliance with policy. These facts provide no basis to infer union animus in the actions concerning Krempa.

> 2. *The record establishes Starbucks would have disciplined and discharged Krempa absent protected activity.*

Even if the initial *Wright Line* burden was met, the record establishes Starbucks would have taken the same actions absent protected activity by Krempa.

On randomizing shifts, the ALJ says Starbucks gave no "legitimate explanation[,]" ignoring Morton's unrebutted testimony that Krempa asked to work different shifts. (Tr. 2814-15).

As to Mann's alleged verbal warning in telling Krempa not to swear in November 2021, the ALJ says Starbucks failed to show it would have issued absent union activity, and regarding the final written warning for that conduct, the ALJ points to Krempa's testimony that she swore in the past, hadn't been disciplined, and that the only past discipline at Transit & French for similar conduct had been in 2018. (ALJD 177:36-41,178:34-40). However, Mann came to the Transit & French store in October 2021 and testified she addressed Krempa's profanity just as she would have in her former store in Illinois (Tr. 2589-92, 2611). The record also shows Starbucks addressed

foul language and disrespect at Transit & French before August 23, 2021 and other stores in Buffalo, apart from the two 2018 instances the ALJ identified. (Exhibit A; ALJD 15-16).

Regarding the claimed verbal dress code warning in mid-February 2022, the ALJ says Starbucks didn't show it would have issued absent union activity and as to the February coaching after Krempa continued to wear non-compliant pins, he says only that Krempa cleared this with a prior store manager and previously wasn't disciplined. (ALJD 175:25-27, 177:38-40). As to being sent home in mid-March 2022 after flatly refusing to comply with her store manager's directive, the ALJ in garbled language appears to say Krempa would not have been sent home except for Starbucks' stricter enforcement of its dress code. (ALJD 172:32-34, 192). These conclusory findings ignore that Transit & French partners were informed in Fall 2021 they needed to comply with the policies, that Starbucks coached other partners and Krempa for not complying with the dress code policy, and that Krempa was sent home only after willfully refusing to comply. Starbucks' treatment of Krempa was not inconsistent with its treatment of other partners under the dress code policy, including the pins or jewelry and body piercings sections. (*See* Exhibits A and B; Tr. 3178-79).

Regarding Krempas' discharge for tardiness reasons and disregard of other policies, the ALJ finds Starbucks failed to show it would have discharged her absent union activity, saying the discharge relied on a recent, unlawfully-motivated discipline and Starbucks disregarded Krempa's explanations for her two tardy arrivals. (ALJD 184:14-21). However, Krempa's prior disciplines were not unlawful, and she violated the attendance policy multiple times right after she and other partners were reminded of it on February 27, 2022. *Before* August 23, 2021, Starbucks frequently disciplined partners for attendance policy violations, roughly 45 times including a number at

Transit & French, which the ALJ noted in his decision, but ignored in his analysis. (ALJD 15-16; Exhibit A; *see also* ALJD 135-136 and Exhibit B (post-August 23, 2021 comparator examples).

The foregoing demonstrates partners were coached or disciplined for tardiness or irregular attendance both before and after the union campaign, regardless of union activity, with Partner Resources advising on consistent enforcement. (Exhibits A and B; R Ex. 182 at 0007198; Tr. 3136-40, 3155-56, 3167, 3175, 3185, 3188, 3192 3312; R Ex. 150). The record reflects Starbucks carried its *Wright Line* burden of showing it would have taken the same actions absent union activity.

CC.     Starbucks Did Not Violate Section 8(a)(4) With Respect To Angel Krempa

The ALJ also found Section 8(a)(4) violated with respect to Krempa, based on the below allegations from paragraph 13 of the Complaint (GC Ex. 1zzz):

- ¶ 13(h)(ii) – a final written warning for cursing on December 7, 2021 (ALJD 179:19-22, 184:13); and
- ¶ 13(r)(vi) – being discharged on April 1, 2022 (ALJD 184:9-27, 193:36-39).

The ALJ erroneously finds Starbucks violated Section 8(a)(4) because it "cannot meet its burden of establishing that it would have disciplined or terminated Krempa had she not participated in the Board's processes," that "the final written warning . . . violated Section 8(a)(4)" and that, since Krempa "participated in the Board's processes by testifying on behalf of the Union, the evidence supports inferences that it retaliated against Krempa by more strictly enforcing its policies . . . and terminating him(sic) in violation of Section [8(a)(4)]." (ALJD 179:19-23, 184:13, 24-27, 194:28-32; *see* GC Ex. 1zzz ¶ 13(h)(ii, (r)(vi) and (z)).

In a Section 8(a)(4) case, the Board applies *Wright Line. American Gardens Management Co.*, 338 NLRB 644 (2002). The claimed predicate conduct here is Krempa's testimony in the representation case concerning the Transit & French bargaining unit on December 3, 2021. (Tr. 948, 951-952; ALJD 93:5-6).

1.    *Krempa's final written warning did not violate Section 8(a)(4).*

The record includes *no* evidence that any decision-maker regarding Krempa's final written warning knew of her testimony at an NLRB hearing. More important, no causal nexus can be established between Krempa's representation case testimony and her final written warning (GC Ex. 61) because the decision to issue the warning *predated her testimony*. The final written warning on its face recites: "Date Created:11/23/2021." (GC Ex. 61). Mann testified about its preparation, saying November 23 is "when we had called in for consult to ensure that this [final written warning] was in alignment with what we had delivered across the market for consistency. And then on 12/7 is when we were able to deliver it based on when Angel was working and when I was working." (Tr. 2611). PRM Emily Filc confirmed she was consulted and helped decide on the final written warning. (Tr. 2938). Without reason, the ALJ finds Mann's explanation not credible. (ALJD 99:fn. 330). Both Mann's and Filc's testimony were consistent with record evidence of how Starbucks store managers go about determining discipline. (Tr. 2931-32, 3145-51, 3181-82, 3195-202, 3399-400; R. Ex. 182). There is no record evidence that Krempa's final written warning was somehow "backdated" after her hearing testimony.

Adverse action taken *before* an employee engages in protected activity cannot be retaliation because that is not how causation works. "[A]n effect never precedes its cause." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 414 (2d Cir. 2014). The finding that Krempa's final written warning violated Section 8(a)(4) fails because it preceded her hearing testimony.

2.    *Krempa's discharge did not violate Section 8(a)(4).*

Krempa's discipline and discharge also did not violate Section 8(a)(4) because they are too distant in time from the protected activity, and there is no evidence that her testimony – as opposed to her admitted conduct, for which Starbucks consistently disciplined partners - caused that discipline or discharge.

Krempa's NLRB representation hearing testimony was on December 3, 2021. Her verbal warning for dress code violation with respect to non-compliant pins was on February 16, 2022, a coaching on the same point on February 25, 2022, she was sent home from work on March 15, 2022 after refusing to comply with dress code, and was discharged on April 1, 2022. These events were two and a half to almost four months after Krempa testified.

In determining whether a *prima facie* showing has been made in a Section 8(a)(4) case, the Board examines the timing of the employer's conduct. *Sportsmen's Service Center*, 317 NLRB 195 (1995). The lack of temporal proximity between Krempa's testimony and her discharge defeats any inference of causation. *See, e.g.*, *NLRB v. Kay Elecs., Inc.*, 410 F.2d 499, 502 (8th Cir. 1969) (two months between union activity and discharge "weighs heavily against" finding of causation); *Frierson Bldg. Supply Co.*, 328 NLRB No. 149 (1999) (two months between concerted activities and employee discharges regarded as not warranting inference of animus); *see also Ogihara Am. Corp. & Int'l Union*, 347 NLRB 110, 114 (2006) (evidence failed to establish discharge related to Board testimony rather than employee's unprotected activity), *aff'd by Int'l Union v. NLRB*, 514 F.3d 574, 586 (6th Cir. 2008).

The Board also looks to whether the employer has selectively enforced its policies. *ABF Freight System*, 304 NLRB 585 (1991). For all the reasons set out in the preceding sections concerning alleged violation of Section 8(a)(3) as to Krempa, the record does not support that she was discharged because she testified in a representation hearing. Her intentional and repeated disregard of policies which Starbucks applied before and after the union campaign and before and after the December 3 representation hearing support that Starbucks did not violate Section 8(a)(4).

DD.  Starbucks Did Not Constructively Discharge Kellen Higgins In Violation of Section 8(a)(3)

The ALJ finds Starbucks violated Section 8(a)(3) by constructively discharging Kellen Higgins. (ALJD 49:13-36, 50:1-31, 184:33–185:47; 194:30-32; *see* GC Ex.1zzz ¶ 14(a)-(c)). Neither the record evidence nor the law supports the ALJ's analysis or conclusion.

Establishing a constructive discharge has two elements: (1) the burdens imposed on the employee must be intended to and must cause a change in working conditions so difficult or unpleasant as to force the employee's resignation; and (2) it must be shown these burdens were imposed because of the employee's union activity. *American Licorice Co.*, 299 NLRB 145, 148 (1990) (*See* ALJD 185:20-25). The ALJ's findings establish neither of these elements.

In pertinent part, the ALJ's findings regarding Higgins are:

- From approximately the beginning of his employment in November 2018 until Fall 2021, his availability was cyclical, working full-time between semesters and two days a week, Thursday and Saturday, during semesters as an undergraduate student;
- In Fall 2021, Higgins began graduate school and requested availability of one day per week;
- After the Fall 2021 semester, Higgins became available to work full-time hours and Higgins' manager, Shanley, approved his fluctuating availability though January 2022;
- When Higgins asked Shanley to accept availability of one day a week at the end of January 2022, Shanley met with him and informed him that the store needed an additional day of availability and 20 hours per week because the store was in "off-season" and the company was "cutting" hours;
- Higgins could not commit to two days and 20 hours per week, but Shanley worked with him for two months, including offering him Saturday shifts; and
- Though Higgins offered more availability in mid-March on Thursday and Friday and Shanley put him on the schedule, Higgins decided to resign in early April 2022.

(ALJD 49:11-36–50:1-26). These findings establish neither intent to force Higgins to resign nor that Shanley's response to Higgins' request for reduced availability was due to his union support.

First, Higgins testified that he received Starbucks' availability policy in the Partner Guide and understood that "hours aren't guaranteed. You can put whatever on the schedule, but you will not end up with that all the time." (Tr. 652). He also admitted "staffing was a big issue" at the Elmwood store where he worked. (Tr. 644). So, he knew the store had staffing needs and his

availability might not be acceptable. His further testimony confirms this: he asked Shanley at the end of January 2022 to "accept" his new availability request of only Saturdays. (ALJD 49:28-29).

Second, the evidence does not show an intent to force Higgins to resign. The ALJ's findings reflect Shanley trying to work with Higgins and encouraging him to provide additional availability while he considered his options. (ALJD 50:13-18). Shanley even put Higgins on the schedule in mid-March after he offered more availability on Thursday and Friday, even though "it could not be every Friday." (ALJD 50:21-22). His union activity was never discussed in the conversations he and Shanley had about his availability. (Tr. 686). These facts do not establish an intent to force Higgins out. They reflect the opposite - an intent to try to retain him.

In *North Carolina Prisoner Legal Services*, 351 NLRB 464, 470 (2007), cited by the ALJ, the Board's constructive discharge finding relied on statements the Board said demonstrated an intent to target the constructively discharged employee, including that the employee regarded reduced-hours scheduled as "an entitlement" and that the employer "was not going to put up with [the employee] undermining his position and causing trouble anymore." The record here includes no such comments. Rather, Higgins testified that "Patty [Shanley] was trying to help me." Shanley encouraged Higgins to offer more time so that he could stay on the schedule. (Tr. 676, 685).

Third, there is no evidence Starbucks' response to Higgins' request for less availability was based on Higgins' union support. The ALJ acknowledged that Shanley told Higgins in or about November 2021 that she respected his decision to support the union and it did not change her personal view of Higgins (though the ALJ confusingly found this "strongly suggested coercion"). (ALJD 41:36-38). Higgins testified he was never punished or directed to refrain from such conduct and he admitted his union support was never discussed in connection with his availability. (Tr. 623, 684, 686).

Moreover, Shanley provided a legitimate, non-retaliatory basis for her response to Higgins - the store was in its "off-season" and the company was "cutting" hours. (ALJD 50:1). No evidence was presented that this reason was unfounded or to suggest that Starbucks would have responded differently absent Higgins' union activity. Cutting hours during an "off-season" or period of reduced business is a prudent business decision and is not retaliatory. *Munford, Inc.*, 266 NLRB 1156, 1157 (1983) (where legitimate business needs necessitate changes to employee schedules, employer may protect its interests even though employees previously had been allowed to work lenient hours based on "personal and family obligations").

Finally, there was no "new minimum availability policy." Starbucks' written policy, acknowledged by Higgins, is that availability must meet the business needs of the store. (GC Ex. 140 at 0000102).

Based on the foregoing, paragraphs 14(a)-(c) of the complaint should be dismissed.

### iv.    Section 8(a)(5) Claims

A.    Starbucks Did Not Violate Section 8(a)(5) With Respect To Angel Krempa And Edwin Park

The complaint alleges and the ALJ finds Starbucks failed to provide notice to the union or an opportunity to bargain regarding the discharges of Edwin Park on March 21, 2022 and Angel Krempa on April 1, 2022. (GC Ex. 1zzz ¶ 16(b), (c), (e), (f) and (h); ALJD 101:14-17, 102:26-29). The ALJ does not address paragraph 16 of the complaint, but finds Section 8(a)(5) violated with respect to both Park and Krempa, saying Starbucks failed to bargain over their discharges. (ALJD 182:6-14, 184:22-31, 195:15-17).

In *800 River Rd. Operating Co., LLC, D/B/A Care One*, 369 NLRB No. 109 (2020) ("*Care One*"), the Board returned to prior authority holding that  after union certification but before an initial contract, employers are not obligated to bargain over discipline of unit employees that is in

accordance with an established disciplinary policy or program. *See also Raytheon Network Centric Systems*, 365 NLRB N0. 161, slip op. at 7 (2017).

Here, both discharges were preceded by discipline authorized by and consistent with Starbucks' policies in its Partner Guide. The General Counsel's failure to bargain allegations in paragraph 16 therefore must be dismissed and the ALJ's findings as to Park and Krempa rejected.

      B.      Starbucks Did Not Violate Section 8(a)(5) With Respect To the Minimum Availability Policy At Elmwood

The complaint alleges that since February 2022 Starbucks has been implementing a minimum availability policy at the Elmwood store, violating Section 8(a)(5). (GC Ex. 1zzz ¶ 16(a), (d) and (g)). The ALJ finds Starbucks neither bargained with the union nor notified the union of an intent to change the availability policy. (ALJD 43:fn.132, 48:6-8, 50:29-31). The ALJ does not address paragraph 16 but finds Section 8(a)(5) violated as to Higgins, saying Starbucks unilaterally changed Elmwood employees' terms and conditions of employment. (ALJD 50:29-31, 184:29-47, 195:10-13).

The union was certified as the collective bargaining representative at Elmwood on December 17, 2021. (GC Ex. 5). In early February 2022, Fleischer sought to reduce her availability to limited hours on Friday nights and Saturday mornings. After store manager Shanley rejected her request, she had multiple conversations with both Shanley and district manager Murphy about her request. They told her the limited hours she sought did not meet the store's needs, which had changed at least in part because so many partners had sought limited availability. They asked her to offer more hours. (GC Ex.141(b), pp. 3-4; GC Ex. 145(b), pp. 3-7; GC Ex. 34(a) and (b), pp. 5-6); Tr. 2050). In late January, Higgins also sought to reduce his availability to one day. Shanley asked him for another day of availability. Shanley and Higgins then tried to work out a way for him to provide more hours, but ultimately could not. (Tr. 646, 649-656, 669-680).

Store availability needs are not unchanging. They vary based on level of business, staffing, season, changes in clientele, partners seeking to change availability, and other reasons. (Tr. 1729, 1895-96, 2602, 2722-25, 2786-89, 2825, 2844, 2908-10, 2989, 3086, 3404-07, 3411, 3424-29, 3477; R Ex. 104). General Counsel witnesses confirmed this, testifying that before the union campaign their schedules and availability requests changed. For Higgins and Reeve, it related to school schedules. (Tr. 633-34, 1130-31). Eisen historically participated in local theater after the holidays, changing her availability. (Tr. 52, 346, 673, 2049). Rizzo moved to opening instead of closing shifts based on store needs. (Tr. 746-47).

Both before and after the union campaign, Starbucks' Partner Guide provided:

> A partner's hours of work are largely dependent on the store's business needs and the partner's availability. An hourly partner will be asked to provide a schedule of the days and hours available to work by filling out a Partner Availability Form. With this information and that of fellow partners, the store manager will create a weekly work schedule for the store that balances partner availability and business needs. There is no assurance or guarantee that hourly partners will receive their preferred hours or shifts, the same schedule each week, a minimum or maximum number of hours, or that a request for a schedule change will be approved . . . *A partner will be expected to make himself or herself available for work for a minimum number of days or hours each week. Availability that doesn't meet business needs may result in separation from employment.*

(GC Ex. 140 at 0000102 (emphasis added)). This policy allows scheduling to meet the demands of the business and ensure customer service. (Tr. 3078). Store managers have a Partner Hours Platform that takes account of past trends, product mix, sales, number of partners and their availability to project staffing by the half hour and create schedules. Managers also have a Partner Planning Tool to determine whether a store has the right number of partners and partner hours. Starbucks posts schedules three weeks ahead. (Tr. 2915-18, 3389-92; R Ex. 104).

Starbucks also has a policy guide, "Resolution: Insufficient Availability," which outlines management options where partner availability does not meet business needs. It advises meeting

with the partner to obtain needed availability and, if that does not work, the manager may provide options: open more availability; employment in a different role; transfer; or voluntary resignation. If a partner does not select any of these options by a deadline, the manager may "involuntarily separate [the partner] for insufficient availability." (R Ex. 285).

Murphy testified that, when Fleischer's requested change in availability did not meet Elmwood store needs, the store presented her with options, consistent with policy. (Tr. 2734-39). Higgins also was presented with options. (Tr. 649-53). What occurred here was not a change in Starbucks' availability policy, but Starbucks responding to partner requests for reduced availability. An employer may not unilaterally implement a change in terms and conditions of employment for represented employees absent agreement with the union or impasse. *See NLRB v. Katz*, 369 U.S. 736 (1962). But Starbucks made no unilateral change. In accordance with its policy, it continued addressing availability based on store needs. An employer may continue a past practice of adjusting schedules and hours based on operational needs. *See The Atlantic Group*, 371 NLRB No. 119, slip op. at 2 (2022); *T Kal-Die Casting Corp*, 221 NLRB 1068 (1975) (upholding employer right to reduce hours of overtime available because employer's practice was to adjust overtime consistent with business needs); *KDEN Broadcasting Co.*, 225 NLRB 25 (1976) (upholding employer right to change work schedules consistent with past practice).

In sum, Starbucks effected no unlawful change and did not violate Section 8(a)(5).

C.    The Record Does Not Support The ALJ's Finding That A *Gissel* Bargaining Order Is Warranted At The Starbucks' Camp Road Store

On August 31, 2021, the union filed an RC petition, supported by 16 authorization cards in a unit of 29 or 30 employees, to represent baristas and shift supervisors at the Camp Road store in Hamburg, New York. The vote tally in the December 9, 2021 election was 8 yes, 12 no. (ALJD 20:26-28, 186:45-47, 187:1-1). The ALJ finds a *Gissel* order warranted

because Starbucks' "extensive and pervasive campaign resulted in a loss of support and, ultimately, the Union's loss of the December 9 election" and that Starbucks violated Section 8(a)(5) by refusing to bargain at Camp Road. (ALJD 189:1-3, 195:5-7, 15-18; *see* ALJD 186:1 – 189:3; GC Ex. 1zzz ¶ 17). These findings arde contrary to the record facts and caselaw.

The ALJ finds Starbucks committed hallmark violations: seven discharges; the Galleria kiosk closure; and a nationwide wage increase. (ALJD 187:26-45). The errors in finding these violations are discussed elsewhere. However, the key points are that *none* of the terminations occurred at Camp Road or *before* the Camp Road election, the kiosk that closed was a small mall location not near Camp Road, and the January 2022 wage increase was neither specific to Camp Road nor shown to have been implemented.

The ALJ also finds a bargaining order warranted "even absent the hallmark violations" based on the "sheer number of the remaining violations."  (ALJD 187:42-47, 188:1-8). But the "hundreds" of unfair labor practices the ALJ erroneously finds were mostly not at Camp Road. Those he did find at Camp Road, unsupported by the record, are: solicitation of grievances and promises; store renovation to eliminate fruit flies; allowing shift supervisors to close channels; threats about managers not being able to help on the floor, partners and managers losing a direct relationship, losing the right to pick up shifts elsewhere; surveillance by presence of managers and use of headsets; reduction of hours and temporary store closures; fewer shift supervisor assignments for one employee; refusal to allow an employee to attend a different meeting than what was scheduled; and verbal warnings. (ALJD 63-74, 138:41-45, 139:1-15, 147:20-45, 148, 152, 156-157, 163, 171, 186-204).

Even if upheld, these unfair labor practices do not warrant a bargaining order. In *Wake Electric Membership Corp.*, 338 NLRB 298, 301 (2002), the Board found the absence of hallmark

violations like unlawful discharges, or a plant closure or threat of same, to be the basis to deny a *Gissel* order despite numerous Section 8(a)(l) violations, including:

> soliciting and promising to remedy grievances, promising benefits if employees ceased their support for the Union, polling employees to determine whether they would ask the Union to withdraw its election petition, telling employees that their union activities would damage their relationships with other electric cooperatives and cause the latter to discontinue helping employees during emergencies, telling employees that it would be futile to select the Union, threatening employees with unspecified reprisals, threatening employees with discharge, creating an impression of surveillance of union activities, and accelerating the resignation dates of four employees and granting them severance pay.

*See also Cast-Matic Corp. d/b/a Intermet Stevensville*, 350 NLRB 1349 1359 (2007) (no bargaining order despite multiple Section 8(a)(l) violations); *Register Guard*, 344 NLRB 1142, 1146 (2005) (grant of wage increase, solicitation of and promises to remedy grievances, and solicitation of withdrawals from union membership violating Section 8(a)(1) insufficient to warrant bargaining order).

Unfair labor practices more serious than those claimed here have not warranted a bargaining order. In *Hialeah Hospital,* 343 NLRB 391 (2004), the employer violated Section 8(a)(l) by threatening reprisals and discharges, creating an impression of surveillance and surveilling union activities through a hidden camera, implying futility in supporting the union, soliciting employees to campaign against the union by promising future benefits, more strictly enforcing department rules, retaliating by removing recreational gear, and threatening discharges. The employer also violated Section 8(a)(3) by discharging a union adherent. The Board stated that a *Gissel* order is an "extraordinary remedy" and "its traditional remedies-- including reinstatement . . . are sufficient here[.]" *Id.* at 395-96. *See also Blue Grass Industries, Inc.,* 287 NLRB 274 (1987) (no *Gissel* bargaining order despite numerous Section 8(a)(l) violations); *The Jewish Home for the Elderly,* 343 NLRB 1069 (2004) (*Gissel* bargaining order not warranted even though employer committed serious and pervasive unfair labor practices);

*Desert Aggregates,* 340 NLRB 289, 294 (2003) (traditional remedies adequate to redress employer's discriminatory layoff of two union supporters, and solicitation of and promise to remedy employee grievances in small unit); *Burlington Times, Inc.,* 328 NLRB 750, 752 (1999) (Board declined to issue bargaining order where employer in group meeting threatened to close plant, made noneconomic grants of benefits, promised to improve wages and other benefits, discharged a supervisor to grant a benefit, and solicited grievances in unit of 11 employees).

Not only are the unfair labor practices the ALJ finds insufficient, but also no basis exists to conclude those away from Camp Road had any effect there. The ALJ says one of the four factors the Board and courts look to when evaluating the propriety of a bargaining order is dissemination (ALJD 188:10-12), but critically, the record here is virtually devoid of evidence of dissemination. No evidence was introduced that information about events at other stores before (or after) December 9 was conveyed or communicated to Camp Road partners, nor was evidence introduced on how Camp Road partners might reasonably be expected to know of events at other Buffalo stores. The General Counsel's only evidence was from William Westlake, who worked at Camp Road and testified he was aware of the temporary closure of two stores – where no partner lost their job or any pay and all were offered transfers or paid time off. (Tr. 1174, 1179). Camp Road shift supervisor Katie Spicola, who voted in the election, testified that activities in the larger Buffalo market did not affect her vote, that everybody got to have their say and voted fairly, that everything "was good" and they made their choice not to have a union. (Tr. 3276-78). The ALJ discounts this testimony as limited to Spicola's personal experience (ALJD 72:fn. 250), but Spicola testified the whole atmosphere at the Camp Road store was "good."

The ALJ simply *assumes* Camp Road partners knew of events at other Buffalo-area stores and without record support finds Starbucks' conduct "likely left a lasting impact as to the importance of voting against representation." (ALJD 188:1). No basis exists for this finding. *See Cardinal Home Products, Inc.*, 338 NLRB 1004, 1010-11 (2003) (Board declined to issue *Gissel* bargaining order, reversing ALJ, who cited no evidence of dissemination).

Finally, the ALJ finds that the union's 16 authorization cards with a two or three card majority when the petition was filed in late August supports bargaining. (ALJD 194:34-44, 195:5-18). The December 9 tally of ballots showing 12 partners voting "no" and eight partners voting "yes" reflects a slim card majority lost and some eligible voters not voting. To conclude the union's election loss resulted from claimed unfair labor practices, mostly not occurring at Camp Road and many after the election, which the record does not establish were communicated to Camp Road employees, is pure conjecture. The ALJ's finding of a *Gissel* bargaining order should be rejected and paragraph 17 of the complaint dismissed.

### v.    Remedies

#### A.    To The Extent The ALJ Has Granted A Nationwide Remedy, Such A Remedy Is Unwarranted And An Error

The ALJ's order includes no geographic limitation except where directed to bargaining at particular stores, relief for individually-identified discriminates or relief confined to Buffalo area stores. (ALJD 196-204; ¶¶ 1-2 (all subparagraphs)). It also requires physical notice posting at all Starbucks' facilities in the U.S. and its territories, and electronic distribution to all employees in the U.S. and its territories by text, social media websites, internal apps and intranet websites, insofar as Starbucks communicates with employees by such means. (ALJD 203; ¶ 2(bb) and (cc)).

The record does not support such relief. This is a local dispute. Although multiple unfair labor practices are alleged, they all are claimed to arise at stores in the Buffalo area and one store

in Rochester. The ALJ makes no findings to support remedies extending beyond these stores. The only nationwide act alleged to be an unfair labor practice was the announcement of a nationwide wage increase in October 2021 and its implementation in January 2022. (GC Ex. 1zzz ¶¶ 7e and 9v). However, there is no allegation that either of these actions constituted an unfair labor practice anywhere but in the stores at issue. The announcement of that increase could conceivably violate Section 8(a)(1) only where organizing was occurring, and the record includes no evidence that organizing was occurring anywhere but in the Buffalo area and Rochester in October 2021. As to implementation of the increase, the General Counsel failed to prove the increase was actually effected in Buffalo in January 2022 and introduced no evidence it was effected elsewhere. (*See* II, I, B, *supra*). The foregoing renders specious the ALJ's finding that Starbucks "disseminated its unfair labor practices beyond the Buffalo market by announcing and implementing a nationwide wage increase" and that its wage increase "had a national reach." (*See* ALJD 188:42-45, 196:27-28). Nor does the record support the ALJ's accompanying finding that receipt by Eisen, Brisack and other union supporters of calls from employees around the country demonstrates that the unproven wage increase had nationwide effects. (*See* ALJD 188:fn. 443). Eisen did not testify to any such calls and Brisack's brief testimony about communications with persons outside Buffalo includes no mention of it. (Tr. 2253-54)  Brisack's  testimony in any event improper cannot be considered because it was offered solely to prove a Section 10(j) injunction was "just and proper." (Tr. 2242)  The ALJ stated he did not consider such evidence. (ALJD 3:fn. 5).

In sum, no basis exists for an order or direction of relief beyond the locations involved. *See Albertson's, Inc.*, 307 NLRB 787 (1992), *rev'd on other grounds*, 8 F.3d 20 (5th Cir. 1993) (Board order required posting notice at two stores in same corporate district where substantially similar unfair labor practices occurred in contemporaneous union organizing drive). This was the first

unfair labor practice case tried involving Workers United organizing in Starbucks' stores. The evidence adduced focused on Buffalo stores and one store in Rochester. No evidence was adduced of a pattern of unlawful conduct beyond these stores. As to nationwide posting, it is unsupported – the record establishes neither violations beyond the stores at issue nor flagrant violations.[5] *Cf. Miller Group*, 310 NLRB 1235 (1993) (notice posting at facility where unfair labor practice did not occur justified by recidivist history of committing unfair labor practices, clear patten or practice of unlawful conduct and centralized control of labor relations).

    B.    The ALJ Erred In Ruling That Starbucks Must Compensate Discriminatees For Direct Or Foreseeable Pecuniary Harm Based On *Thryv, Inc.*

The ALJ directs, based on *Thryv, Inc.*, 372 NLRB No. 22 (2022), that Starbucks shall compensate identified "discriminatees for any direct or foreseeable pecuniary harms incurred as a result of the unlawful adverse actions against them, including reasonable search-for-work and interim employment expenses," and issued an order to that effect. (ALJD 195:45-196:4, 201 ¶ 2(i), (j)). Starbucks excepts to this because the decision in *Thryv, Inc.* is incorrect for reasons including those identified in its dissent: (1) ordering compensation for all direct or *foreseeable* harm as a result of unfair labor practices permits the award of speculative damages beyond the Board's statutory authority; and (2) award of tort-like remedies runs afoul of the Seventh Amendment to the U. S. Constitution.

    C.    The ALJ's Direction That The Notice Be Posted For The Length Of The Organizing Campaign, Distributed To Current And New Supervisors And Managers, And Be Publicly Read In The Buffalo Stores By Or In The Presence Of Named Senior Managers Is Unwarranted

The ALJ's order directs that the Notice, apart from nationwide posting and distribution, be posted for the length of the organizing campaign, distributed to current and new supervisors and

---

[5]  That complaints have issued against Starbucks in other regions and the existence of administrative law judge decisions does not establish recidivist history because these are not Board orders.

managers along with the Board's orders, and be read by Howard Shultz or Denise Nelson with both a Board agent and union representative present or by a Board agent in the presence of Shultz or Nelson and a union representative, and that a video recording of the reading be made and distributed to employees electronically or by mail. (ALJD 203 ¶2(bb) and (ee)). These directives are unwarranted.

First, the order is contradictory as to duration of posting, stating it should be posted both for "the length of the organizing campaign" and for "60 consecutive days[.]" (ALJD 203 ¶2 and (bb)). The first quoted phrase should be stricken. It is so vague that it cannot be interpreted. It is impossible to discern what organizing campaign is being referred to – all of the Workers United campaigns around the country, those involving other unions, just those in Buffalo, or something else. The organizing efforts with respect to Starbucks stores are single store campaigns that culminate in facility-by-facility votes. Further, this phrase would appear to put notice-posting duration in the unilateral control of a union or unions – as long as organizing is occurring somewhere in the Starbucks orbit, posting continues.

Second, the requirement that the Notice and the Board's orders be distributed to current and new supervisors and managers (apart from issues of geographic scope and duration) is unnecessary if physical and electronic posting occurs. That would make supervisors and managers aware of the Notice and Board orders. Further, it is inappropriate for the Board to require mailing and distribution of these documents to non-unit employees.

Third, notice reading is not justified. In the eight months from the end of August 2021 into April 2022, during which time petitions were filed at 12 of the 22 stores at issue, 11 in Buffalo and 1 in Rochester, and Workers United was certified at eight stores, the General Counsel aggregated unfair labor practice charges to file a consolidated complaint in May 2022. (ALJD 2, 20). There

are Buffalo-wide allegations, but the number of alleged unfair labor practices specific to stores varies widely. For example, three are alleged at the UB Commons store and none involve threats or coercion or Section 8(a)(3) claims, two are alleged at the McKinley store and again none involve threats of coercion or Section 8(a)(3) and at the Monroe Avenue store in Rochester the only alleged unfair labor practices involve Brian Nuzzo. Aggregating charges and including Buffalo-wide allegations mostly directed to Starbucks efforts to ameliorate substandard store conditions inaccurately portrays the claimed unfair labor practices as a monolithic response to union organizing when the reality is that events differed substantially from store to store. Notice reading is unwarranted where the claimed violations lack uniformity store-by store, and where there is no history of recurring and extreme unlawful conduct. *Compare HTH Corp.* 362 NLRB 709, 710, 712 (severe and pervasive unfair labor practices, lasting for over a decade, failure to comply with previously-imposed remedial obligations even in face of a Section 10(j) injunction). This paragraph also references an "Explanation of Rights" without description or provision of verbiage.

D.    The Other Forms Of Special Relief Ordered By The ALJ Are Not Warranted Based On The Record

The ALJ has ordered Starbucks to provide Workers United with employee contact information, equal time to address employees if convened by Starbucks for pre-election meetings about union representation, and reasonable access to bulletin boards and all places where notices to employees are customarily posted, to provide employee, supervisory and manager training through the Federal Mediation and Conciliation Service (FMCS) on rights under the Act and compliance with Board orders, and to grant visitation rights. (ALJD 202 ¶ 2(z), 203 ¶ 2(aa), (dd)).

Regarding the directives to provide employee contact information, equal time in pre-election meetings and bulletin board access, apart from the unjustified national scope, the proposed order identifies no duration for this requirement. For that reason alone, it should be rejected.

Further, if limited to stores which were the subject of the complaint, despite the General Counsel's effort to pyramid different claimed violations in differing locations to paint a picture of asserted egregious violations, the claimed unfair labor practices here do not support this remedy. The need for it is belied by the fact that the union won all but two of the elections in the stores at issue.

A training order typically is a remedy for a disruptive failure to bargain. *See, e.g., NLRB v. United States Postal Service*, Nos. 14-1223 and 14-2575 (6th Cir. 2018). Refusal-to-bargain issues are a minor part of this case and do not warrant such a remedy. Here, the ALJ has expanded the training to include rights under the Act and compliance with Board orders. How that effectuates the policies of the Act is unclear. Finally, the Board does not have the authority to direct that FMCS perform training.

As to visitation, the Board has granted broad visitation orders "when the equities demonstrate a likelihood that a respondent will fail to cooperate or otherwise attempt to evade compliance" and "it appears possible that the respondent may not cooperate in providing relevant evidence unless given specific, sanction-backed directions to do so." *Cherokee Marine Terminal*, 287 NLRB 1080, 1083 fn. 14 (1988). The Board has ordered a limited visitation order where the employer over a 10-year period twice engaged in objectionable conduct interfering with elections, was subject to two Section 10(j) injunctions, and was found in contempt of court for violating a federal district court injunction. These facts demonstrated absence of compliance with the remedial obligations imposed in multiple earlier encounters. *HTH Corporation*, 361 NLRB 709, 710 (2014). In these circumstances, the Board held "a duly-appointed Board agent may enter the Respondents' facility for a period of 3 years, at reasonable times and in a manner not to unduly interfere with the Respondents' operations, for the limited purpose of determining whether the Respondents are in compliance with our posting, distribution, and mailing requirements." *Id*. at 717.

This case does not warrant a visitation order. Although the ALJ found numerous violations, challenged in Starbucks' exceptions, Starbucks does not have a 10-year history of unfair labor practices, nor has it been held in contempt for violating a federal court injunction.

E.     **The ALJ's Order That Starbucks Cease And Desist From Interfering With, Restraining or Coercing Employees In The Exercise of Section 7 Rights In Any Like Or Other Manner Is Not Warranted**

The ALJ directed a broad order under *Hickmott Foods*, 242 NLRB 1357 (1979), extending his cease-and-desist order to infringement on Section 7 rights in any other manner because of Starbucks' "egregious and widespread misconduct." (ALJD 195:24-26, 196, 200 ¶ 1(kk)). In this case, only a narrower order is necessary because the record does not establish that Starbucks is a repeat offender or an egregious violator of the Act.

### III.    CONCLUSION

Based on the foregoing, the unfair labor practice allegations against Starbucks should be dismissed.

Respectfully submitted,

*/s/ Terrence H. Murphy*

Terrence H. Murphy
LITTLER MENDELSON, P.C.
625 Liberty Avenue, 26th Floor
Pittsburgh, PA 15222-3110
Telephone: 412-201-7621
Email: tmurphy@littler.com

Jacqueline Phipps Polito
LITTLER MENDELSON, P.C.
375 Woodcliff Drive, Suite 2D
Fairport, NY 14450
Telephone: 585-203-3413
Email: jpolito@littler.com

Ethan Balsam
LITTLER MENDELSON, P.C.
815 Connecticut Avenue, NW, Suite 400
Washington, DC 20006-4046
Telephone: 202-789-3424
Email: ebalsam@littler.com

Jeffrey S. Hiller
LITTLER MENDELSON, P.C.
41 South High Street, Suite 3250
Columbus, OH 43215
Telephone: 614-463-4230
Email: jhiller@littler.com

William Whalen
LITTLER MENDELSON, P.C.
312 North Clark Street, Suite 1100
Chicago, IL 60654
Telephone: 312-795-3252
Email: wwhalen@littler.com

Bruce Buchanan
LITTLER MENDELSON, P.C.
333 Commerce Street, Suite 1450
Nashville, TN 37201
Telephone: 615-514-4122
Email: bbuchanan@littler.com

Dated:  April 28, 2023

# EXHIBIT A

**Chart A**

| Store | Employee | Date | Policy | Discipline | Exhibit # |
|---|---|---|---|---|---|
| Camp Road | Cam Geiger | 8/19/2021 | Disrespectful Communication | Termination | Rx 261 |
| Galleria Kiosk | Victoria Conklin | 10/5/2018 | Behavior | Written warning | Rx 294 |
| Mt. Hope Ave. | Denisha Brown | 3/7/2019 | Disrespectful Communication | Termination | Rx 251 |
| Sheridan-Bailey | Weston Costello | 6/17/2021 | Behavior | Termination | Rx 224(a)-(b) |
| Sheridan-Bailey | Bianca Limina | 4/28/2021 | Disrespectful Communication | Written warning | Rx 227(a)-(b) |
| Transit & French | Alyssa Scheida | 11/9/2020 | Disrespectful Communication | Documented coaching | Rx 235 |
| Transit & French | Joe Nasby | 11/9/2020 | Disrespectful Communication | Documented coaching | Rx 236 |
| Transit & Regal | Lexa Michels | 7/3/2018 | Dress/Behavior | Final written warning | Rx 254 |
| Camp Road | Gianna Reeve | 6/30/2021 | Cash handling | Documented coaching | Rx 189 |
| Del. & Chippewa | C. Roosevelt | 6/15/2019 | Cash handling | Documented coaching | Rx 209 |
| Camp Road | Star Foy | 4/19/2021 | T & A | Final written warning | Rx 238 |
| Camp Road | Sennie Lay | 4/13/2021 | T & A | Documented coaching | Rx 204 |
| East Robinson | Denasia Starks | 6/20/2021 | T & A | Written warning | Rx 240 |
| Elmwood | Myke Gollwitzer | 12/3/2019 | T & A | Written warning | Rx 253 |
| Genesee Street | Alexis Rizzo | 8/16/2021 | T & A | Written warning | Rx 188 |
| Genesee Street | Brandon Janca | 8/9/2021 | T & A | Final written warning | Rx 108-109 |
| Genesee Street | R. Rivera-Long | 7/14/2021 | T & A | Documented coaching | Rx 206 |
| Genesee Street | John Kappel | 7/14/2021 | T & A | Documented coaching | Rx 259 |
| Genesee Street | Alexis Rizzo | 6/4/2020 | T & A | Documented coaching | Rx 186 |
| Genesee Street | Alexis Rizzo | 5/22/2021 | T & A | Written warning | Rx 187 |
| Genesee Street | Danka Dragic | 5/5/2021 | T & A | Final written warning | Rx 197 |

| | | | | | |
|---|---|---|---|---|---|
| Genesee Street | Ronnie Dolan | 4/4/2021 | T & A | Written warning | Rx 207(a), (b), (c) |
| Genesee Street | Danka Dragic | 3/17/2021 | T & A | Written warning | Rx 196 |
| Genesee Street | N. Krishnakumar | 3/4/2021 | T & A | Documented coaching | Rx 215 |
| Genesee Street | Patricia Pulichene | 1/26/2021 | T & A | Final written warning | Rx 267 |
| Genesee Street | Danka Dragic | 10/23/2020 | T & A | Documented coaching | Rx 195 |
| Genesee Street | Alexis Rizzo | 8/29/2018 | T & A | Written warning | Rx 185 |
| Genesee Street | Alexis Rizzo | 8/14/2017 | T & A | Documented coaching | Rx 184 |
| Genesee Street | Chris Davis | 2/11/2017 | T & A | Written warning | Rx 263 |
| Monroe Avenue | Mari Smith | 7/8/2021 | T & A | Written warning | Rx 244 |
| Monroe Avenue | Haleigh Fagan | 6/1/2021 | T & A | Written warning | Rx 281 |
| Monroe Avenue | Brian Nuzzo | 2/24/2019 | T & A | Documented counseling | Rx 194 |
| Monroe Avenue | C. Lockwood | 1/17/2019 | T & A | Written warning | Rx 245 |
| Monroe Avenue | Brian Nuzzo | 11/12/2018 | T & A | Documented coaching | Rx 193 |
| Monroe Avenue | Brian Nuzzo | 10/31/2018 | T & A | Documented coaching | Rx 192 |
| Mt. Hope Ave. | Denisha Brown | 10/23/2018 | T & A | Written warning | Rx 250 |
| Mt. Hope Ave. | Mysia Turner | 10/22/2018 | T & A | Termination | Rx 252 |
| NFB | Kayla Casey | 8/16/2021 | T & A | Documented coaching | Rx 243 |
| Sheridan-Bailey | Eden Cruz | 12/31/2020 | T & A | Final written warning | Rx 228 |
| Sheridan-Bailey | Andy Smead | 10/26/2020 | T & A | Final written warning | Rx 226 |
| Sheridan-Bailey | Weston Costello | 10/23/2019 | T & A | Written warning | Rx 224(a)-(b) |
| Sheridan-Bailey | Sean Bartlett | 1/15/2019 | T & A | Termination | Rx 229(a)-(b) |
| Sheridan-Bailey | Sean Bartlett | 1/8/2019 | T & A | Final written warning | Rx 229(a)-(b) |
| South Greece | Fabrizio Dinitto | 12/30/2020 | T & A | Written warning | Rx 272 |
| Transit & French | Samantha Larson | 6/30/2021 | T & A | Written warning | Rx 198 |

| Transit & French | Jim Kramer | 11/16/2019 | T & A | Final written warning | Rx 234 |
|---|---|---|---|---|---|
| Transit & French | Katie Woltz | 10/29/2019 | T & A | Final written warning | Rx 233 |
| Transit & French | Cameron Stoke | 7/13/2015 | T & A | Documented coaching | Rx 223 |
| Transit & Maple | Kailey Saad | 7/30/2021 | T & A | Written warning | Rx 237 |
| Transit & Regal | Lily Want | 7/12/2021 | T & A | Documented coaching | Rx 257 |
| Transit & Regal | Andrew Laspesa | 6/27/2021 | T & A | Written Warning | Rx 256 |
| Transit & Regal | Andrew Laspesa | 5/22/2019 | T & A | Documented coaching | Rx 255 |
| Monroe Avenue | J. Sincerbeaux | 6/6/2021 | T & A | Documented coaching | Rx 284 |
| Monroe Avenue | K. Lani Panneltz | 6/6/2021 | T & A | Documented coaching | Rx 283 |
| Transit & Regal | Danielle Love | 2/14/2021 | T & A | Final written warning | Rx 178 |
| Walden & Ander. | Ryan Mox | 1/28/2021 | Food safety | Written warning | Rx 225 |
| Del. & Chippewa | C. Roosevelt | 3/11/2019 | Safety | Written warning | Rx 210 |
| Galleria Kiosk | Erin O'Hare | 2/10/2021 | Health | Documented coaching | Rx 190 |
| Galleria Kiosk | Victoria Conklin | 12/30/2019 | Health | Documented coaching | Rx 293 |
| Galleria Kiosk | Erin O'Hare | 12/30/2019 | Health | Documented coaching | Rx 191 |
| Genesee Street | Connor Maggiore | 1/12/2021 | Health | Termination | Rx 205 |
| Genesee Street | Amara Williams | 12/13/2018 | Beverage | Final written warning | Rx 263 |

# EXHIBIT B

**Chart B**

| Store | Employee | Date | Policy | Discipline | Exhibit # |
|---|---|---|---|---|---|
| Del. & Chippewa | C. Casamassa | 12/8/2021 | Health, Dress | Final written warning | Rx 211 |
| Henrietta Sq. Mkt. | David Goyette | 6/6/2022 | Dress | Documented coaching | Rx 280 |
| Camp Road | William Westlake | 7/26/2022 | Dress | Documented coaching | Rx 319 |
| Transit & French | Henyia Scott | 12/2/2021 | Dress | Documented coaching | Rx 258 |
| Hamburg | Lyla Dunkle | 6/15/2022 | Dress | Documented coaching | Rx 214 |
| Orchard Park | Dena Mohammad | 3/1/2022 | Dress | Documented coaching | Rx 249 |
| South Greece | Sandra Griffith | 6/21/2022 | Dress | Documented coaching | Rx 274 |
| Transit & French | Kayla Sturniolo | 2/4/2022 | Dress | Documented coaching | Rx 176 |
| Transit & French | Ryan Wawrzeniec | 2/4/2022 | Dress | Documented coaching | Rx 218 |
| Transit & French | Laura Duggan | 1/14/2022 | Dress | Documented coaching | Rx 217 |
| Del. & Chippewa | Kayla Sturniolo | 1/10/2022 | T & A, Dress | Documented coaching | Rx 239 |
| Camp Road | William Westlake | 12/9/2021 | T & A | Documented coaching | Rx 314 |
| Del. & Chippewa | Jonavn Simmons | 7/10/2022 | T & A | Termination | Rx 181 |
| Del. & Chippewa | Melanie Petrone | 7/5/2022 | T & A | Leave of absence | Rx 169 |
| Del. & Chippewa | T. Chaney-Logan | 7/5/2022 | T & A | Final written warning | Rx 168 |
| Del & Chippewa | Allegra Anastasi | 12/16/2021 | T & A | Written warning | Rx 213 |
| Del. & Chippewa | Allegra Anastasi | 9/14/2021 | T & A | Documented coaching | Rx 212 |
| Del. & Kenmore | Gabe DeAngelo-Diel | 1/5/2022 | T & A | Documented coaching | Rx 175 |
| Del. & Kenmore | Brennan Jaquith | 12/31/2022 | T & A | Documented coaching | Rx 173 |
| Del. & Kenmore | Anahi Vidal | 12/24/2022 | T & A | Documented coaching | Rx 174 |
| Del. & Sheridan | Kyra Rowsey | 7/7/2022 | T & A | Termination | Rx 230 |
| Del. & | Shalonda Colbert | 5/18/2022 | T & A | Written | Rx 177 |

| Sheridan | | | | Warning | |
|---|---|---|---|---|---|
| East Robinson | Guss Birtha | 5/14/2022 | T & A | Documented coaching | Rx 292 |
| East Robinson | Rokhya Cisse | 3/24/2022 | T & A | Written warning | Rx 248 |
| East Robinson | Denasia Stewart | 3/9/2022 | T & A | Written warning | Rx 241 |
| Genesee Street | Brandon Janca | 11/23/2021 | T & A | Written warning | Rx 260 |
| Genesee Street | Alexis Rizzo | 9/20/2021 | T & A | Written warning | Rx 308 |
| Genesee Street | Yazminn Green | 9/14/2021 | T & A | Documented coaching | Rx 208 |
| Henrietta Sq. Mkt. | David Goyette | 6/6/2022 | T & A | Written warning | Rx 279 |
| Monroe Avenue | Jessica Woods | 5/31/2022 | T & A | Written warning | Rx 282 |
| Orchard Park | Brittany Patterson | 6/21/2022 | T & A | Written warning | Rx 202(a)-(b) |
| Orchard Park | Benjamin Laflin | 6/13/2022 | T & A | Written warning | Rx 247(a)-(b) |
| Orchard Park | Benjamin Laflin | 5/12/2022 | T & A | Documented coaching | Rx 247(a)-(b) |
| Orchard Park | Mariah Brooks | 3/2/2022 | T & A | Documented coaching | Rx 246 |
| Orchard Park | Brittany Patterson | 1/21/2022 | T & A | Documented coaching | Rx 202(a)-(b) |
| Transit & Regal | Brian Murray | 1/9/2022 | T & A | Leave of absence | Rx 309 |
| Sheridan-Bailey | Nahja White | 1/30/2022 | T & A | Documented coaching | Rx 232 |
| Transit & French | James Boyers | 2/4/2022 | T & A | Written warning | Rx 171 |
| Transit & French | Perry Wheeler | 1/14/2022 | T & A | Documented coaching | Rx 219 |
| Transit & French | Nashaly Gauthier | 1/6/2022 | T & A | Documented coaching | Rx 202(a)-(b) |
| Transit & French | Kourtni McDaniel | 1/6/2022 | T & A | Documented coaching | Rx 170 |
| Williamsville Pl. | Marcile Shanklin | 6/17/2022 | T & A | Termination | Rx 150 |
| Williamsville Pl. | Mariyi Ramos | 6/17/2022 | T & A | Documented coaching | Rx 167 |
| Elmwood | Cortlin Harrison | 3/30/2022 | T & A, Behavior | Final written warning | Rx 179 |
| Transit | Alyssa Cofield | 9/24/2021 | T & A, | Written | Rx 268 |

| | | | Behavior | warning | |
|---|---|---|---|---|---|
| Commons | | | | | |
| Transit & French | Jennifer Caravata | 11/-/2021 | Disrespectful Communication | Termination | [Tr. 967-970; 1057-1059).] |
| Sheridan-Bailey | Ash Goldenberg | 12/20/2021 | Disrespectful Communication | Written warning | Rx 231 |
| Sheridan-Bailey | Matthew Morreale | 10/18/2021 | COVID-Honesty | Termination | Rx 143 |

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Starbucks' Brief in Support of Exceptions was e-filed on April 28, 2023, through the National Labor Relations Board's website and served via email upon the following:

Linda M. Leslie, Regional Director
National Labor Relations Board
Region 3 – Buffalo Office
Niagara Center Building, Suite 630
130 S. Elmwood Avenue
Buffalo, NY 14202
linda.leslie@nlrb.gov

Jessica Cacaccio
Regional Attorney
National Labor Relations Board
Region 3 – Buffalo Office
Niagara Center Building, Suite 630
130 S. Elmwood Avenue
Buffalo, NY 14202
jessica.cacaccio@nlrb.gov

Alicia Pender Stanley
Field Attorney
National Labor Relations Board
Region 3
11A Clinton Avenue, Room 342
Albany, NY 12207
alicia.stantley@nlrb.gov

Ian Hayes, Esq.
HAYES DOLCE
471 Voorhees Avenue
Buffalo, NY 14216
ihayes@hayesdolce.com

Michael Dolce, Esq.
HAYES DOLCE
471 Voorhees Avenue
Buffalo, NY 14216
mdolce@hayesdolce.com

*/s/ Terrence H. Murphy*
Terrence H. Murphy

4884-6952-2272.1 / 055187-1254