No. 24-60650

# In the United States Court of Appeals for the Fifth Circuit

STARBUCKS CORPORATION,

*Petitioner/Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner.*

*On appeal from a decision of the National Labor Relations Board, Nos. 03-CA-285671, et al.*

## REPLY BRIEF FOR PETITIONER/CROSS-RESPONDENT STARBUCKS CORPORATION

JEFFREY S. HILLER
LITTLER MENDELSON, P.C.
  *41 S. High Street, Ste. 3250*
  *Columbus, OH 43215*

JONATHAN O. LEVINE
LITTLER MENDELSON, P.C.
  *1111 E. Kilbourn Avenue, Ste. 1000*
  *Milwaukee, WI 53202*

LISA S. BLATT
  *Counsel of Record*
AMY MASON SAHARIA
DANIELLE J. SOCHACZEVSKI
KEES D. THOMPSON
CLAIRE R. CAHILL
SEPHORA D. GREY
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue, S.W.*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

*Counsel for Petitioner/Cross-Respondent*

# TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................1
ARGUMENT ..................................................................................................2
I.  Starbucks Preserved Its Challenges ...............................................2
II.  Starbucks Did Not Violate Section 8(a)(1) ....................................5
    A.  Starbucks Did Not Unlawfully Solicit Grievances or Extend Benefits.................................................................................5
    B.  Starbucks Did Not Unlawfully Promise or Implement a Wage Increase or Promote Employees.........................................10
    C.  Starbucks Did Not Create a Coercive Impression of Surveillance..............................................................................12
    D.  Starbucks Did Not Coercively Interrogate ...............................14
    E.  Starbucks Did Not Unlawfully Threaten Employees .................15
III.  Starbucks Did Not Violate Sections 8(a)(3), 8(a)(4), or 8(a)(5) .............16
    A.  The Board's Cross-Cutting Errors Infect All Its Conclusions..............................................................................16
    B.  The General Counsel Failed to Meet Its *Wright Line* Burden......................................................................................16
        1.  *The Board improperly inferred anti-union animus from normal business decisions*.........................................16
        2.  *The record does not prove knowledge of union activity* .................................................................................23
    C.  Starbucks Showed That It Would Have Taken the Same Actions.....................................................................................24
    D.  Starbucks Did Not Violate Section 8(a)(5).................................28
IV.  Certain Remedies Require Vacatur.........................................................29
    A.  The Damages Remedy Is Unlawful..............................................29
    B.  The *Gissel* Bargaining Order Was Unwarranted ......................29
    C.  The Impossible Order to Reopen the Galleria Kiosk Is Unlawful....................................................................................32
    D.  The General Counsel Fails to Justify the Notice-Reading Remedy....................................................................................33
CONCLUSION.................................................................................................34

# TABLE OF AUTHORITIES

Page

## CASES

*800 River Rd. Operating Co.*, 369 NLRB No. 109 (2020) ...................................28

*Abbey's Transportation Services, Inc. v. NLRB*,
   837 F.2d 575 (2d Cir. 1988) .............................................................18, 19

*Absolute Healthcare v. NLRB*, 103 F.4th 61 (D.C. Cir. 2024)..........................21

*Brooks v. Houston Indep. Sch. Dist.*,
   86 F. Supp. 3d 577 (S.D. Tex. 2015) ...........................................................20

*Cal. Gas Transp. v. NLRB*, 507 F.3d 847 (5th Cir. 2007) ...............................30

*Cent. Freight Lines, Inc. v. NLRB*, 653 F.2d 1023 (5th Cir. 1981).................25

*Charlotte Amphitheater Corp. v. NLRB*, 82 F.3d 1074 (D.C. Cir. 1996) ........30

*Charter Commc'ns, LLC*, 366 NLRB No. 46 (2018)........................................13

*Conley v. NLRB*, 520 F.3d 629 (6th Cir. 2008)...............................................14

*Cordua Rests., Inc. v. NLRB*, 985 F.3d 415 (5th Cir. 2021)..............................3

*Denton Cnty. Elec. Coop., Inc. v. NLRB*,
   962 F.3d 161 (5th Cir. 2020)........................................29, 30, 31, 33

*Detroit Edison Co. v. NLRB*, 440 U.S. 301 (1979) ...........................................3

*Dish Network Corp. v. NLRB*, 953 F.3d 370 (5th Cir. 2020) .......................3, 30

*Fla. Builders, Inc.*, 111 NLRB No. 130 (1955)...............................................12

*Hecla Mining Co. v. NLRB*, 564 F.2d 309 (9th Cir. 1977)...............................16

*Hendrickson USA, LLC v. NLRB*, 932 F.3d 465 (6th Cir. 2019).....................15

*Hendrix Mfg. Co. v. NLRB*, 321 F.2d 100 (5th Cir. 1963) ...............................13

*Hiran Mgmt., Inc. v. NLRB*, 157 F.4th 719 (5th Cir. 2025)............................29

*Intertape Polymer Corp.*, 372 NLRB No. 133 (2023)......................................18

*J.P. Stevens & Co. v. NLRB*, 441 F.2d 514 (5th Cir. 1971) .............................30

*Lion Elastomers, LLC v. NLRB*, 108 F.4th 252 (5th Cir. 2024)................12, 32

*NLRB v. AllService Plumbing*, 138 F.4th 889 (5th Cir. 2025)........................32

*NLRB v. Camco, Inc.*, 340 F.2d 803 (5th Cir. 1965) ...................................14, 15

*NLRB v. Dorn's Transp. Co.*, 405 F.2d 706 (2d Cir. 1969) .............................10

*NLRB v. Exch. Parts Co.*, 375 U.S. 405 (1964)..........................................7, 11

*NLRB v. Gibson Prods. Co.*, 494 F.2d 762 (5th Cir. 1974).........................29, 31

*NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) .............................2, 23, 29, 30

*NLRB v. Lenkurt Elec. Co.*, 438 F.2d 1102 (9th Cir. 1971) .............................16

*NLRB v. Mini-Togs, Inc.* 980 F.2d 1027 (5th Cir. 1993)..................................28

Page

Cases—continued:

*NLRB v. Mooney Aircraft, Inc.*, 310 F.2d 565 (5th Cir. 1962)...........................3
*NLRB v. Mueller Brass Co.*, 509 F.2d 704 (5th Cir. 1975) ........................12, 17
*NLRB v. Nueva Eng'g, Inc.*, 761 F.2d 961 (4th Cir. 1985) ..............................13
*NLRB v. United Min. & Chem. Corp.*, 391 F.2d 829 (2d Cir. 1968).................9
*NLRB v. Wagner Elec. Corp.*, 586 F.2d 1074 (5th Cir. 1978) ...........................3
*Pa. State Corr. Officers Ass'n v. NLRB*, 894 F.3d 370 (D.C. Cir. 2018) .....3, 32
*Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413 (D.C. Cir. 1996)............18
*Poly-Am., Inc. v. NLRB*, 260 F.3d 465 (5th Cir. 2001) ...............................23, 24
*RAV Truck & Trailer Repairs, Inc. v. NLRB*,
    997 F.3d 314 (D.C. Cir. 2021)....................................................32, 33
*Rojas v. Fla.*, 285 F.3d 1339 (11th Cir. 2002).......................................19, 27
*Southwire Co.*, 277 NLRB No. 43 (1985) ..............................................12
*Stern Produce Co. v. NLRB*, 97 F.4th 1 (D.C. Cir. 2024) ................................17
*Thryv, Inc. v. NLRB*, 102 F.4th 727 (5th Cir. 2024) ........................................3
*Wal-Mart Stores Inc.*, 339 NLRB 1187 (2003)........................................9
*Wal-Mart Stores, Inc.*, 348 NLRB 274 (2006) .......................................8
*Wal-Mart Stores, Inc.*, 352 NLRB 815 (2008)...................................12

## STATUTE

29 U.S.C. § 160 ..............................................................................32

**INTRODUCTION**

From faulting Starbucks for supposedly under- and overstaffing stores at the same time, to condemning it for *not* waiting 12-18 months to rid stores of insects, the General Counsel's brief doubles down on the damned-if-you-do-damned-if-you-don't straitjacket the Board imposed below. Although the General Counsel repeatedly casts Starbucks' actions in Buffalo as "unprecedented," it does not support that characterization with actual evidence. There was nothing unprecedented about Starbucks' implementing operational improvements to strengthen an underperforming region once upper management discovered the magnitude of the operational problems. That those standard acts of corporate management occurred during a union campaign does not transform them into labor-law violations.

The General Counsel's brief ignores or unpersuasively dismisses the substantial, cross-cutting errors underlying the Board's decision—including factual errors regarding when changes began in Buffalo and whether level-setting occurred elsewhere, and legal errors like conflating but-for causation with anti-union animus. The General Counsel improperly contorts the *Wright Line* framework into a guilty-until-proven-innocent approach for nearly every corporate action, no matter how routine. And the General Counsel even goes

so far as to infer animus from Starbucks' managers traveling to Buffalo to discuss unionization with employees, despite the NLRA protecting and even *encouraging* employer-employee dialogue on unionization. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969).

Additionally, the General Counsel improperly offers new justifications for the Board's overbearing remedies, implicitly acknowledging the Board's reasoning does not itself suffice. None of the arguments (old or new) validate the remedies. This Court should deny enforcement.

## ARGUMENT

## I.   Starbucks Preserved Its Challenges

The General Counsel (at 21-22) errs in arguing that Starbucks waived challenges to several of the 146 alleged violations in the ALJ's 204-page decision by not specifically addressing them in its Board exceptions or opening appellate brief.

1. The General Counsel (at 20) cites the Board's conclusion that Starbucks did not except to certain findings. *See* RE2 n.5. But Starbucks' exceptions covered each of them. *See* ROA.9316 (Exception 69 – increasing staffing), 9318 (Exception 81 – prohibiting protected speech), 9322 (Exception 106 – verbal warnings to Reeve and Dragic), 9328 (Exception 155 – threatening

2

reprisal against partners, such as Emler and Conklin); 9333 (Exception 194 – refusing work to union supporters).

The General Counsel (at 20) also cites the Board's conclusion that Starbucks did not sufficiently elaborate in briefing on its exception to the ALJ's conclusion regarding Dragic's and Lerczak's reduced hours. *See* RE7 n.16. But the NLRA's exhaustion provision does not require elaboration in briefing to the Board. *See Pa. State Corr. Officers Ass'n v. NLRB*, 894 F.3d 370, 376 (D.C. Cir. 2018); *see also Thryv, Inc. v. NLRB*, 102 F.4th 727, 741 (5th Cir. 2024) (objection at any stage of Board proceedings, including ALJ stage, preserves issue).[1]

2. When the Board's decision rests on "foundational error," all conclusions flowing therefrom "fall together." *Dish Network Corp. v. NLRB*, 953 F.3d 370, 376, 381 (5th Cir. 2020). Starbucks adequately challenged the entirety of the Board's order in its opening appellate brief. Starbucks argued (at

---

[1] The General Counsel's cited waiver cases are thus inapposite. *See Cordua Rests., Inc. v. NLRB*, 985 F.3d 415, 422 (5th Cir. 2021) ("Cordúa does not oppose the Board's request for summary enforcement."); *NLRB v. Wagner Elec. Corp.*, 586 F.2d 1074, 1076 n.2 (5th Cir. 1978) (no indication that company contested waiver); *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 311 n.10 (1979) (challenger conceded failure to object); *NLRB v. Mooney Aircraft, Inc.*, 310 F.2d 565, 566 (5th Cir. 1962) (per curiam) (affirming waiver by party who submitted "no written exceptions").

4) that the Board committed "significant, cross-cutting errors" infecting the analysis at every step, and identified those errors. Starbucks also argued (at 41) that any error under Section 8(a)(1) would require a remand under Section 8(a)(3) because the ALJ and Board linked the two sets of conclusions.

A few examples: Starbucks highlighted (at 25) the ALJ's erroneous finding that Starbucks officials "rallied to Buffalo only because of the Dear Kevin letter" in August 2021, RE104, even though Starbucks reassigned regional manager Deanna Pusatier to Buffalo by July 2021. ROA.2821-23, 2826-34. That factual error, which the General Counsel does not contest, taints all the Board's conclusions regarding solicitation of grievances, extension of benefits, and level-setting. Starbucks Br. 20-27, 42-46. The Board's foundational logical error confusing but-for causation with anti-union animus likewise infects the same conclusions. Starbucks Br. 25-27, 40-41.

Similarly, the record disproves the ALJ's finding (adopted by the Board) that "there is no evidence that the Respondent ever level set stores outside of the Buffalo market," RE106, which the General Counsel does not deny, *see* NLRB Br. 42. *See* ROA.3202, 3374-77, 3385-86 (level-sets in Philadelphia, Georgia, Virginia, and Maryland). That error undermines the Board's conclusions establishing animus based on level-setting. *See* Starbucks Br. 42-46.

And the Board's artificially narrow approach of considering comparators only from the same store where discipline occurred invalidates its discipline-related conclusions.  Starbucks Br. 43-45.

Starbucks (at 4) appropriately asked the Court to deny "enforcement in full" because of these and other errors.  If the Court doubts how the cross-cutting errors affect particular conclusions, the appropriate course would be to vacate and remand for the Board to reconduct its analysis untainted by the errors.

## II.     Starbucks Did Not Violate Section 8(a)(1)

### A.     Starbucks Did Not Unlawfully Solicit Grievances or Extend Benefits

The Board's overarching errors and failure to consider the entire record afflict its conclusions regarding soliciting grievances and extending or promising benefits.

1. The ALJ found but failed to account for evidence that Starbucks had an established, nationwide practice of soliciting grievances and making operational improvements.  The General Counsel (at 27) claims "there was no evidence of this level of solicitation of grievances, promises, or fixes outside Buffalo."  As to solicitation of grievances and fixes, however, the General Counsel cites no finding that Starbucks' practices in Buffalo differed from

5

what occurred elsewhere.  The General Counsel ignores altogether the ALJ's findings that "it was not unusual for … high level corporate officials to visit markets to assess needs and respond," RE35 n.42, and that an official "explained that it was his past practice [] to meet with baristas and, based on what they needed, 'act immediately,'" RE96.  The General Counsel thus has failed to defend the Board's conclusion that Starbucks' solicitation of grievances violated Section 8(a)(1).[2]

As to alleged benefits, the only record citations the General Counsel offers (at 26-28) relate to repairs at Buffalo-area stores.  The General Counsel thus has failed to defend the vast majority of the conclusions regarding unlawful benefits.  *See* RE3-4.  As to repairs, the General Counsel cites evidence that (1) Starbucks typically planned store renovations 12-18 months in advance, (2) fourteen Buffalo-area stores underwent renovations, and (3) many of the renovations had not previously been requested or planned.  RE98-99.  But the General Counsel identifies no evidence that Starbucks defers renovations for

---

[2] The Union (at 11) claims that "one manager admitted [the Buffalo listening sessions] were not like other meetings the company had held elsewhere," but neglects to mention that she said this when explaining there were some questions management would not "be able to kind of answer" because of the first-ever union campaign.

12-18 months when learning of serious problems like "damaged counters, flooring, and structural components," "broken or outdated equipment," or "pest issues." RE99. That Starbucks promptly repaired both unionizing *and non-unionizing* stores in Buffalo says nothing about its motive for those repairs. (The General Counsel tellingly ignores the evidence that Starbucks repaired non-unionizing stores. *See* Starbucks Br. 22.) The notion that Starbucks needed to wait 12-18 months to rid Buffalo-area stores of fruit flies and bees to avoid violating the NLRA is untenable.

The General Counsel improperly attempts to shift the burden to Starbucks, claiming (at 26-27) it was "Starbucks's burden … to show that it acted in Buffalo when it did for reasons other than the union campaign." But the General Counsel bears the burden under Section 8(a)(1), which required it to prove Starbucks made repairs "with the express purpose of impinging upon" Buffalo partners' organizing efforts. *NLRB v. Exch. Parts Co.*, 375 U.S. 405, 409 (1964). If the General Counsel could meet that burden merely by proving an employer fixed operational problems during a union campaign, employers would have to freeze normal operations anytime union activity is afoot.

2. As the Board previously has recognized, operational fixes with "*incidental*" benefits for employees, like unclogging drains or building cabinets, do

not violate Section 8(a)(1). *Wal-Mart Stores, Inc.*, 348 NLRB 274, 282 (2006) (emphasis added). Even if the *Exchange Parts* rule might sometimes extend to non-economic benefits, that does not mean that operational fixes with incidental effects on employees can violate Section 8(a)(1). In the Board's words, "it would be quite extraordinary to conclude that the Act required a business to violate sanitation codes." *Id.* The General Counsel now urges this Court to adopt that "extraordinary" conclusion, claiming that remedying safety violations violates Section 8(a)(1) if "antiunion sentiment" motivated the remedy. The Court need not decide whether that could ever be so; here, no evidence demonstrates that Starbucks remedied health and safety issues to suppress union support.

3. The General Counsel repeats on appeal the Board's conflation of but-for causation and motive. *See* Starbucks Br. 25-27. It claims (at 25) that Starbucks unlawfully solicited grievances and granted benefits "once it became aware of the employees' union activity and *because of* that activity." To start, that claim overlooks evidence that Starbucks' new regional manager Pusatier began addressing operational issues *before* the union campaign and planned changes consistent with her experiences outside Buffalo. *See* Starbucks Br.

25; *supra* p.4.[3]  The Board's failure to reconcile this evidence with its conclusions is fatal.

Regardless, an employer's learning of operational issues *because of* a union campaign does not prove the employer fixed those issues *with the motive of* interfering with unionization.  *See Wal-Mart Stores Inc.*, 339 NLRB 1187, 1188 (2003).  The General Counsel acknowledges (at 28) that "employer actions following a union campaign are not *necessarily* motivated by it," yet claims the circumstances here are "suspicious."  In the case it cites, however, the court observed that "suspicious" timing, by itself, "might not suffice"; the court also considered that the employer's explanation for firing the union leader the day after the first union meeting lacked credibility.  *NLRB v. United Min. & Chem. Corp.*, 391 F.2d 829, 833 (2d Cir. 1968).  There is nothing incredible about Starbucks' decision to fix serious problems in Buffalo (including firing the district manager whom the General Counsel (at 6) admits did not visit stores under his supervision) once upper management learned of them.  The General Counsel identifies no evidence that Starbucks would not have done the same in other regions.

---

[3] That one store manager claimed to have raised issues earlier, presumably before Pusatier's appointment, thus is immaterial.  *Contra* Union Br. 11.

9

4. The Board's overreach led to logically inconsistent conclusions, *see* Starbucks Br. 23, 26-27, which the General Counsel incredibly embraces on appeal (at 26 n.6). For example, Starbucks supposedly both improperly extended benefits by "alleviating understaffing," RE4, and "discriminated against partners by overstaffing stores," RE108. Under the Board's "damned if you do, damned if you don't" approach, *NLRB v. Dorn's Transp. Co.*, 405 F.2d 706, 715 (2d Cir. 1969), employers will commit NLRA violations whether they address or ignore operational issues during union campaigns.

## B. Starbucks Did Not Unlawfully Promise or Implement a Wage Increase or Promote Employees

1. The Board's conclusion that Starbucks' October 2021 announcement of its already planned January 2022 nationwide pay increase violated Section 8(a)(1) lacks substantial evidence. The General Counsel's claim (at 30-31) that the October 2021 action "promis[ed] a 'major benefit' ahead of union elections" overlooks critical evidence. As originally announced, partners hired before July 2021 would receive an increase of "at least 5%," and "tenured" partners would receive an increase of "at least 6%." RE97; ROA.7933. In October 2021, Starbucks stated that partners with two years' experience "could" receive an increase of "up to 5%" (*i.e.*, the *same* or *less* than originally planned), and "tenured" partners with at least 5 years' service "could" receive an increase of "up

to 10%" (*i.e.*, more, less, or the same as "at least 6%").  RE97; *see* ROA.4414.[4] The ALJ's finding that Starbucks provided a new "major benefit" in October 2021 thus lacks record support.

The General Counsel also identifies no evidence of improper "purpose." *Exch. Parts*, 375 U.S. at 409.  The General Counsel (at 31) argues Starbucks had the "burden of showing that it would have made the same change to an already-announced nationwide compensation plan in the absence of union activity."  That assertion improperly relieves the General Counsel of its burden to prove improper motive.  Even if it were appropriate to shift the burden to the employer, that the pay increase did not in fact go up for some employees would rebut any inference of improper motive.

2. The General Counsel does not deny that the Board decided Starbucks violated Section 8(a)(1) by promoting two employees without hearing from Starbucks on the issue.  The General Counsel (at 31 n.7) argues that Starbucks needed to move for reconsideration to preserve this objection.  The Board, however, preemptively passed on the objection, asserting the issue was "fully litigated."  RE8 n.19 (citation omitted).  "Where, as here, the Board is on notice

---

[4] The ALJ mistakenly referred to 10 years' experience. *Compare* RE97 *with* ROA.4414.

of a party's purportedly unexhausted argument, a motion for reconsideration is not required." *Lion Elastomers, LLC v. NLRB*, 108 F.4th 252, 258 (5th Cir. 2024).

### C.    Starbucks Did Not Create a Coercive Impression of Surveillance

The ALJ's surveillance conclusions exemplify the agency's tendency to turn anything Starbucks supervisors did into Section 8(a)(1) violations. Section 8(a)(1) "does not proscribe all surveillance of employee activities by the employer," only that which "tends to interfere with, restrain, or coerce Union activities." *NLRB v. Mueller Brass Co.*, 509 F.2d 704, 708 (5th Cir. 1975). No coercion occurred.

1. The General Counsel cites no case holding that increased presence of supervisors in spaces open to all employees is unlawful or inherently coercive, nor does it grapple with the Board's cases holding that "management officials' observation of public union activity" does not violate the Act absent extraordinary circumstances. Starbucks Br. 30 (quoting *Wal-Mart Stores, Inc.*, 352 NLRB 815, 816-17 (2008)); *see also, e.g.*, *Southwire Co.*, 277 NLRB No. 43, slip op. 3 (1985), *enf'd*, 820 F.2d 453 (D.C. Cir. 1987). Employers may instruct supervisors to monitor and report on union activity occurring openly at the workplace without violating the Act. *See, e.g.*, *Fla. Builders, Inc.*, 111 NLRB

No. 130, slip op. 1 (1955).  The General Counsel cites *Charter Communications, LLC*, 366 NLRB No. 46 (2018), *enf'd*, 939 F.3d 798 (6th Cir. 2019), to argue that monitoring employees more closely constitutes unlawful surveillance, but there the employer had expressly threatened to monitor the employee in connection with union activity.  *Id.*, slip op. 8.

2. The General Counsel likewise cites no authority for the proposition that managers' wearing headsets *used for work-related communications on the job* constitutes unlawfully coercive surveillance.  *Cf. NLRB v. Nueva Eng'g, Inc.*, 761 F.2d 961, 967 (4th Cir. 1985) (surveilling "off duty employees"); *Hendrix Mfg. Co. v. NLRB*, 321 F.2d 100, 104 & n.7 (5th Cir. 1963) ("furtive … snooping" of "union meeting downtown") (both cited by General Counsel at 34).

3. The General Counsel claims a supervisor engaged in the "unprecedented practice" of photographing an employee wearing a union pin.  NLRB Br. 34 (quoting RE105).  That assertion ignores authority cited by Starbucks (at 31) holding that photographing union activity does not violate Section 8(a)(1) absent coercion.  And neither the General Counsel here, nor the ALJ below, grappled with the evidence that the manager had taken pictures before. *See* ROA.415.

13

4. When an employer confronts an employee about a chat message calling another employee a "white fucking twink," RE62, any reasonable employee would assume a colleague reported the chat to the employer. The Board's conclusion that an employee reasonably would assume the employer surreptitiously surveilled the chat is completely implausible. The General Counsel proposes a bright-line rule that an employer unlawfully creates an impression of surveillance when it confronts employees about misconduct but "does not reveal the manner in which it learned the information." NLRB Br. 35 (cleaned up). That rule indefensibly would require employers to reveal confidential complaints about union supporters' misconduct to avoid Section 8(a)(1) liability. That cannot be the law, and the Board cites no court precedent embracing that irrational rule.[5]

### D.    Starbucks Did Not Coercively Interrogate

The General Counsel conspicuously ignores this Court's cases holding that "casual question[s]" about union support like the one here do not violate Section 8(a)(1). Starbucks Br. 33-34 (citing cases). The General Counsel cites not one case finding a question like this one unlawful. It cites *NLRB v. Camco,*

---

[5] In *Conley v. NLRB*, 520 F.3d 629 (6th Cir. 2008) (per curiam) (cited at NLRB Br. 35), the employer confronted employees about their union activity, not about misconduct.

*Inc.*, 340 F.2d 803, 804 n.6 (5th Cir. 1965), for the proposition that even one question can be unlawful, but in *Camco*, the questioning of multiple employees was "systematic and intensive," there was "a manifestly close correlation between the interrogations and the terminations of employment," and the employer "gave no assurances against reprisals." *Id.* at 807.

Here, by contrast, the supervisor merely asked one partner wearing a union pin if he supported the union. The ALJ identified no correlation between other alleged NLRA violations and this lone question. And the supervisor assured against reprisal, telling the partner immediately thereafter that "she respected" his decision. RE105; ROA.623-24. The General Counsel also does not defend the Board's failure to consider the partner's subjective reaction to the question. *See* Starbucks Br. 34.

### E.    Starbucks Did Not Unlawfully Threaten Employees

Regarding the Board's threat conclusions, the General Counsel (at 31) claims that supervisors made "predictions" about unionization's effects without citing "objective facts." One supervisor, however, merely stated that unionized employees may or may not receive new benefits depending on the "contract." ROA.4969:10-16. That statement predicts nothing, and lawfully describes "the natural give and take of the bargaining process." *Hendrickson*

*USA, LLC v. NLRB*, 932 F.3d 465, 472 (6th Cir. 2019).  The other statements merely noted well-known effects of unionization:  managers cannot perform bargaining-unit work, and transfers between unionized and non-unionized locations may be challenging.  *See* ROA.4978:8-11;  ROA.4976:6-14; ROA.4236:21-4237:3.  Courts have rejected Section 8(a)(1) violations based on similar statements.  *See, e.g.*, *Hecla Mining Co. v. NLRB*, 564 F.2d 309, 315 (9th Cir. 1977) ("free transfer policy of the company between work sites might be incompatible with the union structure"); *NLRB v. Lenkurt Elec. Co.*, 438 F.2d 1102, 1107 (9th Cir. 1971) (similar).

## III.   Starbucks Did Not Violate Sections 8(a)(3), 8(a)(4), or 8(a)(5)

### A.   The Board's Cross-Cutting Errors Infect All Its Conclusions

The General Counsel again argues (at 43)—incorrectly—that Starbucks insufficiently challenged certain discrimination conclusions by focusing on cross-cutting flaws in legal reasoning.  The Board's (1) failure to prove unlawful motivation, (2) improper inference of anti-union animus, and (3) failure to find decision-makers' knowledge of partners' union activity infect all the Section 8(a)(3) and (4) conclusions.  *See supra* Part I.

### B.    The General Counsel Failed To Meet Its *Wright Line* Burden

#### 1.    *The Board improperly inferred anti-union animus from normal business decisions*

The General Counsel does not dispute the ALJ's finding that "many" Buffalo partners "were out of compliance" with Starbucks' policies.  RE106. The General Counsel nonetheless claims (at 38-42) that Starbucks' supposed Section 8(a)(1) violations and the supposedly suspicious timing of its level-setting campaign support the Board's conclusion that anti-union animus motivated Starbucks' operational decisions, including disciplinary actions. Both aspects of this claim are flawed.

a. As Starbucks argued (at 40-41), at *Wright Line*'s first step, the Board cannot infer unlawful animus from general Section 8(a)(1) violations because the General Counsel must "establish[] a reasonable inference of *causal connection* between the employer's antiunion motivation and the employee's discharge." *Mueller Brass*, 509 F.2d at 711 (emphasis added). "[G]eneral hostility" does not suffice.  *Stern Produce Co. v. NLRB*, 97 F.4th 1, 12 (D.C. Cir. 2024) (citations omitted).  The General Counsel failed to show Starbucks took any particular action *because of* anti-union animus.  Animus in the abstract does not prove the motivation for particular decisions by particular supervisors.

17

Trying to justify this evidentiary shortcut, the General Counsel points to the cases on page 5 of the Board's decision, but none helps the Board.  In *Intertape Polymer Corp.*, 372 NLRB No. 133, slip op. 9-10 (2023), the Board ruled that "an employer's statement that it will fire anyone who engages in union activities … may give rise to a reasonable inference that a causal relationship exists."  The General Counsel does *not* (because it cannot) cite any similar statement by Starbucks management.

In *Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413 (D.C. Cir. 1996), the court held that surveillance violating Section 8(a)(1), combined with a general manager's unlawful anti-union speech, constituted "the link between an employer's knowledge of an employee's union activities and reprisals taken against that employee."  *Id.* at 424 (emphasis omitted).  But the at-issue surveillance was directed at the disciplined employee, a known union supporter. *See id.* at 421.  *Parsippany* does not condone using alleged Section 8(a)(1) violations in an entire region to prove anti-union animus motivating particular disciplinary actions.

*Abbey's Transportation Services, Inc. v. NLRB*, 837 F.2d 575 (2d Cir. 1988), expressly states that Section 8(a)(1) violations are "not in themselves

18

dispositive" of animus. *Id.* at 580. The court cited Section 8(a)(1) violations only to confirm the otherwise-supported finding of anti-union animus. *See id.*

Finally, the General Counsel does not dispute that if this Court denies enforcement of any alleged Section 8(a)(1) violation, it must remand on the Section 8(a)(3) conclusions. *See supra* p.4.

b. Additionally, the Board improperly inferred animus from Starbucks' level-setting. Undisputed evidence proved that Starbucks engaged in level-setting in multiple markets without union activity. ROA.3202, 3374-77, 3385-86 (level-sets in Philadelphia, Georgia, Virginia, and Maryland). The ALJ's finding to the contrary, which the General Counsel does not defend, was wrong. *See* RE106.

The General Counsel (at 40-41) claims the level-setting's timing proves animus, noting the deficiencies in Buffalo "were not new." But that argument again ignores that Starbucks appointed Pusatier as regional manager a month *before* the union campaign. *See supra* p.4. The deficiencies were "new" to Pusatier, and she appropriately addressed them as she did in Boston. *See* Starbucks Br. 6-7. In the similar Title VII context, courts accept a new super-visor's arrival as a legitimate, non-discriminatory explanation for diligent rule enforcement. *See, e.g., Rojas v. Fla.*, 285 F.3d 1339, 1343 (11th Cir. 2002) (per

curiam); *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 587 (S.D. Tex. 2015).[6]

That claim also confuses but-for causation with motive. Even assuming Starbucks level set in Buffalo because the union campaign alerted management to serious operational problems there, that in no way proves animus motivated the level-setting—particularly when the company had level set elsewhere and where the discharges occurred many months after union activity began. *See* Starbucks Br. 9. Likewise, that a manager allegedly said partners were unionizing because "Buffalo was not to standard" does not demonstrate that anti-union *animus* motivated Starbucks' efforts to bring Buffalo up to standard. ROA.1850-51; *see* NLRB Br. 39.

The General Counsel (at 42) dismisses the evidence that Starbucks has "occasionally 'level set' in other parts of the country," claiming that Starbucks cannot meet its burden at *Wright Line* step two by "[s]howing a history of level setting that *could have* informed the decision to level set in Buffalo." But the

---

[6] Although the General Counsel ignores the new regional manager, it claims (at 41-42) the Board could infer animus from the *absence* of evidence that Starbucks "address[ed] deficiencies" elsewhere in the region in summer 2021. *See also* Union Br. 13. But the regional manager testified that conditions in Buffalo were "worse than [she] imagined," even after learning of conditions elsewhere. ROA.2832-36.

burden to prove unlawful animus at *Wright Line*'s first step is on the General Counsel, *not* Starbucks.

As Starbucks previously explained (at 43-44), the Board not only ignored Starbucks' consistent practices outside Buffalo, but it ignored disciplinary practices within and nearby Buffalo. And the ALJ bizarrely considered only the *one* store in which the purported adverse action occurred, even when another store *in Buffalo* had administered the same discipline regardless of union activity. RE116. Likewise, the ALJ artificially ignored at least four dozen Buffalo comparators disciplined after the August 2021 "Dear Kevin" letter, casting them aside as "stricter enforcement"—despite the majority being mere coachings or warnings or being issued at stores where petitions were not filed. *See* RE31-32, 92-94. These actions arbitrarily limited the field of comparators. *See* Starbucks Br. 43-45; *Absolute Healthcare v. NLRB*, 103 F.4th 61, 71 (D.C. Cir. 2024) ("The Board cannot ground its decisions in a skewed or 'clipped view' of the record."). The Board erred in disregarding this evidence.[7]

---

[7] The Board also erred in assuming animus where an employee was the first to be disciplined for particular misconduct. *See* Starbucks Br. 46. The General Counsel does not defend this aspect of the Board's decision.

The General Counsel relegates its response to this glaring logical gap to one footnote (at 40 n.10), claiming without supporting authority that "the Board reasonably asked whether enforcement of Starbucks's pre-existing policies aligned with past practice at the particular store involved." It asserts "the evidentiary record that Starbucks helped to develop did not establish any widespread borrowing or sharing of practices between stores." That assertion again improperly shifts the burden to Starbucks. It also ignores the evidence that Starbucks upper management worked with individual stores to determine fair discipline, *e.g.*, ROA.3144-51, and that Starbucks had *one* policy and set of standards that it enforced when level setting, ROA.5506-86. That some store managers previously had underperformed, *see, e.g.*, ROA.2832-34, is no reason to bar Starbucks from enforcing its policies once better management arrived.

Finally, the General Counsel (at 38-39) suggests the Board could infer animus because Starbucks sent executives to Buffalo, held listening sessions, and discussed unionization with partners. But the First Amendment and

NLRA Section 8(c) protect that conduct: "[a]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union …." *Gissel Packing*, 395 U.S. at 618.[8]

### 2.    *The record does not prove knowledge of union activity*

The General Counsel also failed to prove the relevant decision-makers knew of partners' union activity. The General Counsel incorrectly claims (at 44) that "Starbucks essentially admits" that many decision-makers knew of union activity. That Starbucks identified exemplars (at 47) is not a concession that the General Counsel proved knowledge for all other instances.

The General Counsel (at 45) asserts that "the employees' union support was openly communicated to the highest-ranking officials at Starbucks." But this Court has rejected the argument that employees' "openness in … union involvement … standing alone, constitute[s] substantial evidence that [a supervisor] was aware of the activity." *Poly-Am., Inc. v. NLRB*, 260 F.3d 465,

---

[8] The General Counsel (at 39) invokes the ALJ's finding that management offered a "blatantly false" reason for listening sessions—"that they heard the pleas of Buffalo employees about the problems they were dealing with and were there to help." That finding lacks substantial evidence. Although the ALJ asserted that the "Dear Kevin" letter did not reference "problems," no evidence proved that management was referencing that letter in those comments.

489 (5th Cir. 2001). The General Counsel must prove "the particular supervisor responsible for the firing knew about the discharged employee's union activities." *Id.* (citation omitted). The General Counsel did not prove that each decision-maker knew of the disciplined employees' union activity. It also does not rebut Starbucks' assertion (at 8) that no evidence proves that Pusatier knew that Walden Galleria kiosk employees were considering unionizing when she ordered the kiosk's closure.

The General Counsel addresses only one of Starbucks' exemplars, embracing in a footnote (at 45 n.11) the Board's illogical conclusion that Starbucks violated Section 8(a)(4) by issuing a final written warning to Krempa *before* she testified at a Board hearing. The General Counsel observes that the warning was formally delivered after the hearing, but the record shows that Starbucks frequently drafts warnings before their delivery, and the decision to *issue* the warning predated Krempa's testimony. Starbucks Br. 48.

## C. Starbucks Showed That It Would Have Taken the Same Actions

Starbucks met its burden to show it would have closed the Galleria Kiosk and discharged policy-violating employees absent anti-union animus.

1. <u>Galleria kiosk</u>. The closure of the kiosk, and its timing, reflected standard corporate decision-making. Starbucks did not need to keep open an

24

underperforming location because a union campaign was ongoing, and the kiosk's financials, when reviewed, justified the closure. ROA.2836-37, 2852. The General Counsel argues (at 52-53) that the kiosk's deficiencies "all existed prior to the union campaign," but what matters is what would have happened *once Starbucks managers who made the decision learned about the deficiencies*.

The General Counsel unpersuasively contends (at 53) that Starbucks' cleaning and repairing the location—including installing a new stove—demonstrates anti-union motivation. Starbucks temporarily closed the kiosk to fix the issues and only then learned of the dismal financial performance justifying permanent closure. RE108-09; ROA.2852. The decision to clean and remodel the store occurred when the union campaign was underway. *See* ROA.1285-86. If Starbucks wanted to close the kiosk as punishment for the campaign, management would not have *temporarily* closed the store for cleaning or repairs. Nor would it have offered to transfer affected employees to other stores. *See* Starbucks Br. 49. The General Counsel's contrary narrative is illogical.

2. <u>Nuzzo</u>:  Starbucks' longstanding policies prohibited employees from entering stores alone. ROA.5524. An employer may discipline employees for policy violations, even if an employee is the first violator. *Cent. Freight Lines,*

*Inc. v. NLRB*, 653 F.2d 1023, 1027 (5th Cir. 1981).  Additionally, Nuzzo's lying about the incident warranted termination, and Starbucks introduced evidence of discharging employees for dishonesty.  ROA.8229, 8360.  The General Counsel (at 51) bizarrely contends it is "irrelevant" Nuzzo lied, and provides no support for its assertion that Starbucks would never have investigated such clear policy violations—despite the undisputed evidence of level-setting. ROA.3202, 3374-77, 3385-86.

3. <u>Park</u>:  The General Counsel (at 50) claims that "Park's conduct pales in comparison to the 'lesser food-safety violations.'"  But *Wright Line*'s second step does not require identifying an identical comparator, and the NLRA does not authorize the Board to micro-manage Starbucks' reasonable food-safety decisions.  Additionally, the General Counsel ignores that Park already received a final written warning for profanity, throwing objects, and slamming doors in customers' earshot.  ROA.2614-18, 2810-12, 7882.  Each violation warranted discharge; together Park's record of misconduct was overwhelming.

4. <u>Tarnowski</u>:  The General Counsel does not dispute that Starbucks had a COVID-19 virtual coach requiring employees to report symptoms like diarrhea.  ROA.3134-35, 8093.  Tarnowski had diarrhea, and lied about it.

Dishonesty and violating Starbucks' health-and-safety policy justify termination, and Starbucks discharged employees for the same conduct absent union activity.  ROA.8229, 8360.

5. <u>Krempa</u>:  The General Counsel does not deny that Krempa was discharged for multiple instances of tardiness while on a final written warning for profanity.  The General Counsel (at 52) improperly discards Starbucks' comparators by improperly limiting the comparators to *one store*.  *See supra* p.21.

6. <u>Rojas</u>:  The General Counsel's attempt (at 48-49) to categorize Rojas's tardiness as "minor" and "slight" grossly minimizes his misconduct.  Rojas, the shift supervisor, was at least 26 minutes late, leaving his partners locked outside in freezing weather.  ROA.2142-43, 5747.  Additionally, as with Krempa, the General Counsel (at 48) artificially limits Starbucks' comparators.  The ALJ's finding that Rojas was the first disciplined at his store for time-and-attendance violations since December 30, 2020, also ignored evidence that another partner (Nahja White) was disciplined in January 2022 at that store.  RE93-94.

7. <u>Fleischer, Higgins</u>:  Starbucks' minimum-availability policy was not new.  ROA.5523.  When multiple partners at Fleischer's store, including Fleischer, asked to reduce availability in early 2022, Starbucks had to enforce

its policy. RE46-47; ROA.2049-50, 2734-37. The example the General Counsel cites to show that Starbucks accepted others' accommodation requests cuts *against* the Board, because that request was *also* from a union supporter. ROA.2049. For the same reasons, Higgins "fired [him]self." *NLRB v. Mini-Togs, Inc.* 980 F.2d 1027, 1034 (5th Cir. 1993).

### D. Starbucks Did Not Violate Section 8(a)(5)

Starbucks did not violate Section 8(a)(5) by purportedly changing its longstanding minimum-availability policy or discharging Park and Krempa. As previously established, Starbucks made no changes to existing policies. ROA.3077-78, 3389-92, 5523. The Board cites no evidence that Starbucks' minimum-availability policy differed from existing policy, and Starbucks was permitted to apply its longstanding policy. *800 River Rd. Operating Co.*, 369 NLRB No. 109 (2020). Regarding Park and Krempa, Starbucks had disciplined employees for the same violations absent union activity. *See supra* pp.26-27.

## IV.    Certain Remedies Require Vacatur

### A.    The Damages Remedy Is Unlawful

The General Counsel (at 55-56) "acknowledges" that *Hiran Mgmt., Inc. v. NLRB*, 157 F.4th 719 (5th Cir. 2025), "forecloses" the compensatory-damages remedy.

### B.    The *Gissel* Bargaining Order Was Unwarranted

The General Counsel's post-hoc defense of the Board's cursory justification of the Camp Road bargaining order does not suffice.

*Gissel* bargaining orders are "*extraordinary*" remedies, so this Court requires detailed factual findings and legal reasoning justifying the order. *Denton Cnty. Elec. Coop., Inc. v. NLRB*, 962 F.3d 161, 173 (5th Cir. 2020) (citation omitted); *see* Starbucks Br. 60-65.  In *NLRB v. Gibson Prods. Co.*, 494 F.2d 762 (5th Cir. 1974), for example, this Court rejected a bargaining order because the Board "merely stated that a bargaining order was the 'only available, effective remedy for substantial unfair labor practices' without any indication why less drastic remedies would not serve to achieve a fair election now." *Id.* at 766 (citation omitted).

The Board breezed through the four-factor test—significantly, failing to identify any so-called "hallmark" violations.  RE14.  The General Counsel (at

58-60) tries to do the Board's work, cobbling together alleged violations discussed in *other* parts of the Board's decision. But courts "may not accept appellate counsel's *post hoc* rationalizations for agency action; *Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself." *Dish Network*, 953 F.3d at 379-80; *accord Charlotte Amphitheater Corp. v. NLRB*, 82 F.3d 1074, 1080 (D.C. Cir. 1996) (rejecting bargaining order because "a court may consider only the Board's own reasons, not the rationalizations of counsel"). The Board neglected to identify "serious and extensive" violations to justify its chosen remedy. RE13-14.

Similarly, the General Counsel fails to justify the Board's inappropriate "inferences" based on alleged violations at *other* stores. *See* Starbucks Br. 63-64. To impose a bargaining order, courts must ensure that overriding elections is necessary based on alleged misconduct pertaining to a specific "bargaining unit." *Cal. Gas Transp. v. NLRB*, 507 F.3d 847, 854 (5th Cir. 2007).

*J.P. Stevens & Co. v. NLRB*, 441 F.2d 514 (5th Cir. 1971), does not hold otherwise. There, this Court discussed misconduct outside the at-issue plant solely when explaining why the facts justified treatment under *Gissel* category I (where the union never enjoyed majority support). *Id.* at 521-22; *see Denton*

*Cnty.*, 962 F.3d at 172.  The category I analysis asks whether violations were sufficiently "outrageous and pervasive."  Not so under category II, where the focus narrows to the *effect on the bargaining unit.  See id.*  It was error to aggregate alleged violations outside the bargaining unit (*i.e.*, the Camp Road Store) in this category II case.

Even if aggregation were acceptable in the abstract, the General Counsel fails to justify the Board's supposition that alleged violations at other stores influenced Camp Road employees.  It (at 61) offers only the unremarkable observation that Buffalo partners "were in contact" *generally* and that company actions were "highly publicized" (where? to whom?).  Those weak generalizations cannot overcome a Camp Road partner's testimony that "activities that occurred in the larger Buffalo market" did not "impact" the Camp Road vote.  ROA.3276; *see Denton Cnty.*, 962 F.3d at 172-74 (citation omitted).

As to the ultimate question whether a fair election could occur, the Board merely stated that traditional remedies would be "inadequate," without meaningfully explaining why.  RE14.  Overriding employees' will requires more than this ipse dixit declaration.  *See Gibson Products*, 494 F.2d at 766-67.

### C.    The Impossible Order To Reopen the Galleria Kiosk Is Unlawful

Regarding the Board's remedial command to reopen the Galleria kiosk, the General Counsel (at 61-63) attacks a strawman argument.  Starbucks does not argue it would be "unduly burdensome" to reopen the store.  Rather, it is *impossible* to reopen the store.

The General Counsel's forfeiture argument is a non-starter.[9]  In Exception 217, Starbucks excepted to "[t]he ALJ's issued remedy … to restore the operations at the Galleria kiosk."  ROA.9337.  Litigants exhaust arguments by raising them "in [their] exceptions to the ALJ's decision," even if they "did not repeat" the "point in [their] brief before the Board."  *Pa. State Corr. Officers Ass'n*, 894 F.3d at 376 (citations omitted).

On the merits, contrary to the General Counsel's claim (at 62) of no evidence, the record demonstrates that Starbucks no longer controls the store— which is "owned and operated by the Walden Galleria" mall.  RE67; ROA.2853.

The General Counsel (at 62) incorrectly dismisses Starbucks' authority as "dicta."  In *RAV Truck & Trailer Repairs, Inc. v. NLRB*, 997 F.3d 314 (D.C.

---

[9] Although the General Counsel (at 62) casts its forfeiture argument as "jurisdiction[al]," this Court has rejected this argument under section 160(e).  *See Lion Elastomers*, 108 F.4th at 258; *NLRB v. AllService Plumbing*, 138 F.4th 889, 898 n.3 (5th Cir. 2025).

Cir. 2021), impossibility was one of four reasons the "Board's judgment defie[d] reasoned decision making," necessitating a "remand," *id.* at 330. Likewise here:  the ALJ acknowledged that Starbucks no longer owned the kiosk, RE67, yet unreasonably ordered Starbucks to reopen it "as it existed prior to September 2021," RE128(ff).

### D.   The General Counsel Fails To Justify the Notice-Reading Remedy

The Board erred in requiring notice reading without determining that Starbucks was a "repeat violator" with violations so serious that they created an "atmosphere of fear."  Far from "dicta" (NLRB Br. 64), this standard drove this Court's decision to vacate the notice-reading order in *Denton County*, 962 F.3d at 174-75.  The Board's one-sentence justification lacked any reference to Starbucks as a repeat violator, either expressly or by implication.  RE15.  Instead, it mentioned only the supposed numerosity and seriousness of the violations, which is insufficient under *Denton County*.  The General Counsel's after-the-fact attempt (at 64-65) to plug the holes in the Board's analysis cannot support the order.[10]

---

[10] The General Counsel identifies only two ALJ orders involving several of Starbucks' 10,000-plus stores—neither of which had been judicially enforced when the alleged violations occurred.  The Union's cases post-date the alleged

## CONCLUSION

The Court should deny enforcement.

Respectfully submitted,

/s/ Lisa S. Blatt

| | |
|---|---|
| JEFFREY S. HILLER<br>LITTLER MENDELSON, P.C.<br>    41 S. High St., Ste. 3250<br>    Columbus, OH 43215 | LISA S. BLATT<br>AMY MASON SAHARIA<br>DANIELLE J. SOCHACZEVSKI<br>KEES D. THOMPSON<br>CLAIRE R. CAHILL |

JEFFREY S. HILLER
LITTLER MENDELSON, P.C.
    41 S. High St., Ste. 3250
    Columbus, OH 43215

LISA S. BLATT
AMY MASON SAHARIA
DANIELLE J. SOCHACZEVSKI
KEES D. THOMPSON
CLAIRE R. CAHILL
SEPHORA D. GREY

JONATHAN O. LEVINE
LITTLER MENDELSON, P.C.
    1111 E. Kilbourn Ave., Ste. 1000
    Milwaukee, WI 53202

WILLIAMS & CONNOLLY LLP
    680 Maine Avenue, S.W.
    Washington, DC 20024
    (202) 434-5000
    lblatt@wc.com

DATED: JANUARY 7, 2026

---

violations, and it identifies only one that has been judicially enforced.  These fail to substantiate "repeat violator" status.

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2026, I electronically filed the fore-going document with the United States Court of Appeals for the Fifth Circuit by using the appellate NextGen system.  I certify that all participants in the case are registered NextGen users and that service will be accomplished by the appellate NextGen system.


Dated:  January 7, 2026                    /s/ *Lisa S. Blatt*
                                           LISA S. BLATT

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, that the attached Reply Brief for Petitioner/Cross-Respondent Starbucks Corporation contains 6,494 words and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2019, in 14-point CenturyExpd BT.

Dated:  January 7, 2026                    */s/ Lisa S. Blatt*
                                           LISA S. BLATT