No. 24-60650

# In the United States Court of Appeals for the Fifth Circuit

STARBUCKS CORPORATION,

*Petitioner/Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner.*

*On appeal from a decision of the National Labor Relations Board,*
*Nos. 03-CA-285671, et al.*

## PETITIONER/CROSS-RESPONDENT STARBUCKS CORPORATION RECORD EXCERPTS VOLUME 1 OF 13

JEFFREY S. HILLER
LITTLER MENDELSON, P.C.
  41 S. High St., Ste. 3250
  Columbus, OH 43215

JONATHAN O. LEVINE
LITTLER MENDELSON, P.C.
  1111 E. Kilbourn Ave., Ste. 1000
  Milwaukee, WI 53202

LISA S. BLATT
  *Counsel of Record*
AMY MASON SAHARIA
DANIELLE J. SOCHACZEVSKI
KEES D. THOMPSON
CLAIRE R. CAHILL
SEPHORA D. GREY
WILLIAMS & CONNOLLY LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  lblatt@wc.com

*Counsel for Petitioner/Cross-Respondent*

# TABLE OF CONTENTS

| Tab | Document | ROA |
|-----|----------|-----|
| **Volume 1** | | |
| 1 | Hearing Transcript (July 11, 2022) | 1-141 |
| 2 | Hearing Transcript (July 12, 2022) | 142-246 |
| 3 | Hearing Transcript (July 13, 2022) | 247-404 |
| **Volume 2** | | |
| 4 | Hearing Transcript (July 14, 2022) | 405-517 |
| 5 | Hearing Transcript (July 25, 2022) | 518-657 |
| 6 | Hearing Transcript (July 26, 2022) | 658-813 |
| **Volume 3** | | |
| 7 | Hearing Transcript (July 27, 2022) | 814-939 |
| 8 | Hearing Transcript (July 28, 2022) | 940-1064 |
| **Volume 4** | | |
| 9 | Hearing Transcript (Aug. 1, 2022) | 1065-1271 |
| 10 | Hearing Transcript (Aug. 2, 2022) | 1272-1405 |
| **Volume 5** | | |
| 11 | Hearing Transcript (Aug. 3, 2022) | 1406-1584 |
| 12 | Hearing Transcript (Aug. 4, 2022) | 1585-1776 |
| 13 | Hearing Transcript (Aug. 5, 2022) | 1777-1819 |
| **Volume 6** | | |
| 14 | Hearing Transcript (Aug. 22, 2022) | 1820-1972 |
| 15 | Hearing Transcript (Aug. 23, 2022) | 1973-2213 |
| **Volume 7** | | |
| 16 | Hearing Transcript (Aug. 24, 2022) | 2214-2383 |
| 17 | Hearing Transcript (Aug. 25, 2022) | 2384-2532 |
| **Volume 8** | | |
| 18 | Hearing Transcript (Aug. 29, 2022) | 2533-2694 |
| 19 | Hearing Transcript (Aug. 30, 2022) | 2695-2795 |
| 20 | Hearing Transcript (Aug. 31, 2022) | 2796-2878 |
| **Volume 9** | | |
| 21 | Hearing Transcript (Sept. 1, 2022) | 2879-2970 |
| 22 | Hearing Transcript (Sept. 12, 2022) | 2971-3110 |
| 23 | Hearing Transcript (Sept. 13, 2022) | 3111-3317 |
| **Volume 10** | | |
| 24 | Hearing Transcript (Sept. 14, 2022) | 3318-3486 |

| Tab | Document | ROA |
|---|---|---|
| **Volume 10 (continued)** | | |
| 25 | GC-3 | 3877-3880 |
| 26 | GC-4 | 3881-3883 |
| 27 | GC-5 | 3884-3886 |
| 28 | GC-6 | 3887-3889 |
| 29 | GC-7 | 3890-3892 |
| 30 | GC-8 | 3893-3899 |
| 31 | GC-9 | 3900-3902 |
| 32 | GC-10 | 3903-3904 |
| 33 | GC-11 | 3905-3907 |
| 34 | GC-12 | 3908-3910 |
| 35 | GC-13 | 3911-3912 |
| 36 | GC-14 | 3913-3915 |
| 37 | GC-15 | 3916-3918 |
| 38 | GC-16 | 3919-3921 |
| 39 | GC-17 | 3922-3924 |
| 40 | GC-18 | 3925-3927 |
| 41 | GC-19 | 3928-3930 |
| 42 | GC-20 | 3931-3933 |
| 43 | GC-21 | 3934-3936 |
| 44 | GC-22 | 3937-3939 |
| 45 | GC-23 | 3940-3941 |
| 46 | GC-24 | 3942-3943 |
| 47 | GC-25 | 3944-3947 |
| 48 | GC-26a | 3948-3949 |
| 49 | GC-26b | 3950 |
| 50 | GC-27a | 3951-3952 |
| 51 | GC-27b | 3953 |
| 52 | GC-28a | 3954-3955 |
| 53 | GC-28b | 3956 |
| 54 | GC-29a | 3957-3958 |
| 55 | GC-29b | 3959 |
| 56 | GC-30-31 | 3960 |
| 57 | GC-32 | 3961-3963 |
| 58 | GC-33 | 3964-3967 |
| 59 | GC-34a | 3968-3969 |

| Tab | Document | ROA |
|---|---|---|
| | **Volume 10 (continued)** | |
| 60 | GC-34b | 3970 |
| 61 | GC-35a | 3971-3972 |
| 62 | GC-35b | 3973-4037 |
| 63 | GC-39 | 4125-4126 |
| | **Volume 11** | |
| 64 | GC-52b | 4214-4305 |
| 65 | GC-56a | 4313-4405 |
| 66 | GC-59 | 4410-4419 |
| 67 | GC-61 | 4422-4423 |
| 68 | GC-67 | 4457-4458 |
| 69 | GC-75b | 4476-4572 |
| 70 | GC-76a | 4573 |
| 71 | GC-76b | 4575-4691 |
| | **Volume 12** | |
| 72 | GC-99b | 4896-4983 |
| 73 | GC-115b | 5175-5250 |
| 74 | GC-117 | 5253-5254 |
| 75 | GC-118 | 5255-5257 |
| 76 | GC-121 | 5262-5263 |
| 77 | GC-126 | 5275-5277 |
| 78 | GC-127 | 5278-5279 |
| 79 | GC-133b | 5297-5352 |
| 80 | GC-140 | 5506-5586 |
| 81 | GC-148b | 5686-5691 |
| 82 | GC-151 | 5722-5723 |
| 83 | GC-152 | 5724-5726 |
| 84 | GC-154 | 5747-5748 |
| 85 | GC-161 | 5763-5764 |
| 86 | GC-162b | 5767-5827 |
| | **Volume 13** | |
| 87 | R-93 | 7882-7884 |
| 88 | R-112 | 7929-7932 |
| 89 | R-113 | 7933-7935 |
| 90 | R-138 | 8063-8066 |
| 91 | R-144 | 8093-8095 |

| Tab | Document | ROA |
|-----|----------|-----|
| **Volume 13 (continued)** | | |
| 92 | R-150 | 8097-8101 |
| 93 | R-181 | 8162-8167 |
| 94 | R-191 | 8197-8199 |
| 95 | R-204 | 8226-8228 |
| 96 | R-205 | 8229-8231 |
| 97 | R-206 | 8232-8234 |
| 98 | R-227a | 8297-8298 |
| 99 | R-227b | 8299-8300 |
| 100 | R-235 | 8318-8319 |
| 101 | R-236 | 8320-8321 |
| 102 | R-238 | 8324-8326 |
| 103 | R-251 | 8358-8359 |
| 104 | R-252 | 8360-8367 |
| 105 | R-253 | 8368-8371 |
| 106 | R-254 | 8372-8373 |
| 107 | R-259 | 8386-8387 |
| 108 | R-261 | 8390-8391 |
| 109 | R-263 | 8393-8394 |
| 110 | R-275 | 8413-8414 |
| 111 | R-276 | 8415-8416 |
| 112 | R-277 | 8417-8418 |
| 113 | R-278 | 8419-8420 |
| 114 | R-288 | 8439-8441 |
| 115 | R-293 | 8446-8447 |
| 116 | R-323 | 8596-8598 |
| 117 | Starbucks Corporation's Exceptions to Decision of Administrative Law Judge (Apr. 28, 2023) | 9306-9339 |

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 3

In the Matter of:

| | |
|---|---|
| Starbucks Corporation, | Case Nos.  03-CA-285671, |
| | 03-CA-290555, 03-CA-291157 |
| Employer, | 03-CA-291196, 03-CA-291197 |
| | 03-CA-291199, 03-CA-291202 |
| and | 03-CA-291377,  3-CA-291378 |
| | 03-CA-291379, 03-CA-291381 |
| Workers United, | 03-CA-291386, 03-CA-291395 |
| | 03-CA-291399, 03-CA-291408 |
| Charging Party. | 03-CA-291412, 03-CA-291416 |
| | 03-CA-291418, 03-CA-291423 |
| | 03-CA-291431, 03-CA-291434 |
| | 03-CA-291725, 03-CA-292284 |
| | 03-CA-293362, 03-CA-293469 |
| | 03-CA-293489, 03-CA-293528 |
| | 03-CA-294336, 03-CA-293546 |
| | 03-CA-294341, 03-CA-294303 |
| | 03-CA-206200 |

_____

_____

Place: Buffalo, New York

Dates: July 11, 2022

Pages: 1 through 141

Volume: 1

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 3**

| | |
|---|---|
| In the Matter of:<br><br>STARBUCKS CORPORATION,<br><br>                 Employer,<br><br>and<br><br>WORKERS UNITED,<br><br>           CHARGING PARTY. | Case Nos.  03-CA-285671,<br>03-CA-290555, 03-CA-291157<br>03-CA-291196, 03-CA-291197<br>03-CA-291199, 03-CA-291202<br>03-CA-291377,  3-CA-291378<br>03-CA-291379, 03-CA-291381<br>03-CA-291386, 03-CA-291395<br>03-CA-291399, 03-CA-291408<br>03-CA-291412, 03-CA-291416<br>03-CA-291418, 03-CA-291423<br>03-CA-291431, 03-CA-291434<br>03-CA-291725, 03-CA-292284<br>03-CA-293362, 03-CA-293469<br>03-CA-293489, 03-CA-293528<br>03-CA-294336, 03-CA-293546<br>03-CA-294341, 03-CA-294303<br>03-CA-206200 |

The above-entitled matter came on for hearing, pursuant to

notice, before **MICHAEL A. ROSAS**, Administrative Law Judge, at

the National Labor Relations Board, Region 3, Robert H. Jackson

United States Courthouse, Wyoming (5E) Courtroom, 2 Niagara

Square, Buffalo, New York 14202, on **Monday, July 11, 2022,** at

**1:06 p.m.**

www.escribers.net | 800-257-0885

1                           <u>A P P E A R A N C E S</u>

2      **On behalf of the Employer:**

3          **JACQUELINE PHIPPS POLITO, ESQ.**
           **ETHAN BALSAM, ESQ.**
4          **WILLIAM WHALEN, ESQ.**
           LITTLER MENDELSON P.C.
5          375 Woodcliff Drive
           Suite 2D
6          Fairport, NY 14450
           Tel. (585)203-3413
7
       **On behalf of the Union:**
8
           **IAN HAYES, ESQ.**
9          HAYES DOLCE
           471 Voorhees Avenue
10         Buffalo, NY 14216
           Tel. (716)608-3427
11
       **On behalf of the General Counsel:**
12
           **JESSICA CACACCIO, ESQ.**
13         **ALICIA PENDER STANLEY, ESQ.**
           NATIONAL LABOR RELATIONS BOARD REGION 3
14         130 S. Elmwood Avenue
           Suite 630
15         Buffalo, New York 14202-2465
           Tel. (716)551-4931
16         Fax. (716)551-4972

17

18

19

20

21

22

23

24

25



1                              <u>I N D E X</u>

2

3    <u>WITNESS</u>           <u>DIRECT</u>   <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>   <u>VOIR DIRE</u>

4    Michelle Eisen      51,73                                    55,61
                         75,78                                    71,74
5                        80,96                                    75,79
                                                                  87,95
6                                                                 133

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



www.escribers.net  |  800-257-0885

1          <u>E X H I B I T S</u>

2

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---|---|---|
| **General Counsel:** | | |
| GC-1(a) through GC-1(cccc) | 6 | 7 |
| GC-2 | 54 | 60 |
| GC-3 | 60 | 63 |
| GC-4 | 67 | 67 |
| GC-5 | 68 | 68 |
| GC-6 | 68 | 68 |
| GC-7 | 69 | 69 |
| GC-8 | 70 | 70 |
| GC-9 | 73 | 73 |
| GC-10 | 74 | 75 |
| GC-11 | 75 | 78 |
| GC-12 | 81 | Rejected |
| GC-13 | 81 | 84 |
| GC-14 through 24 | 25 | 93 |
| | | |
| **Respondent:** | | |
| R-1 through 24 | 15 | Not Admitted |
| R-25 through 27 | 16 | Not Admitted |
| R-28 | 17 | 17 |



1                    P R O C E E D I N G S

2          JUDGE ROSAS:  All right.  This is a proceeding before the

3    National Labor Relations Board Division of Judges.  I am

4    Administrative Law Judge Michael A. Rosas.  This is the matter

5    of Starbucks Corporation and Workers United, and there are, if

6    I remember correctly, 30 cases in total, but they're led by the

7    index case 03-CA-285671, and there is a representation case

8    with the same parties with the case number 03-RC-282127.

9          All right, at this time, counsel state your appearances,

10   General Counsel.

11         MS. CACACCIO:  My name is Jessica Cacaccio, the last name

12   spelled C-A-C-A-C-C-I-O, one of the counsel to the General

13   Counsel.

14         MS. STANLEY:  Alicia Stanley for the General Counsel.

15         JUDGE ROSAS:  Okay.  Charging Party, and name of firm?

16         MR. HAYES:  Ian Hayes, Hayes Dolce, Buffalo, New York for

17   Workers United, the Charging Party.

18         JUDGE ROSAS:  Respondent?

19         MS. POLITO:  Good afternoon, Your Honor.  Jacqueline

20   Phipps Polito on behalf of Respondent Starbucks with the law

21   firm of Little Mendelson, and as I mentioned in one of our

22   proceedings, I do have a hearing loss in one ear, so if I would

23   be kind enough to ask everyone to talk into the microphone that

24   would help me from asking everyone to talk into the microphone,

25   so thank you for that --



1      JUDGE ROSAS:  How --

2      MS. POLITO:  Okay.

3      JUDGE ROSAS:  -- are we doing so far?

4      MS. POLITO:  I -- I have a little trouble hearing some of

5  the dialogue.

6      JUDGE ROSAS:  Okay.  Just, you know, raise it, you know,

7  when it happens, okay?

8      MS. POLITO:  Thank you, Judge.

9      MR. BALSAM:  Good afternoon, Your Honor.  Ethan Balsam on

10  behalf of Starbucks Corporation with the law firm of Littler

11  Mendelson.

12      MR. WHALEN:  Good afternoon, Your Honor.  William Whelan

13  on behalf of Starbucks Corporation with the law firm of Littler

14  Mendelson.

15      JUDGE ROSAS:  Location?

16      MR. WHALEN:  Washing --

17      MS. POLITO:  Rochest --

18      MR. WHALEN:  -- sorry.

19      MS. POLITO:  -- sorry.  Ro -- Rochester, New York.

20      MR. WHALEN:  Washington, D.C.

21      MR. BALSAM:  Chicago, Illinois.

22      JUDGE ROSAS:  Okay.  All right.  Counsel for the General

23  Counsel, before we proceed, you distributed the formal papers.

24  Can you identify them for the record?

25      MS. CACACCIO:  Yes, Your Honor.  I'm seeking admission of



1   the formal papers which were previously emailed out by the

2   General Counsel as a PDF but are now also available today in

3   paper copies pre-marked as GC Exhibits 1(a) through 1(cccc),

4   that's four c's, with 1(cccc) being the index and description

5   of this formal document.  Today's version is different from the

6   PDF in that it also includes Respondent's answer to the third

7   amended complaint.

8        JUDGE ROSAS:  Charging Party, you've had an opportunity to

9   review all the formal papers?

10       MR. HAYES:  Yes, sir.

11       JUDGE ROSAS:  All right, and they -- they appear to be

12   what they are represented by the General Counsel to be?

13       MR. HAYES:  Yes, sir.

14       JUDGE ROSAS:  Respondent?

15       MS. POLITO:  We have reviewed those, Your Honor.

16       JUDGE ROSAS:  Okay.  General Counsel's Exhibit 1(a)

17   through 1(cccc) is received in evidence.

18   **(General Counsel Exhibit Numbers 1(a) through 1(cccc) Received**

19   **into Evidence)**

20       JUDGE ROSAS:  Okay.  At this time, I'm going to issue a

21   sequestration order as we've discussed in this matter.  All

22   right, at this point, potential witnesses, except for

23   designated party representatives, will be excluded from the

24   hearing until such time as they are called to testify.  Party

25   representatives may be present at all times except when



1    witnesses on their side are giving testimony regarding events

2    that the designated individuals are expected to testify about.

3        The order prohibits all witnesses and counsel from

4    discussing with other witnesses or potential witnesses the

5    testimony that they have already given or will give.  Counsel

6    may, however, for purposes of preparing witnesses for rebuttal,

7    at that point inform witnesses about the testimony of opposing

8    party witnesses.  Counsel are expected to police the rule and

9    bring any issues related to it to my attention.

10        Anybody have any questions at this point?

11        MR. HAYES:  Your Honor, I -- I have a question about that.

12    So we're going to have dozens of witnesses who are, you know,

13    active Union supporters, Union activists, who are appearing as

14    the General Counsel's witnesses, and you know, the -- the Union

15    represents many of them as members and were in close contact

16    with the rest of them just as supporters.  I -- I'm sure you've

17    seen, Your Honor, the -- the -- the scope of this complaint is

18    huge, both over time and in terms of the categories of conduct

19    that it deals with, and those subjects are often the subject of

20    conversation and whatever discussion and organizing among Union

21    members and Union supporters, and that's, to be frank, a big

22    part of the lives of many of the workers, and it has been for

23    the last ten months, so what I -- maybe this is being overly

24    cautious to even ask this question, but I'd like some -- some

25    guidance since I'll be the one policing it for many of those



1    witnesses about, I guess, the specific parameters.

2        I -- I think it's obvious that a -- a witness or potential

3    witness can't say I testified about this and I will be

4    testifying about that.  That's -- nobody's going to have a

5    disagreement about that, but what I am wondering is whether the

6    sequestration order extends to the entire subject matter of

7    each respective witness' testimony because if it does, I think

8    the Union has to oppose the -- the order because that is not

9    manageable.  That would radically limit many Union's members

10   and activists in their ability to participate in -- in daily

11   life until the end of this hearing, which would be several

12   months from now.

13       JUDGE ROSAS:  All right.

14       MR. HAYES:  So --

15       JUDGE ROSAS:  Well, Counsel, you know, that -- that --

16   that is an ethical point that you correctly raise,

17   appropriately so.  It's realistic.  It's -- it's a -- a problem

18   that you have that you'll have to really work hard at policing,

19   but the sequestration order will -- will stand, and

20   witnesses -- potential witnesses need to understand what we're

21   talking about here.  I mean, that's -- that's your job to let

22   them know that, when they get called, they're probably going to

23   be asked who, if anyone, they've spoken to about this case, and

24   if it's a matter of talking about, you know, on a given day

25   people that are working alongside each other, you know,



1    something like, you know, how was your day, well, you know, I

2    was somewhere or I went shopping, and you know, I was called to

3    testify as a witness the other day, or something like that.

4        You know, we'll have to assess any -- any issues, any

5    potential problems that may come up, which I'm sure they'll

6    come up either on direct examination, if they're asked, or I'm

7    sure on cross-examination.  I mean, it's -- it's everybody's

8    job to do the best they possibly can to ensure that the

9    testimony that I'm getting has integrity to it, okay, is --

10   is -- is -- is testimony that I would need to -- in those kinds

11   of instances where it comes up as an issue, it's an issue

12   because it's something that I may have to make a judgment about

13   the credibility of the witness because of something that's

14   disputed, whether it was the time of the day when something

15   occurred or whether somebody said something, whatever it is.  I

16   mean, these are the tools that we have to try to make these

17   decisions when the time comes.  I mean, it's -- sometimes it's

18   not an easy one to make, and this is a very important rule, so

19   you know, I -- I know you've -- you've got a challenge ahead.

20   The -- the landscape that you're describing is one that you're

21   going to have to work hard at making sure that your clients all

22   understand what their responsibilities are, okay?

23       MR. HAYES:  So Your Honor, just so I understand, I --

24       JUDGE ROSAS:  Testimony.  Testimony.  Don't talk about

25   your testimony.  And when a jury comes home at night in a jury

1    trial, you know, they're told by the judge not to discuss the

2    case, but you know, do they in some instances possibly tell the

3    witnesses -- tell their family what they had for lunch when

4    they were there or how the temperature in the courtroom was,

5    whether they're hungry, whether they had a hard day.  I mean,

6    you know, it -- it -- it all depends, okay, on -- on just

7    everyday conversational talk.  People work with each other, and

8    I understand that, but again, they're going to have to

9    understand the responsibility that they have.

10        MR. HAYES:  So Your Honor, I -- I appreciate what you just

11    said.  I'm -- I'm trying to draw the distinction between

12    talking about testimony and talking about the subject matter of

13    the entire case because the subject matter of the entire case

14    is in a major way the lives of most of these witnesses for the

15    better part of the last year, including the terminations and

16    the disruptions at stores, et cetera.

17        If they're not able to talk about those things -- not --

18    not talking about this is what I testified about, this is what

19    I did testify about.  Leaving aside, you know, explicit

20    mentions of the -- this hearing, if they're not able to talk

21    about that subject matter, of course, I'll do my best, but I

22    don't know how to police that.  That's imposing a limitation

23    on -- you know, just sort of a common-sense limitation on the

24    way these workers have been living, but it's also a limitation

25    on their ev -- you know, day-to-day exercise of their rights

1    under the Act, so --

2        JUDGE ROSAS:  So it's -- it's really pretty simple as a

3    rule, which is you can't discuss your testimony with anyone.

4    You can't tell them what we've said.  You can't tell someone

5    else -- you can't talk to someone else who's testified about

6    their testimony.  It -- it's pretty simple.  I mean, if -- if

7    they're talking about, you know, their employer, their employer

8    is a matter of fact.  I -- I -- I can't advise you further,

9    but --

10       MR. HAYES:  I understand, Your Honor.

11       JUDGE ROSAS:  -- we have to apply the rules.  We have to

12   apply the rules as best we can.

13       MR. HAYES:  That -- that's helpful.  I understand, Your

14   Honor.  Thank you.

15       JUDGE ROSAS:  Anybody else want to add anything?

16       MS. POLITO:  No, Your Honor.  Thank you.

17       UNIDENTIFIED SPEAKER:  No, Your Honor.

18       JUDGE ROSAS:  Okay.  How -- how is that coming across?

19   Everything good?

20       MS. POLITO:  Yes, thank you --

21       JUDGE ROSAS:  Okay.

22       MS. POLITO:  -- Judge.

23       JUDGE ROSAS:  All right.  All right.  So we've gotten the

24   sequestration order.  I believe we have the full papers in

25   place.



1          Respondent, you have submissions that you want to raise at

2     this time?

3          MS. POLITO:  Yes, Your Honor.  Do you mind if I stand at

4     the podium?

5          JUDGE ROSAS:  Please.

6          MS. POLITO:  Good afternoon, Your Honor.  At this point,

7     the Respondent would like to enter into the record the petition

8     to revoke.  There's a -- we're moving into those documents, and

9     we have a -- a copy for the clerk, but we'd like to submit into

10    the record the Board's subpoena, B-1, 1(g), 5(w), 8(jf) which

11    was served on June 6, 2022, the petition to revoke which was

12    served on June 13th, the opposition to the petition to revoke

13    which was served on June 30th, the reply which was served on

14    July 6th, a further reply which was served on July 7th, and the

15    order that was issued by Your Honor on July 8th.

16         We'd also like to submit the Union's subpoena, which is

17    B-1-1(gaweo9), which was served on June 21st, 2022, the

18    petition to revoke which was served on July 1st, the opposition

19    which was served on July 7th, and the order of this judge which

20    was served on July 9th.

21         Finally, with respect to the subpoenas, Judge, we'd like

22    to offer into the record Board subpoena B(1)-1(gdenil), served

23    on June 28, 2022, the petition to revoke served on July 6th,

24    2022, the opposition served on July 8th, and the order dated

25    July 9th.

1       And Judge, I've got a copy for the court reporter or for

2  Your Honor.  I did not make a copies for opposing parties

3  because they're so voluminous, but I've got the two extra if

4  anyone likes a copy.

5       JUDGE ROSAS:  You -- you're referring to the -- to the

6  three orders for which -- that related to petitions to revoke?

7       MS. POLITO:  Correct, Judge.

8       JUDGE ROSAS:  Against the Respondent?

9       MS. POLITO:  Correct, Judge.

10      JUDGE ROSAS:  Wasn't the -- wasn't the last one on July 10

11  issued the order?

12      MS. POLITO:  So on July 10th, I have a reference to that

13  in my notes, we had filed a motion, I think, for

14  reconsideration.

15      MS. CACACCIO:  Your Honor, I --

16      MS. POLITO:  No, no, Judge.  I think this -- because I

17  think the July 10th order related to the 10J and not the

18  subpoenas, if I'm correct.

19      MS. CACACCIO:  No.

20      JUDGE ROSAS:  Let's go -- let's go off the record.

21  (Off the record at 1:21 p.m.)

22      JUDGE ROSAS:  All right, so Counsel, again, this could be

23  subject to correction, but it is my recollection that the third

24  order on petitions to revoke was issued yesterday, July 10th --

25      MS. POLITO:  That is --



1          JUDGE ROSAS:  -- 2022.

2          MS. POLITO:  -- that is correct, Judge.  And that was

3    relating to a subpoena duces tecum B-1-1(gawe09).  That's

4    correct, Your Honor.  Thank you.  We'd like those to be in the

5    record.

6          JUDGE ROSAS:  What have you designated them as?

7          MS. POLITO:  I -- I -- I haven't just designated them,

8    Judge, and I don't know if we -- if you -- we -- if we do -- do

9    different numbers, or letters but --

10         JUDGE ROSAS:  Everything will be R-1 and so on for the

11   Respondent.  Charging Party will be CP-1.  To the extent that

12   they have anything that's distinguishable for the

13   representation case, in those limited instances, you can do

14   R -- what is it -- U-1, and the Respondent can do ER-1.  I

15   mean, that's how the parties oftentimes like to do it, but it's

16   not going to confuse anybody greatly if you just keep it with

17   the R, CP, and GC designations.

18         MS. POLITO:  So like, my question for Your Honor, the

19   volume of those documents that I referred to are 24, so then I

20   would move Respondent's 1 through 24 into the record, 24 being

21   Starbucks' motion for reconsideration.

22         MS. CACACCIO:  Your Honor, before we can submit comment,

23   we've got to be able to see it, and there's no copy for us to

24   be able to --

25         JUDGE ROSAS:  Or -- okay, so that'll be reviewed by the



1   General Counsel and the Charging Party, and they'll provide me

2   with their positions on that offer, essentially authenticate

3   what you're referring to.

4        MS. POLITO:  And in addition, Judge, Respondent would note

5   that we filed a motion for a bill of particulars on June 10th,

6   which was opposed on June 14th and was denied by Your Honor on

7   June 20th, and we ask that those documents be placed into the

8   record as R-24 through -- 25 through 27, and I understand from

9   the General Counsel's objection that she'd like to see a copy

10  of those records as well.

11       JUDGE ROSAS:  That's -- the order and the motion and the

12  opposition, 20 and -- and what else?

13       MS. POLITO:  The motion for a bill of particulars, the

14  opposition filed by the Board, and the order filed by Your

15  Honor.

16       JUDGE ROSAS:  So it's 24 through 27?  No, 25 --

17       MS. POLITO:  25 -- 25 --

18       JUDGE ROSAS:  -- 25.

19       MS. POLITO:  -- to 27, Your Honor.

20       JUDGE ROSAS:  Got it.  Okay.  All right.

21       MS. POLITO:  We'd also like to note for the record, Your

22  Honor, that you issued an order on July 10th which states that

23  the Board may not solicit or introduce any 10(j) evidence into

24  the record until such time as the Board reviews the appeal.

25  That order was issued by email, and we'd like that entered into



1    the record as Respondent 28.

2        JUDGE ROSAS:  What was the day on that, again?

3        MS. POLITO:  July 10th.

4        JUDGE ROSAS:  My order on the 10(j)?

5        MS. POLITO:  Correct.

6        JUDGE ROSAS:  Let's go off the record.

7    (Off the record at 1:26 p.m.)

8        JUDGE ROSAS:  All right, Counsel, so you've clarified this

9    is an email from me to the parties yesterday, July 10, 2022,

10   relating to just improper evidence in connection with the 10(j)

11   proceeding being offered in this case.  Okay.  That will be

12   Respondent's 28 --

13       MS. POLITO:  Correct, Judge.

14       JUDGE ROSAS:  -- for ID.  Okay?

15   **(Respondent Exhibit Number 28 Received into Evidence)**

16       MS. POLITO:  Next, Judge, I'd like to request that the

17   court sever 03-RC-28217 from this proceeding.  As this ALJ is

18   aware, the case -- the third amended complaint asserts 32

19   independent charges against Respondent.  Each charge has a

20   number of allegations which has resulted in a request for

21   thousands of documents as addressed in various petitions to

22   revoke that we just discussed earlier.  We ask that Your Honor

23   exercise his discretion and grant Respondent's application

24   involving a highly complex third amended complaint which

25   intertwines the representation case improperly.  It would be



1     more efficient for this Court and to all parties involved in a

2     representation case proceeded separately and independently from

3     the remaining 32 charges.  To move forward, we will build a

4     confusing record, moreover severing the representation case

5     could result in a faster final resolution of the representation

6     case since the underlying charges, again involving 32 succinct

7     charges each with a number of subparts and expected to go

8     through the end of October before this hearing is even

9     concluded.  So for that reason, Judge, we'd ask that this Court

10    sever 03-RC-282127 from the third amended complaint.

11         MS. CACACCIO:  Your Honor, may I be heard?  That -- the RC

12    case number was included in the second amended complaint.  It's

13    not unique to the third amended complaint, so to the extent

14    this is something that should've been raised, it should've at a

15    minimum been raised for your motions in limine request by

16    (indiscernible).  This is the first that General Counsel is

17    hearing of it and of course we oppose the -- the issues are

18    overlapping, they're timed in relation to every other

19    allegation in the charge, and given -- given the -- the

20    extensive nature of the state that it is, another 30

21    allegations aren't going to change the timeline.

22         JUDGE ROSAS:  Another how many?

23         MS. CACACCIO:  She has it to 30.  I don't think it's that

24    many, but that's what Respondent has just reported to the

25    Court.



1        JUDGE ROSAS:  Charging Party, you want to address --

2        MR. HAYES:  Your Honor, the -- the Charging Party opposes

3    the request for the same reasons.  It's all part of the same

4    in -- inextricably intertwined series of facts, and the

5    objections in this case and -- and the RC case were filed last

6    December.  If they were going to be resolved, they should've

7    been resolved much earlier.  We believe the Region properly

8    included them in the second consolidated complaint.

9        JUDGE ROSAS:  All right.  We had discussions early on, if

10   I recall, regarding the order of the RC case and proof in the

11   RC case to the extent that there would be anything separate and

12   unique to just the RC proceeding; is that correct?

13       MS. CACACCIO:  Yes, Your Honor.

14       JUDGE ROSAS:  So my practice has been in previous cases of

15   this sort where you have CA and RC cases combined that where

16   there is evidence that is common to both proceedings,

17   obviously, when witnesses are called, counsel, to the extent

18   that -- well, if it's -- if it's evidence that serves the CA,

19   there's no explanation, but when you have a witness on the

20   stand who has, separate and distinct from the CA case,

21   testimony to offer relating to the RC case, it is -- it is

22   something that I typically consider, and failing any convincing

23   argument from the Respondent, generally, the concept of

24   judicial economy, especially in an instance where it's been

25   referred to me by the Regional Director for a combined



1    adjudication, you know, again, it -- it -- you know, it --

2    it -- I'll hear -- I'll hear oral arguments, but -- but

3    generally, you know, this favors judicial economy to proceed

4    jointly on -- on -- on all ends.

5        MS. POLITO:  Judge, if I may --

6        JUDGE ROSAS:  Go ahead.

7        MS. POLITO:  -- respond?  Sticking on the notion of

8    judicial economy, the allegations at Camp Road are discrete

9    allegations alleging unfair labor practice violations.  Those

10   issues can be tried separate and apart from the remaining 32

11   charges that are set forth in the complaint, and the charges

12   are not intertwined.  Allegations at Camp Road versus distinct

13   allegations the testimony of what happened there that reflect

14   that both partners not what happened in other stores, and so

15   it -- for judicial economy purposes, you probably could do

16   those our representation case within a matter of weeks and

17   bring that to a close rather than combining it with these 32

18   other charges across the market, which is going to last through

19   October and potentially into next year, so for judicial economy

20   and for making the record clear focused on the distinct claims

21   relating to the Camp Road store, it would organize the case in

22   a much more comfortable manner if we sever that representation

23   case from the remaining 32 charges.

24       MS. CACACCIO:  Your Honor, may I be heard?

25       JUDGE ROSAS:  General Counsel, are there unfair labor

1    practices that are alleged relating to this facility that

2    Counsel referred to?

3        MS. CACACCIO:  Yes, Your Honor, and there are allegations

4    in this complaint that span all the Buffalo stores, including

5    that at -- that at Camp Road, so you can't sever that case from

6    the others.  You just can't.  The evidence is a related

7    enterprise.  It's all related, Judge.  You --

8        JUDGE ROSAS:  Okay.

9        MS. CACACCIO:  -- can't pull out one store -- you can't

10   even pull out just the RC because that's not the only Camp Road

11   allegation, so it's not possible.

12       MR. HAYES:  That's the Charging Party's position, Your

13   Honor.

14       JUDGE ROSAS:  Do you want a last stab at this?

15       MS. POLITO:  No, Judge, I'd like to just note our pattern

16   for the record and our request, and if Your Honor is declining

17   that motion, it just ask that we -- we will consider whether or

18   not we need to file an immediate appeal of that decision.

19       JUDGE ROSAS:  That motion is denied.

20       MS. POLITO:  Okay.  Thank you, Judge.

21       JUDGE ROSAS:  I -- before -- on the grounds of what I

22   believe is judicial economy, and the fact that the General

23   Counsel and Charging Party represent that there will be

24   testimony by witnesses regarding unfair labor practices; is

25   that correct --



1    MS. CACACCIO:  Yes, Your Honor.

2    JUDGE ROSAS:  -- in the CA case or cases that --

3    MS. CACACCIO:  It's case numbers, at a minimum, 03-CA-

4    291157, which was specific to Camp Road allegations, as well as

5    the 03-CA-285671, which is the Buffalo-wide allegation.

6    JUDGE ROSAS:  And are these witnesses that will be

7    testifying to both evidence that you believe would support the

8    unfair labor practice allegations and support the objections?

9    And I'm referring to individuals --

10    MS. CACACCIO:  Yes, Your Honor.

11    JUDGE ROSAS:  -- as opposed to some individuals being

12    called in to testify regarding unfair labor practices allegedly

13    occurring at that facility and other witnesses being called in

14    to testify just to objections?

15    MS. CACACCIO:  Yes, Your Honor.  They're -- they're

16    intertwined; they're the same -- they're one and the same.

17    JUDGE ROSAS:  All right.  The objection is overruled for

18    those purposes.

19    MS. POLITO:  Judge, Respondent respectfully states that we

20    intend on appealing that decision to the Board.  We're seeking

21    written special permission to appeal, and finally, Judge, in

22    light of all the foregoing, the outstanding discovery requests,

23    the petitions to revoke, Respondent moves for a continuance

24    before the commencement of this hearing and asks that the Court

25    exercise discretion and grant the continuance until such time



1    as a decision is rendered on the motion to reconsider or at

2    such time that the Board -- our understanding from this

3    morning's filing that every day that the judge knows and I

4    apologize I got some of the dates confused because every day

5    there's a new filing -- or multiple filings and orders, and

6    this morning there was another filing made.  And it seems

7    inappropriate to serve a case with this magnitude when there

8    are outstanding requests to the Board with respect to the

9    evidence and proof to be heard at this hearing as well as

10   outstanding requests with respect to the evidence.  Part of our

11   request was attorney appointment under special management and

12   that's still outstanding, and we think that a hearing would run

13   much smoother if all the issues that I just addressed were

14   resolved prior to commencement of the hearing.

15       JUDGE ROSAS:  Okay.

16       MS. CACACCIO:  It probably goes without saying that we

17   oppose that, Your Honor.  This is just -- it's another attempt

18   at delay.  Those motions that Respondent mentioned were -- have

19   been done.  They had five weeks at a minimum to consider the

20   majority of our subpoena requests.  We, to date, have received

21   nothing from Respondent in that regard.  Even as the hearing

22   opens, we've gotten nothing so far.  It's inappropriate to

23   delay this proceeding, and we oppose it.

24       MR. HAYES:  The Charging Party opposes for the same

25   reasons.  We've waited ten months to be here.  We should start



1    today.

2        JUDGE ROSAS:  Well, Counsel, again, the -- that motion

3    is -- is denied.  It is not unusual in many of these

4    proceedings for subpoenaed material issues related thereto to

5    carry over into the commencement of the hearing.  As I

6    indicated to counsel in our pre-hearing conference, you -- you

7    all have your rights.  I expect you to tenaciously and

8    courteously advocate for your clients throughout this

9    proceeding, but at the same time, we will proceed in a way that

10    seeks to both comply with the intention of the National Labor

11    Relations Act, which is to essentially proceed with

12    expeditious -- as expeditious a proceeding as possible, and at

13    the same time, afford you all of your rights.  There is, as we

14    know, no discovery in these proceedings, but -- but that is

15    sort of a -- almost a misnomer because the parties are entitled

16    to production of materials from each other under the rules, and

17    rule 26 of the Federal Rules of Civil Procedure governs, as --

18    as -- as much as possible, but not always, but as practically

19    as possible these proceedings.

20        So we're going to do the best we can, and what my

21    experience has told me over -- over the years is that, as cases

22    start to move, a lot of these -- a lot of these issues tend to

23    get worked out or they become a lot more clear in my mind, as

24    the one who has to understand what the story is and make a

25    final decision as to what that story was and where it's going



1    to end up.  So we're going to proceed.  That motion is denied.

2        MS. POLITO:  Judge, if I just may add that Respondent has

3    no intent to delay.  In fact, our lead trial attorney is

4    suffering from COVID, and we did not request an extension of

5    this hearing today.  The reason that we requested the

6    continuation is specifically because of all the issues that I

7    fronted to Your Honor relating to the subpoenas, the motions,

8    the applications pending with the Board and the limitations on

9    evidence, as well as our request to sever the representation

10   case, so I believe that Respondent has a fair and equitable

11   request for a continuance in light of those things, and I want

12   the record to be clear there was no intent to delay.  We just

13   heard the answer for the third amended complaint today, and we

14   are -- we are here and we do not seek to delay this

15   proceeding --

16       JUDGE ROSAS:  Well, let me just -- one --

17       MS. POLITO:  -- uh --

18       JUDGE ROSAS:  -- one last comment that -- that I will make

19   and that is to reiterate what I say my very first pre-hearing

20   conference with the parties, and that is that to the extent

21   that it's possible to work together before a hearing goes

22   forward ends up being more convenient for everybody as a rule.

23   It generally will just work out that way.  I will proceed with

24   this case, open the record today, and we will see where the

25   chips will fall, but you know, we're going to be calling



1   witnesses, and I'm going to issuing rulings, and y'all will

2   respond accordingly, and we'll see where it goes from there.

3        MS. POLITO:  Thank you, Judge.

4        JUDGE ROSAS:  All right?  Okay.  Is there anything else?

5        MS. CACACCIO:  Yes, Your Honor.  Per our pre-trial

6   discussions, I'd like to have formally on the record the

7   following stipulations.

8        Tori Clow held the position of store manager PLA from May

9   to September 2021 and a retail talent acquisition PLA or

10  recruiter from September 2021 to the present, and that Tori

11  Clow is a section 2(11) supervisor under the Act.

12       Mallori Coulombe held the position of regional operations

13  coach from April to November 2021 and the position of director

14  regional operations retail from November 21st -- sorry -- from

15  November 2021 to the present, and that Mallori Coulombe is a

16  section 2(11) supervisor under the Act.

17       Joanne Hernandez held the position of director regional

18  operations retail from June to September 2021, district manager

19  licensed from September 2021 to February 2022, and director of

20  regional operations, licensed, from February 2022 to present,

21  and that Joanne Hernandez is a section 2(11) supervisor under

22  the Act.

23       Melanie Joy held the position of district manager licensed

24  from April 2021 to January 2022, and partner resources manager

25  PLA from January 2022 to present and that Melanie Joy is a



1    section 2(11) supervisor under the Act.

2        Marsh King held the position of district manager retail

3    from April 2021 to January 2022 and the regional operations

4    coach from January 2022 to present and that Marsh King is a

5    2(11) supervisor under the Act.

6        Lori Ruffin held the position of store manager PLA from

7    May 2021 to September 2021 and retail talent acquisition PLA

8    from September 2021 to present and that Lori Ruffin is a

9    section 2(11) supervisor under the Act.

10       Brittany Sanders held the position of district manager

11   retail from September 2021 to present and that Brittany Sanders

12   is a section 2(11) supervisor under the Act.

13       Alyssa Scheida held the position of director of regional

14   operations retail from April 2021 to present and that Alyssa

15   Scheida is a section 2(11) supervisor under the Act.

16       Gina Sterling held the position of director of regional

17   operations retail from April 2021 to present and that Gina

18   Sterling is a section 2(11) supervisor under the Act.

19       Chris Stewart held the position of partner resources

20   manager from April 2021 to April 2022 and director of partner

21   resources from April 2022 to present and that Chris Stewart is

22   a section 2(11) supervisor under the Act.

23       And finally, Ashlyn Tehoke held the position of shift

24   supervisor from March to October 2021 and assistant store

25   manager from October 2021 to present and that Ashlyn Tehoke has

1    been a section 2(11) supervisor under the Act since she began

2    her role of assistant store manager in October of 2021.

3        Those are the stipulations.

4        JUDGE ROSAS:  Is that so stipulated?

5        MR. BALSAM:  I want to sit down, Your Honor.  It's a lot

6    easier.

7        JUDGE ROSAS:  Okay.

8        MR. BALSAM:  Those stipulations were discussed with the

9    General Counsel on the condition that Starbucks was not going

10    to be required to produce documents in connection with the

11    subpoenas.  It's unclear to me at this point in time whether or

12    not that agreement is in place.  To the extent that the General

13    Counsel is withdrawing those requests for documents concerning

14    those individuals --

15        MS. CACACCIO:  That --

16        MR. BALSAM:  -- Starbucks will, in fact, stipulate to what

17    was just said.

18        MS. CACACCIO:  That was the response to this -- to the

19    motion.

20        MS. POLITO:  Judge, that's not the full response.  We

21    specifically say in our response that --

22        MS. CACACCIO:  No, I'm -- I'm agreeing with you.  I'm

23    saying yes.  I'm saying that in our response we accepted your

24    stipulations.

25        MS. POLITO:  Okay, so this is the first that we're hearing



1    of this disagreement with respect to the stipulations --

2        MS. CACACCIO:  It's in writing.

3        MS. POLITO:  -- which is late, so we've made progress.  My

4    only hesitation is, in response to our discovery, the subpoena,

5    we did make a suggestion that we would have certain

6    stipulations.  I haven't compared what Counsel just indicated

7    with what we said, so I would at least, for the record, would

8    like to know what they both are and at least do the

9    comparison --

10       MS. CACACCIO:  Your Honor --

11       MS. POLITO:  -- and then if it's accurate, which I'm sure

12   that it is just --

13       JUDGE ROSAS:  Subject to con --

14       MS. POLITO:  -- (indiscernible) the time, I'd like to --

15       JUDGE ROSAS:  Subject to confirmation.  You're not calling

16   one of those individuals while Counsel's checking --

17       MS. POLITO:  No, Judge.

18       JUDGE ROSAS:  -- the --

19       MS. POLITO:  No.

20       JUDGE ROSAS:  -- you know, so they're -- they're stayed

21   the effort of having to come in so you could establish that

22   they were supervisors or their agents --

23       MS. POLITO:  Yes, sir.

24       JUDGE ROSAS:  -- okay.

25       MS. CACACCIO:  And that was in writing, so it shouldn't be



1    a surprise because we -- we responded to the -- the petition to

2    revoke by saying that, and this was in your order, as well,

3    Judge, so.

4         Next, I'm requesting permission to make an oral amendment

5    to the complaint.  Mr. Kellen Montanye recently had a legal

6    name change to Kellen Higgins (phonetic throughout), so the

7    complaint alleges Mr. Higgins as Mr. Montanye, and we'd like to

8    make that correction, so wherever Mr. Cullen Montanye's name

9    appears in the complaint, it should read Mr. Kellen Higgins.

10        JUDGE ROSAS:  Counsel, point that I'd like to also make at

11   this point is whenever counsel refer to a change in the

12   pleadings and whenever there's an objection on the basis of

13   relevance, I want counsel to refer me to the decretal paragraph

14   in the complaint that something is relevant.

15        So I find that it saves time sometimes having to excuse

16   witnesses when I'm able to see exactly what the -- what the

17   issue is when it's based on relevance.  If counsel can just

18   point me to a particular paragraph so that we don't go through

19   the process of having to excuse the witness or leave the

20   witness there and then the witness gets inadvertently coached,

21   you know, so I just want to make that point.  What paragraph is

22   that individual referred to?

23        MS. CACACCIO:  Your Honor, this is going to be a challenge

24   in this case given the length of the complaint, but I do --

25   hang on, if you could give me just a second.



1      JUDGE ROSAS:  Well, I'm working with --

2      MS. CACACCIO:  Mr. Montanye's name first appears in 14(a).

3      JUDGE ROSAS:  And -- and we're referring to General

4  Counsel's Exhibit 1(bbbd), right?

5      MS. CACACCIO:  Yes, Your Honor, the --

6      JUDGE ROSAS:  Okay.

7      MS. CACACCIO:  -- third amended complaint.

8      JUDGE ROSAS:  14?

9      MS. CACACCIO:  14(a), 14(b), and then in the wherefore

10  clauses, as well.  Wherefore clause (d), D as in David, (p) --

11      JUDGE ROSAS:  Hold on one second.  I -- I've been

12  referring to the wrong pleading.  This is actually the -- the

13  top pleading is the -- the answer.

14      MS. CACACCIO:  Right.

15      JUDGE ROSAS:  So it's 1(aaaa)?

16      MS. CACACCIO:  It's the third amended complaint.

17      MS. STANLEY:  Can I see the thing?

18      MR. HAYES:  I have 1(ggg).

19      MS. CACACCIO:  It's 1(zzz).  Oh, that's -- yeah --

20      MS. STANLEY:  Yeah.

21      MS. CACACCIO:  -- it's the third amended consolidated

22  complaint.

23      MS. POLITO:  So Judge, if it's easier, we -- we don't have

24  any objection if there's been a formal name change --

25      MS. CACACCIO:  Yeah.



1      MS. POLITO:  -- to reflect the correct name.  Maybe

2   there's a way that addresses the record if we can to make it

3   easier.

4      JUDGE ROSAS:  All right, so -- so that change is reflected

5   in -- in the pleading without objection.

6      MS. CACACCIO:  Yes, Your Honor.  We'd also like to note

7   for the record that Respondent issued 13 duces tecum subpoenas

8   on individual nonparty witnesses today.  We anticipate filing

9   petitions to revoke.  Similarly, Respondent filed a duces tecum

10   on me personally today and we again anticipate filing a

11   petition to revoke.

12      JUDGE ROSAS:  So it's 14 subpoenas?

13      MS. CACACCIO:  Yes, Your Honor.

14      JUDGE ROSAS:  Okay.

15      MS. CACACCIO:  And we anticipate more forthcoming.

16      JUDGE ROSAS:  Okay.

17      MS. CACACCIO:  Next, I'd like to read into the record some

18   subpoena requests and responses that were received to those

19   based on papers.  For General Counsel's first subpoena requests

20   15, 16, and 31, in its papers, Respondent has indicated that

21   Holly Klein is not employed by Starbucks and thus no subpoena

22   responsive documents would exist to those requests.

23      Similarly, for the General Counsel's first subpoena

24   request, that no employee of Starbucks named David Morales

25   worked in Starbucks Buffalo stores during the relevant time



1    period in the complaint or otherwise had any involvement in the

2    conduct alleged in the complaint.

3        MS. CACACCIO:  Can I see the subpoena?

4        In the General Counsel subpoena, we requested documents

5    that describe, relate, or refer to promises of store

6    renovations and converting the store to a drive-thru and mobile

7    ordering store made by Respondent at Respondent's Williamsville

8    Place store on about the following dates for the period covered

9    by the subpoena.  That was September 28, 2021, and October

10   2021.  Respondent denies the existence of documents responsive

11   to that request.

12       Request 46, we requested documents that describe, relate,

13   or refer to promises of onsite mental health counselors made by

14   Respondent at Respondent's Main Street store in about October

15   2021 for the period covered by the subpoena.  Again, Respondent

16   denies the existence of documents responsive to that request.

17       General Counsel requested documents that describe, relate,

18   or refer to promises of seniority or tenure-based wage

19   increases made by Respondent at Respondent's Transit Commons

20   store in about October 2021 for the period covered by the

21   subpoena.  Respondent denies that this is a document responsive

22   to that request.

23       Number 48, documents that describe, relate, or refer to

24   promises made by Respondent at Respondent's Elmwood store on

25   October 1st, 2021, for the period covered by the subpoena.



1    Respondent denies the existence of documents responsive to the

2    request.

3        Request 43 -- sorry 53, documents that describe, relate,

4    or refer to a promise of a store renovation made by Respondent

5    at Respondent's Elmwood store in about November 2021 or

6    December 2021 for the period covered by the subpoena.

7    Respondent denies the existence of documents responsive to that

8    request.

9        Number 54, documents that describe, relate, or refer to

10   promises of store expansion and renovation made by Respondent

11   at Respondent's Transit & French store for the period covered

12   by the subpoena.  Respondent denies the existence of documents

13   responsive to that request.

14       Number 61, photographs or pictures taken by Respondent at

15   Respondent's Transit Commons facility that show employees or

16   their accessories, including but not limited to pins, buttons,

17   or aprons from April -- from August 1st, 2021, to October 1st,

18   2021.  Respondent denies the existence of documents responsive

19   to that request.

20       Number 67, documents that describe, relate, or refer to

21   headset usage or requirements among Respondent's managers,

22   supervisors, or agents in Respondent's Buffalo facilities for

23   the period covered by the subpoena.  Respondent denies the

24   existence of documents responsive to that request.

25       Number 69, documents that describe, relate, or refer to



1    Union or labor-related pins, paraphernalia, or clothing worn at

2    Respondent's Buffalo facilities from July 1st, 2021, to

3    present.  Respondent denies the existence of documents

4    responsive to that request.

5         And number 109, documents that describe, relate, or refer

6    to the disconnection of the direct telephone line for

7    Respondent's Genesee Street store for the period covered by the

8    subpoena, including but not limited to a disconnection on about

9    December 9th, 2021.  Respondent denies the existence of

10   documents to that particular request.

11        In addition, as I briefly mentioned earlier, General

12   Counsel has yet to receive any response to our subpoenas.  I

13   understand from pre-trial discussions that -- that I wasn't

14   going to be getting the totality of what I requested, but given

15   that there was at least five weeks between when I issued it and

16   now and Respondent has an obligation to begin at least looking

17   through those records upon the issuance of a subpoena

18   regardless of whether you ruled or -- which you have in this

19   case about that subpoena, I -- I think that we should be

20   entitled to at last some documents at this point, Judge.

21        MR. BALSAM:  Sorry, Your Honor.  Since the issuance of the

22   subpoena, and we have represented that we are -- we have begun

23   and we are looking for certain documents -- cats -- categories

24   of documents that was reflected in our petition to revoke.  As

25   we've mentioned numerous times to both the Court and also the



1    General Counsel, the sheer volume of documents that have been

2    requested will take time to produce, but we have started the

3    process and we can commit to producing those documents by the

4    end of the month, not today, unfortunately, just because of the

5    sheer volume.  Along those same lines, Your Honor, in a ca --

6    it was mentioned in our petition to revoke that Your Honor

7    ordered us to produce a privilege log regarding these

8    documents.  Again, it would be -- it is impossible to produce a

9    privilege log by July 18th given the fact that there is

10   hundreds if not hundreds of thousands of documents that Your --

11   Your Honor has ordered us to look through, and we cannot commit

12   to producing a privilege log by that deadline.

13       JUDGE ROSAS:  Let's see what your written response is

14   tonight to the Respondent's motion.

15       MS. CACACCIO:  Yes, Your Honor.  Your Honor, what's your

16   preference regarding requesting permission to use the well of

17   the court and approach witnesses?

18       JUDGE ROSAS:  To use what?

19       MS. CACACCIO:  The well of the court or to approach

20   witnesses?

21       JUDGE ROSAS:  You want to use the podium?

22       MS. CACACCIO:  Do -- do you like us to ask every time we

23   approach a witness?

24       JUDGE ROSAS:  No, no, it's fine, but like I said, you

25   know, we're not getting our steps here, okay, so try to be as



1    efficient as possible with respect to any anticipated exhibits,

2    all right?

3        MS. CACACCIO:  Yes, Your Honor.  And given the

4    sequestration of witnesses except for party representatives,

5    we'd like on the record who the party representatives are for

6    each side.

7        JUDGE ROSAS:  Who do you have?

8        MS. CACACCIO:  We don't, Judge.

9        JUDGE ROSAS:  Charging Party?

10       MR. HAYES:  Judge, the Charging Party has Michelle Eisen

11   as the party representative.

12       JUDGE ROSAS:  Okay.  Respondent?

13       MS. POLITO:  Judge, I -- I apologize.  I have to find her

14   full name because we refer to her as "M.K.", and unfortunately,

15   she could not be here today --

16       JUDGE ROSAS:  Okay.

17       MS. POLITO:  -- but she will be here tomorrow at the

18   proceeding.  It's is Kristina M-K-R-U-T-U-M-Y-A-N.

19       JUDGE ROSAS:  Okay.  And -- and just to reiterate, I think

20   I explained to Counsel, notwithstanding the sequestration rule,

21   what that means is that if a -- a designated representative

22   individual needs to be excused, someone else can take their

23   place, okay, when they're testifying or excluded in those

24   instances, all right?  Okay.  Anything else?

25       MS. CACACCIO:  Just one moment, Your Honor.  With that,



1      General Counsel is ready to proceed with opening statements,

2      Your Honor.

3           JUDGE ROSAS:  Okay.  Go ahead.

4           MS. CACACCIO:  Would you like me with my opening

5      statement, Your Honor?

6           JUDGE ROSAS:  Yes.

7           MS. CACACCIO:  One moment, Your Honor.  Cassie Fleischer,

8      Danny Rojas, Min Park, Brian Nuzzo, Nathan Tarnowski, Angel

9      Krempa, Kellen Higgins, what do these people all have in

10     common?  They worked for Starbucks, they were pro-Union, and

11     they were fired.  These seven employees from five western New

12     York stores were discharged over the course of six weeks in the

13     spring of 2022.  These terminations represented a crescendo in

14     Respondent's anti-Union campaign, but this is not where it all

15     began.

16          The evidence will show that on August 23rd, 2021, almost

17     50 baristas from stores throughout Buffalo put their name to a

18     letter to Respondent's then CEO stating their intention to

19     unionize, and in that letter, the employees asked for a

20     partnership, for equal power.  They asked for respect, but

21     Respondent refused.  Instead, Respondent used these names to

22     form a proverbial hit list of places to target where the Union

23     support was the strongest.  Why?  You will learn that the

24     Buffalo baristas were the first in the country to make such a

25     pro-Union statement to Respondent, and Respondent reacted with



1    an iron fist to try and nip this campaign in the bud.

2        Terminations were not the only aggressive tactic that

3    Respondent used to try and take back control and stop the Union

4    campaign.  During this hearing, you will learn that half of the

5    employees from Respondent's kiosk located inside the Walden

6    Galleria Mall put their name to that August 23rd letter to

7    Respondent's CEO supporting the Union campaign, and you will

8    learn that within weeks, Respondent had permanently closed that

9    location, and that was not the only store that Respondent

10    closed.

11        The evidence will show that, again, a few short weeks

12    after the Union campaign went public and shortly after the

13    Union filed a petition at the Walden and Anderson store,

14    Respondent closed that store to the public and converted it

15    into a tra -- centralized training facility scattering Union

16    supporters across the market.  Oh, and centralized training

17    facilities, during this case, you'll learn that centralized

18    training facilities were something that was unheard of in the

19    Buffalo area, well, prior to the Union campaign, of course, and

20    once that store reopened, Respondent converted additional

21    stores into training facilities thereby attempting to remedy

22    grievances and impacting employee pay and working conditions.

23        You will hear testimony about how shortly after the

24    employees' Union -- pro-Union announcement, Respondent

25    mobilized.  The evidence will show that dozens of out-of-state



1  managers descended on Buffalo under the guise of helping

2  Buffalo stores.  The evidence will show that the out-of-state

3  managers were given a new position, a new title of support

4  manager, a role that was previously unheard of even among the

5  longest-tenured baristas, well, before the campaign.  You will

6  hear how these support managers, as well as Respondent store

7  managers, started working at stores around the clock and how

8  employees felt like they were in a fishbowl.  You will hear how

9  these managers wore headsets even when their role would have

10  otherwise not required it so that they could listen in on

11  employees' conversations.  The testimony will show that

12  managers also interrogated and threatened employees, solicited

13  grievances and promised benefits.

14     Support managers and store managers were not the only

15  officials that swarmed the Buffalo stores after the campaign

16  was announced.  Respondent brought high-ranking corporate

17  officials to Buffalo, officials like the president of Starbucks

18  North America, the director of U.S. community engagement, and

19  the senior vice president of U.S. operations, and that they

20  stayed as a presence in the stores for months.  The evidence

21  will show that these high-ranking officials repeatedly held

22  meetings they called listening sessions where they solicited

23  grievances and promised benefits.  The evidence will also show

24  that these officials had almost never been seen in those stores

25  before the campaign and certainly not for a long time.



1          You will even hear how the president of Starbucks North

2     America, it got boring and started sweeping the store floor.

3     She also took it upon herself to remedy an employee's grievance

4     by resolving a timely schedule posting issue in a store.  You

5     will also hear how she told employees that Respondent would not

6     offer additional benefits in a contract with the Union and that

7     employees would lose other benefits if they selected the Union

8     to represent them.

9          You will hear how officials told employees they would lose

10    their great relationship with management, that management would

11    no longer be able to help out on the floor, and that employees

12    would no longer be able to pick up shifts at other stores if

13    they selected a union.

14         Now, with respect to these captive audience meetings,

15    witnesses will testify that in some instances they were told

16    they had to attend meetings or be forced to attend a makeup

17    session.  Witnesses will testify that these meetings were put

18    on their schedules and that when stores were closed for these

19    meetings, they would only be paid if they attended, which made

20    these meetings effectively mandatory for baristas living

21    paycheck to paycheck.

22         While Respondent gave with one hand it took away with the

23    other.  The evidence will show these benefits included but were

24    not limited to store refreshes, remodels, renovations, and

25    facility improvements.  Employees will testify that Respondent



1    doled out a first-of-its-kind seniority-based wage increase

2    across the country which had been a major pro-Union talking

3    point.  Witnesses will testify that Respondent began allowing

4    shift supervisors to disable mobile ordering and close cafes,

5    which is something they had been requesting and a perc that

6    Respondent later took away.  The evidence will also show that

7    Respondent began offering additional hours to employees and

8    adding more labor per week until Respondent, again, changed its

9    unit avoidance strategy and took away that benefit.

10        Witnesses will testify that in an effort to remedy

11    grievances, Respondent also removed problematic managers while

12    hiring additional employees to resolve staffing concerns.  The

13    evidence will show that Reslayant -- Respondent began more

14    strictly enforcing rules, including but not limited to those

15    involving civility, dress code, free food item benefits,

16    attendance and punctuality, and those relating to illness.  You

17    will also learn that Respondent created and enforced a new

18    employee minimum availability requirement.  The evidence will

19    show that pro-union employees were targeted for discipline

20    based on these new policies.

21        When other methods didn't work, Respondent escalated its

22    tactics.  I already told you that you'll hear how over the

23    course of six weeks Respondent fired seven organizers at five

24    stores.  But you'll also hear how it even banned one from

25    setting foot in a Starbucks ever again.



1        The evidence will also show that Respondent failed to

2    bargain over the two terminations at the Union represented

3    Transit & French store, and that Respondent failed to bargain

4    before implementing that minimum availability policy that led

5    to the termination of one employee and the constructive

6    discharge of another at its Union-represented Elmwood store.

7        Given Respondent's extensive, aggressive, and unlawful

8    conduct, employees' opinions of the Union campaign were

9    unlawfully manipulated.  The General Counsel is seeking a

10   Gissel bargaining order in this case for Respondent's Camp Road

11   store.  The bargaining order is warranted due to Respondent's

12   pervasive and severe unfair labor practices which caused Union

13   disaffection and interfered with employees' free choice in

14   their elections.

15       My name is Jessica Cacaccio, and along with my colleague,

16   Alicia Stanley, we are counsel for the General Counsel in this

17   case against Respondent, Starbucks Corporation.  And somehow,

18   despite the fact that I've been monologuing to you for about

19   ten minutes straight, these are not even all of the unlawful

20   acts that the General Counsel is alleging Respondent committed.

21   It's just an overview.

22       This case alleges nearly 300 allegations at 22 stores

23   running the gamut of unfair labor practice violations,

24   including those found in Sections 8(a) 1, 3, 4, and 5 of the

25   National Labor Relations Act.  At its core, this case is about



1   Respondent's attempt to leverage the power and balance between

2   itself, a multi-billion-dollar company, and its baristas to

3   quash a Union campaign and silence their voices.

4        The National Labor Relations Act codified employees'

5   fundamental and federally-protected right to seek better

6   working conditions and representation without fear of

7   retaliation.  But Respondent, with all of its power, thought it

8   was above that law and Respondent should be held accountable.

9        Thank you.

10   JUDGE ROSAS:  Charging Party, you can give an opening at

11   this time, you can waive, or you can reserve until it's your

12   turn.

13        MR. HAYES:  I'll give an opening now, Your Honor.

14        Your Honor, I'll start by saying the Union believes the

15   record that will be developed in this case will support a

16   finding that Starbucks violated the Act regarding every

17   allegation in the third-amended complaint for the reasons that

18   were just summarized by the GC.

19        Right now I think it's easy for the real core of this case

20   to be lost in discussion of motions, and subpoena issues, and

21   sequestration issues, so I'd just like to take a couple minutes

22   to describe the broader context and what the Union believes

23   this case really means.

24        So as you've heard, Starbucks workers in Buffalo began

25   organizing, and they publicized their campaign last summer.



1      From that moment, Starbucks declared war on its own workforce,

2      and apparently decided to stop at nothing to kill the

3      organizing campaign while it still only existed here in

4      Buffalo.

5          That partially worked and it partially didn't.  To the

6      extent the workers persevered, if they were able to, the

7      workers in Buffalo sparked a movement to organize under the

8      Act, and through that NLRB process, that spread throughout the

9      entire company, which has about 9,000 stores and nearly 300,000

10     employees.

11         The record in this case will show that there must have

12     been decisions at the highest levels that the Company would

13     systematically and overtly violate the NLRA and beat its

14     workers into the ground as a deliberate display and in order to

15     send a message to the whole country, then deal with the

16     consequences of those violations sometime later down the line

17     as essentially the cost of doing business.  That was apparently

18     the plan.

19         A key aspect to that plan is that Starbucks would make a

20     spectacle of its violations of law and its rage over its own

21     employees trying to have a say in the everyday conditions of

22     their working lives.  It would do things so transparently in

23     violation of the Act that were -- would start getting around.

24     So the company temporarily and permanently closed stores they

25     thought were the centers of organizing.  So workers would start

1    saying, that's what happens if you try to organize.  That's

2    what happens when you try to enforce your rights under the law.

3         They flooded stores with managers from across the country

4    and multimillionaire executives to spy on and terrorize the

5    workers in all the stores throughout the Buffalo area.  And

6    while the workers tried to give those people a wide birth, it's

7    difficult to do that when you're confined behind a counter or

8    in a store lobby, which is a very physically small space.

9    Again, the Company did this so that workers would say, if you

10   unionize or you try to unionize, you'll be overwhelmed by

11   management and you'll never get a moment's rest.

12        The Company fired workers who were publicly supporters and

13   leaders, and who put themselves out there in national media so

14   the message that this is what happens when you unionize would

15   also be noted.  Based on the record that will be developed

16   here, there will be no other conclusion to draw that this was

17   the intent all along.

18        So as the campaign to unionize Starbucks moved outside

19   Buffalo, the Company's response did too.  And nothing so far

20   has stopped it from violating the law hundreds of times over.

21   The Union filing dozens then hundreds of ULP charges hasn't

22   stopped it.  Merit determinations by regional offices across

23   the company on hundreds of allegations hasn't stopped it.  In

24   fact, throughout Starbucks has displayed open contempt for the

25   Act and for the agency that's trying to enforce it.



www.escribers.net | 800-257-0885

1        Public outcry hasn't stopped it.  This is one of the

2   largest employers in the U.S.  And for all intents and

3   purposes, they have infinite money to spend on this project,

4   and they're not going to stop on their own.

5        So the question is what does the NLRA mean in the face of

6   a situation like this?  Can it lead to consequences -- real

7   consequences that are proportionate to the Company's

8   violations, or will this just, at the end of the day, be the

9   cost of doing business for the Company?  Because that question

10  is key, Your Honor, the Union will be seeking far-reaching,

11  extraordinary remedies to match the extraordinary violations

12  that the Company has carried out here.

13       I realize the question I'm raising about the very nature

14  of the act itself is grandiose, but that's because this entire

15  situation is grand.  Starbucks Corporation sent its president

16  of North America to live in Buffalo, New York for about half a

17  year.  The current CEO of Starbucks Corporation was apparently

18  put in that position because the Company thought he could

19  answer what it viewed as the problem of its workers trying to

20  unionize.

21       And then beyond that, there is a workers' movement in the

22  United States right now that hasn't been seen in over a

23  century, and Starbucks workers from Buffalo and elsewhere have

24  helped inspire that movement and are at the center of it,

25  despite all of the violence the Company has done to those

1    workers exercising their rights over the last year.

2        So as uncomfortable as it might be to hear, I think

3    everyone in this case is speaking into history.  And this case

4    is asking an important question, the answer to which is not

5    going to go unnoticed.  Again, that question is, what does the

6    Act mean in the 21st century when a giant employer has infinite

7    resources, has no hesitation in breaking the law, and it views

8    its employees exercising their rights under the law as a

9    crisis?  What can the Act do about that?  The significance of

10   that question is why what happens here matters.

11       Thank you.

12       JUDGE ROSAS:  Respondent, you can give an opening now,

13   reserve, or waive.

14       MS. POLITO:  Thank you, Your Honor.  We're going to

15   reserve until our case-in-chief.

16       JUDGE ROSAS:  Okay.  All right.  Let's take five minutes.

17   We'll go off the record and then we'll start with your first

18   witness, okay?

19   (Off the record at 2:15 p.m.)

20       JUDGE ROSAS:  Okay.  We're on the record.

21       Counsel, call your first witness.

22       MS. CACACCIO:  Your Honor, counsel for the General Counsel

23   calls Michelle Eisen to the stand.

24   Whereupon,

25                          **MICHELLE EISEN**


www.escribers.net | 800-257-0885

1   having been duly sworn, was called as a witness herein and was

2   examined and testified as follows:

3       JUDGE ROSAS:  All right.  State and spell your name and

4   provide us with an address, business is fine.

5       THE WITNESS:  Michelle Eisen, M-I-C-H-E-L-L-E E-I-S-E-N,

6   2500 Dollar Avenue, Apartment 1, Buffalo, New York 14213.

7       MS. POLITO:  Judge, Respondent does have a standing

8   objection.  To the extent that the Board is submitting evidence

9   at this time in support of the continuing 10(j) proceeding,

10  Leslie v. Starbucks in the Western District of New York,

11  pending before Honorable Sinatra, which was stayed, in part, by

12  Judge Sinatra on -- which was stayed in full by Judge Sinatra

13  on June 30th, 2022, Respondent objects to such evidence and

14  notes for the record that none of the evidence that the Board

15  is about to submit can be used in the continuing 10(J)

16  proceeding per order of Your Honor issued on July 10, 2022,

17  which effectively stays such evidence until the Board rules on

18  Respondent's special request.

19      MS. CACACCIO:  If I may be heard?

20      JUDGE ROSAS:  Sure.

21      MS. CACACCIO:  Counsel Cacaccio.  Counsel, given your --

22  given your order awaiting the response to the special appeal,

23  at this time we will not be entering any chill evidence into

24  this particular proceeding, i.e., the just and proper prong.

25  However, obviously a reasonable -- the reasonable cause prong



1    is basically the basis of this case.  So obviously, we'll be

2    entering evidence with respect to the reasonable cause that we

3    had to proceed on 10(J).

4         JUDGE ROSAS:  Anything else you want to add?

5         MS. POLITO:  No, Your Honor.  Thank you.

6         JUDGE ROSAS:  Okay.

7         MS. CACACCIO:  And Your Honor, as we've discussed, off the

8    record at least, as General Counsel has not received any

9    subpoenaed documents, we call Ms. Eisen with -- subject to

10   recall --

11        JUDGE ROSAS:  That is --

12        MS. CACACCIO:  -- as necessary.

13        JUDGE ROSAS:  -- that is going to be the case with respect

14   to any witnesses that are called for which subpoenaed material

15   is outstanding.  And that applies to everyone --

16        MS. CACACCIO:  Yes, Judge.

17        JUDGE ROSAS:  -- including General Counsel subpoenas,

18   Charging Party subpoenas, and Respondent subpoenas.  So --

19        MS. CACACCIO:  Yes, Your Honor.

20        JUDGE ROSAS:  -- everybody is subject to recall.

21        Like I said, I work with what I've got and I try to make

22   some rationality out of this.

23        MS. CACACCIO:  I understand.

24        JUDGE ROSAS:  Let's go.

25        MS. CACACCIO:  And I -- I don't need to --



1      JUDGE ROSAS:  No.

2      MS. CACACCIO:  -- state that every time.

3      JUDGE ROSAS:  No, no, don't --

4      MS. CACACCIO:  Okay.

5      JUDGE ROSAS:  -- these things need to be -- these things

6  need to be reenforced --

7      MS. CACACCIO:  Okay.

8      JUDGE ROSAS:  -- and clarified.  We move forward.  The

9  train is leaving now.

10      MS. CACACCIO:  Understood.

11                    **<u>DIRECT EXAMINATION</u>**

12  Q    BY MS. CACACCIO:  Good afternoon, Michelle.  What are your

13  pronouns?

14  A    She/her.

15  Q    Who is your employer?

16  A    Starbucks Corporation and Workers United.

17  Q    How long have you worked for Starbucks?

18  A    I was originally hired in August of 2010.  I was with the

19  Company until May of 2012.  I left for a few months.  And my

20  rehire date is February of 2013.

21  Q    And what positions did you hold with Starbucks?

22  A    I have been a shift supervisor and a barista.  I am

23  currently a barista.

24  Q    When were you a shift supervisor?

25  A    I was shift supervisor in -- from 2011 until 2012.  Then



1    again from 2014 to 2015.

2    Q    Can you tell us what locations you've worked in and when

3    you worked there?

4    A    I started at the Transit Commons location in East Amherst

5    in August of 2010.  I was there until January of 2012, and then

6    transferred to a location on the Island of Oahu, Hawaii.  The

7    name of the store was Mililani Town Center.  I was there from

8    February 2012 until May of 2012.  I then left the Company.  I

9    moved back to Buffalo.  I was rehired at Transit Commons in

10   February of 2013.  I was there until March of 2015.  And then I

11   transferred to the Elmwood Avenue location in March 2015, and I

12   am currently still there.

13   Q    How often do you work currently?

14   A    Currently my availability is Mondays and Tuesdays.

15   Q    And how many hours are you working currently?

16   A    Subject to weekly scheduling, about ten hours a week I

17   would say.

18   Q    And when did your availability become those two days?

19   A    I submitted that availability request in early January of

20   2022.

21   Q    And what happened to that request?

22   A    It stayed sort of on ice for a number of weeks, and then

23   it was subsequently approved by my store manager.

24   Q    Are you familiar with the Union Workers United?

25   A    Yes, I am.



1    Q    How are you familiar with the Union?

2    A    I'm a member of the Workers United Union, and I am

3    employed by them as well.

4    Q    In what position are you employed by them?

5    A    The title is director of partner education.

6    Q    And when did you get that title?

7    A    Mid-February of 2022.

8    Q    And prior to mid-February of 2022, were you employed by

9    the Union prior to that?

10   A    No, I was not.

11   Q    And what title do you currently have with the Union?

12   A    It is still director of partner of education.

13   Q    And what do you do as the director of partner education?

14   A    I talk to respective organizing stores and partners across

15   the country and advise them on this process, offer support

16   based on experiences that I went through organizing the Elmwood

17   location.  I'm basically on hand if they have any questions

18   they may have about the campaign or the process.

19   Q    Are you a member of the Union's organizing committee?

20   A    Yes, I am.

21   Q    And when did you join the organizing committee?

22   A    Approximately August 17th of 2021.

23   Q    And even with this new role that you have with the Union,

24   are you still a member of the organizing committee?

25   A    Yes, I am.



1   Q    What do you do as a member of the organizing committee?

2   A    It's very similar to the director of partner education.

3   It is connecting with stores.  They'll reach out if they have

4   interest in organizing, guiding them through that process.

5   Holding weekly calls, discussing what point we are in

6   organizing, if they're -- have petitions or staffing cards,

7   staying in communication with them throughout that process.

8   Q    Are you involved in bargaining?

9   A    I am as well.

10  Q    For what locations?

11  A    The Elmwood Avenue location, the Genesee Street location,

12  and the Power and Baseline location in Mesa, Arizona.

13  Q    Do you know when the Union campaign went public?

14  A    It went public Monday, August 23rd, 2021.

15  Q    And how did the campaign go public?

16  A    A letter was sent to the then CEO, Kevin Johnson, and also

17  posted on our social media accounts, I believe Twitter,

18  Instagram, and Facebook, all of which also went live on August

19  23rd.

20  Q    If I showed you a copy of that letter, would you be able

21  to recognize it?

22  A    Yes, I would.

23  Q    I'm now directing your attention to what's in front of you

24  as General Counsel Exhibit 2.  What is the document that's in

25  front of you?



1    A      This is a picture of a tweet from August 23rd, 2021 where

2    we posted the letter to Kevin Johnson expressing our interest

3    to organize.

4    Q      And what's the Twitter handle at the top left?  Whose

5    Twitter handle is that?

6    A      SB Workers United.  That would be the Twitter handle for

7    the campaign.

8    Q      And do you know when the tweet went public -- when it was

9    posted?

10   A      August 23rd, 2021.  Looks like 12:30 in the afternoon.

11          MS. POLITO:  Object, Your Honor.  I'm going to object to

12   the word public.  Just because it was tweeted doesn't mean that

13   it went public.  Not everybody reads Twitter.

14          JUDGE ROSAS:  Sustained for that purpose.  Sustained for

15   that purpose.  Right now we're -- we're still establishing

16   foundation for receipt of the document.

17          Next question.

18          MS. CACACCIO:  I'd offer General Counsel Exhibit 2.

19          JUDGE ROSAS:  Any objection?  Voir dire?

20          MS. POLITO:  I'm sorry, I --

21          MS. CACACCIO:  I'm sorry.  I offer General Counsel Exhibit

22   2.

23          MS. POLITO:  Yes, I'd like to voir dire.

24                        **VOIR DIRE EXAMINATION**

25   Q      BY MS. POLITO:  Ms. Eisen, the General Counsel Exhibit



1   Number 2 is a copy of a page from a Twitter account; is that

2   correct?

3   A    It looks like a screen grab from our Twitter account, yes.

4   Q    And when you say it looks like a screen grab, did you do

5   the screen grab, or did someone else do it?

6   A    I did not do the screen grab, no.

7   Q    So how do you know that this would be an accurate copy of

8   that screen grab?

9   A    Because I know what a screen grab looks like, and I know

10   what a Twitter account looks like.

11   Q    But you don't -- you don't know that this is a complete

12   screen grab of this particular "Dear Kevin" letter; is that

13   correct?

14   A    I -- I guess I know what the "Dear Kevin" letter looks

15   like, and I can attest that this is the image of that letter.

16   Q    Okay.  But this image also includes additional information

17   on it, so -- is that correct -- relating to the Twitter feed?

18   A    The page -- the full piece of paper, or the two images of

19   the letter?

20   Q    The -- the piece of paper -- sticking with the piece of

21   paper in front of us, you've already testified that you do not

22   know that this is a full screen grab; is that correct?

23      MS. CACACCIO:  Objection.  Misstates the evidence.  That's

24   not what she testified to.

25      JUDGE ROSAS:  Overruled.



1          You can answer if you know.

2    A    I mean, I know that this is a screen grab of a Twitter

3    post from our account, yes.

4    Q    BY MS. POLITO:  But you don't know that it's a complete

5    screen grab.  That's what I asked you earlier and you said,

6    yes; is that correct?

7    A    I guess I don't know for sure that it's a complete screen

8    grab.

9          MS. POLITO:  Judge, I would object on those grounds.

10         MS. CACACCIO:  May I ask some more --

11         MS. POLITO:  The letter speaks for itself.  The "Dear

12   Kevin" letter speaks for itself.

13         JUDGE ROSAS:  You need further questions?

14         MS. CACACCIO:  Yes.

15                    **RESUMED DIRECT EXAMINATION**

16   Q    BY MS. CACACCIO:  Michelle, did you ever see the tweet

17   that was posted?

18   A    Yes, I did.

19   Q    When was the last time you saw that tweet?

20   A    I saw it the day that it was posted, on the 23rd of August

21   2021.

22   Q    When was the last time you saw it?

23   A    And then it was reposted a couple of weeks ago on our

24   account.

25   Q    Do you remember anything else in the tweet other than



1  what's on the paper in front of you?

2  A    No, I do not.

3       MS. CACACCIO:  Your Honor, I now offer General Counsel

4  Exhibit 2.

5       JUDGE ROSAS:  Is there anything you want to add?

6       MR. HAYES:  No.

7       JUDGE ROSAS:  Okay.  So help me out here.  We're talking

8  about a -- a screen grab of a Twitter feed?

9       THE WITNESS:  I believe so, yes.

10      JUDGE ROSAS:  Is that the entire page that we're looking

11  at?

12      THE WITNESS:  This would be what a screen grab looks like.

13  So it would have the date of the original posting, which this

14  does have, and it would have the retweets, the post-tweets, and

15  the number of likes that had occurred on that post at the time

16  the screen grab was taken.

17      JUDGE ROSAS:  So the logo in the upper left, from there

18  down to -- and I'll assume that there's nothing behind the

19  exhibit label.  Lower right-hand corner, the word "like," then

20  you go to the other side of the lower corner, 854, and you go

21  to the upper right, you see three dots; is that correct?

22      THE WITNESS:  That is correct.

23      JUDGE ROSAS:  Okay.  So the four corners of that piece of

24  paper, are you saying that that's the entirety of a screen

25  grab?



1          THE WITNESS:  For this tweet, yes, I am.

2          MR. HAYES:  Your Honor, if I -- if I may?  Just over

3     her -- I was just -- I -- I took the screen grab.

4          MS. POLITO:  Judge, Counsel can't testify.

5          JUDGE ROSAS:  Yeah, it --

6          MR. HAYES:  I --

7          JUDGE ROSAS:  Look, let -- let me complete it with the

8     witness.  Okay.  So I've asked her those questions.

9          MS. POLITO:  So --

10         JUDGE ROSAS:  Let -- let me hear from the Respondent

11    before you address this.

12         MS. POLITO:  Judge, we object to the introduction of

13    General Counsel Exhibit Number 2 because this witness has

14    testified that she does not know that this is the entire screen

15    grab.  She did not do the screen grab.  All she is stating is

16    that she's looking at a document that could have been printed

17    by anyone, could have been modified.  There's dates, August

18    23rd.  I don't know if that's accurate.  She doesn't know if

19    it's accurate.  And she stated that she didn't do it.  So this

20    witness can't authenti -- authenticate this document.  So for

21    those reasons it should not be entered into evidence.

22         MS. CACACCIO:  If I might be --

23         JUDGE ROSAS:  Anything else?

24         MS. CACACCIO:  -- heard?  That's not what the witness

25    testified to, Judge.  Not only did she say that's when the



1    tweet went out, that she saw it the day it went out.  She saw

2    it as recently as a week or two ago.  And as -- when there were

3    more questions asked of her, she was able to identify that

4    there would be nothing additional in -- in the tweet that would

5    be missing.  And if -- if Respondent thinks there's additions,

6    they're hap -- I'm happy to accept any additions there might be

7    to this tweet, but there aren't any.

8        JUDGE ROSAS:  Okay.  So the witness has responded in the

9    affirmative.  I understand you've asked some questions that, in

10   your mind, may create some confusion or doubt.  However, all

11   that -- for the admission of a document that is required, is

12   that there be some indication by the witness that the document

13   is what the witness says it purports to be.  What you're

14   addressing is essentially something that will go to the weight

15   of the document.  But based on what I recall her saying, this

16   will be received into evidence.  You can address the weight.

17   You can address the credibility.  You can address the

18   testimony.  Okay?  Overruled.

19       General Counsel's 2 is received.

20   **(General Counsel Exhibit Number 2 Received into Evidence)**

21       MS. POLITO:  Please note our objection for the record.

22       JUDGE ROSAS:  Um-hum.

23   Q    BY MS. CACACCIO:  Michelle, I want to direct your

24   attention to General Counsel Exhibit 3.  What's that document?

25   A    This is the entirety of the "Dear Kevin" letter that was



1   sent to Kevin Johnson on August 23rd, 2021 expressing our

2   desire to organize.

3   Q    How many pages is it?

4   A    It is three pages.

5   Q    What's the third page?

6   A    The third page is the noninterference and fair election

7   principles for partner unionization.

8   Q    And what are the first two pages?

9   A    They are the letter themselves -- the letter itself, as

10  well as the list of partners who signed on publicly to it.

11  Q    And how do you know what this is -- what General Counsel

12  Exhibit 3 is?

13  A    I was presented with it before it was sent to Kevin

14  Johnson.  I was able to view it.  I also signed on to it.  And

15  I viewed it both on our -- our social medias on August 23rd,

16  and had access to the email that it was sent from as well.

17       MS. CACACCIO:  Your Honor, I'd offer General Counsel's

18  Exhibit 3.

19       JUDGE ROSAS:  Respondent?

20       MS. POLITO:  Your Honor, if I may?

21       JUDGE ROSAS:  Um-hum.

22              <u>**VOIR DIRE EXAMINATION**</u>

23  Q    BY MS. POLITO:  Ms. -- Ms. Eisen, your name is identified

24  on page 2 of General Counsel Exhibit 3; is that correct?

25  A    That is correct.



1    Q    And you testified that you reviewed the letter before you

2    signed it; is that correct?

3    A    Correct.

4    Q    And the content of the letter on page 1 are what you

5    reviewed before you signed it?

6    A    That is correct.

7    Q    Did you mail the letter out?

8    A    The letter was emailed from the SB Workers United Gmail

9    account.

10   Q    Okay.  Going to page 3 of the letter, the noninterference

11   and the -- and the caption?

12   A    Yes.

13   Q    Was that included in the letter before you signed it?

14   A    The -- the non -- yes.

15   Q    That exhibit to the letter was included before you

16   reviewed the letter contents on page 1?

17   A    We had -- had reviewed this list around the same time as I

18   reviewed the letter.

19   Q    That -- that wasn't my question though.  So you indicated

20   that you reviewed page 1 of the letter before you signed it.

21   My question is, page 3 of the attachment, did you review that

22   completely -- that attachment -- before you signed the letter?

23   A    That was presented at the same meeting where I agreed to

24   sign the letter.

25   Q    And so all three documents you reviewed before you signed



1    the letter?

2    A    Correct.

3    Q    And you are aware that that letter was emailed by

4    Starbucks Workers United; is that correct?

5    A    Correct.

6         MS. POLITO:  No objection, Judge.

7         JUDGE ROSAS:  General Counsel's 3 is received.

8    **(General Counsel Exhibit Number 3 Received into Evidence)**

9                    <u>**RESUMED DIRECT EXAMINATION**</u>

10   Q    BY MS. CACACCIO:  Other than signing this letter, have you

11   made your Union support known in any other way?

12   A    I have.

13   Q    How?

14   A    The first thing I did when we went public was to put a

15   Union pin on my apron.

16   Q    How did you get that pin?

17   A    A coworker of mine came in the day that we went public

18   with a handful of them and handed them to me across the -- the

19   counter.  I was in the bar position.  And I took one of the

20   pins and put it on my apron.

21   Q    Who was that --

22        MS. POLITO:  Judge, I'm just going to object to the

23   witness' continued use of the work pubic.  I -- I don't know

24   what means in this context, and there's been no evidence that

25   any campaign was made public on any particular date.



1      MS. CACACCIO:  Your Honor, if I might be heard?  The

2  witness has already testified that they put this letter on all

3  their social medias, that it was sent to Respondent's CEO.  I

4  don't know how much more public you can get than posting to all

5  of your social media.  I mean, that's about -- that -- that's

6  what public means as a -- as a general definition.

7      MS. POLITO:  Judge, if I -- if I may respond?  The use of

8  social media in this case is a -- is a big deal, but it doesn't

9  mean that anybody actually saw it.  And the letter that was

10  just admitted as an exhibit doesn't even have a date on it.  So

11  the continued reference to a particular date, as well as the

12  fact that something was made public is inappropriate and should

13  be stricken from the record.

14      MS. CACACCIO:  If I might be heard?  General Counsel's

15  Exhibit 2 does have a date on it.  And the witness just

16  testified that that was emailed to Kevin Johnson on that same

17  date.  So the witness has testified to that.  Whether the

18  exhibit itself has a date on it or not is irrelevant.

19      JUDGE ROSAS:  All right.  I'm going to overrule the

20  objection, but note that I'm receiving the testimony

21  essentially for the -- for the point that the witness has

22  testified that this information was put on social media.

23      The Respondent -- to the extent the Respondent is

24  concerned about whether or not anyone or any -- anyone in the

25  public that's not a Starbucks employee, or that the Respondent

1     received notice, you know, is -- is not the case.

2          You know, this is going to be an example of instances in

3     which certain terms can be loaded from the standpoint of -- of

4     the case, can -- in the view of some counsel might have some

5     conclusory aspect to it that could have a legal connotation to

6     it, but you know, we can only inhibit common language, you

7     know, so much.  And at the same time we'll just make note of

8     what these -- what the testimony means.  Okay?

9          MS. POLITO:  Thank you for noting that objection, Your

10    Honor.

11    Q     BY MS. CACACCIO:  Michelle, do you know whether the

12    Union's Twitter is public or private?

13    A     It is a public Twitter account.

14    Q     And I apologize if I asked this already.  Who is the

15    coworker that gave you those pins?

16    A     Jaz Brisack.

17    Q     And what did you do when she gave you the pin?

18    A     I took one for myself.  I put it on my apron immediately.

19    I put a couple of others in my apron pocket in case somebody

20    else asked for one.

21    Q     And how often did you wear that pin after that?

22    A     Every day, with the few exceptions of a customer

23    expressing interest in me taking it off to give it to them.

24    And then I replaced it with another one at my earliest

25    convenience.



1    Q    And what was the design of the pin that wore?

2    A    It is the green Starbucks Workers United shaker fist logo.

3    Q    Now, have you talked to the media at all about the

4    campaign?

5    A    Yes, I have.

6    Q    And as far as you know, have any of those media interviews

7    been published?

8    A    Yes, they have.

9    Q    Do you remember any specifically?

10    A    The first one I did was sometime around the middle of

11    September.  It was a live phone interview with Yahoo Finance.

12    And there were many, many others after that.

13    Q    Do you know what stores filed petitions in the Buffalo

14    area?

15    A    The first round or in their entirety?

16    Q    In their entirety.

17    A    Eight.

18    Q    What are they?

19    A    Elmwood Avenue location, Genesee Street, Camp Road, Walden

20    Anderson, Transit Commons, Depew, Sheridan and Bailey, Delaware

21    and Chippewa, East Robinson, and I believe that is it.

22    Q    Do you know whether the Williamsville Place store filed?

23    A    Oh.  I'm sorry, yeah.  My apologies.

24    Q    And when were the first petition filed in the Buffalo

25    area?



1    A    Monday, August 30th, 2021.

2    Q    And how do you know that?

3    A    One of them was the Elmwood location, which was my store.

4    Q    Now, if I showed you a copy of the Elmwood petition, could

5    you identify it?

6    A    Yes, ma'am.

7         MS. CACACCIO:  Your Honor, I'm showing the witness General

8    Counsel's Exhibit 4.  It is double-sided, just so you know.

9    BY MS. CACACCIO:

10   Q    What's General Counsel's Exhibit 4?

11   A    It is the petition for the Elmwood Avenue location.

12   Q    How do you know that?

13   A    It has the Elmwood Avenue address listed in the 2B box.

14        MS. CACACCIO:  Your Honor, I now offer General Counsel's

15   Exhibit 4.

16        MS. POLITO:  No objection, Your Honor.

17        JUDGE ROSAS:  General Counsel's 4 is received.

18   **(General Counsel Exhibit Number 4 Received into Evidence)**

19   BY MS. CACACCIO:

20   Q    What was the result of the Elmwood election?

21   A    The Elmwood Avenue won their election.

22   Q    If I showed you a copy of the Elmwood certification of

23   representative, would you be able to recognize that?

24   A    Yes, I would.

25        MS. CACACCIO:  I'm now showing the witness General



1    Counsel's Exhibit 5.

2    BY MS. CACACCIO:

3    Q    What's General Counsel's Exhibit 5, Michelle?

4    A    It is the certification for the Elmwood Avenue location.

5         MS. CACACCIO:  Your Honor, I now offer General Counsel's

6    Exhibit 5.

7         MS. POLITO:  No objection, Your Honor.

8         JUDGE ROSAS:  General Counsel's 5 is received.

9    **(General Counsel Exhibit Number 5 Received into Evidence)**

10   BY MS. CACACCIO:

11   Q    You also mentioned Camp Road.  If I showed you a copy of

12   that petition, could you recognize it?

13   A    Yes.

14        MS. CACACCIO:  I'm now showing the witness General

15   Counsel's Exhibit 6.

16   BY MS. CACACCIO:

17   Q    What's General Counsel's Exhibit 6?

18   A    It is the petition for the Camp Road location.

19        MS. CACACCIO:  Your Honor, I now offer General Counsel's

20   Exhibit 6.

21        MS. POLITO:  No objection, Your Honor.

22        JUDGE ROSAS:  General Counsel 6 is received into evidence.

23   **(General Counsel Exhibit Number 6 Received into Evidence)**

24   BY MS. CACACCIO:

25   Q    Do you know what the result was of the Camp Road election?



1    A    To the best of my knowledge, it has not been determined as

2    of yet.

3    Q    You mentioned Genesee Street.  If I showed you a copy of

4    the Genesee Street store petition, could you identify it?

5    A    Yes, I could.

6         MS. CACACCIO:  Showing the witness General Counsel Exhibit

7    7.

8    BY MS. CACACCIO:

9    Q    What's General Counsel's Exhibit 7?

10   A    It is a petition for the Gene -- Genesee Street location.

11        MS. CACACCIO:  Your Honor, I now offer General Counsel

12   Exhibit 7.

13        MS. POLITO:  Judge, again, we have no objection.  This is

14   a public document.  So for that reason we're not objecting to

15   the RC petition document.

16        JUDGE ROSAS:  General Counsel 7 is received.

17   **(General Counsel Exhibit Number 7 Received into Evidence)**

18   BY MS. CACACCIO:

19   Q    What were the results of the Genesee Street election?

20   A    It was not determined, again, on the day of the vote

21   count, but was later certified, I believe, January 10th of

22   2022.

23   Q    If I showed you a copy of that certification, would you be

24   able to recognize it?

25   A    Yes, I would.


www.escribers.net | 800-257-0885

1     MS. CACACCIO:  Showing the witness General Counsel's

2     Exhibit 8.

3     BY MS. CACACCIO:

4     Q    Directing your attention to page 5 of 6 and 6 of 6.  Do

5     you know what this document is?

6     A    It is the certification for the Genesee Street location.

7     MS. CACACCIO:  Your Honor, I offer General Counsel Exhibit

8     8 into evidence.

9     MS. POLITO:  Judge, Respondent has no objections because

10    it's a public document, again, from the case.  We're still not

11    convinced that this witness has the foundation to enter this

12    document into evidence or talk about it other than the fact

13    that she's seen it.  But we have no objection, because it's a

14    public document, to Counsel admitting it into the record.

15    JUDGE ROSAS:  General Counsel 8 is received.

16    **(General Counsel Exhibit Number 8 Received into Evidence)**

17    BY MS. CACACCIO:

18    Q    You mentioned Transit Commons filed a petition.  If I

19    showed you a copy of that petition, could you recognize it?

20    A    Yes, I could.

21    MS. CACACCIO:  Showing the witness General Counsel's

22    Exhibit 9.

23    BY MS. CACACCIO:

24    Q    What's General Counsel's Exhibit 9?

25    A    This is the first petition for the Transit Commons



1    location.

2        MS. CACACCIO:  Your Honor, I now offer General Counsel

3    Exhibit 9.

4        MS. POLITO:  Can I just ask the witness a question?

5                    **VOIR DIRE EXAMINATION**

6    Q    BY MS. POLITO:  Ms. Eisen, you indicated this is the first

7    petition.  How do you know it's the first petition?

8    A    Because they filed their first petition on the 8th of

9    September, and then subsequently withdrew it a day or two later

10   in order to not restart the clock on the first group petition

11   filed among them.

12   Q    And when you said, I filed it, did you actually file it?

13   A    No, I didn't say I.  I said they.

14   Q    They filed it.  And so at the bottom, there's a date of

15   September 8th?

16   A    Correct.

17   Q    So wouldn't that be the first petition?  This is the first

18   petition?

19   A    That's what I said.

20   Q    Okay.  So there's two days.  There's also a date on the

21   top that says date filed, 9/9/2020.

22   A    I believe the date filed by the Union was the 8th, and the

23   date received by the NLRB was the 9th.

24   Q    How do you know that information?  Just by reading the

25   document?  Or did someone tell you that information?



1    A    Well, I understand how these work.  This is the tenth one

2    we've done.

3    Q    But my question wasn't whether you understood how it

4    worked --

5    A    At some point --

6    Q    Let me finish my question please.  My question was, how

7    did you know of those dates?  Did someone tell you that

8    information?

9    A    Did someone tell me the date that something was filed?

10   Q    Correct.

11   A    Yes.  The barista at the Transit Commons location said,

12   we're filing our petition today.  And that was the 8th of

13   September.

14   Q    And who told you that?

15   A    Michael Sanabria.

16   Q    And who is he?

17   A    He is a barista or shift supervisor, I believe, at the

18   Transit Commons locations.

19       MS. CACACCIO:  Your Honor, I object.  This voir dire is

20   outside the scope of voir dire.

21       JUDGE ROSAS:  Well --

22       MS. CACACCIO:  If she wants to bring this up on cross-

23   examination, she can.

24       JUDGE ROSAS:  I'm pretty liberal about the scope of voir

25   dire because it obviates the need for further questioning on



1    cross-examination.  Anything previously asked and answered on

2    voir dire has been answered for purposes of cross.  Unless

3    there is anything in addition that needs to be addressed vis-a-

4    vi way.

5        MS. POLITO:  No further questions, Judge.  And we have no

6    objection to the introduction.

7        JUDGE ROSAS:  General Counsel's 9 is received.

8    **(General Counsel Exhibit Number 9 Received into Evidence)**

9                         **DIRECT EXAMINATION**

10   Q    BY MS. CACACCIO:  And you sort of just went through this

11   with Ms. Polito, but did that store have an election based on

12   the petition that we just showed you, General Counsel's Exhibit

13   9?

14   A    No, it did not.

15   Q    What happened?

16   A    My understanding of what happened is that it was going to

17   restart those -- that petition was going to restart the clock

18   on the first three petitions that were filed in Buffalo on

19   August 30th.  With that recognition, the partners at that store

20   decided to pull that petition, and to wait to refile until

21   after we received the decision from our -- this hearing.

22   Q    So if I showed you a copy of the order approving the

23   withdrawal of that petition, would you recognize it?

24   A    I would.

25       MS. CACACCIO:  I'm now showing the witness General



1    Counsel's Exhibit 10.

2    BY MS. CACACCIO:

3    Q    What's that document?

4    A    It's the withdrawal request for that petition for Transit

5    Commons.

6        MS. CACACCIO:  Your Honor, I offer General Counsel's

7    Exhibit 10.

8        MS. POLITO:  Your Honor, if I may?

9                    **VOIR DIRE EXAMINATION**

10    Q    BY MS. POLITO:  Ms. Eisen, do you recognize this document

11    just because someone's provided you with a copy of the

12    document?

13    A    Yes.  Yes, I do.

14    Q    So you've seen it before?  Is that correct?

15    A    Yes, these are all emailed documents from throughout this

16    campaign process.

17    Q    In your role in working for the Union, is it your -- under

18    your scope to maintain a record of these documents at all?

19    A    No, I don't maintain a record of them.

20    Q    Is there anyone at the Union that is tasked with

21    maintaining these petitions and orders that we're talking

22    about?

23    A    There may be, but I do not know who that person would be.

24    Q    Okay.

25        MS. POLITO:  Judge, we have no objection for the reason we



1    discussed earlier, that it's a public document.  And for that

2    reason, we'll allow it.

3         JUDGE ROSAS:  General Counsel's 10 is received.

4    **(General Counsel Exhibit Number 10 Received into Evidence)**

5                        <u>**DIRECT EXAMINATION**</u>

6    Q    BY MS. CACACCIO:  Do you know whether the Transit Commons

7    store ever refiled?

8    A    They did, yes.

9    Q    Yeah, but do you know about when that happened?

10   A    It was the end of April of 2022.

11   Q    If I showed you a copy of that petition, would you

12   recognize it?

13   A    Yes, I would.

14        MS. CACACCIO:  Your Honor, I'm now showing the witness

15   General Counsel's Exhibit 11.

16   BY MS. CACACCIO:

17   Q    Michelle, what's General Counsel's Exhibit 11?

18   A    This is the new petition for the Transit Commons location.

19

20        MS. CACACCIO:  Your Honor, I offer General Counsel's

21   Exhibit 11.

22                     <u>**VOIR DIRE EXAMINATION**</u>

23   Q    BY MS. POLITO:  Ms. Eisen, when you said new petition, was

24   there a prior petition?

25   A    The prior petition was the one we just finished



1    discussing.

2    Q    Okay.  Any other prior petitions?

3    A    Not that I'm aware.

4    Q    You didn't have any involvement with creating this

5    document; is that correct?

6    A    I did not.

7    Q    And you just reviewed the document as it was presented to

8    you; is that correct?

9    A    Yes, correct.

10   Q    You don't know in fact that it was filed on April 28,

11   2022, other than reading the document, is that correct?

12   A    I mean, I have correspondence with partners at that store

13   that said, we're filing our petition today.  And that was my --

14   Q    Okay.  Was the form of that correspondence email or --

15   A    Text message.

16   Q    -- some other form of --

17   A    Text message.

18   Q    Text messages?

19   A    And email, as well.

20   Q    Okay.  And what text messages would reflect that you were

21   told on April 28th that this was filed?

22   A    An excited text message from a partner that said, we're

23   filing our petition today.

24   Q    And do you remember the name of that partner?

25        MS. CACACCIO:  Your Honor, I object.  If I might be heard?



1    This isn't -- not only is this not appropriate at this -- at

2    this juncture.  It appears as though -- well, we can deal with

3    that later.

4        We object that this isn't relevant at this point.  It's

5    not voir dire, it's not cross-examination yet, and it's not

6    relevant, to the exception that maybe, Respondent's going to

7    now be subpoenaing this witness, which they have not yet done.

8        JUDGE ROSAS:  Overruled.  Anything else?

9        UNIDENTIFIED SPEAKER:  Did you get an answer on that?

10   BY MS. POLITO:

11   Q    What were -- who was the excited person that sent you the

12   text message?

13   A    Michael Sanabria.

14   Q    And were -- was it just the two of you on the text

15   message?

16   A    I do not recall.

17   Q    And did you send copies of those text messages?

18   A    I may.

19   Q    Through your cell phone?

20   A    Through mine, yes.

21   Q    You also said that there were emails, I think?

22   A    Correct.

23   Q    And who were on the emails?

24   A    Aside from my myself and Michael, I am not entirely sure.

25   Q    And was that an email from your employment with the Union



1    or was that a private email?

2    A    That was with a private email.

3    Q    Could you send out a copy of that email?

4    A    I may, yes.

5    Q    Thank you.

6    MS. POLITO:  No objection to this document, Judge.

7    JUDGE ROSAS:  General Counsel's 11 is received.

8    **(General Counsel Exhibit Number 11 Received into Evidence)**

9    <u>DIRECT EXAMINATION</u>

10   Q    BY MS. CACACCIO:  Do you know what the results were of

11   that election?

12   A    I believe that the vote count is happening today.

13   Q    You also mentioned that the Walden and Anderson store

14   filed a petition.  If I showed you a copy of that petition,

15   would you recognize it?

16   A    Yes, I would.

17   MS. CACACCIO:  Showing the witness General Counsel's

18   Exhibit 12.

19   BY MS. CACACCIO:

20   Q    What's that document?

21   A    This is the first petition filed for the Walden and

22   Anderson location.

23   Q    How do you know that?

24   A    Because of the date at the bottom listed as the 8th of

25   September, 2021.



1      MS. CACACCIO:  Your Honor, I now offer General Counsel's

2  Exhibit 12.

3                    **VOIR DIRE EXAMINATION**

4  Q     BY MS. POLITO:  Ms. Eisen, if you take a look at the top

5  of Exhibit 12, is it accurate to say that the case number and

6  date filed are empty, blank?

7  A     They aren't.

8  Q     And so you don't know as of today if that was actually

9  filed, is that correct?

10  A     I mean, only going by the date at the bottom, but if it --

11  if we have to focus on the date on the top, then I don't know.

12  Q     The date bottom is just the date that Mr. Hayes signed the

13  document, is that correct?

14  A     I believe so.

15      MS. POLITO:  And so Judge, I will object to the

16  introduction of this document because it does not indicate when

17  it was actually filed.  If General Counsel has a different

18  petition with a filing date, I'm happy to reconsider.

19      JUDGE ROSAS:  What is this being offered for?

20      MS. CACACCIO:  For the date that it was filed.  I mean, if

21  you would look at General Counsel's Exhibit 13, Judge, you'll

22  see that it was withdrawn, which means it was filed --

23      JUDGE ROSAS:  Put it aside.  Hold on.  Go to the next one.

24      MS. CACACCIO:  The copy in our records doesn't have that

25  case number filled in, but it was obviously filed if it was



1     then withdrawn.

2          JUDGE ROSAS:  You're going to go -- you said that General

3     Counsel's 13 for identification would provide context?

4          MS. CACACCIO:  Yes, Your Honor.

5          JUDGE ROSAS:  Well, go to it.

6                          **DIRECT EXAMINATION**

7     Q    BY MS. CACACCIO:  Michelle, I'm directing your attention

8     to General Counsel's Exhibit 13 -- well, before you do that,

9     Michelle -- do you know what happened to the first Walden and

10    Anderson petition?

11    A    It was very similar.  It was the same situation as the

12    first Transit Commons petition.  Once it was -- they were made

13    aware that it would start the clock over on the first three

14    petitions filed on August 30th, in Buffalo, they chose to

15    withdraw that, in order not to restart the clock --

16         MS. POLITO:  Objection.  I'm going to object based on

17    hearsay.  She's talking about they chose to object.  I don't

18    know who they are.  She's indicated she's not a party to that.

19    So I'm asking that the --

20         JUDGE ROSAS:  I'm going to sustain that.

21    BY MS. CACACCIO:

22    Q    How do you know, Michelle?

23    A    How do I know that they chose -- that the partners at the

24    store chose to withdraw the petition?

25    Q    Yeah.



1    A    Because I had communication with partners at that store.

2         MS. POLITO:  So we object in direct of hearsay testimony.

3         MS. CACACCIO:  Your Honor, I believe it's subject to

4    connection with other witnesses from that location.

5         JUDGE ROSAS:  Subject to corroboration.

6         MS. CACACCIO:  Yes, Your Honor.

7         JUDGE ROSAS:  Okay.  So in these -- in these cases, we can

8    receive hearsay testimony that might not otherwise be

9    admissible in the District Court if it is reliable, and one of

10   the modes for establishing reliability would be corroboration.

11        And with Counsel's representation, I'm going to

12   conditionally receive it, subject to being stricken, should

13   that not end up being the case.  Okay?

14   BY MS. CACACCIO:

15   Q    So Michelle, looking at General Counsel's Exhibit 13, do

16   you know what that is?

17   A    The request for withdrawal of the first petition filed by

18   the Walden and Anderson location.

19        MS. CACACCIO:  Your Honor, I offer General Counsel Exhibit

20   12 and Exhibit 13.  And Ms. Polito has pointed out, these are

21   public records, and they are self-authenticating, at least

22   General Counsel's Exhibit 13 is.

23        MS. POLITO:  Judge, I have no objection to Exhibit Number

24   13, but I my objection to Number 12 remains.  There is no

25   indication on Exhibit 12 that I can see that actually



1    references the case number, and there's no date filed.  So

2    again, subject to an actual filed document, I object to Exhibit

3    12 into the record, but I -- we have no objection to Exhibit

4    13.

5         MS. CACACCIO:  Your Honor, I would be happy to look in

6    that case file again, but this is the filed charge.  Whether it

7    has the date or case number in it, it seems like a filing

8    problem.  But that doesn't mean it wasn't filed after there was

9    a withdrawal of it in General Counsel's Exhibit 13.  It was

10   pulled out of that case file.

11        JUDGE ROSAS:  General Counsel's 13 refers to a request to

12   withdraw a petition without prejudice.  And further orders that

13   a notice of representation hearing previously issued in this

14   matter is withdrawn.  The hearing that is scheduled for

15   September 29, 2021 is canceled.

16        I'm not sufficiently satisfied that it corroborates

17   General Counsel's Exhibit 12 for the point that it was filed.

18   It may have been in a file, but that doesn't convince me or

19   give me enough indicia of reliability that it was filed,

20   because there is no file date at the top.  So it's going to

21   need further evidence to support that argument, if at all.

22   So --

23        MS. CACACCIO:  Your Honor --

24        JUDGE ROSAS:  -- sustained at the General Counsel's 12 at

25   this point.



1    **(General Counsel Exhibit Number 12 Rejected)**

2        MS. CACACCIO:  I'd ask Your Honor to take judicial notice

3    of case 03RC-282641, which was opened for the filing of the

4    petition at the Walden and Anderson store.

5        JUDGE ROSAS:  Repeat that again.

6        MS. CACACCIO:  I'd ask Your Honor to take judicial notice

7    of case 03RC-282641, which was opened for the filing of the

8    petition at the Walden and Anderson store.

9        JUDGE ROSAS:  Do you have that?

10       MS. CACACCIO:  It's in front of you, as you see, Exhibit

11   12.

12       JUDGE ROSAS:  No.  You said -- you said there was a

13   decision in that case, and that's what this order is?

14       MS. CACACCIO:  Judge, the case number at the top --

15       JUDGE ROSAS:  This --

16       MS. CACACCIO:  -- right.

17       JUDGE ROSAS:  This result?

18       MS. CACACCIO:  Right.  Was the result of a filing of a

19   petition at the Walden and Anderson store, in case number 03RC-

20   282641.

21       JUDGE ROSAS:  It doesn't refer to it -- the date that a

22   petition was filed.  How do I know it's this petition?

23       MS. CACACCIO:  That's why I'm asking you to take judicial

24   notice of it, Judge.  Because it's all -- it's all public

25   record.



1       I mean, I can't produce something that doesn't exist.  And

2   because we didn't, for some reason, put a date -- a file date,

3   doesn't mean it wasn't filed, Judge.  That's my problem.

4       JUDGE ROSAS:  Well --

5       MS. CACACCIO:  I can't produce to you something I don't

6   have.  So I can look to file again.  I can talk to whoever took

7   it.  I can, you know -- but --

8       JUDGE ROSAS:  That piece is missing, Counsel.  You're

9   going to need to establish that with someone other than this

10  witness.

11      Sustained, as to General Counsel's 12.  General Counsel's

12  13 is in evidence.

13  **(General Counsel Exhibit Number 13 Received into Evidence)**

14      MS. CACACCIO:  Your Honor, I'd like a five-minute recess.

15      JUDGE ROSAS:  Off the record.

16  (Off the record at 3:13 p.m.)

17      MS. CACACCIO:  The General Counsel has located a petition

18  that -- the one I was just talking about, 12, but with the date

19  filed and the case number on the top.  It was actually emailed

20  to Respondent's Counsel, with respect to that particular issue.

21      I would consider substituting that with this one, if

22  that's amenable to everybody.  If you wanted to, the email that

23  you guys received, I'm happy to show you that too, out of the

24  case file.

25      JUDGE ROSAS:  We're going to get it at some point, right?



1        MS. CACACCIO:  It's coming right now.  It's on its way.

2        JUDGE ROSAS:  Okay.  So that's going to be General

3    Counsel's 12?

4        MS. CACACCIO:  12.

5        MS. STANLEY:  Right.

6        MS. CACACCIO:  Correct.

7        JUDGE ROSAS:  This will be pulled, right?

8        MS. CACACCIO:  Yes.

9        MS. STANLEY:  Yeah.

10       JUDGE ROSAS:  Okay.  Is this part of a critical path, or

11   do --

12       MS. CACACCIO:  Yes.

13       JUDGE ROSAS:  -- can we just continue?

14       MS. CACACCIO:  Oh.  She'll be here in just a minute.

15       JUDGE ROSAS:  Okay.

16       MS. CACACCIO:  But we can -- I mean, we can continue.  I

17   mean, the problem is it's part of the series of the stores'

18   issues so it's up to you, Judge.

19       JUDGE ROSAS:  It's more of the same, I mean, you know, so

20   --

21       MS. CACACCIO:  Right.

22       JUDGE ROSAS:  I mean, we can always go back.

23       MS. CACACCIO:  Yes, Judge.

24       JUDGE ROSAS:  Right?

25       MS. CACACCIO:  Yes, Judge.



1      JUDGE ROSAS:  Okay.  Now, the question is --

2      MS. CACACCIO:  I'll go get Michelle.

3      JUDGE ROSAS:  Let's go off the record, yes.

4    (Off the record at 3:24 p.m.)

5                   **RESUMED DIRECT EXAMINATION**

6    Q    BY MS. CACACCIO:  Michelle, we're going to go back to

7    General Counsel's Exhibit 12 in a minute.

8      MS. CACACCIO:  Your Honor, was Exhibit 13 -- was accepted,

9    yes?

10      JUDGE ROSAS:  Correct.

11      MS. CACACCIO:  Okay.

12    BY MS. CACACCIO:

13    Q    Do you know whether the Walden and Anderson store ever

14    refiled?

15    A    The Walden Anderson store did refile, yes.

16    Q    Do you know about when that was?

17    A    The first or second week in November.

18    Q    If I showed you a copy of that petition, would you

19    recognize it?

20    A    Yes, I would.

21      MS. CACACCIO:  I'm showing the witness General Counsel's

22    Exhibit 14.

23    BY MS. CACACCIO:

24    Q    What's General Counsel's Exhibit 14?

25    A    It is the refiling of a new petition for the Walden and



1    Anderson location.

2        MS. CACACCIO:  Your Honor, I now offer General Counsel

3    Exhibit 14 into evidence.

4                    **VOIR DIRE EXAMINATION**

5    Q    BY MS. POLITO:  Ms. Eisen, did you prepare Exhibit 14?

6    A    No, I did not.

7    Q    And do you know that it's the petition only by reading it

8    today in court?

9    A    I mean, I've seen the petition before.  But do I know that

10   it's the petition for Walden and Anderson?  Yes, I do.

11   Q    Were you involved in the preparation of the petition?

12   A    I was not.

13   Q    How have you seen it before?

14   A    These are sent in the emails, generally once the petitions

15   are filed for stores in Buffalo.

16   Q    And who is the subject of those emails?

17   A    Members of the organizing committee.

18   Q    So you're testifying you're the member of the organizing

19   committee that you received a copy of the petition after it was

20   filed?

21   A    I believe I did, yes.

22   Q    And you received that via email?

23   A    Yes.  I believe so.

24   Q    And was that from Mr. Haynes?

25   A    Correct.



1    Q    But you otherwise had no involvement in the preparation of

2    the actual Exhibit Number 14.  Is that correct?

3    A    That is correct.

4    Q    Who are the other members of the organizing committee?

5    A    Do you want me to list all of them by name?

6

7    Q    Please.

8    A    There's well over a hundred and -- plus members.

9    Q    Okay.  So maybe not.  But does --

10    A    I don't have all of them memorized.

11    Q    -- the email that you referenced include all of those

12    individuals?

13    A    No, it did not include all of the individuals.

14    Q    Okay.  So the email that you referenced where you received

15    a copy of this -- our petition, who would be on those emails?

16    A    I don't know all of them, but I can name some of them, I

17    believe, for you.

18    Q    Why would it be different than the organizing committee of

19    more than 100 people that you just referenced?

20        MR. HAYES:  Your Honor, I object to this.  I know you're

21    being, you know, very liberal in these voir dire questions.

22    This is just so far beyond what's necessary to authenticate

23    this document.

24        MS. POLITO:  That's because --

25        JUDGE ROSAS:  Where are you going with this?



1          MS. POLITO:  She can't authenticate -- the whole point is

2     she can't authenticate it.  She didn't prepare it.

3          MS. CACACCIO:  Your Honor --

4          MS. POLITO:  She's only been handed it.  Let me finish,

5     please.

6          They decided to introduce these documents through this

7     witness who has no proper authentication for any of these

8     documents, quite frankly.  All she's saying is, I reviewed it

9     and I received it by copy of an email.

10         MS. CACACCIO:  Your Honor --

11         MS. POLITO:  That's what she's saying.

12         MS. CACACCIO:  If I might be heard?  That's all she needs

13    to say.  These are public records, and some of them -- they're

14    self-authenticating.  So she doesn't need to say anything other

15    than that.  And if Respondents willing to stipulate them in,

16    I'm happy to do that, too.

17         JUDGE ROSAS:  Counsel, you know, when I hear this kind of

18    testimony, you have to imagine, in the context of business

19    records, for example, and, you know, we validate those under

20    Federal Rule 803(6), you know, often times, they're referred

21    to -- gotten through -- in through witnesses who did not

22    generate them, but who know that it's a document that is

23    maintained in the regular course of business of that entity.

24         And so we're dealing with a labor organization here,

25    essentially, that this witness is a part of, she's explained,



1    as I hear it.  And she's getting these documents in the

2    ordinary course of her duties for that organization, regardless

3    of the fact that, you know, they're public records.

4        I mean, if we want to put them in through public record,

5    you can just ask me to take administrative notice of all of

6    them, and, you know, and -- easily enough.  But we're

7    belaboring this a little too much, I think.

8        MS. CACACCIO:  Judge, I'm happy to do that.

9        JUDGE ROSAS:  Counsel, Counsel.  So let me just make a

10   procedural point so we know where I'm coming from.  And that is

11   that a labor organization, like a business, has and maintains

12   records.  And I have to evaluate these things on that kind of a

13   standard.

14       And again, you know, if you look at the commentators under

15   803(6), you know, it's one thing to receive something, but it's

16   another thing if you want to go after it to undercut the

17   weight, if any, that it should be given, based on the admission

18   through a particular witness.  That is your prerogative.

19       But I'm going to overrule the objection, and I'm going to

20   receive it.

21   **(General Counsel Exhibit Number 14 Received into Evidence)**

22       MS. CACACCIO:  Your Honor, I'm going to offer General

23   Counsel's Exhibits 14 through 24.

24       JUDGE ROSAS:  Okay.  All right, let's go off the record.

25   (Off the record at 3:30 p.m.)



1        JUDGE ROSAS:  All right.  Do you want to show Counsel what

2    you've got?

3        MS. CACACCIO:  Yes, Judge.  I'm trying to label them all.

4        JUDGE ROSAS:  Oh.

5        MS. CACACCIO:  Your Honor, I'm going to pass out a

6    substituted General Counsel's Exhibit 12.  It's two pages,

7    front and back.  It does have a case number and date filed on

8    the top right.

9        MS. STANLEY:  It would be front and back.

10       MS. CACACCIO:  One page, front and back, sorry.  It's two

11   pages total, one front and back.

12       MS. STANLEY:  You just need a second?

13       MS. CACACCIO:  Yeah.  Sorry.  I'm trying to label them.

14   Can you -- thank you.

15       JUDGE ROSAS:  You gave her 12?  You gave her the other --

16       MS. STANLEY:  Yeah.

17       MS. CACACCIO:  Can you just take away the first one?

18       MS. STANLEY:  Here.  I'll take the -- oh.  There it is.

19       MS. CACACCIO:  Did you get one yet?  Does everybody have

20   one?  You got one, right?

21       THE COURT REPORTER:  I should have.

22       MS. CACACCIO:  You got a 12, right?

23       THE COURT REPORTER:  Yeah, I got 12.

24       MS. CACACCIO:  Yeah.  He has one.  Thank you.

25       JUDGE ROSAS:  Okay.  So we're on the record.



1    Respondent, any objection to 12?

2    MS. CACACCIO:  Your Honor, I'm offering General Counsel's

3    Exhibits 12 and 14 through 24, as public record documents.

4    MS. POLITO:  No objection, Your Honor.

5    JUDGE ROSAS:  General Counsel's 12 and 14 through 24 are

6    received.

7    **(General Counsel Exhibit Numbers 12 and 14 through 24 Received**

8    **into Evidence)**

9    <u>**RESUMED DIRECT EXAMINATION**</u>

10   Q    BY MS. CACACCIO:  Michelle, what were the results of the

11   second Walden and Anderson petition?

12   A    Not determinative, I believe, I would respond.

13   Q    And what were the results of the Williamsville Place

14   election?

15   A    Also not determinative.

16   Q    What about the East Robinson election?

17   A    I believe their objection (indiscernible) is not

18   determinative.

19   Q    After that letter went out, the one from August 23rd, did

20   you notice Respondent making any changes?

21   MS. POLITO:  I'm just going to object to Counsel saying

22   that the letter went out on August 23rd because there is

23   nothing in the record that indicates that the letter went out

24   on August 23rd.

25   MS. CACACCIO:  Your Honor, if I might be heard, the



1    witness actually testified to that.

2         JUDGE ROSAS:  Overruled.

3         THE WITNESS:  After the letter to (indiscernible) was --

4    went out or made public on August 23rd, changes -- I mean, are

5    we talking about changes to the store?

6    BY MS. CACACCIO:

7    Q    What was the first change you noticed?

8    A    The first change I noticed was the district manager being

9    ever-present in the store, and I had previously not seen them.

10   Q    And what's the district manager's name?

11   A    David LeFrois.

12   Q    And do you know how long he had been the district manager?

13   A    He had been the district manager of Elmwood since, I

14   believe, May or June of 2022 -- 2020, I'm sorry.

15   Q    And you said that he was present in the store.  When did

16   he visit?

17   A    The first time I saw him after the letter went out was

18   that Thursday.  So I believe that would be the 26th of August.

19   Q    And how often did he come into your store before the

20   campaign?

21   A    I can only remember seeing him once in the store prior to

22   the campaign.

23   Q    And what about after the letter went out?

24   A    After the letter went out, he was there almost daily.

25   Q    And when he visited on the 26th, what did he do?



1    A    He set up a computer in the lobby at one of the tables.

2    He was very much on his computer and on his phone the entire

3    time.

4    Q    And what did he do during his other visits to the store?

5    A    The same.

6    Q    Do you know if he still works for Starbucks?

7    A    He does not.

8    Q    Do you know when he left Starbucks?

9    A    Mid -- I believe early to mid-September of 2021.

10    Q    And how did you learn that?

11    A    Initially, I learned it through a text message from

12    another partner who had overheard a store manager mention that

13    he was no longer with the company.  And then I believe the next

14    day, a letter was posted to the partner hub, which was then

15    printed out and put on a back-room fridge in the Elmwood

16    location.

17    Q    Did you see the letter on the fridge?

18    A    I did.

19    Q    And if I showed you a copy of that letter, could you

20    identify it for us?

21    A    Yes, I could.

22    Q    Michelle, I'm showing you General Counsel Exhibit 25.

23    Take a look at it.  What's this document?

24    A    This is -- these are images of the letter that I was

25    referencing.



1    Q    And is it in the same or similar circumstance -- is it the

2    same -- in the same condition as to when you saw it?

3    A    It is, yes.

4        MS. CACACCIO:  Your Honor, I'd offer General Counsel

5    Exhibit 25.

6                    **VOIR DIRE EXAMINATION**

7    Q    BY MS. POLITO:  Ms. Eisen, how do you know that this

8    letter is the same that you saw posted at your Elmwood store

9    after Mr. LeFrois was departed from Starbucks?

10   A    Because it's same letter that I read that was posted.

11   Q    It's just based on recollection, then?

12   A    Correct.

13   Q    Do you know how long the posting was at the store?

14   A    How long it was on the back fridge?

15   Q    Yeah.

16   A    Probably a few weeks.  They generally tend to stay up for

17   quite some time.

18   Q    It's dated 9/9/21.  So does that mean Mr. LeFrois had left

19   before 9/9/21?

20   A    I don't know when his official re -- resignation date

21   would have been.  I know that I heard about it through a text

22   message the day before I found this letter -- the day before

23   this letter was posted.

24       MS. POLITO:  So Judge, I'm just going to object to the

25   extent that what I heard the testify was that the letter was



1  posted after Mr. LeFrois was terminated, but that Mr. LeFrois

2  continued to work for some period of time.  So the letter

3  itself is dated September 9th, 2021.  So I don't -- I'm

4  objecting to the testimony tying the letter to Mr. LeFrois'

5  termination.  Because I -- I think that there was an inaccuracy

6  about that.

7      MS. CACACCIO:  Your Honor, that doesn't have anything to

8  do with the admissibility of this particular document which I'm

9  offering at this time.

10     JUDGE ROSAS:  Well, Counsel, you're partly correct.  To

11 the extent that the offer for Court to tie in an individual's

12 departure from the company, that remains to be seen.  There is

13 some testimony from this witness reflecting on that.  But

14 otherwise, there's sufficient evidence for the admissibility of

15 this letter, General Counsel's 25, for receipt in evidence.

16 Overruled.

17 **(General Counsel Exhibit Number 25 Received into Evidence)**

18                     <u>**RESUMED DIRECT EXAMINATION**</u>

19 Q    BY MS. CACACCIO:  Michelle, can you look at page 2 of

20 Exhibit 25, three paragraphs up from the bottom?

21 A    Yes.

22 Q    After reading this letter, what did you learn about Mr.

23 LeFrois?

24 A    That he had made the decision to resign from the company.

25 Q    Now, you mentioned that Mr. LeFrois was the district



1    manager at the time.  Who was your store's manager prior to

2    August 23rd --

3    A    Patty --

4    Q    -- 2021?  Sorry.

5    A    That's okay.  Patty Shanley.

6    Q    Do you know when Ms. Shanley joined the store as the store

7    manager?

8    A    August of 2020, I believe.

9    Q    And when I say "the store", what store did Ms. Shanley

10   manage?

11   A    The Elmwood Avenue location in Buffalo.

12   Q    And prior to August 23rd, how often was she in the store?

13   A    Often.  She was a very attentive store manager.

14   Q    What did she do when she was there?

15   A    It depended on the day.  She was either floor coverage,

16   which meant that she was on the floor with us serving customers

17   in a number of particular roles, or it could have been an -- an

18   admin day, when she was doing payroll, or scheduling, or on

19   conference calls, or placing orders.

20   Q    And after the campaign -- sorry, after August 2020 --

21   sorry, after -- struggle.  After August 23rd, 2021, how often

22   was she in the store?

23   A    As often as she had been prior to that.

24   Q    And what did she do in the store after August 23rd, 2021?

25   A    The same responsibilities.  She was either floor coverage,



1  or she was doing admin, which was placing orders, writing

2  schedules, on different conference calls.

3  (Counsel confer)

4  Q    BY MS. CACACCIO:  After August 23rd, 2021, who did the

5  scheduling in your store?

6  A    Up until a point, probably mid-September, it would have

7  still been Patty, to the best of my knowledge.

8  Q    What happened then?

9  A    Once we received the support managers into the store, it

10  became either one of their responsibilities, or they were doing

11  it together with Patty.

12  Q    How do you know that?

13  A    Because I saw them on the back computer doing them.

14  Q    And did your schedule change at all at that point?

15  A    My schedule did not.

16  Q    And what about those you were working with?

17      MS. POLITO:  Object.  Hearsay.

18      MS. CACACCIO:  Your Honor, it's based on her direct

19  observations.

20      JUDGE ROSAS:  Repeat the question.

21      MS. CACACCIO:  I asked what happened to the people she was

22  working with at that time, how they were scheduled, what she

23  saw about that.

24      JUDGE ROSAS:  What she saw.  Overruled.

25  A    The people I was scheduled with on a daily basis did


www.escribers.net | 800-257-0885

1    change.

2    Q    BY MS. CACACCIO:   How?

3    A    I found myself scheduled with the exact same people day in

4    and day out.  I'm an opener, so I would always work the morning

5    shift.  And that could fluctuate based on other partners'

6    availability.  But I noticed that I was working with the same

7    group of people day in and day out.

8    Q    And why was that a change?

9         MS. POLITO:  Object to form.  It's hearsay.  And she can't

10   answer --

11        JUDGE ROSAS:  Rephrase.

12        MS. POLITO:  -- why it was changed.

13        JUDGE ROSAS:  Rephrase.

14   Q    BY MS. CACACCIO:  How did that differ from your prior

15   experience?

16   A    How did me being scheduled with the same people differ

17   from my prior -- because that's just the way that it was.  It

18   was not a block set of people that worked a specific daypart.

19   Some people might have been available Wednesday mornings but

20   weren't available Tuesday mornings, so they would work a

21   Wednesday morning but then a Tuesday night.

22   Q    And what partners were you scheduled with that then became

23   the consistent scheduled partners after this?

24   A    More often, it was the -- the more local Union supporters.

25        MS. POLITO:  Object.  I think the que -- object to the



1    answer because it doesn't give me who she's talk -- I don't

2    know who she's talking about.  Who are the specifics that she's

3    talking about?  What people?

4        MS. CACACCIO:  That can be examined on cross-examination,

5    Judge.  The witness answered the question.

6        MS. POLITO:  Well, then I ask that the answer be stricken

7    from the record.

8        JUDGE ROSAS:  I'm going to sustain that.  It's a little

9    vague.  You're going to need to try to establish some

10   individual names.

11   Q    BY MS. CACACCIO:  Who'd you work with, Michelle?

12   A    I'll try to list them all off, but this is a while.  I

13   would be scheduled with Jaz Brisack.  I would be scheduled with

14   JP.  I would be scheduled with Emily.  I would be scheduled

15   with Angela.  I'm just trying to go through the list of people

16   from a year ago.  I don't know that I can rattle off any more

17   names at this point.

18   Q    Do you know JP's full name?

19   A    Yes.  Jeremy Pasquale.

20   Q    And what about Emily?

21   A    Emily Hersch.

22   Q    And the other ones you named, can you give full names for

23   them?

24   A    Jaz Brisack, Angela Dudzik.

25   Q    And what, if anything, do you know about the partners'



1    Union support, and how do you know it?

2    A    I only know it based on what they told me and on

3    conversations, which was that they were for the Union.

4    Q    Were they wearing -- do you remember if -- do you remember

5    if they ever wore any pins to work?

6    A    I do not.

7    Q    Okay.  Other than store managers, do you have -- did you

8    have any other types of managers in the Elmwood store prior to

9    August 23rd, 2021?

10    A    No, we did not.

11    Q    Is Ms. Shanley still the store manager?

12    A    No, she's not.

13    Q    Do you know when she left the company?

14    A    Mid-May of 2022.

15    Q    Who's the store manager now?

16    A    Her name is Merley Alameda-Rulon, I believe.

17    Q    And how often is Ms. Rulon in the store?

18    A    Not as often as Patty was.  So I'm only there two days a

19    weeks, so I'm probably not the best judge of -- of how often

20    she's in the store.

21    Q    Have you worked any shifts when she's there?

22    A    Yes, I have.

23    Q    And what does she do when she's there?

24    A    She's incredibly undertrained, so not very much.  I think

25    she can be in approximately two positions when she's on the



1    floor or at the porch.  Other than that, she spends a lot of

2    time in the back room.  I don't know what she's doing back

3    there.

4        MS. POLITO:  Object to the answer -- the portion of the

5    answer that says that she's undertrained and ask that be

6    stricken from the record.  This witness has no personal

7    knowledge as to what the manager's training was.

8        JUDGE ROSAS:  I'll sustain to turn "undertrained" --

9    "undertrained"?  "Undertrained".  And what else?

10       MS. POLITO:  That was it, Judge.

11       JUDGE ROSAS:  Okay.

12   Q    BY MS. CACACCIO:  How many positions are there?  You said

13   she's able to do two of them.

14   A    Can I just count really quick?

15   Q    Yeah, sure.

16   A    I think seven.

17   Q    What two positions does she do?

18   A    Point of sale, which is the front register; and warming,

19   which is the oven.

20   Q    And what are the other?

21   A    Bar 1, bar 2, cold bar, customer support, handoff.  I

22   think that's it.

23   Q    How difficult is the warming station?

24   A    It -- it is not.  It's usually where we put brand-new

25   partners who are still getting used to the roles of the store.



1    Q     And how difficult is it to be on point of sale?

2          MS. POLITO:  Objection to the question.  Difficult.  I

3    don't know what that means.

4          JUDGE ROSAS:  Repeat the question.

5    Q     BY MS. CACACCIO:  How difficult is it to be on point of

6    sale in your experience?

7          MS. POLITO:  Same as --

8          JUDGE ROSAS:  I'm going to ask you to rephrase that.

9    Q     BY MS. CACACCIO:  Have you ever worked point of sale?

10   A     Yes, I have.

11   Q     What do you do?

12   A     Customers come up to the register, giving your order --

13   their order.  You punch it into the register, and you cash them

14   out.

15   Q     And what about when you're on bar?  What do you have to do

16   there?

17   A     You're in charge -- depending on which bar placement

18   you're at, you're in charge of the production of all of the

19   beverages that come through that station.

20   Q     And in your experience, how does working on point of sale

21   compare to the other positions in the store?

22   A     The bar positions, particularly bar 1, are certainly much

23   higher-skilled positions.  You have to have memorization of the

24   recipes and all -- and the ability to produce drinks in a -- a

25   pretty quick pace.  In my opinion, point of sale, everything is



1    laid out on the computer, so it's a matter of pushing a button.

2    Q    You mentioned the support manager.  What is a support

3    manager?

4    A    I didn't know what a support manager was prior to August

5    23rd, 2021.

6    Q    What do you know it to be --

7        MS. POLITO:  Objection to the answer as being

8    nonresponsive to the question.

9    A    I don't know what it --

10       JUDGE ROSAS:  Repeat the question.

11       MS. CACACCIO:  I asked her --

12       JUDGE ROSAS:  No.  Repeat the quest -- repeat your answer.

13       THE WITNESS:  That I didn't know what a support manager

14   was prior to August 23rd --

15       JUDGE ROSAS:  Overruled.

16       THE WITNESS:  -- 2021.

17       JUDGE ROSAS:  The answer stays.

18   Q    BY MS. CACACCIO:  Do you know what it is now?

19   A    I'm told that it is a manager that is sent in from a high-

20   performing store in another location to support the store

21   manager at that store that they're sent to.

22   Q    And how do you know that?

23   A    Because that's what we were told by members of corporate

24   when we asked what a support manager was.

25   Q    And what did you view a support manager as?



1    A    I viewed a support manager as somebody sent there to

2    interfere with our Union campaign and to overhear conversations

3    going on between partners on the floor.

4    Q    And why'd you think that?

5    A    Because that's what I witnessed them doing.

6    Q    Had any of the stores you'd ever worked in ever had a

7    support manager prior to August 23rd, 2021?

8    A    No, they did not.

9    Q    Had you ever heard of a support manager prior to August

10    23rd, 2021?

11    A    No, I had not.

12    Q    And how long had you been with the company?

13    A    At that point, about 11 years.

14    Q    And what support managers were at the Elmwood store?

15    A    We received two by mid-September:  Dustin Taylor and Matt

16    LaVoy.  We also received another one sometime around December.

17    Q    And who was that?

18    A    Catherine Posey, I believe was her name.

19    Q    And are those the only support managers your store

20    received?

21    A    We had a support manager for our support manager when they

22    had to take a vacation.  Her first name was Sara, and I -- I

23    actually do not remember her last name.

24    Q    When was your store first assigned a support manager?

25    A    I don't have an exact date.  I think it was mid-September



1    of 2021.

2    Q    And why do you think that's when it was?

3    A    I remember getting a text message from Jeremy Pasquale,

4    JP, saying, we have a new support manager.  His is name is

5    Dustin.

6    Q    Do you know where Dustin came from?

7    A    He came from a store somewhere in Georgia.

8    Q    Do you know what he did in Georgia?

9    A    He was the store manager at that store.

10   Q    How did he join the store, or what happened there?  Do you

11   know?

12   A    I was not there his first week or his first day.

13   Q    When was the first time you saw him?

14   A    It would have been late September of 2021.

15   Q    And what did you do when you saw him?

16   A    I introduced myself.  He introduced himself by name.  We

17   were working together that morning pretty closely.

18   Q    Did he say anything to you?

19   A    He did not.

20   Q    When Dustin was there, how often did he work at your

21   store?

22   A    He was scheduled full time, I believe, which is

23   approximately 40 for a store manager.  It's a salaried

24   position, so it fluctuates a little bit.

25   Q    And what did he do when he was there?



www.escribers.net | 800-257-0885

1    A    It depended on the situation.  If Patty was also there, he

2    was generally following her around.  I'm not sure what they

3    were doing, helping with orders or scheduling.  Usually

4    scheduling I saw him do with her.  If Patty wasn't there, then

5    he was on the floor, working with us.

6    Q    What does it mean to be "on the floor, working" with you?

7    A    On-floor, or floor coverage, would mean that you are in a

8    position that is facilitating and serving customers.  That's

9    the most immediate need.

10   Q    Does Dustin still work at your store?

11   A    He does not.

12   Q    Do you know when he left?

13   A    Mid to late December, he was transferred to the Camp Road

14   location.

15   Q    And how do you know that?

16   A    I remember his last day.  It was a Sunday.  I think I

17   stopped in to get a drink, and he told me it was his last day.

18   Q    You mentioned a support manager named Matt.  When was the

19   first time you saw him?

20   A    Right around the same time that I saw Dustin.

21   Q    And what happened that day?

22   A    It was, I believe, his first shift, actually.  He was on

23   the warming station.  He accidentally left a breakfast sandwich

24   in the oven for too long, and it caught on fire and created

25   quite a commotion.



1    Q    Does Matt still work at your store?

2    A    He does not.

3    Q    When did he leave?

4    A    He was sent back to his store in Boston mid-December.  The

5    16th is ringing a bell.

6    Q    You said, "his store in Boston".  Do you know what he did

7    in Boston?

8    A    He was a store manager.

9    Q    Why do you think he left when you said that he did?

10   A    He left a big long --

11        MS. POLITO:  Object to form.  I think the question, why

12   did he -- I'm sorry, can you read back the question?

13        MS. CACACCIO:  I don't think they do that.

14        MS. POLITO:  Can't do that?

15        THE COURT REPORTER:  I can play it back, but it takes a

16   couple minutes.

17        JUDGE ROSAS:  Yeah.

18        MS. CACACCIO:  I could just ask -- withdraw, and I'll ask

19   again.

20        MS. POLITO:  Okay.

21        MS. CACACCIO:  It's faster.

22        MS. POLITO:  Thank you.

23   Q    BY MS. CACACCIO:  You told me when he left.

24   A    Uh-huh.

25   Q    Why do you think you remember why -- when he left?



1    A    He -- he wrote a big, long good-bye note on one of our

2    backroom fridges with a chalk marker.

3    Q    When Matt was at your store, how often did he work?

4    A    He was also scheduled, you know, 40 hours or whatever,

5    full time week for a store manager.

6    Q    And what did he do when he was there?

7    A    Very similar to Dustin.  If Patty was there, he was

8    assigned to follow her around in whatever they were doing.  And

9    then if Patty wasn't there, he was floor coverage with us.

10    Q    Do you know how their hours were divided, based on your

11    observation?

12    A    Based on my observations, they were there to cover all

13    dayparts.

14    Q    And what -- when you say, "dayparts", what does that mean?

15    A    Typically, a day -- a day would be broken up into three

16    dayparts.  You have the opening daypart, the mid daypart, and

17    the closing daypart.  And so it doesn't mean that there isn't

18    some overlap.  Usually, the mid overlaps the opener, and the --

19    and then the closer overlaps the mid.  But they were scheduled

20    so that there was always managerial coverage throughout the

21    day.

22    Q    So prior to August 23rd, 2021, in your observations, was

23    there always a manager in the store?

24    A    No.  There could not be.

25    Q    Why not?



1    A    Because there's only one store manager.  So they could not

2    have all dayparts covered seven days a week.

3    Q    You mentioned someone named Catherine.  What was her role?

4    A    She was a support manager that came in.  There may have

5    been some overlap between her and Dustin and -- and Matt.  But

6    essentially, she came in to replace Dustin and Matt.

7    Q    Do you remember about when she came into your store?

8    A    Mid-December, I think, before Christmas.

9    Q    Why do you think that?

10   A    Because she was there for the Christmas holiday, and she

11   covered -- Patty Shanley took a vacation over the Christmas and

12   New Year's holidays, and she was the acting store manager

13   during that period of time.

14   Q    Do you know where Catherine came from?

15   A    I want to say northern California.  Definitely California,

16   I'm just not sure what city.

17   Q    And how long did she stay?

18   A    I believe she was gone by mid to late January.

19   Q    Of what year?

20   A    Of 2022.

21   Q    And how often was Catherine in the store when she worked

22   at Elmwood?

23   A    She was also scheduled, you know, 40 hours or whatever the

24   standard scheduling is for the store manager.

25   Q    And what did she do when she was there?



www.escribers.net | 800-257-0885

1    A    Again, she was assisting Patty with a lot of the

2    managerial duties, or she was floor coverage.

3    Q    You also mentioned a manager named Sara.  What was her

4    role?

5    A    Sara was brought in in the fall, I believe late October,

6    somewhere around there, because either Dustin or Matt -- and I

7    can't remember -- had a scheduled vacation, and she was brought

8    in to cover for their vacation.

9    Q    How long was that vacation?  Do you remember?

10   A    About two weeks, I think.

11   Q    And do you remember about when the vacation was?

12   A    I believe it was after the Elmwood remodel, which would

13   have put it somewhere mid to late October.  But I can't be

14   certain.

15   Q    And how long was Sara there?

16   A    For the duration of that vacation.  And then on occasion,

17   she would -- she would come in and work a shift, as well.

18   Q    When Sara was working at Elmwood, how often was she there?

19   A    It was the same as Matt or Dustin.  It was to cover

20   whatever shifts they weren't available to -- to work.

21   Q    And what did she do when she was there?

22   A    The same as Matt and Dustin.  She was either floor

23   coverage, working alongside myself and my fellow partners on

24   the floor, or she was assisting Patty.

25   Q    Do you know where Sara came from?



1    A    I think Chicago, but I can't be certain.

2    Q    We talked about support managers.  Were there ever

3    district managers in your store?

4    A    There was a district support manager.

5    Q    Do you know who that was?

6    A    Her name's Kelly.  I do not remember her last name.  She's

7    from Minnesota.

8    Q    What was Kelly's role prior to -- do you know what Kelly's

9    role was prior to coming to Elmwood?

10   A    My understanding is that she was a district manager in --

11   in her district in Minnesota.

12   Q    And what interaction, if at all, did she have in the

13   Elmwood store?

14   A    She came in as a district manager, so I was told by her

15   that she was there as a support district manager to support the

16   other district managers in Buffalo.  So she would meet with

17   them at our store sometimes, or she would meet with Patty and

18   the support managers to discuss how their store was running.

19   Q    Does she still work in Buffalo, to the best of your

20   knowledge?

21   A    I don't believe so, no.

22   Q    Do you know when she left?

23   A    I think she lived here until January or February of 2022.

24   Q    And what did she do when she was in your store?

25   A    She was either meeting with Patty and the support



1    managers, or if some of the other -- the -- the newly appointed

2    intern district managers in -- in the district were there.

3    Sometimes they would get a cafe table.  On occasion, she would

4    be on the floor in some appointed position, helping me serve

5    customers.

6    Q    Are you familiar with someone -- a manager in your store

7    named Ana?

8    A    Ana Gutierrez, I believe.

9    Q    And who is that?

10   A    I was told she was an operations manager.

11   Q    And what was your personal interaction with Ana?

12   A    The very first, I believe, was -- was in a listening

13   session on October 20th, I believe was my first interaction.

14   She was present for that.  My first interaction with her at

15   Elmwood was the following morning.

16   Q    What happened?

17   A    She came in, said hello, said that she was -- she was

18   going to be here on the floor to assist us this morning.  She

19   placed herself on the outward handoff position, which is on the

20   outside of the -- the bar counter.  You're essentially handing

21   drinks to customers if they -- if they're ready.  I noticed

22   when she came in that she was wearing bracelet and large rings,

23   and she had her nails painted, which is all against Starbucks

24   dress code.  I was upset by that, so I approached my shift

25   supervisor and told him that I was going to ask her about that



1    situation, and I did.

2    Q    And what happened?  What did she say, if anything?

3    A    I told her that these were dress code violations and that

4    they were -- partners at Elmwood, we would have sent them home

5    for that.  And she said, oh, okay.  And that was the end of the

6    conversation.

7    Q    Did she do anything because of what you told her?

8    A    She did not.

9    Q    Okay.  How often was Ana in the store?

10   A    Ana and I only had a handful of interactions in the store,

11   so I can't speak to that.

12   Q    Okay.  Does Ana still work at your store?

13   A    She does not.

14   Q    Do you know about when she left?

15   A    I do not.  I'm sorry.

16   Q    Okay.  Other than the store managers and support managers,

17   did you see any other Starbucks officials in your store after

18   August 23rd, 2021?

19   A    I did, yes.

20   Q    When was the first time you saw a Starbucks official in

21   your store after August 23rd, 2021?

22   A    I believe it was Saturday morning.  September 4th sounds

23   familiar.  I --

24   Q    Were you working that day?

25   A    I was not.



1    Q    So why were you in your store?

2    A    I was on my way to the theater for either a rehearsal or a

3    performance, and I stopped in, as I normally do, to -- to get a

4    drink on my way to the theater.

5    Q    And what did you see?

6    A    I saw three people, of which I recognized by face as

7    Rossann Williams, Deanna Pusatier, and Allyson Peck.

8    Q    What was Rossann doing when you saw her?

9    A    Rossann, I believe, was behind the counter.

10   Q    And what was Deanna doing?

11   A    Deanna was standing by the entrance -- Elmwood has three

12   entrances.  She was standing by the patio entrance door.

13   Q    And what was Allyson doing?

14   A    Allyson was over by the handoff lane.

15   Q    And what's Rossann Williams' title, if you know it?

16   A    President of Starbucks North America.

17   Q    And Deanna Pusatier, what's her title?

18   A    She was our -- our newly -- recently appointed regional

19   director.

20   Q    And what about Allyson Peck?  Do you know her title?

21   A    She is the regional vice president.

22   Q    And what was happening?

23   A    A lot of chaos.

24   Q    Why?

25   A    It was a busy Saturday morning.  Most of them are.  We



1    have the Elmwood Farmers Market right there, so generally, it's

2    pretty busy.  It was a nice day.  So it's just a busy day

3    overall.  Deanna was saying hello to customers as they entered

4    the store.  I believe Rossann was back there trying to assist

5    with drinks.  And then Deanna -- or Allyson was standing at the

6    handoff lane, talking to customers and -- and helping to hand

7    out finished beverages and food.

8    Q    Prior to that day, had you ever seen the president of

9    Starbucks North America in any store that you worked?

10   A    I did not.

11   Q    And what about the regional director?  Had you ever seen

12   anyone in that position in any store that you'd worked?

13   A    Not in the last five or so years.

14   Q    And what about before that?

15   A    There's -- there's always been occasions where, you know,

16   maybe we exceeded a sales goal and someone was coming through,

17   and they might have popped in to say hello.  But the last time

18   that happened, I think I was still at Transit Commons.  So it

19   was a long time ago.

20   Q    And what about the regional vice president?  Had you ever

21   seen anyone with that title in any store you'd worked prior to

22   August 23rd, 2021?

23   A    I had met Allyson when she was -- had just been hired with

24   the company in the spring of 20 -- spring or early summer of

25   2020, we had recently reopened Elmwood, and we had exceeded



1     some sort of goal.  And she came in to congratulate us, but

2     that was the only time0147510014658 7876I7 had seen her.

3     Q     And what about anyone else in that title?  The person

4     before Allyson -- had you ever seen them in your store?

5     A     Not that I can recall.

6     Q     Now, after this first visit, did you ever see any other

7     corporate officials in your store?

8     A     There was a group that came in towards the tail-end of one

9     of my shifts, pretty early on in the campaign.  They did not

10    introduce themselves.  I was actually on the point of sale, but

11    I didn't realize that they were corporate at first.  They came

12    in and ordered, did not present partner numbers with their

13    order.

14    Q     What does that -- can you tell us what that means?

15    A     Sure.  We are all assigned a number -- a partner number

16    when we're hired with the company, and that is how you get your

17    discount when you're coming into the store.  So it's very

18    unusual, if you have them, not to utilize that discount.  So

19    the assumption -- I just assumed they were regular customers.

20         They then took a seat at a cafe table and were joined by

21    one of the store managers, and that's when I sort of put two

22    and two together that they were probably members of corporate.

23    So a little while later, they reapproached to order something

24    else, and I asked directly if they wanted to use a partner

25    number.  And they said, no, they wouldn't be using partner



1    numbers.

2    Q    Okay.

3         MS. CACACCIO:  Your Honor, I promised that I would tell

4    you when we're about to enter the line of recording.  We're

5    about to enter that right now.

6    Q    BY MS. CACACCIO:  So we talked about the officials and the

7    managers that came to your store.  What was the next change you

8    noticed after the union campaign went public?

9    A    The next change would have been the listening sessions, as

10   the company called them.

11   Q    What, in your understanding, was a listening session?

12   A    It was described to us as an opportunity to meet with

13   high-level members of corporate to discuss issues that were

14   happening in our stores.

15   Q    And when was the first time you heard about the listening

16   session?

17   A    There were two scheduled the Thursday and Friday after we

18   filed our petition at Elmwood.  They were held at the Main

19   Street Starbucks location in Williamsville, and there were two

20   times left -- one for Thursday and one for Friday.

21   Q    And how -- how did you become aware of it?

22   A    My store manager sent me a text message, ask -- telling me

23   about them and asking me if I could attend one of the two

24   meetings.

25   Q    And who was your store manager at that time?



1  A    Patty Shanley.

2  Q    Do you know who was supposed to attend these sessions?

3  A    They were open to Star -- all Starbucks partners in the

4  Buffalo market, as far as I know.

5  Q    Did you attend those sessions that you just mentioned?

6  A    I did not attend either of those.

7  Q    And since when -- since the time you first joined the

8  company, had you ever been notified of city-wide listening

9  sessions?

10  A    I had not.

11  Q    You testified you didn't attend the listening sessions --

12  those -- those first two.  Do you -- do you know the dates of

13  those?

14  A    It was in September -- 2nd and 3rd, I believe -- Thursday

15  and Friday.

16  Q    Did you attend any listening sessions?

17  A    After those days?  Yes, I did.

18  Q    What was the first session you attended?

19  A    Friday, September 10th, 2021.

20  Q    And how did you learn about that meeting?

21  A    I was contacted again by my store manager and told that we

22  had -- there was two listening sessions scheduled for the

23  Elmwood location.  They were to take place in a hotel

24  conference room by the airport.  And I was asked to make sure

25  that I attended one of those two meetings.



1    Q    Do you know who those sessions were for?

2    A    Those were for the Elmwood partners.  Yeah.

3    Q    What time was that meeting -- the meeting you attended --

4    held?

5    A    I attended the Friday, September 10th session.  I think it

6    was scheduled for 4 p.m. to 5 p.m.

7    Q    Would the store usually be open during that time?

8    A    Yes, it would.

9    Q    Was the store open during that time?

10    A    I believe it was, yes.

11    Q    And who ran the meeting?

12    A    This meeting was run by Rossann Williams, Deanna Pusatier,

13    and Allyson Peck.

14    Q    And about how many employees attended the meeting?

15    A    I think that particular one was seven or eight of us.

16    Q    And how long did it last?

17    A    It got off to a late start because they forgot that they

18    scheduled it.  And then --

19    Q    Why do you -- how do you know that?

20    A    Well, no one was there to meet us when we arrived.

21    Eventually, someone came out and realized that we were there

22    and then had to make phone calls to the other corporate members

23    who were across the street at the Genesee location.  So they

24    came over and apologized.

25          The person who was supposed to check us in for the COVID



1  log was not there.  I think she was off getting something to

2  eat.  She was another Starbucks partner.  So they had to borrow

3  the thermometer from the hotel reservation desk to temp us in,

4  which was a part of the COVID policy at that point for the

5  company.  So I think we started about 15 minutes later than we

6  were supposed to.

7  Q    Did you record the meeting?

8  A    I did.

9  Q    How did you record it?

10  A    I used my Apple Watch.

11  Q    Did you alter the recording in any way?

12  A    I did not.

13  Q    If I played you the recording, could you identify it for

14  us?

15  A    Yes, I could.

16       MS. CACACCIO:  So Your Honor, at this time, we're looking

17  at General Counsel Exhibits 26(a) and 26(b).  26(b) is a

18  transcript for aide in the recording, and I don't know how

19  you'd like me to proceed at this point.  I can hook my laptop

20  up to play it for the witness so she can identify it.  If you

21  want to go off the record, I can talk to Respondent's counsel

22  about the best way to move forward with these because, like I

23  said, we're going to have a lot -- not just with -- not just

24  this witness, but with many.

25       JUDGE ROSAS:  Okay.  Off the record.



1    (Off the record at 4:11 p.m.)

2        MS. CACACCIO:  So Judge, what I wanted to say with the

3    witness excused is that this is just one of many recordings.

4    There may be close to 40 recordings that we have in this

5    matter.  Many of them range about an hour a piece.  So for us

6    to do this in the way that we're talking about doing it right

7    now is going to take at least one week's worth of time.  So

8    that's why I'm trying to see if there's some kind of better

9    method.  I'm happy for voir dire.  I'm happy for whatever we

10   can do to save the Court at least 40 to 50 hours of playing

11   recordings.

12       JUDGE ROSAS:  Well, you indicated that you were going to

13   have to go to certain parts of these recordings in order to

14   identify individuals.

15       MS. CACACCIO:  So this is what I was suggesting earlier,

16   Judge -- that if we were able to, with Respondent, be able to

17   identify speakers, we wouldn't have to do that necessarily with

18   the witness, as long as she's able to identify the recordings,

19   Judge.  We can make stipulations.  We could go off the record.

20   I mean, I think we have choices other than listening to 40 to

21   50 hours of recordings of these meetings.

22       JUDGE ROSAS:  That's not practical --

23       MS. CACACCIO:  Okay.

24       JUDGE ROSAS:  -- for sure.  So -- okay.  Is that why you

25   wanted her excused?



1    MS. CACACCIO:  Yeah, but I mean, the number of recordings

2  we have the length of this one, I just didn't want to take the

3  testimony at all with talking about other people's recordings

4  and other -- you know.

5    JUDGE ROSAS:  So she can --

6    MS. CACACCIO:  Okay.

7    JUDGE ROSAS:  It -- it sounds like she can come back here.

8  I mean --

9    MS. CACACCIO:  Okay, sure.

10    JUDGE ROSAS:  -- when she comes back --

11    MS. CACACCIO:  Sure.

12    JUDGE ROSAS:  Let's -- let's wait until the witness comes

13  back and --

14    MS. CACACCIO:  Sure.

15    JUDGE ROSAS:  Well, do we want to argue this outside her

16  presence?

17    MS. CACACCIO:  We could.

18    JUDGE ROSAS:  Do you care?

19    MS. POLITO:  It's up to you, Your Honor.  I would like --

20    JUDGE ROSAS:  I don't, you know --

21    MS. POLITO:  -- to have my objections on the record.

22    JUDGE ROSAS:  -- I can't see any -- any fallback on this.

23    MS. CACACCIO:  Sure.  I'll bring her back, Judge.

24    JUDGE ROSAS:  One way or the other.

25  (Off the record at 4:18 p.m.)



1      JUDGE ROSAS:  And we're dealing with one offered audio

2   recording at this time.

3      MS. CACACCIO:  Yes, Judge.

4      JUDGE ROSAS:  And -- and you've -- you've designated that

5   as General Counsel's 26(b)?

6      MS. CACACCIO:  26(a) is the recording.  26(b) is the

7   transcript, Judge.

8      JUDGE ROSAS:  Okay.  Okay.  So we've discussed this off

9   the record -- the -- the procedure of playing it for the

10  witness, in an effort to have her authenticate it and -- or

11  clarify aspects of the recording and to authenticate it, right?

12     So Respondent, you have an objection --

13     MS. POLITO:  Yes, Your Honor.

14     JUDGE ROSAS:  -- before we've even asked, right?

15     MS. POLITO:  That's correct, Your Honor.

16     JUDGE ROSAS:  Go ahead.

17     MS. POLITO:  Your Honor has the authority to exclude

18  evidence, including, but not limited to, electronically stored

19  information such as audio and video recordings that are not

20  authenticated.  Federal Rules of Evidence 901(a) requires that,

21  for the evidence to be authenticated, the proponent must

22  produce evidence sufficient to support a finding that the item

23  is what the proponent claims it is, before it is received into

24  evidence.

25     Examples of evidence that satisfy the requirements are



1    testimony of a witness with knowledge, distinctive

2    characteristics, and opinion about a voice.  We've already

3    heard that there are voices on this audio recording that the

4    witness cannot authenticate.  So that's one of the reasons why

5    these audio recordings should not be introduced into evidence.

6        MS. CACACCIO:  Your --

7        MS. POLITO:  Moreover, Judge, there are multiple audio

8    recordings that General Counsel has indicated that she would be

9    submitting.  We have no indication how they were created, why

10   they were created, whether or not they are originals, copies,

11   or they may have been truncated or altered, whether they are

12   the complete recordings of the specific event that we're

13   referring to.  So the testimony, as set forth, lacks proper

14   foundation for admission.

15       Moreover, Judge, it's cumulative and duplicative.  The

16   witness testified that she was at this listening session.

17   There's no reason why she can't testify as to what she heard

18   and recalls from the listening session.  So an audio recording

19   that lacks proper foundation, and for which no one can testify

20   as to who the voices are, is completely inappropriate and

21   should not be admitted into evidence.

22       MS. CACACCIO:  Your Honor, if I might be heard?

23       This witness didn't say she could identify the voices.

24   That never happened.  Second of all, until we play the

25   recording, we can't -- all these -- all of Respondent's



1    objections are untimely at this point.  This witness has

2    already testified it's her recording.  She testified when she

3    made it.  The recording itself is the best evidence of what

4    happened in that meeting, and we have it.  So that's the

5    evidence that should be used.

6         MS. POLITO:  Your Honor, just so that we're clear, the

7    exhibit that I have actually has unidentified speakers right in

8    the transcript.  So --

9         MS. CACACCIO:  Right.  And Your Honor --

10        MS. POLITO:  -- I don't know how we could listen to a

11   recording or a transcript where clearly there's unidentified

12   speakers.

13        MS. CACACCIO:  Your Honor, can I be heard?

14        JUDGE ROSAS:  No, not yet.

15        MS. CACACCIO:  Okay.

16        JUDGE ROSAS:  So just a reminder to everyone that

17   everybody gets their chance when the other one finishes.  Okay?

18        MS. CACACCIO:  Yes, Judge.

19        JUDGE ROSAS:  Okay.  I won't say it's the last word unless

20   it's obviously clear.  You'll all get your chance.

21        Go ahead.

22        MS. CACACCIO:  This witness didn't make the transcript,

23   and we never purported that she did.  This transcript was made

24   by the transcription recording service.  If the transcription

25   recording service wasn't able to identify the speaker, that's a



1  separate problem from whether this witness could identify the

2  speaker, which is why I offered to Respondent to make

3  stipulations about the speaker so we can save time here, but

4  that doesn't seem to be -- they're not -- didn't seem to be

5  interested in that.  So I'm having to have this witness do it

6  because she was there, and she can testify to it.

7      MS. POLITO:  Your Honor, if I may, asking me as an

8  attorney to listen to a recording and make some representation

9  who spoke is wholly improper.  So I'm not trying to be

10  difficult, and -- and the insinuation is -- I know it's getting

11  late in the day, but it's a wholly improper request to ask me

12  to authenticate a voice of someone that I may or may not have

13  ever heard before, number 1.

14      Number 2, the fact that the transcript was issued by a

15  third party, and we have no knowledge, and there's been no

16  foundation laid, as to how that transcriber got the recording,

17  was it a complete recording, was it -- did it contain the whole

18  record, and how they transcribed it -- is also wholly improper

19  for foundational purposes.  And the audio recording and the

20  transcription should not be entered into evidence.

21      JUDGE ROSAS:  Well, --

22      MS. CACACCIO:  May I be heard?

23      JUDGE ROSAS:  Not yet.  Let me just -- let me just tell

24  you what my interim thoughts are right now, as you all are

25  talking about the transcript versus the audio.  It -- it sounds



1   like the transcript is a -- is a best effort on the part of

2   someone to transcribe what is uttered in General Counsel's

3   26(a) for identification.  So whether General Counsel's 26(b)

4   is received in evidence or not remains to be seen.

5      I want to remind counsel that we -- we have instances in

6   which, in litigation, oftentimes, in order to assist the fact

7   finder, parties come up with data compilations, as an

8   analogy -- okay -- that, in and of themselves, are not regular

9   business records, were not contemporaneously created at the

10  time of a transaction or an event.  But oftentimes, the finder

11  of fact will receive those documents in evidence as an aide,

12  keeping in mind that the -- the evidence that's chief is the

13  underlying, the base, the -- the -- the original evidence,

14  which in this case is the audio.

15     So let's -- let's kind of put, you know -- and I'm

16  referring to Federal Rule of Evidence -- I believe it's 10 --

17  1006, okay?  That's been used in a lot of respects by parties

18  in these litigations.  But put that on the side.  The -- the

19  main issue right now is 26(a) -- is the audio recording and

20  what the General Counsel has indicated is -- is a rerun on --

21  on -- on many occasions, if we can't figure out some

22  streamlined way to -- to address this.

23     You know, if it -- if we have to play every audio in the

24  hearing -- and they're not going to be transcribed.  They're

25  not going to be transcribed.  But -- but they've got to be



1    listened to by me when -- when I deliberate on this case, on

2    the record.  If -- if a USB or a CD is uploaded electronically,

3    and -- and you know, and it -- it's received in evidence as --

4    you know, as evidence of the -- of a -- of a -- of a recording,

5    I'm going to have to make do with what I'm listening to when --

6    when I deliberate.  So either I listen to it now, or I listen

7    to it later.

8         Now, you know, what we can do is we can, if we want -- and

9    it's just something to consider -- we can address the -- the

10   underpinnings, the -- the -- the creation, the authenticity of

11   what is purported to be audio recordings.  Okay?  I don't know

12   if, you know, the parties are interested in figuring out a way

13   so that especially the Respondent is -- feels assured that it

14   is what the witness purports it to be.  But those are just some

15   thoughts.  Any -- any -- any response to that?

16        MS. POLITO:  Well, Judge, I mean, I suppose I can

17   certainly voir dire the witness a little bit about her

18   recording of this particular listening session.  But my same

19   objection stands.  If -- and we're entitled to hear the whole

20   recording as well.  If it's -- if it's --

21        JUDGE ROSAS:  You're entitled --

22        MS. POLITO:  Right.

23        JUDGE ROSAS:  Let me interrupt you, Counsel.  I forgot to

24   also --

25        MS. POLITO:  Yes.



1      JUDGE ROSAS:  -- throw in --

2      MS. POLITO:  Yep.

3      JUDGE ROSAS:  -- the fact that not -- not only are you

4  entitled; you have to listen -- you have to know what it is,

5  and you're entitled to establish the circumstances regarding,

6  you know, what it purports to represent.

7      However, the point that we've already heard from her in

8  this -- in this scenario is not the best evidence.  If there is

9  evidence that exists -- you know, you can argue conversely that

10  her testimony about what tran -- what transpired technically

11  could, you know, be stricken in place of the actual audio.  So

12  to the -- except to the extent that it just provides a general

13  parameter of what transpired and maybe could clarify what's in

14  the audio, where maybe there are some questions.

15      But anyway, go ahead.

16      MS. CACACCIO:  Your Honor --

17      MS. POLITO:  I --

18      MS. CACACCIO:  Sorry.  May I be heard?

19      JUDGE ROSAS:  No.  I want to hear from her.

20      MS. POLITO:  There still is nothing in the record that

21  indicates any proper authentication or foundation for the audio

22  recording and/or the transcript.  And starting with the audio

23  recording, there is no indication, other than the witness

24  saying that she went to a session, recorded something on her

25  Apple Watch, and that's it.  There's no authentication.  We



1    don't have the original recording.  We have no indication of

2    the -- the metadata which said when it was recorded, how long

3    it was recorded.  We don't have any of that information.

4        We have no information as to when it went to a

5    transcriber, who -- who transcribed it.  I think the -- someone

6    from the Board may have transcribed it.  I'm -- I don't know

7    who the transcriber is.  eScribers -- it looks like eScribers

8    transcribed it.  I don't have any of that information.

9        Yes, General Counsel did provide me with a copy of the

10   audio recording, and she provided me with a copy of the

11   transcript.  It's evident from the transcript that there are

12   people speaking at this listening session that apparently no

13   one in this room knows who those people were.

14       So I don't know how it would be properly authenticated or

15   how the foundation could possibly be laid to allow that and

16   introduce that into evidence, when the witness is here, and she

17   can testify as to what she heard at that listening session,

18   what she walked away from, just as she did for the last two

19   hours about her observations about what happened at this

20   particular event.

21       JUDGE ROSAS:  Counsel, did you subpoena this material?

22       MS. POLITO:  We have issued a subpoena on the Board, yes.

23       JUDGE ROSAS:  On the Board or on this witness?

24       MS. POLITO:  We have not yet issued any individual

25   subpoenas on this particular witness, no.



1    JUDGE ROSAS:  Okay.  So on this particular point, for

2    example, you haven't subpoenaed the material, the -- the -- the

3    supporting material that you're addressing, that you're going

4    to inquire about on voir dire now.

5    Before she goes into voir dire, is there anything else you

6    want to ask the witness?

7    MS. CACACCIO:  I would like to make argument on the

8    record, Judge.  Can I do that?

9    JUDGE ROSAS:  Go ahead.  Go ahead.

10   MS. CACACCIO:  Your Honor, the transcription isn't being

11   offered as evidence.  It wasn't made by this witness.  It was

12   made by this office in an effort to aid in the testimony.  It's

13   just a testimonial aide.  This --

14   JUDGE ROSAS:  Right.

15   MS. CACACCIO:  -- transcription is not evidence.

16   Moreover, this witness has already testified that she can talk

17   about -- and I think it's asked again, but she already

18   testified that she can identify the voices on the record.  And

19   when I asked Respondent to perhaps consider stipulations, I

20   didn't expect Ms. Polito herself to be able to identify the

21   voices.  I expected her client to be able to help her and aid

22   her in doing so, so that we could perhaps streamline some of

23   the testimony.

24   So this witness is more than qualified to testify to her

25   own recording.  She already testified how she made it.  She



1    already testified when she made it.  She testified generally

2    who was there.  She's sufficiently authenticated this record

3    for me to be able to play it out loud.  I'm not even offering

4    it at this time.

5         JUDGE ROSAS:  Okay.  All right.  Voir dire?  Before I

6    rule?

7         MS. POLITO:  Thank you, Your Honor.

8                    **VOIR DIRE EXAMINATION**

9    Q    BY MS. POLITO:  Ms. Eisen, you've indicated to us that you

10   have recorded a listening session from September 10th.  Is that

11   correct?

12   A    That's correct.

13   Q    And you recorded that listening session on your Apple

14   Watch?

15   A    I did.

16   Q    And why did you record that session?

17        MS. CACACCIO:  Objection.  Relevance.  And it's --

18        JUDGE ROSAS:  Overruled.

19        You can answer.

20   A    Because I wanted a record of what was being said.

21   Q    BY MS. POLITO:  Okay.  And when did you start the

22   recording on September 10th?

23   A    I believe as we were entering the conference room.

24   Q    What time was that?

25   A    Sometime between 4:15 and 4:20, I think.



1    Q    Do you know the exact time that you started the recording?

2    A    I don't know the exact time.

3    Q    And the conference room was located where?

4    A    The conference room was located in a hotel near the

5    airport.  I think it was the Courtyard Marriott.

6    Q    How many people were present when you started the

7    recording?

8         MS. CACACCIO:  Objection, Your Honor.  This doesn't go to

9    the credibility of the recording, and if we play the recording,

10   we'll know exactly how many people were there.

11        JUDGE ROSAS:  What's the relevance?

12        MS. POLITO:  It goes to the foundation.  I -- I don't

13   know -- she just told me she doesn't know what time she started

14   the recording.

15        So perhaps if I know how many people were there when she

16   started it, that's going to help us to figure out when the

17   recording started.

18        JUDGE ROSAS:  Okay.  Overruled.

19        You can answer if you know.

20   A    I believe there were three members of corporate, myself,

21   and seven other partners, approximately.

22   Q    BY MS. POLITO:  And when you -- you testified that, when

23   you walked into the conference room, you started the recording

24   on your watch?

25   A    I started it on my watch, yes.



1    Q    And you know for a fact the recording started?

2    A    I -- I do know that it started.

3    Q    And when did you stop the recording on your watch?

4    A    I stopped it as -- as we were leaving the meeting.

5    There might have been some that -- some conversation that

6    took place in the lobby afterwards.

7    Q    Did the conversations in the conference room that you were

8    in end before you stopped your watch?

9    A    No.

10   Q    So there were still conversations occurring in the

11   conference room when you stopped your watch, your audio

12   recording?

13   A    Can you rephrase that?  I'm sorry.

14   Q    Sure.  You told me that you stopped the recording --

15   A    Um-hum.

16   Q    -- when you were in the conference room.

17   A    No.  I stopped the recording when I was in the lobby.

18   Q    Okay.  So when you -- was the meeting in the conference

19   room complete and done when you entered -- entered -- left the

20   conference room and went into the lobby?

21   A    It was, yes.

22   Q    So the speakers were done talking?

23   A    They were.

24   Q    And then you went into the lobby, and that's when you

25   stopped your watch?



1    A    Yes.

2    Q    And then what did you do with the recording after you

3    stopped your watch?

4    A    The way that it works on the Apple Watch is it

5    automatically transfers it over to your phone.

6         So I checked later that night to see if it had transferred

7    over to my phone, and it had.  And then, the following day, I

8    emailed it to Richard Bensinger, I believe.

9    Q    Why did you email it to Richard Bensinger?

10        MS. CACACCIO:  Objection.  Relevance.

11        This doesn't have to do anything with the recording or the

12   authenticity of it.

13        MS. POLITO:  It's --

14        JUDGE ROSAS:  I'll allow that.  Overruled.

15        You can answer.

16   A    He was helping with our organizing, and I wanted him to be

17   able to hear what was said.

18   Q    BY MS. POLITO:  What happened to the recording after you

19   gave it to Mr. Bensinger?

20   A    To the best of my knowledge, it was sent over to our

21   attorney, Ian Hayes.

22   Q    But you don't know that for a fact, right?

23   A    I don't know that for a fact.

24   Q    And you don't know what Mr. Bensinger did to it, correct?

25   A    I don't.



1    Q    You don't know if he altered it, shortened it, or modified

2    it in any way, correct?

3    A    All I can tell you -- I don't.  All I can tell you is that

4    the one I heard is the same as the one that I sent to him.

5    Q    When you sent the recording to Mr. Bensinger, did you

6    delete it from your phone?

7    A    I did not.

8    Q    Do you still have it on your phone?

9    A    Yes, I do.

10    Q    Did you give it to anyone else, other than Mr. Bensinger?

11    A    I don't believe there was anyone else on that email.

12    There's a possibility that Jaz Brisack was also on that email,

13    but I can -- I'd have to check.

14        MS. POLITO:  So Judge, based on the witness' testimony, if

15    the Court's inclined to allow the recording, I think that her

16    original recording, which she testified is on her phone, would

17    be the recording that the Court should consider.

18        MS. CACACCIO:  Your Honor -- Your Honor, that's the

19    recording we're going to play.  We're going to play --

20        JUDGE ROSAS:  So --

21        MS. CACACCIO:  -- the recording that Michelle has heard.

22        JUDGE ROSAS:  Off the record.

23    (Off the record at 4:37 p.m.)

24        JUDGE ROSAS:  All right.  So we had an off-the-record

25    discussion relating to the General Counsel's intentions.



1    And that is that there are more audio recordings, in

2    addition to this one, that are going to have to be played in

3    order to identify --

4        MS. CACACCIO:  Oh.

5        JUDGE ROSAS:  -- certain individuals.

6        MS. CACACCIO:  Judge, that's not what I meant.  If that's

7    what you understood, that's not what I meant.

8        JUDGE ROSAS:  Okay.  Tell me --

9        MS. CACACCIO:  This -- this recording -- Michelle, in

10   theory, will be able to identify the individual speakers on

11   this recording.

12       We won't need more recordings to identify those speakers.

13   But other recordings will also have speakers on them that will

14   also need to be identified --

15       MS. STANLEY:  By the witnesses.

16       MS. CACACCIO:  -- by the witnesses.

17       JUDGE ROSAS:  That weren't identified on -- on a

18   transcription that was generated --

19       MS. STANLEY:  Right.

20       MS. CACACCIO:  Right.

21       JUDGE ROSAS:  -- of 26(a)?

22       MS. CACACCIO:  Right.

23       JUDGE ROSAS:  Right.  Okay.  So at this point, is there

24   anything else the Respondent wants to add?

25       MS. POLITO:  I would just like to add for the record that



1    Exhibit 26(b) has unidentified speakers in it, and so the --

2    the objection by Respondent stands.  The transcript is unclear.

3    The witness testified that she emailed it to a Richard

4    Bensinger, and she does not know what happened to it after

5    that.  So we are -- we are going to be listening to a recording

6    that we don't know if it's been modified by someone, at the

7    same time when she has the original recording still on her

8    phone.  So that's my objection for the record, Judge.  Thank

9    you.

10    JUDGE ROSAS:  Yeah.  I mean, I don't know what's going to

11    happen with 26(b), but let's -- let's go ahead and -- I'm going

12    to initially overrule the objection with respect to 26(a).

13    I believe the -- the witness has sufficiently testified,

14    based on her direct examination and in response to cross, that

15    what she heard initially that she supposedly recorded is what

16    she heard again when she heard the recording again.

17    All right.  Go ahead.

18    MS. CACACCIO:  Judge -- do you know about how long the

19    recording is, Michelle?

20    THE WITNESS:  It's going to be approximately an hour,

21    probably a little bit more.

22    MS. CACACCIO:  So do you want me to start this recording

23    now, knowing that it won't be finished before we have to leave

24    this room?

25    JUDGE ROSAS:  All right.  Let's go off the record.



1    (Whereupon, the hearing in the above-entitled matter was

2    recessed at 4:40 p.m. until July 12, 2022 at 9:00 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                          <u>C E R T I F I C A T I O N</u>

2        This is to certify that the attached proceedings before the

3        National Labor Relations Board (NLRB), Region 3, Case Number

4        03-CA-285671, et al., Starbucks Corporation and Workers United,

5        held at the National Labor Relations Board, Region 3, Robert H.

6        Jackson United States Courthouse, Wyoming (5E) Courtroom, 2

7        Niagara Square, Buffalo, New York 14202, on July 11, 2022, at

8        1:06 p.m. was held according to the record, and that this is

9        the original, complete, and true and accurate transcript that

10       has been compared to the reporting or recording, accomplished

11       at the hearing, that the exhibit files have been checked for

12       completeness and no exhibits received in evidence or in the

13       rejected exhibit files are missing.

14

15

16

17                                      _____

18                                      THOMAS BAKER

19                                      Official Reporter

20

21

22

23

24

25

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 3

In the Matter of:

| | |
|---|---|
| Starbucks Corporation, | 03-CA-285671, 03-CA-290555, |
| | 03-CA-291157 03-CA-291196, |
| Employer, | 03-CA-291197 03-CA-291199, |
| | 03-CA-291202 03-CA-291377, |
| and | 03-CA-291378 03-CA-291379, |
| | 03-CA-291381 03-CA-291386, |
| Workers United, | 03-CA-291395 03-CA-291399, |
| | 03-CA-291408 03-CA-291412, |
| Charging Party. | 03-CA-291416 03-CA-291418, |
| | 03-CA-291423 03-CA-291431, |
| | 03-CA-291434 03-CA-291725, |
| | 03-CA-292284 03-CA-293362, |
| | 03-CA-293469 03-CA-293489, |
| | 03-CA-293528 03-CA-294336, |
| | 03-CA-293546 03-CA-294341, |
| | 03-CA-294303 03-CA-206200 |

_____

_____

Place: Buffalo, New York

Dates: July 12, 2022

Pages: 142 through 246

Volume: 2

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

REGION 3

| In the Matter of: | |
|---|---|
| STARBUCKS CORPORATION,<br><br>Charging Party,<br><br>and<br><br>WORKERS UNITED,<br><br>Employer. | 03-CA-285671, 03-CA-290555,<br>03-CA-291157 03-CA-291196,<br>03-CA-291197 03-CA-291199,<br>03-CA-291202 03-CA-291377,<br>03-CA-291378 03-CA-291379,<br>03-CA-291381 03-CA-291386,<br>03-CA-291395 03-CA-291399,<br>03-CA-291408 03-CA-291412,<br>03-CA-291416 03-CA-291418,<br>03-CA-291423 03-CA-291431,<br>03-CA-291434 03-CA-291725,<br>03-CA-292284 03-CA-293362,<br>03-CA-293469 03-CA-293489,<br>03-CA-293528 03-CA-294336,<br>03-CA-293546 03-CA-294341,<br>03-CA-294303 03-CA-206200 |

The above-entitled matter came on for hearing, pursuant to notice, before **MICHAEL ROSAS**, Administrative Law Judge, at the National Labor Relations Board, Region 3, Robert H. Jackson United States Courthouse, Wyoming (5E) Courtroom, 2 Niagara Square, Buffalo, New York 14202, on **Tuesday, July 12, 2022, 9:01 a.m.**

1                     <u>A P P E A R A N C E S</u>

2   On behalf of the Employer:

3        JACQUELINE PHIPPS POLITO, ESQ.
         ETHAN BALSAM, ESQ.
4        WILLIAM WHALEN, ESQ.
         LITTLER MENDELSON, P.C.
5        375 Woodcliff Drive
         Suite 2D
6        Fairport, NY 14450
         Tel. (585)203-3413
7
    On behalf of the Union:
8
         IAN HAYES, ESQ.
9        HAYES DOLCE
         471 Voorhees Avenue
10       Buffalo, NY 14216
         Tel. (716)608-3427
11
    On behalf of the General Counsel:
12
         JESSICA CACACCIO, ESQ.
13       ALICIA PENDER STANLEY, ESQ.
         NATIONAL LABOR RELATIONS BOARD REGION 3
14       130 S. Elmwood Avenue
         Suite 630
15       Buffalo, New York 1402-2465
         Tel. (716)551-4931
16       Fax. (716)551-4972

17

18

19

20

21

22

23

24

25



1                                    <u>I N D E X</u>

2

3    <u>WITNESS</u>              <u>DIRECT</u>   <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>   <u>VOIR DIRE</u>

4    Michelle Eisen          149                                        188

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



www.escribers.net | 800-257-0885

1                              <u>E X H I B I T S</u>

2

3       <u>EXHIBIT</u>                          <u>IDENTIFIED</u>        <u>IN EVIDENCE</u>

4       **General Counsel:**

5           GC-26(a)                          150               180

6           GC-27(a)                          187               202

7           GC-27(b)                          187

8           GC-28(a)                          229               231

9           GC-29(a)                          235

10          GC-29(b)                          235

11          GC-30(a)                          238               244

12          GC-30(b)                          238

13

14

15

16

17

18

19

20

21

22

23

24

25


www.escribers.net | 800-257-0885

1                    <u>P R O C E E D I N G S</u>

2       JUDGE ROSAS:  Good morning.  General Counsel, you had

3    something?

4       MS. CACACCIO:  Yes, Your Honor.  Before we begin this

5    morning, General Counsel would like to make a motion.  As you

6    know, five weeks ago, on June 6th, counsel for the General

7    Counsel issued a comprehensive subpoena duces tecum that was

8    returnable yesterday.  On June 28th, two weeks ago today,

9    counsel for the General Counsel issued a second smaller duces

10   tecum subpoena that was also returnable yesterday.  Your Honor

11   has now upheld those subpoenas three times in the face of

12   Respondent's petitions to revoke.

13       To date, Respondents have yet to produce a single document

14   to the General Counsel.  I understand the train is leaving and

15   has left the station, but it seems that, at this point, there's

16   no luggage on board.  As you know, Respondent has an obligation

17   to begin a good-faith effort to gather responsive documents

18   upon service of a subpoena, regardless of anticipated rulings

19   on petitions to revoke.  One need look no further than the case

20   of McAllister Towing and the case of San Luis Trucking to

21   support the proposition.

22       Yesterday, Respondent asserted for the first time they

23   would not be producing any records until the end of July at the

24   earliest, which will be two months after the first subpoena

25   issued and three weeks from the General Counsel's testimony.



1    Moreover, Respondent also asserted yesterday that they will be

2    defying your order and not producing a privilege log by July

3    18th.

4        Similarly, when we issued our first duces tecum subpoena

5    we issued a corresponding ad testificandum subpoena for Howard

6    Schultz or the custodian of records.  As no one appeared

7    yesterday to comply with that subpoena, accordingly, we are

8    requesting evidentiary sanctions.  Specifically, we are

9    requesting that Respondent be barred from introducing

10   responsive unproduced documents into the record.  There is,

11   again, ample legal support for such a request, which again, I

12   look to IATSE Local 720, Shamrock Foods Company and MD Miller

13   Trucking and Perdue Farms.

14       We are also requesting that an adverse inference be drawn

15   given Respondent's total noncompliance.  Again, there is ample

16   legal support for such a request.  We can look at Shamrock

17   Foods, Sparks Restaurant, Metro West Ambulance Service, and

18   Essex Valley Visiting Nurses Association.  The General Counsel

19   respectfully requests that you grant these evidentiary

20   sanctions given Respondent's ongoing and total noncompliance

21   with the subpoena.  Thank you.

22       JUDGE ROSAS:  Quick response?

23       MS. PHIPPS POLITO:  Your Honor, we ask that the motion be

24   denied.  In the petition to revoke we have outlined clearly the

25   efforts that we have undertaken to start collecting the



1  documents.  We indicated a category of documents that we would

2  be willing to provide subject to stipulation.  For the first

3  time yesterday in this courtroom, we heard that General Counsel

4  would agree to stip -- those stipulations and -- and actually

5  read those into the record.  We have been diligently working to

6  comply on producing the categories of documents that we said we

7  could comply.  It's significant.  It's overwhelming.  If we

8  were in a federal court I would have 9, 12, 18 months to gather

9  those documents.  We are working on them diligently.  We

10  provided the petition to revoke.  We ask for the continuance in

11  light of the fact that the discovery has not yet been

12  disclosed, despite our due diligence.  And we indicated

13  yesterday to this court that we anticipate being able to get

14  those category of documents that we agreed to by the end of

15  this month.  So for those reasons, we ask that the motion be

16  denied.

17      JUDGE ROSAS:  All right.  Well, counsel, I was going to

18  mention today that have -- having reviewed the -- the materials

19  further yesterday, looked at the record, looked at the

20  arguments, the opening statements -- I can tell you from your

21  statements, from your concessions -- that there is information

22  that should be flowing, at some point relatively soon.  The

23  date that I put in my order, of July 18th, for the submission

24  of equivalence law -- well, that's a -- that's a significant

25  interval.  By that date, common sense suggests -- while I'm



1    denying the General Counsel's motion at this time because the

2    train has not arrived at the second stop yet.  We're still --

3    we're still moving along here, and we're getting settled.

4         But I can tell you that there should be some growing

5    disclosure -- some significant growing disclosure by Monday.

6    Okay.  That's -- that's what common sense suggests to me.  All

7    right?  So it's premature at this time.  The motion is denied.

8    Off the record.

9    (Off the record at 9:06 a.m.)

10        MS. CACACCIO:  Yes, Judge.  Michelle Eisen's back on the

11   stand.

12   Whereupon,

13                        **MICHELLE EISEN**

14   having been previously sworn, was called as a witness herein

15   and was examined and testified as follows:

16                  **RESUMED DIRECT EXAMINATION**

17   Q    BY MS. CACACCIO:   Ms. Eisen, have you talked to anyone

18   about your testimony between yesterday and today?

19   A    I have not.

20   Q    And if I play you this audio recording, will you be able

21   to identify it?

22   A    I would.

23        MS. CACACCIO:  For the purposes of the record, my screen

24   is being broadcast and should be -- if you guys can't see my

25   screen, please tell me.  It's being broadcast to just about



1    everyone in the room.  The recording itself is 55 minutes and

2    56 seconds.  So what I'm going to do is I'm going to play the

3    recording, and I'm going to stop it to have the witness

4    identify speakers as we go through.

5         JUDGE ROSAS:  What have we labeled it for identification?

6         MS. CACACCIO:  GC Exhibit 26(a), Your Honor.

7         MS. PHIPPS POLITO:  Your Honor, on behalf of Respondent,

8    we argued the objections yesterday, so I want to continue to

9    note our objection to the introduction of this audio recording

10   into evidence at this time.

11        JUDGE ROSAS:  There are always continuing objections.

12   (Audio played at 9:13 a.m., ending at 9:14 a.m.)

13   Q    BY MS. CACACCIO:  What's happening there, Michelle?

14   A    We are entering the conference room, just sitting down.

15   Q    And who was talking about weddings?

16   A    That was myself and Courtney Stroehar, another partner I

17   don't (indiscernible, simultaneous speech).

18   (Audio played at 9:14 a.m., ending at 9:14 a.m.)

19   Q    Who's that?

20   A    That's me.

21   Q    And we're at 12 seconds on the recording.

22   (Audio played at 9:14 a.m., ending at 9:14 a.m.)

23   Q    Who's talking about samplers?

24   A    That's me as well.

25        MS. PHIPPS POLITO:  Judge, if I may?  Number one, I can



1    barely hear a single thing that's being played.

2         JUDGE ROSAS:  Can you play it louder?

3         MS. CACACCIO:  No, Judge.

4         MS. PHIPPS POLITO:  Number two, the -- they -- the Board

5    has a submitted a 26(b) (phonetic throughout) transcript, which

6    I am, because of my hearing loss, was trying to utilize to

7    assist the process.  But this portion of the testimony's not

8    even in the transcript.  We're objecting to the transcript

9    anyway, so I don't know what's to be done, but I can't hear

10   what's being said.  I have -- I have no idea what this

11   recording is.  It's not --

12        MS. CACACCIO:  Your Honor --

13        MS. PHIPPS POLITO:  -- (indiscernible, simultaneous

14   speech) 26(b) -- maybe it's the beginning.  Maybe it's the full

15   recording, which goes to my objection yesterday.  I -- I don't

16   know what recording this is, who it came from.  If it's the one

17   that was emailed, if it's one from her phone -- I have no idea,

18   and I can't hear it, and there's multiple speaking, and she's

19   only identifying some of them.

20        JUDGE ROSAS:  How much of the recording is untranscribed?

21        MS. CACACCIO:  So we submitted the entire recording to be

22   transcribed, but for whatever reason, the court reporting

23   service didn't transcribe anything before the meeting started.

24   But the recording itself is the evidence we're admitting.

25   We're not admitting the transcript as evidence.  The recording



1    is the evidence.  The transcription's just an aid that was

2    hopeful to be used to aid in the proceeding.

3        JUDGE ROSAS:  Approximately how much time are we talking

4    about that's being played -- or going to be played -- that is

5    untranscribed?

6        MS. CACACCIO:  Give me just one second.

7    (Audio played at 9:16 a.m., ending at 9:16 a.m.)

8        MS. CACACCIO:  Less than two minutes, Judge.

9        MS. PHIPPS POLITO:  Judge, again, for the record, I can't

10   hear what's being said, number one.  Number two, she's clearly

11   not identifying every speaker on this recording.  It's

12   completely inappropriate to submit a recording of an audio

13   conversation where we don't know who's speaking about what at

14   any given time.  It completely lacks foundation.  I'm going to

15   restate my objection from yesterday.  The witness is on the

16   stand.  She can testify as to what she heard that day and

17   why -- they can discuss why they think it's relevant to these

18   proceedings.  I can't understand the recording, and she clearly

19   is not able to identify every person that's speaking.  Every

20   time that that happens I'm going to have to move to strike that

21   from the record.  And it's just convoluting the record at this

22   point.

23       JUDGE ROSAS:  Okay.

24       MS. CACACCIO:  May I go?

25       JUDGE ROSAS:  No.  So -- can you -- at this point, since



1    counsel's unable to follow with the aid -- because that's --

2    that's the best we can do at this point.  I mean, the evidence

3    that's being tendered is the evidence.  It's the best evidence

4    based upon the offer that's been made and the foundational

5    testimony that's been offered.  So can you just accelerate it

6    or just go to the part where it starts at this point that is

7    transcribed?

8        MS. CACACCIO:  Yes, Judge.

9        JUDGE ROSAS:  Okay.

10       MS. CACACCIO:  I will --

11       JUDGE ROSAS:  Counsel, we're going to basically just -- I

12   don't know if she's going to play it on play mode or if she can

13   accelerate it.  But basically, we can resume the fight when she

14   starts playing the part that is transcribed.

15       Now, let me ask you.  Are you able to hear any of it

16   sufficiently enough to follow in the transcript?

17       MS. PHIPPS POLITO:  I -- I'm go -- I'm going to try.

18   One -- once we get there, Judge, I will let you know.

19       JUDGE ROSAS:  Okay.

20       MS. PHIPPS POLITO:  Thank you.

21   (Audio played at 9:18 a.m., ending at 9:18 a.m.)

22   Q    BY MS. CACACCIO:  Who is that first speaker?

23   A    That was Allyson Peck.

24   (Audio played at 9:18 a.m., ending at 9:18 a.m.)

25   Q    And who's that?



1    A    Can you play that again?

2    Q    Yeah.  I'm sorry.  I'm going to play it a little longer.

3    (Audio played at 9:18 a.m., ending at 9:18 a.m.)

4    Q    Who said, "Yeah, sorry about that"?

5    A    That was Courtney Stroehar.

6    (Audio played at 9:18 a.m., ending at 9:19 a.m.)

7    Q    Who said, "sure"?

8    A    That's me.

9    (Audio played at 9:19 a.m., ending at 9:19 a.m.)

10    Q    Who said, "Do you want to kick us off"?

11    A    Can you go back?

12    Q    Yep.

13    (Audio played at 9:20 a.m., ending at 9:20 a.m.)

14    A    That sounds like Peck again at 51 where I came from.

15    (Audio played at 9:20 a.m., ending at 9:20 a.m.)

16    Q    Who's that?

17    A    Cameron Leading (phonetic).

18    (Audio played at 9:20 a.m., ending at 9:20 a.m.)

19    Q    Who says "thanks"?

20    A    Allyson Peck as well.

21         MS. PHIPPS POLITO:  Judge, I'd like --

22    (Audio played at 9:20 a.m., ending at 9:20 a.m.)

23         MS. PHIPPS POLITO:  I'd like to note for the record that

24    the transcript has that as an unidentified speaker, so it's not

25    consistent with what the witness's testimony is.



1          JUDGE ROSAS:  Noted.  Next.

2     (Audio played at 9:20 a.m., ending at 9:21 a.m.)

3     Q    BY MS. CACACCIO:  Who's that?

4     A    Myself.

5     (Audio played at 9:21 a.m., ending at 9:21 a.m.)

6     Q    Who says, "well"?

7     A    Can you back up?

8     (Audio played at 9:21 a.m., ending at 9:22 a.m.)

9     A    I think it's -- I think she's saying, "wow", not "well".

10    And it's -- it's Allyson Peck.

11    (Audio played at 9:22 a.m., ending at 9:22 a.m.)

12    Q    Who was that?

13    A    That was also myself.

14    (Audio played at 9:22 a.m., ending at 9:22 a.m.)

15    Q    Who was that?

16    A    That was Allyson Peck.

17    (Audio played at 9:22 a.m., ending at 9:22 a.m.)

18    Q    Who's that?

19    A    Courtney Stroehar.

20    (Audio played at 9:23 a.m., ending at 9:23 a.m.)

21    Q    Who's that?

22    A    That was Rossann Williams.

23    (Audio played at 9:23 a.m., ending at 9:23 a.m.)

24    Q    And who was that?

25    A    Rossann Williams.



1    (Audio played at 9:24 a.m., ending at 9:24 a.m.)

2    Q    Who said -- who said, "Thank you -- thank you for being

3    here today"?

4    A    Rossann Williams.

5    (Audio played at 9:24 a.m., ending at 9:24 a.m.)

6    Q    Who's that?

7    A    Austin Reed.

8    Q    And who is he?

9    A    A partner at Elmwood.

10   (Audio played at 9:24 a.m., ending at 9:24 a.m.)

11   Q    Who's that?

12   A    Deanna Pusitier.

13   Q    And who is she?

14   A    I believe she is the regional director for the Elmwood

15   store.

16   (Audio played at 9:24 a.m., ending at 9:24 a.m.)

17   Q    Who's that?

18   A    That's (audio interference).

19   (Audio played at 9:25 a.m., ending at 9:25 a.m.)

20   Q    Who's that?

21   A    Rossann Williams.

22   (Audio played at 9:25 a.m., ending at 9:25 a.m.)

23   Q    Who's that?

24   A    That's Blue (phonetic throughout).  I don't -- I think you

25   pronounce his last name Dejulia (phonetic throughout) --



1    something along those lines.

2    (Audio played at 9:25 a.m., ending at 9:29 a.m.)

3    Q    Who gave that speech?

4    A    That was Allyson Peck.

5    (Audio played at 9:29 a.m., ending at 9:29 a.m.)

6    Q    Who's that?

7    A    Rossann Williams.

8    (Audio played at 9:30 a.m., ending at 9:38 a.m.)

9    Q    Who gave that speech?

10   A    Rossann Williams.

11   Q    We're at 18:04 on the recording.

12   (Audio played at 9:38 a.m., ending at 9:38 a.m.)

13   Q    Do you know who this is?

14   A    Deanna Pusitier.

15   (Audio played at 9:38 a.m., ending at 9:41 a.m.)

16   Q    So who gave the speech prior to the -- the voice we just

17   heard?

18   A    Deanna Pusitier.

19   Q    And do you know who just started speaking?

20   A    Allyson Peck.

21   Q    We're at 21:21 on the recording.

22   (Audio played at 9:42 a.m., ending at 9:44 a.m.)

23   Q    Who is that?

24   A    Rossann Williams.

25   Q    We're at 24:03 on the recording.



1   (Audio played at 9:45 a.m., ending at 9:45 a.m.)

2   Q    Who's that?

3   A    That's me.

4   (Audio played at 9:45 a.m., ending at 9:46 a.m.)

5   Q    Who gave that speech?

6   A    That was me.

7   Q    We're at 25:53 on the recording.

8   (Audio played at 9:46 a.m., ending at 9:47 a.m.)

9   Q    Do you know who that was?

10  A    Breanna (phonetic throughout).

11  Q    And we're at 26:25 in the recording.  And who is -- who is

12  that person you just said?

13  A    Breanna's another partner at Elmwood.

14  (Audio played at 9:47 a.m., ending at 9:49 a.m.)

15  Q    Who was talking there?

16  A    That was Rossann Williams.

17  Q    We're at 27:58 on the recording.

18  (Audio played at 9:49 a.m., ending at 9:49 a.m.)

19  Q    Who's that?

20  A    That's me.

21  (Audio played at 9:49 a.m., ending at 9:50 a.m.)

22  Q    Who is -- who gave that speech?

23  A    That was me.

24  Q    We're at 29:09 in the recording.

25  (Audio played at 9:50 a.m., ending at 9:50 a.m.)



1   Q    Who said the sentence that ended with "bad news"?

2   A    That was me.

3   Q    Okay.  And do you know who responded to that?

4   A    Can you take it back?

5   Q    Yep.  Oh.  I went way --

6        MS. PHIPPS POLITO:  I don't think it was played yet.

7   (Audio played at 9:51 a.m., ending at 9:51 a.m.)

8   Q    BY MS. CACACCIO:  Do you also -- know who that is?

9   A    I think that was Allyson Peck.

10  (Audio played at 9:51 a.m., ending at 9:52 a.m.)

11  Q    Who gave that speech?

12  A    That was also me.

13  Q    We're at 30:13.

14  (Audio played at 9:52 a.m., ending at 9:54 a.m.)

15  Q    Who gave that speech?

16  A    That was also me.

17  Q    We're at 31:57 on the recording.

18  (Audio played at 9:54 a.m., ending at 9:54 a.m.)

19  Q    Who's that?

20  A    That's Allyson Peck.

21  Q    We're at 32:41 on the recording.

22  (Audio played at 9:54 a.m., ending at 9:55 a.m.)

23  Q    Who gave that speech?

24  A    That was me.

25  Q    We're at 32:50 on the recording.



1    (Audio played at 9:55 a.m., ending at 9:56 a.m.)

2    Q    Who gave -- who was just talking?

3    A    Courtney Stroehar.

4    Q    We're at 33:51 on the recording.

5    (Audio played at 9:56 a.m., ending at 9:56 a.m.)

6    Q    Who's that?

7    A    That's also Courtney Stroehar.

8    (Audio played at 9:56 a.m., ending at 9:56 a.m.)

9    Q    Who asked that question?

10   A    That was Rossann Williams.

11   Q    Okay.

12   (Audio played at 9:56 a.m., ending at 9:58 a.m.)

13   Q    Who's -- who was talking -- hold on.  Let me back it up a

14   second.

15   (Audio played at 9:58 a.m., ending at 9:58 a.m.)

16   Q    Let me jump ahead a second.  I went too far.

17   (Audio played at 9:58 a.m., ending at 9:59 a.m.)

18   Q    Who's that?

19   A    That was Courtney Stroehar.

20   Q    We're at 35:36.

21   (Audio played at 9:59 a.m., ending at 9:59 a.m.)

22   Q    Do you know who said that?

23   A    Rossann Williams.

24   (Audio played at 9:59 a.m., ending at 10:00 a.m.)

25   Q    Who's that?



1    A    Courtney Stroehar.

2    Q    We're at 36:11.

3    (Audio played at 10:00 a.m., ending at 10:00 a.m.)

4    Q    Who said that?

5    A    An individual who that's been properly trained with me.

6    (Audio played at 10:00 a.m., ending at 10:01 a.m.)

7    Q    Who's that?

8    A    Courtney Stroehar.

9    Q    We're at 36:39 in the recording.

10    (Audio played at 10:01 a.m., ending at 10:01 a.m.)

11    Q    Who's that?

12    A    Rossann Williams.

13    Q    We're at 36:50.

14    (Audio played at 10:01 a.m., ending at 10:01 a.m.)

15    Q    Who's that?

16    A    Courtney Stroehar.

17    (Audio played at 10:01 a.m., ending at 10:02 a.m.)

18    Q    Who's that?

19    A    The interjecting voice or the voice that was just

20    speaking?

21    Q    The voice that was just speaking.

22    A    Courtney Stroehar.

23    Q    And was the interjecting voice?

24    A    Rossann Williams.

25    Q    We're at 37:20.



1    (Audio played at 10:02 a.m., ending at 10:02 a.m.)

2    Q    Who's that?

3    A    Courtney Stroehar.

4    (Audio played at 10:02 a.m., ending at 10:02 a.m.)

5    Q    Who is the interjecting voice?

6    A    Rossann Williams.

7    Q    And who was speaking before that?

8    A    Courtney Stroehar.

9    Q    We're at 37:56 in the recording.

10        MS. PHIPPS POLITO:  I -- I'm sorry.  Can we just pause for

11   one minute?  You just said that -- when you said, "So we saw

12   our DM".  Who -- who did you say was speaking then?

13        THE WITNESS:  Can you say that line again?

14        MS. CACACCIO:  I'm going to play the recording back.

15        MS. PHIPPS POLITO:  That would be helpful.

16   (Audio played at 10:03 a.m., ending at 10:03 a.m.)

17        MS. CACACCIO:  That was too far back.

18   (Audio played at 10:03 a.m., ending at 10:03 a.m.)

19   Q    BY MS. CACACCIO:  Who's that?

20   A    Courtney Stroehar.

21   Q    We're at 37:30.

22   (Audio played at 10:03 a.m., ending at 10:04 a.m.)

23   Q    We're stopping at 37:52.  Who was that?

24   A    Courtney Stroehar.

25   (Audio played at 10:04 a.m., ending at 10:04 a.m.)



1    Q    Do you know who says, "I don't think I've had a fair

2    assessment"?

3    A    Courtney Stroehar.

4    (Audio played at 10:04 a.m., ending at 10:04 a.m.)

5    Q    Who just started talking?

6    A    Rossann Williams.

7    Q    We're at 37:58.

8    (Audio played at 10:04 a.m., ending at 10:04 a.m.)

9    Q    Who ended the sentence with "DM"?

10    A    Rossann Williams.

11    Q    And who's the interjecting voice?

12    A    Courtney Stroehar.

13    (Audio played at 10:04 a.m., ending at 10:04 a.m.)

14    Q    Do you know who said that sentence?

15    A    Rossann Williams.

16    (Audio played at 10:04 a.m., ending at 10:04 a.m.)

17    Q    Do you know who the "yeah" is?

18    A    Courtney Stroehar.

19    (Audio played at 10:04 a.m., ending at 10:04 a.m.)

20    Q    Who ended the sentence with(audio interference)?

21    A    Rossann Williams.

22    Q    And who was the interjecting voice?

23    A    Courtney Stroehar.

24    Q    We're at 38:14 on the recording.

25    (Audio played at 10:04 a.m., ending at 10:05 a.m.)



```
1    Q     Who said that sentence?

2    A     Rossann Williams.

3    (Audio played at 10:05 a.m., ending at 10:05 a.m.)

4    Q     Who ended the sentence with "just asking for

5    similarities"?

6    A     Rossann Williams.

7    Q     And who's the interjecting voice?

8    A     Courtney Stroehar.

9    Q     We're at 38:35 in the recording.

10   (Audio played at 10:05 a.m., ending at 10:05 a.m.)

11   Q     What's an ASM?

12   A     Assistant store manager.

13   Q     And who is talking?

14        MS. PHIPPS POLITO:  Judge, I'm going to object.  We're

15   either listening to the audio recording -- the witness is

16   identifying people, but she's not going to start explaining

17   what's in there.  That's a completely improper question.

18        JUDGE ROSAS:  That was -- that term was used in the

19   meeting?

20        MS. CACACCIO:  The -- the witness -- yeah, Judge.  The

21   witness just used the word -- the recording just has the word

22   ASM, and if this witness knows what that acronym is she should

23   be able to testify to it.

24        JUDGE ROSAS:  Overruled.  If you know.

25   A     Assistant store manager.
```



1   Q    BY MS. CACACCIO:   And who was talking?

2   A    Rossann Williams.

3   (Audio played at 10:06 a.m., ending at 10:06 a.m.)

4   Q    What's a "DM"?

5   A    District manager.

6        MS. PHIPPS POLITO:   Judge, I'm just going to note the same

7   objection.   She -- we are listening to an audio recording.   We

8   are not asking back and forth questions.   She can -- counsel

9   can asks those questions later on -- what these acronyms mean.

10  And we're also talking about someone else that's speaking.   And

11  it's just interfering with this whole subject of this audio

12  recording, which, my understanding was, we were going to play

13  the whole thing in full, and figure out who's speaking.

14       JUDGE ROSAS:   Overruled.   If you know.

15  A    DM stands for district manager.

16  (Audio played at 10:06 a.m., ending at 10:07 a.m.)

17  Q    BY MS. CACACCIO:   Who ended the sentence with "the

18  similarities make sense to me"?

19  A    Rossann Williams.

20  Q    And who was the interjecting voice?

21  A    Courtney Stroehar.

22       MS. CACACCIO:   We're at 39:19 on the recording.

23  (Audio played at 10:07 a.m., ending at 10:07 a.m.)

24  Q    BY MS. CACACCIO:   Pause.   Who says that?

25  A    Courtney Stroehar.



1    Q    Who says -- who interjected?

2    A    That was me.

3         MS. CACACCIO:  We're at 39:30 on the recording.

4    (Audio played at 10:08 a.m., ending at 10:08 a.m.)

5         MS. CACACCIO:  Counsel, did you say something?  No, okay.

6    (Audio played at 10:08 a.m., ending at 10:08 a.m.)

7    Q    BY MS. CACACCIO:  Who's talking right now?

8    A    Myself.

9         MS. CACACCIO:  We're at 39:53 in the recording.

10   (Audio played at 10:08 a.m., ending at 10:09 a.m.)

11   Q    BY MS. CACACCIO:  Who just gave that speech?

12   A    That was me.

13        MS. CACACCIO:  We're at 40:53 on the recording.

14   (Audio played at 10:09 a.m., ending at 10:09 a.m.)

15   Q    BY MS. CACACCIO:  Who's that?

16   A    Deanna Pusatier.

17   (Audio played at 10:09 a.m., ending at 10:09 a.m.)

18   Q    BY MS. CACACCIO:  Who's speaking there?

19   A    Deanna Pusatier.

20   (Audio played at 10:09 a.m., ending at 10:09 a.m.)

21   Q    BY MS. CACACCIO:  Who started talking there?

22   A    I think that's me, but I need to hear it a little bit

23   more.

24   (Audio played at 10:10 a.m., ending at 10:10 a.m.)

25   Q    BY MS. CACACCIO:  Do you know who that is?



1    A    That's me.

2    (Audio played at 10:10 a.m., ending at 10:10 a.m.)

3    Q    BY MS. CACACCIO:  Who's that?

4    A    That's me.

5    MS. CACACCIO:  We're at 41:34.

6    (Audio played at 10:10 a.m., ending at 10:10 a.m.)

7    Q    BY MS. CACACCIO:  Do -- were you able to hear the

8    interjecting voices there?

9    A    If you can take it back, I may be able to.

10   (Audio played at 10:10 a.m., ending at 10:11 a.m.)

11   A    I'm sorry, I can't hear that.

12   Q    BY MS. CACACCIO:  Okay.

13   (Audio played at 10:11 a.m., ending at 10:11 a.m.)

14   Q    BY MS. CACACCIO:  Who's that?

15   A    That, I believe, is Austin Reed (phonetic throughout).

16   Q    Who is the one that just gave a speech?

17   A    That was myself.

18   Q    And who was the interjecting voice?

19   A    Austin Reed.

20   (Audio played at 10:11 a.m., ending at 10:12 a.m.)

21   Q    BY MS. CACACCIO:  Who was that?

22   A    That was me.

23   MS. CACACCIO:  We're at 42:52 in the recording.

24   (Audio played at 10:12 a.m., ending at 10:12 a.m.)

25   Q    BY MS. CACACCIO:  What is IMS?



1   A   It is an inventory management system.

2   (Audio played at 10:13 a.m., ending at 10:13 a.m.)

3   Q   BY MS. CACACCIO:  Who was just giving that speech?

4   A   That was myself.

5       MS. CACACCIO:  We're at 44:09 on the recording.

6   (Audio played at 10:14 a.m., ending at 10:14 a.m.)

7   Q   BY MS. CACACCIO:  Do you know who's asking that question?

8   A   Deanna Pusatier.

9   (Audio played at 10:14 a.m., ending at 10:14 a.m.)

10  Q   BY MS. CACACCIO:  Who's that?

11  A   That's me.

12  (Audio played at 10:14 a.m., ending at 10:14 a.m.)

13  Q   BY MS. CACACCIO:  Who responded to you?

14  A   Deanna Pusatier.

15  (Audio played at 10:14 a.m., ending at 10:15 a.m.)

16  Q   BY MS. CACACCIO:  Who just gave that speech?

17  A   That was me.

18      MS. CACACCIO:  We're at 45:16 on the recording.

19  (Audio played at 10:15 a.m., ending at 10:15 a.m.)

20  Q   BY MS. CACACCIO:  Do you know who that is?

21  A   Rossann Williams.

22  (Audio played at 10:15 a.m., ending at 10:15 a.m.)

23  Q   BY MS. CACACCIO:  Who's that?

24  A   Can I hear a little bit more of that?

25  (Audio played at 10:15 a.m., ending at 10:16 a.m.)



```
1    Q    BY MS. CACACCIO:  Do you know who that is?

2    A    I think that's me.

3    (Audio played at 10:16 a.m., ending at 10:16 a.m.)

4    Q    BY MS. CACACCIO:  Who's talking there?

5    A    Courtney Stroehar.

6         MS. CACACCIO:  We're at 45:38 on the recording.

7    (Audio played at 10:16 a.m., ending at 10:16 a.m.)

8    Q    BY MS. CACACCIO:  Who's that?

9    A    Courtney Stroehar.

10        MS. CACACCIO:  We're at 45:44.

11   (Audio played at 10:16 a.m., ending at 10:16 a.m.)

12   Q    BY MS. CACACCIO:  Who's that?

13   A    Courtney Stroehar.

14        MS. CACACCIO:  We're at 45:59.

15   (Audio played at 10:16 a.m., ending at 10:17 a.m.)

16   Q    BY MS. CACACCIO:  Who's that?

17   A    Courtney Stroehar.

18        MS. CACACCIO:  We're at 46:15.

19   (Audio played at 10:17 a.m., ending at 10:17 a.m.)

20   Q    BY MS. CACACCIO:  Who's that?

21   A    Rossann Williams.

22        MS. CACACCIO:  We're at 46:20.

23   (Audio played at 10:17 a.m., ending at 10:18 a.m.)

24   Q    BY MS. CACACCIO:  Who was giving that speech?

25   A    Rossann Williams.
```



1    Q    Do you know who interjected?

2    A    At the end, that was Brianna Marcina (phonetic

3    throughout).

4          MS. CACACCIO:  Are you missing a page because I have a

5    single page.  Do you have everything you need?

6          MS. POLITO:  I'm -- I'm sorry.

7          MS. CACACCIO:  Are you able to follow along?

8          MS. POLITO:  Mostly.

9          MS. CACACCIO:  Okay, my -- my -- my copy is missing a

10   page, so if you're missing a page then --

11         MS. POLITO:  Oh.

12         JUDGE ROSAS:  Off the record.

13   (Off the record at 10:19 a.m.)

14                    **RESUMED DIRECT EXAMINATION**

15   Q    BY MS. CACACCIO:  Do you know who that is?

16   A    Brianna Marcina.

17   (Audio played at 10:19 a.m., ending at 10:19 a.m.)

18   Q    BY MS. CACACCIO:  Who's that?

19   A    Brianna Marcina.

20         MS. CACACCIO:  We're at 47:57.

21   (Audio played at 10:19 a.m., ending at 10:20 a.m.)

22   Q    BY MS. CACACCIO:  Who was that?

23   A    Brianna Marcina.

24         MS. CACACCIO:  We're at 48:31 on the recording.

25   (Audio played at 10:20 a.m., ending at 10:21 a.m.)



 1    Q    BY MS. CACACCIO:  Who was talking?

 2    A    Brianna Marcina.

 3         MS. CACACCIO:  Sorry, we're at 49:17.

 4    (Audio played at 10:21 a.m., ending at 10:21 a.m.)

 5    Q    BY MS. CACACCIO:  Do you know who said "we can address

 6    that"?

 7    A    Rossann Williams.

 8    (Audio played at 10:21 a.m., ending at 10:21 a.m.)

 9    Q    BY MS. CACACCIO:  Do you know who that was?

10    A    Deanna Pusatier.

11    (Audio played at 10:21 a.m., ending at 10:21 a.m.)

12    Q    BY MS. CACACCIO:  Do you know who says another -- probably

13    another couple minutes here?

14    A    If you can play it back, I'm pretty sure it's Allyson

15    Peck.  I just want to hear it.

16    (Audio played at 10:21 a.m., ending at 10:22 a.m.)

17    A    That was Al -- Al -- Allyson Peck.

18    (Audio played at 10:22 a.m., ending at 10:22 a.m.)

19         MS. POLITO:  Sorry, excuse me.

20         JUDGE ROSAS:  Hold on.

21         MS. POLITO:  Can you pause?  What -- what portion of the

22    record are you at because now I'm lost.  When you said Allyson

23    Peck --

24         MS. CACACCIO:  We're at the top of page 45.

25         MS. POLITO:  And --


www.escribers.net | 800-257-0885

1    MR. BALSAM:  So -- so from our transcript, we have

2    probably another couple more minutes, and then it jumps into --

3    JUDGE ROSAS:  All right, off the record.

4    (Off the record at 10:22 a.m.

5    (Audio played at 10:23 a.m., ending at 10:23 a.m.)

6    MS. POLITO:  I think we're good.

7    MS. CACACCIO:  Okay.

8    MS. POLITO:  I think we're on the same --

9    MS. CACACCIO:  Okay.

10   MS. POLITO:  -- page now.

11                  **RESUMED DIRECT EXAMINATION**

12   Q    BY MS. CACACCIO:  Do you know who just started to talk?

13   A    Deanna Pusatier.

14   MS. CACACCIO:  We're at 49:33 on the recording.

15   (Audio played at 10:24 a.m., ending at 10:24 a.m.)

16   Q    BY MS. CACACCIO:  Who was that?

17   A    Deanna Pusatier.

18   MS. CACACCIO:  We're at 50:25 in the recording.

19   (Audio played at 10:24 a.m., ending at 10:25 a.m.)

20   Q    BY MS. CACACCIO:  Who's that?

21   A    Rossann Williams.

22   MS. CACACCIO:  We're at 50:27.

23   (Audio played at 10:25 a.m., ending at 10:25 a.m.)

24   Q    BY MS. CACACCIO:  Who's that?

25   A    Deanna Pusatier.



1    (Audio played at 10:25 a.m., ending at 10:25 a.m.)

2    Q    BY MS. CACACCIO:  Who's that?

3    A    Allyson Peck.

4        MS. CACACCIO:  We're at 50:48 on the recording.

5    (Audio played at 10:25 a.m., ending at 10:25 a.m.)

6    Q    BY MS. CACACCIO:  Who's that?

7    A    That's me.

8    (Audio played at 10:25 a.m., ending at 10:25 a.m.)

9    Q    BY MS. CACACCIO:  Do you know who says who responded to

10   you initially?

11   A    Can you take it back just a bit?

12   (Audio played at 10:25 a.m., ending at 10:26 a.m.)

13   A    At the end, it's Deanna Pusatier.

14   Q    BY MS. CACACCIO:  Do you know who was before that?

15   A    I believe it was Courtney Stroehar.

16   (Audio played at 10:26 a.m., ending at 10:26 a.m.)

17   Q    BY MS. CACACCIO:  Who's that?

18   A    Deanna Pusatier.

19       MS. CACACCIO:  We're at 51:58 on the recording.

20   (Audio played at 10:26 a.m., ending at 10:26 a.m.)

21   Q    BY MS. CACACCIO:  Who's that?

22   A    Deanna Pusatier.

23       MS. CACACCIO:  51:23 on the recording.

24   (Audio played at 10:26 a.m., ending at 10:26 a.m.)

25   Q    BY MS. CACACCIO:  Who's that?



1    A    Rossann Williams.

2    (Audio played at 10:27 a.m., ending at 10:27 a.m.)

3    Q    BY MS. CACACCIO:  Who's that?

4    A    That's me.

5        MS. CACACCIO:  We're at 51:36.

6    (Audio played at 10:27 a.m., ending at 10:27 a.m.)

7    Q    BY MS. CACACCIO:  Who's that?

8    A    That's me, as well.

9        MS. CACACCIO:  51:41.

10    (Audio played at 10:27 a.m., ending at 10:27 a.m.)

11    Q    BY MS. CACACCIO:  Who's that?

12    A    That's me.

13        MS. CACACCIO:  We're at 51:56.

14    (Audio played at 10:27 a.m., ending at 10:27 a.m.)

15    Q    BY MS. CACACCIO:  Do you know who responded to you?

16    A    I believe that was Allyson Peck saying okay.

17    (Audio played at 10:27 a.m., ending at 10:27 a.m.)

18    Q    BY MS. CACACCIO:  Who was that?

19    A    That's me.

20        MS. CACACCIO:  We're at 52:01.

21    (Audio played at 10:27 a.m., ending at 10:28 a.m.)

22    Q    BY MS. CACACCIO:  Who's that?

23    A    That's me.

24        MS. CACACCIO:  52:10.

25    (Audio played at 10:28 a.m., ending at 10:28 a.m.)



1   Q    BY MS. CACACCIO:  What -- who was -- who was talking --

2   the speech?

3   A    That was me.

4   Q    And who interjected; do you know?

5   A    Deanna Pusatier.

6   (Audio played at 10:28 a.m., ending at 10:28 a.m.)

7   Q    BY MS. CACACCIO:  Do you know who was talking?

8   A    Deanna Pusatier.

9   Q    And do you know who responded?

10  A    Rossann Williams.

11  (Audio played at 10:28 a.m., ending at 10:29 a.m.)

12  Q    BY MS. CACACCIO:  Do you know who that is?

13  A    The "great" was me.  The voice --

14  Q    Okay.

15  A    -- after was Rossann.

16  (Audio played at 10:29 a.m., ending at 10:29 a.m.)

17  Q    BY MS. CACACCIO:  Who's that?

18  A    That's me.

19  (Audio played at 10:29 a.m., ending at 10:29 a.m.)

20  Q    BY MS. CACACCIO:  Who's that?

21  A    That was me.

22  Q    Do you know who responds to you?

23  A    I think it's Deanna Pusatier.

24  (Audio played at 10:29 a.m., ending at 10:29 a.m.)

25  Q    BY MS. CACACCIO:  Do you know who that is?



1   A    Brianna Marcina.

2        MS. CACACCIO:  We're at 53:03.

3   (Audio played at 10:29 a.m., ending at 10:29 a.m.)

4   Q    BY MS. CACACCIO:  Who's that?

5   A    Rossann Williams.

6   (Audio played at 10:29 a.m., ending at 10:30 a.m.)

7   Q    BY MS. CACACCIO:  Who's that?

8   A    Rossann Williams.

9        MS. CACACCIO:  We're at 53:33.

10  (Audio played at 10:30 a.m., ending at 10:30 a.m.)

11  Q    BY MS. CACACCIO:  Who's that?

12  A    Rossann Williams.

13       MS. CACACCIO:  We're at 53:46.

14  (Audio played at 10:30 a.m., ending at 10:30 a.m.)

15  Q    BY MS. CACACCIO:  Is that the end of the meeting?

16  A    That's us leaving the conference room, yes.

17       MS. CACACCIO:  Your Honor, I'm happy to continue to play

18  the recording, but that's the pertinent parts.

19       JUDGE ROSAS:  Tell me again?

20       MS. CACACCIO:  I'm happy to play the rest of the

21  recording, but that's the pertinent parts.  There's another two

22  minutes or so left.

23       JUDGE ROSAS:  Does the Respondent care to hear the rest of

24  it?

25       MS. POLITO:  Judge, if you could just give me a minute.



1      JUDGE ROSAS:  Sure, off the record.

2   (Off the record at 10:31 a.m.)

3      MS. POLITO:  If the video is going to be introduced into

4   evidence, and I would prefer that the whole thing get played

5   subject to my objections --

6      JUDGE ROSAS:  Okay.

7      MS. POLITO:  -- or subject to my objections once it's

8   played that any portion of the audio transcript where there's

9   been a speaker that's not been identified, I'm going to ask the

10  Court strike that portion from the transcript.

11     JUDGE ROSAS:  And I'm going to -- oh, back on the record.

12  Let's play it.

13  (Audio played at 10:31 a.m., ending at 10:32 a.m.)

14                **RESUMED DIRECT EXAMINATION**

15  Q    BY MS. CACACCIO:  Who's that?

16  A    That's me.

17  (Audio played at 10:32 a.m., ending at 10:32 a.m.)

18  Q    BY MS. CACACCIO:  Who are you talking to there?

19  A    Talking to partners from the Genesee store that are

20  waiting to go into their meeting.

21  (Audio played at 10:32 a.m., ending at 10:32 a.m.)

22  Q    BY MS. CACACCIO:  Who's that?

23  A    That's me.

24  (Audio played at 10:32 a.m., ending at 10:32 a.m.)

25  Q    BY MS. CACACCIO:  What's the music?



1    A    We're in the lobby of the hotel.

2    (Audio played at 10:32 a.m., ending at 10:33 a.m.)

3    Q    BY MS. CACACCIO:  Do you know who that is?

4    A    That's Kellen Higgins.

5    (Audio played at 10:33 a.m., ending at 10:33 a.m.)

6    Q    BY MS. CACACCIO:  Do you know who that is?

7    A    That was me.

8    (Audio played at 10:33 a.m., ending at 10:33 a.m.)

9    Q    BY MS. CACACCIO:  Where -- who is that?

10    A    Courtney Stroehar.

11    (Audio played at 10:33 a.m., ending at 10:33 a.m.)

12    Q    BY MS. CACACCIO:  Who's that?

13    A    That's me.

14    (Audio played at 10:33 a.m., ending at 10:34 a.m.)

15    Q    BY MS. CACACCIO:  Who's that?

16    A    Courtney Stroehar.

17    (Audio played at 10:34 a.m., ending at 10:34 a.m.)

18    Q    BY MS. CACACCIO:  Who's that?

19    A    Kellen Higgins.

20    Q    End of the recording.  Michelle, did you have any part in

21    making the transcription for this?

22    A    I did not.

23    Q    And was this the full recording that you recorded on your

24    Apple Watch?

25    A    That was the full recording that I have, yes.


www.escribers.net | 800-257-0885

1    Q    Did it seem tainted to you in any way?

2    A    It did not.

3    Q    Or changed in any way?

4    A    It did not.

5         MS. CACACCIO:  Your Honor, I will offer General Counsel's

6    Exhibit 26(a), and to the extent it's helpful for the Court,

7    26(b) just for reference.

8         JUDGE ROSAS:  Respondent?

9         MS. POLITO:  Judge, for the reasons that were stated in

10   the record yesterday, we object to the use of this audio

11   recording pursuant to 901.  There's not been proper

12   authentication with respect to the recording.  The witness

13   testified yesterday that she actually uploaded the audio from

14   her watch and emailed it to a Mr. Gunlinger (phonetic), and

15   from there, she was not sure what happened to the audio

16   recording, and she just confirmed for the record that she did

17   not transcribe the recording and is not -- therefore does not

18   know if the transcription is an accurate version of the audio

19   recording.

20        Alternatively, Judge, if -- if the Court is inclined to

21   grant the audio recording, we request that all portions of the

22   record where a voice that was not identified by the witness or

23   where the witness misidentified a voice, those parts of the

24   audio be stricken from the record.

25        JUDGE ROSAS:  All right.  The motion is granted.  The



1    offer to receive 20 -- General Counsel's 26(a) is received in

2    evidence.

3    **(General Counsel Exhibit Number 26(a) Received into Evidence)**

4    JUDGE ROSAS:   General Counsel's 26(b), let me put that on

5    the side for the moment, but the witness, based on her direct

6    examination, has provided sufficient foundation for the receipt

7    of -- of this audio recording as something that she heard at

8    the time that it would -- these statements were made, and she's

9    identified the statements now as those statements on the audio

10   recording.  It's absolutely appropriate under Federal Rule of

11   Evidence 901(b)(5) her testimony regarding the -- the voices

12   that are identified on that audio recording, so -- so that

13   audio recording will be received in evidence.

14   With respect to General Counsel's 26(b), let me suggest

15   that at this time that, while a transcription to be offered by

16   a party should always be received because while it is not a

17   contemporaneous document created at the time that the

18   statements were made, it is an effort by someone, oftentimes

19   it's the attorneys.  It's not usually a third party.  Sometimes

20   it could be transcribed by a reporter, but oftentimes it's just

21   done by the off -- by the lawyers themselves and provided to

22   the judge as made that being said, the Respondent can also

23   provide its own version if the parties can't agree.

24   Now, that being said, what I will suggest to the General

25   Counsel is so that the aide is an aide, that whether you can



1   get the original file from whomever created this aide, it would

2   be useful for everyone, including the factfinder, to have any

3   references to unidentified speakers to be revised with whomever

4   you all -- or you all believe the speakers were, or corrections

5   to the transcription in -- in any parts, but the key here is

6   that -- that the primary evidence here, the only evidence,

7   really, is 26(b).

8       MS. CACACCIO:  (a), Judge.

9       JUDGE ROSAS:  (a) -- General Counsel's 26 -- 26(a).  To

10  the extent that a transcription comes in -- comes in as

11  evidence, just like evidence comes in all the time because it

12  passes the -- the test for admissibility, okay, and in this

13  case, we have identified what these transcriptions -- the

14  transcription or transcriptions will come in for, okay, so --

15  so General Counsel's 26(b) will re -- be received whenever it

16  is offered, and Respondent's version of it, if at all, will be

17  received when the Respondent wants to tender it, if that

18  becomes the case.

19      Now -- now, it -- it behooves us to talk about additional

20  audios going forward, and -- and again, having just basically

21  explained what the record needs to have, if there are audio

22  recordings -- additional audio recordings that are offered and

23  are admitted, the question's going to be going forward what

24  needs to be done, what time needs to be expended in order to

25  deal with that evidence, okay, but again, all that evidence, if



1    and when it comes in, has to be reviewed in the record.

2        And for audio to be played, you know, the parties can

3    review audio and they can submit their transcription versions

4    of audio prior to the record closing, if y'all can't get

5    together on it.  If you want to play it in court, then we'll

6    deal with it, but I got to tell you if we're dealing with, say,

7    for example, three individuals allegedly speaking at a series

8    of meetings that are always on the Respondent's side that are

9    speaking, I'm not sure what the point is to have them

10   identified every time in the hearing.  If we're -- if we're

11   moving around to different locations and we have to other

12   individuals, you know, if y'all can't agree, then, perhaps we

13   have to deal with that.

14       MS. POLITO:  Judge, if I may?

15       JUDGE ROSAS:  Go ahead.

16       MS. POLITO:  We did try to have a conversation about how

17   we could have -- counsel to the General Counsel could play the

18   recordings.  The issue from the Respondent's side is I don't

19   know who all those baristas are and I'm not going to have a

20   single person at my client to be able to say that these are all

21   the people speaking, so that's not -- it's not possible for us

22   to be able to identify all the speakers in audio recordings,

23   and so we had talked about potentially having the witness

24   identify the -- the people that were there.  Candidly, I

25   thought that this was more helpful for the witness to try to



1     identify the people as we were going through because she

2     identified some of the speakers that, again, Respondent would

3     not know.  Some of it was inconsistent with the transcript and

4     some of the speakers still were not identified at all, but to

5     the extent that the witness was able to identify the speakers,

6     that was helpful to Respondent.

7          MS. CACACCIO:  Might I be heard, Judge?  I think that the

8     pertinent -- I don't know that -- that it's the General

9     Counsel's opinion that every person on every recording does not

10    need to be identified for the recording to be admitted given

11    what the witness testifies foundationally, so I think that we

12    might be able to do some kind of compromise where I don't know

13    that the individual baristas need to be identified.  It's not

14    necessary, at least not for the position of the General

15    Counsel.  If we're able to identify the Respondent's speakers

16    and that the person responding to them are baristas, which I

17    think nine-tenths of these recordings will be self-explanatory,

18    we wouldn't have to play 50 hours of this.

19          JUDGE ROSAS:  Well, the Respondent is entitled to probe

20    the evidence, so you can't preclude the Respondent from asking

21    about the content of the video, but these are all ideas that

22    are out there, and I haven't -- I haven't arrived at a decision

23    on how we're going to deal with each and every one, but we have

24    a little bit of a picture at this point, I think, right?  Okay.

25          All right, off the record.  Let's take five.



1    (Off the record at 10:43 a.m.)

2        MS. CACACCIO:  Sorry, I have to turn my computer back on.

3    It shuts itself off.

4                    **RESUMED DIRECT EXAMINATION**

5    Q    BY MS. CACACCIO:  That meeting that you just -- that we

6    just listened to, were you paid to attend it?

7    A    I was paid to attend it, yes.

8    Q    How did that work?

9    A    We were told that we were compensated for our time, I -- I

10   think.  There was some discrepancy initially because there was

11   an unawareness that the law in New York State was that you had

12   to paid for a minimum of three hours, so initially, we were

13   only compensated for the one.

14       MS. POLITO:  I'm just going to object to the witness's

15   discussion of what New York State law is.

16       JUDGE ROSAS:  The answer was yes.  Next question.

17       MS. CACACCIO:  Judge, my question was how -- how she was

18   compensated, and that's --

19       JUDGE ROSAS:  She --

20       MS. CACACCIO:  -- what she was explaining.

21       JUDGE ROSAS:  She was paid.  All right, next question.

22   Q    BY MS. CACACCIO:  When was the next session that you

23   attended?

24   A    Sunday, September 18th, 2021.

25   Q    How did you learn about that meeting?



1    A    My store manager was going around a few days prior with a

2    clipboard that had three time slots listed and a date of

3    Sunday, September 18th asking us which of these three sessions

4    we would be able to attend.

5    Q    Do you know -- do you remember what day of the week it

6    was?

7    A    That she was walking around?

8    Q    Yes.

9    A    I had a conversation with her that Wednesday, I believe.

10   Q    And when was the meeting?

11   A    Sunday, the 18th.

12   Q    Are you sure that the Sunday was -- are you sure about the

13   date or the day of the week?

14   A    Can you rephrase that?  It may have been the 19th, if

15   that's what you're asking.  It was a Sunday.

16   Q    It was a Sunday?

17   A    It was the Sunday after Friday the 10th.

18        MS. CACACCIO:  Your Honor, I ask you take judicial notice

19   that September 19th, 2021, was a Sunday.

20        JUDGE ROSAS:  You -- you just -- just stated it on the

21   record.

22   Q    BY MS. CACACCIO:  How did you learn about this meeting?

23   A    My store manager, Patty Shanley, was going around that

24   week with a clipboard pulling partners aside and asking them

25   which of the three time slots they would be able to attend on



1    Sunday the 19th.

2    Q    And what were those time slots?

3    A    8 a.m., 12 p.m., and 4 p.m.

4    Q    What -- did Patty say anything about whether attendance

5    was going to be required at this meeting?

6    A    I made the assumption that it was because I wasn't given

7    an option not to attend.

8    Q    Where was the meeting held?

9    A    The Suzanne Miller Hotel conference room in the medical

10   corridor.

11   Q    What time was the meeting you attended?

12   A    I attended the 8 a.m. session.

13   Q    And would the store usually be open during that time?

14   A    Yes, it would.

15   Q    Was it?

16   A    It was, yes.

17   Q    Who ran this meeting?

18   A    This meeting was also run by Deanna Pusatier, Allyson

19   Peck, and Rossann Williams.

20   Q    And about how many employees attended the meeting?

21   A    I think this one was attended by eight or nine partners.

22   Q    And those partners, what stores did they work in?

23   A    They were all from the Elmwood location.

24   Q    About how long did this meeting last?

25   A    A little over an hour, I believe.



1   Q    Did you record it?

2   A    I did.

3   Q    How did you record it?

4   A    Using my Apple Watch.

5   Q    Did you make any alterations to that recording?

6   A    I did not.

7   Q    And what did you do with that after you recorded it?

8   A    This one was sent directly to our attorneys.

9   Q    Did you record the full meeting?

10  A    I did.

11  Q    If I played you a copy of that recording, could you

12  identify it for us?

13  A    Yes, I could.

14       MS. CACACCIO:  Your Honor, I'm now identifying for the

15  record 27(a), which is the recording of the meeting that Ms.

16  Eisen just identified along with 27(b), which is an aide for

17  that recording.

18       JUDGE ROSAS:  Tell me the number again.

19       MS. CACACCIO:  27(a) for the recording, Your Honor, and

20  27(b) for the transcript.

21       JUDGE ROSAS:  Have the parties seen that?

22       MS. CACACCIO:  We did send it to them, Your Honor.

23       MS. POLITO:  We have -- we received a copy of several

24  recordings relating to this witness late Friday, Your Honor.

25       JUDGE ROSAS:  Okay.



1      MS. POLITO:  Can I ask a couple -- the witness a few voir

2   dire questions before we start?

3      JUDGE ROSAS:  Sure.

4                    **VOIR DIRE EXAMINATION**

5   Q    BY MS. POLITO:  Ms. Eisen, have you listened to the actual

6   recording that the counsel for the General Counsel is going to

7   play?

8   A    Yes, I have.

9   Q    When did you listen to it?

10  A    Last week.

11  Q    I'm sorry?

12  A    Last week.

13  Q    Last week?  And your testimony is that this is the same --

14  it's a complete recording that you took on your Apple Watch on

15  the day of the meeting; is that correct?

16  A    That is correct.

17  Q    And you -- that -- as I understand from your testimony

18  yesterday, when you record on the Apple Watch, it automatically

19  uploads to your cell phone; is that correct?

20  A    That's correct, yes.

21  Q    Do you know if it's in the same data format or a different

22  data format?

23  A    I don't think I know.

24  Q    And when it went to your phone, you then sent it to Mr.

25  Hayes; is that correct?



1    A    Yes.

2    Q    And you sent it via email?

3    A    Yes, I don't know if it was a drop -- it was a big file,

4    so I'm not sure if it was an attachment or in a Dropbox, but

5    it -- the correspondence was via email.

6    Q    Okay, so the -- this second -- the audio recording might

7    have been sent to Mr. Hays via Dropbox?

8    A    Probably like it's a little Google drive, I think.

9    Q    Okay.  Was it sent to anyone other than Mr. Hayes?

10   A    There were probably a couple of other people on that

11   email, yes.

12   Q    And did you compare the recording last week with your

13   original recording to make sure that it was a complete

14   recording of the meeting on September 19th?

15   A    I did.

16        MS. POLITO:  That's all I have.  Thank you, Judge.

17        MS. CACACCIO:  And Your Honor, just for clarity for the

18   record, at about 13 minutes and 20 seconds, that's when the

19   transcription picks up because that's when the meeting starts,

20   so I'm happy to play the first 13 minutes and 20 seconds, but

21   it's not relevant to the meeting itself, but that's how we

22   demonstrate it's a full recording.

23        JUDGE ROSAS:  What do you prefer?

24        MS. POLITO:  I prefer a transcript of the complete audio

25   recording, Judge, which we don't have.



1    JUDGE ROSAS:  Okay.  So we're going to proceed with 27(a)

2    today at this point, so what do you prefer, that she start from

3    the get-go or when the transcription that currently exists

4    starts?

5    MS. POLITO:  When she starts from the beginning?

6    JUDGE ROSAS:  Okay.

7    (Audio played at 11:06 a.m., ending at 11:06 a.m.)

8    Q    BY MS. CACACCIO:  Who's that?

9    A    The very first voice was Angela Dudzic.

10   Q    And the next voice?

11   A    I think you hear Jeremy Pasquale in there and then myself.

12   Q    And who are those people?

13   A    Both are partners at Elmwood.

14   (Audio played at 11:06 a.m., ending at 11:07 a.m.)

15   MS. CACACCIO:  I'm sorry, I should note for the record,

16   this recording is 1 hour and 19 minutes and 37 seconds.

17   (Audio played at 11:07 a.m., ending at 11:07 a.m.)

18   Q    BY MS. CACACCIO:  Who's that?

19   A    That was me.

20   MS. CACACCIO:  We're at 30 seconds.

21   (Audio played at 11:07 a.m., ending at 11:07 a.m.)

22   Q    BY MS. CACACCIO:  Who are you talking to there?

23   A    Jeremy Pasquale.

24   (Audio played at 11:07 a.m., ending at 11:07 a.m.)

25   Q    BY MS. CACACCIO:  Who were you talking about there?



1     A     I'm talking about Cassie Fleischer.

2     Q     And who's that?

3     A     She's also -- was a partner at Elmwood.

4     (Audio played at 11:07 a.m., ending at 11:08 a.m.)

5          MS. CACACCIO:  Your Honor, at this point, I'm going to

6     play this beginning for the first 13 minutes and 20 seconds.

7     If it's oh -- I would propose that if at some point during this

8     recording Respondent would like me to stop to have a speaker

9     identified, I'll do so, but given that it's not -- it's just

10     for completeness.  I don't know that I even have a speaker at

11     this point.

12          JUDGE ROSAS:  All right.  You can raise your hand or

13     signal somehow and she can stop immediately, okay?

14     (Audio played at 11:08 a.m., ending at 11:18 a.m.)

15     Q     BY MS. CACACCIO:  Who all is speaking?

16     A     I think that was Deanna Pusatier.

17          MS. CACACCIO:  And we're at 10:59 in the recording.  It's

18     not in the transcript yet.  The meeting hasn't started

19     presumably.

20     (Audio played at 11:18 a.m., ending at 11:19 a.m.)

21     Q     BY MS. CACACCIO:  What's happening at this point in the

22     recording?

23     A     We're commenting on the carpet in the conference room.

24          JUDGE ROSAS:  What's the time?

25          MS. CACACCIO:  We're at, like, 11:46-ish, Judge.



1    (Audio played at 11:19 a.m., ending at 11:19 a.m.)

2    Q    BY MS. CACACCIO:  We're at 11:59.  What happened there?

3    A    He spilled my coffee on myself.

4    (Audio played at 11:20 a.m., ending at 11:20 a.m.)

5    Q    BY MS. CACACCIO:  We're at 12:39.  What's happening there?

6    A    They're passing out coffee.  That was in the meeting for

7    us to do a coffee tasting.

8    A    Do you know who's passing out the coffee?

9    A    Deanna and Allyson, I believe.

10    (Audio played at 11:20 a.m., ending at 11:20 a.m.)

11    MS. CACACCIO:  Sorry, we're at, like, 12:40 in the

12    recording.

13    (Audio played at 11:20 a.m., ending at 11:21 a.m.)

14    Q    BY MS. CACACCIO:  Who is that?

15    A    That was me.

16    Q    And who are you talking to?

17    A    Talking to Jeremy.

18    MS. CACACCIO:  We're at 12:47 in the recording.

19    (Audio played at 11:21 a.m., ending at 11:21 a.m.)

20    Q    BY MS. CACACCIO:  Do you know who that is?

21    A    That's Allyson Peck.

22    MS. CACACCIO:  We're at 13:10.

23    (Audio played at 11:21 a.m., ending at 11:21 a.m.)

24    Q    BY MS. CACACCIO:  Do you know who this is?  We're at

25    13:20, which is where the transcription starts?


www.escribers.net | 800-257-0885

1    A    When she starts saying was anyone not at the meeting,

2    that's Deanna Pusatier.

3    (Audio played at 11:21 a.m., ending at 11:22 a.m.)

4    Q    BY MS. CACACCIO:  Who responds "thanks"?

5    A    That's me.

6         MS. CACACCIO:  Just one second, Judge.

7    (Audio played at 11:22 a.m., ending at 11:22 a.m.)

8    Q    BY MS. CACACCIO:  Do you know who that is?

9    A    I think that's Deanna Pusatier.

10   (Audio played at 11:22 a.m., ending at 11:22 a.m.)

11   Q    BY MS. CACACCIO:  Who's that?

12   A    That's me.

13        MS. CACACCIO:  We're at 13:40.

14   (Audio played at 11:22 a.m., ending at 11:23 a.m.)

15   Q    BY MS. CACACCIO:  Do you know who was speaking there?

16   A    Deanna Pusatier.

17   (Audio played at 11:23 a.m., ending at 11:23 a.m.)

18   Q    BY MS. CACACCIO:  Do you know who that is?

19   A    Deanna Pusatier.

20        MS. CACACCIO:  We're at 14:15.

21        Judge, I don't know.  And we just, sort of, talked about

22   this briefly before we played this recording after the last

23   one.  We have discussed how if the speakers, or speakers, we

24   had just identified earlier, maybe wouldn't have to identify

25   them every time.  I'm happy to keep doing it the way we're



www.escribers.net | 800-257-0885

1    doing it.  But I'm open to suggestion.

2         HEARING OFFICER ROSAS:  Well, we have constants of -- and

3    I don't want to get any of the names wrong, but --

4         MS. CACACCIO:  Rossanne, Deanna, and Allison.

5         HEARING OFFICER ROSAS:  Correct.  And then, we have Ms.

6    Eisen.  So my preference would be not to identify those

7    individuals when they're speaking, but new individuals that

8    have not been identified as the voice.  That's my preference.

9    It's up to you, Counsel.  You have a right.

10        MS. PHIPPS POLITO:  Judge, I think that that makes sense.

11   Where Ms. -- I mean, I don't know, if even the first time we

12   want to say next in the hearing, Ms. Williams --

13        HEARING OFFICER ROSAS:  Sure.

14        MS. PHIPPS POLITO:  -- and Ms. Peck.

15        HEARING OFFICER ROSAS:  Yeah.

16        MS. PHIPPS POLITO:  We could, you know, employees.

17        HEARING OFFICER ROSAS:  When it comes to statements --

18        MS. PHIPPS POLITO:  Yeah.

19        HEARING OFFICER ROSAS:  Allegedly uttered by --

20        MS. PHIPPS POLITO:  Uh-huh.

21        HEARING OFFICER ROSAS:  -- your -- your manager,

22   supervisors, officials at any of these meetings, you -- you

23   know, we -- we've already got some introduction to what they

24   sound like from this witness.  And you can take a different

25   interpretation of who's saying what, who's saying it and what



1     they're saying, and your version of a transcription should it

2     not be agreed upon, okay?

3          MS. PHIPPS POLITO:  I -- agree, Judge.

4          HEARING OFFICER ROSAS:  Okay.

5          MS. PHIPPS POLITO:  And -- and -- and we had discussed

6     that as a possibility identifying those individuals up front,

7     Ms. Eisen, that's the first time her voice comes on.  But for

8     the other employees and -- or I'm sorry, for the partners and

9     baristas that are present that we don't know they are, I still

10    think there may need to know who they are for the record.

11         HEARING OFFICER ROSAS:  So it sounds like based on your

12    discussions, General Counsel will just play it.  And General

13    Counsel will stop it when they feel that they need to identify

14    something.  And if you want somebody to be identified, or need

15    it to stop, you will indicate.  This motion -- or --

16         MS. PENDER STANLEY:  I'll keep it on.  It's okay.

17         HEARING OFFICER ROSAS:  Ask the General Counsel, okay --

18         MS. PHIPPS POLITO:  Yeah.

19         HEARING OFFICER ROSAS:  -- to stop.

20         MS. PHIPPS POLITO:  I under -- my understanding, Judge, is

21    every time a barista speaks that I don't recognize it, we're

22    going to need the identification.

23         HEARING OFFICER ROSAS:  Just -- just say stop, if the

24    General Counsel hasn't stopped.

25         MS. PHIPPS POLITO:  Okay.



1      HEARING OFFICER ROSAS:  Okay?

2  (Audio played at 11:26 a.m., ending at 11:27 a.m.)

3      MS. PHIPPS POLITO:  So this is a stop.  Okay, what --

4      MS. CACACCIO:  I'm sorry, what?

5      MS. PHIPPS POLITO:  Could we just identify Emily and

6  LaRue's last name for the record?

7      THE WITNESS:  Emily Hirsch and LaRue Heutmaker,

8  H-A-U-T-M-A-K-E-R (sic), I think.  Or -- yeah, some --

9  something like that.

10  Q    BY MS. CACACCIO:  Do you know how to spell LaRue?

11  A    L-A, capital R-U-E.

12      MS. PENDER STANLEY:  Jessie (phonetic throughout), can I

13  go on?

14      MS. CACACCIO:  If there's any.

15      MS. PENDER STANLEY:  Um-hum.

16  (Audio played at 11:27 a.m., ending at 11:27 a.m.)

17  Q    BY MS. CACACCIO:  Can you identify that person's last

18  name?

19  A    Cathy Fletcher (phonetic throughout).

20  Q    And who's that?

21  A    She is one of the partners at Elmwood.

22  (Audio played at 11:27 a.m., ending at 11:27 a.m.)

23  Q    BY MS. CACACCIO:  Do you know who that is?

24  A    Laila (phonetic throughout) Gentil, G-E-N-T-I-L.

25  (Audio played at 11:27 a.m., ending at 11:28 a.m.)



1    A    Angela Dudzik.

2    (Audio played at 11:28 a.m., ending at 11:34 a.m.)

3    Q    BY MS. CACACCIO:  Who spoke before the "you're telling

4    me"?  Who was the person who was talking about, "when they're

5    down and out, I help them"?

6    A    Jerry Lipscomb (phonetic throughout).

7    Q    And who --

8    A    Jerry Lipscomb.

9    Q    And who was just speaking?

10    A    Austin Reed.

11    (Audio played at 11:34 a.m., ending at 11:35 a.m.)

12    Q    BY MS. CACACCIO:  Can you identify this speaker?

13    A    Emily Hirsch.

14        MS. CACACCIO:  We're at 22:42.

15    (Audio played at 9:35 a.m.)

16        MS. PHIPPS POLITO:  I'm sorry?

17    (Audio ends at 11:35 a.m.)

18    A    Emily Hirsch.

19        HEARING OFFICER ROSAS:  Keep your voice up.

20    (Audio played at 11:36 a.m., ending at 11:36 a.m.)

21        MS. PHIPPS POLITO:  I'm sorry.  I just want the

22    transcript -- transcript uploaded where --

23        MS. PENDER STANLEY:  We are on page 14.

24        MS. CACACCIO:  Line 10.

25        MS. PHIPPS POLITO:  Can the witness identify which barista



1    was just speaking?

2        THE WITNESS:  Yes.  It was LaRue Heutmaker.

3        MS. PHIPPS POLITO:  Thank you.

4    (Audio played at 11:37 a.m., ending at 11:37 a.m.)

5        MS. PENDER STANLEY:  Are you ready?

6        MS. CACACCIO:  Um-hum.

7    (Audio played at 11:37 a.m., ending at 11:39 a.m.)

8    Q    BY MS. CACACCIO:  Can you identify the acronym, NFB?

9    A    Niagara Falls Boulevard.

10   (Audio played at 11:39 a.m., ending at 11:39 a.m.)

11   Q    BY MS. CACACCIO:  Do you know what she said, when she

12   said, "you know, just like where blank is put"?

13   A    The nitro.

14   Q    And what's that?

15   A    It's the -- the cold -- the nitro-cold room cooling for --

16   it looks like a beer tap.

17   (Audio played at 11:40 a.m., ending at 11:41 a.m.)

18   Q    BY MS. CACACCIO:  Can you identify the speaker?

19   A    Allyson Peck.

20   (Audio played at 11:41 a.m., ending at 11:42 a.m.)

21   Q    BY MS. CACACCIO:  Do you know who that was?

22   A    Austin Reed.

23   (Audio played at 11:42 a.m., ending at 11:42 a.m.)

24       MS. CACACCIO:  Sorry.  That was around, like, 12 -- 28:15,

25   roughly.



1    (Audio played at 11:42 a.m., ending at 12:02 p.m.)

2        MS. POLITO:  Can we just stop and confirm that that's

3    Austin?

4    Q    BY MS. CACACCIO:  Who's that speaker?

5    A    That's Austin Reed.

6        MS. POLITO:  Last name again?

7        THE WITNESS:  Reed, R-E-E-D.

8        MS. POLITO:  Thank you.

9    (Audio played at 12:02 p.m., ending at 12:04 p.m.)

10       MS. CACACCIO:  So we're at 49:41.

11   (Audio played at 12:04 p.m., ending at 12:04 p.m.)

12   Q    Do you recognize that speaker?

13   A    That's Allyson Peck.

14       MS. CACACCIO:  We're at 1:15:05.

15   (Audio played at 12:29 p.m., ending at 12:30 p.m.)

16   BY MS. CACACCIO:

17   Q    Do you know who that is?

18   A    LaRue Heutmaker.

19       MS. CACACCIO:  We're at 1:15:35.

20   (Audio played at 12:30 p.m., ending at 12:30 p.m.)

21   BY MS. CACACCIO:

22   Q    What's ETF?

23   A    Elmwood Taco and Subs.

24   (Audio played at 12:30 p.m., ending at 12:31 p.m.)

25       MS. POLITO:  Can we just pause?  Is this -- is this



1    Michelle speaking the past few minutes?

2        THE WITNESS:  No, that's LaRue.

3        MS. POLITO:  LaRue's, okay. .

4        THE WITNESS:  Yes.

5        MS. POLITO:  Thank you.

6        MS. CACACCIO:  We're at 1:16:25.

7    (Audio played at 12:31 p.m., ending at 12:32 p.m.)

8        MS. CACACCIO:  So that's the end of the transcript, but

9    there's about two minutes and 23 seconds left.

10        JUDGE ROSAS:  Do you want to play it?

11        MS. POLITO:  Yes.

12    (Audio played at 12:32 p.m., ending at 12:32 p.m.)

13        MS. CACACCIO:  I'm going to handle this the way I did in

14    the beginning.  If there's someone you want me to identify, at

15    some point, let me know, otherwise I won't identify.

16    (Audio played at 12:32 p.m., ending at 12:33 p.m.)

17        MS. CACACCIO:  We're at about 1:18:05.

18    BY MS. CACACCIO:

19    Q    Michelle, what's happening at this part of the recording?

20    A    We're all gathering our stuff and either, like, just

21    milling about the conference room or leaving the conference

22    room.

23    (Audio played at 12:33 p.m., ending at 12:35 p.m.)

24    BY MS. CACACCIO:

25    Q    Michelle, that's a recording of the meeting that you



1    recall reporting on about September 19th?

2    A    Yes.

3    Q    Was it altered in any way?

4    A    It was not.

5    Q    Were you -- did you take any part in the transcription of

6    this recording?

7    A    I did not.

8         MS. CACACCIO:  Your Honor, I will **offer** General Counsel's

9    27(a), which is the recording.  And as we just discussed for

10   the last recording, I'll -- we'll do the transcript when we

11   reach that point in relationship.

12        JUDGE ROSAS:  Any additional voir dire?

13        MS. POLITO:  No additional voir dire, Judge.  Two

14   objections, with respect to 27b.  And I also note that the

15   transcript was titled Employer Captive Audience Meeting, and

16   I'm asking that that be stricken from the transcript.  It was

17   not an Employer Captive Audience Meeting.  The witness heresel

18   testified that she was not mandated to go there.

19        JUDGE ROSAS:  Well, in a revised version of 27(b), you

20   might be able to take care of that, General Counsel.

21        MS. CACACCIO:  Yes.

22        JUDGE ROSAS:  Call it what it is, right?

23        MS. CACACCIO:  Yes, Judge.

24        JUDGE ROSAS:  Okay.  And identify the unidentified.

25        MS. CACACCIO:  Yes, Judge.  I will do my best.



1    JUDGE ROSAS:  Okay.  So over objection, same ruling.

2  General Counsel's 27(a) is received at this time.

3  **(General Counsel Exhibit Number 27(a) Received into Evidence)**

4  BY MS. CACACCIO:

5  Q    Michelle, what did you do after this meeting ended?

6  A    I drove myself and another partner back to the Elmwood

7  location.

8  Q    And who was the other partner?

9  A    Layland Gambino (phonetic).

10  Q    And what did you do when you got to the Elmwood location?

11  A    I met another partner, Jaz Brisack, and sat at a café

12  table where I told her what had happened in the meeting I was

13  just at.

14  Q    And what happened then?

15  A    As we were talking, Deanna Pusatier, Elle Posack

16  (phonetic) and Rossann Williams came through the door of the

17  café.  They went around the -- somewhere behind the bar and

18  started talking to those partners that were running the store.

19    MS. CACACCIO:  Your Honor, at this point, it's about

20  12:30.  I have another -- we're going to have another recording

21  to play.  It's also lengthy.

22    JUDGE ROSAS:  Okay.

23    MS. CACACCIO:  I can tell you exactly how lengthy.

24    JUDGE ROSAS:  Off the record.

25  (Off the record at 12:37 p.m.)



1                    <u>**RESUMED DIRECT EXAMINATION**</u>

2    Q    BY MS. CACACCIO:  Michelle, we just talked about the

3    recording before the break.  We talked about a listening

4    session where you kind of -- on your lunch break, did you talk

5    to anyone else in this room?

6    A    I did.

7    Q    I'd like to talk to you about a listening session on

8    September 19th.  Did you ever attend another one after that?

9    A    The next one I attended was Friday, October 1st.

10   Q    And how did you hear about this session?

11   A    Now, they were posting it on our back fridge in the store.

12   Q    And what did the posting say, if you remember?

13   A    That the store was going to be closed for the next day to

14   have a -- have a store meeting.  And we were all supposed to

15   make it a priority to attend.

16   Q    And where was the meeting held?

17   A    That was held in the Elmwood location.

18   Q    Do you remember what time the meeting was?

19   A    The meeting began at 5 p.m. or it began at 6 p.m.  I'm not

20   sure.  In the evening.

21   Q    Would the store usually be open during that time?

22   A    It would, yeah.

23   Q    And what time did the store close that day?  What time

24   should it have closed that day?

25   A    I think 9 or 9:30 that evening.



1    Q    Do you know what time it closed?

2    A    It closed an hour prior to whatever the scheduled meeting

3    time was.

4    Q    Who ran this meeting?

5    A    This one was run by Allyson Peck, Chris Stewart, and Mark

6    Szto, I think.  Or is it -- I don't know how to pronounce his

7    last name.

8    Q    Do you know who Chris Stewart is?

9    A    He -- e's a member of the corporate team.  I think he said

10   he was in partner resources.

11   Q    And what about Mark Szto?

12   A    He was one of the interim district managers brought in.

13   Q    About how many employees attended the meeting?

14   A    I think there were maybe a dozen.

15   Q    And how long did it last?

16   A    A little over an hour, I think.

17   Q    Did you record it?

18   A    I did.

19   Q    How did you record it?

20   A    I used my Apple Watch.

21   Q    Did you make any changes to that recording?

22   A    I did not.

23   Q    And have you listen to the recording?

24   A    I have.

25   Q    And is it a full copy of the recording that you were --



1    that you remember it to be?

2    A    Yes.

3    Q    And what did you do with the recording once you took it?

4    A    That was sent over to our training EMDs (phonetic).  I

5    think it was the Google drive -- sent to the Google drive.

6        MS. CACACCIO:  So Your Honor, at this time, we're going to

7    be -- General Counsel would like to play recording 28a.  And

8    there is a transcript here, 28b.  It goes along with it.

9        JUDGE ROSAS:  That's fine.

10       Any voir dire, Respondent?

11       MS. POLITO:  No voir dire, Judge.

12       JUDGE ROSAS:  Is there any objection?

13       MS. POLITO:  We object, I think.  Yes.

14       JUDGE ROSAS:  Overruled.

15       Go ahead.

16       MS. CACACCIO:  Judge, I believe -- and I guess we'll find

17   out when I hit the buttons.  But I believe that this

18   transcription is complete, in that there's no pre or post -- it

19   follows right along with the -- the recording.  Of course, if

20   I'm not right, I'm about to find out in just a second, so give

21   me just a second.

22       And I'm going to do what we did last time.  It seemed to

23   work well for everyone involved, so  I'm going to stop whenever

24   anyone asks me to and the first speaker identified if we have

25   new voices, unless there's an objection to that, I guess.



1    (Audio played at 1:48 p.m., ending at 1:49 p.m.)

2        MS. POLITO:  Could she identify any of those people just

3    by being there or by voice recognition?

4    BY MS. CACACCIO:

5    Q    Could you tell us what's happening?

6    A    Yeah.  We're doing another coffee tasting.

7    Q    Who's in the room at this point?

8    A    All of the partners that attended.  The person leading the

9    coffee tasting was Allyson Peck.  One of the dominant voices is

10   Jeremy Pasquale, and then there's another voice that sounds

11   kind of close.  A deeper voice.  That's Chris Stewart.  And

12   then Courtney Stroehar is a -- the female voice that's pretty

13   prominent at that point.

14       MS. CACACCIO:  Does that take care of it?

15       MS. POLITO:  Thank you.

16       MS. CACACCIO:  Yes.

17   (Audio played at 1:50 p.m., ending at 1:50 p.m.)

18   BY MS. CACACCIO:

19   Q    Just for clarity, who's speaking right now?

20   A    Allyson Peck.

21       MS. CACACCIO:  And we're at 1:25.

22   (Audio played at 1:50 p.m., ending at 1:52 p.m.)

23   BY MS. CACACCIO:

24   Q    And who was that last noise?

25   A    The one I sat directly to the -- Tatyana Gonzalez.



1    MS. CACACCIO:  We're at 3:13.

2    (Audio played at 1:52 p.m., ending at 1:53 p.m.)

3    BY MS. CACACCIO:

4    Q    Who said hi?

5    A    That's Mark.

6    (Audio played at 1:53 p.m., ending at 1:55 p.m.)

7    BY MS. CACACCIO:

8    Q    What's an M-2?

9    A    I actually do not know.  Oh, M-2 is administrative, sorry.

10   That's the espresso bar.  Yeah.

11   (Audio played at 1:55 p.m., ending at 1:55 p.m.)

12   BY MS. CACACCIO:

13   Q    Was that your voice?

14   A    It was, yeah.

15   (Audio played at 1:55 p.m., ending at 1:58 p.m.)

16   BY MS. CACACCIO:

17   Q    Who's talking there?

18   A    Tatyana Gonzalez.

19   (Audio played at 1:58 p.m., ending at 1:59 p.m.)

20   BY MS. CACACCIO:

21   Q    What does POS mean?

22   A    Point of Sale, front register.

23   MS. CACACCIO:  We're at 9:28.

24   (Audio played at 1:59 p.m., ending at 2:00 p.m.)

25   BY MS. CACACCIO:



1    Q    Who was that just before?

2    A    That's me.

3    Q    Who's speaking right now?

4    A    That's me.

5    (Audio played at 2:00 p.m., ending at 2:01 p.m.)

6    Q    BY MS. CACACCIO:  Do you know who that is?

7    A    The male voice that just came in?

8    Q    Yes.

9    A    That's Mark.

10    MS. CACACCIO:  We're at 10:52.

11   (Audio played at 2:01 p.m., ending at 2:01 p.m.)

12   Q    BY MS. CACACCIO:  Who's speaking there?

13   A    Can I hear a little bit more?

14   Q    Yep.

15   (Audio played at 2:01 p.m., ending at 2:01 p.m.)

16    MS. CACACCIO:  Sorry.  We're at 11:05, roughly.

17   (Audio played at 2:01 p.m., ending at 2:01 p.m.)

18   Q    BY MS. CACACCIO:  And the responses to Mark, who is that

19   person responding?

20   A    That's Deborah Ashrayer (phonetic throughout).

21   Q    Okay.

22   (Audio played at 2:02 p.m., ending at 2:02 p.m.)

23   Q    BY MS. CACACCIO:  Who's responding to Mark?

24   A    That's Jess Morganstrayer (phonetic throughout).

25   Q    And is that her that whole time?



1     A     Yes, it is.

2     (Audio played at 2:02 p.m., ending at 2:02 p.m.)

3     Q     BY MS. CACACCIO:  Who's that?

4     A     Jeremy Pasquale.

5           MS. CACACCIO:  We're at 11:50.

6     (Audio played at 2:02 p.m., ending at 2:03 p.m.)

7     Q     BY MS. CACACCIO:  Do you know who that speaker is?

8     A     Tatyana Gonzalez.

9     (Audio played at 2:03 p.m., ending at 2:03 p.m.)

10    Q     BY MS. CACACCIO:  Who asks that or who said that?

11    A     Lauren Heutmaker.

12          MS. CACACCIO:  We're at 12:25.

13    (Audio played at 2:03 p.m., ending at 2:03 p.m.)

14    Q     BY MS. CACACCIO:  Who's that?

15    A     That's still Lauren.

16    Q     So I'm sorry.  So who?

17    A     Lauren, L-A-U-R-E-N.

18    Q     Lauren.  Got it.  Thank you.

19    A     Sure.

20    (Audio played at 2:03 p.m., ending at 2:04 p.m.)

21    Q     BY MS. CACACCIO:  Who -- I'm sorry.

22    (Audio played at 2:04 p.m., ending at 2:04 p.m.)

23    Q     BY MS. CACACCIO:  Do you know who asked that question?

24    A     Can you go back?

25    (Audio played at 2:04 p.m., ending at 2:04 p.m.)



1    A    I can't make that one out.  I'm sorry.

2    Q    BY MS. CACACCIO:  Okay.

3    (Audio played at 2:04 p.m., ending at 2:05 p.m.)

4    Q    BY MS. CACACCIO:  Who's that?

5    A    Kellen Higgins.

6         MS. CACACCIO:  We're at 13:35.

7    (Audio played at 2:05 p.m., ending at 2:05 p.m.)

8    Q    BY MS. CACACCIO:  Who's speaking?

9    A    Kellen Higgins.

10   (Audio played at 2:06 p.m., ending at 2:06 p.m.)

11   Q    BY MS. CACACCIO:  Who was just speaking?

12   A    Kellen Higgins.

13        MS. STANLEY:  We're at about 14:43.

14   Q    BY MS. CACACCIO:  Spell that.

15   A    Kellen, K-E-L-L-E-N.  Higgins, H-I-G-G -- I think he

16   spells it, I-N-S.

17   (Audio played at 2:07 p.m., ending at 2:07 p.m.)

18   Q    BY MS. CACACCIO:  Who is responding to Mark in that

19   conversation?

20   A    That's still Kellen Higgins.

21        MS. CACACCIO:  And we're at 15:13 right now.

22   (Audio played at 2:07 p.m., ending at 2:08 p.m.)

23   Q    BY MS. CACACCIO:  Who is speaking there?

24   A    That was me.

25   (Audio played at 2:08 p.m., ending at 2:17 p.m.)



1    Q    BY MS. CACACCIO:   Who says, raise your hand or whatever

2    made sense?

3    A    I think that's Mark.

4         JUDGE ROSAS:   Time?

5    MS. CACACCIO:   24:41, Judge.

6    (Audio played at 2:17 p.m., ending at 2:18 p.m.)

7    Q    BY MS. CACACCIO:   What's the hub?

8    A    It's an internal communication system within Starbucks.

9         MS. CACACCIO:   So that was at 25:12.

10   (Audio played at 2:18 p.m., ending at 2:18 p.m.)

11   Q    BY MS. CACACCIO:   Michelle (phonetic throughout), what are

12   you talking about here?

13   A    The context of the entire conversation, or that subject?

14   Q    That subject, what are you talking about?

15   A    It was a partner food and beverage benefit that was rolled

16   out during the pandemic, which allowed us to come into the

17   stores on our off days to receive free beverage and free food

18   item, which was not typical prior to the pandemic.   And they

19   had just recently altered part of it and discontinued another

20   part of it.

21        MS. CACACCIO:   Sorry.   We're at about 25:32.   I'm going to

22   hit play.

23   (Audio played at 2:19 p.m., ending at 2:19 p.m.)

24   Q    BY MS. CACACCIO:   Who's that?

25   A    Kellen Higgins.



1     MS. CACACCIO:  And we're at 25:56.

2    (Audio played at 2:19 p.m., ending at 2:26 p.m.)

3    Q    BY MS. CACACCIO:  Do you know who that is?

4    A    Tatyana Gonzalez.

5    Q    And is that who started with the question in terms of the

6    vote?

7    A    Yes.  Yes.

8    Q    And she's still speaking when I paused it?

9    A    Correct.

10     MS. CACACCIO:  So we're at 32:36.

11    Q    BY MS. CACACCIO:  And you said it was Tatyana Gomez?

12    A    Gonzalez.

13    Q    Gonzalez.  I'm sorry.  Thank you.

14    (Audio played at 2:26 p.m., ending at 2:27 p.m.)

15    Q    BY MS. CACACCIO:  Do you know who asked that?

16    A    That's still Tatyana Gonzalez.

17    (Audio played at 2:27 p.m., ending at 2:27 p.m.)

18    Q    BY MS. CACACCIO:  Who's that?

19    A    Tatyana Gonzalez.

20    (Audio played at 2:27 p.m., ending at 2:29 p.m.)

21    Q    BY MS. CACACCIO:  Who's that?

22    A    (Indiscernible).

23     MS. CACACCIO:  We're at 35:32.

24    (Audio played at 2:29 p.m., ending at 2:30 p.m.)

25    Q    BY MS. CACACCIO:  Who's that?



1   A     That's Tatyana Gonzalez.

2   (Audio played at 2:30 p.m. --

3   Q     Who's the one who interjected between them?

4   A     Can I hear it again?

5   Q     Sure.  I think this is the one I -- I had a question about

6   that.

7   (Audio played at 2:32 p.m., ending at 2:32 p.m.)

8   Q     Nope.  Hold on.

9   (Audio played at 2:33 p.m., ending at 2:33 p.m.)

10  Q     What is Sedgwick?

11  A     Sedgwick is a third-party -- I think it has multiple roles

12  but it's most commonly utilized when a partner needs to take a

13  leave of absence.  And it deals with, like, short-term

14  disability or however that's processed.

15        MS. CACACCIO:  We're at 37:46.

16  (Audio played at 2:33 p.m., ending at 2:34 p.m.)

17  Q     Who's that?

18  A     I can't make out who it is.  I'm sorry.

19  (Audio played at 2:34 p.m., ending at 2:35 p.m.)

20  Q     Who said "Sophie, don't activate it"?

21  A     Allyson Peck.

22  (Audio played at 2:36 p.m., ending at 2:36 p.m.)

23  Q     Do you know who that is?

24  A     Jeremy Pasquale.

25  (Audio played at 2:36 p.m., ending at 2:36 p.m.)



1    Q    Who says that, "set the premium"?

2    A    That is still Jeremy.

3    (Audio played at 2:36 p.m., ending at 2:36 p.m.)

4    Q    Do know who said "they put me on, too"?

5    A    Can you take it back just a bit?

6    Q    Yeah.  Right now, we're at 40:22, so let me try to --

7    (Audio played at 2:36 p.m., ending at 2:37 p.m.)

8    A    I can't make that out.  I'm sorry.

9    Q    Okay.

10   (Audio played at 2:37 p.m., ending at 2:37 p.m.)

11   Q    And who is talking right then, "take it out like you no

12   longer work for Starbucks"?

13   A    That is still Jeremy.

14   (Audio played at 2:37 p.m., ending at 2:37 p.m.)

15   Q    Who's that?

16   A    Jeremy.

17   (Audio played at 2:37 p.m., ending at 2:38 p.m.)

18   Q    Who's that?

19   A    That's Tatyana Gonzalez.

20   (Audio played at 2:38 p.m., ending at 2:38 p.m.)

21       MS. CACACCIO:  Sorry, we were right before 41:30.

22   (Audio played at 2:38 p.m., ending at 2:39 p.m.)

23   Q    BY MS. CACACCIO:  Who's speaking right now?

24   A    Tatyana Gonzalez.

25       MS. CACACCIO:  We're at 42:26.



1    (Audio played at 2:39 p.m., ending at 2:40 p.m.)

2    Q    BY MS. CACACCIO:  Who's saying that?

3    A    That's Emily Hirsch.

4         MS. CACACCIO:  We're at 42:55.

5    (Audio played at 2:40 p.m., ending at 2:41 p.m.)

6    Q    BY MS. CACACCIO:  Do you know who says "insurance"?

7    A    Can you take it back a little bit?

8    (Audio played at 2:41 p.m., ending at 2:41 p.m.)

9    A    It's -- it's Tatyana Gonzalez who says insurance, and then

10   that's who's speaking now.

11        MS. CACACCIO:  We're at 43:50.

12   (Audio played at 2:41 p.m., ending at 2:42 p.m.)

13   Q    BY MS. CACACCIO:  Who's that?

14   A    Jeremy.

15   (Audio played at 2:42 p.m., ending at 2:42 p.m.)

16        MS. CACACCIO:  Sorry, at about 44:36.

17   (Audio played at 2:42 p.m., ending at 2:43 p.m.)

18   Q    BY MS. CACACCIO:  Do you know who that is?

19   A    Yes, that's Myke, M-Y-K-E, Gollwi -- Gollwitzer.  I don't

20   know how to pronounce his last name.

21   Q    Who is -- who is Myke?

22   A    He's a partner at Elmwood.

23        MS. CACACCIO:  We're at 45:34.

24   (Audio played at 2:43 p.m., ending at 2:44 p.m.)

25   Q    BY MS. CACACCIO:  Who is answering him?



1      A      Allyson Peck.

2      (Audio played at 2:44 p.m., ending at 2:44 p.m.)

3      Q      Who's saying that?

4      A      That's still Myke.

5            MS. CACACCIO:  We're at 46:13.

6      (Audio played at 2:44 p.m., ending at 2:45 p.m.)

7      Q      BY MS. CACACCIO:  Do you know who that is?

8      A      Tatyana Gonzalez.

9            MS. CACACCIO:  We're at 46:43.

10     (Audio played at 2:45 p.m., ending at 2:45 p.m.)

11     Q      BY MS. CACACCIO:  Who -- and who says "Starbucks is trying

12     to increase the pay?"

13     A      That's still Tatyana Gonzalez.

14           MS. CACACCIO:  Is that the one you wanted, Jackie

15     (phonetic throughout)?

16           MS. POLITO:  Yeah, was there another -- a gentleman's

17     voice?

18           THE WITNESS:  That's still Myke --

19           MS. POLITO:  Myke.

20           THE WITNESS:  -- and Tatyana going back and forth.

21           MS. POLITO:  Thank you.

22           MS. CACACCIO:  We're at 47:17.

23     (Audio played at 2:46 p.m., ending at 2:46 p.m.)

24     Q      BY MS. CACACCIO:  Who's that that?

25     A      That's Jaz Brisack.



1    (Audio played at 2:46 p.m., ending at 2:46 p.m.)

2        MS. CACACCIO:  Sorry.  We're at 47:30.

3    (Audio played at 2:46 p.m., ending at 2:48 p.m.)

4    Q    BY MS. CACACCIO:  Who's that?

5    A    Allyson Peck.

6        MS. CACACCIO:  We're at 49:30.

7    (Audio played at 2:48 p.m., ending at 2:48 p.m.)

8    Q    BY MS. CACACCIO:  Do you know who that is?

9    A    Tatyana Gonzalez.

10       MS. CACACCIO:  We're at 49:25.

11   (Audio played at 2:48 p.m., ending at 2:49 p.m.)

12   Q    BY MS. CACACCIO:  Do you know who that is?

13   A    That's Jeremy.

14   (Audio played at 2:49 p.m., ending at 2:50 p.m.)

15   Q    BY MS. CACACCIO:  Do you know who that is?

16   A    That's Allyson Peck.

17       MS. CACACCIO:  We're at 51:16.

18   (Audio played at 2:50 p.m., ending at 2:50 p.m.)

19   Q    BY MS. CACACCIO:  Who's that?

20   A    Courtney Stroehar.

21       MS. CACACCIO:  We're at 51:22.

22   (Audio played at 2:50 p.m., ending at 2:52 p.m.)

23   Q    BY MS. CACACCIO:  Do you know who that is?

24   A    That's LaRue Heutmaker.

25       MS. CACACCIO:  We're at 52:44.



1    (Audio played at 2:52 p.m., ending at 2:53 p.m.)

2        MS. CACACCIO:  Can we go off the record?

3    (Off the record at 2:53 p.m.)

4        MS. CACACCIO:  We paused at 53:19, so I'm going to hit

5    play.

6    (Audio played at 3:00 p.m., ending at 3:05 p.m.)

7                    **RESUMED DIRECT EXAMINATION**

8    Q    BY MS. CACACCIO:  Who's that?

9    A    That's Myke.

10        MS. CACACCIO:  Sorry, we're at 58.

11    (Audio played at 3:05 p.m., ending at 3:05 p.m.)

12    Q    BY MS. CACACCIO:  Who says, "we got to pay shit"?

13    A    I don't know what that -- who that is, I'm sorry.

14    (Audio played at 3:05 p.m., ending at 3:05 p.m.)

15    Q    BY MS. STANLEY:  Who were you talking to?

16    A    I asked Jaz what she was about to say, but then the voice

17    that comes in is actually Tatyana.

18    Q    You said Jaz?

19    A    Jaz, yeah, J-A-Z.

20    (Audio played at 3:05 p.m., ending at 3:05 p.m.)

21    Q    BY MS. CACACCIO:  So who's that?

22    A    That's Tatyana Gonzalez.

23        MS. CACACCIO:  We're at 58:32.

24    (Audio played at 3:06 p.m., ending at 3:06 p.m.)

25    Q    BY MS. CACACCIO:  What's the Third Place?



1    A    The Third Place is a term that Starbucks uses to refer to

2    its stores in regards to how its customers view it.  Your first

3    place is supposed to be your home.  Your second place is your

4    job, and then the third place is supposed to be Starbucks.

5         MS. CACACCIO:  We're at 59:18.

6    (Audio played at 3:07 p.m., ending at 3:07 p.m.)

7    Q    BY MS. CACACCIO:  Who is that?

8    A    Tatyana Gonzalez.

9    (Audio played at 3:07 p.m., ending at 3:07 p.m.)

10   Q    BY MS. CACACCIO:  Who's that right now?

11   A    Still Tatyana Gonzalez.

12   Q    We're at 59:51.

13   (Audio played at 3:07 p.m., ending at 3:08 p.m.)

14   Q    BY MS. CACACCIO:  Who's saying this is my house?

15   A    Tatyana Gonzalez.

16   (Audio played at 3:08 p.m., ending at 3:08 p.m.)

17   Q    BY MS. CACACCIO:  Who are you referencing there?

18   A    Jaz, J-A-Z.

19   Q    That was about 1:00:34 roughly.

20   (Audio played at 3:08 p.m., ending at 3:08 p.m.)

21   Q    BY MS. CACACCIO:  Who's talking there?

22   A    Jaz Brisack.

23   Q    We're at 1:00:40.

24   (Audio played at 3:08 p.m., ending at 3:11 p.m.)

25   Q    BY MS. CACACCIO:  Who's talking right there?



1    A    Tatyana Gonzalez.

2    Q    We're at 1:02:55.

3    (Audio played at 3:11 p.m., ending at 3:11 p.m.)

4    Q    BY MS. CACACCIO:  Who says that?

5    A    LaRue Heutmaker.

6    Q    1:03:36.

7    (Audio played at 3:12 p.m., ending at 3:12 p.m.)

8    Q    BY MS. CACACCIO:  Who said put out a fire?

9    A    Tatyana Gonzalez.

10    Q    We're at 1:04:07.

11    (Audio played at 3:12 p.m., ending at 3:12 p.m.)

12    Q    BY MS. CACACCIO:  Who's responding?  Who's talking right

13    now?

14    A    Allyson Peck.

15    Q    We're 1:04:20.

16    (Audio played at 3:12 p.m., ending at 3:13 p.m.)

17    Q    BY MS. CACACCIO:  Who's talking right there?

18    A    Can you just take that back a little bit?

19    (Audio played at 3:13 p.m., ending at 3:13 p.m.)

20    Q    BY MS. CACACCIO:  Who's that?

21    A    Emily Hirsch.

22    Q    We're at 1:04:53.

23    (Audio played at 3:13 p.m., ending at 3:14 p.m.)

24    Q    BY MS. CACACCIO:  Who's talking there?

25    A    That was Emily Hirsch and then overheard a little bit was



1    Tatyana Gonzalez.

2    (Audio played at 3:14 p.m., ending at 3:14 p.m.)

3    Q    BY MS. CACACCIO:  Do you know who that is?

4    A    That -- her name is Erin (phonetic throughout).  I can't

5    remember her last name.  She was a displaced partner after the

6    Walton Galleria closing.

7    Q    We're at 1:05:34.  At some point, you remember her last

8    name, let us know.

9    A    I will.

10    (Audio played at 3:14 p.m., ending at 3:16 p.m.)

11    Q    BY MS. CACACCIO:  Who's talking there?

12    A    That's still Erin.

13    Q    We're 1:07:14.

14    (Audio played at 3:16 p.m., ending at 3:17 p.m.)

15    Q    BY MS. CACACCIO:  Michelle, who's talking right there?

16    A    That's Shariah Lyons, L-Y-O-N-S.

17    Q    We're at 1:07:42.

18        MS. POLITO:  What was the first name?

19        THE WITNESS:  Shariah, S-H-A-R-I-A-H.

20        MS. POLITO:  Thank you.

21    (Audio played at 3:17 p.m., ending at 3:17 p.m.)

22    Q    BY MS. CACACCIO:  Who's talking right there?

23    A    That's Erin again.

24    Q    We're at 1:08:14.

25    (Audio played at 3:18 p.m., ending at 3:18 p.m.)



1    Q    BY MS. CACACCIO:  You know who that is?

2    A    Jeremy.

3    (Audio played at 3:18 p.m., ending at 3:18 p.m.)

4    Q    BY MS. CACACCIO:  Who is that?

5    A    That's Erin.

6    Q    We're at 1:08:47.

7    (Audio played at 3:18 p.m., ending at 3:18 p.m.)

8    Q    BY MS. CACACCIO:  Do you know who Robert (phonetic

9    throughout) is that they're talking about?

10   A    I believe Robert is the store manager from the Delaware --

11   was the store manager at the Delaware and Chippewa store at the

12   time.

13   Q    We're at 1:09:01.

14   (Audio played at 3:19 p.m., ending at 3:20 p.m.)

15   Q    BY MS. CACACCIO:  Who were the -- who did you just say?

16   A    Who were the names I just mentioned?

17   Q    Yep.

18   A    Jaz and LaRue.

19   Q    We're at 1:09:49.

20   (Audio played at 3:20 p.m., ending at 3:21 p.m.)

21   Q    BY MS. CACACCIO:  Who says that?

22   A    Can you take it back and then I'll be able to tell you?

23   (Audio played at 3:21 p.m., ending at 3:22 p.m.)

24   A    I think it's Jaz, but I can't be certain.

25   Q    BY MS. CACACCIO:  So 1:11:26.



1     (Audio played at 3:22 p.m., ending at 3:22 p.m.)

2     Q    BY MS. CACACCIO:  Do you know who that is?

3     A    I think that's Tatyana Gonzalez.

4     Q    That's at 1:11:35.

5     (Audio played at 3:22 p.m., ending at 3:27 p.m.)

6     Q    BY MS. CACACCIO:  Who are you talking to?

7     A    Who just started speaking?

8     Q    Yeah.

9     A    Maya Panos.

10    Q    We're at 1:16:04.  And who's Maya Panos?

11    A    She's a partner at Elmwood.

12    (Audio played at 3:27 p.m., ending at 3:28 p.m.)

13    Q    BY MS. CACACCIO:  Who's talking right now?

14    A    Allyson Peck.

15    Q    We're at 1:17:16.

16    (Audio played at 3:28 p.m., ending at 3:29 p.m.)

17    Q    BY MS. CACACCIO:  Who's asking now?

18    A    Maya Panos.

19    Q    We're at 1:17:54.

20    (Audio played at 3:29 p.m., ending at 3:31 p.m.)

21    Q    BY MS. CACACCIO:  Who's that?

22    A    That's Erin again.

23    Q    We're at 1:19:45.

24    (Audio played at 3:31 p.m., ending at 3:31 p.m.)

25    Q    BY MS. CACACCIO:  Who's talking right now?



1   A     Mark.

2   Q     We're at 1:20:17.

3   (Audio played at 3:31 p.m., ending at 3:34 p.m.)

4   Q     BY MS. CACACCIO:  Who's that?

5   A     Allyson Peck.

6   Q     We're at 1:22:27.

7   (Audio played at 3:34 p.m., ending at 3:34 p.m.)

8   Q     BY MS. CACACCIO:  Do you know who that is?

9   A     Can I just listen to it a little bit longer?

10  Q     We're at 1:22:51.

11  (Audio played at 3:34 p.m., ending at 3:34 p.m.)

12  A     I think that's Shariah Lyons.

13  Q     We're at 1:23:01.

14  (Audio played at 3:34 p.m., ending at 3:35 p.m.)

15  Q     BY MS. CACACCIO:  Do you know who it is?

16  A     That is Shariah Lyons, yes.

17  Q     We're at 1:23:18.

18  (Audio played at 3:35 p.m., ending at 3:36 p.m.)

19  Q     BY MS. CACACCIO:  Do you know who says that about

20  townhouses?

21  A     I'm pretty sure that's Jeremy.

22  Q     We're at 1:24:19.

23  (Audio played at 3:36 p.m., ending at 3:36 p.m.)

24  Q     BY MS. CACACCIO:  Do you know who's talking right now?

25  A     Shariah Lyons.



1    Q    We're at 1:24:37.

2    (Audio played at 3:36 p.m., ending at 3:37 p.m.)

3    Q    Can you say who that is?

4    (Audio ending at 3:37 p.m.)

5    Q    Do you know who that was?

6    A    I think that's still Shariah, but may you take it back

7    just a minute?

8    Q    Yep.

9    (Audio played at 3:37 p.m., ending at 3:38 p.m.)

10   Q    Who's talking right now?

11   A    I don't know who says, "I think this is our".  I'm not

12   sure who that is.  And -- and Shariah picks back up.

13       MS. CACACCIO:  We're at 1:25:39.

14   (Audio played at 3:38 p.m., ending at 3:39 p.m.)

15   Q    BY MS. CACACCIO:  Do you know who says, "It's a waste of

16   time"?

17   A    The voice before that is Myke, and if you can let me hear

18   "It's a waste of time" one more time, I can probably figure

19   that out.

20   (Audio played at 3:39 p.m., ending at 3:39 p.m.)

21   A    I think that's Emily Hirsch.

22   (Audio played at 3:39 p.m., ending at 3:40 p.m.)

23   Q    Who's that?

24   A    Tatyana Gonzalez.

25       MS. CACACCIO:  We're at 1:26:36.


www.escribers.net | 800-257-0885

1    (Audio played at 3:40 p.m., ending at 3:41 p.m.)

2    Q    BY MS. CACACCIO:  Who starts talking at "I'm not doing

3    that"?

4    A    That's still Tatyana.

5         MS. CACACCIO:  We're at 1:27:29.

6    (Audio played at 3:41 p.m., ending at 3:41 p.m.)

7    Q    BY MS. CACACCIO:  What who just said?  Do you know what --

8    what name she said?

9    A    She said, "because of what y'all just said".

10   Q    Okay.

11   (Audio played at 3:42 p.m., ending at 3:42 p.m.)

12   Q    Who said they were not in the queue?

13   A    That, I believe, was LaRue.

14        MS. CACACCIO:  That's, like, at around 1:28:45.

15   (Audio played at 3:43 p.m., ending at 3:43 p.m.)

16   Q    BY MS. CACACCIO:  Do you know who that is?

17   A    Tatyana Gonzalez.

18        MS. CACACCIO:  1:29:02.

19   (Audio played at 3:43 p.m., ending at 3:43 p.m.)

20   Q    BY MS. CACACCIO:  Do you know what she said -- what store

21   she said there?

22   A    She was previously at the Delaware and Kenmore location.

23        MS. CACACCIO:  That's at 1:29:17.

24   (Audio played at 3:43 p.m., ending at 3:44 p.m.)

25   Q    BY MS. CACACCIO:  Who's that?



1    A    That's LaRue.

2         MS. CACACCIO:  We're at 1:29:50.

3    (Audio played at 3:44 p.m., ending at 3:44 p.m.)

4    Q    BY MS. CACACCIO:  Who's that?  "Yeah, so that's an issue"?

5    A    That's still LaRue.

6         MS. CACACCIO:  We're at 1:30:13.

7    (Audio played at 3:44 p.m., ending at 3:45 p.m.)

8    Q    BY MS. CACACCIO:  Who's that?

9    A    I believe that's Jayden Davis.

10        MS. CACACCIO:  We're at 1:30:46.

11   Q    BY MS. CACACCIO:  And who's Jayden Davis?

12   A    Another partner at Elmwood.

13   Q    Do you know how to spell "Jayden"?

14   A    J-A-Y-D-E-N.

15   (Audio played at 3:45 p.m., ending at 3:45 p.m.)

16   Q    Is that -- who was that?

17   A    That's still Jayden.

18        MS. CACACCIO:  We're at 1:30:55.

19   (Audio played at 3:45 p.m., ending at 3:46 p.m.)

20   Q    BY MS. CACACCIO:  Who's talking right now?

21   A    Jayden.

22        MS. CACACCIO:  We're at 1:31:05.

23   (Audio played at 3:46 p.m., ending at 3:47 p.m.)

24   Q    BY MS. CACACCIO:  Who was asking that?

25   A    That's Allyson Peck.


www.escribers.net | 800-257-0885

1      MS. CACACCIO:  We're at 1:32:27.

2   (Audio played at 3:47 p.m., ending at 3:47 p.m.)

3   Q    BY MS. CACACCIO:  Who's talking right now?

4   A    Jaz Brisack.

5      MS. CACACCIO:  We're at 1:32:45.

6   (Audio played at 3:47 p.m., ending at 3:48 p.m.)

7   Q    BY MS. CACACCIO:  Who's that?

8   A    Allyson Peck.

9      MS. CACACCIO:  We're at 1:33:32.

10  (Audio played at 3:48 p.m., ending at 3:49 p.m.)

11  Q    BY MS. CACACCIO:  Who's responding to you?

12  A    That's me speaking.  Are you asking who's talking over me?

13  Q    Yeah.

14  A    Can you take it back so I can try to hear it?

15  Q    Yep.

16  (Audio played at 3:49 p.m., ending at 3:49 p.m.)

17  Q    I went too far.  (Indiscernible, simultaneous speech)

18  A    (Indiscernible, simultaneous speech)

19  Q    Yeah, yeah.  Okay.

20  (Audio played at 3:49 p.m., ending at 3:50 p.m.)

21  A    That was Kellen Higgins.

22     MS. CACACCIO:  We're at about 1:34:05.

23  (Audio played at 3:50 p.m., ending at 3:51 p.m.)

24  Q    BY MS. CACACCIO:  Who said, "That's kind of disruptive"?

25  A    Can you take it back?



1    Q    Yep.

2    (Audio played at 3:51 p.m., ending at 3:52 p.m.)

3    A    That's Emily Hirsch.

4         MS. CACACCIO:  We're at 1:34:57.

5    (Audio played at 3:52 p.m., ending at 3:52 p.m.)

6         MS. CACACCIO:  So that's the end of the transcription, but

7    there's another, like, roughly four minutes of recording.

8    Would you like me to play it?

9    (Audio played at 3:52 p.m., ending at 3:55 p.m.)

10   Q    BY MS. CACACCIO:  Who's saying that?

11   A    That's LaRue Heutmaker.

12   Q    Who's she talking to?

13   A    Me.

14        MS. CACACCIO:  1:37:51.

15   (Audio played at 3:55 p.m., ending at 3:57 p.m.)

16        MS. CACACCIO:  That's the end of the recording.

17   Q    BY MS. CACACCIO:  Is this your full recording, as you

18   remember having made it?

19   A    Yes, it is.

20   Q    Is that the meeting as you remember having attended it?

21   A    Yes, it is.

22   Q    Is -- was it changed or altered in any way?

23   A    It was not.

24        MS. CACACCIO:  Your Honor, I now offer General Counsel's

25   Exhibit 28(a), which is the recording, and I will be offering



1   28(b) when we've had a chance to make certain changes to the

2   transcript.

3        MS. POLITO:  Judge, same objection as earlier, with

4   respect to the audio recording.  And with respect to 28(b), the

5   same objection with respect to 27(b).  It is entitled "Employer

6   Captive Audience Meeting", which is a legal assertion by the

7   Board, and there is no evidence in the record that it was an

8   employer captive audience meeting.  So that should be stricken

9   from the transcript.

10       And the transcript should be a full and complete

11  transcript.  It's clear that this transcript is not a full and

12  complete transcript.  And so we ask that the -- if the judge is

13  inclined to allow this into evidence, that with respect to the

14  transcripts today, that a transcriptionist review the entire

15  transcript and we be provided with a complete copy.

16       MS. CACACCIO:  Your Honor, General Counsel objects to

17  that.  If Respondent wants to make a transcript, they're more

18  than welcome to do so.  It's not on the General Counsel to do

19  that.  The portions of the transcript that are relevant are in

20  front of us.

21       JUDGE ROSAS:  So there were a couple of components to

22  that.  Yes, change the --

23       MS. CACACCIO:  Yes, Your Honor.

24       JUDGE ROSAS:  -- change the description --

25       MS. POLITO:  Yes.



1    JUDGE ROSAS:  -- a nondescript transcription of meeting on

2    October 1st, 2021.  The request that the General Counsel add to

3    the transcription with the portion before and after that are

4    not -- that are transcribed -- that -- that is denied, as the

5    Respondent can provide those if -- if it likes.  It can provide

6    its version.  So I'm going to overrule the objection.  General

7    Counsel's 28(a) and 28(b) -- 28(a) is received in evidence, and

8    28(b) will be revised and submitted for consideration.

9    **(General Counsel Exhibit Number 28(a) Received into Evidence)**

10   JUDGE ROSAS:  All right.  Off the record for five minutes.

11   (Off the record at 3:59 p.m.)

12                    **RESUMED DIRECT EXAMINATION**

13   Q    BY MS. CACACCIO:  Michelle, the meeting that you attended

14   on September 19th -- what, if anything, were you told about

15   your attendance at that meeting?

16   A    We were -- I was asked to take one of the three time slots

17   that was offered.

18   MS. POLITO:  Objection.  Asked and answered earlier.

19   JUDGE ROSAS:  Sustained.

20   Rephrase your next question relating to that, if you want

21   to pick up on that.

22   Q    BY MS. CACACCIO:  Do you know if it was mandator -- what

23   did you think about whether it was mandatory or voluntary?

24   A    I --

25   MS. POLITO:  Objection.  Asked and answered.



1      JUDGE ROSAS:  You can clarify whether it was mandated.

2  Overruled.

3  A    I thought that it was mandated.

4  Q    BY MS. CACACCIO:  And what about the meeting on October

5  1st?  Did they -- did anyone tell you anything about whether

6  attendance was required at that meeting?

7  A    It was posted on the fridge, and I -- we were told that we

8  needed to attend it.  I assumed it was mandatory.

9  Q    And were you paid for attending the meeting on September

10  19th?

11  A    I was.

12  Q    And were you paid for attending the meeting on October

13  1st?

14  A    I was.

15  Q    You had mentioned the store was closed on October 1st for

16  this meeting.  Were you supposed to be working that day?

17  A    I was not scheduled for that day, no.

18      MS. CACACCIO:  And I -- I understand this is going to

19  sound like (indiscernible), but I'm going to lay the foundation

20  for it, so I don't have to play it right now.

21  Q    BY MS. CACACCIO:  When was the next session you attended

22  after October 1st?

23  A    Wednesday, October 20th, I believe.

24  Q    And how did you hear about that meeting?

25  A    That was delivered as an invitation in an envelope with my



1    name on it by one of the support managers.

2    Q    And who gave you -- do you remember which support manager

3    it was?

4    A    I think it was Matt.

5    Q    And what did Matt say?

6    A    He said, here, Michelle, this is for you.

7    Q    And what did you do with it?

8    A    I opened it.  It was a sheet of paper that had me

9    scheduled for an 8 p.m. meeting on Wednesday, October 20th.  It

10   also stated that, if I was unable to attend that meeting, that

11   there were two make-up sessions the following Saturday; that I

12   should pick one of those if I couldn't attend the one on

13   Wednesday.

14   Q    And where was the location supposed to be?

15   A    This was at another hotel conference room -- the hotel on

16   the corner of Delaware and Chippewa that is not the Westin.

17   I -- I don't -- I'm not sure what it is.  Maybe the Hyatt.

18   Q    Did they say anything about whether attendance was

19   required at this meeting?

20   A    I was handed an invitation that had it already scheduled,

21   so I assumed it was mandatory.

22   Q    Did you attend -- when were the scheduled times?

23   A    The -- the letter I was given only had one time slot

24   listed, which was the time slot for myself.  I was able to find

25   out from other partners that there were two additional time



1    slots also that day.

2    Q    Did -- did you attend your scheduled time slot?

3    A    I did not.

4    Q    Oh.  What time slot did you attend?

5    A    I went to the 6 p.m., I believe.

6    Q    And what time were you scheduled for?

7    A    The 8 p.m.

8    Q    And do you know what the other scheduled time was?

9    A    I believe it was 4 p.m.

10   Q    Now, would the store usually be open during the time slot

11   that these meetings were held?

12   A    Yes.

13   Q    Do you know whether the store was open that day?

14   A    I do not believe that it was, at least not during that --

15   those time periods.

16   Q    Do you know when the store was supposed to be open?

17   A    If it was a Wednesday, it probably would have been -- I

18   think we closed at 9:30 at that point.

19   Q    So what time would the store have closed?

20   A    I think it closed at 3 p.m. or an hour prior to the first

21   time slot.

22   Q    And who ran this meeting?

23   A    This one was Allyson Peck, Ana Gutierrez, and Nathalie --

24   I'm going to pronounce her last name incorrectly -- it's, like,

25   Cioffi or something, C-O-I-F-F-I (sic).



1    Q    How many employees attended this meeting?

2    A    This was small.  I think there was only four of us.

3    Q    And what employees were those?

4    A    If I'm remembering correctly, it was myself, Angela

5    Dudzic, LaRue Heutmaker, and Tatyana Gonzalez.

6    Q    Where did those employees work?

7    A    At the Elmwood location.

8    Q    How long did this meeting last?

9    A    About an hour.

10   Q    Did you record it?

11   A    I did.

12   Q    How did you record it?

13   A    On my Apple Watch.

14   Q    And what did you do after you recorded it?

15   A    It was sent to our attorney, Ian Hayes.

16   Q    Did you alter it in any way?

17   A    I did not.

18   Q    Did you record the entire meeting?

19   A    I did.

20   Q    And if I play it, could you identify it?

21   A    Yes, I could.

22        MS. CACACCIO:  Your Honor, I'm going to not do that right

23   now, given what Respondent's counsel has said.  I'm going to

24   skip ahead.  This will -- this will be recording 29(a), with

25   the transcript of 29(b).  Is everyone okay with that?



1    JUDGE ROSAS:  You've provided that to counsel?

2    MS. CACACCIO:  Yes, Judge.

3    JUDGE ROSAS:  Okay.  All right.  Let's go off the record.

4    (Off the record at 4:21 p.m.)

5                    **RESUMED DIRECT EXAMINATION**

6    Q    BY MS. CACACCIO:  Did you attend any meetings after the

7    one you attended on October 20th?

8    A    No, I did not.

9    Q    Were there any scheduled meetings that you knew about?

10   A    Yes.  There was one scheduled for Monday, November 8th.

11   Q    What do you know about that meeting?

12   A    There were two time slots scheduled.  One, I believe, was

13   5:30, and the other was again 8 p.m.  I was scheduled for the 8

14   p.m. meeting, and I chose to try to attend the -- the earlier

15   meeting.

16   Q    How did you hear about this meeting?

17   A    It was presented the same way as the previous one, with

18   a -- a letter that was given to me.

19   Q    And what did the letter look like?

20   A    It -- it was exactly the same as the other one.  It was --

21   you know, my name was on it.  It said that I was being asked to

22   attend a listening session.  It -- it listed the -- the date

23   and time and location for that listening session.

24   Q    Who gave you the invitation?

25   A    It was again handed to me by another support manager.  It



1    could have been Matt again, or it might have been Dustin.

2    Q    Did it say anything about whether attendance was required?

3    A    No, but as with the first one, it was given to me as a

4    scheduled time, and I assumed it was mandated.

5    Q    Did this one -- was there anything about a make-up

6    session?

7    A    Not on this one, no.  Oh, I'm sorry.  Let me go back.

8    There was a make-up session scheduled for Tuesday afternoon,

9    the 9th.

10    Q    Where was this meeting held?

11    A    The one on the 8th was held at the Elmwood location.

12    Q    And where was the make-up session supposed to be?

13    A    It was in a hotel conference room.  I don't know if it was

14    the Westin or the -- the one across the street from it.

15    Q    Now, would the store usually be open during the time this

16    meeting was scheduled?

17    A    Yes, it would.

18    Q    Was it open?

19    A    It was not.

20    Q    And what time did it close?

21    A    The first session was scheduled for, I think, 5:30, so

22    probably an hour before that.

23    Q    Now, you said you didn't actually attend this meeting.

24    What happened?

25    A    I showed up and parked in the back parking lot, walked up



1   to the backdoor, which was locked.  Kelly, the support -- I

2   believe it was Kelly, the support district manager -- let me

3   in.  Deanna was standing at a high-top table that they had slid

4   over to be near that doorway.  She was checking people in.  She

5   stated that she had me scheduled --

6   Q    Well, be -- before we do that, did you record this

7   interaction?

8   A    I did, yes.

9   Q    And how did you record it?

10  A    On my Apple Watch.

11  Q    And who was with you?

12  A    I walked in with Natalie Wittmeyer and Cassie Fleischer.

13  Q    And what did you do with the recording once you made it?

14  A    I sent it to Ian Hayes, our attorney.

15  Q    And did you alter it in any way?

16  A    I did not.

17  Q    And what is the -- well, we'll say that --

18       MS. CACACCIO:  So Your Honor, that's my foundation for

19  this particular line of questioning.

20       JUDGE ROSAS:  And what are they --

21       MS. CACACCIO:  It's going to be recording 30(a), with

22  transcript 30(b).  And before we take a brief break, which I

23  think we're about to do --

24  Q    BY MS. CACACCIO:  The meeting on October 20th -- bouncing

25  back -- sorry, Michelle -- were you paid to attend that



1    meeting?

2    A    Yes, I was.

3         MS. CACACCIO:  So if opposing counsel needs a break, we

4    can take one now if you'd like.

5         JUDGE ROSAS:  Okay.  All right.  Off the record.

6    (Off the record at 4:26 p.m.)

7                    **RESUMED DIRECT EXAMINATION**

8    Q    BY MS. CACACCIO:  Ms. Eisen, we're looking at -- or we're

9    listening to the recording that you made from what you

10   testified to as November 8th.  And I'm going to play it now.

11   It's eight minutes and 40 seconds in length.

12        MS. CACACCIO:  Were people using the time on the screen in

13   front of you?  Was that being helpful to you?

14        MS. POLITO:  We were.

15        MS. CACACCIO:  Okay.  Don't -- don't touch it.  Let me --

16   it's me.

17        MS. POLITO:  It's not the end of the world if, for this

18   one --

19        MS. CACACCIO:  Okay.  I unplugged it.  I just -- I think I

20   can plug it back in.  If it wasn't helpful to anyone, I wasn't

21   going to show it.  Okay.

22   (Audio played at 4:46 p.m., ending at 4:47 p.m.)

23   Q    BY MS. CACACCIO:  Who was that?  Who's speaking?

24   A    That's me.  I'm saying hi to Natalie Wittmeyer.

25        MS. CACACCIO:  And that's at 19 seconds into the



www.escribers.net | 800-257-0885

1    recording.

2    (Audio played at 4:47 p.m., ending at 4:47 p.m.)

3    Q    BY MS. CACACCIO:  I'm sorry.  Did you say Natalie's last

4    name?

5    A    Wittmeyer.

6    (Audio played at 4:47 p.m., ending at 4:47 p.m.)

7    Q    Who'd you get off the phone with?

8    A    Jaz.

9        MS. CACACCIO:  We're at 33 seconds.

10   (Audio played at 4:47 p.m., ending at 4:47 p.m.)

11   Q    Who said that?

12   A    Natalie.

13   Q    Was anyone else with you in this conversation?

14   A    Not at this moment, no.

15       MS. CACACCIO:  We're at 41 seconds.

16   (Audio played at 4:47 p.m., ending at 4:48 p.m.)

17   Q    BY MS. CACACCIO:  Who's that?

18   A    I'm looking in the store, and I saw a new partner named

19   Courtlyn (phonetic throughout).

20       MS. CACACCIO:  It's playing.  That's at 57 seconds.

21   (Audio played at 4:48 p.m., ending at 4:48 p.m.)

22   Q    BY MS. CACACCIO:  Who was -- who's that?

23   A    That's Deanna.

24       MS. CACACCIO:  And we're at 1:06.

25   (Audio played at 4:48 p.m., ending at 4:48 p.m.)



www.escribers.net | 800-257-0885

1    Q    BY MS. CACACCIO:  Who said that to you?

2    A    That's still Deanna Pusatier.

3         MS. CACACCIO:  We're at 1:18.

4    (Audio played at 4:48 p.m., ending at 4:49 p.m.)

5    Q    BY MS. CACACCIO:  Who says that?

6    A    Can you take it back, and I'll be able to tell you?

7    (Audio played at 4:49 p.m., ending at 4:49 p.m.)

8    A    I -- I think that that is Allyson Peck.

9    (Audio played at 4:49 p.m., ending at 4:49 p.m.)

10   Q    Who -- who said that we scheduled it to keep it a smaller

11   group?

12   A    I think -- I actually do not know who that is.

13   Q    Who was -- and who -- who were you talking to at this

14   point?

15   A    I was talking to Deanna, who was standing at the doorway.

16   Q    Was there anyone else there?

17   A    Kelly, the support GM was there.  I'm sure that there were

18   a couple of other people.  Dustin, our support manager, was

19   also there.  This was prior to any start of the meeting, so

20   nobody's in the station slot.  They're just kind of walking

21   about the lobby of the store.

22        MS. CACACCIO:  We're at 2:07.

23   (Audio played at 4:50 p.m., ending at 4:50 p.m.)

24   Q    BY MS. CACACCIO:  Who said, "We'll do a one-on-one"?

25   A    That should be Deanna.



1       MS. CACACCIO:  We're at 2:19.

2   (Audio played at 4:50 p.m., ending at 4:51 p.m.)

3   Q    BY MS. CACACCIO:  Who said, "We'll do a one-on-one"?

4   A    Deanna.

5       MS. CACACCIO:  We're at 2:51.

6   (Audio played at 4:51 p.m., ending at 4:51 p.m.)

7   Q    BY MS. CACACCIO:  Who says, "We don't know that we are

8   yet"?

9   A    That should be Deanna, as well.

10      MS. CACACCIO:  We're at 3:05.

11  (Audio played at 4:51 p.m., ending at 4:51 p.m.)

12  Q    BY MS. CACACCIO:  Who says -- who said that?

13  A    I don't know.

14  (Audio played at 4:52 p.m., ending at 4:52 p.m.)

15  A    I don't know who that is.

16      MS. CACACCIO:  We're at 3:16.

17  (Audio played at 4:52 p.m., ending at 4:52 p.m.)

18  Q    BY MS. CACACCIO:  Who are you calling?

19  A    I'm calling Jaz Brisack.

20      MS. CACACCIO:  We're at 3:44.

21  (Audio played at 4:52 p.m., ending at 4:53 p.m.)

22  Q    BY MS. CACACCIO:  Who said they're going to get started?

23  A    Deanna.

24      MS. CACACCIO:  We're at 4:26.

25  (Audio played at 4:53 p.m., ending at 4:54 p.m.)



1    Q    BY MS. CACACCIO:  Who are you talking to?

2    A    I'm on the phone with Jaz.

3    (Audio played at 4:54 p.m., ending at 4:55 p.m.)

4    Q    Who were you talking to there?

5    A    Cassie.

6    MS. CACACCIO:  We're at six minutes.

7    (Audio played at 4:55 p.m., ending at 4:57 p.m.)

8    Q    BY MS. CACACCIO:  Is that the recording you remember

9    making?

10   A    Yes, it is.

11   Q    And was it true and correct?

12   A    Yes, it was.

13   Q    Did you make any edit to that recording?

14   A    I did not.

15   Q    Is that the interaction as you remember it happening?

16   A    It is.

17   MS. CACACCIO:  Your Honor, I now offer General Counsel's

18   Exhibit 30(a), which is the recording, and will offer 30(b)

19   with amendments.

20   MS. POLITO:  Judge, I believe we have a standing objection

21   to that audio recording, and this transcript does not have that

22   language on it, so other than that same objection with respect

23   to the transcript.

24   JUDGE ROSAS:  Okay.  General Counsel's 30(a) will be

25   received over objection, and General Counsel's 30(b) will be



1    revised for submission but is otherwise in evidence.

2    **(General Counsel Exhibit Number 30(a) Received into Evidence)**

3        JUDGE ROSAS:  Okay.  Anything else?

4        MS. CACACCIO:  Just a second, if we can.

5    Q    BY MS. CACACCIO:  Michelle, why were you so upset at

6    this -- at this interaction?

7    A    This was the first time I had been told I wasn't allowed

8    to attend a meeting at -- with my -- my partners from my store.

9    Q    Did you personally attend any other meetings and listening

10    sessions put on by the Respondent about the union?

11    A    After this date?

12    Q    Yes.

13    A    No, I did not.

14        MS. CACACCIO:  Your Honor, when would you like to stop for

15    today?  It's -- it's 5:00.

16        JUDGE ROSAS:  You're done; otherwise, you'd be going into

17    the next video?

18        MS. CACACCIO:  Well, I'd like to go back --

19        JUDGE ROSAS:  Audio?

20        MS. CACACCIO:  -- to that video.  Yeah, I do -- I do -- or

21    audio.  Sorry.

22        JUDGE ROSAS:  Okay.

23        MS. CACACCIO:  I do have other questions, but I know you

24    said we wanted to --

25        JUDGE ROSAS:  Okay.  So we'll adjourn at this point.



1    We'll reconvene tomorrow at 9 a.m.  Off the record.

2    **(Whereupon, the hearing in the above-entitled matter was**

3    **recessed at 4:59 p.m. until Wednesday, July 13, 2022 at 9:00**

4    **a.m.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>C E R T I F I C A T I O N</u>

2    This is to certify that the attached proceedings before the

3    National Labor Relations Board (NLRB), Region 3, Case Number

4    03-CA-285671, et al., Starbucks Corporation, Charging Party,

5    and Workers United, Employer., held at the National Labor

6    Relations Board, Region , Region 3, Robert H. Jackson United

7    States Courthouse, Wyoming (5E) Courtroom, 2 Niagara Square,

8    Buffalo, Buffalo, New York 14202, on July 12, 2022, at 9:01

9    a.m. was held according to the record, and that this is the

10   original, complete, and true and accurate transcript that has

11   been compared to the reporting or recording, accomplished at

12   the hearing, that the exhibit files have been checked for

13   completeness and no exhibits received in evidence or in the

14   rejected exhibit files are missing.

15

16

17

18                              THOMAS BAKER

19
                                Official Reporter
20

21

22

23

24

25



OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 3

In the Matter of:

| | |
|---|---|
| Starbucks Corporation, | Case Nos.  03-CA-285671, |
| | 03-CA-290555, 03-CA-291157 |
| Employer, | 03-CA-291196, 03-CA-291197 |
| | 03-CA-291199, 03-CA-291202 |
| and | 03-CA-291377, 03-CA-291378 |
| | 03-CA-291379, 03-CA-291381 |
| Workers United, | 03-CA-291386, 03-CA-291395 |
| | 03-CA-291399, 03-CA-291408 |
| Charging Party. | 03-CA-291412, 03-CA-291416 |
| | 03-CA-291418, 03-CA-291423 |
| | 03-CA-291431, 03-CA-291434 |
| | 03-CA-291725, 03-CA-292284 |
| | 03-CA-293362, 03-CA-293469 |
| | 03-CA-293489, 03-CA-293528 |
| | 03-CA-294336, 03-CA-293546 |
| | 03-CA-294341, 03-CA-294303 |
| | 03-CA-206200 |

_____

_____

Place: Buffalo, New York

Dates: July 13, 2022

Pages: 247 through 404

Volume: 3

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 3**

| | |
|---|---|
| In the Matter of:<br><br>STARBUCKS CORPORATION,<br><br>                    Employer,<br><br>and<br><br>WORKERS UNITED,<br><br>                    Charging Party. | Case Nos.  03-CA-285671,<br> 03-CA-290555, 03-CA-291157<br> 03-CA-291196, 03-CA-291197<br> 03-CA-291199, 03-CA-291202<br> 03-CA-291377, 03-CA-291378<br> 03-CA-291379, 03-CA-291381<br> 03-CA-291386, 03-CA-291395<br> 03-CA-291399, 03-CA-291408<br> 03-CA-291412, 03-CA-291416<br> 03-CA-291418, 03-CA-291423<br> 03-CA-291431, 03-CA-291434<br> 03-CA-291725, 03-CA-292284<br> 03-CA-293362, 03-CA-293469<br> 03-CA-293489, 03-CA-293528<br> 03-CA-294336, 03-CA-293546<br> 03-CA-294341, 03-CA-294303<br> 03-CA-206200 |

The above-entitled matter came on for hearing, pursuant to
notice, before **MICHAEL A. ROSAS**, Administrative Law Judge, at
the National Labor Relations Board, Region 3, Robert H. Jackson
United States Courthouse, Wyoming (5E) Courtroom, 2 Niagara
Square, Buffalo, New York 14202, on **Wednesday, July 13, 2022,
9:03 a.m.**

1                     <u>A P P E A R A N C E S</u>

2      **On behalf of the Employer:**

3              **JACQUELINE PHIPPS POLITO, ESQ.**
               **ETHAN BALSAM, ESQ.**
4              **WILLIAM WHALEN, ESQ.**
               LITTLER MENDELSON P.C.
5              375 Woodcliff Drive
               Suite 2D
6              Fairport, NY 14450
               Tel. (585)203-3413

7
       **On behalf of the Union:**

8
               **IAN HAYES, ESQ.**
9              HAYES DOLCE
               471 Voorhees Avenue
10             Buffalo, NY 14216
               Tel. (716)608-3427

11
       **On behalf of the General Counsel:**

12
               **JESSICA CACACCIO, ESQ.**
13             **ALICIA PENDER STANLEY, ESQ.**
               NATIONAL LABOR RELATIONS BOARD REGION 3
14             130 S. Elmwood Avenue
               Suite 630
15             Buffalo, New York 14202-2465
               Tel. (716)551-4931
16             Fax. (716)551-4972

17

18

19

20

21

22

23

24

25



1                                    **I N D E X**

2

3    **WITNESS**              **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**   **VOIR DIRE**

4    Michelle Eisen          258,276 342       401
                             298,314
5                            298,317
                             324
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                               <u>E X H I B I T S</u>

2

3      <u>EXHIBIT</u>                                <u>IDENTIFIED</u>        <u>IN EVIDENCE</u>

4      **General Counsel:**

5          GC-29(a)                                259              276

6          GC-29(b)                                259          Not Admitted

7          GC-32                                   292              293

8          GC-33                                   297              298

9          GC-34(a)                                317              322

10         GC-34(b)                                317          Not Admitted

11         GC-42                                   253              254

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    P R O C E E D I N G S

2        JUDGE ROSAS:  All right, this is the continuation in the

3    matter of Starbucks Corporation.  Counsel?

4        MS. CACACCIO:  I'm sorry, I said on the record but I might

5    be able to -- could we go off the record for one second?

6        JUDGE ROSAS:  Okay, off the record.

7    (Off the record at 9:03 a.m.)

8        JUDGE ROSAS:  On the record.

9        General Counsel?

10       MS. CACACCIO:  Good morning, Judge.  Just for the record,

11   yesterday evening counsel for the General Counsel filed its

12   petition to revoke the subpoena duces tecum that was filed

13   against myself.  And I'm wondering if we couldn't get a -- a

14   briefing scheduled or something so that we can get a ruling on

15   that?

16       JUDGE ROSAS:  When does the Respondent plan to file an

17   opposition?  I assume today?

18       MR. BALSAM:  Your Honor, to be quite honest with you, I

19   haven't even looked at it.  There was a number of things that

20   we needed to do and it came in late yesterday, so we have not

21   had a chance to look at it.  To be quite honest, also, the

22   counsel for the General Counsel --

23       JUDGE ROSAS:  Off the record.

24   (Off the record at 9:11 a.m.)

25       JUDGE ROSAS:  Go ahead.  Back on the record.



1      MR. BALSAM:  Your Honor, while we were off the record, I

2    took a chance to look at what we set to achieve last night at

3    9:08 p.m.  I will note that, for the record, that when

4    Respondents did in fact file their petition to revoke, the

5    counsel for the General Counsel had at minimum two weeks to

6    respond.  Given the trial schedule in this case, I would

7    request that we do have at least until next week, especially

8    given the break, to respond to the current petition to revoke.

9      MS. CACACCIO:  Your Honor, may I be heard briefly?  The

10   petition to revoke that we responded to was 182 pages, this

11   one's 15.  So to the extent that we had more time, it had to do

12   with length rather than anything else.  This is just a simple

13   petition to revoke a subpoena that was improperly served on the

14   General Counsel.

15     JUDGE ROSAS:  Well, this is relative to the General

16   Counsel's files, right?

17     MS. CACACCIO:  Yes, Your Honor.

18     JUDGE ROSAS:  And information supplied to the General

19   Counsel by the Union or Union sources; is that correct?

20     MR. BALSAM:  In part, yes.

21     JUDGE ROSAS:  Okay.  Well, it's everything that's in the

22   Union -- in the General Counsel's file, right?  All right.  So

23   we're waiting on your opposition and with respect to your

24   opposition, whenever it comes, you want to have to deal with

25   the issue of Board Rule 102.118A, okay?



1          Obviously, with respect to matters that are not strictly

2     Jencks material, or otherwise privileged that are in the

3     General Counsel's file, I strongly suggest that, you know, the

4     Parties have a discussion regarding the General Counsel's

5     approval for the release thereof.  Now, obviously to the extent

6     that those materials are in the possession or emanated from

7     someone else -- and obviously you're gonna be subpoenaing it

8     from both sources as well.  But to the extent that any of it is

9     to corroborate, verify, whatever -- you know, obviously, you do

10    what you have to do.  But obviously, you'll address all of this

11    in the opposition but I'm just letting you know what my stream

12    of subconscious thought tells me.  Okay?

13         MR. BALSAM:  Thank you, Your Honor.

14         JUDGE ROSAS:  All right.  Is there any other concern on

15    your part right now?  Essentially, I have no answer for you.

16         MS. CACACCIO:  Understood, Your Honor.  Yes, I do have one

17    other thing before we get started.  I know that Respondent's

18    counsel -- which is why I took that brief break this morning --

19    Respondent's counsel is going to be offering a set of exhibits,

20    which includes petitions to revoke, oppositions to those, et

21    cetera.  Not included therein is the subpoena -- the ad

22    testificandum subpoena to Howard Schultz or custodian of

23    records, to which there was no petition to revoke.  And so I'm

24    asking that to be admitted now as General Counsel's Exhibit 42.

25         JUDGE ROSAS:  So the Respondent has seen this?


www.escribers.net | 800-257-0885

1      MS. CACACCIO:  It was served on them, Judge, but I'll --

2  I'll give it to them now.

3      MS. POLITO:  We have seen it, Your Honor.

4      JUDGE ROSAS:  Okay, any objection?

5      MS. POLITO:  No objection, Judge.

6      JUDGE ROSAS:  General Counsel's 42?  And that is just the

7  subpoena served on who?

8      MS. CACACCIO:  Mr. Howard Schultz, or custodian of

9  records, which was returnable on Monday.

10     JUDGE ROSAS:  Okay.  General Counsel's 42 is received.

11     **(General Counsel Exhibit Number 42 Received into Evidence)**

12     MS. POLITO:  Judge, I would just like to note for the

13 record that since there has been no agreement with respect to

14 discovery in documents, no one was available on Monday because

15 there's been no agreement.  So --

16     MS. CACACCIO:  If I may be heard --

17     MS. POLITO:  -- I would just like to note that for the

18 record.

19     MS. CACACCIO:  If I may be heard on that?

20     JUDGE ROSAS:  Again, wait until we all finish.

21     MS. CACACCIO:  I thought she was done.

22     JUDGE ROSAS:  Okay.

23     MS. CACACCIO:  Sorry, Judge.  That isn't the only reason a

24 custodian is called.  A custodian can be called to determine

25 what search efforts have even been made, which was the attempt



1  but no one appeared.  So obviously, that -- that doesn't --

2  that doesn't absolve them of producing the custodian.

3      JUDGE ROSAS:  Anything else?

4      MS. CACACCIO:  Not before we start, Judge.

5      MR. HAYES:  Judge, I have something very quickly.

6      JUDGE ROSAS:  Okay.

7      MR. HAYES:  For the Charging Party, I want to just

8  basically echo what the General Counsel said yesterday morning

9  before we started testimony.  The Union served a subpoena on

10  the company on -- I think it was dated June 23rd but we agreed

11  it would be counted as served June 24th.  Your Honor ruled on

12  the substance or the merits of that twice and upheld the

13  subpoena except for, I believe, one request.  It's mostly or

14  virtually all the same request that the General Counsel has

15  made and just as with the General Counsel, we haven't received

16  anything as of today.

17      So yesterday morning, Your Honor said that the information

18  needs to start flowing and our position is that needs to start

19  flowing to the Union as well.  That was me.

20      JUDGE ROSAS:  Okay.

21      MS. POLITO:  Judge, we would like to note for the record

22  again that we filed several petitions to revoke Your Honor was

23  ruling on those throughout the course of the weekend before

24  this Administrative Hearing was scheduled to begin on Monday.

25  When we appeared on Monday, we noted for the record that the



1    issues were still outstanding and we ask for the appointment of

2    a special master.  Forgive me, Judge, but I'm not sure if that

3    decision came in late Monday night or first thing Tuesday

4    morning, but there was a recent denial of the appointment of a

5    special master.  We are still considering whether or not we

6    appeal that or -- the reasons for such, are more accurately set

7    forth in our petition to revoke.

8        The extensive nature of this litigation, as both counsel

9    for the General Counsel and counsel for Workers United,

10   Indicated in the opening statements, this is one of the largest

11   administrative hearings likely in the United States and as

12   such, the requests are significantly broad.  We have tried to

13   narrow those requests, we have tried to engage in good-faith

14   discussions, and we are still at the point where we are

15   considering what we can do in response to the subpoenas and

16   whether or not an appeal will be issued with the Board for the

17   appointment of a special master.

18       MR. HAYES:  Your Honor, if I may be heard briefly, I

19   understand there's a little -- there's overlap between requests

20   from the General Counsel and the Union, but I'm not aware of

21   any discussions between -- or attempted discussions between the

22   Company and the Union about document production.

23       JUDGE ROSAS:  Well, you know, when things are simplified

24   for me in terms of what's what and what has been provided to

25   General Counsel, what -- what -- what has been made available

1    to you, obviously, you know, we'll -- we'll deal with that.  We

2    want to avoid duplication if at all possible here.  We want to

3    talk as much as possible regarding matters that are, as I

4    indicated long ago in pre-hearing conferences, matters over

5    which there are no dispute that the parties shouldn't have an

6    issue with, that they should be talking about.  Stuff that the

7    Parties are aware of -- I mean, you know, it's nonsense to be

8    belaboring a lot of this stuff, okay?

9        So when the time comes, we'll -- we'll deal with any

10    issues that -- that remain, but right now we have Ms. Eisen,

11    who is testifying and she still has a bit more to go.  And to

12    the extent that there is anything that is due to the Union or

13    due to the General Counsel with respect to subpoenas, to the

14    extent that testimony is completed, she is subject to recall in

15    matters that are subsequently produced.  Okay?

16        And that is the principle that will apply in the case of

17    all witnesses for which subpoenaed documentation subsequently

18    arrives that has not otherwise been dealt with.  Okay?  So

19    as -- and I indicated that long ago in pre-hearing, okay?

20        You know, this -- this case keeps moving and at the same

21    time, the parties are entitled to the material that they have

22    subpoenaed, okay, that is appropriately due to them.

23        All right, anything else?

24    MS. CACACCIO:  Just for the purpose of the record, to

25    date, the General Counsel has received no documents still.



1     JUDGE ROSAS:  Okay.  Anything else?  Okay.  Are we ready?

2     Ms. Eisen is still under oath.

3   Whereupon,

4                        **MICHELLE EISEN**

5   having been previously sworn, was called as a witness herein

6   and was examined and testified as follows:

7     MS. CACACCIO:  Good morning, Ms. Eisen.

8     THE WITNESS:  Good morning.

9                   **RESUMED DIRECT EXAMINATION**

10  Q    BY MS. CACACCIO:  Between yesterday and today, did you

11  speak to anyone about your testimony?

12  A    I did not.

13  Q    I know you did a little bit of bouncing around yesterday

14  but I'm gonna go back to a meeting that you attended and

15  recorded on October 20th.  Okay?

16  A    Mmhmm.

17  Q    And like before, what I'm going to do is I'm going to play

18  the recording and I'll stop for anyone who has a question as to

19  speaker.

20  (Audio played at 9:23 a.m., ending at 9:23 a.m.)

21  Q    BY MS. CACACCIO:  Do you know who that speaker is?

22  A    Natalie Cioffi, C -- C-O-I-F-F-I (phonetic)or C-I-O-F-F-I,

23  something like that.

24  Q    Do you know who that person is?

25  A    I actually do not know her, no.  She's a member of



1    Starbucks Corporation.

2        JUDGE ROSAS:  Counsel, what Exhibit is this audio?

3        MS. CACACCIO:  The Exhibit -- apologies, Judge, the

4    Exhibit is 29(a) and the transcription is 29(b).

5        MS. POLITO:  And Judge, we had made standing objections, I

6    just want to note those for the record since we're jumping

7    right into them this morning.

8        JUDGE ROSAS:  They're ongoing with respect -- they're

9    continuing objections with respect to all of the audio

10    recordings that will be offered by the General Counsel or the

11    Charging Party.  All right?

12        MS. POLITO:  Thank you, Your Honor.

13        JUDGE ROSAS:  Okay.

14    Q    BY MS. CACACCIO:  How do you know that she was a member of

15    Starbucks Corporate?

16    A    She does at some point introduce herself, I think, in

17    that, and tells us that she's a member.

18    (Audio played at 9:24 a.m., ending at 9:25 a.m.)

19    Q    BY MS. CACACCIO:  Who speaks that -- that's moved about

20    two years out?

21    A    I think that's still Natalie.

22    (Audio played at 9:25 a.m., ending at 9:25 a.m.)

23    Q    BY MS. CACACCIO:  Who asked that question?

24    A    Allyson Peck.

25    Q    And who responded?


www.escribers.net | 800-257-0885

1    A    I think that was me.

2         MS. CACACCIO:  And we're about 18 seconds.

3    (Audio played at 9:25 a.m., ending at 9:25 a.m.)

4    Q    BY MS. CACACCIO:  Who asked how your shift was?

5    A    That was also Allyson Peck.

6    (Audio played at 9:25 a.m., ending at 9:26 a.m.)

7    Q    BY MS. CACACCIO:  What were you talking about there?

8    A    We had just reopened after the remodel.

9         MS. CACACCIO:  We're at 50 seconds.

10   (Audio played at 9:26 a.m., ending at 9:26 a.m.)

11   Q    BY MS. CACACCIO:  Who talked about a transfer to Brandy's

12   store together?

13   A    That's Angela Dudzik.

14   (Audio played at 9:26 a.m., ending at 9:26 a.m.)

15   Q    BY MS. CACACCIO:  Who asked that?

16   A    That's Natalie.

17        MS. CACACCIO:  We're at 1:06.

18   (Audio played at 9:27 a.m., ending at 9:27 a.m.)

19   Q    BY MS. CACACCIO:  Who says that?

20   A    Angela Dudzik.

21   (Audio played at 9:27 a.m., ending at 9:27 a.m.)

22   Q    BY MS. CACACCIO:  Who's that?

23   A    Tatyana Gonzalez.

24        MS. CACACCIO:  We're at 1:19.

25   (Audio played at 9:27 a.m., ending at 9:27 a.m.)



1    Q    BY MS. CACACCIO:  Who says that?

2    A    Angela Dudzik.

3        MS. CACACCIO:  We're at 1:32.

4    (Audio played at 9:28 a.m., ending at 9:28 a.m.)

5    Q    BY MS. CACACCIO:  Who was talking before you started

6    talking?

7    A    Tatyana Gonzalez.

8        MS. CACACCIO:  We're at 1:49.

9    (Audio played at 9:28 a.m., ending at 9:29 a.m.)

10   Q    BY MS. CACACCIO:  Who's speaking right now?

11   A    Allyson Peck.

12       MS. CACACCIO:  We're at 2:30.

13   (Audio played at 9:29 a.m., ending at 9:29 a.m.)

14   Q    BY MS. CACACCIO:  Were you given a copy of the PowerPoint?

15   A    We were not, no.

16       MS. CACACCIO:  Your Honor, obviously this is something the

17   General Counsel has subpoenaed, so without it received, we'd

18   may have to to do something with it.

19       We're at 2:43.

20   (Audio played at 9:29 a.m., ending at 9:32 a.m.)

21   Q    BY MS. CACACCIO:  Who responded "no?"

22   A    Allyson.

23       MS. CACACCIO:  We're at 5:06.

24   (Audio played at 9:32 a.m., ending at 9:42 a.m.)

25   Q    BY MS. CACACCIO:  Do you know who she was talking to?



1    A    She says Ana?

2    Q    Yes.

3    A    That Ana Gutie -- Gu -- Gutierrez.

4    Q    And who is that?

5    A    She was an -- a -- or an ops person.

6    Q    And how do you know that?

7    A    She had introduced herself I think prior to -- to me

8    starting.  And I heard that she'd been in and out of the

9    stores.

10    MS. CACACCIO:  We're at 15:08.

11    (Audio played at 9:42 a.m., ending at 9:44 a.m.)

12    Q    BY MS. CACACCIO:  Who is that?

13    A    Allyson Peck.

14    MS. CACACCIO:  We're at 16:48

15    (Audio played at 9:44 a.m., ending at 9:44 a.m.)

16    Q    BY MS. CACACCIO:  Do you know who that is?

17    A    I think that's Tatiana Gonzalez.  But I just need to hear

18    it a little bit more.

19    (Audio played at 9:44 a.m., ending at 9:44 a.m.)

20    A    It's her.

21    Q    BY MS. CACACCIO:  Do you know who that is?

22    A    That's Tatiana Gonzalez.

23    MS. CACACCIO:  We're at 17:14.

24    (Audio played at 9:45 a.m., ending at 9:55 a.m.)

25    Q    BY MS. CACACCIO:  Who is asking that?


www.escribers.net | 800-257-0885

1    A    Tatiana Gonzalez.

2         MS. CACACCIO:  We're at 28:05.

3    (Audio played at 9:55 a.m., ending at 9:57 a.m.)

4    Q    BY MS. CACACCIO:  Who asked that question?

5    A    Tatiana Gonzalez.

6    (Audio played at 9:57 a.m., ending at 10:00 a.m.)

7    Q    BY MS. CACACCIO:  Do you know what was?

8    A    That's Ana.

9         MS. CACACCIO:  We're at 32:17.

10   (Audio played at 10:00 a.m., ending at 10:02 a.m.)

11   Q    BY MS. CACACCIO:  Do you know who that is?

12   A    Allyson Peck.

13        MS. CACACCIO:  We're at 34:16.

14   (Audio played at 10:02 a.m., ending at 10:03 a.m.)

15   Q    BY MS. CACACCIO:  Who asked that question?

16   A    Can you take it back?

17   Q    Yep.

18   (Audio played at 10:03 a.m., ending at 10:04 a.m.)

19   A    I think that's Kat Ginsberg.

20   Q    BY MS. CACACCIO:  And who's that -- who's that?

21   A    That -- that's a barista at -- at Elmwood.

22        MS. CACACCIO:  We're at 35:43.

23   (Audio played at 10:04 a.m., ending at 10:04 a.m.)

24   Q    BY MS. CACACCIO:  Do you know who that speaker is?

25   A    LaRue Heutmaker.



1    MS. CACACCIO:  We're at 35:58.

2    MS. POLITO:  I'm sorry, can you just say the name one more

3    time?

4    THE WITNESS:  Sure, LaRue, L-A-R-U-E.

5    MS. POLITO:  Thank you.

6    JUDGE ROSAS:  Spell the last name of the person you

7    identified.

8    THE WITNESS:  I'm going to try.  H-E-U-T-M-A-K-E-R.

9    MS. CACACCIO:  We're at --

10   Q    BY MS. CACACCIO:  And who is LaRue?  I think we did this

11   yesterday.

12   A    Yeah.  LaRue's the -- she was a barista at Elmwood.

13   MS. CACACCIO:  We're at 35:58.

14   (Audio played at 10:05 a.m., ending at 10:05 a.m.)

15   Q    BY MS. CACACCIO:  Do you know who responded to LaRue?

16   A    Angela Dudzik.

17   (Audio played at 10:05 a.m., ending at 10:05 a.m.)

18   Q    Do you know who that is talking right now?

19   A    That's still LaRue.

20   MS. CACACCIO:  We're at 36:33.

21   (Audio played at 10:06 a.m., ending at 10:06 a.m.)

22   Q    BY MS. CACACCIO:  Who said the financial statements are

23   public?

24   A    Natalie.

25   MS. CACACCIO:  We're at 36:57.  Sorry, hang on.



www.escribers.net | 800-257-0885

1    (Audio played at 10:06 a.m., ending at 10:07 a.m.)

2    Q    BY MS. CACACCIO:  Who's that?

3    A    That's LaRue.

4         MS. CACACCIO:  We're at 35 -- 37:35.

5    (Audio played at 10:07 a.m., ending at 10:09 a.m.)

6    Q    BY MS. CACACCIO:  Do you know who that was?

7    A    The therapy comment?

8    Q    Yep.

9    A    That was LaRue.

10        MS. CACACCIO:  We're at 39:35.

11   (Audio played at 10:09 a.m., ending at 10:09 a.m.)

12   Q    BY MS. CACACCIO:  Do you know who says that?

13   A    Can you take it back?

14   Q    Yep.

15   A    I believe that's LaRue.

16        MS. CACACCIO:  We're at 40:03.

17   (Audio played at 10:10 a.m., ending at 10:10 a.m.)

18   Q    BY MS. CACACCIO:  Do you know who that is?

19   A    Kat Ginsberg.

20        MS. CACACCIO:  We're at 40:10.

21   Q    BY MS. CACACCIO:  Do you know how to spell that?

22   A    First name or last name?

23   Q    Both.

24   A    It's -- it's short for Katarina, but K-A-T, and Ginsberg,

25   G-I-N-S-B-E-R-G.



1    MS. CACACCIO:  We're at 40:10.

2    (Audio played at 10:10 a.m., ending at 10:11 a.m.)

3    Q    BY MS. CACACCIO:  Do you recognize that voice?

4    A    Angela Dudzik.

5    MS. CACACCIO:  We're at 30:48.

6    (Audio played at 10:11 a.m., ending at 10:12 a.m.)

7    Q    BY MS. CACACCIO:  Do you know who responded to LaRue?  I'm

8    sorry, to Angela?

9    A    Tatiana Gonzalez.

10    MS. CACACCIO:  We're at 41:39.

11    (Audio played at 10:12 a.m., ending at 10:12 a.m.)

12    Q    BY MS. CACACCIO:  Do you know who is talking?

13    A    LaRue.

14    MS. CACACCIO:  We're at 42 minutes.

15    (Audio played at 10:13 a.m., ending at 10:13 a.m.)

16    Q    BY MS. CACACCIO:  Who's talking right now?

17    A    That's still LaRue.

18    MS. CACACCIO:  We're at 42:21.

19    (Audio played at 10:13 a.m., ending at 10:14 a.m.)

20    Q    BY MS. CACACCIO:  Do you know who that is?

21    A    Angela Dudzik.

22    MS. CACACCIO:  We're at 43:07.

23    (Audio played at 10:14 a.m., ending at 10:14 a.m.)

24    Q    BY MS. CACACCIO:  Do you know who's talking right now

25    about the viral video?



1    A    I believe it's LaRue.

2        MS. CACACCIO:  We're at 43:55.

3    (Audio played at 10:15 a.m., ending at 10:16 a.m.)

4    Q    BY MS. CACACCIO:  Who's talking right now?

5    A    Allyson Peck.

6        MS. CACACCIO:  We're at 45:01.

7    (Audio played at 10:16 a.m., ending at 10:16 a.m.)

8    Q    BY MS. CACACCIO:  Who's talking right now?

9    A    Angela Dudzik.

10        MS. CACACCIO:  We're at 45:36.

11    (Audio played at 10:16 a.m., ending at 10:18 a.m.)

12    Q    BY MS. CACACCIO:  Who is talking right now?

13    A    That's LaRue Heutmaker.

14        MS. CACACCIO:  We're at 47:32.

15    (Audio played at 10:18 a.m., ending at 10:18 a.m.)

16    Q    BY MS. CACACCIO:  Who said February?

17    A    Tatiana Gonzalez.

18    (Audio played at 10:19 a.m., ending at 10:19 a.m.)

19    Q    BY MS. CACACCIO:  Who said that?

20    A    Ana.

21    Q    That it's supposed to be installed the 28th?

22    A    Yeah, I think she's saying that it's going to be a

23    installed before February; that it's due in on the 28th of that

24    month, which would have been October.

25        MS. CACACCIO:  We're at 47:47.



1    (Audio played at 10:19 a.m., ending at 10:20 a.m.)

2    Q    BY MS. CACACCIO:  Who is talking right now?

3    A    Kat Ginsberg.

4         MS. CACACCIO:  We're at 48:16.

5    (Audio played at 10:20 a.m., ending at 10:21 a.m.)

6         MS. POLITO:  There's a couple of people speaking in that

7    last dialogue, and I'm just not sure --

8         MS. CACACCIO:  I don't know that it's necessary.

9         JUDGE ROSAS:  How much time is left in the video?  In the

10   audio?

11        MS. CACACCIO:  We're at 48 -- we're at 48:59 and

12   there's -- it's an hour and two-minute recording.

13        JUDGE ROSAS:  So about 14 more minutes, right?

14        MS. CACACCIO:  Yep.

15        JUDGE ROSAS:  Okay.  You good?

16        MS. POLITO:  I just wanted to know who those last few

17   speakers were.  I think they we're LaRue and Kat, but I just --

18        THE WITNESS:  I -- it's LaRue and Kat for certain.

19   There's probably someone else mixed in there, but it's LaRue

20   talking over Kat.

21        MS. POLITO:  Thank you.

22   (Audio played at 10:21 a.m., ending at 10:22 a.m.)

23   Q    BY MS. CACACCIO:  Who's right now?

24   A    LaRue is talking currently.  I interjected over her.

25        MS. CACACCIO:  We're at 49:22.



1    (Audio played at 10:22 a.m., ending at 10:24 a.m.)

2    Q    BY MS. CACACCIO:  Do you know who said they don't feel

3    human half the time?

4    A    Angela Dudzik.

5    (Audio played at 10:24 a.m., ending at 10:24 a.m.)

6    Q    BY MS. CACACCIO:  Who asked when it happened?

7    A    I think it was Ana, but if you could back it up, I can

8    confirm that.

9    Q    That's too far.

10   (Audio played at 10:24 a.m., ending at 10:25 a.m.)

11   A    I can't tell if it's ana or Allyson.

12       MS. CACACCIO:  We're at 51:22.

13   (Audio played at 10:25 a.m., ending at 10:25 a.m.)

14   Q    BY MS. CACACCIO:  Who asked which store, do you know?

15   A    I think that was Angela Dudzik.

16       MS. CACACCIO:  We're at 51:37.

17       THE WITNESS:  I'm sorry, that was not Angela Dudzik.

18   Q    BY MS. CACACCIO:  Who was it?

19   A    I think it was Natalia.

20       MS. CACACCIO:  Okay.  We're at 51:30 -- that was at 51:37.

21   (Audio played at 10:26 a.m., ending at 10:33 a.m.)

22   Q    BY MS. CACACCIO:  Do you know who is talking right now?

23   A    Allyson Peck.

24       MS. CACACCIO:  We're at 59:03.

25   (Audio played at 10:33 a.m., ending at 10:36 a.m.)



1    Q    BY MS. CACACCIO:  Who wanted a ride?

2    A    Angela Dudzik.

3    (Audio played at 10:36 a.m., ending at 10:36 a.m.)

4    Q    BY MS. CACACCIO:  Who said they didn't want to take an

5    Uber?

6    A    I think that was also Angela Dudzik.

7    (Audio played at 10:36 a.m., ending at 10:36 a.m.)

8    Q    BY MS. CACACCIO:  Who also offered to give her a ride?

9    A    I think that was LaRue.

10   Q    Do you know what's talking there, what's happening there?

11   A    Yes, I got a text message with a video attachment, and I

12   opened it.  And it overwrote the recording.

13        MS. CACACCIO:  We're at 1:01:47.

14   A    And I can't remember what it was.

15   Q    BY MS. CACACCIO:  And did that happen at that time?

16   A    Yes.  I had just looked at my phone when we came out of

17   the meeting, and that was on there.

18        MS. CACACCIO:  We're at 1:02:01.

19   (Audio played at 10:37 a.m., ending at 10:37 a.m.)

20   Q    BY MS. CACACCIO:  Who asked for the bathroom rest, do you

21   know?

22   A    If you can take it back, I might be able to figure that

23   out.

24   (Audio played at 10:37 a.m., ending at 10:37 a.m.)

25   A    I -- I think Kat is asking where the bathroom is.



1    (Audio played at 10:37 a.m., ending at 10:38 a.m.)

2        MS. CACACCIO:  So that's the end of the recording, the end

3    of the transcription.

4    Q    BY MS. CACACCIO:  Is that recording what --

5        MS. POLITO:  Yeah, so I'm sorry, can you just identify

6    that last speaker?

7        MS. CACACCIO:  I don't -- Your Honor, I -- I don't think

8    that's necessary.  I mean, I'll do it because we've been doing

9    it, but I'm going to start objecting to getting names and

10   speakers for things that aren't relevant to the actual

11   proceedings, because I think it's going to be wasting the

12   Court's time when we have, you know, 40, 50 of these.

13       JUDGE ROSAS:  So when we submit the transcriptions, we're

14   going to leave out some of the names that are unidentified?

15       MS. CACACCIO:  Correct.  It'll just say unidentified

16   speaker.

17       MS. POLITO:  Judge, that is my understanding of what we

18   discussed yesterday.  But it also lends to my objection.  Most

19   of these speakers have been identified throughout the course of

20   the proceeding, and the last person I just couldn't make out.

21   So I'm just asking who that speaker was so I have some context

22   of the overall proceeding that Counsel is trying to introduce

23   into evidence.

24       MS. CACACCIO:  If I might be heard --

25       MS. POLITO:  I should know who the speakers are.



1      MS. CACACCIO:  The last sentence was "My girlfriend is,

2   like, my live-in baby, so I'm definitely going home."  That's

3   certainly not relevant.  The speaker does not need to be

4   identified for this recording to be admitted.  It's not

5   necessary and it's wasting a lot of the Court's time.  So

6   I -- I don't think that every speaker needs to be identified

7   before a recording is admitted.  That's certainly not -- not

8   the rule or requirement.  This witness has already testified

9   that she attended the meeting.  She recorded it in full.  And

10  every speaker need not be identified for a recording to be

11  admitted.

12      JUDGE ROSAS:  So we've taken time to identify speakers

13  before now that were speaking before the meetings started.  But

14  you take issue with this particular segment?

15      MS. CACACCIO:  I -- I'm willing to do it for this -- at

16  this -- at this point for this particular recording because

17  we've been doing it for the whole thing.  But I'm going to

18  start objecting to -- to this line because I think that

19  it's -- it's wasting a lot of the Court's time.

20      JUDGE ROSAS:  So let me just make sure.  Is there anything

21  sensitive about that because --

22      MS. CACACCIO:  No.

23      JUDGE ROSAS:  -- we -- we referenced the baby --

24      MS. CACACCIO:  Correct.

25      JUDGE ROSAS:  -- living -- okay.



1      MS. CACACCIO:  No, no.  There's nothing sensitive, Judge.

2  I just -- I think --

3      JUDGE ROSAS:  That's all I cared about.

4      MS. CACACCIO:  No, Judge.

5      JUDGE ROSAS:  So the objection -- the -- the -- the

6  objection is noted and -- and I'm instructing the General

7  Counsel to be consistent --

8      MS. CACACCIO:  Yes, Judge.

9      JUDGE ROSAS:  -- as far as any transcription that you want

10  to offer --

11      MS. CACACCIO:  Yes, Judge.

12      JUDGE ROSAS:  -- it -- if it's going to be of assistance

13  to the fact finder because it falls under the category of hey,

14  you never know, you know.  I think there was a lottery -- a New

15  York lottery saying to that effect one time, you know, why you

16  should always play it, right.

17      But we're talking about voice identification issues

18  possibly.  And look, you know, who spoke when and so on, that

19  was such and such.  You just never know, right?

20      MS. CACACCIO:  Yes, Judge.

21      JUDGE ROSAS:  So if we're going to do it for pre-meeting

22  in some instances, we're going to do it for all, we're going to

23  do it for post-meeting.  It's going to be a transcription of

24  whatever it is that you have the audio for that y'all are

25  submitting the transcription for.  Okay?  All right.  So that's



1    that.  Anything else?

2        MS. CACACCIO:  Judge, I'm still not clear on the -- on the

3    ruling.  For you to accept the recordings into evidence, are

4    you suggesting that every speaker needs to be identified?

5        JUDGE ROSAS:  Well, that's what you were establishing on

6    the record --

7        MS. CACACCIO:  Only because --

8        JUDGE ROSAS:  Well, look --

9        MS. CACACCIO:  -- Respondent had objected to it and I -- I

10   was just doing it.  But I'm -- I'm now objecting to that as a

11   concept.

12       JUDGE ROSAS:  Well, let's -- let's do this.  Let -- let me

13   partially reconsider this, Respondent.  If we're having the

14   witness identify who the unidentified are on the record, do we

15   need to do it in the recording?  I mean, do we need to do it

16   the transcription?

17       MS. POLITO:  Yes, Your Honor, because the -- all day

18   yesterday, there were discrepancies between what the witness

19   testified to with respect to a particular voice and also what

20   was in the transcript.  So the witness actually helped identify

21   all day yesterday the voices that she recognized.  And as the

22   Respondent, we have -- we're entitled to know the completeness

23   of who was there, who all was present.  I don't know if this

24   particular speaker is relevant or not.  I happen to not

25   recognize the voice from all the voices that we went through.



1     So I asked a simple question for completeness, who was that

2     voice.  Suddenly now after a whole day of going through this,

3     Gen -- Counsel for the General Counsel is going to object to

4     identifying people?

5          JUDGE ROSAS:  Okay.

6          MS. CACACCIO:  I have a proposal.

7          JUDGE ROSAS:  Last -- last -- last --

8          MS. CACACCIO:  Yes, Your Honor.

9          JUDGE ROSAS:  -- choice.

10          MS. CACACCIO:  I have a proposal.  Perhaps because we do

11     have so many, Judge.  I mean, we have -- we have so many of

12     these recordings for so many hours.  Perhaps prior to the

13     witness testifying, they could review the transcript, listen to

14     the recording, make edits.  Then we wouldn't need to play it in

15     court.  If Respondent has cross-examination for it, so be it.

16     Obviously, everyone would have to understand that the original

17     transcriptions were not made by the witness.  They would just

18     be editing them for the purpose of completeness.  And we

19     wouldn't be having to play these over and over and over.

20          JUDGE ROSAS:  As -- as far as I'm concerned, somebody

21     could handwrite over something to facilitate that.  But the

22     answer is that my ruling stands.  Compared to all of the work

23     that is going to have to get done to clarify who unidentified

24     speakers are through those many minutes of many meetings, the

25     before and the after is relatively insignificant.  So that's



1    the end of that discussion.

2        Okay.  Next issue.  Any -- any other questions at this

3    time before we break?

4        MS. CACACCIO:  Not before we break, Judge.

5        JUDGE ROSAS:  Nothing relating to this particular exhibit?

6    You offer --

7        MS. CACACCIO:  I -- I would like --

8        JUDGE ROSAS:  -- this exhibit?

9        MS. CACACCIO:  -- to offer it.  I would like to offer

10   29(a).  And then 29(b) will be an annotated transcript.

11       MS. POLITO:  Same objection stands.

12       JUDGE ROSAS:  Okay.  29(a) is received over objection.

13   **(General Counsel Exhibit Number 29(a) Received into Evidence)**

14       JUDGE ROSAS:  29(b) to be submitted and considered

15   at -- at a future time.  Okay.  Now --

16       MS. CACACCIO:  Your Honor, are you asking -- would you

17   like to have the witness identify the very last speaker for

18   this since --

19       JUDGE ROSAS:  Oh, yes.

20       MS. CACACCIO:  -- it will be consistent?

21       JUDGE ROSAS:  Yes.

22                    <u>**RESUMED DIRECT EXAMINATION**</u>

23   Q    BY MS. CACACCIO:  Michelle, I'm going to play the

24   last -- the last bit for you.

25   (Audio played at 10:44 a.m., ending at 10:44 a.m.)



1     A     That is Tatyana Gonzalez.

2          JUDGE ROSAS:  Okay.  So the tape is over.  No other

3     questions regarding this exhibit?

4          MS. CACACCIO:  Not at this time.

5          JUDGE ROSAS:  Okay, we're going to break.  Take that -- a

6     few minutes, five minutes or so.  Let me ask you.  So you have

7     one more audio with this witness?

8          MS. CACACCIO:  Yes, Judge.

9          JUDGE ROSAS:  And how long is it?

10          MS. CACACCIO:  It won't be immediate.  It's not the

11     immediate next thing that's happening, Judge.

12          JUDGE ROSAS:  So you're going to have some questions?

13          MS. CACACCIO:  Yes, Judge.

14          JUDGE ROSAS:  And then --

15          MS. CACACCIO:  That's what you asked me to do --

16          JUDGE ROSAS:  And then --

17          MS. CACACCIO:  -- so we will do that.

18          JUDGE ROSAS:  And then -- and then how long will it take

19     you?

20          MS. CACACCIO:  33 minutes and 16 seconds.

21          JUDGE ROSAS:  Okay.  And when we complete the playing of

22     that tape, do you have additional questioning on this witness'

23     direct examination?

24          MS. CACACCIO:  So I broke it up such that we wouldn't be

25     doing recordings back to back, considering I was trying to be



1    respectful for -- for --

2        JUDGE ROSAS:  I'm just trying to get a sense.

3        MS. CACACCIO:  So when we play the last recording, I'll

4    probably need a brief break just to consult.  And then -- and

5    then we'd be --

6        JUDGE ROSAS:  Okay.  And then -- then we would probably be

7    close to taking a break for lunch.  And at that point, you're

8    going to be prepared for cross-examination of this witness.

9    And the question is how much Jencks material do you have for

10   this witness?

11       MR. HAYES:  Your Honor, I should point out I -- over here.

12   I do have --

13       JUDGE ROSAS:  You know, let me just tell you.  Yeah.  I

14   mean, it's -- maybe you male individuals that will -- are

15   tending to sound alike sometimes.  Raise your hand when you

16   talk.

17       MR. HAYES:  I -- I will raise my hand.

18       JUDGE ROSAS:  I was -- I was looking at you guys, thinking

19   the voice was coming over here before I realized that it was

20   the Union complaining about their subpoena.  And you know,

21   it -- I was distracted for a little bit not seeing any movement

22   on your part.  And not that you were really moving either.

23       MR. HAYES:  Yeah.  I'm not very animated.

24       JUDGE ROSAS:  And that's really -- the mask really does a

25   job.  But anyway, go ahead.



1       MR. HAYES:  So Your Honor, I just want to point out, I

2    will have some brief direct exam of the witness as well for the

3    Charging Party.

4       JUDGE ROSAS:  Yes, okay.  Sorry, I --

5       MR. HAYES:  That's okay.

6       JUDGE ROSAS:  -- neglected you.

7       MR. HAYES:  It -- it won't be --

8       JUDGE ROSAS:  My practice is for the Charging Party to

9    then ask their questioning.  Will that be long?

10      MR. HAYES:  No, it won't.  Not at all.

11      JUDGE ROSAS:  Okay.  Okay.  So I'd like to ideally break

12   so we can figure out a lunch break as well as a cross-

13   examination preparation break.  Okay.

14      MS. POLITO:  Judge, are we off the record?

15      JUDGE ROSAS:  Hold on.  Let me get an idea of how many

16   pages.  Because my -- my rule of thumb is generally a minute a

17   page.

18      MS. CACACCIO:  So Judge, we do have to talk a little bit

19   about this.  We'll actually have some time before we do it.

20   There is -- so there are -- Michelle has produced a number of

21   affidavits.  One of them, we believe, is not appropriate Jencks

22   material because it's an affidavit for a case that isn't before

23   the Court at this time.  But it -- I need to figure out what

24   the status of the investigation is even at this point.

25      JUDGE ROSAS:  I'll have to look at it.



1    MS. CACACCIO:  I know that it's not in this case.  It's

2   regarding a bargaining allegation that isn't -- that isn't at

3   issue in this case.

4    JUDGE ROSAS:  I still have to look at it.

5    MS. CACACCIO:  I understand.

6    JUDGE ROSAS:  I still have to look at it to see if it

7   references any of the facts of this case.

8    MS. CACACCIO:  So absent that --

9    JUDGE ROSAS:  Let me look at it now, as a matter of fact.

10   MS. CACACCIO:  Okay.

11   JUDGE ROSAS:  And anything else that's -- that you claim

12   is going to fall under that.

13   MS. CACACCIO:  Right.  So it's just this one affidavit.

14   Which obviously, we would object that they are not entitled to

15   it as it's not -- whatever.  We can talk about that later.

16   This one's very brief.  It's three pages.  This one's longer,

17   at 20 pages.  This one is shorter, at three pages.  So I'm

18   trying to -- yeah.  This one.

19   JUDGE ROSAS:  Is that it?

20   MS. CACACCIO:  Yep.  Let me double-check.  If I can have a

21   second for that.  Yes, Judge.  That's it.

22   JUDGE ROSAS:  Okay.  So it's looking like right now, we'd

23   probably be taking an hour and a half break.

24   MS. POLITO:  Judge, if I may.  We're off the record,

25   right?  Respondent's intention is to resort --



1    JUDGE ROSAS:  We're not off --

2    MS. CACACCIO:  Oh, I actually have --

3    JUDGE ROSAS:  Okay.  Let's -- let's go off the record.

4    (Off the record at 10:50 a.m.)

5    JUDGE ROSAS:  All right.  Go ahead, Respondent.

6    MS. POLITO:  I don't believe I have to make a motion,

7    Judge.  I was just being courteous --

8    JUDGE ROSAS:  Go ahead.

9    MS. POLITO:  -- to the Court that --

10   JUDGE ROSAS:  Go ahead.

11   MS. POLITO:  -- we were having a conversation on the

12   record about timing.  And we were informing the Court that

13   Respondent intends on reserving its cross-examination of the

14   Board's witnesses until our case-in-chief.  And we will be

15   serving the witnesses with a subpoena duces tecum as well as a

16   testifying subpoena for the witness to be recalled during our

17   case-in-chief, which we have every right and entitlement to do

18   so.  There's no rule requiring us to engage in cross-

19   examination at this time.

20   MS. CACACCIO:  Your Honor, this witness shouldn't be

21   recalled by Respondent for cross-examination.  If they want to

22   recall her for some kind of direct examination, so be it.  But

23   she definitely can't be recalled for cross.  What this is is an

24   attempt to circumvent the subpoena that we issued, Your Honor,

25   because we don't have any documents for her yet.  She's been



1    required to testify with no documents, with nothing that has

2    been produced by Respondent.  So what they're going to do,

3    based on what they've just said, is they're going to wait or

4    they're going to try to wait, recall her, then present all

5    kinds of records and documents that we will not have been able

6    to see because they haven't been produced.  They should be

7    required to cross-examine her now.  It's not appropriate to

8    wait to cross-examine her for four months from now when their

9    case-in-chief may begin.

10    MR. HAYES:  Your Honor, the Charging Party will oppose any

11    motion along the same lines for this witness or any other.

12    MS. CACACCIO:  The recall of these witnesses -- my

13    understanding, the recall of these witnesses for the -- for the

14    purpose of documentation only.  Not for them to withhold their

15    cross-examination of them.

16    MS. POLITO:  Judge, if I may.  Just to be clear, the

17    Respondent is not making a motion.  Respondent is not required

18    to make a motion.  Respondent has every right to reserve cross-

19    examination and recall the witness, pursuant to a subpoena

20    duces tecum and testify subpoena at a later date in our case-

21    in-chief.  And as a courtesy, we were informing the Court and

22    counsel about our intention because we happened to be

23    discussing breaks and what that might look like.  So as -- as a

24    courtesy, we were sharing that with the Court now.  But there

25    is no requirement in the rules that we need cross-examination.



1        Moreover, Your Honor, as everyone is well aware, we are

2   continuing to work on the voluminous request of discovery.  We

3   have indicated that to counsel.  We just got rulings from Your

4   Honor -- again, I apologize -- either Monday night or Tuesday

5   morning.  We fully expected a special master to be appointed.

6   That hasn't happened.  We're going to start to try to roll out

7   documents.

8        Your Honor has indicated multiple times that the witness

9   will be subject to recall in the event such documents were

10  relevant to this particular witness by both the Board and both

11  by the Union's counsel.  As such, it only makes most judicial

12  sense for us to reserve our cross until such later time as

13  it -- it A, either the witness needs to be recalled by Counsel

14  for the General Counsel or the Board's -- Board's Counsel

15  or -- I mean, the Union's Counsel, or at such time when we are

16  calling the witness in our case-in-chief, which we fully intend

17  to do and have every right to do so.

18       JUDGE ROSAS:  All right.  I'm going to reserve on that

19  issue.  Let's just call it an issue right now.  The General

20  Counsel still has a little bit more to go.  And the Charging

21  Party will have some examination as well.  So let me mull that

22  all over.

23       MS. CACACCIO:  Your Honor, to the extent that this is

24  granted, I'm going to have to talk to my office about possibly

25  filing a special appeal.  Moreover, we certainly won't be



1  turning over Jencks material if they're not beginning to cross-

2  examine this witness.

3      JUDGE ROSAS:  Well, no.  There would be no Jencks material

4  if there's no cross-examination.  You are correct.  All right.

5  Like I said --

6      MS. CACACCIO:  And Judge, forever.  I mean, if they're not

7  cross examining her and they're calling her on their case-in-

8  chief --

9      JUDGE ROSAS:  Correct, correct.

10      MS. CACACCIO:  -- then you get --

11      JUDGE ROSAS:  So there --

12      MS. CACACCIO:  -- no Jencks material.

13      JUDGE ROSAS:  -- wouldn't be any Jencks at that time,

14  yeah.

15      MS. POLITO:  Judge, just for the record, there was a ten-

16  day proceeding filed by the Board in which there are publicly

17  filed documents that include witness affidavits signed by Ms.

18  Eisen.  And so those documents are now public documents.  And

19  our position is we may fully cross-examine the witness because

20  the Board has chosen to file those as a public document.

21  They're --

22      JUDGE ROSAS:  Just --

23      MS. POLITO:  -- not filed under seal.

24      JUDGE ROSAS:  -- improper evidence?

25      MS. POLITO:  Excuse me?



1    JUDGE ROSAS:  Just -- just improper evidence?

2    MS. POLITO:  Not for just improper evidence.  It's a

3 publicly sworn statement filed by the witness.

4    JUDGE ROSAS:  But you're saying that it would be rel -- it

5 would be questioning related to the 10(J).

6    MS. POLITO:  No, no.  That's --

7    JUDGE ROSAS:  Oh, because you say that --

8    MS. POLITO:  -- not what I said.

9    JUDGE ROSAS:  -- it's been waived because it's been filed

10 in that case?

11    MS. POLITO:  That's correct.  And it's --

12    JUDGE ROSAS:  The -- the Jencks privilege?

13    MS. POLITO:  -- it's not been -- sorry, Judge.  It has not

14 been filed under seal and it's not been filed --

15    JUDGE ROSAS:  Correct.

16    MS. POLITO:  -- confidentially.  So it's been waived.  I

17 don't know what the examination would be with respect to those

18 statements.  But I do want to alert the judge to our position

19 that those statements have been publicly filed in a federal

20 court proceeding.  They were not filed under seal and they are

21 sworn statements.  And they are tools that we may use in cross-

22 examination, separate and apart from the Jencks rule.

23    MS. CACACCIO:  Moreover, Your Honor, obviously this is the

24 first we're hearing of this.  It certainly is going to throw

25 off the rest of our week.  We expected the cross-examination.



1    No one said anything otherwise.  So I'm going to have to try to

2    scramble and see what I can do.  If -- if you go with this

3    plan, I'm going to have to figure out what I can do with

4    witnesses for the rest of --

5         JUDGE ROSAS:  Like I said, I'm mulling it over.

6         MS. CACACCIO:  Okay.

7         JUDGE ROSAS:  All right.  Let's take a recess and we'll

8    reconvene, ready to go right into the questioning.

9         MS. CACACCIO:  How long is the recess, Judge?

10        JUDGE ROSAS:  All right, go ahead.  We're on break.  We're

11    off the record.

12    (Off the record at 10:57 a.m.)

13        MS. CACACCIO:  Would you like me to resume direct

14    examination?

15        JUDGE ROSAS:  Please.

16                 **RESUMED DIRECT EXAMINATION**

17    Q    BY MS. CACACCIO:  Michelle, did you notice any physical

18    changes to your store after August 23rd?

19    A    The first physical change was the removal of a backroom

20    carpet.

21    Q    Can you tell us a little bit about that carpet?

22    A    Sure.  There's a backroom located on -- that was put in, I

23    think, the last remodel, so maybe a dozen years ago or so.  It

24    was intended initially for conferences, which is why it was

25    carpeted.



1        It had since been commandeered as a supply room and an

2    employee breakroom.  The carpet was dirty.  It had a lot of

3    spilled coffee and all sorts of stuff on it.  And I don't know

4    why, but for some reason that was the first thing that was

5    focused on after we went public with the union campaign.

6    Q    How did you learn about the carpet removal?

7    A    There were members of corporate and facilities walking

8    through the store, taking note of things.  That was one of the

9    things that was talked about pretty heavily.  We had a problem

10   with fruit flies at the time.  And so they attributed the fruit

11   fly issue with the backroom carpet.

12   Q    And what ended up happening with the carpet?

13   A    It was removed and the entire -- that entirety of the

14   backroom was separately remodeled before the official remodel

15   that happened in October.

16   Q    How long did that take?

17   A    It was supposed to be two days, we were told.  It ended up

18   taking about a week.

19   Q    And what impact, if any, did that have on your work?

20   A    Besides being a big pain in the butt, all of -- everything

21   in the backroom had to be emptied out and stored either outside

22   of the store or in the store lobby.  So it was in the way for

23   customers and our operations.  It also took the -- the only

24   area in the store we had that was not the lobby of the store

25   where we could, you know, take our breaks and store our



1    personal items, have any sort of conversations that were not on

2    the floor.  It removed that element from the store.

3    Q    Now, you said that there was a renovation later.  What was

4    the renovation that you learned about?

5    A    We found out, I think, middle of -- middle of September

6    that the store was going to be closed for a week in October for

7    what they were calling a remodel.

8    Q    How did you learn that?

9    A    Our store manager told us.  It was also talked about in

10   the first -- I believe either the first listening session or

11   possibly the second one on the 19th of September.

12   Q    And did you ever hear any comments from any managers about

13   the renovation?

14   A    It was unexpected is what I was told.  Having been with

15   the company for as long as I have, these remodels are usually

16   planned a couple of years in advance.  There's a lot of

17   logistics that have to go into making sure that the partners

18   are housed in other stores so that they get their hours.  I've

19   also never known it to only take a week.  It's usually, you

20   know, several weeks.  So it was an unusual circumstance to

21   begin with.

22   Q    When did the renovation occur?

23   A    I think we were closed October 11th through the 16th or

24   somewhere in that -- somewhere in that realm.

25   Q    And what were employees supposed to do for work during the



1    renovation?

2    A    There were a couple of options proposed.  One was to see

3    if they could be scheduled at other locations in the area.  The

4    other option was to take vacation time if you had any accrued

5    or you could take unpaid time off.

6    Q    And who made those proposals?

7    A    In my case specifically, Patty, our store manager, sent me

8    a text message asking me what I would prefer for that period of

9    time.  I responded that I would use vacation time.

10    Q    And so -- so what did you end up doing?

11    A    I ended being -- taking the week and using whatever

12    vacation time I had accrued.

13    Q    And did you notice any changes when you returned?

14    A    Physical changes?

15    Q    Yes.

16    A    Not -- not many for a -- for a full remodel.  They -- I

17    think they pushed the bar are out something like 12 inches.

18    They separated the bars -- the two espresso bars and put an

19    individual rinse sink and ice bin for each of those bars.  And

20    then they added the addition of a -- a digital order screen

21    that allowed customers to see what -- at what point in the

22    process their order was.

23        MS. CACACCIO:  Your Honor, can I just have one second?

24    Q    BY MS. CACACCIO:  Had you heard anything -- you mentioned

25    that there weren't a lot -- you didn't notice a lot of changes



1    when you got back.  Did anyone comment on that at all?

2    A    Yeah, we all commented on that.  Most of us commented on

3    that.

4    Q    And what did you say?

5    A    That if this was a -- a remodel, we would have expected

6    them to -- to do more.  It's a very old store, and so it hadn't

7    been remodeled in at least a decade, probably longer than that.

8    And so I was anticipating something that would be more useful

9    to us in our jobs.

10   Q    Did management ever make comments about it?

11   A    One of our store managers, Dustin Taylor, commented to a

12   couple of partners that we shouldn't worry because this was

13   just a fake remodel and that the real one was slated to happen

14   sometime in the early spring or late winter of 2022.

15   Q    Now, you said that there was a remodel that was going to

16   happen in 2022.  Who told you about that?

17   A    The first I heard of it was from Dustin.

18   Q    And what did Dustin say?

19   A    Just that this -- the one that we had just been shut down

20   for a week for was -- he used the word "fake", and that

21   the -- the real one that would shut us down for, you know,

22   close to two months was slated to happen, I think he -- he had

23   thought he had gave an approximate date of late winter to early

24   spring of 2022.

25   Q    And when did you have that conversation with him?



1   A    He was having it with several partners before -- before I

2   heard him say it the week after we reopened.  I think that date

3   was Monday the 18th of October.

4   Q    Was that the -- did that -- did that remodel ever happen?

5   A    It did not.

6   Q    So what did you do about it, if anything?

7   A    Once that kind of was clocked in and we had heard it sort

8   of whispered about, having had -- our store manager had had

9   some conversations with the shift supervisors leading up to

10  that time period.  Mostly, it was shift supervisors asking for

11  more information so that we could start to, you know, plan our

12  lives around that proposed shut down.  Eventually, I sent -- I

13  believe it was -- I believe it was Bridgett Shannon, a shift

14  supervisor at our store, sent an email to Alan Model of Littler

15  Mendelson requesting to bargain over the proposed or the

16  upcoming shutdown of Elmwood for this remodel.  We received a

17  response saying that after speaking to the company, there was

18  no upcoming shutdown scheduled for the Elmwood location.

19      MS. CACACCIO:  Your Honor, can we go off the record

20  briefly?

21      JUDGE ROSAS:  Off the record.

22  (Off the record at 11:24 a.m.)

23      JUDGE ROSAS:  Back on.

24                    **RESUMED DIRECT EXAMINATION**

25  Q    BY MS. CACACCIO:



1    Ms. Eisen, can you look at General Counsel Exhibit 32?  Can you

2    identify that document, it's front and back?

3    A    The -- the bottom portion and the back is an email sent

4    from Bridgett Shannon to Alan Model requesting that we bargain

5    over the upcoming closure of the Elmwood location.

6    Q    And were you included on that?

7    A    I was cc'd on it, yes.

8    Q    Okay.  And what happened after that?

9    A    The top portion is the response from Mr. Model stating

10   that as of now, there is no proposed date for an Elmwood

11   closure.

12   Q    And --

13        MS. POLITO:  Objection, Your Honor, because that's not the

14   document.  If they're seeking to include the document, the

15   document speaks for itself and contains additional language

16   other than what the witness is testifying to.

17        JUDGE ROSAS:  Objection is sustained at this time.  The

18   General -- the exhibit is before the witness.  It is not in

19   evidence, and I don't want it read from other than to be

20   identified in order to be offered, right?

21        So you're offering this into evidence?

22        MS. CACACCIO:  Yes, Your Honor.  And she wasn't reading

23   from it, either, but I am offering it now, so.

24        JUDGE ROSAS:  Okay.  Any objections?

25        MS. POLITO:  Yes, Your Honor.  A, we object on the grounds



1      of relevancy.  Ms. -- I'm not sure why it's relevant to this

2      proceeding, and Ms. Eisner (sic) has testified that the Elmwood

3      cafe was not remodeled, number 1.  Number 2, the email seems to

4      attempt to put into play bargaining requests that have been

5      made between the parties, so to that extent, we would ask for

6      all -- any and all such emails exchange with Ms. Eisen, Mr.

7      Hayes, and any other member of the organizing committee

8      regarding bargaining.  And last, Your Honor, this email is from

9      Mr. Model, who is an attorney at Littler.  By no means is this

10     particular email privileged, but we are reserving all of our

11     rights with respect to any other emails identifying any

12     attorneys at Littler that may be subject to attorney client

13     privilege.  And the only reason this would not be is because of

14     the request relating to bargaining, which again, makes it an

15     in -- incomplete record, and we would request all of the email

16     exchanges regarding bargaining between all parties.

17          JUDGE ROSAS:  The email -- the email refers to the closure

18     of a store.  Which store?

19          MS. CACACCIO:  The Elmwood Avenue location.

20          JUDGE ROSAS:  All right.  Overruled.  General Counsel's 32

21     is received.

22     **(General Counsel Exhibit Number 32 Received into Evidence)**

23          MS. POLITO:  And just for the record, Judge, it doesn't

24     relate to the closing the store, it relates to a remodel of a

25     cafe at a particular store.



1      JUDGE ROSAS:  Counsel, you can cross-examine ov -- over

2  it.

3      Next question.

4  Q   BY MS. CACACCIO:  Michelle, when was the last time that

5  you noticed your store got a new barista?

6  A   Until very -- we have had three recent hires in the last

7  few weeks, but are you asking prior to that?

8  Q   Yes.

9  A   The last hiring into the Elmwood location was done in

10  October of 2021.

11  Q   And the ones that you got just a few weeks ago, do you

12  remember approximately when they started?

13  A   They didn't train at our location.  I believe their hire

14  date would have needed to have been early to mid-June.

15  Q   And why do you think that?

16  A   Based on the training schedule.  That's how much time they

17  would have needed to train before coming on the floor as -- as

18  fully certified baristas, and they -- they entered our schedule

19  around the end of June.

20  Q   And how many employees were hired in the end of October of

21  2021?

22  A   There were seven total, I believe, that were hired new,

23  and there was one that was transferred in from another

24  location.

25  Q   And in your opinion, did the store need those new hires?



1    A    We did not.

2    Q    Why not?

3    A    We were fully staffed based on the needs of the business,

4    which is what the -- what the company would call that.  We

5    stated as such in -- at several locations.  When we were asked

6    about staffing as to whether we thought we were adequate

7    staffed, we said we were.

8    Q    And when did you -- when did you tell them that?

9    A    At every listening session, we were asked that question.

10   Q    What, if any, other effect did the hiring of new employees

11   to the Elwood store have on you back in October?

12   A    Well, it put us well over what would be a normal capacity

13   on the floor behind the counter, which created a whole bunch of

14   different effects in terms of tripping over people, in -- in --

15   in that regard.  It also shortened our tips.  The more people

16   that are working, equals the more hours worked, and the way

17   that tips are processed, it's dollars divided by hours.  So

18   there are more hours being worked, then -- and the tips remain

19   the same, it's a -- it's a smaller number per hour that people

20   are getting in tips.

21   Q    Do you have any specific examples of times when you

22   thought you were overstaffed?

23   A    There was one particular morning, it would have been late

24   October.  I think there was somewhere between 12 and 14

25   partners at our store, which is just -- that's on the floor



1    working, which is an absurd number of people at a half-day

2    location, where you don't have a drive-thru window and that

3    sort of thing to deal with.  I was in the customer support

4    role, which is a very fluid role that allows you to --

5    essentially, you're doing the stocking and the -- the cleaning

6    tasks.  It's on a -- like, a rotating timer and you're brewing

7    the coffee, and there's a whole sequence to it.  One of the

8    parts of the sequence is to do what's called the lobby slide,

9    which is -- takes you out into the lobby to wipe down the

10   tables and the -- the high touch points, the door -- the

11   handles.  And I reached that point in my sequence, and I went

12   to go around the counter to go do the lobby slide, and the

13   shift supervisor who was on at the time said, you don't need to

14   do that.  I have Blue stationed in the lobby.  And I said, you

15   have a partner just standing in the lobby solely to wipe down

16   tables and -- and door handles?  And he said, Michelle, I have

17   so many people here, I don't know what else to do with them.

18   Q    How many people, in your opinion, would be fully staffed

19   for your store?

20   A    Fully staffed for peak, eight would be an ideal number.

21   Q    Okay.  And what about not peak?

22   A    It would depend on the day part.  You would probably have

23   anywhere between four and five to take care of breaks.

24   Q    And do you know how many employees, approximately, worked

25   at your store in October 2021?



1    A     Prior to the hiring?

2    Q     Correct.  Well -- yes.

3    A     I think we were mid-20s, maybe 25 to 27.

4    Q     And what about after that?

5    A     I believe the total number brought us up to 34.

6    Q     And how do you know that?

7    A     Well, I -- I know that based on the schedules that are

8    posted.  I also know what the final voter list looked like for

9    the Elmwood location as well.

10   Q     And if I showed you a copy of that -- of the voter list,

11   would you be able to recognize it for us?

12   A     Yes, I would.

13         MS. CACACCIO:  Showing the witness General Counsel Exhibit

14   33.

15   Q     BY MS. CACACCIO:  Ms. Eisen, what's in front of you?

16   A     It is the copy of the voter list for the Elmwood Avenue

17   location.

18   Q     And how do you recognize it?

19   A     I've seen it.  I was sent it via email.

20   Q     And when did you see it?

21   A     When it was first released by the company.  Sometime in, I

22   think, early November of 2021.

23   Q     And is it fair and accurate, as far as you know?

24   A     As far as I know, yes.

25         MS. CACACCIO:  Your Honor, I'm going to offer General



1    Counsel's Exhibit 33.

2        JUDGE ROSAS:  Voir dire?  Objection?

3        MS. POLITO:  Just a few questions.

4                    **VOIR DIRE EXAMINATION**

5    Q    BY MS. POLITO:  Ms.  Eisner, you said that you received it

6    via email.  Who did you receive it from via email?

7    A    Ian Hayes.

8    Q    Excuse me.  And when did you receive it via email?

9    A    Whatever day it was released to our attorneys by the

10   company.

11   Q    So your understanding is that the company sent the

12   material to Mr. Hayes, and then he sent it to you; is that

13   correct?

14   A    Correct.  That is my understanding.

15   Q    Is it your also understanding that the company prepared

16   Exhibit Number 33?

17   A    As far as I know, yes, the company had prepared that.

18       MS. POLITO:  No objection, Judge.

19       JUDGE ROSAS:  General Counsel's 33 is received.

20   **(General Counsel Exhibit Number 33 Received into Evidence)**

21                  **RESUMED DIRECT EXAMINATION**

22   Q    BY MS. CACACCIO:  Ms. Eisen, looking at General Counsel's

23   Exhibit 33, has your store lost any employees since this was

24   created?

25   A    Yes, it has.



1    Q    Which ones?

2    A    Do you want me to go by name or number?

3    Q    If you could do both, that'd be really helpful to the

4    Court.

5    A    Sure.  1, Tyler Anatole, 2, Stephen Bishop, 4, Janae

6    Cabrera, 7, Blue Digiulio, 9, Michael Donovan, 12 Cassie --

7    Cassie Fleischer, 13, Leyla Gentil, 16, Tatyana Gonzalez, 17,

8    Cortlin Harrison, 18, LaRue Heutmaker, 20, Erin Kidd, 21,

9    Shariah Lyons, 23, Josh Mendez, 24, Kellen Mon -- Montanye, or

10   Kellen Higgins, 26, Kevin Parham, 29, Alex Rosche is not a

11   partner at Elmwood, 30, Trenton Santoro-Bissett, 31, Alexa

12   never actually worked at the store.  She was hired, but didn't

13   show up.  32, Tati Staniszewski, 33, Courtney Stroeher, 34,

14   Alyssa Warrior, and that is it.

15   Q    So since October, when this list was created --

16   A    Um-hum.

17   Q    -- and the time you said you just received new hires, how

18   many employees have been hired for your store?

19   A    There was one transfer that wasn't listed here, Bridgett

20   Shannon, and there was one more transfer, Nabe O'Brien

21   (phonetic), sometime in early spring.  Other than that, there

22   have been no new hires into the store.

23   Q    So how many employees, approximately, work in the store

24   right now?  Do you know?

25   A    With the -- with the three that were just brought on, I



1    think we're at 23, maybe.

2    Q    And how do you know that?

3    A    Again, based on the weekly schedules that are posted.

4    Q    And was this gap between hiring typical in your

5    experience?

6    A    Not in my experience, no.

7    Q    Why not?

8    A    Because the store -- the company's always hiring.  And

9    I -- I don't say that lightly.  I mean, there's a po -- there's

10   a post in every single Starbucks in the country that says "we

11   are hiring", and that's what we're told to tell people when

12   they approach us at the register to ask if we're hiring, that

13   we are always hiring.  And in my experience, we are always

14   hiring.  It's a very high -- you know, it can be a very high

15   turnover industry, and so there's always a need to replace

16   somebody.  There's -- it's generally a very flexible schedule,

17   which means that current partners are adjusting their schedule

18   for other things, other jobs, or school, and so in order to

19   replace those people with, you know, more limited availability,

20   or to have appropriate people trained to take over for people

21   who may be, we're continually hiring.

22   Q    What impact, if any, is this having on your store's

23   operations?

24   A    It's been very detrimental.  There's been several

25   occasions just in the last couple of months where one call off



1    has meant having to shut down the entire store because there is

2    not enough staff to cover that one person who can't come in and

3    work.

4    Q    And is that typical?

5    A    Absolutely not.

6    Q    What usually happens?

7    A    There is a pool of people who you can call and reach out

8    to and say, hey, so and so called in.  They're not feeling

9    well.  Do you want to come in and work this shift?

10    Q    Directing your attention to one of Respondent's stores at

11    Walden and Anderson Road.  Are you familiar with that store?

12    A    I am, yes.

13    Q    How are you familiar with that store?

14    A    Aside from it being a store in the market that I've gone

15    to to either -- as a customer or to pick up supplies, I'm

16    familiar with it as one of the -- the petitions that was filed

17    in the second round of -- of Buffalo petitions in early

18    September.

19    Q    Do you have any familiarity with the union support at that

20    store?

21    A    Currently, or --

22        MS. POLITO:  Objection, Judge.

23        JUDGE ROSAS:  What's the objection?

24        MS. POLITO:  She has no personal knowledge with respect to

25    that store.  I mean, we -- she doesn't work at the store.



1      JUDGE ROSAS:  Well, repeat the question?

2      MS. CACACCIO:  I asked if she had any familiarity with the

3   union support of the store.

4      JUDGE ROSAS:  I'll allow that.  Let's see where it goes.

5   A    I do, yes.

6   Q    BY MS. CACACCIO:  And how do you know that?

7   A    One of the leaders of that store, Colin Cochran, is a good

8   friend of mine, and so I knew when they were filing, what the

9   union support was.

10      MS. POLITO:  Object that the answer is based on hearsay.

11   Colin can come in and testify to his own experience with

12   respect to the store.

13      MS. CACACCIO:  And the --

14      JUDGE ROSAS:  Overruled this time.  Let's see where it

15   goes.

16      Next question.

17   Q    BY MS. CACACCIO:  So what happened after the petition was

18   filed?

19   A    The original one?

20   Q    Yes.

21   A    It was pulled in order not to restart the clock on the

22   first three petitions, and then shortly after that, the Walden

23   Anderson location was shut down.

24   Q    How long did that closure last?

25   A    It was initially said to be for a week.  It was -- they



1    were told it was -- the partners there were being told it was

2    being shut down to deal with pest issues.

3        MS. POLITO:  I'm going to object to the answer also being

4    hearsay.  It doesn't sound to me like it's based on any

5    personal knowledge, but based on what she was told by others.

6        JUDGE ROSAS:  Is there going to be corroboration for this?

7        MS. CACACCIO:  Yes, Judge.

8        JUDGE ROSAS:  Eyewitnesses testifying to this?

9        MS. CACACCIO:  Yes, Judge.

10       JUDGE ROSAS:  All right.  Subject to being stricken later

11   on, requiring corroboration.

12   Q    BY MS. CACACCIO:  Do you have any personal knowledge about

13   the closure of that store?

14   A    Just what I saw in our -- a group meeting with partners

15   who worked at that store, saying this is why they were told it

16   was being shut down.

17   Q    And can you tell us, and I apologize if you said it, how

18   long was the closure supposed to last?

19   A    Initially, a week to deal with pest issues.  Then they

20   were told that it was not opening again in a week.  It was

21   going to remain shut down for an undetermined period of time to

22   become a closed training facility.

23   Q    Had you ever seen a closed training facility like that

24   before?

25   A    I had not.



1    Q    How was training performed before the centralization?

2    A    Baristas, new baristas were hired into whatever store was

3    going to be their home store by that store manager, and then

4    the training was done on the floor of that home store by what's

5    called a barista trainer.

6    Q    Are barista trainers compensated?

7    A    They are.

8    Q    Had you ever experienced a -- let me withdraw that.

9    While on the national shutdown, how were employees trained in

10   the market?

11   A    They were all being trained within that closed store.

12   Q    Had you ever experienced anything like that before?

13   A    I had not.

14   Q    What impact did, if any, did the centralizing of training

15   have on existing employees?

16   A    Well, it removed the -- the aspect of getting to know your

17   new coworkers prior to them entering your store as fully-

18   trained baristas.  It also took the -- the training bonuses

19   away from the trained barista trainers within those stores.

20   Q    Did you observe any of the new hires that came from that

21   training facility?

22   A    I did, yes.

23   Q    How many?

24   A    Five of them were brought into Elmwood in late October.

25   Q    And how, in your opinion, was the work performed?



1    A    It appeared that they had little to no training.

2    Q    And I apologize if I -- if I didn't ask this, but what is

3    a barista trainer?  What do they do?

4    A    A barista trainer is a kind of a position between a

5    barista and a shift supervisor.  They go through a tra --

6        MS. POLITO:  I'm going to object again, Judge.  This

7    witness is not a barista trainer, so she cannot testify as to

8    what a barista trainer does.  She can only testify to what

9    she's maybe perhaps herself witnessed or experienced, not what

10   these other people may or may not have experienced during their

11   training.

12       JUDGE ROSAS:  Sustained.  Foundation?

13   Q    BY MS. CACACCIO:  Have you ever been a barista trainer?

14   A    Yes, I have.

15   Q    Can you tell us what a barista trainer does?

16   A    A barista is a barista who goes through a training process

17   to learn how to train other baristas.

18   Q    So how -- how was their work performance when they came

19   back from that training facility?

20   A    It was poor --

21       MS. POLITO:  Object that there has been no indication that

22   she's worked with each of these five individuals, who they are,

23   what their role was.

24       JUDGE ROSAS:  Object -- sustained as to form.  A little

25   vague.



www.escribers.net | 800-257-0885

1    Q    BY MS. CACACCIO:  Did you work with any of these baristas

2    when they came back from the training facility?

3    A    Yes, I did.

4    Q    And what did you observe?

5    A    That their training was poor or nonexistent.

6    Q    Why do you think that?

7    A    They approached me to tell me that.

8    Q    And so what did you do?

9        MS. POLITO:  Objection.  Hearsay.  Those individuals can

10   come in and talk about their experiences.

11       MS. CACACCIO:  Your Honor, this witness has already

12   testified that she's observed their behavior.  I can go into

13   that more, if you'd like.

14       JUDGE ROSAS:  Well, as to statements that other employees

15   told this employee, I'm going to sustain the objection, unless

16   you can assure me that there will be a specific instance of a

17   corroboration, and that would have to be specified here --

18       MS. CACACCIO:  I'll do it the short way.

19       JUDGE ROSAS:   -- what she is referring to.

20       MS. CACACCIO:  I understand.

21   Q    BY MS. CACACCIO:  Did you ever observe them yourself?

22   A    Yes, I did.

23   Q    What did you observe?

24   A    Would you like a name?

25   Q    Yes, please.



1    A    The first day that Malik Code, Malik goes by August now,

2    was on the floor, I was assigned by the shift supervisor to

3    shadow them.  They were on the point of sale location, which is

4    the front register.  We were talking.  It appeared that they

5    were distressed.  I asked, you know, if they were okay, and

6    they said, I just wanted to let you know that I feel completely

7    untrained to be here right now.  And I said that was okay.  We

8    understood what was going on, and that I would help them in any

9    way that I could.

10    Q    How was training handled after Walden and Anderson

11    reopened to the public?

12    A    There were two other stores.  One of them might have

13    remained the Walden Anderson location, that were solely acting

14    as training stores.  So they weren't closed, but all of the

15    baristas that were being hired were being trained in one of two

16    locations in Buffalo, not necessarily at the store that would

17    become their home store.

18    Q    And do you know what stores those were?

19    A    I think that they were Niagara Falls Boulevard and East

20    Robinson.

21    Q    And where were the new hires that were just trained -- or

22    that were just brought into your store trained?

23    A    They were trained at the Walden Anderson location.

24    Q    The ones that came in just three weeks ago?

25    A    Oh, I'm so sorry.  The -- I've only spoken to one, Al



1    (phonetic).  Al said they were trained for one week at Niagara

2    Falls Boulevard, and then they were trained for one week at the

3    Tonawanda location.

4    Q    I'd like to direct your attention to your wages.  When was

5    the last time you received a seniority-based wage increase with

6    Respondent?

7    A    I have -- I have not received a seniority-based wage

8    increase.

9    Q    Have you ever heard of such a thing?

10   A    I had not heard of such a thing until October of 2021.

11   Q    And what happened with that?

12   A    There was an announcement made from the company, I believe

13   the date was October 27th, 2021, that they would be

14   implementing a seniority-based raise increase.

15   Q    And how was it announced?

16   A    I heard it through the media, initially.

17   Q    And what about after that?  Did you ever hear it from the

18   company itself?

19   A    There was a -- it appeared in the weekly update, which

20   would have been the following, I think the 27th was the

21   Wednesday, so it would have appeared in the following weekly

22   update, which would have been Monday.  Whatever the Monday was.

23   Q    And from the company, did you ever learn what the terms of

24   that seniority-based raise were going to be?

25   A    Yes.  I -- they were a bit vague, but it essentially said



1    if you've been with the company for six years or more, you

2    could get up to a ten percent wage increase, and if -- if you

3    had been with the company for between two and five years, it

4    was some other percentage.  I didn't pay attention to it --

5    that because it didn't -- it didn't pertain to me.

6    Q    And in your ten plus years with the company prior to this,

7    had you ever received a seniority-based wage increase?

8    A    I had not.

9    Q    And was this something that had been discussed before it

10   occurred?

11   A    It was a major talking point of the union campaign.

12   Q    And did you ever receive one, as far as you know?

13   A    A seniority --

14       MS. POLITO:  Objection.  Asked and answered.

15       JUDGE ROSAS:  Repeat the question?

16       MS. CACACCIO:  I asked if she ever received one.

17       JUDGE ROSAS:  A seniority-based wage increase?

18       MS. CACACCIO:  Correct.  The one that was announced.

19       JUDGE ROSAS:  Did she received a -- one for the first

20   time?

21       MS. CACACCIO:  Has she rec -- did she receive one after

22   the announcement.

23       JUDGE ROSAS:  You're objecting to that, Counsel?

24       MS. POLITO:  It's -- she already asked it and answered it,

25   Judge.



1        JUDGE ROSAS:  Not that I recall.  Overruled.

2        You can answer.

3    Q    BY MS. CACACCIO:  Did you receive one after the

4    announcement?

5    A    Not that I'm -- not that I'm aware of, no.

6    Q    I want to direct your attention to the Employer's leave

7    request policies.  What do you have to do if you want to take

8    time off?

9    A     It depends on the circumstances.  If it's just a vacation,

10   there's a partner hours app.  You go into that, there's a

11   little plus sign for requests offs, and then you submit the

12   dates that you are requesting off.

13   Q    And what if it lasts longer than two weeks?

14   A    Until recently, the -- there -- there -- there was no

15   stipulation or restrictions on that as far as I know.

16   Q    And what do you -- what do you mean, "until recently"?

17   A    I've since been told that if you're going to take a --

18   a -- a leave for more than two weeks, you have to apply for a

19   leave of absence, which is very different.

20   Q    How did you learn that?

21   A    A coworker tried to take a -- a two-and-a-half-week

22   vacation, and was told that she was going to have to apply for

23   a leave of absence if she wanted to be away from the store for

24   that long.

25        MS. POLITO:  Objection.  Hearsay.



1       JUDGE ROSAS:  Hold on.  What?

2       MS. POLITO:  It's hearsay.  The coworker can come in and

3   testify as to her experiences.  There's no reason for Ms.

4   Eisner (sic) to be testifying as to what a coworker may or may

5   not have done with respect to a request for leave.  It's all

6   speculation and hearsay, Judge.

7       MS. CACACCIO:  And the coworker will testify, Judge, but

8   this witness has direct knowledge about it.

9       JUDGE ROSAS:  Subject to.  Overruled.

10  Q    BY MS. CACACCIO:  Who was it?

11  A    Jaz Brisack.

12  Q    And what happened there, do you know?

13  A    She was told that the vacation request was being denied.

14  She would need to apply for a leave of absence if she wanted to

15  take the time off.  She did go through the process of applying

16  for the leave of absence, was assured that it would be

17  approved, and then found out it was later denied.

18  Q    What do you know about leaves of absence?

19  A    Up until the point of the pandemic, a leave of absence was

20  only approved for medical reasons.

21  Q    How do you know that?

22  A    Because I tried to take a leave of absence, or looked into

23  taking a leave of absence, back in 2016, I believe, and I was

24  told by the company that unless it was for medical reasons, it

25  would not be approved.



1    Q    And did you ever end up taking a leave of absence for any

2    reason?

3    A    In the winter of 2018, I broke my ankle, and did take a

4    leave of absence for a medical reason.

5    Q    And what about now?  What are leaves of absence used for

6    as far as you know?

7    A    As far as I know, the policy has not changed.  At least

8    I've not seen a written policy change.  The pandemic, it seemed

9    like there was a loosening of that.  During the pandemic,

10   partners were encouraged to apply and take leaves of absence

11   shortly after the stores reopened in -- in the early stages of

12   the pandemic, because if -- the company said, if you would like

13   to take a leave of absence and utilize the unemployment

14   benefits as opposed to staying on our payroll and not being

15   able to be given the number of hours you would need, then they

16   were encouraging people to do that.

17   Q    Are you familiar with a person by the name of Cassie

18   Fleischer?

19   A    Yes, I am.

20   Q    How do you know her?

21   A    She's a friend.  She's also one of my partners at the

22   Elmwood location.

23   Q    Is she currently?

24   A    She is not.

25   Q    What happened?  Do you know what happened?



```
 1    A    She was --

 2         MS. POLITO:  Same objection, Judge.  If Ms. -- Ms.

 3    Fleisher can come in and testify.  Ms. Eisner (sic) has no

 4    knowledge, other than what Ms. Fleischer has said to her about

 5    her termination.  She should not be permitted to testify about

 6    Ms. Fleischer's exiting from the company.  It's all hearsay.

 7    It's all speculation, and it's not even a complete record.

 8         MS. CACACCIO:  May I be heard?

 9         JUDGE ROSAS:  Let's -- let's -- let's rephrase that and

10    establish some foundation as to her knowledge regarding that

11    individual's status with the company.

12    Q    BY MS. CACACCIO:  How do you know that she doesn't work

13    there anymore?

14    A    She doesn't work there anymore, and she told me when she

15    was terminated.

16    Q    Were you part of the situation at all?

17    A    I was, yes.

18    Q    How?

19    A    I sat in as a witness, a union witness, to a meeting

20    between Patty Shanley, our store manager, and Michaela Murphy,

21    our district manager.

22    Q    Did you record that meeting?

23    A    Yes, I did.

24    Q    How did you record it?

25    A    I used my Apple Watch.
```



1    Q    And what did you do after you recorded it?

2    A    I sent it to Ian Hayes, our attorney.

3    Q    And have you listened to it?

4    A    I have.

5    Q    Is it full and accurate in its representation?

6    A    It is, yes.

7        MS. CACACCIO:  So Your Honor, we have another recording.

8    I don't know how you want to handle it.  I don't know if --

9    it's noon.  Do you want to do it -- do you want to start it?

10   Do you want to do it now?

11       JUDGE ROSAS:  We'll do it now.

12       MS. CACACCIO:  Okay.

13       JUDGE ROSAS:  Does anybody need to take a -- a -- a five-

14   minute break?

15       MS. POLITO:  No, but I do have some voir dire before it

16   starts, please.

17       JUDGE ROSAS:  You have what?

18       MS. POLITO:  Some voir dire on the recording before it

19   starts.

20       JUDGE ROSAS:  Go ahead.

21              **VOIR DIRE EXAMINATION**

22   Q    BY MS. POLITO:  So Ms. Fleischer -- or I'm sorry, Ms.

23   Eisner (sic), you indicated that Ms. Fleisher was going into a

24   disciplinary meeting and asked you to be a witness; is that

25   correct?



1      MS. CACACCIO:  Objection.  Assumes facts not in evidence.

2  That's not what she testified to.

3      JUDGE ROSAS:  Repeat the question?

4      MS. POLITO:  The question was whether or not Ms. Fleischer

5  asked Ms. Eisner (sic) to attend a disciplinary meeting with

6  her.

7      JUDGE ROSAS:  Overruled.  You can answer.

8  A    She asked me to attend the meeting with her.

9  Q    BY MS. POLITO:  Did she think she was going to be

10  terminated at the meeting?

11  A    She --

12      MS. CACACCIO:  Objection.  Speculation.

13      JUDGE ROSAS:  Sustained.  Rephrase.

14  Q    BY MS. POLITO:  Isn't it a -- the meeting was scheduled

15  with respect to Ms. Fleischer's termination; isn't that

16  correct?

17      MS. CACACCIO:  Objection.  Speculation.

18      JUDGE ROSAS:  Hold on.  Hold on.  I'm going to sustain the

19  objection.  It's beyond the scope of voir dire with respect to

20  this audio --

21      MS. POLITO:  Well, -- well --

22      JUDGE ROSAS:  -- that's being offered to be played, before

23  it's played.

24      MS. POLITO:  Okay, Judge.

25      JUDGE ROSAS:  Go ahead.  Any other questions regarding



1    that?  You can save all that for cross.

2    Q    BY MS. POLITO:  The recording that you took on your Apple

3    Watch, you then -- after the recording, you gave to Mr. Hayes?

4    A    That is correct.

5    Q    And -- and how did you send it to Mr. Hayes, through a

6    Google drive?

7         MR. HAYES:  Your Honor, objection.  I -- I -- over here,

8    Your Honor.  I've been kind of lax about this so far, but these

9    questions have to -- are covered by attorney-client privilege,

10   if it's about communications between Ms. Eisen and me.

11        MS. POLITO:  It again, Judge, goes to the authenticity of

12   the recording.  If she do -- does it on the watch, sends it in

13   a different format, over the --

14        JUDGE ROSAS:  Yes, abso -- overruled.

15        You can answer.

16   A    Yes, it was sent, I believe, via Google Drive.

17   Q    BY MS. POLITO:  Did you send anyone else?

18   A    Not that I'm aware of.

19   Q    And your understanding is that you sent a complete copy of

20   the re -- of the audio recording from March 19, '22?

21   A    Yes.

22   Q    And do you still have the original recording?

23   A    I do, yes.

24        MS. POLITO:  That's all I have, Judge.

25        JUDGE ROSAS:  Objection as to this audio?  What is the



1    exhibit number?

2         MS. CACACCIO:  34(a) is the recording.

3         JUDGE ROSAS:  All right.  Same objection as to the audio

4    recording.  General Counsel's 34(a) is -- will be played.

5    Overruled.

6         MS. POLITO:  Same -- same standing objection, Judge, with

7    respect to --

8         JUDGE ROSAS:  Correct.

9         MS. POLITO:  Thank you.

10         MS. CACACCIO:  And 34(b) is the transcript.

11                    **RESUMED DIRECT EXAMINATION**

12    Q    BY MS. CACACCIO:  How many people were in this meeting?

13    A    Four.

14    Q    And who are they?

15    A    Michaela Murphy, our district manager.  Patty Shanley, the

16    then store manager of Elmwood.  Cassie Fleischer and myself.

17    Q    And are there any other voices on this recording as far as

18    you know?

19    A    You're going to -- we met in a cafe, not -- not the

20    Elmwood location, so you're going to probably hear people at

21    other cafe tables.

22    Q    And about how long was the meeting?

23    A    A little over a half-hour, I think.

24    Q    Did you --

25    A    Or somewhere in there.



1    Q    Did you make any alterations to the recording?

2    A    I did not.

3    Q    And I'd -- I'd like to point out myself that the back of

4    this says "Employer Captive Audience Meeting".  I assure I had

5    nothing to do with that.  I don't know why it keeps saying

6    that.  But we're happy to change that on 34(b).

7         JUDGE ROSAS:  What -- what -- what did you say at the

8    outset?

9         MS. CACACCIO:  It -- it's listed as a captive audience

10   meeting, which is not something that we said.

11        JUDGE ROSAS:  Correct.

12        MS. CACACCIO:  But that's what it's listed as and so we're

13   happy to change that --

14        JUDGE ROSAS:  Okay.

15        MS. CACACCIO:  -- preemptively.

16        JUDGE ROSAS:  Okay.

17        MS. CACACCIO:  The recording was playing, but I am not

18   plugged in.  So nothing was happening.  So I'm trying to figure

19   out what's going on here.  So if you give me just a second to

20   plug in.

21   Q    BY MS. CACACCIO:  Sorry.  Before we play it.  Does this

22   recording cover the meeting in its entirety?

23   A    It does, yes.

24   (Audio played at 11:58 a.m., ending at 11:58 a.m.)

25   Q    BY MS. CACACCIO:  And do you remember when this meeting


www.escribers.net | 800-257-0885

1     occurred?

2     A     It was the evening of Wednesday, March 9th.

3     Q     And where were you?

4     A     We were at Dash's Market, which is on the corner of Hertel

5     and -- I don't know if it's, maybe, Parkside.

6     (Audio played at 11:58 a.m., ending at 11:58 a.m.)

7         MS. CACACCIO:  Your Honor, the meeting -- the

8     transcription for the meeting begins at about 3 minutes and 40

9     seconds in, and it ends about a minute 30 before the

10    transcription ends.  As we discussed before, I'm happy to play

11    the first 3 minutes and 40 seconds, if you like.  Given that

12    you're not going to be able to do it.

13    (Audio played at 11:59 a.m., ending at 12:02 p.m.)

14    Q     BY MS. CACACCIO:  So what's been happening up to this

15    point?

16    A     That's us walking through the parking lot into the back

17    entrance, through the bottom part of the store, up an

18    escalator, and then eventually to the table that Patty and

19    Michaela are sitting at.

20    Q     When you say "us", who do you mean?

21    A     Myself and Cas -- Cassie Fleischer.

22        MS. CACACCIO:  We're at 3:23 on the recording.

23    (Audio played at 12:02 p.m., ending at 12:02 p.m.)

24    Q     BY MS. CACACCIO:  Who responded "sure"?

25    A     Patty.



1    Q    And who's Patty?

2    A    Patty Shanley was the store manager at Elmwood.

3    (Audio played at 12:03 p.m., ending at 12:03 p.m.)

4    Q    BY MS. CACACCIO:  Who was that voice?

5    A    Michaela Murphy.

6    (Audio played at 12:03 p.m., ending at 12:03 p.m.)

7    Q    BY MS. CACACCIO:  Who is that?

8    A    That's Michaela Murphy.

9    (Audio played at 12:03 p.m., ending at 12:05 p.m.)

10   Q    BY MS. CACACCIO:  Who responds?

11   A    Cassie.

12        MS. CACACCIO:  We're at 5:31.

13   (Audio played at 12:05 p.m., ending at 12:07 p.m.)

14   Q    BY MS. CACACCIO:  Who is this voice?

15   A    Michaela Murphy.

16        MS. CACACCIO:  We're at 7:37.

17   (Audio played at 12:07 p.m., ending at 12:10 p.m.)

18   Q    BY MS. CACACCIO:  Who's speaking right now?

19   A    That is Patty Shanley.

20        MS. CACACCIO:  We're at 1:14 -- I'm sorry -- 11:14.

21   (Audio played at 12:11 p.m., ending at 12:14 p.m.)

22   Q    BY MS. CACACCIO:  Who's talking right now?

23   A    Michaela Murphy.

24   Q    We're at 14:48.

25   (Audio played at 12:14 p.m., ending at 12:21 p.m.)



1    Q    BY MS. CACACCIO:  Who's talking right now?

2    A    Michaela Murphy.

3    Q    And who is that?

4    A    Our district manager.

5    Q    We're at 21:08.

6    (Audio played at 12:21 p.m., ending at 12:31 p.m.)

7         MS. CACACCIO:  So that's the end of the transcription, but

8    the recording continues, but I will play it per your request.

9    (Audio played at 12:31 p.m., ending at 12:33 p.m.)

10   Q    BY MS. CACACCIO:  What happened between the end of the

11   meeting and the end of the recording?

12   A    We were going back down the escalator.  I think Cassie

13   bought a salad for dinner, and then we walked out to the

14   parking lot.

15   Q    Is this recording a full recording of the meeting?

16   A    It is, yes.

17   Q    Did you make any alterations to it?

18   A    I did not.

19        MS. CACACCIO:  Your Honor, I now offer General Counsel's

20   34(a), which is the recording.  And I'm going to be offering

21   34(b) with some, I think, easy oral amendments.  Unidentified

22   speaker 3, as Ms. Eisen just testified, is herself as we -- as

23   we've all heard.  Unidentified speaker 2 is Ms. Cassie

24   Fleischer.  Unidentified speaker 1 is Ms. Patty Shanley.  And

25   unidentified speaker 4 is Ms. Michaela Murphy.  And rather than



1    employer captive audience meeting, it should say meeting on

2    March 9th, regarding Ms. Fleischer.

3        JUDGE ROSAS:  Respondent?

4        MS. POLITO:  Judge, same standing objections with respect

5    to the other recording and transcript.

6        JUDGE ROSAS:  Okay.  Same ruling.  General Counsel's 34(a)

7    is received.

8    **(General Counsel Exhibit Number 34(a) Received into Evidence)**

9        JUDGE ROSAS:  General Counsel's 34(b) will be considered

10   at the time it is submitted.  I do have a question for General

11   Counsel.  I haven't seen these.  I was told that they were

12   referred to as unidentified speakers.  Are they now referred to

13   in some instances as speaker 1, 2, 3, and so on?

14       MS. POLITO:  Yes.

15       MS. CACACCIO:  Yes, Judge.  In this -- in this particular

16   recording.  It depended on who transcribed it.  In this

17   particular it's identified speaker 2, unidentified speaker 4.

18   They're not all like that, Judge, but this one is.  And I am

19   offering it at this time.  And if what you're asking is that I

20   make those changes within the document, I can do that.  But I

21   think that in this specific instance, I can -- we can do it the

22   way I just proposed.

23       JUDGE ROSAS:  So -- so this transcript refers to

24   unidentified speakers 1 through 4?

25       MS. CACACCIO:  Correct.



1      JUDGE ROSAS:  Okay.  So it seems to me that all you'd need

2  to do there is just to have a glossary or something that'll say

3  at the outset who 1, 2, 3, and 4 are.  But you don't have that

4  in the others?

5      MS. CACACCIO:  Correct.

6      JUDGE ROSAS:  Okay.

7      MS. CACACCIO:  There may be -- there may be others that do

8  have it, but the ones we talked about today it's not --

9      JUDGE ROSAS:  So that would suffice.  If there's some

10  easier way of doing it rather than revising references to

11  unidentified speakers, that would be fine.  But just wondering.

12  Okay.

13      MS. CACACCIO:  Could we just have a brief moment?

14      JUDGE ROSAS:  Okay.  Off the record.

15  (Off the record at 12:35 p.m.)

16      MS. CACACCIO:  I just want to make sure that I actually

17  offered Exhibit 29(a).  It was the recording -- oh.  What

18  happened to our sound system?  Hang on.  We lost the power.

19      JUDGE ROSAS:  Oh.  Did I --

20      MS. CACACCIO:  Nope.  Your Honor, did you touch the thing?

21      JUDGE ROSAS:  I did.

22      MS. CACACCIO:  Okay.

23      MS. POLITO:  It's on.

24      MS. CACACCIO:  It's on?

25      MS. POLITO:  This guys on.



1     MS. CACACCIO:  Okay.

2     JUDGE ROSAS:  Does that help with --

3     MS. POLITO:  Yes, Your Honor.  It's now playing --

4     JUDGE ROSAS:  -- the regular audio in the room as well?

5     MS. POLITO:  Yes.  It's a -- it's a little -- little

6     heavy, but it actually is helping a lot, so thank you.

7     JUDGE ROSAS:  Good.

8     MS. CACACCIO:  I just want to confirm that I offered

9     Exhibit 29(a), which was the recording of October 20th from

10    this morning.  I thought that I did.  And I thought it was

11    admitted, but I want to confirm that I did it.  Are we on the

12    record?  Sorry?  Okay.  Good.

13    JUDGE ROSAS:  I believe everything has gone in.

14    MS. CACACCIO:  Okay.

15    JUDGE ROSAS:  If it's not in, it's in over objection.

16    MS. CACACCIO:  Okay.

17    JUDGE ROSAS:  Continuing objections for all of them.

18    MS. CACACCIO:  Your Honor, at this time I have no further

19    questions for Ms. Eisen subject to re-call, of course, in the

20    event that documents are produced to which we need to re-call

21    her.

22    JUDGE ROSAS:  Charging Party?

23    MR. HAYES:  Thank you, Your Honor.

24                          **DIRECT EXAMINATION**

25    Q   BY MR. HAYES:  Michelle, I'm going to ask you a few


www.escribers.net | 800-257-0885

1    questions about the testimony you've already given in this

2    hearing.  And because of the way we've had to do this, that's

3    going back a couple days, so if you don't understand what I'm

4    asking about, just say so, okay?

5    A    Okay.

6    Q    All right.  Do you remember testifying about having a

7    support manager come and replace another support manager who

8    was temporarily not in your store?

9    A    I do, yes.

10   Q    Okay.  In your experience, did that same thing happen with

11   store managers before August of 2021?

12   A    It did not, no.

13   Q    What would happen if a store manager wasn't in the store?

14   A    If the store manager was on vacation there would be a

15   proxy store manager who would be the store manager of another

16   store in the area.  They may stop in on occasion to check on us

17   but they wouldn't be stationed in the store at the frequency

18   that the -- the actual store manager would be there.

19   Q    Does that mean that the proxy store manager wasn't

20   physical assigned to your store in that case?

21   A    No, not physically.  They would call and check in.  They

22   may stop in on the way to their store that they would be

23   responsible for.  They would be the person we would call if

24   there was an issue that couldn't be handled by one of the shift

25   supervisors.



1    Q    Okay.  And before September of 2021 did you ever see more

2    than one manager working in a store at a time?

3    A    Assigned to that store?

4    Q    Well, we'll take it one at a time.  First of all --

5    yeah -- answer the question about being -- having more than one

6    manager assigned to a store.

7    A    No.

8    Q    Did you ever see more than one manager work in a store?

9    A    No.

10   Q    And you're answering based on your entire experience with

11   Starbucks, right?

12   A    Yes, I am.

13   Q    Now, you -- you testified about a series of listening

14   sessions that you experienced in the -- in the Company,

15   correct?

16   A    Yes.

17   Q    Before September of 2021, how many listening sessions had

18   you attended while working for Starbucks?

19   A    Zero.

20   Q    Are you aware of any listening sessions happening aside

21   from ones you might have attended?

22   A    I was not.

23   Q    I'm going to ask you about the listening session on

24   October 20th.  Do you remember testifying about that?

25   A    Yes, I do.



1    Q    Okay.  Did you believe that attendance at that meeting was

2    mandatory?

3    A    I did, yes.

4    Q    Based on what?

5    A    It was an invitation handed to me with a listed scheduled

6    time and location to attend.

7    Q    Did you have to sign in and out of those listening

8    sessions -- the four that you testified about?

9    A    Yes, we did.

10   Q    What -- what did the sign-in -- sign-in and out process

11   look like?

12   A    It was partially rolled into the COVID policies and

13   procedures, so it said that we had been temped and that we, you

14   know, we passed whatever the COVID policy was.  It wanted us to

15   sign in with what the start time was and then the end time, I

16   assumed for payroll purposes.

17   Q    And did you do that for all four listening sessions about

18   which you've given testimony?

19   A    I don't believe they had an official sign-in -- oh, no.

20   Yeah, we did.  We did.

21   Q    For all four?

22   A    For all four, yes.

23   Q    Michelle, in -- I think it was the last listening session

24   that we heard -- heard a recording of there was a reference

25   towards the end to the store getting a keypad in order to enter



1    a bathroom.  Do you remember that?

2    A    I do, yes.

3    Q    Did that ever happen?

4    A    It did.

5    Q    Do you remember when?

6    A    It was not by the 28th of October, which I think was the

7    date that was stated in that recording.  It might have been

8    about a month later.

9    Q    So Michelle, these listening sessions that you've been

10   testifying about, did they have any effect on your health from

11   what you observed?

12   A    They did, yes.

13   Q    What effect?

14        MS. POLITO:  Objection, Judge.  What's the relevance?

15        JUDGE ROSAS:  I'll allow it.  Overruled.

16   A    At every listening session, except for the one I attended

17   on September -- September 10th -- I received a high heart rate

18   notification in my health app on my Apple Watch.

19   Q    BY MR. HAYES:  Okay.  Let's -- let's just explain that.

20   What's the health app?

21   A    It's an app -- an Apple app that tracks, I guess,

22   different -- a bunch of different things, but among them -- one

23   of the features is that it allows it to read your heartrate and

24   give you a reading should you need one.

25   Q    Okay.  And what is the alert that you just referred to?



1    A    It's literally just called a high heartrate alert.  And it

2    takes place when you've sustained a high heartrate for ten

3    minutes or more.

4    Q    Do you know what counts as a high heartrate?

5    A    For myself or for the app?

6    Q    For yourself.

7    A    For myself, anywhere over 120 would qualify as a high

8    heartrate.

9    Q    Do you know what that's based on?

10   A    It's based on the information that you enter into that

11   particular app when you download it or start it.

12   Q    All right.  So just tell us again, for which of the lis --

13   listening sessions did you receive a high heartrate alert?

14   A    September 19th, October 1st.  And October 20th I received

15   two.

16   Q    And did the -- did you get those alerts in the middle of

17   those meetings?

18   A    I did.  I did -- I mean, I felt my -- my -- I felt my

19   watch buzz, but I didn't look at it until after I had got out

20   of the meeting and I saw what it was for.

21   Q    Okay.  So the notification happened during those meetings,

22   and you saw it later, correct?

23   A    Yeah.  In real-time, yes.

24   Q    Outside of those meetings, how many times have you gotten

25   a high heartrate alert?



1   A   Zero.

2   Q   And how long have you had the Apple Watch?

3   A   Two years.

4   Q   Did you experience any health effects listening to the

5   recordings in this courtroom?

6   A   I experienced the same feelings I felt when I was in those

7   meetings.

8   Q   Does that include your heartrate?

9   A   Yes.

10  Q   You're not wearing your Apple Watch?

11  A   I am not.

12  Q   Were you allowed to bring it into the courtroom?

13  A   I was not.

14  Q   Are you able to tell when your heart is beating faster

15  than your normal rate?

16  A   Yes.

17      MS. POLITO:  Same objection, Judge, as to relevance.

18      JUDGE ROSAS:  I'm going to ask you to just step outside

19  over there.  I think I have a vague idea where you're going

20  with this, but enlighten me.

21      MR. HAYES:  First of all, I'll say, Your Honor, I'm

22  basically done.  I wanted this information on the record

23  because it goes to at least two issues that have come up since

24  this hearing started.  One of which is the playing of every

25  single recording that every witness has made, you know, in the



1    last ten months.  My contention is that evidentiary issues

2    aside, which are very important, the -- experiencing those

3    meetings in the first place included some kind of psychological

4    trauma for many of the witnesses.  And listening to the

5    recordings again, especially in the charged atmosphere of a

6    courtroom, retraumatizes or at least has the potential to

7    retraumatize witnesses.  So I -- you know, as part of the

8    project of us trying to figure out how to handle these

9    recordings, I need to add that as a consideration.  And

10   Michelle's here.  She's able to speak to that.  I wanted it on

11   the record.

12       JUDGE ROSAS:  And why is psychological trauma an issue in

13   this case?

14       MR. HAYES:  Well --

15       JUDGE ROSAS:  In a -- in a -- in an unfair labor practice

16   case?

17       MR. HAYES:  I -- I'm not offering it as part of an

18   analysis under the Act.  I'm offering it on the record because

19   of these evidence issues.  I -- I know later in the proceeding

20   witnesses might be re-called to offer just and proper evidence,

21   in which case I would argue it might be relevant then.  That --

22   I -- that is not the purpose for offering beforehand.

23       JUDGE ROSAS:  Is it the General Counsel's position that --

24   that certain effects or mental health effects be part of

25   consequential damages to be claimed in remedies?



1    MS. CACACCIO:  So Your Honor, it could be used for that

2    purpose, but it does go to the effect of whether these

3    meetings, you know, were captive audience meetings, how they

4    impacted employees, if they thought they were mandatory, how it

5    made them feel.  I mean, it certainly goes to remedy, Your

6    Honor.

7        JUDGE ROSAS:  There's no Board precedent on it yet.  So

8    I'm not going to -- I'm not going to belabor it too much, but

9    I'll let you have it on the record, but --

10       MR. HAYES:  Thank you, Your Honor.

11       JUDGE ROSAS:  -- over objection.  But I'm not going to go

12   down a collateral path here.

13       MR. HAYES:  Thank you, Your Honor.  That was -- that

14   wasn't my intent.

15       JUDGE ROSAS:  To -- to any significant extent.

16       MS. CACACCIO:  Understood.

17       MS. POLITO:  And -- and Judge, if it's being allowed in

18   the record, then -- and -- and the -- counsel to General

19   Counsel is indicating that it goes consequential damages then

20   I'm entitled to her medical records to explore her alleged

21   heart condition and stress and all that other stuff.  They're

22   opening the door for all of that information, pursuant to

23   subpoena duces tecum and testifying subpoena to serve on her.

24       MS. CACACCIO:  Your Honor, rather than me, on my own,

25   opening potentially -- even potentially opening the door to



1    that, I'd -- I'd probably have to consult the Region.  If you

2    agree with Respondent's position?

3        MR. HAYES:  And Your Honor, I'll just -- I'll just say

4    again that wasn't the reason.  I was, you know --

5        JUDGE ROSAS:  Well --

6        MR. HAYES:  -- going down this road, so.

7        JUDGE ROSAS:  You -- it wasn't the reason?

8        MR. HAYES:  Consequential damages were not the reason we

9    were asking --

10       JUDGE ROSAS:  So what would be --

11       MR. HAYES:  -- the question.

12       JUDGE ROSAS:  What would be the reason?

13       MR. HAYES:  The -- the issue of how this hearing is going

14   to be conducted over the next several months.

15       MS. POLITO:  Your Honor, if I may, that -- that has

16   nothing to do with this witness.

17       JUDGE ROSAS:  So what you're saying is how it effects

18   people is a consideration on how to conduct these proceedings?

19       MR. HAYES:  A consideration among many, yes.

20       JUDGE ROSAS:  Only for that purpose?

21       MR. HAYES:  Correct.

22       JUDGE ROSAS:  Okay.  Okay.  Yeah.  I mean, that's --

23   that's what it's being offered for the purpose of.

24       MS. POLITO:  Judge, I -- I ask that her testimony -- all

25   the testimony relating to her Apple Watch, her heart



1    condition -- all that be stricken from the record as completely

2    irrelevant and objectionable.  And it's just being put in the

3    record to serve to bolster or claim something we're not really

4    clear of.  She did the recordings.  She came in to testify to

5    the recordings.  The only way for the Respondent to know the

6    recordings is to listen to the recordings and have the people

7    identified.  I -- I think allowing that in the record is

8    severely prejudicial and improper and there is no relevance, as

9    was just discussed.

10    JUDGE ROSAS:  All right.  I'm -- I'm going to ask -- I

11    will certainly keep that in mind -- that's under

12    consideration -- a motion to strike such testimony.  I'm going

13    to ask the General Counsel and Charging Party to have some

14    discussions regarding this.  The one thing I don't want is for

15    this proceeding to delve down a process collaterally of -- as

16    counsel indicated.  If it's going to become relevant in any

17    respect with respect to the merits of the case, it could open

18    up to further litigation, such as you know, the subpoenaing of

19    documents and exploration of a witness's preexisting and any

20    current and any subsequent effects, impacts, permanent, you

21    know, impact.  So why don't you have some discussions on that,

22    and I'll deal with that either later today or -- or by tomorrow

23    at the latest.

24    MS. CACACCIO:  Your Honor, may I be heard very briefly --

25    JUDGE ROSAS:  Yeah.



1    MS. CACACCIO:  -- about something Respondent said --

2    Respondent Counsel said?  They suggested that the only way for

3    Respondent to be able to listen to these recordings and

4    identify speakers is by playing them in their entirety in the

5    courtroom.  And we've provided numerous different ways that

6    that could be done.  You know, this isn't my first case with a

7    recording, and I'm almost never seen it done like this.

8    Typically, the parties are able to get together.  They're able

9    to agree to a transcript.  We don't need to play these in their

10   entirety.  The -- the recordings, when they go in the record,

11   will be in the record.  And so you know, I object to -- to that

12   particular cross.

13       JUDGE ROSAS:  I can tell you 20 years of hearing this

14   stuff, sometimes it is, sometimes it ain't.  So it is what it

15   is.  All right.

16       Can I ask one of you to get some steps in?  And bring back

17   the witness?  Okay.

18       MR. HAYES:  Nothing further, Your Honor.

19       JUDGE ROSAS:  All right.  That concludes your testimony on

20   direct examination.  All right.  Now, to the question of cross-

21   examination; now or later.  I considered it.  I considered it

22   briefly, and I couldn't see any -- any reason justifying the

23   delaying of cross-examination until the Respondent's case.

24       As -- as the General Counsel has indicated, there's been

25   no production of documentation.  We have testimony from this



1    witness, aside from the audio tapes relating to her personal

2    involvement in this campaign.  Dealing with the Respondent.

3    The Respondent's managers and supervisors and officials.  And

4    so the time is now.  We will break.  It is approaching 1:00.

5    We will resume at 2:30 for cross-examination.

6         General Counsel, tender the Jencks material to the

7    Respondent.

8         MS. CACACCIO:  Your Honor, I will do that with the

9    exception of the one affidavit that we discussed earlier, which

10   I believe needs to be inspected in-camera.

11        MS. POLITO:  Judge, I would just like to note for the

12   record that we -- of course, the Respondent was not informed

13   that Ms. Eisen would be testifying.  And she's testified now

14   for the better half of two-and-a-half days, either through her

15   own oral testimony or through her audio recordings.  She's

16   referenced a number of documents, herself, that we will be

17   seeking via a subpoena duces tecum.  And for those reasons, we

18   believe that we've stated a sufficient basis to reserve our

19   cross-examination at a later date to be more judicious in terms

20   of asking her questions and then reviewing the appropriate

21   documents that she's testified to over the last two-and-a-half

22   days.

23        Your Honor is requiring us to go forward this afternoon.

24   We're going to ask for at least a minimum of two hours to

25   prepare for that cross-examination over the lunch period,



1    again, in light of the two-and-a-half days of testimony we've

2    taken so far.

3        JUDGE ROSAS:  Okay.  That's fine.  We'll resume at 3:00

4    then.  Off the record.

5    (Off the record at 12:58 p.m.)

6        JUDGE ROSAS:  On the record.

7        MS. CACACCIO:  Your Honor, I'm about to approach you with

8    an affidavit that Ms. Eisen gave to the Labor Board.

9        JUDGE ROSAS:  Oh.

10       MS. CACACCIO:  It's case -- it's 03-CA-295542.  This

11   affidavit is three pages in length and we're arguing that it

12   shouldn't be producible to Respondent as that case isn't

13   contained in this particular proceeding and that it's an

14   investigation with the Board.  And it could become a Jefferson

15   Chemical problem to the extent it becomes an issue here.

16       JUDGE ROSAS:  Okay.  We're off the record.

17   (Off the record at 12:59 p.m.)

18       MS. CACACCIO:  Now, I'm giving Respondent an affidavit of

19   three pages in length.  Another with case -- case number

20   296200, an affidavit that is 20 pages in length.  It's 285671.

21   And an affidavit that is three pages in length.  The case

22   number is 293469.  And I'm giving it to them now.

23       MS. POLITO:  Thank you.

24       JUDGE ROSAS:  You did?  Good.  Okay.

25       MS. CACACCIO:  Your Honor, I would like to note, with



1   respect to one of the affidavits, it's the --

2       JUDGE ROSAS:  Let me ask you something.  Hold on.  General

3   Counsel's 32, it was an email from Bridgett Shannon (phonetic)

4   to Alan Model.  What's the date of that email?

5       MS. CACACCIO:  January 14th, 2022.

6       JUDGE ROSAS:  Is that an email that is referred to in

7   paragraph 3 of this affidavit?

8       MS. CACACCIO:  No, Judge.  That should be a different

9   issue, I believe.  There's more than one bargaining issue,

10  Judge.

11      JUDGE ROSAS:  Okay.

12      MS. CACACCIO:  This -- this complaint only contains one

13  part, because --

14      JUDGE ROSAS:  The Respondent is familiar with this charge?

15      MS. POLITO:  I'm not familiar with the charge, Judge.  And

16  if they offer --

17      JUDGE ROSAS:  You've given them the index, right?

18      MS. POLITO:  I'm -- I'm sorry, what was it?

19      JUDGE ROSAS:  You've given -- you articulated the case

20  number, right?

21      MS. CACACCIO:  Yes, Judge.

22      JUDGE ROSAS:  Do you have the case number for the subject

23  of this affidavit?  They're both 03-CA-285671 and 2963469?  I

24  think there's too many --

25      MS. CACACCIO:  Yeah.



1       JUDGE ROSAS:  -- many letters there.

2       MS. CACACCIO:  Yeah.

3       JUDGE ROSAS:  Too many numbers.

4       MS. CACACCIO:  Yeah.  Those have been provided, Judge.

5       JUDGE ROSAS:  2 -- what's the right number there?

6       MS. STANLEY:  The right number.

7       MS. CACACCIO:  293469.

8       JUDGE ROSAS:  Okay.

9       MS. POLITO:  Which is one is being withheld, Judge?

10      MS. CACACCIO:  Neither of those.

11      JUDGE ROSAS:  It -- this references those two charges --

12      this affidavit.  It's in connection with those two charges.

13      MS. POLITO:  Okay.

14      MS. CACACCIO:  Right.  So --

15      MS. POLITO:  So they're trying to withhold a fourth

16      affidavit based on two charges, that that they're submitting

17      another affidavit, and potentially an email that relates to the

18      allegedly-withheld affidavit?

19      MS. CACACCIO:  No, Judge.

20      JUDGE ROSAS:  They -- they say it doesn't.  It's not

21      included.

22      MS. CACACCIO:  Correct.  So Judge, that affidavit -- if

23      you read that, that just says that Michelle previously gave

24      affidavits in other cases, not that it has anything to do with

25      that one.  It's just so that it skips the initial, I have



1    worked here for X years, and I did this and that.  That

2    affidavit has nothing to do with the previous one, only that

3    Michelle has given other affidavits to the Board previously.

4         MS. POLITO:  Am I entitled, Judge, to know what case

5    number that affidavit is referring to?

6         MS. CACACCIO:  I read it before I gave it to him.

7         MS. POLITO:  Yeah.

8         JUDGE ROSAS:  The two case numbers that -- that --

9         MS. CACACCIO:  That's the one on the top, Judge.  Top

10   right, that's the one she wants to have.

11        JUDGE ROSAS:  That's the case number?

12        MS. CACACCIO:  Yes, Judge.

13        JUDGE ROSAS:  03-CA-295542.

14        MS. POLITO:  And there's only one case number on the

15   affidavit, Judge?

16        MS. STANLEY:  Right.

17        MS. CACACCIO:  Correct.

18        JUDGE ROSAS:  That's correct.  So I was -- I was wrong.

19   This is the first paragraph that is referring to other

20   affidavits that she has given.

21        MS. CACACCIO:  Correct.

22        JUDGE ROSAS:  That should be considered with this

23   affidavit?

24        MS. STANLEY:  Correct.

25        MS. CACACCIO:  Only in that she gave those ones.


www.escribers.net | 800-257-0885

1    JUDGE ROSAS:  According to what she says here?

2    MS. CACACCIO:  Correct.  If I might be heard briefly, just

3    so you understand?  There is a -- there is a current charge

4    with the Board regarding meeting, whether it needs to be

5    in-person or virtually.  And that's what this affidavit is

6    regarding, which is not subject to this proceeding.  I don't

7    even know the state of that investigation, Judge.  But I can

8    find that out.

9    MR. HAYES:  It's not -- there hasn't been a merit

10   determination.  I mean, I'm saying that as the Charging Party.

11   MS. CACACCIO:  Okay.  Okay.  So it's an active

12   investigation, Judge.

13   JUDGE ROSAS:  I see Mr. Model, Ms. Shannon are featured

14   prominently in here.  This has nothing to do with -- it has --

15   it has everything to do with bargaining -- it's bargaining

16   topic, and it has nothing to do at all with General Counsel 32,

17   the only reference by this witness to any bargaining that

18   transpired, as far as her testimony is concerned.  So that's

19   fine.  This affidavit will be withheld.

20   MS. CACACCIO:  Yes, Your Honor.

21   JUDGE ROSAS:  Okay.  All right.  See everybody at 3:00.

22   MS. POLITO:  Can we do 3:07, Judge?

23   JUDGE ROSAS:  Well, let's -- let's -- that's fine.  That's

24   fine.

25   (Off the record at 1:07 p.m.)



1      JUDGE ROSAS:  Yeah.

2      MS. POLITO:  In the interim, right before you came back

3   in, we were just handed a ad testificandum subpoena for Ms.

4   Eisen, as well as a duces tecum subpoena for Ms. Eisen as well.

5   Respondent -- obviously we have objection to the ad

6   testificandum subpoena as the witness is here right now.  So

7   she shouldn't have to be subpoenaed to come back here, as she

8   is currently here in this moment to be questioned by

9   Respondent.

10      The duces tecum subpoena, we'll -- of course, we'll look

11   at it.  We haven't had a chance to do that, because it was just

12   handed to us, and we'll probably be filing petition to revoke.

13   But I can't know that until I've reviewed it.  But am objection

14   to the ad testificandum subpoena.

15      MR. HAYES:  And Judge, I guess the Charging Party would

16   join in that objection, and we plan on filing a petition to

17   revoke as well.

18      JUDGE ROSAS:  Okay.  All right.

19      You're on the stand.

20      Respondent, cross?

21                      **CROSS-EXAMINATION**

22   Q    BY MS. POLITO:  Good afternoon, Ms. Eisen.

23   A    Good afternoon.

24   Q    You've been working with Starbucks now for approximately

25   11 years; is that correct?



1    A    I think actually coming on 12.

2    Q    And you started -- your starting salary with Starbucks was

3    about 7.50 an hour; does that sound right?

4    A    Actually, I do not remember.  I think it might have been a

5    little bit higher than that.

6    Q    And are you currently making about 17.57 per hour?

7    A    I believe that's correct, yes.

8    Q    And the last time you got a raise was in October of last

9    year; is that correct?

10   A    I think so, yes.

11   Q    And you work at the Elmwood Store; is that correct?

12   A    I do.

13   Q    And you work two days a week; is that correct?

14   A    Current availability is Monday and Tuesday.

15   Q    And your current availability is Monday and Tuesday, but

16   in the past five weeks you've only worked about four shifts; is

17   that correct?

18   A    Yes.  That's subject to scheduling.

19   Q    Meaning that you can ask for other individuals to cover

20   shifts for you; is that correct?

21   A    Meaning that I wasn't scheduled for both Monday and

22   Tuesday.  But that was the store manager's scheduling, not my

23   doing.

24        MS. CACACCIO:  Your Honor, I'd ask that Ms. Polito speak

25   into the mic because I'm -- I'm having difficulty hearing.



1     Thank you.

2         MS. POLITO:  Yeah, I've got a lot going on over here, so

3     bear with me.

4     Q     BY MS. POLITO:  So the past five weeks you have worked

5     approximately four shifts though; is that correct?

6     A     That -- over the past five weeks, possibly.  I can't

7     really recall right now.

8     Q     You work opening shift; is that correct?

9     A     Typically.

10    Q     And what are those hours, 4 to 10?

11    A     4:30 would be when we would arrive and punch in.  And then

12    an opening shift can go -- anyway, a full opening shift would

13    be 4:30 to 1 p.m., I believe.

14    Q     Is that what you typically work?

15    A     It's when I'm available to work.  It hasn't been what I've

16    been scheduled.

17    Q     Now, when you say when it's available, that means that you

18    have told the store manager that you are available to work two

19    shifts a week.  So the opening shift, which would typically be

20    that time period, 4:30 to 1; is that correct?

21    A     Yeah.  I mean, it -- there's no set, this is an opening

22    shift.  But a typical shift would be -- if you worked a full

23    shift, it would be eight and a half hours, which would be an

24    eight-hour, on-the-floor shift, including a half hour lunch.

25    Q     But you had indicated that it's based on your



1    availability.  So my question is, your availability right now

2    to your store manager at the Elmwood store, that you're

3    available for two opening shifts; is that correct?

4    A    Correct.

5    Q    Any particular days?

6         MS. CACACCIO:  Objection.  Asked and answered.

7         JUDGE ROSAS:  Basis?

8         MS. CACACCIO:  That's how this cross-examination started,

9    Your Honor.

10        JUDGE ROSAS:  Is that different?

11        MS. POLITO:  I -- I just don't recall what her answer was.

12        JUDGE ROSAS:  Yeah.  Sustained.

13   Q    BY MS. POLITO:  And you also work for Workers United; is

14   that correct?

15   A    Correct.

16   Q    Do you work full time for Workers United?

17   A    I do, yes.

18   Q    And full time is 40 hours a week?

19   A    Yes.  It's a salaried position, but yes.

20   Q    Do you work more than 40 hours a week?

21   A    I think it depends on the week.

22   Q    Do you have a job description for director of partner

23   education?

24   A    Yeah.  It is partner outreach.  So I'm connected with

25   other organizing stores across the country.  If partners have



1    questions about that process, or the process that I personally

2    went through at the Elmwood location, I help guide them through

3    that.

4    Q    Are there other individuals that work for the Union that

5    have the same job title?

6    A    I do not know.

7    Q    And when did you start working for the Union?

8    A    Mid-February of 2022.

9    Q    Did you change your availability at the Elmwood store once

10   you started working full time for the Union?

11   A    No.  My availability change was made based on my schedule

12   for my other job at the theater.

13   Q    When is the last time you worked full time for Starbucks?

14   A    Pri -- it would have been before January of 2022.

15   Q    Is it fair to say that calendar year of 2021 you worked

16   full time for Starbucks?

17   A    Yes.

18   Q    And how many hours a week was that?

19   A    Full time per Starbucks standards is over 20 hours.  So I

20   was probably between 24 and 30 hours a week.

21   Q    And even though you started working as director of partner

22   education in 2022, you became involved with Union organizing in

23   August of 2021; is that correct?

24   A    That is correct.

25   Q    And is -- isn't it a fact that those that work with you at



1    the Elmwood store are aware of your Union organizing activity?

2    A    They are aware, yes.

3    Q    Including your managers?

4    A    Yes, they are.

5    Q    And since then you haven't had any discipline as a result

6    of your involvement in Union activities; isn't that correct?

7    A    I have never had any discipline at Starbucks.

8    Q    And you certainly have had any since you've been vocal

9    about your support of the Union organizing, correct?

10   A    I have not.

11   Q    During your direct examination, which I know has taken

12   place over a couple of days, so we'll bear with each other, you

13   had indicated that you had started wearing Union pins in August

14   of 2021.  Do you remember that testimony?

15   A    I do.

16   Q    And no one prevented you from wearing a pin; is that

17   correct?

18   A    That is correct.

19   Q    And you're aware that Starbucks has a one-pin policy?  Are

20   you aware of that?

21   A    I was not aware of that at the time, but I am now.

22        JUDGE ROSAS:  A what pin?

23        MS. POLITO:  One-pin policy, Your Honor.

24   Q    BY MS. POLITO:  And you became aware of that sometime

25   after August of 2021?



1    A    That is correct.

2    Q    And no one has ever told you to remove your pin; is that

3    correct?

4    A    No.  That is correct.  They've never told me that.

5    Q    And isn't it a fact that every time you've worked since

6    you've received your pins in, on, or about August of 2021 that

7    you wear a pin for every shift?

8    A    Just about, yes.

9        MS. CACACCIO:  Just before you -- if you tip that mic

10   down, I think it will help.  Yeah.  Excuse me.  I'm sorry.

11   Q    BY MS. POLITO:  Ms. Eisen, we talked about some of the

12   store petitions?

13       MS. POLITO:  Is that okay this way?

14       MS. CACACCIO:  That's much better.  Thank you.

15   Q    BY MS. POLITO:  During your direct examination do you

16   recall indicating that you received communications about a

17   petition from someone named Michael Sinobria (phonetic)?

18   A    I do, yes.

19   Q    And how did you receive the communication about a petition

20   from Michael Sinobria?

21   A    I -- in what format?  I'm sorry.

22   Q    Yes.

23   A    We were on a text message together, as well as an email

24   chain.

25   Q    Is the email chain your Michelle dot Renee dot Eisen at



1   Gmail dot com?  Is that the email that you use for these types

2   of messages?

3   A    Yes.

4       MS. CACACCIO:  Your Honor, I'm going to object to

5   relevance.

6       JUDGE ROSAS:  And this was relating to her testimony

7   regarding the petition?

8       MS. POLITO:  That's correct, Judge.  And we had testimony

9   for quite some period of time about her not only relating to

10  the petition but the method of getting that introduced into

11  evidence.  And she testified that she was aware of them from a

12  Michael Sinobria.

13      JUDGE ROSAS:  Overruled.

14      MS. CACACCIO:  Your Hon --

15      JUDGE ROSAS:  You can answer.

16  A    That is the email I use, yeah.

17  Q    BY MS. POLITO:  With respect to the Transit Commons

18  petition that was refiled, you also received notification of

19  that via text and email; is that correct?

20  A    If we're still talking about Michael Sinobria, then yes.

21  Q    Okay.  And on direct examination, I think perhaps during

22  voir dire, you indicated that you might have copies of those

23  messages.  Do you have your copies of those messages still?

24      MS. CACACCIO:  Your Honor, I'm going to renew my

25  objection.  It seems as though counsel is fishing for the duces



1   tecum subpoena that they just issued to assess it.

2       MS. POLITO:  Judge, on the last --

3       JUDGE ROSAS:  It's related -- it's related to the

4   testimony.  Overruled.

5   A    I don't know for certain.

6   Q    BY MS. POLITO:  Okay.  Do you know if you ever destroyed

7   any messages?

8   A    If I have emptied -- or like deleted messages?  I don't --

9   no, not deliberately.  I just --

10  Q    Okay.  With respect to the Walden & Anderson store and the

11  second petition that you discussed in direct examination, you

12  indicated that you were involved because you got an email from

13  the organizing committee; is that correct?

14  A    I was on an email with members of the organizing

15  committee, yes.

16  Q    Do you remember the names of the people on that organizing

17  committee?

18  A    Not all of them offhand.

19  Q    Can you tell me who you recall?

20  A    I think Colin Cochran, possibly Jess Rebeck (phonetic),

21  possibly Casey Moore (phonetic).

22  Q    Anyone else that you can recall?

23  A    Not of the top of my head, no.

24  Q    The district manager, in August of 2021, was David Buforia

25  (phonetic); is that correct?



1    A    That is correct, yes.

2    Q    You only had that one district manager, true?

3    A    In that month, or ever?

4    Q    In that month.

5    A    Yes.

6    Q    And on direct examination you indicated that he was in the

7    store frequently.  Do you recall that testimony?

8    A    I remember saying frequently after the campaign went

9    public.

10    Q    After August 26, '21, correct?

11    A    Correct, yes.

12    Q    And then we learned, after looking at a partner hub

13    message, that you had, in fact, been told that he was no longer

14    with the company as of September 8th; is that correct?

15    A    Correct.

16    Q    So how many times between August 26 and September 8th,

17    which I think is about ten days, did you actually see him in

18    the store?

19    A    About half a dozen times.

20    Q    Six times in that ten-day period?

21    A    Correct.

22    Q    Were you working at Starbucks during the time period?

23    A    I was there full time at that point.

24    Q    Full time, six days a week?

25    A    Full time, four days a week.



www.escribers.net | 800-257-0885

1    Q    And the -- the partner hub message that was publicized in

2    September of 2021, that's the same message that you indicated

3    was posted on the refrigerator at the Elmwood store; is that

4    correct?

5    A    Yes.  Correct.

6    Q    Prior to March of 2020, which is about when the pandemic

7    started, were you ever involved in any Union organizing

8    activity?

9    A    I was not.

10   Q    Was the first time you were involved in about August of

11   2021?

12   A    That is correct.

13   Q    Would you agree that the pandemic impacted the way that

14   the employees worked at Starbucks and how customers were

15   impacted?

16   A    I would agree.

17   Q    And that for a period of time Starbucks as a company

18   allowed individuals to take a leave of absence if needed?

19   A    During which period of time?

20   Q    During the pandemic.  Early stages of the pandemic?

21   A    Yes, I would agree with that.

22   Q    And isn't it a fact that Starbucks didn't require their

23   employees to return to work if they needed to take an extended

24   leave for any reason as a result of the pandemic?

25   A    I don't have an answer to that.



1    Q    Okay.  But you're aware of their leave of absence policy

2    because you testified to that earlier, correct?

3    A    I was aware of their leave of absence policy prior to the

4    pandemic.  I don't know if it's been adjusted.

5    Q    So when you testified earlier about Jaz's request for a

6    leave of absence which occurred this year, are you now saying

7    that you're not familiar with the current leave of absence

8    policy?

9    A    I believe I testified that that is what I was -- that she

10    told me she was told.  But I have never seen anything in

11    writing.

12    Q    Okay.  So you don't know what the actual policy is, you

13    were just relying on what Jaz was telling you?

14    A    Correct.  For the current policy, yes.

15    Q    So going back to the pandemic period, and when the store

16    started to reopen, you would agree that the reopening of stores

17    post-pandemic was slightly chaotic, correct?

18    A    It was.

19    Q    And particularly in New York the laws continued to change

20    with respect to mask wearing, also with respect to COVID

21    protocols upon entering the store, and even reopening cafes; is

22    that correct?

23        MS. CACACCIO:  Your Honor, I object.  Lack of foundation,

24    as well as compound question.

25        JUDGE ROSAS:  It's a little compound.  Break it down a



1     little bit.

2     Q     BY MS. POLITO:  You would agree that reopening the stores

3     after the pandemic started posed some difficulties for both the

4     staff and customers; is that correct?

5     A     From my perspective, yes.

6     Q     And one of those reasons was that individuals, both

7     employees and customers, had to wear masks; is that correct?

8     A     Oh, sure.  Yes.

9     Q     And another reason is that during the -- sometime

10    during -- after the pandemic customers and employees had to do

11    COVID screening to enter the store; is that correct?

12          MS. CACACCIO:  Objection.  Relevance.

13          JUDGE ROSAS:  Overruled.

14    A     Customers did not have to do COVID screening; employees

15    did.

16    Q     BY MS. POLITO:  Were there periods of time, after the

17    pandemic, where cafes were closed, yet -- and a drive thru was

18    left open as a result of continuing laws and regulations

19    regarding opening of cafes?

20          MS. CACACCIO:  Objection.  Lack of foundation.  There's no

21    testimony --

22          MS. POLITO:  She --

23          MS. CACACCIO:  -- whether this witness knows what the laws

24    of New York State were during the pandemic.

25          JUDGE ROSAS:  If you know.  Overruled.  It's cross-



1    examination.

2    A    I don't know in that regards.  And it doesn't have it

3    right here, so I don't know.

4    Q    BY MS. POLITO:  So were there times when the cafe at

5    Elmwood was closed as a result of the pandemic?

6    A    Completely shut down?

7    Q    Yeah.

8    A    Is that what you're asking?  Yes, we were completely shut

9    down for a period of time.

10   Q    Were there also periods of time during the pandemic that

11   the Elmwood store prevented mobile pickups?

12   A    No.  That wasn't part of the policy.  Actually, I think --

13   I think we encouraged that, actually, over in-person ordering.

14   Q    Okay.  So you encouraged your customers at the Elmwood

15   store to place their orders through a mobile app; is that

16   correct?

17   A    Yes.

18   Q    Are you aware of any times when that ordering or that

19   channel of ordering beverages was shut down during the

20   pandemic?

21   A    No, I'm not.

22   Q    At the Elmwood store, post-pandemic --

23        MS. POLITO:  Well, let me -- let me strike that.

24   Q    BY MS. POLITO:  Once the Elmwood store opened, after March

25   of 2020 and up until August of 2021, was Patty Shanley your



1   store manager that entire time?

2   A    She was not.

3   Q    She became your store manager in or about February of

4   2021?

5   A    No.  Late August of 2020.

6   Q    Late August of 2020.  Who was your store manager before

7   that?

8   A    Jenny Stanick.

9   Q    And you testified that Patty was one of the best store

10  managers you ever worked with; is that correct?

11  A    That is correct.

12  Q    So were there ongoing issues at the Elmwood store once

13  Patty became the store manager?

14  A    Can you be more specific?

15  Q    Did you have any concerns about the way that the Elmwood

16  store was operating once Patty became the store manager?

17  A    I didn't have any issues with the way she was doing her

18  job.

19  Q    And then after August of 2021, you testified earlier that

20  there were a number of listening sessions that you attended; is

21  that correct?

22  A    That is correct.

23  Q    And you testified that you assumed some of those listening

24  sessions were mandatory?

25  A    That is correct.



1    Q    But you have no documentation that suggests or indicates

2    that those meetings were actually, in fact, mandatory?

3    A    I don't have any documentation, no.

4    Q    And in fact, you testified that you were provided a note

5    to attend these particular sessions at a particular time, but

6    you chose not to go to that session; is that correct?

7    A    I chose not to go at that time, yes.

8    Q    So if it was mandatory, what did you expect would have

9    happened?  Would you -- were you expecting to be disciplined

10   for not showing up at the time that you were provided to

11   attend?

12   A    No, we'd been -- I did go to one of the meetings, so I

13   didn't miss anything.

14   Q    You went to a later meeting?

15   A    No, I went to an earlier meeting.

16   Q    So not the one that was on the note that was provided to

17   you, correct?

18   A    Correct.  Yes.

19   Q    The first listening session that you attended was on

20   September 10th, 2021; is that correct?

21   A    That is correct.

22   Q    And as I understand, there were a number of different

23   listening sessions between September, October, and November; is

24   that correct?

25   A    There were, yes.



1    Q    Did you attend all of the listening sessions?

2    A    No, I attended the one I was asked to attend for the

3    Elmwood location.

4    Q    And the recordings that have been introduced through your

5    testimony, do you have any other recordings of any other

6    listening sessions?

7         MS. CACACCIO:  Objection.  Relevance.

8         JUDGE ROSAS:  Do you have any -- repeat the question.

9    Q    BY MS. POLITO:  Do you have recordings of any other

10   listening sessions, other than the ones that were introduced

11   through your testimony.

12        MS. CACACCIO:  I objected to the relevance, Your Honor.

13        JUDGE ROSAS:  Overruled.

14   A    I do not.

15   Q    BY MS. POLITO:  Were you provided with recordings of other

16   listening sessions that were held in the Buffalo market that

17   you did not attend?

18   A    I was not.

19   Q    And when you went to the listening session on September

20   10th, had you prepared some type of speech to provide to the

21   partners that were at that session?

22   A    I did not.

23   Q    How many partners were at that session?

24   A    I believe, including myself, seven.

25   Q    All Elmwood partners?



1    A    All Elmwood partners, yes.

2    Q    And do you recall at that listening session that you had

3    stated to those present -- you keep referencing the Union as a

4    third party, but there's no party.  There's no third party.  Do

5    you remember stating that?

6    A    I do.

7    Q    Who told you to say that?

8    A    I said that on my own.

9    Q    You decided to say that on your own?

10   A    Correct.

11   Q    Had you done research into what you should be saying?

12   A    I did research into how to speak.

13   Q    No, what you should be saying with respect to union

14   organizing, prior to attending the September 9th meeting?

15   A    No, I did not.

16   Q    And no one provided you with notice as to what you should

17   or should not say?

18   A    No, they did not.

19   Q    You also indicated that you provided Mr. Hayes with a copy

20   of that audio recording.  Do you recall that?

21   A    I do.

22   Q    And Mr. Hayes is, in fact, a third party, correct?

23        MS. CACACCIO:  Objection.  Argumentative.

24        MS. POLITO:  It's cross-examination.

25        JUDGE ROSAS:  You can work from there.  Overruled.



1    A    He is a third party, in that he does not work for

2    Starbucks, yes.

3    Q    BY MS. POLITO:  Correct.  You also testified that you've

4    emailed to Mr. Bensinger a copy of an audio recording.  He's

5    also not a Starbucks partner; is that correct?

6    A    That is correct.

7    Q    So that would be a third party, correct?

8    A    Correct.

9    Q    At the 9/10 listening session, wasn't it your intent to

10   persuade partners to vote with the Union?

11   A    My intent was to let them know where I stood on the Union.

12   Q    And you also told them that you had no problem having

13   further conversations with anyone present.  Do you remember

14   stating that?

15   A    I do.

16   Q    You also provided talking points.  Were those provided to

17   you by the Union?

18   A    They were not.

19   Q    You developed those on your own?

20   A    I did.

21   Q    And during that initial listening session on September

22   9th, you mentioned that there were problems with facilities,

23   correct?

24   A    On September 10th.

25   Q    On September 10th.  I apologize.



1    A    I did, yes.

2    Q    And when you mentioned that there were problems with

3    facilities, you expected the Starbucks individuals that were

4    there to respond, didn't you?

5    A    I did.

6    Q    In fact, do you recall saying to them, it's embarrassing

7    to have to tell customers that they can't have something

8    because the nitro machine that was just broken two days ago and

9    worked for 12 hours is broken again, and that you need to

10    troubleshoot the problems.  Do you remember stating that?

11    A    I do.

12    Q    And so if the coffee machine was broken, was it your

13    expectation that someone from facilities was going to run right

14    over before trying to figure out if it could be resolved over

15    the phone?

16    A    I mean, that was just an analogy.  That wasn't an

17    immediate issue.  But yes, that's their job, is to send

18    somebody to fix those things.

19    Q    So you think, sitting here today, that the appropriate

20    response if a coffee machine is broken, is that a facilities

21    person should just run right over, rather than talking to a

22    partner to figure out if it could be resolved over the phone?

23    A    If the --

24        MR. HAYES:  Objection --

25    A    -- job of the business is to sell coffee, then I would



1    expect it to be fixed as immediately as possible.

2    Q    BY MS. POLITO:  And it might be fixed, though, if someone

3    pushed an on and off button, correct?

4    A    It's not quite that simple, and it's also not within my

5    job description to be troubleshooting facilities.

6    Q    So your position as a partner at Starbucks for 11 years is

7    that if the coffee machine is broken, your only job is to call

8    facilities and wait for someone to come fix it; is that

9    correct?

10       MR. HAYES:  Objection, argumentative and mischaracterizes

11   testimony.

12       JUDGE ROSAS:  Sustained.  You could try another question

13   or go about it a different way.

14   Q    BY MS. POLITO:  So you testified that you would call

15   facilities to -- you would expect facilities to come and fix

16   the problem if the coffee machine was broken, correct?

17   A    I did, yes.

18   Q    And that you had no expectation that facility should try

19   to have a conversation with a partner about a potential way of

20   fixing the machine before they actually, physically came into

21   the store?

22       MS. CACACCIO:  Objection, asked and answered.

23       JUDGE ROSAS:  I'll allow it.  You can answer.

24   A    Calling facilities to report an issue is actually the

25   protocol of the company.  There is no stated protocol that says



1  it is the partner's job to attempt to fix that issue first.

2  Q    BY MS. POLITO:  And that's your position as a partner of

3  Starbucks, that if a coffee machine is broken, your sole job is

4  to call facilities and wait for them to come and fix it?

5  A    And report the issue, yes.

6  Q    And you have no obligation to try to troubleshoot it

7  before facilities comes out?

8  A    I do not.

9  Q    The example that you provided in the 9/10 listening

10  session about the nitro machine being broken was post-pandemic;

11  is that correct?

12  MS. CACACCIO:  Your Honor, I'm going to object to the

13  vagueness of during the pandemic, post-pandemic.  I mean, we're

14  still in the pandemic.  So if there's a date range or

15  something, I think it would be --

16  JUDGE ROSAS:  Sustained, rephrase it.

17  Q    BY MS. POLITO:  So I'll rephrase that.  So -- and what I'm

18  referring to is when the store started to open after the world

19  was shut down in March of 2020.  The store started to open.  I

20  asked you earlier that there -- that was a chaotic period of

21  time; is that correct?

22  A    Correct.  Yes, it was.

23  Q    And during the example that you've given at the 9/10

24  listening session about the nitro machine being broken, that

25  was an example given after the stores were open sometime in



1    2020; is that correct?

2    A    Yes.  We had those issues prior to that, as well, but yes.

3    Q    And when you had those issues prior to March of 2020, who

4    did you share those concerns with or issues with?

5    A    I'm sure there is a list of facilities calls that were

6    made prior to March of 2020 relating to the same issue.

7    Q    How many times do you remember calling facilities about

8    the particular issue, prior to March of 2020?

9    A    As a barista, I don't have to make those phone calls.

10   Those are the shift supervisors or the store managers.

11   Q    So your job is to just let them know something's not

12   working?

13   A    Correct.

14   Q    From when the stores reopened in 2020 until the present,

15   have you only worked at the Elmwood store?

16   A    I have, yes.

17   Q    And typically speaking, how many employees are working

18   during the opening shift at the Elmwood store?

19   A    That's changed a bit.  It could be anywhere from one shift

20   supervisor to one barista to one shift supervisor and three

21   baristas, depending on the morning.

22   Q    Is it accurate to state that there has to be a minimum of

23   two people to open it?

24   A    That is accurate, yes.

25   Q    Is there a time period in which the third person needs to



1    be present to keep the store open?

2    A    That also fluctuates.  I don't know what they base that

3    off of.  Sometimes, the person is in at open, as opposed to

4    prior to open.  Sometimes, it's not until 7 a.m.

5    Q    And the times that you've worked at the Elmwood store

6    since the reopening in 2020 until the present, it's always been

7    during that opening shift; is that correct?

8    A    Sometimes, I'm in a 6:30.  Sometimes, I'm in at 7 a.m.  I

9    don't think I'm ever in later than 7 a.m.

10    Q    Are you always one of the two people to open the store

11    during the time you work?

12    A    I am not always one of the two people, no.

13    Q    Do you typically have the same team members that you work

14    with?

15    A    Yes.  I'd say it is a fairly small group, but yes.

16    Q    And who are the team members that you typically work with?

17    A    The shift supervisors I typically open with --

18         MS. CACACCIO:  Your Honor, I'm going to object to vague,

19    as to when.

20         MS. POLITO:  I'm talking --

21         MS. CACACCIO:  I mean, she's talked about --

22         JUDGE ROSAS:  What time?

23         MS. POLITO:  I'm talking about the same time period that

24    we're talking about, since the reopening of the store some time

25    in 2020 until the present.



1      MS. CACACCIO:  Your Honor, that's -- that time span is --

2    on direct examination, she testified about how that changed, so

3    that's --

4      JUDGE ROSAS:  If you can.  If you can.

5    A    I can't --

6      JUDGE ROSAS:  Overruled.

7    A    -- give you everything for the last two years.  But I

8    often open with Emily Hirsch and Jeremy Pasquale.  Those would

9    be the two shift supervisors I open with the most often.  As

10   far as baristas, that's going to fluctuate widely in the last

11   two years.

12   Q    Are there any baristas that you've consistently worked

13   with during the past year?

14   A    Yes.

15   Q    And who are they?

16   A    Angela Dudzik, August Code, Alyssa Warrior --

17     JUDGE ROSAS:  Spell the second one?

18   A    August, A-U-G-U-S-T, and Code is C-O-D-E.  There are

19   probably a lot more than that.  That's a handful of them.

20   Q    BY MS. POLITO:  Thank you.  Going back to the September

21   10th listening session, what made you decide to record the

22   session?

23   A    I wanted to be sure that I knew what was being said, and

24   that I didn't --

25     MS. CACACCIO:  Your Honor, asked and answered.  This



1   happened during the voir dire.  And I objected to that, and you

2   said it was essentially an extended cross-examination.

3        JUDGE ROSAS:  Hold on.  Is this 26(a)?

4        MS. POLITO:  Yes, it is, Your Honor.

5        JUDGE ROSAS:  I don't have a note on that, to the extent

6   to which it was voir dired.  I'll allow it.  You can answer if

7   you can.

8   A    I anticipated a lot of information being shared, and I

9   wanted to make sure I didn't miss anything that I could review

10  if I needed to.

11  Q    BY MS. POLITO:  So it's your testimony that no one told

12  you to record it.  You made that decision on your own; is that

13  correct?

14  A    That is correct.

15  Q    Who told you to email the recording to Mr. Bensinger?

16  A    I asked if anyone would want to hear it.  I didn't

17  actually know Mr. Bensinger until the next day.

18  Q    Who did you ask that question to?

19  A    I asked it to him.

20  Q    You asked it to Mr. Bensinger?

21  A    I did.

22       MR. HAYES:  Objection, relevance.

23       JUDGE ROSAS:  All right.  The answer can remain, but let's

24  see -- does it need to go beyond that?  Because I'm not seeing

25  the relevance of this line.



1       MS. POLITO:  The relevance relates to why she's recording

2    a conversation by -- a listening session and providing it to

3    someone by the name of Mr. Bensinger.  And she testified to it

4    earlier.  I'm entitled to ask her about that in cross-

5    examination.

6       MS. CACACCIO:  Your Honor, could I interrupt?

7       JUDGE ROSAS:  Go ahead.

8       MS. CACACCIO:  Just because the witness talked about it --

9    that was the subject of the voir dire at that time, as well.

10   That's how this appeared in the first place.  Just because

11   Respondent opened its own door to something that I objected to

12   at the time as nonrelevant, doesn't make it relevant now.  The

13   recording --

14      JUDGE ROSAS:  So establishing facts is one thing, and

15   pursuing those facts to some extent is -- is fine.  However,

16   when you're asking why, I don't understand why we need to know

17   why, from the standpoint of this witness.  We need to

18   establish, in this case, what transpired, right?  With respect

19   to the relevant material facts.

20      MS. POLITO:  That's exactly what I'm trying to do, Your

21   Honor.  She testified that she emailed this particular

22   recording to an individual.  Are you saying that I can't ask

23   her why she did that?

24      JUDGE ROSAS:  So does this have --

25      MS. POLITO:  Or who gave her direction to do that?



1    JUDGE ROSAS:  Does this have something to do with

2    contesting the authenticity of the evidence?

3    MS. POLITO:  Yes, and why -- and again, why it was done.

4    Why it was emailed.  And then, what happened to the audio

5    recording?  So it certainly is -- it's both, Your Honor.

6    JUDGE ROSAS:  I'm not --

7    MR. HAYES:  Your Honor, if I may.  I think we already

8    covered the authenticity issue.  The witness testified for each

9    recording that what she heard and what the exhibit is, is the

10   same thing she recorded.  That jumps over any chain of custody

11   and related issues.

12   JUDGE ROSAS:  I'm going to sustain any questioning as to

13   why this witness --

14   MS. POLITO:  Emailed it to Mr. Bensinger?

15   JUDGE ROSAS:  At least with respect to the audio tapes,

16   okay?  But on the question of why, let's just leave it at that.

17   I'll sustain anything beyond that.

18   Q    BY MS. POLITO:  Do you know where the recordings are

19   currently stored?

20   MS. CACACCIO:  Objection, relevance.

21   JUDGE ROSAS:  I'll allow that.

22   A    I mean, I have the originals on my phone.

23   Q    BY MS. POLITO:  Ms. Eisen, during the 9/10 listening

24   session, did you share with the group that the pandemic

25   exacerbated the entire situation?  It was like a frog in a pot



1    of boiling water for the last five years?  Do you recall saying

2    that?

3        MS. CACACCIO:  Your Honor, I'm going to object as to form.

4    If she's reading from the transcript, Ms. Eisen should be

5    allowed to look at it.

6        JUDGE ROSAS:  You said five years?

7        MS. POLITO:  She hasn't testified that she doesn't recall

8    stating it yet.  So I can impeach her if you want me to, but

9    I'm asking her initially if she recalls stating something --

10       JUDGE ROSAS:  Okay.

11       MS. POLITO:  -- at the 9/10 listening session.

12       JUDGE ROSAS:  Okay, all right.

13   A    I don't think --

14       JUDGE ROSAS:  I --

15   A    -- that was the entirety of the sentence, because the five

16   years would have gone prior to the pandemic.

17   Q    BY MS. POLITO:  But you recall saying something to that

18   effect.

19       MS. CACACCIO:  Your Honor, this is --

20   Q    BY MS. POLITO:  Is that correct?

21       MS. CACACCIO:  This is the problem.  I object to that,

22   based off -- she's reading something to the witness.  The

23   witness should be allowed to look at it.  Particularly, given

24   that it's -- the recording is less than 9 minutes.

25       JUDGE ROSAS:  Well, I'll let you take your crack at what



1    you believe she said verbatim, and we'll see what the witness

2    recalls or not.

3    Q    BY MS. POLITO:  Do you recall saying that the pandemic

4    exacerbated the entire situation?

5    A    The -- I remember saying that the -- yes.

6    Q    Thank you.  And at the end of the 9/10 listening session,

7    there was some discussion as you were walking out of the

8    session.  Do you recall generally engaging in discussions with

9    people as you were leaving?

10   A    I do, yes.

11   Q    And do you remember stating that your understanding is

12   that their legal is staying here, and they want them close to

13   the airport, so they didn't actually give you guys truthful

14   information when it came to that?  Do you remember stating

15   that?

16   A    I do, yes.

17   Q    Where did you get that information from?

18   A    I overheard somebody talking in our lobby while I was

19   working.

20   Q    You overheard a Starbucks executive or a corporate person

21   talking?

22   A    Yes.

23   Q    Who?

24   A    I don't know who it was.  At that point, I didn't know who

25   anybody was.



1    Q    Do you now know who that person was that was speaking?

2    A    I don't.

3    Q    The next listening session you attended was on September

4    19th; is that correct?

5    A    That is correct.

6    Q    And you also recorded that session as we have discussed,

7    correct?

8    A    Correct.

9    Q    And you have the original of that session --

10    A    I do.

11    Q    -- still, correct?

12    A    Yes.

13    Q    And in that session, do you remember saying to your fellow

14    partners, "our union or hope-to-be-union is fighting to

15    unionize on an individual store basis".  Do you remember

16    stating that?

17    A    I do.

18    Q    And isn't it true that you wanted to be sure that each

19    store could vote to unionize independent of other stores,

20    correct?

21    A    That is correct.

22    Q    And was that your opinion, or were you expressing the

23    opinion on behalf of the union at that time?

24    A    That was my opinion.

25    Q    You were not employed by the Union at that time, correct?



1    A    I was not.

2    Q    You were not paid by the Union at that time; is that

3    correct?

4    A    I was not.

5    Q    You also stated in that listening session that it is very

6    dependent on who your store manager is.  Do you remember

7    stating that?

8    A    I do.

9    Q    And your store manager at the time was one of the best you

10    ever had; is that correct?

11    A    That is correct.

12    Q    During that 9/19 listening session, you explained

13    bargaining rights to the individuals that were there.  Do you

14    remember doing that?

15    A    I do.

16    Q    And where did you learn what the bargaining rights were to

17    be able to explain to the partners?

18    A    I did my own research when I decided to do this.

19    Q    No one gave you that information?

20    A    I did not.

21    Q    During that session, in fact, you went as far to tell your

22    fellow partners what to expect for payment of dues, correct?

23    A    Yes, correct.

24    Q    And you even said that they could expect to pay $5 to $10

25    per hour.  Do you remember stating that?



1    A    I do.

2    Q    Where did you get that information?

3    A    When this was presented as an option to me, I asked the

4    question, as to what the dues would be.  And that's what I was

5    told.

6    Q    You asked the question of who?

7         MR. HAYES:  Objection, relevance.

8         MS. CACACCIO:  Objection.  Right.

9         JUDGE ROSAS:  Hold on.

10        MS. POLITO:  It's completely relevant.  They've introduced

11   these listening sessions into evidence.  I have every right to

12   ask every question relating to the listening sessions that

13   they've introduced into evidence.

14        JUDGE ROSAS:  This is what she said, right?  You've asked

15   her what she said, and she gave you an answer, right?

16        MS. POLITO:  Yes, and then I asked her -- can you read --

17        JUDGE ROSAS:  No.

18        MS. POLITO:  -- the ability to read the last question?

19        JUDGE ROSAS:  No, no.  We don't have to do that.  The

20   question is, taking it from there, finding out the source of

21   her information.  She told you.

22        MS. POLITO:  She said, I asked the question.  My follow-up

23   is, who did you ask the question from?

24        MS. CACACCIO:  Your --

25        MS. POLITO:  That's when I got the objections.



1     JUDGE ROSAS:  Correct.

2     MS. CACACCIO:  Your Honor, if I might be heard?  Who the

3    witness' source is for this information isn't relevant.  What's

4    relevant is the -- what Respondent has said during that

5    meeting.  Ms. Eisen's not on trial here, so where she gets her

6    own information and where -- how she presents it isn't

7    relevant.  And to the extent that this is trying to go into how

8    their organizing is set up, it's improper.

9     MS. POLITO:  Judge, it's directly relevant to Ms. Eisener

10   (sic) attending all these listening sessions where she's asking

11   Starbucks executives specific things, making specific

12   representations, all to entice and solicit certain responses.

13     MR. HAYES:  Your Honor, if I may.  I just have to agree

14   that's not relevant to the merits of the complaint.

15     JUDGE ROSAS:  Well, it's outside the scope of the direct

16   examination.  Let's keep it tight.  What she said, what she

17   didn't say.

18     MS. POLITO:  So she's not allowed to --

19     JUDGE ROSAS:  Correct.

20     MS. POLITO:  -- answer the question --

21     JUDGE ROSAS:  Correct.

22     MS. POLITO:  -- of who she asked?

23     JUDGE ROSAS:  Correct.  Not based on that.

24     MS. CACACCIO:  And just for clarity, her last name's

25   Eisen, with an N, not an R.



1    Q    BY MS. POLITO:  I apologize, Ms. Eisen.

2         During the 9/11 listening session, you were making

3    inquiries of Starbucks with relation -- in relation to fixing a

4    variety of facility issues, do you recall that?

5         MS. CACACCIO:  I'm going to object.  This listening

6    session's not in evidence.  The date is the 10th, which she

7    already testified to, at that.

8         JUDGE ROSAS:  You're right.

9         MS. POLITO:  September 19th.  My apologies.

10   A    I'm sorry, could you repeat that question?

11   Q    BY MS. POLITO:  Sure.  At the September 19th listening

12   session, you asked a number of questions relating to

13   facilities.  Do you recall that?

14   A    I do, yes.

15   Q    And isn't it true that you expected Starbucks to respond

16   to the concerns you raised regarding facility issues?

17   A    By Starbucks, do you mean the people in the room with me?

18   Q    That's correct.

19   A    I expected to have a conversation about them, yes.

20   Q    And then you expected a follow-up response from Starbucks,

21   with respect to the concerns raised relating to facilities,

22   correct?

23   A    I was not expecting a follow-up.

24   Q    Okay.  So why were you raising it, then?

25   A    Because those were the questions that were being asked of



1    us.  They were asking us what the issues were, so I was

2    responding in turn.

3    Q    Pest control was one of the issues; is that correct?

4    A    Correct.

5    Q    Did the Elmwood store have issues with bees?

6    A    We had issues with bees outside of our store, yes.

7    Q    Were those issues ever resolved?

8    A    They were not, to the best of my knowledge, resolved by

9    facilities.  They were resolved by a change in weather.

10   Q    And so is it a season -- continued seasonal issue with the

11   bees?

12   A    It's a seasonal issue, yes.

13   Q    Do you remember during the September 19th listening

14   session, telling the partners who were there, in terms of if a

15   store becomes unionized, then anyone within that store would be

16   part of that union by default.  Do you remember stating that?

17   A    I do.

18   Q    The next listening session that you attended was on

19   October 1st; is that correct?

20   A    That is correct.

21   Q    Didn't you actually request certain benefits at that

22   meeting?

23   A    I did not request certain benefits.  I asked to have an

24   explanation as to why benefits had been adjusted.

25   Q    And you expected Starbucks to respond to you when you



1    asked that question, correct?

2    A    I was asking a question that had been asked by 100

3    partners that week.  I was just reiterating it.

4    Q    How did you know that 100 other partners asked those

5    questions?

6    A    Because those were on the partner Hub, which I think was

7    mentioned at the recording at that meeting, as well.

8    Q    Any other knowledge, other than utilizing the partner Hub?

9    A    The partners in my store had also asked those questions.

10    Q    And what are the benefits you had asked about?

11    Specifically with Spotify, do you remember that?

12    A    I asked for an explanation of Spotify, yes.

13    Q    Not only did you ask for an explanation -- didn't you, in

14    fact, ask Mr. Stewart if he had escalated the problem?  Do you

15    remember that?

16    A    No.

17    Q    That was not part of the Spotify question?

18    A    It was not.

19    Q    What did you ask him to escalate?

20    A    I asked if the issue of the partner beverage and food mark

21    out being changed had been escalated.

22    Q    And you had indicated to the Starbucks individuals present

23    at the October 1st listening session that you were not happy

24    that the food benefit, which had been implemented when the

25    stores reopened after the pandemic -- well, we're still in the



1    pandemic.  But when the stores reopened some time after March

2    of 2020, that that food benefit has now changed; is that

3    correct?

4    A    That is correct, yes.

5    Q    And you expected Mr. Stewart to respond, correct?

6    A    Yes.

7    Q    And isn't it true that you are -- you, at the 10/1

8    meeting, raise the issue of seniority pay.  Isn't that correct?

9    A    I believe I did, yes.

10    Q    Were you aware that in some time in 2020, through the

11    partner Hub, the company had informed all partners nationwide

12    that they were working on a nationwide pay increase?

13    A    I was not aware of that.  And if I was, it certainly

14    wasn't indicated that it was seniority based.

15    Q    So you might have been aware of a pay increase some time

16    in 2020, but you don't recall that being times were --

17    seniority-based pay.

18        MS. CACACCIO:  Your Honor, I'm going to object to --

19        JUDGE ROSAS:  Correct.  So you're going to have to cut

20    back on these questions that are being re-asked in a slightly

21    different format.  I'll allow that one to be answered.

22        MS. CACACCIO:  But if --

23        JUDGE ROSAS:  Go ahead.  Do you recall that?

24        MS. CACACCIO:  Your Honor, if I just for a second --

25        I think that you meant 2021, but if you didn't, then



1    that's fine.

2        JUDGE ROSAS:  Is that a different year?

3        MS. CACACCIO:  She said 2020.

4        JUDGE ROSAS:  2021?

5        MS. POLITO:  It's my understanding that the witness was

6    asked by the Court that if she could answer my question, she

7    could.  If she can't answer it, I'll re-ask another question.

8        JUDGE ROSAS:  Do you recall the question?

9    A    Could you just rephrase -- could you just say the question

10   again, please?

11   Q    BY MS. POLITO:  Were you aware, in 2020, that through the

12   partner Hub, the company had provided an announcement about

13   nationwide pay increases?

14   A    I have no recollection of that in -- from 2020.

15   Q    When you raised the issue of seniority pay at the October

16   1st, 2021 meeting, you expected the corporate executives to

17   respond; is that correct?

18   A    If I'm remembering correctly, that came off of a pay

19   question that Myke Gollwitzer actually stated.  I was just

20   following up on what he said.  That wasn't directed at any

21   member of corporate.

22   Q    Are you stating that Myke was at the 10/1 session with

23   you?

24   A    He was, yes.

25   Q    No one at Starbucks mentioned seniority pay before that



1    question was raised, either by Myke or yourself, at the October

2    21st, 2021 meeting, correct?

3    A    Not to the best of my knowledge, no.

4    Q    And again, you and/or Myke wanted the company to respond

5    to that request, correct?

6    A    You mean that conversation between three partners?  That

7    was myself, Myke, and LaRue.  At no point, do I remember

8    looping one of the corporate members into that conversation.

9    Q    You asked them about seniority pay.  And I told her first,

10    since that was a mixed session, correct?

11    A    I do not remember asking anyone directly about that.

12    Q    And you testified earlier that you don't recall receiving

13    any seniority-based pay since October 1st, 2021; is that

14    correct?

15    A    I don't recall.  I don't even know the last time I looked

16    at a pay stub.  But I don't recall, no.

17    Q    Is that because you're getting paid full time working for

18    the Union?

19    A    That's because our pay stubs are electronically, and need

20    to be pulled up from a backroom computer.  And so unless I have

21    any reason to go there and do that, I don't look at them on the

22    regular.

23    Q    So then, as you sit here today, you don't know if you've

24    actually gotten a raise or not?

25    A    I know that there was one announced in October of 2021,



1    that -- I know there was one that went into effect in October

2    of 2021 that was announced in July of 2021.  I assume I

3    received that one.

4    Q    Do you recall during the October 1st, 2021 meeting asking

5    just Starbucks individuals that were present to provided

6    answers relating to the various questions that had been

7    proposed so far?

8    A    There were members stating that no answers had been

9    provided as of yet.

10   Q    Did that mean you wanted an answer, or did you not want an

11   answer?

12   A    It was just an observation that no answers had been

13   provided as of yet.

14   Q    So you didn't expect them to respond to that?

15        MS. CACACCIO:  Objection.  Asked and answered.

16        JUDGE ROSAS:  Counsel, I'm going to sustain any -- any

17   further, this -- this question, as well as any other questions

18   relating to this witness' expectations at any given time, which

19   is not evidence.  If you want to establish a defense to some

20   alleged promise or benefit, establish what was said at any

21   given time, and what was done before, what was done after.  But

22   let's -- let's move on from this witness' expectations.  You're

23   spending too much time on that.  It's not relevant to me.

24   Q    BY MS. POLITO:  On October 1st, 2021, at the listening

25   session, were you expecting a response from the Starbucks



1     individuals with respect to a variety of benefits and promises?

2          MS. CACACCIO:  Objection.  Asked and answered.

3          JUDGE ROSAS:  Sustained.

4          MS. POLITO:  For the record, Judge, I would just note that

5     I think it's relevant to whether or not the witness is asking

6     executives specific questions, and then, later filing charges

7     about allegations of benefits, when they're -- she's there

8     asking for those minutes and recording conversations about

9     those allegations.

10         MS. CACACCIO:  Your Honor?

11         JUDGE ROSAS:  Yes?

12         MS. POLITO:  Can I be heard?

13         JUDGE ROSAS:  Absolutely.  Ask her what she said.  What

14    she didn't say is fine.

15         MS. CACACCIO:  This witness hasn't filed charges.  And to

16    state that she has in this, it's --

17         MS. POLITO:  I do think --

18         JUDGE ROSAS:  I -- I -- I've issued my ruling.  I'm not

19    getting into any other -- any other discussions.  I know what

20    the law is.

21    Q    BY MS. POLITO:  Your next listening session was on October

22    20th, 2021; is that correct?

23    A    That is correct.

24    Q    And in that session, do you remember indicating or stating

25    that Starbucks was engaging in scare tactics?



1    A    I do.  Yes.

2    Q    Do you also remember in that session stating that partners

3    could be prosecuted by Starbucks?

4    A    I do.  Yes.

5    Q    You're not aware of anyone ever being prosecuted by

6    Starbucks though, correct?

7    A    I am not.

8    Q    Would you agree that that statement might be a scare

9    tactic?

10    MS. CACACCIO:  Objection.  Argumentative.

11    MS. POLITO:  It's cross-examination.

12    JUDGE ROSAS:  I'm sorry.  What -- repeat the question.

13    What's a scare tactic?

14    MS. POLITO:  Her stating in the meeting that partners

15    could be prosecuted by Starbucks, and then, testifying that

16    she's not aware of anyone that was prosecuted, when she's at

17    the same meeting alleging that Starbucks was engaging in scare

18    tactics.

19    JUDGE ROSAS:  I don't know the connection between the two.

20    Try rephrasing it, so I can understand what you're asking.

21    Q    BY MS. POLITO:  My question was, whether or not stating

22    that Starbucks partners could be prosecuted was a means of

23    scare tactics for the fellow partners that were there?

24    A    I don't believe so, no.

25    Q    At the October 20th listening session, you again asked



1     Starbucks em -- employees that were present about additional

2     pay.  Do you recall that?

3     A     I do not.

4     Q     Do you recall asking questions to follow up with respect

5     to Myke's prior questions regarding pay?

6     A     It was not a follow-up regarding pay.  It was a follow-up

7     regarding how pay was calculated.

8     Q     With respect to the cost of living and the inflation rate

9     versus the pay increase; is that correct?

10    A     I do.  Yes.

11    Q     And do you recall asking the Starbucks individuals that

12    were present that question, correct?

13    A     I do.  Yes.

14    Q     You expected them to respond, correct?

15          MR. HAYES:  Objection.  Relevance.

16          JUDGE ROSAS:  Sustained.

17    Q     BY MS. POLITO:  Your final listening -- well, it's titled

18    "Listening Session", but your -- I'll refer to it as a

19    listening session, you attempted to attend a listening session

20    on November 8th, 2021; is that correct?

21    A     That is correct.

22    Q     And that's the one where you got a letter asking you to go

23    to a specific time; is that correct?

24    A     Yes, correct, as well.

25    Q     And you assumed it was mandatory, but you went to a



1    different time; is that correct?

2    A    It -- I tried to go an earlier time slot, yes.

3    Q    It was located at the Elmwood store, correct?

4    A    It was.

5    Q    And you don't know for a fact what time the store was

6    closed that day; is that correct?

7    A    I do actually.  I was standing outside of it when it

8    closed.

9    Q    Waiting for the session?

10   A    Having coffee with a friend down the street, but also

11   waiting for the session, yes.

12   Q    And you weren't allowed to attend that session; is that

13   correct?

14   A    I was not allowed to, no.

15   Q    And that bothered you; is that correct?

16   A    It did.  Yes.

17   Q    And -- and isn't it a fact that you could've attended the

18   later meeting, but you chose not to?  And you stated to your

19   colleague, I can't come to this later meeting, because I just

20   told them I was not able to attend this later meeting.

21        MS. CACACCIO:  I'm going to object.  Vague and compound.

22        JUDGE ROSAS:  Overruled.  You can answer.

23   A    Yes.  I told them I was unable to attend the later

24   meeting, because I had to open the next day.

25   Q    BY MS. POLITO:  But you could, in fact, attend?



1    A    Not and get up at 4:00 the next morning, I could not have,

2    no.

3    Q    Other than -- but there was nothing preventing you from

4    attending?

5    A    The seven-hour turnaround time was preventing me from

6    attending.

7    Q    What seven-hour turnaround time, the New York State law?

8    A    Between the end of the meeting, which was slated to go

9    until 9 p.m., and when my alarm was going to go off at 4 a.m.,

10   is a seven-hour turnaround time.

11   Q    Correct.  And that's the New York law you were referring

12   to on the --

13   A    That's the one.

14   Q    -- video recording?

15   A    Um-hum.  I was later corrected that that law,

16   unfortunately, does not exist.  It is however a violation of

17   company policy.

18   Q    So the law that you were referring to in the audio

19   recording, you've now learned, or discovered, does not exist?

20   A    Not -- I believe it exists within New York City, but not

21   within the broader New York State.

22   Q    And do you recall stating on your audio recording to

23   Cassie, we gave them all the talk -- talking points, so

24   hopefully it's okay?

25   A    I do.  Yes.



1   Q    Who -- and who did you give the talking points to?

2   A    Any partner who was nervous about attending that meeting.

3   Q    And how did you provide the talking points?

4   A    They asked.  And I said, you know, if they talk about

5   this, then you can say this.

6   Q    Do you provide that to them verbally or via the group

7   chat?

8        MR. HAYES:  Objection.

9   A    The --

10       MR. HAYES:  I have an objection to relevance, this whole

11  line.

12       JUDGE ROSAS:  What's the relevance?

13       MS. POLITO:  It's relevant, because they submitted an

14  audio recording with her testimony regarding this particular

15  meeting.  And I'm entitled to ask her questions about the audio

16  recordings, what she instructed people to say, and whether or

17  not there's this effort or attempt to get a Starbucks person to

18  solicit them to say something in response.  Same relevance that

19  I've been on, Judge.

20       JUDGE ROSAS:  So her discussion with other individuals

21  about -- about talking about -- what were they referred to,

22  talking points?

23       MS. POLITO:  Yes.

24       JUDGE ROSAS:  Talking --

25       MS. POLITO:  Your Honor, she said that she gave them the



1    talking points, so hopefully it's okay.

2        JUDGE ROSAS:  Talking points?  No, I'm going to sustain

3    that.  That's -- again, what -- what the tape says, the tape

4    says.  You know, you want to address it un -- under some other

5    circumstances, if it's relevant, go ahead.  But it's not

6    relevant to the direct examination.

7        MS. POLITO:  So then, Judge, I -- I'd like to reserve my

8    rights to request a redaction of all portions of the audio

9    recordings that are not relevant, and for which counsel has

10   raised objections relating to relevance.  And --

11       MR. HAYES:  Your Honor, I --

12       MS. POLITO:  -- we could do that via motion.

13       MR. HAYES:  Your Honor, if I may?  I -- the objection is

14   to the questions as not relevant to the testimony.  That --

15   that has nothing to do with the contents of the transcript or

16   the recording.

17       JUDGE ROSAS:  Anything else?

18       MS. POLITO:  Yeah.  Judge, they submitted the audio

19   recordings through this witness as her testimony.  So it's

20   directly relevant to her testimony what --

21       JUDGE ROSAS:  Right.

22       MS. POLITO:  -- she stated at these meetings.

23       MS. CACACCIO:  Your Honor, if I might be heard?  I -- we

24   didn't submit the recordings as her testimony.  We submitted

25   the recordings as the recordings she made of those meetings,



1  which I think is an important distinction.  But moreover, you

2  know, the -- whether she talked to other witnesses or not, Ms.

3  Eisen didn't hold these meetings.  So I don't -- I don't -- I

4  also object to relevance, in the same way the Union is.

5       JUDGE ROSAS:  The -- the --

6       MS. POLITO:  But -- but Judge, she might have not held the

7  meetings, but she's directing the content of the meetings by

8  asking specific questions and trying to solicit information

9  from the individuals there.  It is directly relevant to this

10  entire case.

11       MS. CACACCIO:  If I might be heard?  For this particular

12  line of questioning, we're talking about a meeting she didn't

13  even attend.  So the extent, you know, Respondent's counsel

14  wants to ask other witnesses who were in that meeting what

15  happened in that meeting, she's welcome to do so.  But this

16  witness didn't attend it, so she can't know what was or wasn't

17  said in that meeting.

18       MS. POLITO:  And I -- again, I'd ask what the purpose of

19  the audio recording was in the first place?

20       MS. CACACCIO:  If I might be heard?

21       JUDGE ROSAS:  No.  We're done.  The objection -- the

22  objection is sustained.  Again, the evidence here is the audio

23  tape.

24  Q    BY MS. POLITO:  The last audio recording you testified

25  about during your direct examination was from March 9th, 2022;



1    is that correct?

2    A    That is correct.

3    Q    And that's when you attended a meeting with Cassie with

4    respect to her availability; is that correct?

5    A    That is correct.

6    Q    And you were aware before you attended that meeting that

7    it was a disciplinary meeting, correct?

8    A    I was not, no.

9    Q    Do you remember telling her, you are not leaving

10   voluntarily.  They have to fire you.  Do you remember telling

11   her that?

12   A    I do.  Yes.

13   Q    But you didn't think it was a disciplinary meeting?

14   A    I did not know what the meeting was going to entail.

15   Q    Do you remember also telling her, stick to what you were

16   going to say?

17   A    I do.  Yes.

18   Q    Isn't it true that you wanted her fired?

19   A    Absolutely not.

20   Q    Is -- is Cassie Fleischer still employed by Starbucks?

21   A    She is not.

22   Q    Turning to the training site.  You testified during direct

23   examination that employees for a period of time were trained at

24   a single store.  Do you recall that?

25   A    Can you give me a time frame?



1    Q    In the fall of 2021.

2    A    Yes.  Correct.

3    Q    And since the fall of 2021, the Buffalo market has

4    continued to train individuals at stores that might not be

5    their home store; is that correct?

6    A    That is correct.  Yes.

7    Q    And in fact, some of those stores are unionized stores; is

8    that correct?

9    A    I'm sorry, which stores are unionized stores?

10   Q    Genesee Street.

11   A    I'm not understanding what you're asking me.  What stores

12   are unionized stores?

13   Q    Let me step back.  You testified on direct examination

14   that in the fall of 2021 Starbucks had Buffalo market-wide

15   training at a single site; is that correct?

16   A    That is correct.  Yes.

17   Q    Since the fall of 2021, the Buffalo market continues to do

18   training at a -- not a single store site, but at -- market

19   training at a store where the partner might not be employed; is

20   that correct?

21   A    That is correct.  Yes.

22   Q    And some of those stores where the trainings are held are,

23   in fact, union -- unionized stores; isn't that correct?

24   A    At the -- I know that I was aware of it.  At the time, no,

25   I did not know that.



1     Q    So currently, are you aware that Genesee Street is a

2     unionized store?

3     A    I'm aware that Genesee is unionized.  I was not aware that

4     it was a training store.

5     Q    What about East Robinson, are you aware that that's a

6     unionized store?

7     A    When that became the training store, it was not a

8     unionized store.  But I'm aware that it is a unionized store

9     now.  But I believe it is still awaiting certification.

10    Q    And are you aware that Starbucks still uses that store for

11    training for its partners to be placed throughout Buffalo

12    market, correct?

13    A    I was not aware of that, no.

14    Q    Are you aware whether or not a GoFundMe page has been set

15    up for any of the individuals that are no longer employed by

16    Starbucks?

17        MR. HAYES:  Objection.

18        MS. CACACCIO:  Objection.

19        MR. HAYES:  Relevance.

20        MS. CACACCIO:  Relevance.

21        JUDGE ROSAS:  What's the relevance?

22        MS. POLITO:  It -- it's -- she's testified to a number of

23    individuals that are discriminatees in this case.  And it's

24    directly relevant to the potential wage claim, whether or not

25    they received payment after they were let go from Starbucks,



1      through a GoFundMe page.

2          JUDGE ROSAS:  Should --

3          MS. CACACCIO:  Your Honor?

4          JUDGE ROSAS:  Should the case go that far, maybe -- maybe

5      it would be relevant.  We're not dealing with any of that now.

6      Sustained.

7      Q    BY MS. POLITO:  Earlier, you talked about your stress

8      related to this -- the last couple of days.  Do you recall that

9      testimony?

10         MS. CACACCIO:  Your Honor, can I be heard on that, just

11     before we move on?

12         JUDGE ROSAS:  All right.  Hold on.  Hold on.

13         MS. CACACCIO:  If we want to look to excuse the witness,

14     or something.  It may -- it may not be necessary.  But it's

15     better safe than sorry.

16         JUDGE ROSAS:  You can step out.

17         What are we doing?

18         MS. CACACCIO:  General Counsel at this time is not going

19     to submit that evidence for consequential damage purposes.

20     Though, the -- to the extent that Mr. Hayes entered it for --

21     for purpose, that's fine.  But I know we had talked about that

22     earlier on the record.  It doesn't mean that the question can't

23     be asked.  I just want to make clear that it's not the

24     consequential damage purposes.

25         JUDGE ROSAS:  But --



1        MS. POLITO:  If you're willing to strike that --

2        JUDGE ROSAS:  But --

3        MS. POLITO:  -- her prior testimony relating to her

4   health, I'm fine.  I won't ask the question.  But otherwise, I

5   think she's opened the door.

6        MR. HAYES:  Your Honor, again, I mean, I think, we went

7   over this.  The testimony was offered for a very specific

8   reason.  I -- there's no reason to strike.

9        JUDGE ROSAS:  Well, coun -- Respondent is entitled to

10  address it for that reason.  So let's bring her back.

11       MR. HAYES:  I'd --

12       JUDGE ROSAS:  What?

13       MR. HAYES:  Sorry.  I'm sorry.  I don't think anybody

14  actually objected.

15       JUDGE ROSAS:  Right.

16       MS. CACACCIO:  No.  I just wanted to make clear that --

17  you had asked me to tell you whether we intended to use that

18  consequential damage purposes.  And so I was telling you we

19  were not doing that.

20       JUDGE ROSAS:  Well --

21       MS. CACACCIO:  And so to the extent that we're going to --

22       JUDGE ROSAS:  I expected you all to discuss whether or not

23  to have the testimony withdrawn or stricken.

24       MS. CACACCIO:  Oh.

25       JUDGE ROSAS:  Yes.



1        MS. CACACCIO:  I did not understand what you were asking

2    of  me.

3        MR. HAYES:  I think we can do that quickly.

4        MS. CACACCIO:  Do you want to do that now?

5        MR. HAYES:  Do you want us to do that now, Your Honor?

6        JUDGE ROSAS:  Sure.

7        MR. HAYES:  Okay.

8        MS. CACACCIO:  My misunderstanding, Judge.  Are we still

9    on the record?

10        JUDGE ROSAS:  Let's go off.

11        MR. HAYES:  I think we just need a minute.

12        MS. CACACCIO:  Yeah.  Just take one minute.

13    (Off the record at 4:20 p.m.)

14        MS. CACACCIO:  Go ahead.

15        MR. HAYES:  Okay.  Your Honor, so we had a brief

16    discussion with the General Counsel.  The Union is not, you

17    know, withdrawing that testimony.  We're asking it to be

18    stricken.  Again, it was offered for the very limited purpose

19    of discussing evidence issues.  And my understanding is, the

20    General Counsel doesn't have an objection to the testimony for

21    that purpose alone.

22        JUDGE ROSAS:  But you -- but you're not moving -- you're

23    not agreeing to strike the testimony?  It stands for the

24    proposition that -- as to the affect that listening to all

25    these audiotapes is having on these witnesses?



1      MR. HAYES:  Exactly, Your Honor.

2      JUDGE ROSAS:  Okay.  And what's the relevant of that --

3  relevance of that?

4      MR. HAYES:  It's relevant to the, I guess, procedural

5  questions that are still open about how the parties are going

6  to handle recordings for future witnesses in this area.

7      JUDGE ROSAS:  Well, we'll discuss that a little more.  But

8  okay.  All right.  So you understand the purpose for which it

9  was offered, right?

10      MS. POLITO:  Well, my understanding from the notes that we

11  took, is that the Union's allegation is that playing of every

12  recording causes trauma to witnesses.  And then, he submitted

13  medical evidence relating to this particular witness, relating

14  to her heart and her Apple Watch, putting her medical evidence

15  into testimony.  We talked for three days now about the

16  recordings.  We have tried to come up with every possible

17  solution, either all people in this room have the most

18  difficulty listening to the audio recordings.  But there is no

19  other way as a company, other than for us to be able to listen

20  to the recordings that they are trying to enter into evidence

21  and have the witness identify the speakers.  We've -- counsel

22  for the General Counsel has actually gotten a pretty good

23  routine now.  It's been going smoothly.  We work together.

24  This testimony is completely irrelevant.

25      JUDGE ROSAS:  Right.



1      MS. POLITO:  I don't particularly want to -- I don't know

2  if we're on the record or not, I don't particularly answer that

3  or not.  Because she --

4      JUDGE ROSAS:  Are we on the record?

5      MS. POLITO:  They put it in the record.

6      JUDGE ROSAS:  Are we back on the record?  Yeah, we are.

7  We are.

8      MS. POLITO:  Oh.

9      JUDGE ROSAS:  So you -- you have a couple of questions on

10  this?

11      MS. POLITO:  Yeah.  I'm going to ask her about her health

12  and her heart rate and her doctor and who she -- she saw anyone

13  about it.

14      JUDGE ROSAS:  Okay.

15      MS. CACACCIO:  Yeah.  You want me to get her?

16      JUDGE ROSAS:  Do you want to get some steps?

17      MS. CACACCIO:  I would.  Thank you.

18      JUDGE ROSAS:  All right.

19      All right.  Go ahead.

20                    <u>**RESUMED CROSS-EXAMINATION**</u>

21  Q    BY MS. POLITO:  Ms. Eisen, I apologize, because I -- I was

22  calling you Ms. Eiser.

23  A    That's right.

24  Q    I have this thing, once I get the name wrong I have a hard

25  time, as my colleagues know, adjusting.  So I apologize.



1    A    No worries.

2    Q    So Ms. Eisen, earlier you gave testimony about being at

3    these listening sessions and your heart rate rising as a result

4    of those listening sessions; is that correct?

5    A    That is correct.  Yes.

6    Q    Do you have a heart problem?

7    A    I do not.

8    Q    Have you sought medical treatment for it?

9    A    I have not.

10   Q    Have you sought therapist treatment for it?

11   A    I have not.

12   Q    Do you continue to wear your Apple Watch normally outside

13   the Federal Court as part of your regular routine?

14   A    Just about every day, yes.

15   Q    And now, are there other times when your heart rate

16   escalates?

17        MR. HAYES:  Objection.  Asked and answered.

18        JUDGE ROSAS:  I'll allow it.  You can answer.

19   A    I have never received that warning again, since then.

20   Q    BY MS. POLITO:  And the warning you say that you received,

21   was it via, like, text, or was it looking at the app on your

22   phone?

23   A    It -- it, like, vibrates and pops up as a little thing

24   with your heart.  And then, the information is downloaded to

25   the health app on your phone.



1    Q    It notifies you on your watch?

2    A    Yes.

3    Q    And so that's how you were aware of it?

4    A    I was aware that something had happened.  I didn't know

5    until after I had got out the meeting and looked at the

6    notification that that's what it was.

7    Q    Okay.  And we've talked about all of the listening

8    sessions that you attended.  We've also talked about all the

9    listening sessions that you recorded?

10    A    Yes.

11    Q    Have you recorded any other meetings --

12         MS. CACACCIO:  Object --

13    Q    BY MS. POLITO:  -- relating to your employment at

14    Starbucks?

15         MS. CACACCIO:  Objection.  Asked and answered.

16         JUDGE ROSAS:  No.  Any other meetings?  You can answer.

17    A    I have not.  No.

18         MS. POLITO:  Judge, if I could just have a few minutes to

19    confirm with my colleagues?

20         JUDGE ROSAS:  Off the record.

21    (Off the record at 4:27 p.m.)

22         JUDGE ROSAS:  Respondent?

23         MS. POLITO:  Good afternoon, Your Honor.  We have nothing

24    further at this time.  But as counsel noted earlier, we have

25    served the witness through Mr. Hayes, the subpoena duces tecum,



1    and the testifying subpoena for a later date, should that be

2    necessary.

3         JUDGE ROSAS:  Redirect?

4         MS. CACACCIO:  Your Honor, would you like me to respond to

5    the -- just duces tecum issue, or just the redirect issue?

6         JUDGE ROSAS:  You get to put in a response.

7         MS. CACACCIO:  Okay.

8         JUDGE ROSAS:  Right?

9         MS. CACACCIO:  Yes, Your Honor.

10        JUDGE ROSAS:  Okay.

11        MS. CACACCIO:  I have no redirect for this witness, Your

12   Honor, not at this time.

13        MR. HAYES:  I -- I have maybe two questions, Your Honor.

14        JUDGE ROSAS:  Charging Party?

15                    **REDIRECT EXAMINATION**

16   Q    BY MR. HAYES:  Michelle, do you remember being asked by

17   the Company's attorney about the Walden-Anderson store being

18   closed down?

19   A    I do.  Yes.

20   Q    And the Genesee and East Robinson stores now acting as

21   training stores?

22   A    I remember that question, yes.

23   Q    Are --

24        MS. POLITO:  I'm just going to object.  I didn't ask about

25   the Walden-Anderson store being closed down.



1          JUDGE ROSAS:  Genesee and another store that wasn't

2     Walden, that's correct.

3          MS. CACACCIO:  Your Honor, the witness testified -- on

4     cross-examination, the witness testified about the stores

5     closing in the fall of 2021.  And that's the best --

6          JUDGE ROSAS:  But you're talking about the training

7     stores?

8          MS. CACACCIO:  And that's the Walden-Anderson store.

9          JUDGE ROSAS:  Oh.  Okay.  Overruled.

10         MR. HAYES:  Okay.

11    Q    BY MR. HAYES:  Michelle, first of all, the Genesee and

12    East Robinson stores, are they still open to the public?

13    A    They are, yes.

14    Q    As far as you know?

15    A    As far as I know.

16    Q    Has the -- since the Walden-Anderson store was closed, and

17    then reopened, has the company closed down any other store in

18    the Buffalo area to be a training store?

19    A    Not that I'm aware of, no.

20         MR. HAYES:  Nothing further.

21         JUDGE ROSAS:  Any follow up to that?

22         MS. CACACCIO:  No, Your Honor.

23         JUDGE ROSAS:  Thank you, ma'am.  You're excused.  Please

24    do not discuss your testimony with anyone.

25         THE WITNESS:  Okay.



1      JUDGE ROSAS:  Other than, you know, obviously, consulting

2  with counsel.

3      Is this witness going to remain your designated --

4      MR. HAYES:  Yes, Your Honor.

5      JUDGE ROSAS:  -- individual?  Okay.

6      MS. CACACCIO:  Your Honor, just for the record,

7  Respondent's counsel did return to me the three Jencks material

8  affidavits that I provided.

9      JUDGE ROSAS:  Okay.  All right.

10      So are you ready with your next witness?

11      MS. CACACCIO:  Not at this time, Your Honor.  It's 4:40.

12  Our witness -- our --

13      MS. STANLEY:  It will take him 20 minutes to get here.

14      JUDGE ROSAS:  Off the record.

15  (Off the record at 4:39 p.m.)

16      JUDGE ROSAS:  All right.  So let's go back on the record.

17  And we'll adjourn at this point until tomorrow at 9 a.m. with

18  everybody then.  Off the record.

19  **(Whereupon, the hearing in the above-entitled matter was**

20  **recessed at 4:44 p.m. until Thursday, July 14, 2022 at 9:00**

21  **a.m.)**

22

23

24

25



1     <u>C E R T I F I C A T I O N</u>

2     This is to certify that the attached proceedings before the

3     National Labor Relations Board (NLRB), Region 3, Case Number

4     03-CA-285671, et al., Starbucks Corporation and Workers United,

5     held at the National Labor Relations Board, Region 3, Robert H.

6     Jackson United States Courthouse, Wyoming (5E) Courtroom, 2

7     Niagara Square, Buffalo, New York 14202, on July 13, 2022, at

8     9:03 a.m. was held according to the record, and that this is

9     the original, complete, and true and accurate transcript that

10    has been compared to the reporting or recording, accomplished

11    at the hearing, that the exhibit files have been checked for

12    completeness and no exhibits received in evidence or in the

13    rejected exhibit files are missing.

14

15

16

17                                        _Jennifer L Lindeman_

18                                  Jennifer L Lindeman, CER-1188

19                                        Official Reporter

20

21

22

23

24

25



## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2026, I electronically filed the Petitioner/Cross-Respondent's Record Excerpts with the United States Court of Appeals for the Fifth Circuit by using the appellate NextGen system.  I certify that all participants in the case are registered NextGen users and that service will be accomplished by the appellate NextGen system.

DATED: JANUARY 7, 2026                    /s/ *Lisa S. Blatt*

                                          LISA S. BLATT