# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 4, 2026

Lyle W. Cayce
Clerk

No. 24-60650

Starbucks Corporation,

*Petitioner/Cross-Respondent*,

*versus*

National Labor Relations Board,

*Respondent/Cross-Petitioner*.

Petition for Review from an Order of the
National Labor Relations Board
Agency Nos. 03-CA-285671,
03-CA-290555, 03-CA-291157,
03-CA-291196, 03-CA-291197,
03-CA-291199, 03-CA-291202,
03-CA-291377, 03-CA-291378,
03-CA-291379, 03-CA-291381,
03-CA-291386, 03-CA-291395,
03-CA-291399, 03-CA-291408,
03-CA-291412, 03-CA-291416,
03-CA-291418, 03-CA-291423,
03-CA-291431, 03-CA-291434,
03-CA-291725, 03-CA-292284,
03-CA-293362, 03-CA-293469,
03-CA-293489, 03-CA-293528,
03-CA-293546, 03-CA-294303,
03-CA-294336, 03-CA-294341,
03-CA-296200, 03-RC-282127

Before WIENER, HAYNES, and GRAVES, *Circuit Judges*.

JACQUES L. WIENER, JR., *Circuit Judge*:

This consolidated petition for review arises from union activity between August 2021 and July 2022 at several stores owned by Petitioner, Starbucks Corporation ("Starbucks"), a popular coffeehouse chain with sites located throughout Buffalo, New York. Despite a voluminous record with generally undisputed facts, the parties disagree over whether those facts constitute substantial evidence of Starbucks's anti-union animus prohibited under § 8 of the National Labor Relations Act ("NLRA").

I.

A. Factual History

On August 23, 2021, Workers United ("the Union") announced the launch of a union organizing campaign for Starbucks stores in the Buffalo region by posting a letter, signed by several employees, on social media addressed to Starbucks's chief executive officer.[1] Those employees then solicited authorization cards from their colleagues to encourage holding union elections throughout the Buffalo market. And, after petitioning for elections at several stores between September 2021 and March 2022, the Union won certification at eight stores. However, it lost the vote at the Camp Road store despite receiving an authorization majority that August—significant to this appeal.[2]

[1] Forty-nine employees signed the letter, and the region of Buffalo contains twenty-one Starbucks stores—also known as "Area 156."

[2] At the Camp Road store, sixteen of the twenty-nine or thirty employees signed authorization cards to hold elections. At the December election, the Union lost the vote to unionize twelve to eight.

The heart of Starbucks's petition for agency review concerns its sweeping actions that ran concurrently with union organizing activity, implementing significant measures in the following general categories.

*1. Attributing changes to poor performance*

The same week that union activity began in Buffalo, Starbucks flew a team of senior executives into town even though none of those individuals had ever previously visited any Buffalo location. That team also infused district managers from other stores around the country to serve as support managers in Buffalo, which was apparently was an unusual and unprecedented practice.

The senior executives held frequent meetings with Buffalo store managers to discuss the union campaign. Through them, Starbucks instructed that, contrary to its previous policy, managers should prohibit employees from wearing pro-union pins in stores. Starbucks cited poor conditions and "widespread facilities issues" at the Buffalo stores as the reason for union activity, and blamed managers for failing to "hold[] employees accountable or provide sufficient training." Despite that, one store manager maintained that any attempt to address these issues was ultimately futile because, according to Starbucks, no funds were ever available.

The day after the Union posted its letter to social media, the senior executives fired the district manager of two Buffalo stores after pulling him away from group meetings to discuss unionizing concerns. And following a September 2 listening session at the Galleria kiosk location ("Galleria"), Starbucks—citing a need for deep cleaning and reorganization of the store—temporarily closed that location on September 8. After extending the temporary closure for another week, Starbucks abruptly closed the kiosk permanently.

The same week the first petitions for representation were filed, the Buffalo regional manager—Deanna Pusatier—initiated major changes across all stores in her region: She "remed[ied] poor leadership, staffing shortages, health-and-safety issues, and negative effects from the COVID-19 pandemic . . . ; sent senior managers to stores to work alongside [employees]; and ordered needed repairs." Notably, although Pusatier was promoted to the position overseeing Buffalo in July 2021 from her previous assignment in Boston, she did not physically arrive in Buffalo until September 1.[3]

Starbucks also repaired and renovated stores at a quicker pace following the start of union activity in Buffalo. Previously, repairs and renovations generally required twelve to eighteen months of advance notice. But by January 2022, Starbucks renovated numerous stores in Buffalo within weeks or months, notwithstanding the fact that most of those repairs or renovations were neither requested nor planned prior to September 2021. In one instance, a facilities manager, who was stationed to oversee Starbucks's locations in Indiana and Illinois, repeatedly visited and implemented changes—at Starbucks's request—across several Buffalo stores during this period.

*2. Soliciting grievances and offering incentives*

Starbucks solicited feedback from its Buffalo employees and appeared to offer them incentives and additional benefits. As stated in its employee handbook, Starbucks hosts "partner listening sessions"—which Starbucks avers are "commonplace nationwide"—to solicit employee feedback and supervisors' assessments and to flag any issues requiring attention. At one September 2021 listening session, Pusatier explained that the sessions in

---

[3] At most, the record shows Pusatier "began immersing [herself] into the [Buffalo] market in August virtually."

Buffalo were "a little b[i]t different than others" because of "a union [that] has filed a petition to hold an election."

After employees complained of numerous issues—understaffing, wages, inadequate training, mobile orders, supply shortages, pest control, and broken equipment—Starbucks initiated a "hiring boom" that caused overstaffing. And as for complaints about seniority pay, Starbucks announced late October 2021 that, contrary to its previous July 2021 announcement, seniority pay would be modified effective January 2022. The modification expanded the category of employees eligible for wage increases and the percentage range of the wage increase.

Other instances of solicitation and incentivization include one manager asking his employees for suggestions for improvement and offering additional support; another manager unexpectedly offering promotions to two employees, one of whom engaged in union activity; and Starbucks suddenly increasing the available hours for employees at one store by sixty hours every week.

*3. Discouraging unionization and monitoring conversations*

Starbucks instructed managers to discourage union activities. Managers were asked to steer employees to vote against unionization by disparaging its effects on workplace conditions. For example, an executive reprimanded a manager for failing to realize that his employees were discussing unionization and completing authorization cards; she ordered him to modify the schedule so that he or another nonlocal support manager was always present. She further emphasized the need for constant managerial presence to deter union discussions, and she urged the manager to interrupt any such conversations.

Other instances demonstrated a similar pattern among managers. One demanded that employees not discuss wages. Another halted union

conversations at one store and privately spoke to purported instigators, prohibiting one employee from speaking to an off-duty employee about the Union. Another instructed a shift leader to stop assigning shifts to union supporters, threatened the shift leader with reprisal when she expressed her union sympathies, and asked for updates on employees at that store who were union supporters. One group of managers removed union literature but left non-union materials, none of which were related to work. And at the Camp Road store, one manager confronted an employee regarding a slur she had used against the manager in an employee-only text thread used for organizing activity.

Starbucks promulgated the narrative that unionizing would prevent managers from supporting employees on the floor, complicate employees' access to shifts at other stores, and generally lead to reduced benefits. One store manager instructed employees that, if they unionized, she would no longer assist by working the floor. Another warned employees they would lose their ability to pick up shifts at neighboring stores.

Managers also used headsets to monitor employees' conversations. Although employees regularly wore headsets for communications, one Starbucks's support manager imposed a new rule that headsets could only be worn by three employees at certain stations. Contrary to past practices, support managers always used headsets. In one instance, two employees were reprimanded for swearing while using their headsets.

*4. Demanding stricter adherence to specific policies*

As common practice, Buffalo store managers enforced Starbucks's workplace polices on an "as needed" basis. For example, some policies, such as dress code and attendance, were loosely enforced. Yet, enforcement grew noticeably strict after Starbucks added support management to the Buffalo market and required all employees to reacknowledge its workplace rules and

policies. Referred to as "level setting," Starbucks did not engage in similar level setting at other stores outside of Buffalo in Area 156 without union activity.

Starbucks also imposed more onerous conditions on its Buffalo stores. At one store, Starbucks routinely granted requests by the location's shift supervisor to disable mobile orders. By February, however, Starbucks demanded more details for each request and rarely granted such requests. Store managers also implemented minimum-availability policies that required employees to work more hours and demanded greater availability than before. Elsewhere, a support manager ended employees' use of a group chat to approve shift-switch requests and, in turn, began requiring employees to call her and contact the necessary managers involved.

*5. Terminating employees*

Starbucks also fired employees based on what it justified as business needs and/or substandard conduct. Starbucks terminated six[4] employees:

- Brian Nuzzo (entering a store alone, ignoring mask policy, and lying about both)
- Edwin Park (dipping his finger into a customer's drink, among other violations like disrespectful communication)
- Nathan Tarnowski (lying about COVID symptoms)
- Angel Krempa (two instances of tardiness, disrespectful communication, and dress code violations)
- Daniel Rojas Jr. (multiple incidents of tardiness, one of which caused a lockout of his peers)

[4] The Union contends a seventh employee was constructively discharged when she was forced to resign due to Starbucks's newly-adopted policy requiring minimum scheduling availability—in other words, for the same reasons Fletcher was discharged.

- Cassie Fletcher (failure to meet store's availability needs)

B. Procedural History

The Union objected to Starbucks's conduct that allegedly affected fair elections at Camp Road. It also accused Starbucks of unfair labor practices in Buffalo. The Board's General Counsel investigated the allegations and ultimately issued multiple consolidated complaints. In March 2023, the ALJ concluded that Starbucks violated NLRA § 8(a)(1), (3), (4), and (5) and sustained the Union's objections to the Camp Road election.[5]

In December 2024, the Board issued a 134-page order adopting the ALJ's conclusions, finding that Starbucks violated § 8(a)(1) by creating the impression that employees' union activities were under surveillance, coercively interrogating employees, soliciting grievances during the organizing campaign, saturating staffing at one store to dilute union elections, promising or granting benefits to employees in response to union organizing, and threatening employees. The Board also determined that Starbucks violated § 8(a)(3) and (4) by closing the Galleria kiosk and disciplining and/or discharging employees based on what it had determined was anti-union animus in its § 8(a)(1) analysis. The Board also found Starbucks violated § 8(a)(5) by changing policies and firing employees without first bargaining with the Union.

From these conclusions, the Board issued sweeping remedies centered around ordering Starbucks to cease and desist from its unfair labor practices. Remedies pertinent to this petition are (1) compensating employees for direct and foreseeable pecuniary harms resulting from Starbucks's conduct; (2) a bargaining order for the Camp Road store; (3)

[5] The ALJ concluded that Starbucks committed 125 violations in sixty different ways under the NLRA.

reopening the Galleria kiosk location; and (4) requiring Starbucks's executives to attend a public reading of a notice to Buffalo employees. Starbucks now petitions us to review the Board's decision and remedial orders.

## II.

We review "the Board's conclusions of law *de novo* and its findings of fact for substantial evidence." *NLRB v. AllService Plumbing & Maint., Inc.*, 138 F.4th 889, 900 (5th Cir. 2025). We will affirm the Board's legal conclusions that have "reasonable basis in the law" and "are not inconsistent with the [NLRA]," *id.* (citing *Entergy Miss. Inc. v. NLRB*, 810 F.3d 287, 292 (5th Cir. 2015), and its findings of fact that are "supported by substantial evidence on the record, considered as a whole." *UNF W., Inc. v. NLRB*, 844 F.3d 451, 456 (5th Cir. 2016) (quoting *Poly-Am., Inc. v. NLRB*, 260 F.3d 465, 476 (5th Cir. 2001)). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *UNF W.*, 844 F.3d at 456.

"Judicial review of NLRB decisions and orders is limited and deferential." *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir. 2018). Even though we must consider countervailing evidence that fairly detracts from the Board's findings, "the ALJ's decision stands if a reasonable person could have found what the ALJ found, even if the appellate court might have reached a different conclusion had the matter been presented to it in the first instance." *UNF W.*, 844 F.3d at 457. *See also El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656 (5th Cir. 2012); *Cordua Rests., Inc. v. NLRB*, 985 F.3d 415, 428 (5th Cir. 2021) (collecting cases).

## III.

We turn to each issue raised for review in the Board's order *seriatim*: Sections 8(a)(1), 8(a)(3) and (4), 8(a)(5). We then review its remedies.

A. Section 8(a)(1)

The Board concluded that Starbucks had unlawfully coerced its employees in their abilities to engage in union organizing activities in five ways: (1) promising benefits and soliciting grievances; (2) announcing a wage increase; (3) surveilling employees; (4) interrogating employees; and (5) making coercive threats. Starbucks contests each of these findings.

*1. Promising benefits and soliciting grievances*

Starbucks maintains that the Board erred in determining its conduct—solicitating grievances and conferring benefits by improving working conditions, expediting store repairs, centralizing training, upping staff count, and increasing wages—amounted to coercion in violation of § 8(a)(1). In adopting the ALJ's decision, the Board purportedly failed to analyze Starbucks's motives for these supposed benefits in three critical ways: (1) ignoring Starbucks's national standards and past practices which demonstrate that any actions taken in Buffalo were in fact ordinary; (2) misconstruing the meaning of "unlawful benefits"; and (3) confusing motive with but-for causation.[6]

An employer violates § 8(a)(1) by bestowing favors or economic benefits on employees with the "express purpose" of influencing unionization. *Delchamps, Inc. v. NLRB*, 588 F.2d 476, 479 (5th Cir. 1979); *Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 685–86 (1944). The

---

[6] Starbucks also criticizes the ALJ's failure to apply the rule set forth by the Supreme Court in *Exchange Parts.* The ALJ instead, according to Starbucks, applied an erroneous "categorical standard" finding it plainly unlawful to confer benefits during a union campaign because such "improperly influences employees' choices."

"inherent danger in well-timed increases in benefits is the suggestion of a fist inside the velvet glove." *Delchamps*, 588 F.2d at 479 (cleaned up) (citing *NLRB v. Exch. Parts Co.*, 375 U.S. 405, 409 (1964)); *accord NLRB v. Rexall Chem. Co.*, 418 F.2d 603, 605 (5th Cir. 1969); *NLRB v. Muscogee Lumber Co.*, 473 F.2d 1364, 1367 (5th Cir. 1973). Under *Exchange Parts*, the analysis of whether a promise or conferral of benefits violates § 8(a)(1) examines motive—whether the promise or grant of benefits was motivated by an unlawful purpose to coerce or interfere with protected union activity. *Network Dynamics Cabling, Inc. & Int'l Bhd. of Elec. Workers, Loc. 98, Afl-Cio*, 351 NLRB 1423, 1424 (2007) (citing *Exch. Parts*, 375 U.S. at 405); *accord NLRB v. WKRG-TV, Inc.*, 470 F.2d 1302, 1308 (5th Cir. 1973).

The Board's conclusion—that Starbucks's solicitation of grievances and conferral of benefits violated § 8(a)(1)—is supported by substantial evidence in the record. Starbucks ventures great lengths to attack the Board and ALJ for three primary errors, but all three allegations fail to address the substantial evidence supporting the Board's conclusion. What's more, Starbucks's allegations rely on a slippery slope and present legal theories that we need not reach or address to resolve this issue.

First, Starbucks points to generalized evidence in the record—its nationwide practice of hosting "listening sessions," preplanned improvements nationwide, importing employees to resolve understaffing, or centralization of training—to first assert that such measures were ordinary and commonplace nationwide. But that only suggests Starbucks's purportedly "ordinary" measures were merely at its disposal. It wholly fails address *why* Starbucks focused and amplified these measures in the Buffalo

region *only after* union organizing activity began.[7] For example, when the Board points to Starbucks's inexplicable fast-tracked repairs and renovations shortly after the start of union organizing—atypical to its longer timeline for approval—Starbucks only points to the implication of an impossible bind that the Board's decision puts it in. It offers no substantive explanation, nor any evidence in the record, for how the process of expediting timelines for improvements were typical nationwide as it was in Buffalo. *See, e.g.*, *Spengler-Loomis Mfg. Co.*, 95 NLRB 243, 245 (1951) (finding facility upgrades unlawful); *U Save Foods d/b/a Sun Mart Foods & United Food & Com. Workers Loc. No. 7, Petitioner*, 341 NLRB 161, 163 (2004) (finding remodeling unlawful). Rather, Starbucks retreats down a slippery slope by alleging later—as it does implicitly in all three of its arguments under this issue—that the Board's conclusion puts it in a "Catch-22" situation, because accepting the Board's reasoning somehow implies Starbucks would never be able to implement repairs once union activity begins. That does nothing to explain why Starbucks did not implement any such measures for improvement until only after union activity began. And, for the remaining evidence on which the Board's decision relies, Starbucks offers nothing to address those facts.

Next, Starbucks's attempt to define the legal meaning of a "benefit" is unconvincing. Relying again on the notion of an "impossible bind," Starbucks repeats its slippery-slope argument by alleging that construing operational changes as "benefits" would prohibit it from taking any actions to improve working conditions during a union campaign. Therefore, as Starbucks maintains, employers would be forced to decide the lesser of two evils: remedy a safety violation out of step with past practices, or violate §

---

[7] In any pertinent area that Starbucks attempts to address the record, it only presents blanket statements and interpretive conclusions that such measures were simply motivated by improving conditions instead of influencing union support.

8(a)(1) in keeping with past practice. First, alleging such a Hobson's choice distracts from the Starbucks's defects under the evidentiary standard. By attacking the legal definition of a "benefit," Starbucks offers nothing to refute the substantial evidence that sustains the Board's conclusions of Starbucks's improper motive in implementing improvements as "benefits." Second, such an argument distracts again from the dispositive question of why Starbucks remedied safety violations only after the onset of union activity. And the fact that Starbucks's argument seems to admit that the act of remedying safety violations was out of step with past practices only reinforces the image of Starbucks's historical neglect of the Buffalo locations until the advent of organizing activity.

And Starbucks's third argument fares no better. By alleging the ALJ confused but-for causation with motive, Starbucks introduces a novel analytical distinction which we need not consider. *See NLRB v. United Min. & Chem. Corp.*, 391 F.2d 829, 834 (2d Cir. 1968) (rejecting but-for causation in a § 8(a)(1) analysis). But without addressing portions of the record that suggest union activity was at least in part a motive for Starbucks's remedial actions, Starbucks inexplicably alleges the ALJ relied on "but-for causation" when its analysis in due part suffices to sustain a finding of motive. And by attacking the ALJ's language using "because of" or "but for," Starbucks skirts addressing the facts examined by the ALJ that suffice to support the conclusion that Starbucks's actions were driven by union activity. Again, its only justification appears as conclusory statements that these improvements stem from "legitimate business reasons to undertake such improvements." And again, Starbucks flags an unfounded fear that accepting the ALJ's findings would somehow threaten a "moratorium" on advancing legitimate concerns just because union activity begins. Yet, there would be no such perceived threat if Starbucks had addressed portions of the record—which it has not—demonstrating that its conduct in Buffalo accords with its past

practices nationwide, or that any countervailing evidence cuts against the reasonable inference that its conduct in Buffalo was motivated by anti-union sentiment.

The only relevant portion of the record that Starbucks contests here is that Pusatier's appointment and purported plan to renovate Buffalo stores occurred in July 2021, before the start of union activity in August 2021. However, that countervailing evidence, while suggestive that Pusatier had intended to implement regional changes regardless of union activity, does not substantively move the needle of reasonableness behind the ALJ's decision. Indeed, the evidence also demonstrates that Pusatier only familiarized herself with Buffalo "virtually" after her July appointment, and she did not actually arrive until September 1—a week after the Union announced its campaign. And, as the court's standard of review is limited and deferential to the ALJ's determinations, the ALJ's decision should stand because a reasonable person could conclude similarly. *In-N-Out Burger*, 894 F.3d at 713.

*2. Increasing wages*

Starbucks opposes the conclusion that it violated § 8(a)(1) by moving up a planned national wage increase.[8] It contends the record demonstrates that, for many years, Starbucks regularly implemented national annual wage increases, that this increase remained "consistent with its pattern of annual compensation increases," and that this increase did not reference Buffalo or any union campaign. Starbucks secondarily contests the Board's *sua sponte* determination that its promotion of two employees violated § 8(a)(1) on the basis that those issues were not argued and were later dismissed by the ALJ, and therefore not fairly litigated below.

---

[8] On July 28, 2021, Starbucks announced that it was moving up a nationwide pay increase from January 2022 to October 2021.

"[A] wage increase made during a union organizational campaign is not forbidden unless it is granted for the purpose of restraining employees in the free exercise of their right of choice of whether to unionize." *Delchamps*, 588 F.2d at 479.

The Board's conclusion that the wage increases were motivated by union activity is supported by substantial evidence. Starbucks's attempts in its opening brief and reply to downplay the evidence of the timing, reasons, and differences in wage increase announcements do not outweigh the reasonableness of the Board's factual findings. Starbucks minimizes the actual differences between the July 2021 announcement and October 2021 revision, contending that no such alleged "major benefit" exists. But a reasonable person may infer that the benefit was major enough, especially if done in the wake of "listening sessions" throughout Buffalo despite employees complaining for years prior of their dissatisfaction with wages. And unilaterally expanding both the class of employees eligible for a wage increase and the percentage increase for each class, as Starbucks did in October 2021, may be viewed as reasonably major. *See NLRB. v. S. Coach & Body Co.*, 336 F.2d 214, 217 (5th Cir. 1964). Starbucks's allegation—that this "major benefit . . . lacks record support"—reduces to disagreeing with the ALJ's interpretation of the facts, to which we must defer. *See In-N-Out Burger,* 894 F.3d at 714; *UNF W.*, 844 F.3d at 457. Starbucks also does not engage with the fact that, despite asserting it numerous times in other portions of its brief, many of these issues were products of the "listening sessions" that it asserts were regular company-wide practices. Given the sufficiently illustrative record, it becomes even more reasonable to infer that Starbucks's wage modification sprung from the listening sessions directed at union organizing activity.

And as for Starbucks's promotion of two employees, one of whom was active with the Union, Starbucks's contention that this issue was not

fairly litigated below is unavailing. Starbucks maintains the Board was on notice regardless of whether Starbucks had exhausted its argument on this issue. This is unpersuasive because Starbucks still concedes that it did not file a motion for reconsideration after the Board determined *sua sponte* that the promotions, originally alleged under § 8(a)(3), violated § 8(a)(1). In other words, it attempts to avoid the consequences of its failure to move for reconsideration by stating that the Board had notice of Starbucks's objections merely because the Board, in a footnote, had found the issue "fully litigated."

*Lion Elastomers, LLC v. NLRB*, to which Starbucks analogizes, is distinguishable. We found in *Lion Elastomers* that the employer preserved its challenge on appeal after the record demonstrated that it had raised the argument in a previous filing, notwithstanding its failure to file a motion for reconsideration before the Board. 108 F.4th 252, 258 (5th Cir. 2024). The Board had indicated that it was on notice by considering the objection in its decision. *Id.* Those facts are distinct because Starbucks does not point to anywhere in the record that it had filed *anything* to put the Board on notice of its opposition to this particular violation. Starbucks only points to the fact that the Board *sua sponte* found a § 8(a)(1) violation by reasoning, in a footnote, a "close[] connect[ion] to the subject matter of the complaint" which was "fully and fairly litigated." But merely because the Board found a separate violation *sua sponte* does not relieve Starbucks of the obligation to exhaust its arguments to preserve a challenge. 29 U.S.C. § 160(e); *see Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982) (failure to exhaust issue by raising before the Board deprives appellate jurisdiction). By merely pointing to the Board's language as purported evidence of its notice, Starbucks attempts to circumvent its own omission and ask the court to consider an argument that has not been fully exhausted before the Board. And nowhere does Starbucks cite an on-point case of such "constructive" notice that would mitigate its failure to exhaust this argument.

*3. Surveilling employees*

Starbucks next disputes as unsupported the Board's conclusion that Starbucks had violated § 8(a)(1) by (1) increasing support manager presence; (2) having support managers use headsets when not working the floor; (3) photographing an employee wearing a Union pin; and (4) referencing an employee-only group chat during an investigation.

An employer violates § 8(a)(1) if it "create[s] the impression of employer surveillance of the union activities of employees." *Delchamps*, 585 F.2d at 93; *see NLRB v. Aero Corp.*, 581 F.2d 511, 512 (5th Cir. 1978). This surveillance or impression thereof must "tend[] to interfere with, restrain, or coerce Union activities." *NLRB v. Mueller Brass Co.*, 509 F.2d 704, 708 (5th Cir. 1975).

Substantial evidence supports the Board's first three findings of unlawful surveillance. Starbucks begins by correctly claiming that the "mere presence of a supervisor" around union activity, absent any "extraordinary conduct" to indicate surveillance, fails to create such an impression. And as it correctly notes, such conduct is "extraordinary" if it causes employees to "reasonably assume" that their activities were being surveilled. But Starbucks inexplicably misses the Board's conclusion: The "extraordinary conduct" in question amounting to surveillance was Starbucks's unexplained saturation of nonlocal support managers to Buffalo stores only *after* the union campaign began. The ALJ examined and credited testimony demonstrating that the increased number of support managers led employees to believe these managers were staffed to surveil their union activities, and Starbucks's alternative theories are inapposite as long as employees reasonably gained that impression. *See also Cordua Restaurants*, 985 F.3d at 422; *NLRB v.*

*McCullough Env't Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993).[9] Starbucks's defenses—regardless of whether it regularly sends support managers where they are ostensibly needed, or whether those support managers in Buffalo were merely to address "operational issues"—do not undercut employees' reasonable impressions that union activity triggered the sudden and unusual influx of nonlocal support managers.

Starbucks's arguments hold no better regarding its managers' headset use. Starbucks complains that the record demonstrates multiple managers testifying to their limited use of headsets. That is inapposite because the ALJ rejected that testimony and instead credited employee testimony. *See Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996). And Starbucks's focus on the appropriateness of headset use for "work-related communications on the job" is likewise inapposite when substantial evidence illustrates support managers using headsets to monitor and confront employees on *and* off the floor. For example, managers reprimanded employees after hearing verbiage they disagreed with. Starbucks merely states that headset use was "part of [the managers'] duties." But this does not explain why it implemented new policies of continuous and ubiquitous headset use by managers until after union activity began.

And as for the manager's purported photograph of an employee wearing a Union pin, the fact that the manager had previously taken photographs in the store is not strong countervailing evidence. Considering the record demonstrates Starbucks had instructed managers to discourage employees from wearing Union pins in stores, and that the manager took a photograph of the employee (or appeared to) only a day or two after the union campaign launched—which included the employee's name—a reasonable

---

[9] Starbucks also does not challenge the ALJ's credibility determinations on appeal.

mind would infer that the manager was taking a photograph of the employee because of his Union pin.

However, whether the manager's confrontation of an employee's derogatory message constitutes substantial evidence of unlawful surveillance is murky. The Board makes the inference that, because the manager knew of the slur that employee used to reference the manager in an employee-only group chat—which also hosted union discussions—but refused to disclose the source of that knowledge, this unequivocally implies surveillance. Yet, that inference is arguably too attenuated to imply surveillance tending to "interfere with, restrain, or coerce" union activities. *Mueller Brass*, 409 F.2d at 708.

The Board relies on *Conley Trucking*, 349 NLRB 308, 315 (2007), *enforced*, 520 F.3d 628 (6th Cir. 2008), and *Charter Communications*, 366 NLRB No. 46, slip op. 6 (Mar. 27, 2018). Both are distinguishable. In *Conley Trucking*, the Sixth Circuit found unlawful surveillance because the employer confronted an employee regarding discovered activity that was squarely union-related: circulating wage petitions. And in *Charter Communications*, the employer explicitly referenced the Union in confronting the employee and his involvement. Those are not the facts here, where the record only demonstrates that a manager confronted an employee over the use of a slur rather than any union activity. And the mere fact that the text thread comprised only of employees and contained union discussions does not constitute substantial evidence of Starbucks unlawfully surveilling union activities. *See, e.g.*, *Greater Omaha Packing Co. v. NLRB*, 790 F.3d 816, 823 (8th Cir. 2015) (missing coercive element when the employer did not "gather[] information about ongoing union activities"); *Stern Produce Co. v. NLRB*, 97 F.4th 1, 10 (D.C. Cir. 2024) (finding "single remark" unrelated to union activity not coercive).

*4. Interrogating employees*

Starbucks disputes the Board's "implausible determination" of unlawful interrogation, in violation of § 8(a)(1), based on a manager's questioning—"you support this?"—of an employee while pointing at her Union pin. Starbucks contends that the remainder of the record illustrates that the employee admitted that the manager "respected [her] decision and it did not change her personal view." Specifically, that employee testified to a "little moment there, just understanding" with the manager. The employee's subjective impression therefore serves as countervailing evidence, according to Starbucks, of any unlawful interrogation.

"It is well established in this Circuit that interrogation of employees is not illegal per se . . . . To fall within the ambit of [§] 8(a)(1), either the words themselves or the context in which they are used must suggest an element of coercion or interference." *Pioneer Nat. Gas Co. v. NLRB*, 662 F.2d 408, 415 (5th Cir. Unit A Nov. 1981) (cleaned up) (citing *Delco-Remy Div., Gen. Motors Corp. v. NLRB*, 596 F.2d 1295, 1309 (5th Cir. 1979)).

The Board's conclusion is not supported by substantial evidence given the countervailing evidence of the employee's own testimony of her conversation with the manager. Admittedly, the manager's inquiry was pointed to where a reasonable mind would perceive the question—"you support this?"—while pointing to a union pin as interrogative. And the Board is correct that "even a single question" can be unlawful against the backdrop of ongoing hostility toward the union campaign, which the record arguably sustains. *See NLRB v. Camco, Inc.*, 340 F.2d 803, 804 (5th Cir. 1965). But the Board's argument falters when it provides no consideration to the countervailing evidence that undermines a reasonable impression of coercion. The Board merely opines, in conclusory fashion, that the employee's ensuing testimony—that the manager respected her decision

after coming to a point of mutual "understanding," and that such did not affect her character opinion—would not have dispelled a reasonable fear of reprisal. Standing alone, the employee's own testimony, when viewed holistically, substantively undermines any impression of coercion that may have sounded in from the manager's initial inquiry.

Although the Board relies on *Camco*, that case is distinguishable because, there, we acknowledged in a footnote that a single question may be unlawful interrogation in the "background of union hostility." 340 F.2d at 804. And, while the Board points to an undeniable record of concurrent conduct by Starbucks that exudes union hostility, the evidence in this specific instance is inadequate to find unlawful interrogation of that employee. *See, e.g.*, *Pioneer Nat. Gas*, 662 F.2d at 416 (noting that inquiry was "the kind of casual question that this court has never held to be a [§] 8(a)(1) violation"); *TRW, Inc. v. NLRB*, 654 F.2d 307, 314–15 (5th Cir. 1981) (similar conclusion on innocuous line of questioning).

*5. Making coercive threats*

Last, Starbucks maintains that its statements comparing benefits of nonrepresentation with unionization did not violate § 8(a)(1). It avers that the record contradicts the Board's characterization of Starbucks's statements, and that its conclusion would (1) "prevent" managers from assisting employees on the floor; (2) "eliminate" their ability to gain extra shifts at other stores; and (3) "prevent" them from receiving new benefits. Listing examples from the record, Starbucks maintains that its legal statements were accurate reflections of the "potential effects" of unionization. Starbucks further maintains that those statements originate from lawful negotiation. And from that, none of those statements could have reasonably been interpreted to threaten unilateral action, especially when the First Amendment and NLRA § 8(c) protect that kind of speech.

Section 8(c) permits an employer to "communicate to employees a statement of opinion about the union as well as predict the effect of unionization on the workplace, so long as such a prediction is based on objectively verifiable facts and does not contain a threat of reprisal or force." *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 633 (5th Cir. 2003). "If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969). Moreover, an "unlawful threat is established if the totality of the circumstances reveals an employee reasonably could conclude the employer is threatening economic reprisals if the employee supports the union." *Brown & Root*, 333 F.3d at 634.

Based on these facts, the Board lacks substantial evidence to find any coercive threats. The parties agree that a prediction must be set in "objectively verifiable facts" as the rule. *See Brown & Root, Inc.*, 333 F.3d at 633. However, contrary to the Board's position, Starbucks is persuasive that the managers' statements—hypothesizing their limited ability to assist employees to the same degree, or unionization's effects on their transferability to other stores—do not suffice to lead a reasonable mind to infer a threat of economic reprisal. In the context of these statements, nothing in the record suggests that these "potential effects" were based on issues unrelated to economic necessities or facts known only to Starbucks. *See Gissel Packing*, 395 U.S. at 618. If anything, gaining or losing those two particular benefits, among others, falls patently in line with the give-and-take of the collective bargaining process. *See, e.g.*, *Hendrickson USA, LLC v. NLRB*, 932 F.3d 465, 472 (6th Cir. 2019) (finding no coercive threat in candid remarks about starting point of benefits in negotiations); *cf. UNF W.*, 844 F.3d at 458

(finding coercive threat when the employer predicted, without qualification, to unilaterally reduce wages absent reference to collective bargaining).

Indeed, the record supports Starbucks's position. One supervisor stated that new benefits may or may not be possible depending on the negotiated contract. And other statements on the record sustain the objective reality if unionization should succeed. To this, the Board—in rather conclusional fashion while asserting broad generalities of rule clusters from some cases—alleges that Starbucks's statements were wholly unsupported by objective facts or the nature of the collective bargaining process, and that *de facto* presumes coercion. But a candid review of the totality of the circumstances here suggests that these statements were made already the context of manager-employee discussions of unionization's effects. Nothing in these facts suggests that those benefits were unrelated to Starbucks's economic necessities or only known to Starbucks. Thus, there is a lack of evidence for a reasonable mind to infer that these statements are unlawful coercive threats under § 8(a)(1).

* * *

Altogether, with exception to (1) one finding of unlawful surveillance, (2) the sole finding of unlawful interrogation, and (3) the sole finding of coercive threats, substantial evidence supports the Board's conclusion that Starbucks violated § 8(a)(1). For those findings, Starbucks's arguments reduce to asking the court to reach a different conclusion. But that does not chin the bar under the deferential standard of review for findings of fact, and Starbucks fails to demonstrate how the Board's conclusion and ALJ's analysis present reversible error. *See UNF W.*, 844 F.3d at 457.

B. Sections 8(a)(3) & (4)

Starbucks next disputes the Board's determination concluding that Starbucks had violated § 8(a)(3) and § 8(a)(4) based on how it disciplined

employees, changed work schedules, and closed the Galleria kiosk. Starbucks broadly alleges "cross-cutting errors in the ALJ's reasoning" resulting in the "kitchen sink" of § 8(a)(3) and § 8(a)(4) violations.

An employer violates § 8(a)(3) by discharging employees because of their union activity. 29 U.S.C. § 158(a)(3); *NLRB v. ADCO Elec. Inc.*, 6 F.3d 1110, 1116 (5th Cir. 1993). Section 8(a)(4) similarly prohibits an employer from taking adverse action against an employee "because [they] have filed charges or given testimony under [the Act]." 29 U.S.C. § 158(a)(4); *Trader Joe's Co. v. NLRB*, 167 F.4th 766, 785 (5th Cir. 2026). A violation of § 8(a)(3) or 8(a)(4) derivatively violates § 8(a)(1). *Trader Joe's Co.*, 167 F.4th at 785; *Indep. Elec. Contractors of Houston, Inc. v. NLRB*, 720 F.3d 543, 547 n.6 (5th Cir. 2013).

To establish § 8(a)(3) and § 8(a)(4) violations, "the General Counsel must first show, by a preponderance of the evidence, that the employee was engaging in protected activity, that the employer had knowledge of the activity, that adverse action was taken against the employee, and that the activity was a motivating factor in the decision to discipline the employee." *NLRB v. Arkema, Inc.*, 710 F.3d 308, 320–21 (5th Cir. 2013) (footnote omitted) (citing *Wright Line*, 251 NLRB 1083 (1980)). If the Board shows all factors to establish a prima facie case of anti-union animus, "the burden shifts to the employer to demonstrate that the action would have taken place regardless of any animus." *Id.* at 321; *see NLRB v. Associated Milk Producers, Inc.*, 711 F.2d 627, 629 (5th Cir. 1983).

*1. Prima facie case of union animus*

Starbucks asserts that the Board failed to prove a prima facie case of anti-union animus when it (1) erred in determining union activity was a motive for Starbucks's actions; and (2) failed to find that Starbucks knew of any union activity under each adverse action taken against certain employees.

For its first argument, Starbucks complains the Board improperly inferred animus by relying on its § 8(a)(1) analysis, thereby amounting to a "shortcut" when no concrete causal connection between any employee's discharge and anti-union animus was ever shown. Pointing to the record, Starbucks claims that both the Board and ALJ artificially restricted their respective review of evidence in a manner that ultimately ignored plausible countervailing explanations that undermine a finding of animus. And, for its second argument, Starbucks complains that the Board improperly inferred Starbucks's specific knowledge of its discharged employees' involvement in union activity; the record, according to Starbucks, is devoid of any evidence that the managers who terminated the employees in question knew of their union affiliations.

Starbucks's violations of § 8(a)(3) and (4) are supported by substantial evidence, but we think this issue necessitates remand for the Board to specify the specific violations it relied on from its § 8(a)(1) analysis.

To start, the Board's decision points to an extensive record of conduct that is more than sufficient for a reasonable mind to infer an anti-union motive in taking adverse actions against union-affiliated employees. Take for instance the Board's reliance on various portions of the record illustrating an "unprecedented" degree of level-setting in Buffalo—which included a mass mobilization of corporate executives—despite a history of lax enforcement. This is sufficient to lend the inference that union activity inspired that kind of response. And, even if the timing alone here appears dubious, *see NLRB v. Arkema, Inc.*, 710 F.3d 308, 323 (5th Cir. 2013), that nothing was new in Buffalo by the fall of 2021, other than union activity, is sufficiently substantial to infer union activity drove Starbucks to tighten enforcement of its rules.

To be sure, Starbucks cites persuasive cases that recite the standard under which the Board and ALJ must abide. *See Delco-Remy*, 596 F.2d at

1305; *DirecTV Holdings, L.L.C. v. NLRB*, 650 F. App'x 846, 852 n.10 (5th Cir. 2016); *Apple Inc. v. NLRB*, 143 F.4th 291, 303 (5th Cir. 2025). But, for instance, even though Starbucks points to "more than 100 examples of employee discipline in stores in the Buffalo region and elsewhere[,]" that fails to grapple with the ALJ's determination that those stores' deficiencies were "not new." The fact that Starbucks engaged in level setting at stores in three other states similarly does not speak to the oddity of timing given the speed at which Starbucks implemented these new policies only after union activity began in Buffalo. And while Starbucks disagrees with the ALJ's purported narrowing of its analysis of employee discipline to only one store, the focal point of that analysis was Starbucks's amplified disciplinary enforcement when there previously was none, rather than its general policy of enforcement nationwide. *See El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 657 (5th Cir. 2012).

Indeed, Starbucks does not directly address those portions of the record and, instead, reaches for its overarching defenses that do all but persuade. Starbucks's allegation that the Board and ALJ improperly took a "shortcut" to find § 8(a)(3) and (4) violations from its § 8(a)(1) analysis is meritless because it implies that the analysis for each must be independent. Not so. The former two may very well result in derivative violations after determining violations of the latter. *See Trader Joe's*, 167 F.4th at 785. In light of that, substantial evidence that supports a § 8(a)(1) violation may be used to also sustain a § 8(a)(3) or (4) violation. *Id.*; *see also Indep. Elec. Contractors*, 720 F.3d at 547 n.6 (5th Cir. 2013).

Starbucks's alternative assertion of the lack of causality between its purported animus and its adverse actions against certain employees is similarly unpersuasive. Starbucks correctly invokes the rule that "simple animus and general hostility toward the union are insufficient" to infer motive when there must be "a reasonable inference of causal connection."

*Stern Produce Co., Inc. v. NLRB*, 97 F.4th 1, 12 (D.C. Cir. 2024) (cleaned up); *NLRB v. Mueller Brass Co.*, 509 F.2d 704, 711 (5th Cir. 1975). However, its premise—that the Board only found "general hostility" here lacking "any concrete finding" of motive—is unavailing when, again, the vast record conveys a reasonable inference that several of these managers and executives who took direct adverse action against were, or should have been, aware of their union affiliation. For example, a corporate executive verbally attributed that listening session to, at least in part, the union campaign. Even though Starbucks is correct that the "at-issue decisions were made by myriad managers," the Board's conclusion was sufficiently detailed to demonstrate it examined the individual instances contrary to some form of generalized hostility. In the same vein, this contradicts Starbucks's contention of the lack of any evidence that managers knew of employees' union activities when the record suggests otherwise.

And elsewhere, Starbucks claims that the Board—apart from identifying Starbucks's level setting and stricter rule enforcement—erroneously failed to specify which specific § 8(a)(1) violations also constituted § 8(a)(3) and (4) violations. However, "[t]he Board is the primary decisionmaker for adjudications of this kind" because it is "best suited to resolve factual disputes" such as here. *Starbucks Corp. v. NLRB*, 175 F.4th 627, 629 (5th Cir. 2026). In adopting the ALJ's findings, the Board concluded that the "'vast and systemic barrage of Section 8(a)(1) violations' warrant an inference that an overwhelming number of the adverse employment actions alleged to be unlawful in the complaint resulted from '[Starbucks's] extreme animus toward the organizing campaign in the Buffalo area.'" Even if we would have reached a different conclusion, we must still affirm. *UNF W.*, 844 F.3d at 457; *see NLRB v. Superior Prot., Inc.*, 105 F. App'x 561, 563 (5th Cir. 2004). Given that substantial evidence vastly

supports the conclusion that Starbucks's committed several § 8(a)(1) violations, the same may be said of Starbucks's § 8(a)(3) and (4) violations.

*2. Adverse employment actions notwithstanding animus*

Starbucks alternatively claims that even if the Board established a prima facie case of anti-union animus, it would have still taken its adverse actions against the employees in question absent any animus. Starbucks first contends the ALJ ignored legitimate business justifications for closing the Galleria kiosk: disrepair and financial underperformance, cost to bring up to standard, its nationwide policy for closing mall kiosks in the wake of the pandemic, and the fact that all employees at this location were permitted to transfer to other stores. Next, Starbucks explains the reasons for which it would have terminated the employees in question regardless of their union affiliations:

- Brian Nuzzo: entering a store alone (when at least two other employees were required) without a mask; lying when questioned about this incident; responding to his subsequent discharge with profanity.
- Edwin Park: "kick[ing] a door, thr[owing] dishes into a sink, and direct[ing] profanity" at another employee; being tardy; sticking his finger in a customer's drink.
- Nathan Tarnowski: "l[ying] about his symptoms on his COVID-19" reporting app.
- Angel Krempa: violating dress code, attendance, language policies numerous times.
- Daniel Rojas, Jr.: being repeatedly tardy, for which he received discipline; being tardy again months later and leaving other employees locked outside.

- Cassie Fleischer: failing to satisfy the store's minimum-availability requirements, even after Starbucks requested more hours or offered her transfer options.

Yet, it is worthwhile to consider the Board's perspective. For the Galleria kiosk, the Board contends that it simply found Starbucks's reasons for its closure uncorroborated by the record. Even if Starbucks cited genuine business interests for closing the kiosk, it took no action until after union campaign launched, and no evidence supports any finding that Starbucks had planned to close the kiosk until after the union campaign began. Quite the opposite, the Board contends that other evidence—Starbucks installing a new stove at the kiosk before abruptly closing it temporarily, or the kiosk's manager feeling "surprised and upset" by the closure as it contradicted news that Starbucks offered earlier—were indicative of pretext. And, as for the terminated employees in question:

- Brian Nuzzo: The rules under which he was punished had never been previously enforced, especially when the record shows opening-shift supervisors regularly entered the stores alone without masks and skirted discipline.
- Edwin Park: The record provides context for why he dipped his finger in a customer's drink; two coworkers asked him to compare two drinks, and he dipped his finger to test. After he learned the drink was for a customer, he threw the drink away to make a new one. Even if that explanation is unlikely, Park's violation pales in comparison to the comparators' conduct that Starbucks cites as evidence of consistent disciplinary policies. And those comparators were only disciplined, not discharged like Park.

- Nathan Tarnowski: He reported his symptoms truthfully as he was instructed, and returned the next day after his symptoms subsided. Starbucks did not discharge other employees who showed up at work despite failing to report an illness.
- Angel Krempa: She had only been tardy twice, and Starbucks did not present any evidence that her store's location ever discharged employees for attendance.
- Daniel Rojas, Jr.: The record demonstrates Starbucks tolerated Rojas's occasional tardiness before the union campaign launched. The comparators that Starbucks offers to demonstrate nondiscriminatory discharges based on performance are distinguishable from Rojas because those employees who were severely and consistently tardy, whereas Rojas's tardiness was occasional and slight.
- Cassie Fleischer[10]: The minimum-availability requirement came only after the union campaign as part of Starbucks's level setting and rule enforcement. Starbucks also accommodated reduced-hours requests of other employees.

Because the record speaks for itself, we conclude that the Board's conclusions here are also supported by substantial evidence. While Starbucks advances a litany of justifications for terminating each union-affiliated employee, the Board's decision and record both substantively show a glaring discrepancy: Starbucks did not consistently take the same adverse action against other employees who engaged in similar if not more egregious

---

[10] The Union intervenes to claim that employee Kellen Higgins also was constructively discharged after she resigned due to Starbucks's minimum-availability policy. Starbucks does not contest that conclusion, but we assume its opposition from its sweeping allegations of the Board's "cross-cutting errors."

conduct than the at-issue employees. In comparing the factual allegations between Starbucks and the Board, the issues may be reduced to a difference in interpretations of facts. While the Board contends Starbucks did not discipline other non-unionizing employees who engaged in the conduct above, Starbucks points to other portions of the record that it did discharge employees for the same conduct absent union activity. In other areas, Starbucks takes special aim at the egregiousness of the employees' conduct to justify their discharge, while the Board focuses on context to demonstrate that the conduct was not in fact as egregious as Starbucks dramatizes.

While we could tediously engage in a case-by-case analysis of each at-issue employee, it does not appear, as an initial matter, that any of the Board's conclusions from its factual determinations are unreasonable or unsupported by substantial evidence in the record when considered holistically. The same may be said of the evidence underlying the parties' dueling narratives of Starbucks's conduct leading up to the closure of the Galleria kiosk. Because the Board cites numerous portions of the record that demonstrate substantial evidence for its conclusions, the court should not reevaluate that evidence and substitute its judgment for that of the Board, especially when the dispute here reduces to conflicting interpretations of fact. *See Hiran Mgmt., Inc. v. NLRB*, 157 F.4th 719, 723 (5th Cir. 2025); *Trader Joe's*, 167 F.4th at 778.

It is debatably suspicious, and therefore reasonable to infer, that the common denominator among the employees who were discharged all around the same period is that they were all affiliated with union activity. That raises the reasonable inference as well that, based on the evidence the Board considered of these particular employees and their comparators, Starbucks might not have discharged these employees if it were not for their union engagements.

* * *

Altogether, a reasonable mind would agree that the Board presented a prima facie case of Starbucks's anti-union animus. Further, Starbucks fails to show that it would not have taken the same actions against the employees in question absent their union activity. Thus, we conclude that substantial evidence supports the conclusion that Starbucks violated § 8(a)(3) and (4).

C. Section 8(a)(5)

Starbucks also contests the Board's conclusion that it violated § 8(a)(5) for failing to bargain with the Union regarding a change in Starbucks's minimum-availability policy and for discharging Park and Krempa. It contends that it never changed its availability policy, which always reflected ongoing business needs, and employees unable to evolve with those needs may be separated. Furthermore, Starbucks continues that it was not required to consult the Union regarding Park and Krempa's discharges because it did so under preexisting disciplinary policies based on their unsatisfactory conduct or failure to meet company needs.

Section 8(a)(5) prohibits an employer from "refus[ing] to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5); *NLRB v. Katz*, 369 U.S. 736, 743 (1962). An employer must "consult and negotiate with the union before changing the terms and conditions of employment." *Elec. Mach. Co. v. NLRB*, 653 F.2d 958, 962 (5th Cir. 1981).

And "[i]f, following a successful union election, the employer begins to strictly enforce previously existing rules which had not earlier been enforced, § 8 of the NLRA is violated." *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 657 (5th Cir. 2012) (cleaned up) (citing Hyatt Corp. v. NLRB, 939 F.2d 361, 372–73 (6th Cir.1991)).

Substantial evidence in the record supports the Board's § 8(a)(5) determination. While Starbucks avers that both policies—minimum availability and discipline—preceded any union certification at that store, Starbucks skirts the dispositive factual issue that the Board emphasizes: Starbucks's enforcement of those policies changed in February 2022 after it appeared to enforce stricter availability requirements. *See El Paso Elec.*, 681 F.3d at 657. Indeed, Starbucks neither imposed nor enforced such an availability requirement at the store in question until February 2022, which came shortly after the store's union certification in December 2021. Thus, regardless of whether those policies were "preexisting" as Starbucks contends, it is precisely Starbucks's stricter enforcement of those policies that rises to the level of an unlawful practice.

The record also cuts against Starbucks's argument given that, prior to union certification of that particular store, Starbucks did not appear to enforce its minimum-availability policy. It is inapposite that Starbucks contends the policy itself has not changed when the issue at hand is its inconsistent and uneven *enforcement* of that policy in the wake of unionization. Neither are Starbucks's attempts to minimize substantial evidence of stricter enforcement—by attributing that enforcement to mere demands of business dictated under the same preexisting policy—convincing. And, because the Board also found substantial evidence of Starbucks's lax enforcement of its disciplinary policy until its enforcement against Krempa and Park, Starbucks's justifications regarding their discharges are also unavailing.

### D. Remedies

Starbucks primarily targets four ordered remedies in its petition for review: (1) compensating employees for direct and foreseeable pecuniary

harm; (2) a bargaining order at Camp Road; (3) reopening the Galleria kiosk; and (4) requiring a public reading of a notice to Buffalo employees.

*1. Consequential damages*

First, the parties stipulate that this circuit prevents the Board from awarding compensatory damages for all direct and foreseeable harms. *See Hiran Mgmt.*, 157 F.4th at 728–29. That is an accurate statement of our precedent, and we are bound by it. *See Gahagan v. United States Citizenship & Immigr. Servs.*, 911 F.3d 298, 302 (5th Cir. 2018) (reciting rule of orderliness). Thus, we reiterate that the Board may not order legal damages under the NLRA and that it is foreclosed from awarding that kind of remedy against Starbucks.

*2. Bargaining order*

Next, Starbucks claims that insufficient evidence supports the Board's remedy of a bargaining order at the Camp Road store. First, Starbucks argues that the Board's decision lacked the requisite analysis finding any of the unfair labor practices identified at the Camp Road store were sufficiently "serious and extensive" to justify a bargaining order. In particular, the Board's reliance on a "grant of benefits" via promotions or "retaliatory demotions" via reduction of employee hours fall short of anything "serious and extensive." Second, Starbucks accuses the Board of padding the record with Starbucks's purported misconduct at other stores when the analysis should have been limited to one store. Third, Starbucks claims that no other employees at the Camp Road store knew of the terminations that took place to impact union elections there. And last, Starbucks argues that the Board did not demonstrate that a new election could not fairly be held to warrant a bargaining order.

Bargaining orders, known as *Gissel* orders, are limited to "exceptional cases where the employer's attempts to circumvent the election process

indicate that the Board's traditional remedies cannot ensure a fair election." *Adams & Assocs., Inc. v. NLRB*, 871 F.3d 358, 375 (5th Cir. 2017); *see NLRB v. Gissel Packing*, 395 U.S. 575, 614 (1969). We abide by a settled four-factor test:

> (a) the union had valid authorization cards from a majority of employees in an appropriate bargaining unit; (b) the employer's unfair labor practices, although not "outrageous" and "pervasive" enough to justify a bargaining order in the absence of a card majority, were still serious and extensive; (c) "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight"; and (d) employee sentiment can best be protected in the particular case by a bargaining order.

*Cal. Gas Transp., Inc. v. NLRB*, 507 F.3d 847, 854–55 (5th Cir. 2007) (quoting *NLRB v. American Cable Sys., Inc.*, 414 F.2d 661, 668–69 (5th Cir. 1969)).

Substantial evidence supports the Board's justification for a bargaining order at Camp Road. To start, the record weighs in favor of the Board under the *Gissel* analysis. Neither party disputes under the first prong that the Camp Road store secured authorization cards. But the record weighs in favor of the Board's conclusion, given its citations that demonstrate instances in which Starbucks engaged in serious and extensive unfair labor practices by coercively granting benefits to employees through a wage increase and promotions, improving working conditions, demoting a lead organizer, reducing store hours, and instructing managers to threaten benefits. This is not what Starbucks incorrectly alleges as the Board and ALJ merely "breez[ing] through the four-factor test." Without any explanation,

Starbucks alleges that these rationales were "*post hoc* rationalizations for agency action" impermissible under this circuit's precedent, but a review of the record demonstrates no purported cherry-picking when much of the same facts affecting Starbucks's other locations were also relevant to the Camp Road store. And perceivably, the record illustrating Starbucks's pervasive conduct at Camp Road, alongside other stores throughout Buffalo, suffices to support an inference of difficulty in ensuring a fair election without the protections of a bargaining order. *See Cal. Gas*, 507 F.3d at 855 (collecting cases); *WKRG-TV*, 470 F.2d at 1319–20.

Starbucks overreads *California Gas* to aver that the Board erroneously expanded its misconduct analysis beyond the Camp Road store. In *California Gas*, we did not hold that a Board's *Gissel* analysis must be restricted to a single store or one particular "bargaining unit" as Starbucks argues. We merely found it unnecessary to reach an objection to the Board's consideration of violations at other facilities, because violations at the one facility were sufficient to "independently justify imposing the *Gissel* Order" there. *Cal. Gas*, 507 F.3d at 853. And Starbucks's remaining contention—Camp Road employees could not have known of the events unfolding at other Buffalo stores to affect their union vote—is unavailing because there is substantial evidence that such information *was* shared, either through employees' communications across stores, or the sheer fact that these violations were overt and publicized by both Starbucks and the Union. To this, Starbucks merely disagrees with that evidence or alleges that the Board discredited and ignored countervailing testimony. That is insufficient under the deferential standard of review to an agency's findings of fact.

*3. Order to reopen the Galleria kiosk*

Starbucks also opposes the Board's order to restore the Galleria kiosk "as it existed prior to September 2021" after shuttering operations there for

"legitimate, non-retaliatory reasons." Specifically, Starbucks contends that the Board lacks authority to order a party to achieve impossible outcomes or force decisions and actions of nonparties, which includes reopening a permanently closed kiosk in a space it does not own.[11]

Whether the Board should order an employer to reinstate operations as a remedy for unfair labor practices "is closely tied to the facts of each case" where "no per se rule can be stated." *Mid-S. Bottling Co. v. NLRB*, 876 F.2d 458, 460 (5th Cir. 1989). The appropriate remedy when an employer shuts down operations for discriminatory purposes is "restoration of the status quo ante." *Id.* And an employer seeking to avoid an imposition of such an order has the burden to show that returning to the status quo ante would impose "an undue or unfair burden on it . . . or threaten[] its viability as a company." *Id.* at 461 (cleaned up) (citations omitted).

Relying on *RAV Truck*, Starbucks emphasizes that requiring it to reopen the Galleria kiosk would be unduly burdensome, if not an entirely impossible feat. We agree. In *RAV Truck*, the D.C. Circuit rejected the Board's restoration order because of its failure to address "compelling and uncontradicted evidence that [the employer] had no suitable space" to operate its business since the record demonstrated a terminated lease. *RAV*

[11] Here and throughout, the Board contends that Starbucks failed to preserve any of its arguments it did not explicitly develop in its briefing for this petition. According to the Board, any findings that Starbucks only gave "cursory treatment" is entitled to summary enforcement. We quickly reject this notion in a footnote, however, to conclude that Starbucks has properly preserved any objection raised as an exception to the ALJ's findings, even if not explicitly developed in its opening brief in this petition. *Thryv, Inc. v. NLRB*, 102 F.4th 727, 741 (5th Cir. 2024) (holding that a party "need only urge an issue before the Board, *its member, agent, or agency* to preserve it for review in the court of appeals"). Because Starbucks filed explicit exceptions to specific findings that it disputes now in its petition for review, and because an "ALJ is a member or agent of the Board," Starbucks preserved this argument and we may consider it. *Id.*

*Truck & Trailer Repairs, Inc. v. NLRB*, 997 F.3d 314, 331 (D.C. Cir. 2021). That record was replete with testimony and other evidence of the size and equipment restrictions of the leased space, the lease itself, and state regulations that restricted the employer's intended use, all of which the Board omitted from consideration. *Id* at 331–32.

While Starbucks, to the Board's credit, may not have offered "compelling and uncontradicted evidence" to the level of that in *RAV Truck*, we can still easily see that requiring Starbucks to reopen a store at a location that it no longer owns or operates is virtually impossible and "defies reasoned decision making." The record demonstrates that the Galleria kiosk is presently—and for the last five years—"owned and operated by the Walden Galleria as a licensed store." Without question, common sense dictates that it would be difficult for Starbucks to break a licensing agreement with a third party, to reassert control of the kiosk, and to force that third party to grant it a new lease of the space.[12] Accordingly, we decline to grant enforcement as to this remedy.

*4. Reading of a public notice*

Last, Starbucks's challenges the Board's order requiring an executive to attend the public reading of a Board-crafted notice. Starbucks contends this remedy is disproportionately punitive given that it was not a "repeat violator" and did not create a "chill atmosphere of fear." It is insufficient, Starbucks maintains, that the violations were merely "numerous and serious" as the Board reasoned when the correct metric is recurrence.

[12] The Board contends that the record demonstrates, which Starbucks does not dispute, that Starbucks closed the kiosk and converted its status to a "licensed store" now managed and operated by the mall, which in turn pays royalties back to Starbucks. While noteworthy, that still fails to controvert the steep burden on Starbucks if we were to order Starbucks to reopen a location it has neither owned nor operated for years.

"For repeated violations persisted in despite intervening declarations of illegality, the Board is warranted in impliedly concluding that such conduct has created a chill atmosphere of fear and, further, in recognizing that the reading requirement is an effective but moderate way to let in a warming wind of information and, more important, reassurance." *UNF W.*, 844 F.3d at 463 (5th Cir. 2016) (cleaned up) (quoting *J.P. Stevens & Co. v. NLRB*, 417 F.2d 533, 540 (5th Cir. 1969)). However, we are cautious to grant this remedy because of our "skepticism regarding public-notice-reading order[s]" when the record is insufficient to demonstrate that an employer is a "repeat offender." *Denton Cnty. Elec. Coop., Inc. v. NLRB*, 962 F.3d 161, 174 (5th Cir. 2020).

Starbucks claims that the language in the Board's order—finding its violations "so numerous and serious"—is insufficient to characterize Starbucks as a "repeat violator" like that in *Denton County.* That is unavailing. While the language between the Board's decision here mirrors the Board's language with which we took issue in *Denton County*, the facts are distinguishable. In *Denton County*, we expressed skepticism with public notice-reading orders as a matter of public policy and determined that the Board erroneously ignored whether the employer was a "repeat offender"; it incorrectly justified the remedy based on the employer's "serious and widespread" unfair labor practices. *Denton Cnty.*, 962 F.3d at 174. We reinforced the test—whether an employer's conduct imposes a "chill atmosphere of fear"—but ultimately determined there that the facts were "not as egregious as cases in which [we] ha[ve] upheld a public notice reading order." *Id.* at 174–175 (citing *UNF W.*, 844 F.3d at 463). To be sure, the record in *Denton County* did not warrant a public notice-reading order because the evidence illustrated employees' independent attempts to oust union representation irrespective of the employer's unfair labor practices. *Id.*

In other words, nothing in the employer's conduct "both in type and frequency" justified characterizing the employer as a repeat offender.

Those facts are not here. Quite the opposite, *UNF West*, which *Denton County* cites, appears to be more analogous to Starbucks's case here. In *UNF West*, we concluded that the employer was a "repeat violator" of § 8(a)(1) after finding that, in another case at the same facility, the ALJ found unfair labor practices. *UNF W.*, 844 F.3d at 463. Because that petition for review "represent[ed] the second round of the same problematic conduct in the same facility, in the context of the same union campaign—only with new characters," we granted enforcement of the order. *Id.*

Notwithstanding that neither the Board nor the Union claim that Starbucks's unfair labor practices recurred in the same one store despite judicial intervention as it did in *UNF West*, the Union cites a litany of recent judicial enforcements and Board decisions illustrating disturbingly similar unfair labor practices that unfolded at other locations around the country. And, while Starbucks claims that a number of those cases postdate this decision—which, according to Starbucks, presumably cannot be cited to imply that it had notice of these violations which it purportedly "repeated"—a cursory examination of even just a few of the cited decisions demonstrate that Starbucks's other unfair labor practices occurred closely, if not concurrently, with the conduct at issue in this petition. *See, e.g.*, *Starbucks Corp.*, 374 NLRB No. 9 (Dec. 16, 2024); *Starbucks Corp.,* 373 NLRB No. 111 (Sept. 25, 2024); *Starbucks Corp.*, 373 NLRB No. 101 (Sept. 6, 2024). And, even if only a few have been judicially enforced, as Starbucks claims, we have relied on a Board's decision to conclude that an employer was a repeat violator. *See UNF W.*, 844 F.3d at 463. Put another way, the myriad decisions involving Starbucks's unfair labor practices lends support to the inference that this petition is not Starbucks's first rodeo. The record is sufficient to

warrant a public notice-reading order because Starbucks's measures throughout its stores in Buffalo created a "chill atmosphere of fear."

## IV.

We **DENY** enforcement of the Board's § 8(a)(1) decision with respect to the one finding of unlawful surveillance, the sole finding of unlawful interrogation, and the sole finding of coercive threats. We **REMAND** the § 8(a)(1) decision to the Board to revise its order not inconsistent with this opinion.

We **GRANT** § 8(a)(3), (4), and (5) enforcement.

And, we **DENY** enforcement of the consequential damages remedy, **GRANT** enforcement of the bargaining order at the Camp Road store, **DENY** enforcement of restoring the status quo ante of the Galleria kiosk, and **GRANT** enforcement of the public notice-reading order.

HAYNES, *Circuit Judge*, concurring in part and dissenting in part:

I agree a bit with the majority opinion. However, I respectfully disagree with the majority opinion's analysis and conclusions on several issues. I discuss those issues, and why I respectfully dissent in part, below.

To begin, I respectfully disagree with several facets of the majority opinion's analysis of Starbucks's purported violations of § 8(a)(1) of the National Labor Relations Act ("NLRA"). *First*, the majority opinion reasons that Starbucks violated § 8(a)(1) by conferring benefits and soliciting grievances from its employees in the Buffalo region. The Board noted that Starbucks's alleged violations included such actions as improving working conditions (e.g., repairing and renovating stores). Starbucks undertook its store improvement efforts once it learned, during the union campaign, that its Buffalo stores were suffering from widespread health and safety problems, including "inadequate . . . store spaces or layouts, damaged . . . structural components, broken or outdated equipment, and pest issues."[1]

Contrary to the majority opinion's conclusions, Starbucks's actions are most properly understood as appropriate efforts that it undertook once it learned of the pervasive, serious issues in those stores—part of its normal practices to improve the health and safety of its Buffalo stores. This read of Starbucks's conduct is substantiated by the fact that Starbucks undertook repairs in both unionizing *and non-unionizing* stores throughout the Buffalo region, showing that it was neither favoring nor disfavoring unionizing

[1] When Deanna Pusatier was asked about what she had "observe[d] about the [Buffalo] market" when arriving in "the market" as the "regional director of operations," she explained that "[i]t was the worst store condition I had ever seen ever in my entire tenure with Starbucks." As she noted, "[t]he cleanliness issues were unlike anything [she had] ever seen. There were fruit flies, bees everywhere. Staffing issues were horrendous. . . . Everyone was overwhelmed, and the customer experience . . . was absolutely terrible."

stores.[2] Under the Board's view in this matter, it is not letting Starbucks do what it needs to do and takes it back and forth.[3] In my view, "it would be quite extraordinary to conclude that the [NLRA] required [Starbucks] to violate sanitation codes" once it discovered the rampant health and safety issues plaguing its Buffalo stores. *Wal-Mart Stores, Inc.*, 348 NLRB 274, 282 (2006).[4] Rather than affirming the Board on this point, I would reverse and make clear that Starbucks possessed the latitude necessary to ensure its stores in the Buffalo region were safe and healthy.

*Second*, the majority opinion concludes that Starbucks also violated § 8(a)(1) by moving up a planned national wage increase and promoting two of its employees. As to Starbucks's national wage increase, Starbucks's announcement that it was "moving up [its] planned January [2022] pay increases to Oct. 4 [of 2021]," took place in July 2021, *before* the union campaign began. Furthermore, the record shows that Starbucks had a practice of implementing annual, nationwide wage increases. The majority opinion notes the "differences between the July 2021 announcement [to move up the wage increase] and [the] October 2021 revision [of the wage increase]." Indeed, the October 2021 revision was after unionization efforts

---

[2] Further, as the majority opinion acknowledges, the record indicates that Starbucks appointed Pusatier as a new regional director in Buffalo in July 2021, *before* the unionization campaign began, and Pusatier implemented changes in Buffalo that she had previously employed in a different region.

[3] *See generally NLRB v. Dorn's Transp. Co.*, 405 F.2d 706, 714–15 (2d Cir. 1969) (concluding that the Board's holding that respondent had violated § 8(a)(1) "by withholding salary increases" was unsupported and explaining that the Board applied "a 'damned if you do, damned if you don't' approach," which "does not further the policies of the [NLRA]").

[4] *See also id.* ("The [NLRA] does not require an employer to leave a drain clogged so that employees would have to wade through waste water, become disgruntled, and therefore vote for the union.").

began. But in finding whether § 8(a)(1) was violated, the Board "must determine whether the record evidence as a whole, including any proffered legitimate reason for the wage increase . . ., supports an inference that the offer was motivated by an unlawful purpose to coerce or interfere with . . . protected union activity." *Network Dynamics Cabling, Inc.*, 351 NLRB 1423, 1424 (2017). Here, any inference of such motive is unreasonable. As Starbucks (persuasively) says, the "conclusion that Starbucks effected an (already announced) nationwide wage increase across 9,000 stores to restrain union organizing in Buffalo is illogical."

I also diverge from the majority opinion when it comes to its treatment of the Board's sua sponte conclusion that Starbucks violated § 8(a)(1) by promoting two of its employees during the union campaign.[5] As a preliminary matter, Starbucks was not required to file a motion for reconsideration to preserve its arguments on this issue.[6] Turning to those arguments, I note that the Board acknowledged that "the promotions were alleged to have violated

[5] The Board adopted the ALJ's dismissal of the allegation that this same conduct violated § 8(a)(3).

[6] Our opinion in *Lion Elastomers, L.L.C. v. NLRB*, 108 F.4th 252 (5th Cir. 2024), is instructive on this point. While the majority opinion correctly observes certain factual distinctions between *Lion Elastomers* and this matter, to the extent the majority opinion questions whether Starbucks has preserved this issue for our appellate consideration, I note that we expressly instructed that "[w]here . . . the Board is on notice of a party's purportedly unexhausted argument, *a motion for reconsideration is not required*." *Lion Elastomers*, 108 F.4th at 258 (emphasis added). Put simply, what matters is whether the Board was on notice of Starbucks's arguments vis-à-vis this purported § 8(a)(1) violation. It appears to me that the Board was on notice—in a footnote, the Board asserted (with emphasis added) that it was "appropriate" for it to find that Starbucks violated § 8(a)(1), "[e]ven though the promotions were alleged to have violated" § 8(a)(3), given that "such a violation 'is closely connected to the subject matter of the complaint *and has been fully litigated*.'" In light of the Board's own characterization of this violation as having been "fully litigated," Starbucks was "not required" to file a "motion for reconsideration" to preserve its argument. *Id.*

[§] 8(a)(3)," rather than § 8(a)(1). In nonetheless finding, sua sponte, a § 8(a)(1) violation, the Board denied Starbucks due process of law. *See Indep. Elec. Contractors of Hou., Inc. v. NLRB*, 720 F.3d 543, 552 (5th Cir. 2013) (reasoning that petitioner "was deprived of due process of law because it was charged and tried under § 8(a)(3), while each Board panel rejected the ALJs' finding of liability under § 8(a)(3), and instead found violations of § 8(a)(1) under a novel theory of liability" (citation modified)). To be clear, § 8(a)(1) and § 8(a)(3) "are not coterminous," *id.* at 553 (quoting *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983)), and "[t]he Board was not at liberty to ignore the distinction between § 8(a)(1) and (3)," *id.*[7] As such, I would deny enforcement of the Board's decision as to this violation.

Separately, as to Starbucks's alleged § 8(a)(3) and (4) violations, I would deny enforcement of the Board's decision or, at a minimum, remand these purported violations to the Board for more fulsome, careful consideration. The Board predicated its conclusion that Starbucks violated § 8(a)(3) and (4) on its antecedent determination that Starbucks also violated § 8(a)(1) in various respects. Given that multiple of the Board's findings of § 8(a)(1) violations against Starbucks rest on shaky ground (at best), and considering the Board's failure to specify *which* § 8(a)(1) violations informed its § 8(a)(3) and (4) conclusions, at a minimum it is necessary to remand this issue to the Board for further consideration.

[7] *See also Lion Elastomers*, 108 F.4th at 260–61 (concluding that the Board violated petitioner's due process rights by overturning Board precedent "without providing the company an opportunity to be heard on the issue"); *id.* ("[D]ue process ensures parties a right to be heard *before* a decision is made, not after. Here, Lion Elastomers was deprived of a pre-decision opportunity to be heard. The fact that it could have complained after the fact via a motion for reconsideration is of no consequence.").

Finally, concerning remedies, I agree with the majority opinion's conclusion to deny enforcement of restoring the status quote ante of the Galleria kiosk.

* * *

For the foregoing reasons, I respectfully dissent in part.